# DECLARATION OF JUDY CLARKE

I, Judy Clarke, hereby declare as follows:

1. I am an attorney licensed to practice law in the State of California. I graduated from the University of South Carolina School of Law in May 1977, took and passed the July 1977 California Bar, and was admitted to practice in California in December 1977. I have been a member in good standing since admission, and remain so today. I am also admitted to practice before the Ninth Circuit Court of Appeals, and the United States Supreme Court.

2. Shortly after being admitted to practice, I accepted a job as a trial attorney with the Federal Defenders of San Diego, and in the fall of 1983 became the Executive Director of that program. I left that position in the fall of 1991 and became a special partner in the San Diego office of McKenna & Cuneo. Within a year, I rejoined the Federal Defender Program as the Executive Director of Federal Defenders of Eastern Washington and Idaho (FDEWI), based in Spokane, Washington. I served as that organization's Executive Director until the summer of 2002, when I returned to San Diego, and became one of two full time salaried Capital Resource Counsel with the Federal Defender Program, consulting with defense counsel in federal capital cases around the country.

3. Most of my practice has been in the federal courts, where I have been both trial and appellate counsel. I have also argued twice before the United States Supreme Court. I am a Fellow in the American College of Trial Lawyers (inducted in 1997), and served as the President of the National Association of Criminal

1

JC

Exh. 1 - 000001

Defense Lawyers (1996-1997). I have served on numerous committees of various legal organizations – the American Bar Association, the National Association of Criminal Defense Lawyers, the California Attorneys for Criminal Justice – and spoken at CLE programs in approximately 40 states around the country. For several years (2006-2013), I was a visiting professor of practice at Washington & Lee University School of Law in Lexington, Virginia. In 2015, I received the Ninth Circuit's John Frank Award which recognizes "a lawyer or judge whose life and practice display sterling character and unquestioned integrity, coupled with ongoing dedication to the highest standards of the legal profession and the rule of law." I have an AV preeminent rating by Martindale-Hubbell.

4. Since 2009, I have been in private practice, and currently practice with the firm of Clarke Johnston Thorp & Rice, in San Diego, California.

5. In July 2005, Joseph Duncan was arrested and charged in Idaho state court with kidnapping and murder charges arising out of acts in Coeur d'Alene, Idaho and the Lolo National Forest outside of Regis, Montana. Roger Peven, the Executive Director of FDEWI asked the federal court to appoint counsel and he/FDEWI was appointed pre-indictment by the federal court to represent Mr. Duncan's legal interests should federal charges be filed. Because of my long-standing relationship with FDEWI and Mr. Peven (whom I had hired as the Chief Trial Attorney for FDEWI in late 1992), my familiarity with John Adams, the Kootenai County Public Defender representing Mr. Duncan in state court, and my capital case consulting role, during the fall of 2005 and periodically throughout 2006, I

2 JC

Exh. 1 - 000002

consulted with the federal defense team and Mr. Adams on this case. I encouraged the state and federal defense teams to work together and share responsibilities, to coordinate visits with the client and share information, and I participated in discussions regarding budgetary needs and discussions regarding outreach to the family of the surviving victim.

6. Mr. Peven's sole goal was to work with Mr. Duncan toward a global settlement of the state and potential federal capital charges. I urged the state and federal teams to coordinate their work and visits with the client, and to expand the work of the federal team to supplement the mitigation investigation by the state team. I met periodically either by telephone or in person to urge coordination and consult on these issues. During 2005-2006, the federal defense team did not investigate Mr. Duncan's life history, except to the extent of identifying people who might help them better understand how to work with Mr. Duncan, and gain his trust to facilitate the goal of getting codes to encrypted computer files, and settlement of the cases.

7. At some point in the late summer or early fall of 2006, Mr. Peven sought my assistance in identifying capitally experienced counsel to add to the federal defense team in the event there could not be a global settlement of the Idaho and potential federal charges. I recommended that he contact experienced Seattle based lawyers for recommendations for qualified counsel in the Pacific Northwest. It is my understanding that through that process, Mr. Peven identified Mark Larranaga as possible additional counsel for the case.

3                                                      JC

Exh. 1 - 000003

8. In October of 2006, Mr. Duncan pled guilty to the state charges with Idaho dropping the death penalty but with no deal regarding the federal charges, and was transferred to the Idaho State Maximum Prison to begin serving life sentences. Thereafter, Mr. Peven contacted me to discuss staffing of the federal defense team and advised that he would remain on the case if the Federal Defenders of Idaho in Boise would assist with client visits; in addition, he said he would seek the appointment of Mark Larranaga of Seattle as "learned counsel" under 18 U.S.C. §3005. I recommended that Mr. Peven also seek the assistance of Debra Garvey, an experienced mitigation investigator with the Federal Public Defender in Los Angeles, to review the mitigation investigation that had been conducted by the Idaho state defense team, and to make recommendations to him about mitigation investigation that still needed to be done. Ms. Garvey had her own caseload, and limited time, but is a very organized and skilled mitigation investigator who I thought could provide guidance to the defense team regarding the mitigation investigation that should be done.

9. In January 2007, the federal indictment was returned, Mr. Duncan was arraigned and Mr. Larranaga was appointed. Within weeks of Mr. Duncan's arraignment, I began to hear concerns about Mr. Peven's personal health and well-being and, relatedly about difficulties various team members were having working with him on the case. On several occasions during February 2007, Ms. Garvey expressed concerns about the case being highly disorganized and that Mr. Peven was not

JC

well. Around that same time, I heard from Dick Rubin, the chief federal defender in Boise, that Peven's wife was leaving him.

10. Around this same time, Mark Larranaga, whom I did not previously know, contacted me and asked for help in working with Mr. Peven. Mr. Larranaga was extremely frustrated and concerned that Mr. Peven seemed unable or unwilling to meaningfully engage with him about the case. Mr. Larranaga was particularly anxious about delays in funding and staffing for the case and his inability to get experts retained.

11. Throughout the spring of 2007, I continued to receive reports about Mr. Peven's lack of attention to the case. While I took these concerns seriously, my response to them was tempered by the fact that I had known Mr. Peven for many years and I knew him to be a talented trial lawyer. Moreover, Mr. Peven repeatedly reassured me that things were on track in the case. I took Mr. Peven at his word, relying on his past performance as a capable attorney and on our longstanding collegial relationship. I also believed that Ms. Garvey, Mr. Larranaga, and a Boise based assistant federal defender, Tom Monaghan, and other staff available in both Spokane and Boise could work together to overcome whatever issues Mr. Peven had at the time. At that time, I simply did not appreciate the severity of Mr. Peven's personal problems and health.

12. Around May 2007, I learned that Mr. Peven had decided that the defense should not conduct any investigation into any of the guilt phase issues in the case. This surfaced after Mr. Larranaga drafted case budgeting documents for the

5

JC ____

Exh. 1 - 000005

Administrative Office of the U.S. Courts that included funding related to investigating culpability issues, and Mr. Peven asked him to remove those funding requests from the draft budget. There was marked disagreement among the team about the issue. Because Mr. Larranaga was primarily responsible for the penalty phase investigation and penalty phase experts, Mr. Peven's decision that there should be no guilt phase investigation was essentially a decision that he, personally, needed to do little work on the case.

13. At some point in the summer of 2007, Mr. Peven told me that he and Mr. Monaghan were both in therapy over trauma caused by their work on the case. This led me to ask Mr. Peven whether the issues were such that one or both of them should withdraw from the case, and allow another qualified lawyer to be added. At about the same time, staff in Mr. Peven's office in Spokane began to be vocal about their concerns about Peven's absences from the office, and his inability to make decisions for his office. Senior attorneys in the Spokane Federal Defender office encouraged Mr. Peven to get off the case, and to take care of the crises in his personal life. Spokane office staff members described him as exhausted, always tired, distracted, and dealing with a potential divorce.

14. In August 2007, after weeks of Spokane staff and other team members suggesting that he should withdraw from the case, Mr. Peven advised Mr. Larranaga and Mr. Monaghan that he had decided that he should withdraw from the case entirely. After making this decision, over the course of several days, Mr. Peven equivocated and needed constant validation from his staff that he was making the

6

JC ____

Exh. 1 - 000006

right decision. At the request of the Spokane office senior attorneys and Mr. Larranaga, I met with Mr. Peven and senior attorneys from his office, expressed my personal concern for his well-being and joined these lawyers in encouraging him to seek to withdraw from the case.

15. In late August 2007, Mr. Peven met privately with Judge Lodge for roughly 15 minutes. This private meeting was at Mr. Peven's request even though Mr. Larranaga and I had both talked with him about the importance of Larranaga's presence at any meeting with the Judge. It is my understanding from Mr. Larranaga that Judge Lodge advised that his ex parte discussion with Mr. Peven did not address any case related matters, but rather was limited to private matters, and that Mr. Peven would be taking on an "advisory role" for the remainder of the case. After the meeting was over, Mr. Peven claimed that he had asked to be relieved from the case, and told the Judge that replacement counsel needed to be appointed. Regardless of the determination that Mr. Peven would remain in an "advisory role," he had not for many months done any work and did not plan to do any work on the case. It was clearly necessary to find counsel to replace Mr. Peven, and to immediately seek funding for investigation and experts.

16. At Mr. Larranaga and Mr. Monaghan's request, I reluctantly agreed to be appointed to replace Mr. Peven, and my host office, Federal Defenders of San Diego, Inc., agreed to provide support and funding for the case. The case file was disorganized and little progress beyond the bare minimum accomplished by the state defense team had been made at investigating Mr. Duncan's life history. No

7

JC

experts had been retained, and indeed Mr. Peven had not approved retainer letters drafted by Mr. Larranaga. It was clear from the condition of the file and lack of work product that Mr. Peven had not worked on the case since the conclusion of the state case, and had impeded other team members in their efforts to prepare the case.

17. At the time of my appointment as counsel for Mr. Duncan in September 2007, it was inescapable that a massive amount of work remained to be done. No one had yet even viewed the physical evidence, several dozens of witnesses remained to be interviewed, many legal issues had not been researched much less litigated, and experts needed to be retained. The case involved an obvious history of trauma and abuse, yet, nine months into the federal case, no mental health experts had been retained. Based on my experience in capital cases, I knew there was no way we could adequately prepare for the guilt/innocence and the penalty phases in the time remaining before the then scheduled (January 2008) trial date.

18. The major difficulty we faced on such a short schedule was securing and preparing experts who might evaluate Mr. Duncan's history and mental condition and testify at trial. Many of those who Mr. Larranaga had contacted earlier in 2007 were no longer available or not willing to become involved in the case given that only a few months remained. Mr. Larranaga had been unable to engage the services of necessary experts until the funding for the case was transferred to my office in San Diego. Before then, Mr. Peven had the exclusive authority to approve and fund

8                                                        JC

Exh. 1 - 000008

experts and he repeatedly refused to do so – or often simply failed to respond to funding requests, much to the consternation of his co-counsel.

19. Plea discussions, in which the defense sought life sentences in lieu of the death penalty, had gone nowhere. The prosecution repeatedly offered to agree to a guilty plea with conditions, but would not drop the death penalty. Toward the middle to end of November 2007, out of time to retain experts in time for a January 2008 trial and with no continuance in sight, our team discussed advising Mr. Duncan to enter guilty pleas in exchange for an agreement by the prosecution to join in a request for a continuance of the penalty phase. The court's denial of a continuance, and denial of an extension of time to file a Rule 12.2 notice (expert mental health evidence) left us with an untenable Hobson's choice: prepare inadequately for both the guilt/innocence and the penalty phase with only weeks remaining and no chance of a continuance or have Mr. Duncan plead guilty, obtain the Government's cooperation in extending the date to commence the penalty phase, and shift all focus entirely to preparation of the penalty phase. Given the work that remained to be done, we opted to abandon the culpability issues as well as the rights afforded to Mr. Duncan were he to proceed to a full trial. This was triage, pure and simple, motivated exclusively by our need for more time to prepare.

20. We did not share that motivation with Mr. Duncan. Mr. Duncan had expressed an interest in pleading guilty, which we capitalized on when it became clear that we had little choice other than a guilty plea if we were to obtain the desperately

JC

Exh. 1 - 000009

needed time to prepare for the penalty phase. Because of that desperation, we advised Mr. Duncan to plead guilty, with no meaningful discussion as to the pros and cons involved in his doing so or of possible defenses we might raise. At the time, we had no idea whether Mr. Duncan would have any mental state defenses or any expert testimony regarding his mental condition that would be admissible during a guilt phase of the case. Indeed, at the time, we were concerned about Mr. Duncan's competency, but had no mental health expert evaluating him or guiding us, or helping us understand the bizarre conversations we routinely had with Mr. Duncan. We agreed that in responding to the inevitable questions about whether we had discussed potential defenses, or whether there was any reason Duncan should not plead guilty, our only response would be "to the best of our knowledge."

21. From September 2007 until April 2008 when jury selection began, we sought to make up for lost time. We were able to retain mental health and other experts, seek their advice and file motions. However, at the time jury selection was scheduled to begin, we were still attempting to fill in the gaps in Mr. Duncan's life history, and to explore what appeared to us to be serious sexual abuse and trauma in Mr. Duncan's history. One of our mental health experts had begun to question Mr. Duncan's competency, but had not had sufficient time working with us and Mr. Duncan to make a formal assessment.

22. Just as jury selection was beginning in mid-April 2008, Mr. Duncan made the decision that he wanted to proceed pro se. Mr. Duncan had periodically raised the

10    JC

question of representing himself well before I joined the defense team, but the defense team was always successful at getting Mr. Duncan to defer any final decision on the question. After Mr. Duncan determined that he would request to represent himself and made that request in open court, we continued to have discussions with him in an attempt to understand his actual reasoning. Mr. Duncan spoke of having an "epiphany" and a "revelation" that words would obstruct the path to the "Truth" and that our actions in defending him risked interfering with the possibility of enlightenment that would come to everyone in the courtroom, including the jurors. It was during these ongoing discussions regarding Mr. Duncan's desire to represent himself, and our pushing him to articulate his actual reasons that it became clear to us, and to our retained mental health experts how Mr. Duncan's mental condition interfered with his ability to work with counsel and rendered him incompetent.

23. As the record reflects, the Court ultimately decided that Mr. Duncan could represent himself and appointed Mr. Larranaga, Mr. Monaghan and me to serve as "stand by counsel." Nothing that could objectively be characterized as a "defense" was put on by Mr. Duncan.

24. In late April 2008, during the midst of competency evaluations ordered by the court, Tom Monaghan was arrested for driving while intoxicated and related offenses. It surfaced that Mr. Monaghan had hidden his heavy drinking from his boss, Dick Rubin, who believed that Tom had been sober as promised. It turned out that Mr. Monaghan had done a lot of drinking with Mr. Peven, who had been

11 JC

Exh. 1 - 000011

his previous boss, and mentor. When Mr. Monaghan was arrested, he called Mark Larranaga and me at approximately 1:00 AM to come bail him out of jail. It took us a few hours, but we were able to get him out and take him home. Very soon thereafter, at the urging of his family and his boss, he entered a 30-day inpatient treatment program for alcoholism.

25. When it became apparent just how disengaged from the case that Mr. Peven had been, I wondered why Mr. Monaghan, who I thought would have been aware if there were real problems with Mr. Peven, had not alerted his boss, Dick Rubin, or me. Knowing what I know now about the extent of Mr. Monaghan's own struggles with alcoholism at the time and Mr. Peven's role in enabling and hiding their common addiction, it is became more understandable why Mr. Monaghan had remained quiet about Peven's problems.

26. There were many failures in the representation of Mr. Duncan leading up to his guilty plea, and ultimate decision to represent himself. There was a major failure by the original federal team squandering critical time in 2005-2006 by not investigating Mr. Duncan's life history, or working with and coordinating any investigation with the state defense team during the many months before the federal indictment. Mr. Peven's singular focus during that time frame on getting Mr. Duncan to reveal codes to certain encrypted computer files to attempt a global settlement was an ineffective strategy. The federal team lacked the necessary guidance or organization from Mr. Peven as lead counsel. Mr. Peven's failure to authorize the timely retention of mental health and other experts after the federal

12                                                                JC ___

Exh. 1 - 000012

indictment and death notice, was inexcusable and rendered the federal team ineffective in preparing the case, and in truly appreciating Mr. Duncan's mental condition until after he pled guilty and sought to represent himself. The decision to advise Mr. Duncan to plead guilty and forego a guilt phase in this very serious case was driven solely by our team's inability to get a reasonable continuance, and not by any thoughtful consideration of mental state defenses or mental condition evidence that could have been presented. The decision to advise Mr. Duncan to plead guilty was done without any real appreciation of Mr. Duncan's mental condition, or an understanding of whether there were any mental state issues that could have helped frontload the presentation of important sentencing considerations during a guilt phase. Mr. Duncan is intelligent, and well spoken, but severely mentally ill and delusional, and was not well served by multiple counsel who were rendered ineffective by personal failings, poor judgment, and the many circumstances described in repeated declarations filed with this court.

I swear under penalty of perjury under the laws of the state of California and the United States of America, that the foregoing statement is true and correct. Executed this 31st day of January, 2017, in San Diego, California.

_____
JUDY CLARKE

13

JC ___

Exh. 1 - 000013

# DECLARATION OF MICHAEL COMTE

I, Michael Comte, declare:

1. I received my Bachelor's degree in Sociology in 1966 from the University of Portland, and my Master's degree in Social Work in 1970 from Portland State University. I have been practicing in the social work field since 1970. I am a licensed Washington State social worker and am certified as a sex offender treatment provider.

2. From 1979 to 1982 I worked at Western State Hospital in Lakewood, Washington. When I began at Western State in the fall of 1979, I worked as a therapist. Eventually, I was promoted to assistant director of the program. I left Western State Hospital for private practice in the fall of 1982.

3. At the time, Western State Hospital was charged with housing and treating individuals sentenced under the state's sexual psychopath laws, which dated back to the 1940's and 1950's. Western State's Sex Offender Program was an alternative to incarceration for people convicted of sexual crimes. In the 1980s the offenders had to meet the legal definition of "Sexual Psychopath" in order to be eligible to participate in the program. The statutory definition of a Sexual Psychopath was very broad, giving administration flexibility in which candidates were admitted into the program.

4. Joseph Duncan, III was in Western State's sex offender program during my tenure at the hospital. He was admitted following a 90-day observation period, during which offenders would be evaluated and admitted if found amenable to treatment. It was extremely unusual to have a teenager admitted to the sex offender program, let alone a

*MC*
MC

Exh. 2 - 000014

17-year-old, as was the case with Mr. Duncan. I only remember one other resident that young even being considered for admission into the program, and that individual was not admitted.

5. The sex offender program divided the men into groups and I began working with ~~"South"~~ "East" MC MC group. I knew nothing about sexual pathology at the time and I learned everything from the offenders in the program. It was the worst experience of my life because of my lack of knowledge or understanding of issues affecting sex offenders. I was totally unprepared for the task that lay before me, yet I was arrogant. I thought I knew it all, and I quickly learned that I did not. We received very little outside training, with the occasional training from the academic community. Although, I recall a Seattle professor named Dr. Dreiblatt, who specialized in sex offender treatment research, speaking to us, that kind of "training" was clearly ~~inadequate~~ insufficient. MC MC

6. In 1980 or 1981, the director of the Sex Offender program, Maureen Saylor, abruptly took a medical leave of absence. She never confided in me what prompted her to take time off. Maureen Saylor was not a people person and had difficulty getting along with others. I took over ~~"South"~~ "East" group from Maureen Saylor. MC MC

7. Retaining staff at Western State was a major issue. It was a very high stress environment, with very little institutional support. During the two years I was there, we had four therapists leave and those positions were not filled for several months, placing even more pressure on already overloaded counselors.

MC

Exh. 2 - 000015

8. The program was organized as a 10-step process, with the tenth step being the work release component. Each step had criteria for advancement to the next step. In order to complete step two, the offender must complete his autobiography. The autobiography underwent revisions and was supplemented from time to time. It was not confidential within the program, and was openly shared with other group members. I never shared an offender's autobiography with his family members, as this would be a breach of confidentiality.

9. The Sex Offender program was based on an ~~insidious~~ Draconian model where reporting on others was mandatory and incentivized. Conversely, individuals were punished if they had knowledge of misconduct by others and did not report it.

10. Group therapy was a major component of the program. Daily group meetings were held, ~~except for the weekend. I~~ attended these meetings as the group therapist. The treatment in group work included victim impact and empathy training. Group members shared their sexual fantasies with the group and these could be extremely graphic. These meetings were tape recorded, but not transcribed.

11. The group therapy model was often not always appropriate for the less sexually experienced offenders like Joseph Duncan. In the group meetings the offenders were required to share their sexual fantasies and sexual criminal acts with the group in explicit detail. There were predatory rapists and pedophiles in group who had engaged in sadistic behavior and had shared their fantasies and deviant thoughts. At minimum, a young offender, especially one without relationship experience, could become confused after

MC

Exh. 2 - 000016

hearing all of the extreme sexual fantasies of others in group. More likely though, younger, less experienced offenders could ~~potentially MC~~ become overwhelmed and traumatized by such exposure.

12. The program had ~~no~~ *inadequate MC* security in place to handle more violent, dangerous offenders. Younger, less savvy offenders were ~~left~~ *at times MC* unprotected from the older men in the group who *occasionally MC* preyed on more vulnerable members of the group. Because we were perpetually understaffed, there was ~~a constant ri~~ *MC* sk for vulnerable members of the program being subjected to unwelcome or assaultive behavior from aggressive offenders, with little protection or awareness by the staff.

13. Overall, I felt that the staff was a good group, and were supportive of offenders who were in their young 20s. The younger guys needed more guidance from the counselors than the older men, especially if they weren't introspective. Some counselors worked better with younger offenders than others.

14. Mike Shepherd was one of the counselors in the Sex Offender Program. He was not a talented counselor and did not work well with offenders of any age. Shepherd was not a smart man or a skilled therapist. He used an aggressive, confrontational approach with his group members and ~~believed~~ *seemed to MC* himself to be ~~God-like~~ *superior MC*. He was unprofessional and, at times, highly inappropriate, especially with offenders' family members. He would have been an exceptionally poor choice as a counselor for young, immature offenders that needed more sensitive, thoughtful guidance.

*MC*
MC

Exh. 2 - 000017

15. In my capacity as Assistant Director I reviewed the reports that Mike Shepherd wrote about his clients. His spelling and grammar were atrocious. His writing abilities were very poor and his reports were factually inaccurate. I spoke with Shepherd about my concerns, not only as they related to his reports, but as it related to his work as a therapist. He was coarse and acted ~~uncivilized~~ _inappropriate mc_ at times. I explicitly told him I had grave concerns about his judgement and did not believe he should be working in the Sex Offender Program.

16. It came to my attention that Mike Shepherd made sexual advances to Joseph Duncan's mother while Duncan was in the sex offender program. When I found out, I immediately sought to have Shepherd terminated. I called Mrs. Duncan to investigate what had happened between her and Shepherd and she confirmed his inappropriate behavior. I spoke with Shepherd about displaying poor decision making skills and challenged his justification that he was merely "providing Mrs. Duncan with emotional support."

17. Although I wanted him fired, ~~Maureen Saylor and~~ _the clinical Director, mc_ Dr. Voorhees disagreed with me and Shepherd was allowed to stay. In fact, I remember someone from administration coming to my office afterwards and trying to talk me out of wanting to fire Shepherd. Management was obviously trying to keep a lid on Shepherd's behavior. Ultimately it was the superintendent and Dr. Voorhees who allowed Shepherd to stay. It was hard to terminate a state employee back then, especially one as "political" as Shepherd. I believe he was the head of the union. I believe that Shepherd received a written reprimand based on his behavior with Mrs. Duncan, but nothing else. I was horrified. I felt that this sent a

_MC_

Exh. 2 - 000018

message to the offenders in the program that rules didn't apply to the staff. Later, when Maureen Saylor returned from her leave of absence, administration divided the staff in half for supervision purposes. Maureen was conveniently in charge of Shepherd's supervision thereafter. Shepherd was eventually transferred from the Sexual Offender Program to the Mentally Ill Offender unit at Western State Hospital.

18. I believe that Joseph Duncan was removed from the program after self-disclosing that he had left a cottage visit with his mother. I also recall that Joseph indicated that he could no longer handle dealing with Shepherd and, consequently, made up the story about leaving the cottage in order to get out of the program. The group confronted Joseph regarding his disclosure that he left the cottage. In my view, Shepherd's behavior towards Joseph's mother and the group's retaliatory response destroyed Joseph's trust in the system, the program and the group. ~likely~ ~c~

19. After leaving the Sex Offender Program at Western State in 1982, I began doing evaluations of Western State Sex Offender alumni that had been kicked out of the program. I was hired to determine the likelihood of re-offense and dangerousness in the community. During this time there was greater scrutiny on the program from the community and there was more pressure to violate individuals for picky transgressions.

20. Based on some of the failures and lessons that came out of the early years at Western State, teenagers being sent to prison for sexual offenses would now be sent ~to the~ Twin Rivers Correctional Center and would serve in the sex offender treatment program towards the end of their sentence, around the last 24 months.

MC

Exh. 2 - 000019

21. The Twin Rivers Sex Offender program lies in sharp contrast to that being implemented at Western State during my tenure there. At Twin Rivers, offenders learn how fantasies influence their sex drive and how to protect themselves from unacceptable urges. Unlike Western State's Sex Offender Program, Twin Rivers is not based on a relationship between the therapist and client or group members.

22. I now testify for both the state and the defense regarding the sex offender program. Even though the Western State Sex Offender Program was the best we had at the time, the confrontational approach was actually counterproductive in many instances. It was a Marine-type model where the idea was to tear people down and build them back up, but this approach doesn't work with everyone. It did not work well for those offenders who were young and sexually inexperienced or had been verbally, sexually or physically abused because they would immediately adopt a defensive posture which is not conducive for therapy.

23. I am giving this declaration to Dorothy Ballew and Erika Feyereisen, investigators for the Federal Defender in Sacramento, California. They came to interview me in November of 2016. Their office is currently representing Joseph Duncan in post-conviction proceedings.

I swear under penalty of perjury under the laws of the state of Washington and the United States of America, that the foregoing statement is true and correct.

Executed this _12th_ day of January, 2017, in Tacoma, Washington.

_____
MICHAEL COMTE

MC

Page 7 of 7

Exh. 2 - 000020

# DECLARATION OF LAURIE CORWIN

I, Laurie Corwin, declare:

1. In 1980, while my boyfriend, Jim O'Neil was a participant in the sex offender program at Western State Hospital, I met a young man I knew as Ed Duncan. Joseph "Ed" Duncan was in Western State's "Aquarius" group with Jim. I would see Ed Duncan when I visited Jim at Western State. My last name at that time was Higgins.

2. I met Jim O'Neil in high school and we started dating in December of 1977. While in high school, Jim excelled at track and field and he had college scholarships pending. Unfortunately, Jim had to have ankle surgery and he was unable to return to athletics. He sunk into smoking pot and partying. I graduated in 1978 and he graduated in 1979.

3. Jim's first contact with law enforcement was in April of 1980 when he was arrested for first degree rape. Jim was 19 or 20 years old when he entered Western State's Sex Offender Program. He was one of the youngest males placed there. I attended counseling group sessions once a week on Tuesdays or Wednesdays during Jim's time at Western State.

4. Before Jim was accepted in the program he was required to go through a 90-day observation period and I was able to visit Jim during this time. While visiting, I met Jim's counselor, Mike Shepherd. Shepherd was a big, solidly built guy. Shepherd explained the program to me and cautioned me that it would be a lot of work to be in a relationship with Jim while he was in the program.

LC

Exh. 3 - 000021

5. At the time Jim entered the program, we were planning to get married. Shepherd encouraged me to wait until Jim got through the program before we made such a drastic step. We never ended up getting married because Jim re-offended while on work release status.

6. Shepherd explained what was expected of Jim and me in the program. He told me I needed to be more aware of what Jim was doing and to be suspicious of his actions. Shepherd attended the weekly couple meetings and on occasion we had separate meetings with Shepherd as a couple to discuss Jim's progress or issues. Others present at couples' weekly meetings were Tim and Maria Anderson, Phil Schlottmann and his wife, Judy and Roger Palmer, and Jim and June Ellis.

7. When Ed Duncan first arrived in the program, Jim had already been there for a while. At 17, Ed was the youngest person in the program. Ed was skinny, tall and gangly with frizzy hair and bad acne.

8. Ed was quiet and withdrawn. Unlike other teenage males I knew, he showed no cockiness or attitude. He was socially awkward and had difficulty interacting with others, especially the older men in the group and the female visitors. He seemed so subdued and anxious.

9. Ed was obviously very uncomfortable around women. He could not make eye contact with the women who visited at Western State, and would deflect his eyes and mumble a response if questioned. Ed was awkward and shy, and it was apparent that it was extremely difficult for him to interact with the opposite sex. Even though Jim was only two years older, he was much more experienced in relating to the opposite sex than Ed


LC

Exh. 3 - 000022

and had already had several girlfriends before we got together. The difference in their demeanor was night and day.

10. There was an obvious hierarchy to the program at Western State, determined by the number of months someone had been in the program and what "step" level they had achieved. From my participation in group sessions, I could see there was an overall pecking order in the group where the adult rapists were seen as superior and pedophiles were viewed as inferior. The adult rapists tended to be more socially aggressive and took over group sessions. Ed was alone at the bottom of the social hierarchy because of his lack of time in the program, his offense, and his age. Jim told me that Shepherd did not attend all of the group meetings, leaving Ed at the mercy of the group most of the time.

11. Ed was in a group with older men, as well as men in their early 20s who were trying to appear more mature than they actually were. They would routinely pick on the member with the least resistance – Ed. When group members took verbal jabs at Ed he was easily rattled. Ed was an easy target for the older, more seasoned offenders in the program. Ed was also vulnerable to inappropriate sexual behavior by such offenders. Even to an observer like me, I could see that some of the men were acting sexually inappropriate towards Ed.

12. The group dynamic I saw was very strange, especially since the counselor was not always present. The guys were trying to portray being on their best behavior, while at the same time, trying to get an upper hand without getting caught or called on it. I always thought it was weird to give group members so much power over one another when they all have

LC

Exh. 3 - 000023

power and control issues and were in the program because, on some level, they had failed to act appropriately on the street. These were not people with very good judgment to begin with.

13. Some of the men knew how to play the game and work the system better than others. Jim caught on quickly and was good at it. Ed didn't seem to be able to catch on, and as a result, struggled more than anyone else. The group seemed resentful that Ed did not always understand what was being discussed, which slowed the progress of the whole group down and created additional work for them.

14. The Sex Offender Program at Western State was designed for adults, not juveniles. Jim wasn't even 20 years old when he entered, and he wasn't sure it was something he could do. Jim moved through the program very rapidly and his success reflected well on Shepherd, he was Shepherd's "star". He ended up learning what to say from watching and listening to others but he did not internalize any of the program teachings.

15. Most of the couples in our couples' group were married. Married couples were allowed conjugal visits in one of the two rooms set aside for that purpose. Married couples were required to report back to group the following week, in detail, on how the conjugal visit went. Unmarried couples were not allowed any intimate contact in the program.

16. Participants were also allowed family visits in cottages on the grounds. Jim had his parents, grandparents and me stay over at the cottage for Thanksgiving one year.

17. Family visits occurred on the ward, and visitors could bring food for their loved one. I spent a lot of time with Tim and Maria Anderson during these visits. I would stay with


LC

Exh. 3 - 000024

Maria on the weekends to save money on gas, driving back and forth between visits and couples' meetings.

18. I remember meeting Ed's mother, Lillian, during a family visit. Jim and I invited Ed and Lillian to play cards with our family during a visit, but generally Ed and Lillian didn't talk much and kept to themselves.

19. Shepherd had a tendency to be rather "huggy" towards me. I wanted to stay in Shepherd's good graces so I overlooked his flirtiness. At the same time, I looked up to him as a teacher. I was only 20 years old and he seemed so much older and wiser.

20. Towards the end of my time involved with the program I noticed that Maria Anderson, Tim Anderson's wife, had become very close to Shepherd. Tim had come into the program before Jim. Maria had aspirations to become a counselor and she looked up to Shepherd. Maria told me that she and Shepherd would meet at a nearby coffee shop. I assumed they were talking about Maria's career plans. When Tim re-offended, Maria spent even more time with Shepherd, meeting with him alone.

21. Jim eventually re-offended while on work release and was sent to prison. I stood by Jim through the guilty plea but we eventually broke up. Jim and I have kept in touch occasionally over the years.

22. I am giving this declaration to Dorothy Ballew and Erika Feyereisen, investigators for the Federal Defender in Sacramento, California. They came to interview me in December of 2016. Their office is currently representing Joseph Duncan in post-conviction proceedings.

*LC*

Exh. 3 - 000025

I swear under penalty of perjury under the laws of the state of Washington and the United States of America, that the foregoing statement is true and correct.

Executed this __19__ day of January, 2017, in Maple Valley, Washington.

_____
LAURIE CORWIN

LC

Exh. 3 - 000026