THE RISE AND FALL

OF THE

SEX OFFENDER PROGRAM

AT

WESTERN STATE HOSPITAL

Ft. Steilacoom, Washington

BY

MAUREEN SAYLOR, R.N., M.A.

PROGRAM COORDINATOR

PRESENTED TO

THE SEVENTH ANNUAL RESEARCH & DATA CONFERENCE

ON

EVALUATION AND TREATMENT OF SEXUAL ABUSERS

Atlanta, Georgia

September 22 to September 25, 1988

Exh. 92 - 000525

In the spring of 1986, the Washington State Legislature passed a bill transferring the authority for the treatment of sex offenders from the Department of Social and Health Service to the Department of Corrections.

> "The legislature finds the Sexual Offender Treatment Programs at Western and Eastern State Hospitals, while not proven to be totally effective, may be of some benefit in positively affecting the behavior of certain sexual offenders. Given the significance of the problems of sexual assault and sexual abuse of children it is, therefore, appropriate to review and revise these treatment efforts.
>
> At the same time concerns regarding the lack of adequate security at the existing programs must be satisfactorily addressed. In an effort to promote public safety, it is the intent of the legislature to transfer the responsibility for felony sex offenders from the Department of Social and Health Service to the Department of Corrections."

(Substitute House Bill No. 1598 Washington State Legislature, 1986.)

Two of the issues mentioned in the house bill are extremely relevant to the demise of the Sex Offender Program, because they reflect some biases and assumptions regarding what can or can not be expected from a treatment program housed in a hospital setting not connected to a prison system. How effective should a sex offender program be? How does one judge whether the program is of use or not? Obviously, this very much depends on the bias of the individual assessing this issue. "Concerns regarding the lack of adequate security" (see above), a treatment program in a mental health setting has always been suspect in some quarters. Is it secure enough? How frequent are the escapes? Are the people accepted for treatment "too dangerous" for the facility?

Providing the best possible treatment, while maintaining adequate security, has always been a goal of the Sex Offender Program at Western State Hospital. However, over time it has consistently been a delicate balancing act. On one occasion, it may result in criticism that the program is "too security conscious" and spends too much time addressing security issues, and is not taking the truly dangerous people who need treatment. In another instance, it has been criticized for being a "country club" where sex offenders do not receive adequate consequences for their behavior. Depending on the problem raised, either of the above stances may be taken at any given point in time.

In reviewing the growth, development, and demise of the programs' 30 plus years of functioning as a treatment facility for sex offenders, there are many things to be learned. It goes without saying that there is a vast reservoir of knowledge regarding the evaluation and treatment of sex offenders residing within the program. However, my intent in reviewing the program at this time is not to spend time discussing the treatment issues, as much as to assess the social, political and economic factors that created the program to begin with, assisted in its growth and development, and ultimately insisted in its demise or phase out. These

Exh. 92 - 000526

-2-

are factors that should be relevant to any and everyone treating sex offenders whether that be in the community, a hospital in a mental health agency, or in prison in a Department of Corrections. While certainly the issues of risk to the community diminish as the facility becomes more secure. All programs, however large or small, are subject to the same scrutiny by a wide variety of groups within the individual community and state. It takes no mastermind to define that the longer you operate, the more clients you process, and the larger you become, the more likely you are to come under scrutiny because the problems that encourage public attention automatically increase.

As one reviews the history of the program through the articles, reports and early writings, either developed by the program or about the program, one point that becomes very clear is that crisis has had a major function in all phases of the program from beginning to end. It began and was developed within the hospital community because of an identified crisis. Many of the changes over the years were generated as part of an identified crisis, and its end was generated by another major crisis. While this is certainly not the best climate in which to begin and develop any program, company, etc., when one deals with a large bureaucracy that has ultimate control of the financial purse strings, it is often the only time that change can be made. It is somehow a sad commentary in a Government system that more often than not, funds are directed toward problems and the public attention they generate, rather than assisting something that is working, but drawing no attention, to become even better.

## BEGINNINGS

The origin of the program can be traced to the development of the sexual psychopath law in the State of Washington.

> "The first sexual psychopath laws in the State of Washington were passed during the Legislative Session of 1949. Chapter 198, an act relating to the care and treatment of mentally ill patients (including section 25 through 40) provided for the commitment, custody, detention, treatment, parole, and discharge of the sexual psychopath. By this legislative act, the state hospitals were given a dual responsibility of custody and treatment of the offenders. However, what actually happened was the offenders, instead of being kept in jails or penitentiaries, were housed in security wards or buildings of mental hospitals but received very little treatment." (di Furia 1966)

This legislation was quite similar to the laws passed in other states during that time period to address the problem of the sex offender.

However, nothing of any consequence occurred for almost ten years. Dr. di Furia further states,

> "In 1959, while the Division of Mental Health was involved in transforming the custodial practices of our mental hospitals

Exh. 92 - 000527

-3-

into psychiatric treatment programs, we at Western State Hospital became more conscious of our sexual offender population and the governing laws. It was apparent that we were not fulfilling the intent of the laws; as no effective treatment was available. This, together with an average of 20 escapes per year, forced us to realize that we offered no treatment and very little of the security which the community expected and the law sought to provide. With limited experience and plenty of courage we proceeded to lay the foundation of a sound program to meet the obvious need. This became the grounds for the present program."

Two other early program writers (MacDonald and Williams 1968) further elaborate on early conditions.

"During their early years, from 1951 to 1958, sex offenders were committed in increasing numbers to hospitals already overcrowded with psychotic patients, badly under staffed, and not prepared to offer any special treatment to this new type of patient. These offenders/patients were, therefore, segregated on maximum security wards or distributed throughout the hospital among psychotic patients on locked wards. With no treatment available and no hope of regaining their freedom, the offenders grew discontented and restless. This resulted in manipulative and disruptive behavior, frequently unauthorized leaves, and much staff anxiety and resentment which was often expressed in an increased and even punitive over control. The situation became steadily worse until a legislative investigation of hospital conditions in general, in 1957 - 1958, resulted in major reforms throughout the hospital."

"For the first time, sex offenders were brought together once per week for staff-directed group therapy. During the following ten years, this 'once a week' evolved into the present program. The change took place in three stages. The first stage, from July 1958 to August 1965, was a period of experimentation and development; the second, from August 1965 to July 1967, a period of reassessment and reform; and the third, from July 1967 to the present, has been a period of rapid expansion and development from a 'group' to a 'program' of many interrelated groups and activities. The program did not begin ten years ago as an organized means of testing or demonstrating a treatment theory or module. It began from necessity and has evolved through trial and error. Initially, therapy was non-specific and not predicated on any stated hypothesis about the nature or course of sexually deviant behavior. Therapy was directed toward somehow developing "insight" which was presumed to auger a change in behavior. No stated criteria was consistently employed to evaluate change and no program evaluation was undertaken."

Exh. 92 - 000528

-4-

As previously noted, the "program" began in 1958 in response to an internal crisis, followed by legislative investigation as a solution to an existing problem.

While the original program may have begun out of crisis, and quoting MacDonald and Williams, "not predicated on any stated hypothesis about the nature and course of sexually deviant behavior."

This changed in the early 1960's and incorporated the clinical biases of its original director, Dr. di Furia.  He continued to say in his 1966 article, "Our therapy program is based on the assumption that deviant sexual behavior is learned behavior which becomes a habitual reaction to stress."  In further describing the treatment process he stated,

> "Thus treatment is based on the learning theory, and our
> attention and total therapeutic endeavor is directed to
> overt behavior rather than to unconscious motives, symbolism,
> regression, fixation, or castration anxiety.  The group members
> will live and work in fairly close proximity and can readily
> focus their attention on their ways of reacting, both in and
> out of group, and exert social group pressures to control one
> another's behavior.  The theory postulates that sexual deviation
> is learned and used by the individual to exploit people for
> personal gain.  Yet the more  typical non-sexual pathological
> pattern used by the patient may be of equal or greater importance.
> The sexual deviation may be viewed as one figure in a larger
> pattern of socially deviant behavior, which the patient has
> learned and adopted as a life time habit complex.  Once the
> group recognizes the specific pattern of interpersonal expedience
> used by an individual member, it then can point to similar
> activity in his history and relate the pattern to his deviant
> sexual behavior.  The therapy helps the individual to identify
> his techniques of exploitation and to substitute them for
> socially acceptable ways of dealing with stress or deprivation
> through social control.  The group then represents the values of
> society to the patient."

While the original program may indeed has begun because of a problem or out of expedience, it becomes clear in reviewing the early writings, even of that first ten year period (1959 - 1969), that many of the concepts, theories and biases regarding the sex offender are remarkably similar to many of those held today.  It becomes even more impressive when one remembers how little was known about the population at that time, and how limited the "literature" was.  The general bias accepted by the psychiatric community was that usual treatment methods were appropriate but rarely worked.

The next significant change that resulted in further program development occurred, because Dr. di Furia had assumed increasing hospital-wide responsibilities and ultimately becoming superintendent in 1965, and because of this appointment of George J. MacDonald, M.D. as program

-5-

director. (Dr. MacDonald would remain a prevailing influence in the program until his death in April of 1977.)

This ten-year period also seems to have been a time of positive recognition and support. Since little or nothing had been done before, the efforts and apparent initial "success" (though guarded) of the program was met with enthusiasm and interest. Local newspaper articles from the latter part of the 1960 decade indicate the enthusiasm and support. The Tacoma News Tribune dated August 4, 1968, is reflective of the interest.

> "A pilot program in the treatment and rehabilitation of sex offenders, almost unbelievable in the simplicity of its principles and application is focusing national attention on Western State Hospital.
>
> The program was originated ten years ago by Dr. Guilio di Furia, hospital superintendent, to cope with an outsized problem of preventing escapes by hospital's sex offenders. Given hope and responsibility, the sex offenders now are among the best security risks.
>
> The program has been recommended for a Hospital in Community Psychiatry Service Achievement award from the American Psychiatric Association."
>
> "Although the program has produced symptoms of outstanding success, its current Director, Dr. George J. McDonald speaks only in cautious terms of 'cures', 'we do not have sufficient follow-up data on which to base an accurate analysis of the long-term effects of the program', he said.
>
> Parole officers and judges, however, have generally reported back favorably on the patients who have completed the program."

The Daily Olympian dated October 20, 1970, is also singing the program's praises in its article The Unmaking of a Sexual Psychopath. They stated,

> "Not too many years ago, the sexual psychopath was shoved into a prison or mental hospital to spend the rest of his days as the low man within the penal system pecking order, despised by the prison staff and his fellow inmates as well. However, this philosophy is changing, more so in the State of Washington in general and at Western State Hospital in particular than in most sections of the country. Western State, in a program launched 12 years ago, is setting the pace for a complete re-evaluation of the type of treatment provided for the sexual psychopath. It seems to be working well, both from the patients' stand point and from the benefit of society as a whole."

Exh. 92 - 000530

-6-

Later in the article they state,

> "Dr. MacDonald also said that he thinks, 'We got something
> here that could be used in other places'. He said a similar
> treatment program is being tried in the Tacoma Narcotics Center
> and is under consideration by Spokane County authorities.
> 'There is nothing like this anywhere else' he said, 'and our
> program is being watched closely by institutions all
> all over the county'."

When one compares these glowing media reports with the negative statements made during the late 1970's and 1980's, one can wish the "honeymoon" would indeed last forever.

"The program's early success also resulted in increased credibility with the criminal justice system. Parole officers and judges, however, had generally reported back favorably on patients who had completed the program." (Tacoma News Tribune, August 4, 1968). As a result, in late 1966, an administrative decision was made that all sex offenders in the State of Washington would be evaluated and treated at Western State Hospital. As a result of that decision, the program expanded "rapidly" in the spring of 1967. The MacDonald/Williams report considers the expansion rapid, in that it doubled from 25 in July of 1966 to 53 in July of 1968. Given the numbers served at a later point in time, this seems a "drop in the bucket". However, this kind of doubling expansion would become a common phenomenon in years to come when the numbers were significantly larger. While the press indeed may have been talking about the program, the community as a whole was unaware of its existence. Apparently, although there were escapes at that time, they did not come under the public's scrutiny as in later years. The residents' actual leaving of the hospital was couched in different terms. "An unauthorized leave" would have been reported at that time versus the term "escape" used from 1974 on. Ironically, the actual escape rate of 7.4 % at that time, was far higher than in later years when the criticism would be far more intense (see Table I). The program's apparent public anonymity at that time obviously had its benefits.

As the resident population increased, additional professional staff were hired. R. Williams was hired and became the program's assistant director. H. R. Nichols became the program's psychologist. These two individuals, in concert with Dr. MacDonald, were to have a significant impact on the direction, growth and development of the program for the next decade to come, if not longer. They further honed and refined the "guided self-help" model, adding couples group counselling for the residents and their spouses, the work release phase of treatment, and the introduction of volunteers from the community to participate in role plays for social skills development.

One gets the definite opinion from reading the available material, as well as talking to the individuals who led the program during that first decade, that it was an extremely challenging and exciting time. Those

Exh. 92 - 000531

-7-

people "broke ground" in an area where most of the treatment community refused to work.  The credibility gained in the first decade pushed the program with momentum into the 1970's.

GROWTH AND DEVELOPMENT

The program of the 1970's experienced significant notoriety.  However, this became a double edged sword, because while its successes were being applauded and studied by its peers in the professional community at large, its failures (particularly escapes and reoffenses) frequently took on headline proportion from 1974 on.  The larger the program became, the greater the demands increased; not only to provide treatment at the same inexpensive rate of its founding years, but to be completely successful, with no significant problems as well.  Obviously, this was a task that no one could accomplish.

Even through the first half of this decade the program was still being called a "pilot", and along with that designation goes the right or ability to still make some mistakes, because after all one is "just learning".  This attitude began to diminish significantly toward the end of the 1970 decade and certainly became non-existent in the 1980's.

One of the major forces impacting the program during the 1970's was the significant increase in population.  From the point at which the hospital assumed state-wide responsibility in 1966, until it relinquished the eastern half of the state in 1977, the program census doubled and tripled over and over again.  The program went from a population of 69 in 1970 to 212 when the fiscal year began July 1, 1977 (see Table II).  Several factors account for the phenomenal growth.  State-wide responsibility increased the catchment area of the program and, therefore, increased the population served.  The program's credibility continued to improve with the courts.  The criminal justice system during this period of time (locally) viewed treatment as the better option for most sex offenders, except for murderers and the very dangerous.  The first Law Enforcement Assistance grant for  victim services in the state began in Seattle/King County in the early 1970's.  Early on, the program, because of its philosophy, gained approval and acceptance from those doing victim work. Because the program's end goal was to protect the community and decrease the number of victims; victim advocates often saw it as a preferable placement to prison for many sex offenders.  With the advent of public education and better victim services, the police's and prosecutors' increased interest and education, the number of offenders apprehended and convicted increased.  Given the previously mentioned biases, "treatment better than prison" the number of offenders referred to us increased significantly as well.

This population increase resulted in the program developing a broader base of knowledge about the sex offender population and its evaluation and treatment.  The program learned from its experience, both good and bad. The "guided self-help" group model continued to be the basis for treatment with additional emphasis placed on skill deficit areas.  Therapy staff

Exh. 92 - 000532

-8-

incorporated social skills, sex education and assertiveness training into the training they provided for the groups.

Of particular importance, the outpatient component was developed in the early 1970's. As indicated earlier, in the late 1960's the program consisted of an inpatient and a work release phase. However, following those two phases, individuals were allowed to return, if they so desired, to their home county of commitment; this might often be on the other side of the state. They continued to be followed for five years by a probation officer. The program attempted to develop "satellite" groups in a number of areas in the state in order to provide the continuing follow-up. It became clear in the early seventies that this was not the best follow-up possible. Once the offenders left the area, they were more easily able to manipulate the people responsible for them, who lacked both the information about the specific individual, as well as experience with sex offenders. Sex offenders, in comparison to other felons, present as "good probationers". Untrained officers often allowed them to return to situations that promoted reoffending behavior. Hence, the program developed its own outpatient component that followed its work release phase of treatment. Initially, its length was 12 months. In 1972, that time was increased to 18 months. Statistics seemed to indicate that one year post-treatment was a time when many sex offenders seemed to experience difficulty. It was hoped that the additional six months might assist that individual beyond that point, and thereby assure greater success. The individual then had to both live and work in Western Washington, so as to be more easily monitored by the program. Additionally, the offender was required to attend a weekly meeting of the outpatient group. As well, the same therapist who monitored his progress on inpatient status continued to monitor him through work release and outpatient status until he successfully completed the program. In my opinion, one of the most significant accomplishments of the 1970's was the development and further refinement of the "follow-up package" of the program. We learned more and more about the problems and pitfalls sex offenders experienced upon return to the community, and we became increasingly more sophisticated at both managing and often preventing the problems.

With the growth of the program the number of staff increased accordingly. The model continued to be one therapist per group with ultimate responsibility and decision making power for all residents in his or her group. This included all three components of that group - inpatient, work release and outpatient status. This ongoing responsibility, coupled with the lengthy follow-up process, gave us significant information about the dynamics and behavioral patterns of sex offenders as a group.

At least for the first half of the decade, though the population increased significantly, the program seemed to be better able to manage that growth because we were able to hire staff somewhat selectively. (Working with sex offenders was not nearly as popular then as it became later.) We educated and indoctrinated them; not only about sex offenders but relative to program structure and function as well, so that in many respects all

Exh. 92 - 000533

-9-

shared the same biases and worked together to keep group management uniform. At that time, we were not forced to develop new groups until we had staff ready to manage them.

The nature of the population had a different quality as well. Since there was little or no community based treatment at the beginning of the decade, we were "the only game in town". Therefore, we often received individuals who were more pro-social with shorter offense histories. This component of the population assisted in managing and maintaining the more antisocial and chronic offender. The former group's value system was often similar to the staff's, so groups were somewhat easier to maintain and control. This factor began to change toward the late seventies as community treatment became available to the less chronic, lower risk offender.

There was a sort of innocence, if not naivety, present in the staff at that time because of the apparent success of the model. We believed using "the system" one could treat most sex offenders, effect change, and expect success. We would shortly learn, unfortunately, that greater selectivity was one of the keys to a successful outcome.

In January of 1974, events occurred that would forever change the program and the position it occupied. Innocence and naivety would become a thing of the past and notoriety would become an often unwelcome partner.

On that eventful day in January of 1974 a rapist escaped. He was subsequently apprehended two months later in Hillsboro, Oregon following the commission of rape. If this was not bad enough, the King County Prosecutor also filed first degree murder charges against the same man for the slaying of a 14 and 17-year-old girl. He was ultimately found guilty on all charges in Washington and Oregon.

The tone in the Tacoma News Tribune which had previously praised the program took on a different note. "An escapee from the sexual psychopath custody at Western State Hospital - now in jail in Hillsboro, Oregon under indictment on rape charges - has been charged by the King County Prosecutor with the rape slaying of two Seattle girls." "The development brought criticism against the hospital from local officials, 'I don't know whether the psychiatrists are doing the job or not', said representative A. A. Adams, D -Tacoma 'but something has to happen'. Mr. Adams is the chairman of the House, Social and Health Services Committee which conducted a hearing earlier this month regarding charges that security at the hospital was too lax. This hearing had been requested by Tacoma City Councilman, Dick Sontag who said that if the hospital 'had half a good security as they do at the local facility for juveniles (Cascadia) they would not have one-hundredth of the escapes they have."

For most of the staff the experience was an extremely trying and devastating one. Certainly it was not the first time someone had escaped nor the first time someone had reoffended, but it was certainly the first time that anyone from the program had committed murder.

Exh. 92 - 000534

-10-

Initially, the program managed the man's escape as it had managed all escapes before.  A search of the grounds was conducted and he was reported as an "an unauthorized leave".  When he did not return, as often had been the case before, his absence was reported to the authorities.  The group and therapist in question reviewed the situation to assess had what happened, what could be learned from it, and what to change in the future. For a brief time the program was able to get on with its business. However, as was indicated in the newspaper article, once the scope of his behavior was identified, a special investigation was initiated.  The program was "grounded" (locked down) and as a body, staff and residents began to look at ways to avoid these kinds of situations in the future. On its own, the program came up with many significant security changes that would ultimately result in the reduction of program escapes.

Retrospectively, one can see now that what happened in this situation was to be repeated a number of times between 1974 and the close of the decade. The public became more aware, so that whenever an incident occurred it received significant notice in all forms of the media.  As a result, a number of politicians became involved.  Many times, because of their interest, support and desire to help with the problem; but unfortunately as well, because the program now attracted media attention, it was a golden opportunity for a politician to gain notoriety as the result of his or her comments.  The program became quite candidly a political football that would be tossed back and forth until that final bill was passed in 1986.

During that spring there were, indeed, legislative committees and reviews. Several politicians including a local law enforcement chief demanded the hospital be more secure and "get its act together".  The program had visits from any number of department level officials from corrections to analyze, review, and give suggestions about our security system.  At that time, treatment effectiveness was not so much the issue but security. Fortunately, at that time, management at all levels even up to the Governor's Office was supportive.  The then governor even spoke to the media stating that the program was valuable, was of consequence, and needed to be retained.

Things did change, some for the better and some because they were demanded.  During the spring of 1974 the program reviewed all of the individuals who had escaped up to that point.  The two common factors present were a prior escape history and prior incarceration of two years or greater.  It was decided that all subsequent admissions would be reviewed with those criteria in mind.  Individual ground privileges were discontinued and the buddy system was developed, so that the only time the offender could leave the ward was with someone else.  The program also discontinued receiving interdepartmental transfers from the Department of Corrections (in 1972 the program had begun to take selective transfers from the Department of Corrections).  It was decided, since the courts had opted not to send those individuals for treatment in the first place, that we might be "playing with fire" to accept someone already in the correctional system.  At the suggestion of the Department of Corrections,

Exh. 92 - 000535

-11-

head counts were initiated every four hours.  Additionally, the hospital began its own security patrol in response to community demands.

It was at this time that the program began its fickle romance with the media.  Several program staff most directly involved received a "bath of fire" and learned to deal with television cameras and reporters.  Having to explain judgments, actions, and decisions to the camera; and later watching your performance on the news is, at the very least, unsettling and often humbling.

So the program moved on.  However, one additional component entered about one year later that would also periodically reoccur from time to time.  The State (the program) was sued for negligence by the parents of two murdered girls.  This kind of phenomenon not only resulted in further media attention, but also in many hours of staff time giving depositions and testimony, not only regarding actual actions and judgments, but also about treatment techniques, rules, policies, etc.  We would also come to learn toward the end of that decade and into the eighties, that we would be forever held responsible for the actions of not only those who had graduated from the program, but often for those who had only stayed a short time.

As previously noted, the program population had grown to 212 by the summer of 1977.  This caused a good deal of consternation in the State's budget planning office; they apparently were unaware of many of the factors that caused our growth.  They had projected there would be far fewer residents in the program in 1977.  The program was running out of space to expand in the hospital.  As there was a state hospital at Medical Lake in Eastern Washington, it was decided to turn the management of sex offenders in that half of the state over to that facility.  In order to begin that program two groups of residents from east of the mountains, who were willing to move, were formed.  Two new therapists were hired who would move and be responsible for the groups.  Management of the program would be assumed by staff all ready working at Eastern State Hospital.  For several months the staff was trained and the groups developed.  Finally, in November of 1976 that component moved and Eastern State Hospital assumed responsibility for all sex offenders in Eastern Washington.

It was now believed by the budget analysts and projectors, that the problem had remedied itself, the population would stabilize and we would not need  further space or monies for some time.  The program did not share that bias and would be proven right three years hence when in the summer of 1980 we once again had a population of 212.

The 1970's could very much be equated as the program's adolescence.  It was a time of ups and downs, successes and recognitions, failures and notoriety.  As we grew, we learned more and more that there were incumbent problems with that same growth.

Several times between 1974 and 1980, there would be an escape and the media would "jump in"; sometimes it meant special investigation and

Exh. 92 - 000536

-12-

changes were made. Often the changes were instigated by the program, and it was those that were most effective.

At the same time, on the other side of the coin, the program was gaining national and international recognition for its pioneering efforts and the techniques it used. Articles were written, stories done and program developers from other states visited to learn about and incorporate our model into their programs. Perhaps one of the greatest benefits of this period was the learning that occurs when sharing takes place. For the first time, the program began to establish contacts with other people providing treatment in other parts of the country. As a result, we felt less isolated and better able to evaluate the relevance of what we were doing. Therefore, while from afar we were being viewed very positively, those in our own "backyard" were not so sure that they liked "the neighbors".

As we closed out the decade, the increase in referrals required the program to expand further, stretching the available resources and expanding the budget.

As we left the decade, one event occurred that was catastrophic and served to literally catapult us into the eighties and the next phase of the program's history. In May of 1979 an individual, who was not only a program graduate but who had subsequently worked as a therapist, was found murdered in an isolated area. He had been shot by a man he was attempting to anally rape. The man got loose, picked up one of the offender's guns and shot him to death. Other bodies were found in the area, a van, and an apartment full of sadomasochistic items were discovered. Needless to say, "it" hit the fan with a vengeance.

Even though the individual in question had completely finished the program at least six or seven years before, and had not worked for the program for over two years; we were identified as being responsible for his actions by several factions in the community. Once again everything was reviewed. A special panel was appointed consisting of four individuals: a judge, a prosecutor, a psychiatrist, and a physician who thoroughly investigated every component of the program. This review took the entire summer of 1979. Additionally, we were also reviewed by both State House and Senate committees. Ironically, these two factions (the special panel and the legislative committees) ended up representing both horns of the dilemma that concerned the program from the mid seventies. This dilemma involved the criticism from one side that the program was not strict enough and needed to be more conservative, while the other side chastised the program for being too security minded and screening out the "really tough clients".

One of the things that had begun to occur in the late seventies was the court's commitment of some individuals to the program against our recommendations. We had, perhaps, sold the idea of treatment too well, because some times it was expected that we could work "wonders" when there was no material to work with at all. By the late seventies we had indeed

Exh. 92 - 000537

-13-

begun to recognize, not only that our facility did not lend itself to certain kind of sex offenders, but also that certain sex offenders not only could not be treated <u>here</u>, but probably not at all. It was also at that time, after two decades of existence, that we began to know we needed to become very good at identifying amenability factors. We also needed to better identifying individuals who fit that criteria, if we were going to continue to exist in the hospital setting under the auspices of the Department of Social and Health Services.

In late summer 1979, we received the report and recommendations of the special panel. As previously intimated, the strange part was that the tack they took dealt much more with what they perceived as our security consciousness and conservatism. They indicated that we spent too much time on security matters, were far too concerned with them, and needed to begin to take some of the more difficult patients we were referring to prison, whom we believed were too dangerous to be housed at our facility. Needless to say, the legislature took some exception to this part of the panel's recommendations. On a positive note, they did identify some needs which we already knew of, but had not able to meet because of lack of available funds and resources. This was certainly one of the times in which crisis resulted in bringing the needs of the program to the attention of those who pulled the "purse strings". Two major items that the panel recommended were more staff and more training for staff. Out of this recommendation, the Director of the Division of Mental Health appointed a forensic psychologist from Oregon to further review the program and to come up with specific changes that would allow a budget increase to be generated. This was a most positive experience; because he talked and met with us, came to understand our strengths, weaknesses and needs, and then formulated recommendations. They included many of the same things we had been trying to accomplish for some of time, in an attempt to update the program, in keeping with what had come to be widely accepted in the offender treatment community nationwide.

Therefore, the seventies were indeed a time of growth and change. There were significant successes and major problems. The program learned and grew from both. As we moved into the eighties, our plans were directed toward upgrading the program to the "state of the art" using what we had learned over two decades. Not only to improve the existing "guided self-help" program, but to add those components that we knew were being widely used elsewhere, and could only serve to improve our effectiveness and, therefore, our end product.

## THE DEMISE

As the eighties began, ironically we were optimistic about the future. We had done some significant learning from what had transpired the decade before. We were beginning some significant exchanges with treatment programs across the country. These contacts resulted in our learning other effective methods of treating and monitoring sex offenders. Certainly, the "crisis mode" had been with us throughout the entire seventies. While the notoriety at times was extremely painful, it also

Exh. 92 - 000538

-14-

resulted in getting the attention of the right people, so we could obtain additional funds and resources. We were no longer innocent or naive. Certainly, not naive to many of our problems, nor the fact that we frequently walked a tight rope relative to remaining in a mental health facility in the community. We knew that on several occasions the issue of moving sex offender treatment to corrections had arisen, but it had been put to rest each time. We had significant support at many levels of management. As 1980 began, we did not foresee that some six years later legislation would be passed that would phase us out. That failure was, indeed, naive.

Some of the same factors or problems which had been present in the seventies remained. Referrals continued to increase, so there were further demands to expand. This time expansion occurred before we could adequately integrate new staff and new patients into the program. This created over extension of existing staff and resources, and that phenomenon resulted in problems of the management and monitoring of the sex offender population.

Simultaneously, as the special consultant was evaluating our program's needs, the population reached 211 in July 1980. The program was almost exactly in the same place it had been, when the program gave up the eastern half of the state in hopes that this would solve the population problem. There was, indeed, no additional hospital space for the program to expand. We were considered to be grossly over capacity, needing to reduce our census to 168.

Therefore, a plan was developed to freeze admissions until that number was reached, and also to develop a "waiting list" for referrals. It was the intent that the referrals from the different counties would then be taken on a "first come, first serve" basis. While this solution was not seen as the best, it was believed that it would provide a "stop-gap" for the time being. Unfortunately, this decision, which seemed logical at the time, served to create a "monster" that plagued the program for several years afterwards. Referrals continued not only at the prior rate but also seemed to increase. As public education about sex offenders continued, more victims came forward and more offenders were identified. Despite the problems that had emerged during the seventies, for the most part, the criminal justice system in the State of Washington had accepted treatment for sex offenders and still identified it as viable. Even though there were more community resources available for the less dangerous sex offenders, the flow of referrals continued to increase.

What has now come to be referred to as the "infamous waiting list" began in September of 1980. We did succeed in decreasing the population to 168 and began taking admissions as bed space became available. This, of course, meant that either someone successfully graduated from the program or else they left as no longer amenable to treatment. Neither of these vacancies occurred with the same rapidity as the waiting list grew. One year from the time the list began, there were 59 people waiting. Two years later 95 persons were waiting, and three years later 145. This, (Please see Table III for waiting list data).

Exh. 92 - 000539

-15-

despite the fact, that people were admitted (though slowly), the program expanded with one new group in June of 1981 intaking 15 people, and two new groups in February of 1982 intaking 30 people.  It became a nightmare that seemed not to have a solution unless the existing conditions changed. Unfortunately, as the demands for space by the program increased, the demands for bed space for the mentally ill increased as well.  The late seventies and early eighties found more and more patients, who had been placed in the community at the time of the great "community treatment experiment" of the mid seventies, returning to the institution for treatment.  This phenomenon as well, set one of the conditions that would later influence the placement of the Sex Offender Treatment Program in the Department of Corrections.

The other issue, as previously discussed, that moved into the eighties with us, was the final point of the crisis of May 1979.  Our special consultant completed his report and submitted it for review and use in November of 1980.  It was entitled, The Sexual Psychopathy Program at Western State Hospital: A Plan for Positive Growth and Development.

The report recommended a number of things:

1.  A review of the existing, but outmoded, sexual psychopath law was recommended. (The program had been assisting the Division of Mental Health toward modification of this law for at least two years.)  The consultant recognized the faulty parts of the law and felt that its modification would help decrease a number of unnecessary patient turn arounds, as well as assist in stopping commitments being forced on us of people we felt were not amenable to treatment.

2.  He recommended the development of a behavioral laboratory to provide physiological assessments and specific behavioral treatment to directly attack deviant  sexual arousal. (The program had also been attempting to  obtain the necessary equipment for physiological assessments since early the same year.)

3.  He also recommended the addition of a series of modules to further enhance the program.  These modules would be designed to attack the skill deficits most prevalent in the sex offender population.  These would include communication and social skills training, assertiveness training, anger management, and sex education.  As well, the consultant recommended the necessary staff to allow the suggested enhancements to occur.

The report and recommendations were well received by the program, the hospital, and upper management in the Department of Social and Health Services.  While we were able to enhance existing staff training, as monies were tight, funding to implement the remaining parts of the plan were not found.  This phenomenon was also quite familiar to us.  We had

Exh. 92 - 000540

-16-

seen it occur several times during the seventies. Crisis created investigation. The investigation produced recommendations which often required money. Those recommendations that either cost little or nothing to implement were often allowed, the rest was frequently deferred because funds were not available. Since the program had operated so cheaply, for so long, and was indeed less expensive than placing someone in prison, funding sources at all levels wanted desperately for that status to be maintained. Unfortunately, upgrading and improvement cost money. The program might have had problems, but it was still effective, and it was cheap.

The population/waiting list problem and the non-implemented recommendations of the special consultant converged in 1983.

As the result of the creation of the waiting list and its ever increasing size, offenders began to get backed up in county jails. The jails become overcrowded and the counties complained, they even threatened lawsuits. As a result, in order to prevent a major lawsuit that could have resulted in the state being forced to take everyone on the waiting list, the program was forced to expand on two separate occasions before it was really ready. This occurred in June of 1981 and in late January of 1982, with 15 and 30 patients being admitted respectively. In order to expand, space and beds that were also needed by mental patients were utilized by the program. This resulted in discontent and complaints from mental health advocate groups in the state, principally W.A.M.I. (Washington Advocates for the Mentally Ill). This factor would also play a part in the final decision to change authority for the program to the Department of Corrections.

While the management of the program recognized the legal difficulty, it was further believed that forcing the program to expand beyond its resources was destined for failure and only buying difficulty. To try and avoid the "difficulty", the then program director appealed to upper management. The inherent hazards were pointed out by giving specific examples of when a similar push had occurred in 1977. Four men had escaped from a group that was not properly supervised and incorporated into the overall treatment philosophy. "This (the prior push) created major difficulty for the Sex Offender Program at Western State Hospital. I had definite concerns that if we are forced to expand too soon, we could end up with another major catastrophe."

"The program, as I am sure you know, is much more complex than it seems on the surface. Unless some of the givens can be met, I would say that significant problems are eminent for the program. Somewhere down the road we will be paying for it in some sort of major issue like an escape or a reoffense while on escape."

Unfortunately, while upper management took the information under advisement, they were unable to put off the program expansion and, therefore, increased the program by 30 in 1982. There were too many new and untrained staff with minimal experience managing the sex offender

Exh. 92 - 000541

-17-

population.   Given the ever increasing problems and stress, longer term staff members left the program, often for private practice and better money.

Subsequently, as predicted, in the spring of 1983 problems began to occur with residents involved in the work release/outpatient phase of the program.   This has always been the more difficult group to monitor and takes a more experienced therapist, not only to identify problems, but also to know how to intervene.   One event occurred in March of 1983 when a resident on work release status failed to return to the hospital.  (This was now being called an escape.)   We no sooner explained that situation, when in June 1983, another work release resident failed to return from work.   When he did not come back at the appointed time, his place of employment was called.   It was discovered that he had not gone to work that day and, therefore, when he had left for work at 3:00 p.m. he clearly had ample time to get quite far away.

The program once again "grounded" itself and upper management in Olympia was notified.   This time the program was called to task.   Fortunately, in March of 1983 the division chief and the hospital and program management had begun meeting to review the existing population problems, as well as, find ways to implement the recommendations from the earlier report.   This process had been ongoing for two to three months when the second event occurred in June.   The secretary of the Department of Social and Health Services requested a full review and explanation.

This was again one of the times when crisis opened the "purse strings". After reviewing the situation, he recognized that the program had identified the potential problems before they happened, and that there had been a number of recommendations made almost three years earlier, which could have helped the situation if they had been implemented.   We were, therefore, directed to prepare a budget plan for the full implementation of the special consultant's report.

Additionally, given the ongoing problems with the waiting list, a plan had been developed in the fall of 1982 for the implementation of a special admission ward.   This ward would be designed to do the necessary specialized evaluations and intake, and to turn over approximately 30 patients per month.   Additionally, where the law allowed, we recommended doing in-jail evaluations.   These assessments were to be done on those individuals on the waiting list who were referred only as a condition of probation, and who did not have the trappings of the sexual psychopath statute.

The budget was juggled and sufficient monies were found to develop the admission ward, the behavioral laboratory, and to provide the necessary equipment and staff to run both.   Both of these items were to be implemented as soon as possible, but no later than the first half of 1984.

The remainder of the package, which concerned increasing staff to patient ratio, and to provide more direct treatment staff, as well as, staff

Exh. 92 - 000542

-18-

necessary to design and teach the special modules, would be included in the department's budget in the next legislative session and implemented as soon as it was approved.

The admission ward opened March, 1984. Through the evaluations performed on the special ward as well as the in-jail assessments, the waiting list was exhausted in December of 1984. The behavioral laboratory was opened in May of 1984 and began conducting physiological assessments for the program.

The program was hopeful. Change had occurred and we were on our way to implementing our plan and fulfilling our goals to upgrade the program. Unfortunately, by the time the legislature convened in January 1985, priorities once again changed and our additional package was excluded from the budget. We were assured that we would be added to the budget at a later point.

The media also played a part in creating a number of conditions that ultimately led to the program's end. They continued to be active in reviewing and investigating the program. In the very early eighties, as a result of the 1979 investigation, we had been able to add a position of "community coordinator". We had identified the need for an individual to act as liaison between the various media agencies, the community, and the program. The utilization of this person had yielded a good deal of success in the early eighties with attention to the program being focused on its positive features. Stories were given to the media that educated the public about the program and how it operated. This was so effective that, on a couple of occasions, smaller crises occurred and they received minimal notice. Certainly not the inflammatory response that had occurred several times in the late seventies. But, once again, when budget cuts were necessary, that particular position was identified as "not critical" and, therefore, eliminated from the program. This left our "flanks exposed" and we began to notice items taking on a more critical bent, and once again negative stories began to appear in response to problems in the program. From 1983 to 1986 when the legislation was passed, it had reached the point that if an offender had crossed over our threshold, if only to be evaluated, and if that person reoffended and came to the public's attention, he was identified as a "former Sex Offender Program resident". Therefore, the public began to draw the conclusion that the program had far more failures than successes, and the figures we claimed were lies. Even when we did take the time to clarify and explain, we were still held responsible. Recidivism figures began to be developed based on total admissions, not those residents that were kept and succeeded. The irony was that the public demanded security and more thorough screening of those patients retained. The program responded to that request in the late seventies, having identified for itself that selection was the key. Four or five years later, we were being held accountable not only for those that we kept, but also for those that we screened out. It was reminiscent of the kind of philosophy that says, if a physician treats cancer patients and they die anyway, the physician is responsible for that failure.

Exh. 92 - 000543

-19-

The climate of public opinion in the State of Washington began to shift from supporting treatment as an acceptable way to deal with many sex offenders, to the punishment attitude prevalent in many parts of the country.

The late seventies and early eighties saw many states not only eliminating their sexual psychopath statutes, but developing nothing to replace them. Jurisdiction for many sex offender programs shifted from mental health to the Department of Corrections. The attitude locally was, one escape is one too many and one reoffense is one too many as well. This despite the fact, that the actual rate of escape in the program had decreased significantly since the major problems in the mid seventies (see Table I).

Consistent with other parts of the country, a major law change occurred in the State of Washington when its legislature changed from indeterminant to determinant sentencing, and passed the Sentencing Reform Act of 1981. This law was implemented on July 1, 1984. Its application eliminated the sexual psychopath law in the State of Washington. While the program welcomed the demise of an old and outdated law, it was concerned that the original legislation provided no inclusion of anything related to sex offender treatment. The mobilization of treaters from both the community and the hospital program, as well as victim agencies, resulted in the Sentencing Guidelines Commission recommending, and the legislature subsequently passing, what is now known as the Sex Offender Sentencing Alternative. This provided for a method of implementing community treatment, as well as, another section that provided for treatment in the hospital programs. Regardless of that improvement, the sentencing structure itself, contains sentences for sex offenders that are far less severe than the old indeterminant sentences. While the special treatment/victim committee may have been able to influence the formation of the Special Sex Offender Alternative, it was unable to move either the commission or the legislature into increasing the sentences for sex offenders. Had sex offender treatment continued under the jurisdiction of mental health, the sentencing structure would have ultimately impacted the program. Our credibility and success would have further decreased because we would have had individuals committed to us with shorter sentences and, therefore, less time to accomplish change. (It should be noted, however, that in the last two years the length of sex offender sentences has increased, and judges have imposed exceptional sentences more frequently.)

Two other issues bear mentioning that have a direct effect on the final outcome of the program's status. With the program's plan for upgrading, it became clear that the program not only had to become more expensive because of the admission ward and behavioral laboratory, but would be even more expensive when the staff to patient ratio was increased and the other items were implemented. It was no longer a "cheap program", in fact, it was now _more expensive_ than prison. With the media's attention to each problem or crisis that occurred, upper management and the legislature found the program's continuing existence less and less appealing.

Exh. 92 - 000544

-20-

Given the increased need for hospital beds and space for the mentally ill, many mental health advocate groups began to agitate for the program's removal from the hospital. Some claimed it (the program) had no "legal" right to be in the hospital, since the hospital had been developed for the "really" mentally ill. They claimed an early land grant specifically designated the land for the mentally ill, began to make "noises" about a lawsuit.

It was with this climate that the final blow was struck, which resulted in more attention, investigation, and the ultimate passage of legislation to change jurisdiction from mental health to corrections.

In late February 1985, a multiple rapist from Clark County (Vancouver, Washington) escaped from the hospital's recreation hall while involved in an activity with his group. The total irony of this event is that the Sex Offender Program sought from the beginning to have this man removed from treatment. He was a prior offender, having previously been jailed in the State of Oregon for multiple rapes. He was evaluated in conjunction with the existing criteria and deemed to be not amenable to treatment; not only because of dangerousness and risk to the surrounding community, but also because of chronicity and a long-standing history of antisocial behavior. As the program evaluation procedure called for at that time, he was evaluated and immediately excluded from the program almost as soon as he came in. He was returned to the jurisdiction of the court within 48 to 72 hours, with the recommendation that while he was a "sexual psychopath", he was not amenable to treatment and too dangerous to be contained at our facility. A prior appellant court ruling regarding the sexual psychopath statute had previously ruled, in the State versus Daniels, that the program could indeed return someone to the county jail who was too dangerous to be retained in its facility, and if a subsequent evaluation for amenability to treatment was necessary, it could take place in the county jail. However, he was still returned. This time we placed him in a more secure portion of the hospital where new admissions for the Mentally Ill Offender Program were evaluated. He was retained there for one week to ten days, evaluated by our staff, and once again returned to the court. A hearing was held that resulted in all day testimony on the part of the program's management. The court still believed we had not sufficiently, proven that he was not amenable to treatment and he was again returned. Following his return the third time, we attempted to utilize a section of the sexual psychopath statute which allowed an individual to be transferred to the Department of Corrections if he was too dangerous for the hospital to contain. The Department of Corrections deferred taking him saying they were already over census.

With these facts in mind, one must see the irony of this man's escape being the event that set things into motion, which lead to the closure of the program.

Again, another investigation occurred and many facts were gathered. This time the investigation was done by a legislative committee. When the final report was received though it was not unfavorable, neither did it

Exh. 92 - 000545

-21-

endorse, wholeheartedly, the maintenance of the program.  As a matter of fact, data was quoted in the report that was erroneous.  Specific data made the success/failure rate of the program look far worse than it was. However, with all the other existing factors, including pending lawsuits, reoffenses of several program graduates, beds needed for mental patients, and now the program too "damned" expensive as well, the ultimate decision was inevitable.  Thus, in the spring of 1986, the legislature passed a modification of the Sentencing Reform Act and moved the jurisdiction of the program from the Department of Social and Health Services to the Department of Corrections.

It is truly unfortunate that so much attention and aggravation had developed from the problems in the program, because the last eight years have also been some of the most productive in terms of further program development and change.  The behavioral laboratory began in May of 1984 and has continued to be utilized to the present.  Since very few new patients are sent to the program for evaluation now, its primary function at this time is assessing the success of specific behavioral procedures. It is also used as a monitoring tool for our work release and outpatient population.  Specific behavioral interventions have been further developed that assist in the decrease of deviant sexual arousal.  This includes recent approval from the hospital's Behavioral Committee to utilize "assisted" covert for appropriate residents.

While we may not have received the funding for the second part of our improvement plan (1983), we have succeeded in adding a number of very specific treatment modules to the program. Ironically,  as the population has decreased with the program phasing out, we have been allowed to increase our staff to patient ratio to the level we had previously requested.  Therefore, it has made the development of some new program components possible.  These components have included anger management, sex education, social skills training, and relapse prevention.

It is humorous to note that in its final two to three years, the program is providing the kind of treatment package it had hoped for when proposals were made in the early eighties.  One gets the sense that is not unlike, "The surgery was successful but the patient died."

Since there has been a good deal of confusion around the legislation closing the program, a couple of issues will be clarified.  First of all, it was indeed the legislative intent that one program would phase out as another one was developing.  The law specifically states that the program in the jurisdiction of the Department of Social and Health Services has until 1993 to complete the process.  Some people have incorrectly assumed that the legislation "closed the program".  That meant that staff and residents, "lock, stock and barrel" would move to some designated place in the Department of Corrections.  However, that has not, and will not, occur.  Instead, the intent was that, at the same time, the Department of Corrections would develop its own program to serve that group of sex offenders, whose crimes occurred after July 1, 1987.  This was also the designated point at which our responsibility for new offenders ended.

Exh. 92 - 000546

-22-

It is a unique experience to be present as the program phases out.  One has the sense that it is the end of a particular era in Washington State. Once the initial shock, anger, frustration, and depression were worked through, it has become enjoyable (for lack of a better word) to do treatment again.  One is no longer hassled by the attention, notoriety, and problems present on a day to day basis for many, many years.  As the security grounding or lock down of the program from 1985 was kept in place, there have been no escapes.  While we are still cognizant that someone could leave, the likelihood is far more remote since residents do not walk the grounds unaccompanied as they once did.  In mid September 1988, we have 33 offenders in residence (this includes both inpatients and work release), and 19 on outpatient status.  We have only two groups left which are managed by three therapists.  We are now housed on only one ward.  It seems not unlike the program 20 plus years ago.  The size and number of staff is very similar to the program of 1968.  Perhaps beginnings and endings are not so dissimilar after all.

## CONCLUSIONS

There is much to be learned from the program's 30 years, not only about treatment methodology per se, but about the management of a sex offender program regardless of its location or size.

If we were starting today, what would we do the same and what would we do differently?

In designing a program today, one must certainly take into consideration the developments in the field, and try to learn first hand from the people who have done the work, what really works and what does not.  Statistics viewed from afar, and in isolation, often do not accurately reflect the real issues or information, but frequently may be over or under estimates of success.  Such a program must include those elements that are necessary for evaluation and assessment, treatment, and follow-up.

The program must be adapted for the population it serves, its location, and what, if anything, the existing law dictates.

In budgeting ask for what you really need and then some, particularly if you are part of any kind of government agency.  If you do not set your sights high, you will probably have a great deal of difficulty increasing your budget and, therefore, your allocations.  I believe the Western State Program is a prime example of this fact.  We were so inexpensive for so long, trying to justify funds for upgrading was almost impossible.  As mentioned many times, it took a crisis to get attention, and even then after things subsided, often recommendations were not fully implemented. Oppositely, Steven Jensen (now Director of The Center of Behavioral Intervention in Oregon) planned for "state of the art" treatment, budgeted accordingly, received most of what he wanted, and was able to begin a "first class" program when he developed the Oregon State Program in Salem several years ago.

Exh. 92 - 000547

-23-

Be selective about clients.  Have an appreciation for what your facility, resources and community can handle.  Understand that all sex offenders are not "treatable".  While sometimes selection may indeed be based on the type of facility you have, (that is community/hospital) one needs to give serious consideration to the offender's chronicity and capability to change.  This is one of the facts we learned working with this population over time; and sometimes the hard way.  The people who were "too dangerous" for the facility were often the easy individuals to rule out.  However, the chronic offender with multiple problems and little, if any, chance of success, was often the individual that staff had difficulty turning away.  Frequently "he has never had a chance at treatment" or "maybe this time" was heard.  I am quite certain at this point in the history of our program, that not only success, but survival to treat others is ruled by one's ability to select out the clients you are really able to treat.

A legal hold or consequence, whether through an actual sentence or a diversion program, are absolutely essential to the management and treatment of sex offenders.  While I recognize that this is not universally accepted in the country, it has been accepted in Washington State, by the program since the late sixties, and has been required by all the reputable community treatment professionals and groups since their inception.  One of Dr. MacDonald's statements from the Daily Olympian article (October 1970) says it rather succinctly.  " 'You got to remember', Dr. MacDonald emphasized, 'that very few sex offenders are willing to give up what they have been doing.  They have been enjoying it and their behavior has not necessarily caused them much remorse'."  Some argue that treatment will not be effective unless it is absolutely voluntary.  Our experience is that while treatment may initially begin as the result of a court mandate and judge saying, "Get treatment or go to prison", often once the individual is involved, acknowledges his behavior and takes responsibility for it, change begins to occur.  Obviously, if the individual maintains the stance that he is not interested in treatment, he has no problem, etc., then indeed treatment cannot be accomplished and the individual must take the consequences of his behavior in the criminal justice system.  This also takes care of the "confidentially dilemma" (which seems to bother some treatment people), because partnership with the criminal justice system mandates keeping the court informed of both the offender's past and present behavior and any progress or lack thereof.  I cannot imagine what it would be like to treat an offender without the ability to control his behavior at the same time.  Because our final goal has always been community safety and victim protection, neither the legal hold or reporting to the court have presented difficulties to us.

A program needs community and media support from its inception.  In other words, do not wait until your doors are open to get the community and the media involved.  Early on, form a partnership.  We also learned this the hard way.  All too often mental hospitals and programs try to avoid media exposure because of the potential for negative reportings and outcomes.  Negative reports and outcomes occur regardless if you talk to the media or

Exh. 92 - 000548

-24-

not.  They are more likely to occur if they do not have an understanding of what you are trying to accomplish and what you do accomplish. Likewise, you need to get individuals who are truly representative of the surrounding community involved at an early point as well.  This includes some of those most critical of the whole endeavor.  Avoiding your critics, quite candidly, makes them more critical and with louder voices.  This participation can be accomplished in a number of ways.  Having a staff position that specifically interfaces with the community and the media is key.  The success we had during the period of time we were allowed to maintain a community liaison person was remarkable.  As noted earlier, the placement of positive stories and education prior to crises is crucial to the interpretation of the program after a crisis has occurred.  It is also helpful to develop some key media individuals who understand your purpose and know you.  It is sometimes helpful to let them know of a problem before they find it out from some other source.  It was mainly after we were no longer allowed to speak to the media, the articles they produced became more antagonistic and negative, because, being denied the direct source, they obtained their information from people who were less informed and or generally not in favor of us.

On the other hand, media access needs to be controlled.  Judgments need to be made about when to participate in particular media programs, i.e., talk shows, town meetings, documentaries, etc.  If it is not controlled, the program can spend too much of its time talking about what it does rather than just doing it.  This is where the liaison person is invaluable.  He or she can screen requests, identify what is appropriate from inappropriate, productive versus exploitative, and control the flow in that manner.  Particularly during the seventies, when we were "new, innovative, pioneering and successful" we were everyone's "darling".  For a couple of years, in my opinion, we were overly involved.  It seemed that staff and residents became preoccupied with being performers rather than patients and therapists.  We did pull back and became more selective.

One of the major ways to get the community involved is through an advisory committee or board.  During the 1974 crisis, program management involved two of its biggest critics in meetings and, interestingly enough, after they were better educated, they were some of the best spokes-people for us.  Unfortunately, following that occurrence we never really continued the process.  Retrospectively, I believe a community advisory group is absolutely essential for survival in any existing community.  People need to be selected from many different walks of life and areas of interest, and including critics is absolutely necessary.  Had we had an active committee, I believe that many of the events that occurred in the late seventies and eighties could have been minimized, fewer complaints written to the legislature, and even help forthcoming in securing what we needed.

While it may seem strange, given the number of problems we have experienced over time, and because we have been held accountable for the long-term behaviors of our residents, I believe that programs are obligated to take responsibility for and make recommendations about the sex offenders they treat.  I am aware that some clinicians do not feel

Exh. 92 - 000549

-25-

that this is their responsibility and that they merely provide treatment. While predicting future dangerousness may be regarded as an elusive issue, those of us who have been treating sex offenders for any time certainly know what behavior makes them at greater or lesser risk. In the State of Washington our programs came out of laws and were developed with community safety in mind. Our ultimate goal has always been community safety and less victims. I believe that this is why sex offenders are being treated and not for the "greater good" of sex offenders. If no responsibility is taken, then it would seem, that one could not be held accountable. While the accountability/responsibility proposition does represent what the program does, and my personal moral and ethical biases, I also do not believe a public program could survive long and continue to be funded if responsibility and accountability are not taken.

I think staff selection is crucial. While academic credentials may be important, experience is even more crucial in working with this population. It is not a field for novices and does require specialized training and experience. Most graduate programs do not provide the clinician with the necessary information or skills for working with sex offenders.

Irwin S. Dreiblatt, Ph.D., a recognized expert in Washington state, addressed this issue in his presentation to the State's Psychological Association in May of 1982.

> "The evaluation of the sex offender has, by necessity, become a specialty area. Knowledgeable people who work within the criminal justice system have begun to place much emphasis on evaluators who have specialized training or a background of experience with this narrow population. It has become reasonably evident that competent health mental professionals without this specialized expertise are more prone to errors, such as undercalling risk; inattention to, or oversimplification of the variables that are relevant; and making unrealistic and/or dangerous recommendations. My experience leads me to believe that this trend towards specialization is appropriate and necessary."

> "Basically what we as practitioners have generally learned in terms of working with the mental health population, does not serve us realistically with the sex offender or criminal population. With the mental health population, we are taught to rely on the patient's self-report, encourage the person to define his/her own personal problems, depend on his/her subjective discomfort as a motivator for treatment, and to have the person's future intentions and wishes guide us. In contrast, it can be all too easy to believe a sex offender who states:

> 1. He feels very badly about molesting his daughter;

Exh. 92 - 000550

-26-

2. He only did it because of marital problems he was experiencing;

3. He had already stopped offending before being caught; and

4. He has been, himself, on the verge of seeking assistance."

Dr. Dreiblatt continues to say when a good understanding of the dynamics of sex offender behavior are understood one does not accept those kinds of statements. He also continues to say,

"Mental health practitioners are trained to adopt a helping, accepting, and caring posture. They are discouraged from taking an authoritarian and controlling stance. The mental health approach emphasizes client support; one attempts to trust and believe one's client and have confidence in him. Although not completely so, this posture is the antithesis of the authority based treatment approach one takes with the sexual offender. Effective assessment and treatment of the offender require a degree of skepticism and cynicism on the part of the professional. I tell my clients that I do not operate on trust basis, trust is what is abusable. I communicate to them that I have no intention of feeling confident in them. Feeling confident about them can be dangerous."

Certainly, Dr. Dreiblatt's biases and approach are accepted realities for those of us that have worked with sex offenders for any length of time at all.

I believe it takes a particular kind of clinician with a very specific approach and bias to successfully work with this population. My own experience in both hiring and evaluating staff is that those who want to be trusting, helpful, understanding, non-directive and provide "unconditional regard" do not fair well with this population. I would encourage those people who really do prefer to be able to trust their clients, to work with other populations. As a matter of fact, at this point in my own career I am almost inclined to advise anyone looking at it as a possibility to "run not walk" in the opposite direction.

Particularly in a larger program it is important to select staff with a similar theoretical orientation and bias. Staff with widely divergent opinions not only make a program difficult to manage on a practical basis, but they also provide multiple opportunities for the sex offender to manipulate and play staff against one another and thus avoid dealing with his behavior.

Finally, evaluation and review must be built into any program regardless of its being private or public, small or large. Any review group should also include clinicians and other individuals from outside the facility,

Exh. 92 - 000551

-27-

who can provide a more objective view on what is actually being accomplished. Any program needs to know if the successes are real and what components within the program structure really are effective.

To date, no national study has ever been done on the effectiveness of sex offender treatment across the country. Mark Weinrott, Ph.D., et. al. developed a research proposal/project in the early eighties that was designed to study sex offender program effectiveness nationwide. Unfortunately, N.I.M.H. did not see fit to fund the project. This was extremely unfortunate because that kind of study is sorely needed.

Finally, I believe that follow-up is absolutely essential. Any intensive inpatient facility must provide an extensive re-entry or outpatient follow-up, it is crucial to long-term success. Despite the fact that many inpatient programs attempt to replicate "every day life in the community", most of us know that the environment is artificial and very controlled. It is only through the gradual re-entry process into the community, and follow-up after one is actually living in the community, that makes long-term success a greater probability. Our experience is that this follow-up works better when it is done by the same program, because the offender's background and behaviors are known well and he is less able to manipulate his environment. Though this program, as you may recall, originally tried to return people to their communities and create "satellite" groups. This was not found to be particularly effective and almost the same as no follow-up at all. Sex offenders need the opportunity to practice their new behaviors under supervision. While they may well have learned how to control their behavior and have developed good coping responses, it is not until they have time to practice them that one really knows whether treatment has been effective or not. I continue to believe that our follow-up program is one of the features that has made us unique and is one of the best in the country.

For 30 years the Sex Offender Program at Western State Hospital has provided evaluation and treatment for the sexual offender. When it began it was one of the few. Its developers were indeed, pioneers in a field that few people wished to work in. Today that is less true, and more and more programs in the community as well as institutions are being developed. There has been a definite swing from providing treatment for the sex offender to punishment. Many mental health hospital programs have closed and changed authority to the Department of Corrections, as it is now happening in Washington state. The truth is that more than likely the pendulum will swing the other way again. Maybe ten years from now, someone else will be talking about beginning a sex offender program in one of the mental hospitals in the State of Washington.

Regardless of who has the responsibility, I think perspective is extremely important. None of us ought to take ourselves too seriously. One of the most dangerous things that can happen in treating sex offenders is that we begin to believe that, "Our program has all the answers and knows what to do." I think we are still walking around in the dark quite a bit. There is still too much to learn and no one has all the answers.

Exh. 92 - 000552

## TABLE I

### TREATMENT PROGRAM FOR THE SEXUAL OFFENDER
### WESTERN STATE HOSPITAL
### ESCAPES

July 1, 1967 -- June 30, 1988

|  | 67-68 | 68-69 | 69-70 | 70-71 | 71-72 | 72-73 | 73-74 | 74-75 | 75-76 | 76-77 | 77-78 | 78-79 | 79-80 | 80-81 | 81-82 | 82-83 | 83-84 | 84-85* | 85-86 | 86-87 | 87-88 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| In Residence | 94 | 97 | 152 | 158 | 231 | 266 | 280 | 296 | 320 | 387 | 348 | 311 | 313 | 315 | 300 | 341 | 309 | 386 | 332 | 174 | 82 |
| Escapes | 7 | 4 | 13 | 5 | 7 | 18 | 8 | 6 | 3 | 7 | 3 | 2 | 0 | 5 | 2 | 6 | 1 | 2 | 0 | 0 | 0 |
| Escape Rate % | 7.4 | 4.1 | 8.6 | 3.2 | 3.0 | 6.8 | 2.9 | 2.0 | 0.9 | 1.8 | 0.9 | 0.6 | 0 | 1.6 | 0.7 | 1.76 | 0.32 | 0.52 | 0 | 0 | 0 |

### ESCAPES BY PHASE OF TREATMENT

| FISCAL YEAR | OBS | FT | WR | TOTAL |
|---|---|---|---|---|
| 67-68 | 4 | 2 | 1 | 7 |
| 68-69 | 2 | 2 | 0 | 4 |
| 69-70 | 4 | 9 | 0 | 13 |
| 70-71 | 2 | 3 | .0 | 5 |
| 71-72 | 2 | 5 | 0 | 7 |
| 72-73 | 5 | 9 | 4 | 18 |
| 73-74 | 2 | 4 | 2 | 8 |
| 74-75 | 1 | 5 | 0 | 6 |
| 75-76 | 3 | 0 | 0 | 3 |
| 76-77 | 3 | 4 | 0 | 7 |
| 77-78 | 0 | 0 | 3 | 3 |
| 78-79 | 0 | 0 | 2 | 2 |
| 79-80 | 0 | 0 | 0 | 0 |
| 80-81 | 1 | 3 | 1 | 5 |
| 81-82 | 0 | 0 | 2 | 2 |
| 82-83 | 0 | 4 | 2 | 6 |
| 83-84 | 0 | 0 | 1 | 1 |
| 84-85 | 0 | 1 | 1 | 2 |
| 85-86 | 0 | 0 | 0 | 0 |
| 86-87 | 0 | 0 | 0 | 0 |
| 87-88 | 0 | 0 | 0 | 0 |
| TOTAL | 29 | 51 | 19 | 99 |

* In residence means all those in the program during that time, including those that came and went.

* In February 1985, to total program was permantly grounded to off ward movement without staff, until

Exh. 92 - 000553

SEX OFFENDER PROGRAM
WESTERN STATE HOSPITAL

TABLE II

PROGRAM-GROWTH

Eastern State Hospital Program
November, 1977

Waiting List
September, 1980

225

200

175

150

125

100

75

50

25

1966  1967  1968  1969  1970  1971 1972 1973 1974 1975 1976 1977 1978 1979 1980 1981 1982 1983 1984  1985  1986  1987  1988

# TABLE III

## WESTERN STATE HOSPITAL SEX OFFENDER PROGRAM WAITING LIST

ADMISSION WARD OPENED
MARCH 21, 1984

30 ADMITTED
NEW GROUPS

15 ADMITTED
STARTED NEW GROUP

DOWN TO CURRENT MONTH
REFERRALS BY DEC. 1984.
THIS NUMBER IS NOW
BEING PROCESSED WITHIN
30 DAYS.

# of Month

# on Waiting List

| 9/80 | 10/80 | 11/80 | 12/80 | 1/81 | 2/81 | 3/81 | 4/81 | 5/81 | 6/81 | 7/81 | 8/81 | 9/81 | 10/81 | 11/81 | 12/81 | 1/82 | 2/82 | 3/82 | 4/82 | 5/82 | 6/82 | 7/82 | 8/82 | 9/82 | 10/82 | 11/82 | 12/82 | 1/83 | 2/83 | 3/83 | 4/83 | 5/83 | 6/83 | 7/83 | 8/83 | 9/83 | 10/83 | 11/83 | 12/83 | 1/84 | 2/84 | 3/84 | 4/84 | 5/84 | 6/84 | 7/84 | 8/84 | 9/84 | 10/84 | 11/84 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 9 | 24 | 27 | 28 | 38 | 48 | 41 | 58 | 68 | 45 | 50 | 53 | 82 | 84 | 96 | 80 | 72 | 67 | 68 | 77 | 93 | 93 | 94 | 95 | 104 | 103 | 111 | 110 | 99 | 94 | 118 | 112 | 129 | 135 | 145 | 141 | 140 | 135 | 140 | 154 | 144 | 133 | 107 | 100 | 83 | 79 | 80 | 35 | 28 | 5 |

## REFERENCES

di Furia, Guilio, M.D., "On the Treatment and Disposition of Sex Offenders," Northwest Medicine.

Dreiblatt, Irwin, Ph.D., "Issues in the Evaluation of the Sex Offender," a presentation at the Washington State Psychological Association meeting, May 1982.

MacDonald, George J., Williams, Robinson, M.S.W, and Nichols, H. R., M.A., "Treatment of the Sex Offender, a Report on the First Ten Years of a Hospital Program." Western State Hospital, Fort Steilacoom, Washington November 1, 1968.

McGovern, Kevin B., Ph.D., "The Sexual Psychopathy Program at Western State Hospital: A plan for positive growth and development." Division of Mental Health, D.S.H.S. Washington State, November 1980.

Exh. 92 - 000556





JD & "BIG AL" PARKS





Exh. 93 - 000557