**ORIGINAL**

STATE OF IDAHO
COUNTY OF KOOTENAI } SS
FILED:

2006 JAN 17 AM 10: 36

CLERK DISTRICT COURT

DEPUTY

John M. Adams, Public Defender
Office of the Kootenai County Public Defender
PO Box 9000
Coeur d'Alene, Idaho 83816-9000
Phone: (208) 446-1700;  Fax: (208) 446-1701
Bar Number: 3504

## IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF KOOTENAI

| | |
|---|---|
| STATE OF IDAHO, )<br><br>Plaintiff, )<br><br>V. )<br><br>JOSEPH E. DUNCAN, III )<br><br><br>Defendant. ) | CASE NUMBER   CR-05-0013674<br>Fel<br><br><br>MOTION FOR CHANGE OF VENUE |

The Defendant, Joseph E. Duncan, III, by and through his attorney, John M. Adams, Public Defender, hereby moves this Court for a change of venue. By this Motion, Duncan requests a jury pool from outside Kootenai County. This Motion is made pursuant to the 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution; Art. I, §§ 1, 6, 7, 13, and 18 of the Idaho State Constitution; I.C.R., Rules 21 and 22; and I.C. §§19-1801, *et seq.*

The grounds for this Motion are that owing to publicity about this case, a fair and impartial trial cannot be had in this county.

## STANDARDS FOR CHANGE OF VENUE
### 1. Presumed Prejudice

The 6th Amendment and Article I, Sections 7 and 13 of the Idaho Constitution guarantee an accused the right to a public trial by an impartial jury. The 5th and 14th Amendments, and Article I,

MOTION FOR CHANGE OF VENUE - 1

Exh. 100 - 000698

Section 13 guarantee that no man shall be deprived of life, liberty, or property without due process of law.   The Supreme Court has given practical meaning and definition to these constitutional provisions in the landmark decisions of *Irvin v. Dowd*, 366 U.S. 717 (1961); *Rideau v. Louisiana*, 373 U.S. 723 (1963); and, *Shepard v. Maxwell*, 384 U.S. 333 (1966). *See also, Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985) (combination of pre-trial publicity and an inflamed community atmosphere could lead to a presumption of prejudice requiring a change of venue).

Collectively, these constitutional decisions recognize that when there has been pervasive media coverage concerning a case which has the effect of establishing the guilt of the accused, or when a community has been so inflamed that there is a reasonable likelihood a fair trial cannot be obtained, prejudice is presumed.  The instant case falls squarely within both of those descriptions.

In deciding whether to grant this Motion, this Court is respectfully requested to consider the doctrine of presumed prejudice articulated by the United States Supreme Court in *Sheppard v. Maxwell*, 384 U.S. 333, 85 S.Ct. 1507 (1966).

*Sheppard* defined the constitutional test for granting a change of venue in cases where prejudice is presumed as the result of pretrial publicity:

> Due process requires that the accused receive a fair trial by an impartial jury free from outside influences.  Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused.
> [....] Where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.

*Id.*, 384 U.S. at 364, 86 S. Ct. at 1522 (emphasis added); *accord, State v. Hall*, 111 Idaho 827, 727 P.2d 1255 (Ct. App. 1986).

The Fifth Circuit , interpreting *Sheppard*, restated the test for presumed prejudice in *Pamplin v. Mason*, 364 F.2d 1 (5th Cir. 1966), *cited with approval in Groppi v. Wisconson*, 400 U.S. 505, 508 n. 6 (1971).  Writing for the panel in *Mason*, Judge Wisdom wrote:

**MOTION FOR CHANGE OF VENUE - 2**

Exh. 100 - 000699

> The test is no longer whether prejudice found its way into the jury box at trial. ... [T]he test is: Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as change of venue, to assure a fair and impartial trial.

*Mason*, 364 F. 2d at 5.

The administration of justice favors a venue transfer where pretrial publicity has been so pervasive that jurors' assurances of impartiality cannot be considered reliable. As the Court stated in *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S. Ct. 1639, 1645 (1961):

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often it's father.

*See, also, id.*, 366 U.S. at 729-30, 81 S. Ct. at 1646 (Frankfurter, J., concurring) ("How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding the matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception.").

The publicity related to this case has been ubiquitous.

Similarly, where pretrial publicity and other prejudicial factors in the district indicate that the process of empanelling a jury will be extremely time-consuming, the administration of justice favors a transfer of venue. In *United States v. Tokars*, 839 F.Sup. 1578, 1584 (N.D. Ga. 1993), the district court granted a change of venue notwithstanding survey evidence that 30 percent of those polled had no opinion about the case. The court explained:

> Of course, the difficult task would be ascertaining which prospective jurors in fact are unbiased. Where the negative publicity has been so intense, the court's task would be made more difficult by prospective jurors' subconscious recollections of news coverage.

**MOTION FOR CHANGE OF VENUE - 3**

Exh. 100 - 000700

In *U.S. v. Engleman*, 489 F. Supp. 48, 50-51, the district court relied on similar reasoning:

> Effective and economical judicial administration is not well served by calling an inordinate and unwieldy number of veniremen to see if an unbiased jury might be obtained, especially when it is already apparent that a substantial chance of intolerable prejudice exists. …A change of venue during voir dire would immeasurably increase the burden, expense, and inconvenience on all parties and the Court, and would result in unacceptable delay. …If the Court did not grant defendants' separate motions for change of venue, this cause would begin with built-in grounds for reversal.

The district court in *Florio*, 13 F.R.D. 296, 298 (S.D.N.Y. 1952), was persuaded by the same considerations:

> The instant case would have been in a state of suspension if on the voir dire a jury could not have been obtained (and the volume and nature of the pretrial publicity indicated that such a result was inevitable). A long adjournment would have been the probable result and many months would have elapsed before the defendant would have been brought to justice. Or, perhaps, the case might have proceeded to trial in this District, under the shadow of a doubt, and only after appeal would there have been any certainty that the procedures by which it was attempted to punish the defendant for his crime – the commission of which he was later to confess – were to any avail.

This type of uncertainty does not serve the administration of justice. As the Supreme Court wrote in *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645 (1961):

> With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion. …

Given the massive pretrial publicity and demonstrated hostility towards Mr. Duncan in this county, a lengthy voir dire of a sizable jury pool will be necessary, with uncertain and unreliable results. In all likelihood it will not be possible to empanel a jury, and if one is seated, there will remain a cloud of reversible error throughout the trial. No trial is error-free, and any errors that do occur will be reviewed in light of uncertainty about whether the jury was truly free of the prejudicial effects of pretrial publicity in the first place. *See, e.g., United States v.*

**MOTION FOR CHANGE OF VENUE - 4**

Exh. 100 - 000701

*Williams*, 523 F.2d 1203 (5th Cir. 1975) (conviction reversed based on the combined effects of prejudicial pretrial publicity and improper argument by the prosecutor).

Inconvenience to the government does not weight heavily against a venue change in this case.   The question of venue is one of Mr. Duncan's constitutional right to a fair trial in a fair forum. The administration of justice is best served by a change of venue.  Inconvenience to the government does not compel a contrary result.

The constitutional requirement that a juror be "as indifferent as he stands unsworn," *Irvin*, 366 U.S. at, 722, 81 S.Ct. at 1624, is not a legal abstraction.  Only the indifferent juror can provide the indispensable, bedrock requirement for a fair trial – a verdict based only on the evidence presented in court.

Generally, voir dire is the procedure used to identify those jurors whose objective connection to the case, based either on prior experiences, relationships, or associations, warrant excusal for cause based on presumed prejudice.  In some cases, however, the circumstances that would generally excuse a juror for cause are so widespread in a community that voir dire is both inadequate and inefficient for ensuring the defendant a fair trial.  This is true, for example, where the community has a strong local interest in the trial and/or there is widespread hostility about the charged offense and the defendant. *See, e.g., United States v. Hoffa*, 205 F. Supp. 710, 722 (D. Fla. 1962), *cert. denied*, 371 U.S. 892, 83 S.Ct. 168 (1962); *Florio*, 13 F.R.D. 296, 298 (S.D. New York (1952); *United States v. Holder*, 399 F. Supp. 220, 227-28; (D.S. Dakota 1975); *United States v. Rossiter*, 25 F.R.D. 258, 259-60 (D. Puerto Rico 1960).  In these cases, a change of venue was a necessary safeguard to protect the defendant's constitutional right to a fair trial by a panel of indifferent jurors.

In this unique case, voir dire is not a reliable safeguard of Mr. Duncan's constitutional right to a fair trial.

The unique circumstances of this case also make it enormously impractical to wait until voir dire to determine whether it is possible to empanel a fair jury for this trial.  A trial of this magnitude and expected duration cannot be moved on short notice.  If, as Duncan maintains, an unbiased panel cannot be selected in Kootenai County, the attempt to find a suitable panel

**MOTION FOR CHANGE OF VENUE - 5**

Exh. 100 - 000702

through voir dire will fail. As a result, there will be substantial delay before trial could begin in a new venue. Additional delay in the trial would be fundamentally unfair to Mr. Duncan. *See, e.g., United States V. Abrahams*, 466 F.Supp. 552, 557 (D. Mass 1978) (noting unfairness of delaying proceedings to allow effects of prejudicial publicity to subside, if such were possible.)

Under the unique circumstances of this case and in light of the wealth of evidence justifying a finding of presumed prejudice, the most prudent, rational and legally sound course of action is to grant this Motion.

### 2. Standard Under Rule 21

Duncan believes the standard under I.C.R., R. 21 and F.R.C.P., R. 21 are the same; therefore, Duncan will refer to federal cases interpreting Rule 21. *See also, State v. Yager*, 139 Idaho 680, 85 P.3d 656 (2002)and *State v. Hall*, 111 Idaho 827, 727 P.2d 1255 (Ct. App. 1986).

In *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171 (1959), the Supreme Court reversed Howard Marshall's conviction for dispensing prescription drugs without a license. During his trial, seven of the twelve jurors read or scanned newspaper articles which detailed Marshall's previous felony convictions for practicing medicine without a license. The Supreme Court ordered that a new trial must be granted in spite of juror assurances that they would not be influenced by the news articles and could decide the case on the evidence. The Court decided the case on the basis of its authority, under court rules, to supervise federal criminal proceedings, not on the basis of the due process clause of the Fifth Amendment:

> In the exercise of our supervisory powers to formulate and apply proper standards for enforcement of the criminal law in the federal courts (*Bruno v. United States*, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257; *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819) we think a new trial should be granted.
>
> Reversed.

Id, 360 U.S. at 313.

In his dissent in *Rideau v. Louisiana, supra*, Justice Clark articulated the difference between the Court's supervisory standard and the due process standard for assuring a fair trial. Justice Clark's

**MOTION FOR CHANGE OF VENUE - 6**

Exh. 100 - 000703

statement makes clear that the Court's supervisory standard may require remedial action even when the constitutional standard does not:

> At the outset, two matters should be clearly established. First, I do not believe it within the province of law enforcement officers actively to cooperate in activities which tend to make more difficult the achievement of impartial justice. Therefore, if this case arose in a federal court, over which we exercise supervisory powers, I would vote to reverse the indent before us. Cf. *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). It goes without saying, however, that there is a very significant difference between matters within the scope of our supervisory powers and matters which reach the level of constitutional dimension.

*Rideau v. Louisiana*, 373 U.S. at 728, 729 (Clark, J., dissenting) (emphasis supplied).

Federal Courts have repeatedly recognized the lesser showing of prejudice to require a change of venue under Rule 21. In *United States v. McNeill*, 728 F.2d 5, 9 n.5, (1st Cir. 1984) the Court stated:

> In the exercise of our supervisory powers over the federal district courts, we may make a finding of juror bias on a lesser showing of prejudice than would be required under the constitutional standard applicable to state courts. See *Murphy v. Florida*, 421 U.S. 797-803, 95 S.Ct. 2034-2037; *Marshall v. United States*, 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959) (per curium).

The federal district courts have applied the less stringent standard for change of venue and granted transfers in a number of cases prior to an attempt to seat a jury. Because these cases also bear striking similarities to the instant case, many of their facts will be detailed here. Collectively, these decisions establish that in a federal case Rule 21(a) requires a transfer upon a showing much less compelling than the showing made herein by Duncan. Even in cases which have attracted national publicity, it is not enough to shrug off the transfer request and say it matters not. The impact of the publicity upon the local community must be examined. Factors considered include whether government agents have been responsible for prejudicial reports (thus giving them credence) and the amount of investigative reporting undertaken by the media (evidencing local interest). Juror assurances of impartiality mean little when daily news repeatedly describes the "facts" of the case.

**MOTION FOR CHANGE OF VENUE - 7**

Exh. 100 - 000704

In *United States v. Moody*, 762 F.Supp. 1485 (N.D. Ga. 1991), Walter LeRoy Moody was charged in a 72 count superseding indictment with the 1989 mail bomb deaths of 11th Circuit Court of Appeals Judge Robert Vance and civil rights attorney Robert E. Robinson. The case received national media attention, including extensive coverage in the New York Times. The return of the indictment was announced in Washington, D.C., by Attorney General Dick Thornburg and F.B.I. Director William S. Sessions. The investigation had taken eleven months and federal agents spent more, than 140,000 hours in their work. Moody presented four hundred fifty-eight representative news articles about him and his case that were printed in twelve newspapers published in the Northern District of Georgia. *Id*, 762 F.Supp. 1488 at n.3. The evidence in support of the motion for change of venue included statements from federal law enforcement officials indicating that the case against Moody was strong. The Court determined "that there has been inordinate, widespread, and prejudicial publicity concerning this case and that government agents had been responsible for much of it." *Id*, at 1490. In determining that the Motion for Change of Venue should be granted the Court relied upon *Pamplin v. Masson*, 364 F.2d I (5th Cir. 1966). In *Pamplin* the Court held:

> As we read the Supreme Court cases, the test is: Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable safeguards, such as change of venue, to assure a fair and impartial trial.

*Id* 364 F.2d at 5.

The *Moody* Court relied upon *Pamplin, Marshall v, United States*, and the A.B.A. standards for criminal justice to formulate the standard for determination of a motion for change of venue in a federal prosecution court:

> The Court interprets the above authorities to require that a Motion for Change of Venue be granted whenever: (1) the Court "is satisfied" of the existence of great prejudice; (2) outside influences affecting the community's opinion as to the defendant are "inherently suspect"; (3) there is "reasonable likelihood that prejudicial news prior to trial will prevent a fair trial"; or (4) there is "substantial likelihood" a fair trial cannot be had in the absence of transfer.

*Id* at 1487.

**MOTION FOR CHANGE OF VENUE - 8**

The Court found further support for a venue transfer under the federal judiciary's exercise of its supervisory powers. The Court stated that the supervisory power in administration of the federal criminal laws provides "an even more exacting fairness standard on this issue". *Id* at 1490. (emphasis supplied).

Ultimately the Court determined that a Change of Venue was appropriate under both standards because *Moody* had demonstrated a reasonable likelihood that prejudicial news prior to trial would prevent a fair trial (the Due Process standard) and had also made a strong showing under the Court's supervisory standard, Rule 21, that he was entitled to a change of venue. *Id* at 1490.

In granting the change of venue the Court determined that the case should be transferred well outside the normal range of Atlanta media coverage in order to obtain jurors least influenced by the adverse publicity. The Court also recognized that a venue change is usually more effective if it is transferred to a more, rather than less, metropolitan community because a big case in a small town quickly becomes a "*cause celebre*" and the focus for even more publicity. See *United States v. Chapin*, 515 F.2d 1274, 1288 (D.C. Cir. 1975), cert. denied, 423 U.S. 1015, 96 S.Ct. 449, 460 L.Ed.2d 387 (1975). Convenience is also a factor and the Court determined the availability of non-stop plane flights between the two districts was appropriate. Also considered were security and a convenient place for lodging the defendant and witnesses in custody and a place where United States Court facilities were readily available. *Id* at 149. The case was transferred from the Northern District of Georgia to the District of Minnesota in St. Paul in the Eighth Circuit.

In *United States v. Abrahams*, 453 F.Supp. 749 (D. Mass. 1978), Alan H. Abrahams was charged with a violation of 18 U.S.C. § 1001 in submitting a false affidavit to a magistrate. In support of his Motion for Change of Venue, Abrahams submitted an Affidavit with 78 photocopied pages of articles from Boston Newspapers concerning the case. The record was replete with statements concerning Abrahams' record of convictions and arrests, and there were zealous attempts by the media to arouse the community against him.

**MOTION FOR CHANGE OF VENUE - 9**

Exh. 100 - 000706

At the hearing on the motion for change of venue, the defendant introduced voluminous newspaper articles concerning the case. The bulk of the articles were drawn from the Boston Globe and the Boston Herald American which were the two major metropolitan daily newspapers in Boston with a huge circulation in most of eastern Massachusetts. Articles were also submitted from the New York Times, the Wall Street Journal, the Tampa (Florida) Tribune, and Time magazine. There were also stories which emanated from wire services for distribution and publication in newspapers throughout the rest of the nation. The defendant also submitted 38 pages of broadcast transcripts from local T.V. news. The record was replete with pejorative characterizations of the defendant and descriptions of the evidence against him, which present the greatest hazards to a fair trial. *Id* at 753. The Court determined that the excessive pretrial publicity created in the District of Massachusetts an atmosphere of pervasive community prejudice so inflammatory as to "substantially reduce the reasonable likelihood of Abrahams attaining a fair trial before a panel of impartial jurors anywhere in the district." *Id* at 753.

The Court also determined it would be impossible for Abrahams to receive a fair trial anywhere in Massachusetts, the northeastern section of the United States, New York, New Jersey, or Pennsylvania. The Court declined the Government's invitation to grant a minor change of venue from Boston to Springfield. The Court transferred the case from the District of Massachusetts to the Western District of Texas in San Antonio in the Fifth Circuit as a forum where Abrahams could obtain a fair trial before jurors whose verdict would be based upon the evidence.

In *United States v. Florio*, 12 F.R.D. 296 (S.D. N.Y. 1952), Edward Florio had been charged in United States District Court for the Southern District of New York in connection with activities at the New York water front docks. The case received extensive publicity in part because the New York State Crime Commission was concurrently investigating conditions on the New York water front. Articles appeared on the morning set for jury selection which described Florio as a mobster and leader of a notorious organization know as the "Ed Florio Gang". Reference was made to the fact that Florio was an ex-convict. In reference to the local nature of the publicity, the Court stated:

**MOTION FOR CHANGE OF VENUE - 10**

Exh. 100 - 000707

The issues which these newspaper articles discussed concerned a matter of peculiarly local interest. Public interest in the work of this commission was and is great and it is understandable that the newspapers of this city would endeavor to bring to the citizens of New York a full coverage of the activities and disclosures of that commission. It was also reasonable to assume that because of this great local interest, the amount of coverage which these matters received and the interest created by these articles in the New York area was far in excess of that accorded this subject elsewhere.

*Id*, 13 F.R.D. 296 at 298.

The Court granted the defendant's Motion for a Change of Venue pursuant to the provisions of Rule 21(a) and transferred the case to the District of Columbia for trial. The Court granted the Motion for Change of Venue because the publicity had been intense, critically timed, and indubitably prejudicial. The Court granted the Motion in order to prevent subsequent questions concerning the fairness of the proceeding.

In *United States v. Tokars*, 839 F.Supp. 1578 (N.D. Ga. 1993) the Court undertook a detailed analysis of the due process standard for change of venue and compared it to the standard required under the Supreme Court's supervisory power. In *Tokars*, the defendant was charged with racketeering, money laundering, drug conspiracy, and various acts of violence including an interstate telephone call to procure the murder of his wife. The case received widespread media coverage in the local newspaper and television reports, Stories concerning the case numbered in the thousands.

Tokars filed a Motion for Change of Venue pursuant to the provisions of Rule 21(a) of the Federal Rules of Criminal Procedure. The magistrate judge conducted a hearing upon that motion and found that while the publicity in the case had been pervasive, the great majority of the reporting had been essentially factual and thus not of the type necessary to support a Change of Venue. The District Court rejected the magistrate's suggestion and granted the defendant's motion. The Court determined that one .of the unusual aspects of the case was the large amount of investigative reporting which was undertaken by the local media, the vast majority of which was quite negative to the defendant. The Court indicated it was not clear whether or to what extent various allegations which surfaced in the reports would be reflected in the Government's evidence at trial. Using a

**MOTION FOR CHANGE OF VENUE - 11**

Exh. 100 - 000708

quantitative approach only, the Court determined that the magistrate judge was correct in finding that the great bulk of the pre-trial publicity had been factual:

> However, combining the extraordinary volume of coverage (virtually all of which is highly negative to the defendants) with the emotional nature of some of the coverage, one may infer that a widespread bias exists which could interfere with a fair trial.

*Id* at 1582.

The District Court noted that the defendant's own poll revealed that at least 30% of the citizens in the district had no opinion whatsoever about the case. There were a sufficient number of unbiased jurors in the district from which to select a jury panel. The Court noted that the difficult task would be in ascertaining which jurors were in fact unbiased, and the difficulty that prospective jurors would have in subduing subconscious recollection of news coverage. The Court found that the defendant had made a sufficient showing that prejudice should be presumed and that a change of venue was constitutionally mandated.

The Court also held that the federal standard for change of venue had been met:

> Turning to an alternative analysis of the Motions for change of venue under the principles of the *Marshall* case, the Court similarly finds that a change of venue should be granted. The decision on this basis is not a close one. Given the extraordinary degree of pre-trial publicity, the difficulty of identifying truly unbiased jurors, the inconvenience of rescheduling the trial should voir dire prove unsuccessful in identifying unbiased jurors, and the availability of a relatively convenient, suitable alternative venue in Birmingham, Alabama, the Court finds that change of venue prior to attempting jury selection is clearly warranted.

*Id* at 1584.

In *United States v. Ingleman*, 489 F.Supp. 48 (E.D. Mo. 1980), Glennon E. Ingleman faced federal charges of damaging a vehicle in interstate commerce by means of an explosive. The case received widespread media attention in the greater St. Louis metropolitan area and during an evening newscast, a St. Louis County Prosecutor indicated that the press release of a key witness' statement would not hurt the government's case. The evidence indicated saturation coverage by the St. Louis

**MOTION FOR CHANGE OF VENUE - 12**

Exh. 100 - 000709

media concerning the case. In determining that the defendant's motion for change of venue pursuant to Rule 21(a) should be granted the Court stated:

> The trial judge has a non-delegable responsibility under Rule 21 of the Federal Rules of Criminal Procedure and the United States Constitution to insure that a defendant receive a fair and impartial trial.

*Id* at 49.

The Government argued that the defendant's motion was premature and urged that the decision could be made at the time of voir dire. The Court rejected the Government's argument, and held that massive publicity-may diminish the efficacy of voir dire in screening prospective jurors. The Court noted that there were major logistical problems concerning hotel accommodations, transportation and lodging for witnesses, attorneys, and staff. The Court noted that to await voir dire would require summoning hundreds of qualified venireman for a panel which in all likelihood would not be used. Change of venue during voir dire would immeasurably increase the burden, expense and inconvenience on all parties concerned and would result in unacceptable delay. The Court ordered the case transferred from the Eastern District of Missouri at St. Louis to the District of Minnesota.

One of the articles the Court found to be extremely prejudicial included a story in the St. Louis Globe Democrat which quoted the St. Louis Prosecutor, Circuit Attorney Peach. The headline read, "Peach Says He'll Seek Death Penalty Against Ingleman In Bombing". Other headlines that the Court relied upon: "Ingleman Pleads Innocent of Bombing and Conspiracy". The article quoted a U.S. Attorney as stating that one of the witnesses in the case had been granted immunity. Another article was entitled "Widow Tells of Plot to Kill Halm". This article detailed the reason the Government had been willing to cut a deal with an informant.

In *United States v. Holder*, 399 F.Supp. 320 (D.S.D. 1975) the defendants were charged with federal offenses arising out of the "Wounded Knee takeover" on the Pine Ridge Indian Reservation in South Dakota during the spring of 1973. In support of their motion for change of venue the defendants submitted survey data and evidence of massive publicity surrounding the incident. The

**MOTION FOR CHANGE OF VENUE - 13**

Exh. 100 - 000710

defendants demonstrated that there was a deeply felt prejudice toward Indians which was reinforced by the Wounded Knee incident.

The Court granted the defendants' motion without a hearing. The Court determined that the documentary evidence established there was "a reasonable likelihood of impairing the defendants' rights to a fair trial on the charges now outstanding against them in connection with the Wounded Knee takeover." *Id* at 328. The Court transferred the case to the United States District Court for the Northern District of Iowa as a venue where the defendants might obtain a fair trial. The Court held that the due process right to a fair trial which inures to the benefit of an accused in a federal trial through the Fifth Amendment required a venue transfer, even prior to voir dire and the attempt to select a jury. The Court relied in part upon *United States v. Marcello*, 280 F.Supp. 510 (E.D. La. 1968), affirmed 423 F.2d 993 (5th Cir. 1970), cert. denied, 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970).

In *Marcello*, the defendant was charged with forcibly assaulting and intimidating an F.B.I. agent in New Orleans. Prior to trial there had been an avalanche of publicity in the New Orleans area which described Carlos Marcello as the leader of the Cosa Nostra or Mafia in Louisiana. There was also a photograph accompanying an article which depicted the defendant striking an F.B.I. agent.

In granting defendant's motion for change of venue prior to an attempt to select a jury, the Court carefully analyzed the provisions of Rule 21(a) and the discretion of the trial court. The Court stated:

> It could hardly be suggested that the vital constitutional right to a fair and impartial trial hinges upon the discretion of a trial judge. This should demonstrably illustrate the difference. The rule is preventive. It is anticipatory. It is not solely curative as is a post conviction constitutional attack. Thus, the rule evokes foresight, always a more precious gift than hindsight, and for this reason the same certainty which warrants the reversal of the conviction will not always accompany the change of venue. Succinctly, then, it is the well grounded fear that the defendant will not receive a fair and impartial trial which warrants the application of the rule. *Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965).

*Id* at 513.

**MOTION FOR CHANGE OF VENUE - 14**

The Court noted that when publicity had begun to subside the community's interest in the case was revived and revitalized by an article appearing in *Life* magazine. The Court recognized that Life magazine had a national circulation, but determined that trial in another state was appropriate nonetheless. The Court recognized that "the articles primarily concerned with Marcello were not read in most other states with as much interest, or with the same effect, as here in Louisiana." *Id* at 517.

There have been a number of other federal court decisions which have granted Change of Venue under the provisions of Rule 21(a) without much discussion. For example, in *United States v. Borders*, 693 F.2d 1318 (11th Cir. 1982), the defendant's case for unlawfully traveling in interstate commerce with intent to commit bribery was transferred from the Southern District of Florida to the Northern District of Georgia. *Id* at 1319. In *United States v. Mazzei*, 400 F.Supp. 17 (W.D. Pa. 1975), the Court ordered a transfer of venue under the provisions of Rule 21(a) because of adverse pre-trial publicity received by the defendant who was a former member of the senate of Pennsylvania. The Court determined that the case must be transferred to a district outside of Pennsylvania and set the trial at the United States District Court for the District of Delaware. *Id* at 20. In *Brinlee v. United States*, 496 F.2d 351 (5th Cir. 1974), Garland Rex Brinlee was originally charged in the Northern District of Oklahoma with carrying an explosive during the commission of a felony in violation of 18 U.S.C. § 844(h). Subsequent to indictment the action was transferred from Tulsa, Oklahoma, to Bismarck, North Dakota, for trial because of the extensive publicity the case had received in Oklahoma. *Id* at 353.

**MOTION FOR CHANGE OF VENUE - 15**

Exh. 100 - 000712

CONCLUSION

The pre-trial publicity in this case has been extensive and unduly prejudicial to Duncan. Based upon the record as a whole and evidence and argument to be presented at the hearing herein, this Court is requested to grant this Motion.

DATED this _____ day of January, 2006.

OFFICE OF THE KOOTENAI
COUNTY PUBLIC DEFENDER

BY: _____
JOHN M. ADAMS
PUBLIC DEFENDER

STATE OF IDAHO } ss
COUNTY OF KOOTENAI
THIS IS TO CERTIFY THAT THE FOREGOING IS
A TRUE COPY OF THE ORIGINAL NOW ON
FILE OR RECORD IN THIS OFFICE.
SEALED ON THIS 21 DAY OF Feb 2017
JIM BRANNON, CLERK OF THE DISTRICT
COURT BY_____
Deputy

page 16 of 17

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was personally served by placing a copy of the same in the interoffice mailbox on the _17th_ day of January, 2006, addressed to:

Kootenai County Prosecutor

_Linda Swenson_

**MOTION FOR CHANGE OF VENUE - 16**

TABLE OF AUTHORITIES

C<small>ASES</small>

*Brinlee v. United States*, 496 F.2d 351 (5th Cir. 1974) ................................................................ 15

*Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985) ..................................................................... 2

*Irvin v. Dowd*, 366 U.S. 717 (1961) ....................................................................................... 2, 3

*Marshall v. United States*, 360 U.S. 310, 313, (1959) ............................................................... 6, 7

*Pamplin v. Masson*, 364 F.2d I (5th Cir. 1966) .................................................................... 2, 8, 9

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ............................................................................. 2, 7

S*hepard v. Maxwell*, 384 U.S. 333 (1966) ................................................................................ 2

*State v. Hall*, 111 Idaho 827, 727 P.2d 1255 (Ct. App. 1986) ................................................... 2, 6

*United States v. Abrahams*, 453 F.Supp. 749 (D. Mass. 1978) ................................................. 5, 9

*United States v. Borders*, 693 F.2d 1318 (11th Cir. 1982) ......................................................... 14

*United States v. Chapin*, 515 F.2d 1274, 1288 (D.C. Cir. 1975) ................................................... 9

*United States v. Engleman*, 489 F.Supp. 48 (E.D. Mo. 1980) .................................................. 3, 12

*United States v. Florio*, 12 F.R.D. 296 (S.D. N.Y. 1952) ........................................................ 4, 10

*United States v. Hoffa*, 205 F.Supp. 710, 722 (D. Fla.1962) ........................................................ 5

*United States v. Holder*, 399 F.Supp. 320 (D.S.D. 1975) ....................................................... 5, 13

*United States v. Marcello*, 280 F.Supp. 510 (E.D. La. 1968), affirmed 423 F.2d 993 (5th
    Cir. 1970), cert. denied, 398 U.S. 959 (1970) ..................................................................... 14

*United States v. Mazzei*, 400 F.Supp. 17 (W.D. Pa. 1975) ....................................................... 15

*United States v. McNeil*, 728 F.2d 5, 9 n.5, (1st Cir. 1984) ........................................................ 7

*United States v. Moody*, 762 F.Supp. 1485 (N.D. Ga. 1991) .................................................... 7-9

*United States v. Rossiter*, 25 F.R.D. 258, 259-260 (D. Puerto Rico 1960) .................................... 5

*United States v. Tokars*, 839 F.Supp. 1578 (N.D. Ga. 1993) .................................................. 3, 11

*United States v. Williams*, 523 F.2d 1203 (5th Cir. 1975) ......................................................... 4

Exh. 100 - 000714

ORIGINAL

STATE OF IDAHO   } SS
COUNTY OF KOOTENAI }
FILED:

2006 JAN 24  PM 3: 31

CLERK DISTRICT COURT
DEPUTY

WILLIAM J. DOUGLAS
Kootenai County Prosecuting Attorney
501 N. Government Way/Box 9000
Coeur d'Alene, ID  83816-1971
Telephone:  (208) 446-1800

ASSIGNED ATTORNEY(S):
WILLIAM J. DOUGLAS, LANSING L. HAYNES
AND RICK BAUGHMAN

IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE

STATE OF IDAHO, IN AND FOR THE COUNTY OF KOOTENAI

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | Case No. **CRF06-13674** |
| | ) | |
| Plaintiff, | ) | |
| | ) | STATE'S MEMORANDUM |
| | ) | OPPOSING CHANGE OF VENUE |
| | ) | AND IN SUPPORT OF |
| vs. | ) | INDIVIDUAL VOIR DIRE |
| | ) | JOSEPH E. DUNCAN III |
| JOSEPH EDWARD DUNCAN, III, | ) | |
| | ) | |
| Defendant. | ) | |

## THE IDAHO SUPREME COURT RECENTLY AFFIRMED WELL ESTABLISHED LAW IN *STATE OF IDAHO V. SCOTT YAGER* THAT THE TRIAL JUDGE'S BROAD DISCRETION WILL NOT BE DISTURBED IN DENYING A CHANGE OF VENUE.

State of Idaho v. Scott D. Yager, 139 Idaho 680, 85 P.3d 656 (2004), is

dispositive of defendant's *Motion for Change of Venue* and is a very recent statement of

Idaho law.  Yager also follows a long line of Idaho Supreme cases which have never

reversed a trial judge's discretion in denying a motion for change of venue even in the

most notorious of cases which received massive  publicity.

STATE'S MEMORANDUM OPPOSING        1
CHANGE OF VENUE AND IN
SUPPORT OF INDIVIDUAL VOIR DIRE

Exh. 100 - 000715

Yager was convicted by a Kootenai County jury trial of the First Degree Murder of Idaho State Trooper Linda Huff. The State alleged that the defendant murdered Trooper Huff on the night of June 17, 1998, in the parking lot of the Idaho State Police District Headquarters in Coeur d'Alene, Idaho. Concisely stated, Judge James Judd denied the defendant's motion for change of venue based on pretrial publicity, but allowed the subject to be revisited during the jury selection process. After the individual voir dire of seventy-six jurors, Judge Judd again denied the defendant's renewed motion for a change of venue, or alternatively, that an out of county jury be selected and transported to Kootenai County. In citing an established line of Idaho cases, the Idaho Supreme Court held that denial of the motion was not an abuse of the trial court's discretion. Thirty of the seventy-six jurors jurors questioned stated that they had formed an opinion that Yager was guilty, and fifteen of those were excused for cause. The remaining fifteen who were not excused stated that they could set aside any opinions they had formed from news accounts, listen to the evidence presented in court, and decide the case solely on the evidence.

The Yager case generated massive publicity because of Trooper Linda Huff's status as the first female police officer murdered while on duty, and because of her execution style murder at the Idaho State Police District Headquarters parking lot. The publicity included quotes from then Governor Batt commenting on the murder, the prosecutor, and letters to the editor calling for justice, speculating as to Yager's guilt and motive, and calling for proper punishment. Trooper Huff was lauded as a heroine who forfeited her life protecting her headquarters from an armed invader. Included in the defense materials submitted in a three ring binder, were news clippings and transcripts of

STATE'S MEMORANDUM OPPOSING        2
CHANGE OF VENUE AND IN
SUPPORT OF INDIVIDUAL VOIR DIRE

Exh. 100 - 000716

television coverage of the statewide funeral at which Trooper Huff was eulogized by the governor, a large local memorial service, and a steady stream of remembrances and fundraisers for her family. Contained in the coverage were numerous calls for justice, appropriate punishment, and speculation about motive.

## IN THE YAGER DECISION, THE IDAHO SUPREME COURT RELIED ON A LONG LINE OF IDAHO CASES IN UPHOLDING THE TRIAL JUDGE'S DISCRETION DENYING THE MOTION FOR CHANGE OF VENUE.

While the defendant relies on federal cases for the notion that there is a presumption of prejudice because of widespread publicity, the bar for presumed prejudice in federal court is high. Indeed, when "the vast majority of the media accounts are largely factual in nature," prejudice is not presumed. Harris v. Pulley, 885 F.2d 1354, 1362 (9th Cir. 1989). In Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993), the media coverage included details of the defendant's criminal history, a sheriff's statement that the defendant was armed and dangerous, details about the nature of the murders and the defendant's arrest and the progress of the investigation. The Ninth Circuit concluded because the nature of the news coverage was factual and not inflammatory, prejudice could not be assumed.

Idaho cases give great discretion to the trial judge and support the notion that there is a presumption of a prospective juror's impartiality, not prejudice. As explained in Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031 (1975), a United States Supreme Court opinion often cited by the Idaho Supreme Court:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Emphasis added.

STATE'S MEMORANDUM OPPOSING          3
CHANGE OF VENUE AND IN
SUPPORT OF INDIVIDUAL VOIR DIRE

In Idaho, a motion for a change of venue is addressed to the sound discretion of the trial court. State v. Winn, 121 Idaho 850, 828 P.2d 879 (1992); State v. Leavitt, 116 Idaho 285, 775 P.2d 599 (1989); State v. Hall, 111 Idaho 827, 727 P.2d 1255 (Ct. App. 1986). The trial court's discretion in these matters is recognized both by statute, I.C. §19-1801, and by court rule, Idaho Criminal Rule 21. The Court's decision to try a case in a particular venue is tested by whether, in the totality of circumstances, juror exposure will result in a trial that is not fundamentally fair. Murphy v. Florida, supra., cited in State v. Winn, supra at 856. Publicity in itself does not require a change of venue. State v. Custodio, 136 Idaho 197, 30 P.3d 975 (Ct. App. 2001); State v. Gray, 129 Idaho 784, 800, 932 P.2d 907 (Ct.App. 1997); State v. Hyde, 127 Idaho 140, 145, 898 P.2d 71 (Ct. App. 1995).

Otherwise stated, "The trial court does not need to find jurors that are entirely ignorant of the facts and issues involved in the case." State v. Hairston, 133 Idaho 496, 506, 988 P.2d 1170 (1999). Indeed, any request for a change of venue based on claims of prejudicial pretrial publicity may be tested during voir dire. See State v. Dambrell, 120 Idaho 532, 536, 817 P.2d 646 (1991). In this regard, the United States Supreme Court stated in Irvin v. Dowd, 366 U. S. 717, 721 (161) that:

> It is not required that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases.

The quality of reportage is a factor to consider in determining whether pretrial publicity precludes the possibility of a fair trial. If the articles or other media coverage contain mere "factual accounts of arraignment and pretrial events and not containing editorials or opinions tending to arouse the feelings of passion of the public" an impartial trial is not denied. State v. Needs, 99 Idaho 883, 890, 591 P.2d 130, 137 (1979), citing State v. Bitz, 93 Idaho 239, 460 P.2d 374 (1969).

## THE STATE SUGGESTS THAT POTENTIAL JURORS BE QUESTIONED CONCERNING THEIR QUALIFICATIONS IN THE MANNER THAT WAS APPROVED BY THE IDAHO SUPREME COURT IN STATE V. YAGER.

The State proposes that a larger than usual jury pool be summoned. Counsel for both sides may submit proposed questions to this court to ascertain 1) whether jurors have formed a fixed opinion of the defendant's guilt or innocence based on pretrial publicity; 2) the nature and content of the pretrial publicity; 3) their ability to cast aside any notion about guilt or innocence and to decide the case on the facts; and, 4) their ability to follow the court's instructions concerning the presumption of innocence and reasonable doubt. Court and counsel can conduct individual voir dire based on questions previously submitted and ask further questions to ascertain qualifications, bias and prejudice. This individual voir dire can be conducted separate and apart from the entire panel to insure candor by the questioned juror and to safeguard the other jurors from any inflammatory responses.

STATE'S MEMORANDUM OPPOSING          5
CHANGE OF VENUE AND IN
SUPPORT OF INDIVIDUAL VOIR DIRE

Exh. 100 - 000719

Using this process, "the court is entitled to rely on assurances from venire persons concerning partiality or bias". Hairston, 133 Idaho at 507. This court will have the opportunity to listen to and evaluate the juror's responses during individual voir dire. Even when a prospective juror expresses an opinion regarding the defendant's guilt because of information from the media, the test is whether the juror could set aside prior beliefs and feelings and follow the court's instructions. Gray, 129 Idaho at 802.

**CONCLUSION**

This court should not presume that a jury pool is prejudiced without first conducting a voir dire examination. Indeed, there have been statewide news accounts about this case. The defendant's chances of selecting impartial jurors in Twin Falls, Rexberg, or Boise, are no greater than his chances of finding impartial jurors in Kootenai County. Juror responses concerning their opinion about the allegations will be no different in Rexberg than in Coeur d'Alene. Juror responses concerning their knowledge and opinion of the case are likely to be similar in Boise as in Coeur d'Alene.

As the state urged in the Yager case, these were crimes committed in this community and an array of Kootenai County citizens should be tested through individual voir dire. It should not be presumed that Kootenai County jurors cannot decide this case based on the facts presented at trial; are unable to follow this court's instructions; are incapable giving the defendant the presumption of innocence; and, will not hold the State to its burden of proof.

STATE'S MEMORANDUM OPPOSING        6
CHANGE OF VENUE AND IN
SUPPORT OF INDIVIDUAL VOIR DIRE

Exh. 100 - 000720

For these reasons, this court should have an opportunity to assess the qualifications of jurors chosen from Kootenai County. After this court and counsel conduct a colloquy with jurors, this court can then exercise its wide discretion in seating an impartial jury. The defendant's motion for a change of venue is premature and should be renewed only after a fair attempt at selecting qualified Kootenai County jurors.

DATED this 24th day of January, 2006.

WILLIAM J. DOUGLAS,
Prosecuting Attorney

## CERTIFICATE OF MAILING

I hereby certify that on the 24th day of Jan, 2006, a true and correct copy of the foregoing was caused to be sent interoffice mail to: JOHN ADAMS, ATTORNEY FOR THE DEFENDANT

And, was sent by FAX to the Shoshone County resident chambers of District Judge Fred M. Gibler.



STATE OF IDAHO
COUNTY OF KOOTENAI } ss

THIS IS TO CERTIFY THAT THE FOREGOING IS A TRUE COPY OF THE ORIGINAL NOW ON FILE OR RECORD IN THIS OFFICE.
SEALED ON THIS 21 DAY OF Feb 2017
JIM BRANNON, CLERK OF THE DISTRICT COURT BY_____ Shaun Patterson
Deputy

page 7 of 7

STATE'S MEMORANDUM OPPOSING          7
CHANGE OF VENUE AND IN
SUPPORT OF INDIVIDUAL VOIR DIRE

Exh. 100 - 000721

ORIGINAL

STATE OF IDAHO  } ss
COUNTY OF KOOTENAI
FILED:

2006 JAN 31  PM 3: 05

CLERK DISTRICT COURT

DEPUTY

John M. Adams, Public Defender
Office of the Kootenai County Public Defender
PO Box 9000
Coeur d'Alene, Idaho  83816-9000
Phone: (208) 446-1700;  Fax: (208) 446-1701
Bar Number:  3504

# IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF KOOTENAI

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | CASE NUMBER    CR-05-0013674 |
| | ) | Fel |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | **REPLY TO STATE'S MEMORANDUM** |
| JOSEPH E. DUNCAN, III | ) | **OPPOSING CHANGE OF VENUE** |
| | ) | |
| | ) | |
| Defendant. | ) | |

The Defendant, Joseph E. Duncan, III, by and through his attorney, John M. Adams, Public Defender, hereby submits the following Reply to the State's Memorandum Opposing Change of Venue.

A fair and impartial jury cannot be found in Kootenai County due to the extensive prejudicial pretrial publicity surrounding this case.  Enlarging the jury pool will not do anything to overcome that pervasive prejudicial publicity because Kootenai County is not a large enough population center to avoid the bias in the community.

I.    **United States Supreme Court and Ninth Circuit case law supports a change of venue because Mr. Duncan cannot receive a fair trial with Kootenai County jurors due to a saturation of prejudicial news coverage.**

The United States Supreme Court's test for granting a change of venue is rather simple:

"...where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                    1

trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell,* 384 U.S. 333, 363 (1966).

The State, in opposing a change of venue, tries to make the point that because a trial court judge in Idaho has never been reversed in his/her decision to deny a change of venue, change of venue is improper in this case. Under this logic, the State is contending that a change of venue is never appropriate; certainly not a reasonable position.

The cases following *Sheppard* flush out and expand on the general rule. *State v. Yager,* 139 Idaho 680, 85 P.3d 656 (Idaho 2004) *and Murphy v. Florida,* 421 U.S. 794 (1975) *and Harris v. Pulley,* 885 F.2d 1354 (9th Cir. 1989). *Yager* sets forth the factors Idaho appellate courts should consider when determining whether the denial of a venue change deprived a defendant of a fair trial:

1) testimony at voir dire from jurors as to whether the jurors had formed an opinion as to the defendant's guilt or innocence based on pretrial publicity
2) whether the defendant challenged any jurors for cause
3) affidavits indicating prejudice or absence of prejudice in the community
4) the nature and content of pretrial publicity
5) the amount of time between the pretrial publicity and the trial

*Yager,* 139 Idaho at 687, 85 P.3d at 663. This multi-factor test names the most prevalent factors to be considered but is not an exhaustive list. *Id.* Also, this test is considered the same as the United States Supreme Court's totality of the circumstances test for reviewing a change of venue decision. *See Murphy, supra* and *Yager, supra.* Obviously, the instant case is not on appellate review. Therefore, *Yager* is not dispositive. Because *Yager* is not controlling and *Sheppard* is, the court should turn its attention to the issue that is outlined in *Sheppard*: prejudicial news coverage. *See Sheppard, supra. Sheppard* is dispositive and the rule applies in this case: there is a reasonable likelihood that prejudicial news coverage will prevent a fair trial, therefore this case must be transferred to another county. *See id.* Certainly, if there was ever a case where a judge

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                    2

would be able to determine that due to the news coverage and publicity there existed a reasonable likelihood that prejudice could be presumed, it is this one. *See id.*

Mr. Duncan agrees that publicity itself does not require a change of venue. Likewise, Mr. Duncan agrees that jurors completely ignorant of the facts and issues involved in this case would be an unreasonable standard, not just for potential Kootenai County jurors, but indeed all Idaho jurors and the vast majority of Americans. *See State v. Hairston*, 133 Idaho 496, 988 P.2d 1170 (Idaho 1999). Publicity is not the issue here. The issue is overly prejudicial publicity in Kootenai County that requires a change of venue. *See Sheppard, supra and Harris, supra.*

The State cites *Harris* for the proposition that when the "vast majority of the media accounts are largely factual in nature," prejudice is not presumed. *Harris*, 885 F.2d at 1360. That may be an appropriate place to stop the inquiry if the vast majority of news coverage regarding Mr. Duncan's case was factual in nature, but it is not. The State does not include in its analysis of *Harris* the outline of the presumed prejudice standard, the standard Mr. Duncan argues should be followed in this case. "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris*, 885 F.2d at 1361. *See also Sheppard*, 382 U.S. at 352-355. The court went on to state "under such circumstances, it is not necessary to demonstrate actual bias." *Harris,* 885 F.2d at 1361 *citing Estes v Texas*, 381 U.S. 532 at 542 (1965).

The impact on the community and the size of the community are two important distinctions between Mr. Duncan's case and the cases cited by the State that deal with presumed prejudice. *See Harris, supra.* In *Harris*, the Ninth Circuit Court of Appeals accepted the California Supreme Court's reasoning that one reason a denial of change of venue was appropriate was the size of community because the size of a community can dissipate the effect

of pretrial publicity. *Harris,* 885 F.2d at 1360 *citing People v. Harris,* 28 Cal.3d 935, 949-950, 623 P.2d 240, 247, 171 Cal.Rptr. 679, 686 (Cal. 1981). Mr. Harris' trial occurred in San Diego in 1979. *Harris, supra.* In 1980, the population of San Diego County was just under two million. http://www.sandiegohistory.org/links/sandiegopopulation.htm.

The State also cites a case from Miami to argue against a change of venue. In *Murphy,* the trial occurred in Miami-Dade County in 1970. *Murphy, supra.* The population of Dade County in 1970 was about 1.3 million. http://www.censusscope.org/us/s12/c86/chart_popl.html. A population of 1.3 million is likely to dissipate any prejudicial effect. *See Harris, supra.*

The State incorrectly cites *Jeffries* as comparable to Mr. Duncan's case. In *Jeffries,* the defendant was convicted of two counts of aggravated first-degree murder in Clallam County, Washington. *Jeffries,* 5 F.3d 1180 (9th Cir. 1993). Clallam County had, at the time of the trial, a population of about 50,000 (36,000 eligible jurors). *Id.* Also, the local newspaper had a circulation of about 13,000. *Id.*

The defendant argued that he was subject to pretrial prejudice from jury members and it impeded his right to a fair trial. *Jeffries, supra.* The court examined the evidence (news reports) before trial and concluded that the news reports included: an account of the defendant's criminal history; sheriff's statements that the defendant was armed and dangerous while on the run and that the murders were premeditated; details about the murder; details of the arrest; details concerning progress of investigation. *Id.* at 1189.

The *Jeffries* court reasoned that although those details may themselves cause people in the community to be outraged that the crime happened, it was not inflammatory in the sense that it was malicious toward the defendant. *See Jeffries, supra.* The media accounts were largely factual in nature, rather than purely inflammatory against the accused. *Id.* The court held that

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                    4

"prejudice is presumed when the record indicates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. *Jeffries*, 5 F.3d at 1189 *citing Harris*, 885 F.2d 1354, 1361. Saturation occurs only in extreme circumstances. *Jeffries*, *supra*. In the *Jeffries* case, the media publicity was substantial but it was factual in nature and related to the crimes being charged. *Id.*

Mr. Duncan's case is substantially different. For the last six months, the media attention surrounding this case has been largely inflammatory and malicious towards Mr. Duncan. In addition to the past reports, future reports leading up to trial may very well further prejudice Mr. Duncan through inflammatory statements and reports.

Mr. Duncan understands that saturation through inflammatory statements and media coverage is found only in extreme circumstances. *Jeffries*, *supra and Harris, supra*. Considering the size of the Kootenai County community, the massive media coverage, and the impact on this community, there can be no doubt that this is the extreme circumstance. *See Jeffries, supra and Harris, supra*. Kootenai County's population is about 120,000 with 90,000 people over the age of 18 (potential jurors). http://quickfacts.census.gov/qfd/states/16/16055.html.

Kootenai County has two major newspapers, the Spokesman-Review (Spokane based) and the Coeur d'Alene Press. The Spokesman-Review has a Northern Idaho daily circulation of about 16,000 (up to 21,000 on weekends) and the Press has a circulation of about 16,000. http://uspolitics.about.com/library/bl_endorsements.htm. (Number in parenthesis is circulation). Therefore, the total circulation ranges from 32,000 on weekdays to about 37,000-40,000 on weekends.

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                    5

Exh. 100 - 000726

The following are examples of media coverage from the Coeur d'Alene Press and the Spokesman-Review. These examples represent nothing factual and only incite an already angered community:

1.   Title: "Some crimes deserve public hangings." Content: "Society can take a great step toward real justice for the alleged killer and repeat pedophile Joseph Duncan. Bring back public hangings." CDA Press, 8/3/2005.

2.   Title: "Sex Offenses." Content: "Save the taxpayers a lot of money and put them (referring to people like Duncan) where they belong…in the ground." CDA Press, 10/5/2005.

3.   Title: "Spare the money on child sex offenders." Content: This is about Joe Duncan…we need to tie them (people like Duncan) to a stump and blow them up…I would love to pay for Duncan's bail then let his alleged victims' family beat him first and then let the community finish him off…Rack him up like a side of beef and let him have it. CDA Press, 8/7/2005.

4.   Title: "Defendant shouldn't be allowed rights." Content: "…Joseph Duncan confessed to the murder of the little boy in California…people like this should have their rights taken away (in reference to Duncan asking for a lawyer). CDA Press, 8/19/2005.

5.   Title: "Duncan submits writing for Internet." Content: "We wanted him to admit other things (referring to having Duncan post on a blog)…he got off on that (apparently referring to an opinion that Duncan was sexually driven to post messages on a blog). CDA Press, 1/25/2006.

6.   Title: "Brother feels no pity for Duncan." Content: Joseph Duncan's brother talks about his support for the death penalty for his brother and compares him to other notorious serial killers: "He has been told this is big news, but I don't think he quite grasps that he's been put up there with Ted Bundy and Jeffrey Dahmer." CDA Press, 11/4/2005.

7.   Title: "Victim's estates sue over Duncan's release." Content: The article was largely about how the families of Duncan's victims were suing different government agencies and States over Duncan's release but also commented on how "news of Duncan's past as a violent sexual predator" was the motivation behind tougher legislation against pedophiles in Idaho and Washington. A similar article expanded that to Congressional action. Spokesman-Review, 12/6/2005.

Exh. 100 - 000727

8. Title: "Duncan inspires sex-law changes." Content: One WA law maker is quoted "The diary of Joe Duncan is what motivates me to keep pushing ahead." Spokesman-Review, 11/29/2005.

9. Title: "Brother says Duncan was planning to turn self in." Content: Duncan's brother quoted as saying "I have no pity for him." Spokesman-Review, 11/6/2005.

10. Title: "Duncan may have more victims." Content: Speculation that Duncan may be a serial killer. Spokesman-Review, 8/5/2005.

11. Title: "Duncan's prison file reveals skilled liar, sexual deviant." Content: The article gives detailed accounts of information exchanged between Duncan's parole officer and his counselor. It also talks extensively about his habit of visiting homosexual bathhouses, and being involved in an extramarital affair with a married woman who also had two children. Spokesman-Review, 7/19/2005

12. Title: "Duncan galvanizes a city on death penalty." Content: The article talks about how Duncan has united support in the CDA community for the death penalty. A pastor talks about how the Duncan situation has nearly changed his mind on the death penalty. Another person interviewed and quoted "He needs to be castrated and thrown in a cave." A line from the article states "The crime itself is terrifying to citizens of Coeur d'Alene, a town where horrible news usually comes from a satellite, not neighbors." Another person is quoted "I think a lot of people in this town are very angry…They are mad as hell. Coeur d'Alene isn't used to this. This isn't Southern California…things like that aren't suppose to happen here." Spokesman-Review, 7/19/2005

The above are just a few of the examples of purely inflammatory statements offered in the media for the people of Kootenai County to read and absorb. Similar stories also aired and continue to air on the three local broadcast television networks KHQ (NBC), KXLY(ABC), and KREM (CBS). Many of these media accounts are not factual in nature as related to the evidence and the circumstances of the crime. *See Jeffries, supra and Harris, supra.* These examples show how outraged the citizens of Kootenai County are about the crime and the amount shows how saturating these comments are. From the tone of many of the statements, Mr. Duncan has been tried and convicted in the court of public opinion. A fair trial can not be found in Kootenai County.

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                    7

**II.      An expanded pool of jurors will not solve the problem because when saturation occurs it precludes the possibility of finding jurors that are unaffected by the news coverage.**

The prosecution is correct when it states that *Irvin v. Dowd* stands for the proposition that a potential juror does not have to be ignorant of the facts of the case. *Irvin v. Dowd*, 366 U.S. 717 at 721 (1961) *and State v. Hairston*, 133 Idaho 496 at 506, 988 P.2d 1170 at 1181 (Idaho 1999).   However, *Irvin* also stands for the principle that even though a potential juror need not be ignorant of the facts of a case, that rule "cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law." *Irvin*, 366 U.S. at 723 *quoting Lisenba v. California*, 314 U.S. 219, 236.

In *Irvin*, the defendant was charged with murder in Vanderbaugh County, Indiana and convicted of murder in neighboring Gibson County, Indiana, after a change of venue. *Irvin, supra*. Gibson County shared the same media outlets as Vanderbaugh County and the case was widely publicized to an inflammatory degree in both counties. *Id*. One media story had reported that the defendant had confessed to the murders, which was never substantiated. *Id*. With a large jury pool of 430, the court excused 268 for cause (opinion the defendant was guilty); 103 excused for objection to death penalty; 20 excused by defendant (maximum allowed); and 10 excused by the State. *Id*. That left 29 jurors to choose from. *Id*. After the jury was selected and seated with two alternates, 15 potential jurors were told to go home. *Id*. Moreover, an examination of the voir dire record showed that of the 430 potential jurors, nearly 90% and formed some opinion as to guilt. *Id*.

The Supreme Court reasoned that a "pattern of deep and bitter prejudice" was present throughout the community. *Irvin*, 366 U.S. at 727. Therefore, there was no way to provide the defendant with a fair trial, a fundamental right of due process. *Harris, supra*. The case was

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                8

remanded to the district court for a new trial that must be moved further away than a neighboring county sharing the same media. *Id.*

Given the extensive news coverage and the bitter prejudice exhibited against Mr. Duncan, *Irvin* should guide the Court's decision in granting a change of venue. *See Irvin, supra.* The pattern of visceral hatred shown in the media will make selecting a jury that is not prejudiced impossible. *See id.* According to the Coeur d'Alene Press, Mr. Duncan, like the defendant in *Irvin,* also reportedly confessed to killings. CDA Press, 8/5/2005. That claim has not been substantiated. However, it certainly gives an inclination as to why the bitterness in this community is so high. *See Irvin, supra.*

By the very nature of saturation, a fair trial with unprejudiced jurors cannot be had in Kootenai County. The media coverage for this case combined with the small population and visceral reaction people have demonstrated in letters to the editor of the CDA Press, show this case as the extreme circumstance. *See Irvin, supra.* No amount of potential Kootenai County jurors will fix that. *See Irvin, supra.*

## CONCLUSION

Boise, Twin Falls or any southern Idaho county/city may not be able to provide jurors totally ignorant of the facts of this case but Kootenai County cannot provide jurors that will not bring prejudice. The State's argument that a Boise, Twin Falls, or Rexburg jury will not be less impartial is incorrect, if for no other reason than the fact that the crime did not occur in their own small, tight-knit community. Through no fault of the citizens of Kootenai County, the media has saturated these potential jurors with graphic details and horrible stories all while conducting a trial of Mr. Duncan in the court of public opinion.

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                    9

The pre-trial publicity in this case has been extensive and unduly prejudicial to Mr. Duncan. Based upon the record as a whole and evidence and argument to be presented at the hearing herein, this Court is requested to grant this Motion.

DATED this _____ day of January, 2006.

                                        OFFICE OF THE KOOTENAI
                                        COUNTY PUBLIC DEFENDER


                        BY:    _____
                                        JOHN M. ADAMS
                                        PUBLIC DEFENDER


CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was personally served by placing a copy of the same in the interoffice mailbox on the _____ day of January, 2006, addressed to:

    Kootenai County Prosecutor



                        _____



REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                    10

John M. Adams, Public Defender
Office of the Kootenai County Public Defender
PO Box 9000
Coeur d'Alene, Idaho  83816-9000
Phone: (208) 446-1700;   Fax: (208) 446-1701
Bar Number: 3504

## IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF KOOTENAI

| | |
|---|---|
| STATE OF IDAHO,<br><br>               Plaintiff,<br><br>V.<br><br>JOSEPH E. DUNCAN, III<br><br><br>               Defendant. | CASE NUMBER    CR-05-0013674<br>                        Fel<br><br><br>REPLY TO STATE'S MEMORANDUM<br>OPPOSING CHANGE OF VENUE |

The Defendant, Joseph E. Duncan, III, by and through his attorney, John M. Adams, Public Defender, hereby submits the following Reply to the State's Memorandum Opposing Change of Venue.

A fair and impartial jury cannot be found in Kootenai County due to the extensive prejudicial pretrial publicity surrounding this case.  Enlarging the jury pool will not do anything to overcome that pervasive prejudicial publicity because Kootenai County is not a large enough population center to avoid the bias in the community.

I.       **United States Supreme Court and Ninth Circuit case law supports a change of venue because Mr. Duncan cannot receive a fair trial with Kootenai County jurors due to a saturation of prejudicial news coverage.**

The United States Supreme Court's test for granting a change of venue is rather simple: "…where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE          1

trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell,* 384 U.S. 333, 363 (1966).

The State, in opposing a change of venue, tries to make the point that because a trial court judge in Idaho has never been reversed in his/her decision to deny a change of venue, change of venue is improper in this case. Under this logic, the State is contending that a change of venue is never appropriate; certainly not a reasonable position.

The cases following *Sheppard* flush out and expand on the general rule. *State v. Yager,* 139 Idaho 680, 85 P.3d 656 (Idaho 2004) *and Murphy v. Florida,* 421 U.S. 794 (1975) *and Harris v. Pulley,* 885 F.2d 1354 (9th Cir. 1989). *Yager* sets forth the factors Idaho appellate courts should consider when determining whether the denial of a venue change deprived a defendant of a fair trial:

1) testimony at voir dire from jurors as to whether the jurors had formed an opinion as to the defendant's guilt or innocence based on pretrial publicity
2) whether the defendant challenged any jurors for cause
3) affidavits indicating prejudice or absence of prejudice in the community
4) the nature and content of pretrial publicity
5) the amount of time between the pretrial publicity and the trial

*Yager,* 139 Idaho at 687, 85 P.3d at 663. This multi-factor test names the most prevalent factors to be considered but is not an exhaustive list. *Id.* Also, this test is considered the same as the United States Supreme Court's totality of the circumstances test for reviewing a change of venue decision. *See Murphy, supra* and *Yager, supra.* Obviously, the instant case is not on appellate review. Therefore, *Yager* is not dispositive. Because *Yager* is not controlling and *Sheppard* is, the court should turn its attention to the issue that is outlined in *Sheppard*: prejudicial news coverage. *See Sheppard, supra. Sheppard* is dispositive and the rule applies in this case: there is a reasonable likelihood that prejudicial news coverage will prevent a fair trial, therefore this case must be transferred to another county. *See id.* Certainly, if there was ever a case where a judge

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE    2

would be able to determine that due to the news coverage and publicity there exists a reasonable likelihood that prejudice could be presumed, it is this one. *See id.*

Mr. Duncan agrees that publicity itself does not require a change of venue. Likewise, Mr. Duncan agrees that jurors completely ignorant of the facts and issues involved in this case would be an unreasonable standard, not just for potential Kootenai County jurors, but indeed all Idaho jurors and the vast majority of Americans. *See State v. Hairston*, 133 Idaho 496, 988 P.2d 1170 (Idaho 1999). Publicity is not the issue here. The issue is overly prejudicial publicity in Kootenai County that requires a change of venue. *See Sheppard, supra* and *Harris, supra.*

The State cites *Harris* for the proposition that when the "vast majority of the media accounts are largely factual in nature," prejudice is not presumed. *Harris*, 885 F.2d at 1360. That may be an appropriate place to stop the inquiry if the vast majority of news coverage regarding Mr. Duncan's case was factual in nature, but it is not. The State does not include in its analysis of *Harris* the outline of the presumed prejudice standard, the standard Mr. Duncan argues should be followed in this case. "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris*, 885 F.2d at 1361. *See also Sheppard*, 382 U.S. at 352-355. The court went on to state that "under such circumstances, it is not necessary to demonstrate actual bias." *Harris*, 885 F.2d at 1361 *citing Estes v Texas*, 381 U.S. 532 at 542 (1965).

The impact on the community and the size of the community are two important distinctions between Mr. Duncan's case and the cases cited by the State that deal with presumed prejudice. *See Harris, supra.* In *Harris*, the Ninth Circuit Court of Appeals accepted the California Supreme Court's reasoning that one reason a denial of change of venue was

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE    3

appropriate was the size of community because the size of a community can dissipate the effect of pretrial publicity. *Harris,* 885 F.2d at 1360 *citing People v. Harris*, 28 Cal.3d 935, 949-950, 623 P.2d 240, 247, 171 Cal.Rptr. 679, 686 (Cal. 1981). Mr. Harris' trial occurred in San Diego in 1979. *Harris, supra.* In 1980, the population of San Diego County was just under two million. http://www.sandiegohistory.org/links/sandiegopopulation.htm.

The State also cites a case from Miami to argue against a change of venue. In *Murphy*, the trial occurred in Miami-Dade County in 1970. *Murphy, supra.* The population of Dade County in 1970 was about 1.3 million. http://www.censusscope.org/us/s12/c86/chart_popl.html. A population of 1.3 million is likely to dissipate any prejudicial effect. *See Harris, supra.*

The State incorrectly cites *Jeffries* as comparable to Mr. Duncan's case. In *Jeffries*, the defendant was convicted of two counts of aggravated first-degree murder in Clallam County, Washington. *Jeffries*, 5 F.3d 1180 (9th Cir. 1993). Clallam County had, at the time of the trial, a population of about 50,000 (36,000 eligible jurors). *Id.* Also, the local newspaper had a circulation of about 13,000. *Id.*

The defendant argued that he was subject to pretrial prejudice from jury members and it impeded his right to a fair trial. *Jeffries, supra.* The court examined the evidence (news reports) before trial and concluded that the news reports included: an account of the defendant's criminal history; sheriff's statements that the defendant was armed and dangerous while on the run and that the murders were premeditated; details about the murder; details of the arrest; details concerning progress of investigation. *Id.* at 1189.

The *Jeffries* court reasoned that although those details may themselves cause people in the community to be outraged that the crime happened, it was not inflammatory in the sense that it was malicious toward the defendant. *See Jeffries, supra.* The media accounts were largely

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                4

Exh. 100 - 000735

factual in nature, rather than purely inflammatory against the accused. *Id.* The court held that "prejudice is presumed when the record indicates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. *Jeffries*, 5 F.3d at 1189 *citing Harris*, 885 F.2d 1354, 1361. Saturation occurs only in extreme circumstances. *Jeffries, supra.* In the *Jeffries* case, the media publicity was substantial but it was factual in nature and related to the crimes being charged. *Id.*

Mr. Duncan's case is substantially different. For the last six months, the media attention surrounding this case has been largely inflammatory and malicious towards Mr. Duncan. In addition to the past reports, future reports leading up to trial may very well further prejudice Mr. Duncan through inflammatory statements and reports.

Mr. Duncan understands that saturation through inflammatory statements and media coverage is found only in extreme circumstances. *Jeffries, supra and Harris, supra.* Considering the size of the Kootenai County community, the massive media coverage, and the impact on this community, there can be no doubt that this is the extreme circumstance. *See Jeffries, supra and Harris, supra.* Kootenai County's population is about 120,000 with 90,000 people over the age of 18 (potential jurors). http://quickfacts.census.gov/qfd/states/16/16055.html.

Kootenai County has two major newspapers, the Spokesman-Review (Spokane based) and the Coeur d'Alene Press. The Spokesman-Review has a Northern Idaho daily circulation of about 16,000 (up to 21,000 on weekends) and the Press has a circulation of about 16,000. http://uspolitics.about.com/library/bl_endorsements.htm. (Number in parenthesis is circulation). Therefore, the total circulation ranges from 32,000 on weekdays to about 37,000-40,000 on weekends.

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                    5

The following are examples of media coverage from the Coeur d'Alene Press and the Spokesman-Review. These examples represent nothing factual and only incite an already angered community:

1.      Title: "Some crimes deserve public hangings." Content: "Society can take a great step toward real justice for the alleged killer and repeat pedophile Joseph Duncan. Bring back public hangings." CDA Press, 8/3/2005.

2.      Title: "Sex Offenses." Content: "Save the taxpayers a lot of money and put them (referring to people like Duncan) where they belong…in the ground." CDA Press, 10/5/2005.

3.      Title: "Spare the money on child sex offenders." Content: This is about Joe Duncan…we need to tie them (people like Duncan) to a stump and blow them up…I would love to pay for Duncan's bail then let his alleged victims' family beat him first and then let the community finish him off…Rack him up like a side of beef and let him have it. CDA Press, 8/7/2005.

4.      Title: "Defendant shouldn't be allowed rights." Content: "…Joseph Duncan confessed to the murder of the little boy in California…people like this should have their rights taken away (in reference to Duncan asking for a lawyer). CDA Press, 8/19/2005.

5.      Title: "Duncan submits writing for Internet." Content: "We wanted him to admit other things (referring to having Duncan post on a blog)…he got off on that (apparently referring to an opinion that Duncan was sexually driven to post messages on a blog). CDA Press, 1/25/2006.

6.      Title: "Brother feels no pity for Duncan." Content: Joseph Duncan's brother talks about his support for the death penalty for his brother and compares him to other notorious serial killers: "He has been told this is big news, but I don't think he quite grasps that he's been put up there with Ted Bundy and Jeffrey Dahmer." CDA Press, 11/4/2005.

7.      Title: "Victim's estates sue over Duncan's release." Content: The article was largely about how the families of Duncan's victims were suing different government agencies and States over Duncan's release but also commented on how "news of Duncan's past as a violent sexual predator" was the motivation behind tougher legislation against pedophiles in Idaho and Washington. A similar article expanded that to Congressional action. Spokesman-Review, 12/6/2005.

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE         6

8.  Title: "Duncan inspires sex-law changes." Content: One WA law maker is quoted "The diary of Joe Duncan is what motivates me to keep pushing ahead." Spokesman-Review, 11/29/2005.

9.  Title: "Brother says Duncan was planning to turn self in." Content: Duncan's brother quoted as saying "I have no pity for him." Spokesman-Review, 11/6/2005.

10. Title: "Duncan may have more victims." Content: Speculation that Duncan may be a serial killer. Spokesman-Review, 8/5/2005.

11. Title: "Duncan's prison file reveals skilled liar, sexual deviant." Content: The article gives detailed accounts of information exchanged between Duncan's parole officer and his counselor. It also talks extensively about his habit of visiting homosexual bathhouses, and being involved in an extramarital affair with a married woman who also had two children. Spokesman-Review, 7/19/2005

12. Title: "Duncan galvanizes a city on death penalty." Content: The article talks about how Duncan has united support in the CDA community for the death penalty. A pastor talks about how the Duncan situation has nearly changed his mind on the death penalty. Another person interviewed and quoted "He needs to be castrated and thrown in a cave." A line from the article states "The crime itself is terrifying to citizens of Coeur d'Alene, a town where horrible news usually comes from a satellite, not neighbors." Another person is quoted "I think a lot of people in this town are very angry…They are mad as hell. Coeur d'Alene isn't used to this. This isn't Southern California…things like that aren't suppose to happen here." Spokesman-Review, 7/19/2005

The above are just a few of the examples of purely inflammatory statements offered in the media for the people of Kootenai County to read and absorb. Similar stories also aired and continue to air on the three local broadcast television networks KHQ (NBC), KXLY(ABC), and KREM (CBS). Many of these media accounts are not factual in nature as related to the evidence and the circumstances of the crime. *See Jeffries, supra and Harris, supra.* These examples show how outraged the citizens of Kootenai County are about the crime and the amount shows how saturating these comments are. From the tone of many of the statements, Mr. Duncan has been tried and convicted in the court of public opinion. A fair trial can not be found in Kootenai County.

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE

**II.     An expanded pool of jurors will not solve the problem because when saturation occurs it precludes the possibility of finding jurors that are unaffected by the news coverage.**

The prosecution is correct when it states that *Irvin v. Dowd* stands for the proposition that a potential juror does not have to be ignorant of the facts of the case. *Irvin v. Dowd*, 366 U.S. 717 at 721 (1961) *and State v. Hairston*, 133 Idaho 496 at 506, 988 P.2d 1170 at 1181 (Idaho 1999).   However, *Irvin* also stands for the principle that even though a potential juror need not be ignorant of the facts of a case, that rule "cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law." *Irvin*, 366 U.S. at 723 *quoting Lisenba v. California*, 314 U.S. 219, 236.

In *Irvin*, the defendant was charged with murder in Vanderbaugh County, Indiana and convicted of murder in neighboring Gibson County, Indiana, after a change of venue. *Irvin*, *supra*. Gibson County shared the same media outlets as Vanderbaugh County and the case was widely publicized to an inflammatory degree in both counties. *Id.* One media story had reported that the defendant had confessed to the murders, which was never substantiated. *Id.* With a large jury pool of 430, the court excused 268 for cause (opinion the defendant was guilty); 103 excused for objection to death penalty; 20 excused by defendant (maximum allowed); and 10 excused by the State. *Id.* That left 29 jurors to choose from. *Id.* After the jury was selected and seated with two alternates, 15 potential jurors were told to go home. *Id.* Moreover, an examination of the voir dire record showed that of the 430 potential jurors, nearly 90% and formed some opinion as to guilt. *Id.*

The Supreme Court reasoned that a "pattern of deep and bitter prejudice" was present throughout the community. *Irvin*, 366 U.S. at 727.   Therefore, there was no way to provide the defendant with a fair trial, a fundamental right of due process. *Harris, supra.* The case was

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE                    8

remanded to the district court for a new trial that must be moved further away than a neighboring county sharing the same media. *Id.*

Given the extensive news coverage and the bitter prejudice exhibited against Mr. Duncan, *Irvin* should guide the Court's decision in granting a change of venue. *See Irvin, supra.* The pattern of visceral hatred shown in the media will make selecting a jury that is not prejudiced impossible. *See id.* According to the Coeur d'Alene Press, Mr. Duncan, like the defendant in *Irvin,* also reportedly confessed to killings. CDA Press, 8/5/2005. That claim has not been substantiated. However, it certainly gives an inclination as to why the bitterness in this community is so high. *See Irvin, supra.*

By the very nature of saturation, a fair trial with unprejudiced jurors cannot be had in Kootenai County. The media coverage for this case combined with the small population and visceral reaction people have demonstrated in letters to the editor of the CDA Press, show this case as the extreme circumstance. *See Irvin, supra.* No amount of potential Kootenai County jurors will fix that. *See Irvin, supra.*

## CONCLUSION

Boise, Twin Falls or any southern Idaho county/city may not be able to provide jurors totally ignorant of the facts of this case but Kootenai County cannot provide jurors that will not bring prejudice. The State's argument that a Boise, Twin Falls, or Rexburg jury will not be less impartial is incorrect, if for no other reason than the fact that the crime did not occur in their own small, tight-knit community. Through no fault of the citizens of Kootenai County, the media has saturated these potential jurors with graphic details and horrible stories all while conducting a trial of Mr. Duncan in the court of public opinion.

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE          9

The pre-trial publicity in this case has been extensive and unduly prejudicial to Mr.

Duncan. Based upon the record as a whole and evidence and argument to be presented at the

hearing herein, this Court is requested to grant this Motion.

DATED this _____ 31st _____ day of January, 2006.



STATE OF IDAHO
COUNTY OF KOOTENAI } ss
THIS IS TO CERTIFY THAT THE FOREGOING IS
A TRUE COPY OF THE ORIGINAL NOW ON
FILE OR RECORD IN THIS OFFICE.
SEALED ON THIS __21__ DAY OF __Feb 2017__
JIM BRANNON, CLERK OF THE DISTRICT
COURT BY_____Shaun Patterson_____
                        Deputy
             page 20 of 20

OFFICE OF THE KOOTENAI
COUNTY PUBLIC DEFENDER

BY: _____
JOHN M. ADAMS
PUBLIC DEFENDER

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was personally served by placing a copy of the same in the interoffice mailbox on the __31st__ day of January, 2006, addressed to:

Kootenai County Prosecutor

_Linda Swenson_

REPLY TO STATE'S MEMORANDUM OPPOSING CHANGE OF VENUE

10

Exh. 100 - 000741

STATE OF IDAHO   } ss
COUNTY OF KOOTENAI }

IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE

STATE OF IDAHO IN AND FOR THE COUNTY OF KOOTENAI   2006 AUG 29  AM 9: 46

CLERK DISTRICT COURT

DEPUTY

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | CASE NO. F05-13674 |
| Plaintiff, | ) | |
| | ) | ORDER |
| vs. | ) | |
| | ) | |
| **JOSEPH EDWARD DUNCAN, III,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The above entitled matters came on for a MOTION FOR CHANGE OF VENUE before the

Honorable Judge Gibler on August 24, 2006.  Personally present were the Defendant's attorneys of

record, John Adams and Lynn Nelson.  Also appearing was Bill Douglas, Prosecuting Attorney and

Rick Baughman, Deputy Prosecuting Attorney. Argument was given. Based upon such, the Court

then ruled as follows:

HEREBY FINDS AND ORDERS:

That the Defendant's Motion for Change of Venue is hereby denied, without prejudice.

DATED this _25_ day of ___August___, 2006.

_____
JUDGE GIBLER

STATE OF IDAHO   } ss
COUNTY OF KOOTENAI }
THIS IS TO CERTIFY THAT THE FOREGOING IS
A TRUE COPY OF THE ORIGINAL NOW ON
FILE OR RECORD IN THIS OFFICE.
SEALED ON THIS _21_ DAY OF _Feb 2017_
JIM BRANNON, CLERK OF THE DISTRICT
COURT BY_____
                    Deputy
                    page 1 of 2

ORDER

CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the 27 day of August, 2006, that a true and correct copy of the foregoing were mailed/delivered by regular U.S. Mail, postage prepaid, Interoffice Mail, Hand Delivered, or Faxed to:

Prosecutor 446-1853    Defense Attorney 446-1701 Defendant _____
KCPSB _____    Auditor _____ Police Agency _____
Bonding Co. _____    Other _____

**DANIEL ENGLISH**
**CLERK OF THE DISTRICT COURT**

BY: _____, Deputy

ORDER

Exh. 100 - 000743