HEATHER E. WILLIAMS, CA Bar No. 122664
Federal Defender
LINDSAY BENNETT, GA Bar No. 141641
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:     (916) 498-5700
Facsimile:     (916) 498-6656
Email:          Lindsay_bennett@fd.org

MARK E. OLIVE, FL Bar No. 578533
Law Offices of Mark E. Olive
320 W. Jefferson Street
Tallahassee, Florida  32301
Telephone:     (850) 224-0004
Facsimile:     (850) 224-3331
Email:          meolive@aol.com

Attorneys for Petitioner,
JOSEPH EDWARD DUNCAN, III

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSEPH EDWARD DUNCAN, III, | Case No.  2:07-cr-00023-EJL |
| Petitioner, | |
| v. | **CORRECTED DEFENDANT'S MOTION FOR COLLATERAL RELIEF** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1

II.  STATEMENT OF THE CASE ................................................................................... 3

   A.  Federal Trial Proceedings ..................................................................................... 3

     1.  Federal Indictment and Initial Defense Team .................................................. 3

     2.  Five Months Before Trial – Lead Counsel Seeks to Withdraw ....................... 4

     3.  Mr. Duncan Pleads Guilty to all Charges and the Sentencing Trial is Reset for April 2008 ..................................................................................................... 8

     4.  Expert Disclosures Under Fed.R.Crim.P. 16(b)(1)(C) and 12.2 ..................... 9

     5.  Mr. Duncan Requests to Proceed *Pro Se*, Which the Court Allows, Resulting in Mr. Duncan Being Sentenced to Death ................................................................. 10

     6.  Mr. Duncan Equivocates Regarding His Appeal ........................................... 10

     7.  The Appeal of the District Court's Order ....................................................... 12

     8.  The Retrospective Competency Hearing and Subsequent Related Proceedings ........... 12

III.  CLAIM 1:  MR. DUNCAN WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006A AND THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND HIS RIGHT TO A RELIABLE DEATH JUDGMENT AS GUARANTEED BY THE EIGHT AMENDMENT TO THE UNITED STATES CONSTITUTION BY THE MULTIPLE PREJUDICIAL ERRORS AND OMISSIONS OF TRIAL COUNSEL, ALL OF WHICH WERE EXACERBATED BY THE ERRONEOUS AND PREJUDICIAL RULINGS OF THE COURT .......................................................................................................... 13

   A.  Lead Counsel, Roger Peven's, Dysfunction and the Devastating Effects it had on Counsel's Capacity to Provide Constitutionally Adequate Counsel ........................................... 14

     1.  July 2005 to October 2006 .............................................................................. 14

     2.  October 2006 to September 2007 .................................................................... 16

     3.  September 2007 to December 3, 2007 ............................................................. 24

     4.  December 4, 2007 to April 16, 2008 ............................................................... 26

     5.  April 17, 2008 to November 24, 2008 ............................................................ 32

   B.  The Trial Court's Role in Compounding the Problems Permeating Mr. Duncan's Defense Team ................................................................................................................. 34

   C.  The Impact of Mr. Duncan's Significant Mental Illness of the Proceedings ..................... 37

   D.  The Deprivation of the Effective Assistance of Counsel Rendered Mr. Duncan's Proceedings Unconstitutional ..................................................................................... 38

     1.  The Breakdown of the System in Mr. Duncan's Case, Including But Not Limited to the Deprivation of His Sixth Amendment Right to Counsel, Constituted Structural Error ...................................................................................................... 38

2.   Had There not Been a Breakdown of the Adversarial System a Significantly Different Picture of Mr. Duncan Would Have Emerged ......................................................... 40

3.   Counsel's Ineffectiveness Set the Stage for Mr. Duncan's Invalid Guilty Plea .............. 45

E.   Conclusion .......................................................................................................... 47

IV.  CLAIM 2:  THE TRIAL COURT'S REFUSAL TO ALLOW MR. LARRANGA TO ATTEND THE AUGUST 28, 2007 STATUS CONFERENCE AND REFUSAL TO HAVE THE PROCEEDINGS RECORDED AND ITS SUBSEQUENT RELIANCE ON THE PROCEEDINGS TO DISALLOW A REASONABLE TIME FOR PREPARATION VIOLATED MR. DUNCAN'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS ........................................................................................................ 48

V.   CLAIM 3:  AS A RESULT OF MENTAL DISEASE, DISORDER OR DEFECT, MR. DUNCAN WAS INCOMPETENT TO PLEAD GUILTY AND HIS PLEA WAS NOT A KNOWING, INTELLIGENT AND VOLUNTARY WAIVER OF HIS RIGHT TO STAND TRIAL ..................................................................................................... 53

A.   The Retrospective Competency Hearing – The "Thorny" Waiver Issue ........................ 54

1.   Defense Experts ................................................................................................. 54

a.   Dr. James R. Merikangas ................................................................... 54

b.   Dr. Ruben Gur ................................................................................... 56

c.   Dr. George W. Woods ........................................................................ 58

d.   Dr. Ari Kalechstein ............................................................................ 59

e.   Dr. Xavier Amador ............................................................................ 61

f.   Dr. Michael First ............................................................................... 63

g.   Dr. Craig Beaver ............................................................................... 63

2.   Prosecution Experts ........................................................................................... 64

3.   Lay Witnesses .................................................................................................... 67

4.   The Court's Prior Order ...................................................................................... 72

B.   The Unresolved Question of Mr. Duncan's Competency to Plead Guilty ....................... 74

1.   The Evidence Clearly Establishes that Mr. Duncan has a Mental Disease, Disorder, or Defect. ................................................................................................. 74

2.   Competency Can Vary Over Time ........................................................................ 77

3.   The Court's Description of Mr. Duncan's In Court Statements As Rational and Coherent Is Contrary to the Verbatim Record and the Uncontroverted Expert Opinion ..... 78

4.   The Evidence Establishes that Mr. Duncan's Belief System is a Delusion, Not a Rational Insight .................................................................................................... 85

5.   The Court Overstated the Importance of Areas of Strengths ....................................... 98

6.   Even the Supposed Assessments of Credibility Themselves Fail to Withstand Scrutiny ................................................................................................................ 102

a.    The "Compelling" and "Sound" Opinions Defended On Cross-Examination Hinge on an Objectively Erroneous View of the Facts.......................................................... 103

b.    The Prosecution Experts Conceded the Issue was "Thorny".................................. 104

c.    In Clear Contrast to the Defense Experts, the Prosecution Experts Testified as to Subjective, Unverifiable Conclusions Not in accord with Prevailing professional norms.......................................................................................................... 106

d.    The Defense Experts' Opinions Were Based on Reliable, Objectively Verified Data.......................................................................................................................... 108

e.    Because the Prosecution Experts Spent Little Time Together With Mr. Duncan Their Failure to Observe Signs of Psychosis is of Limited Probative Value ................................................................................................................ 109

7.    The Court Erred By Relying on the Riverside County Proceedings In Assessing Credibility........................................................................................................................ 112

C.    Trial Counsel's Failure to Declare a Doubt as to Competency to Plead Guilty Constituted Ineffective Assistance of Counsel.......................................................... 114

D.    Even if Competent, the Plea Was Not Knowing, Intelligent, and Voluntary................... 115

E.    Mr. Duncan was Denied Effective Assistance of Counsel at the Retrospective Competency Hearing and the Hearing, Despite its Length, Was Not Full and Fair ............... 117

VI.    CLAIM 4:  EVEN ASSUMING MR. DUNCAN WAS COMPETENT TO PLEAD GUILTY, HE WAS INCOMPETENT TO REPRESENT HIMSELF ...................... 121

VII.    CLAIM 5:  EVEN ASSUMING MR. DUNCAN WAS COMPETENT TO REPRESENT HIMSELF, ALLOWING HIM TO DO SO WAS FUNDAMENTALLY ERRONEOUS.......................................................................... 132

VIII.    CLAIM 6:  MR. DUNCAN'S TRIAL COUNSEL FAILED TO REQUEST A CHANGE OF VENUE IN VIOLATION OF MR. DUNCAN'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL........................................................................... 140

A.    Introduction ......................................................................................................... 140

1.    Facts Supporting a Change of Venue ......................................................... 141

2.    Counsel's Ineffectiveness Deprived Mr. Duncan of a fair tribunal comprised of jurors untainted by the barrage of inflammatory publicity the permeated the community... 143

3.    The Court Failed to Adequately Protect Mr. Duncan's Right to a Fair and Impartial Jury ....................................................................................................... 145

4.    Conclusion ..................................................................................................... 146

IX.    CLAIM 7:  THE ADMISSION OF FUTURE DANGEROUSNESS EVIDENCE, THE PROSECUTION'S ARGUMENTS, AND THE COURT'S INSTRUCTIONS VIOLATED THE FIFITH AND EIGHTH AMENDMENTS AND AND RESULTED IN A FUNDAMENTAL MISCARRIAGE OF JUSTICE......................................... 147

X.    CLAIM 8:  THE ADMISSION OF GRUESOME VIDEOGRAPHIC EVIDENCE

VIOLATED THE FIFTH AND EIGHTH AMENDMENTS AND RESULTED IN A FUNDAMENTAL MISCARRIAGE OF JUSTICE ................................................................. 156

XI.    CLAIM 9: THE STATUTE UNDER WHICH MR. DUNCAN WAS CONVICTED DOES NOT CONSTITUTE A "CRIME OF VIOLENCE" AND CANNOT SERVE AS THE BASIS FOR THE DEATH SENTENCE THAT WAS IMPOSED ON HIM UNDER COUNT 7 OF THE INDICTMENT .......................................................................... 167

    A.    Introduction ................................................................................................................ 167

    B.    Mr. Duncan's Offense Cannot be Deemed a Crime of Violence under the Residual Clause Because that Clause is Unconstitutionally Vague ............................................ 168

    C.    Kidnapping, As Defined by 18 U.S.C. § 1201 (a), Is Not a Crime of Violence Under the "Force" Clause of § 924(c)(3)(A), Because It Does Not Have As An Necessary Element, the Use, Attempted Use, or Threatened Use of Physical Force Against the Person or Property of Another. ...................................................................................... 172

        1.    The principles of analysis .................................................................................... 172

        2.    Kidnapping does not require the use of force ..................................................... 173

    D.    Conclusion .................................................................................................................. 174

XII. CLAIM 10: THE COURT VIOLATED MR. DUNCAN'S RIGHT TO DUE PROCESS BY ACCEPTING A WAIVER OF APPEAL THAT WAS NEITHER CLEAR AND UNEQUIVOCAL NOR KNOWING, INTELLIGENT OR VOLUNTARY ........................................................................................................................ 175

    A.    Mr. Duncan Expressed No Clear and Unequivocal Desire That His Conviction and Sentence Not Be Appealed ........................................................................................ 183

    B.    The Record Establishes that the Purported Waiver Was Anything But Knowing, Intelligent and Voluntary ........................................................................................... 185

    C.    Neither the Court Nor Counsel Adequately Advised Mr. Duncan that Appellate Proceedings Would be Initiated Whether or Not He Stated He Wanted to Appeal ............. 186

    D.    Subsequent to the Invalid Acceptance of Waiver and Prior to the Nunc Pro Tunc Competency Finding, Mr. Duncan Repeatedly Sought to Invoke His Right to Appeal ........... 187

    E.    Conclusion .................................................................................................................. 188

XIII.    CLAIM 11: THE COMBINATION OF PROBLEMS AT EVERY STEP OF THE PROCEEDINGS, DEPRIVED MR. DUNCAN OF FAIR AND RELIABLE PROCEEDINGS AND THE DUE PROCESS TO WHICH HE WAS ENTITLED ............ 189

    A.    Facts in Support & Procedural History ....................................................................... 191

        1.    Pre-plea Proceedings: The Incapacity of Lead Defense Counsel, The Court's Unrecorded Refusal to Consider Requests for Any Continuance, and Defense Efforts to Obtain Adequate Time to Prepare ........................................................ 191

        2.    The Setting of a Trial Date .................................................................................. 191

        3.    Mr. Peven's Issues Are Brought to the Court's Attention, New Counsel is Appointed .......................................................................................................... 192

4.    New Counsel's Request for a Continuance .................................................................. 194

5.    The Court's Revelation that the Entry of New Counsel Had Been Premised On Counsel Not Seeking a Continuance.......................................................................... 196

6.    Defense Counsel Peven's Incapacity ........................................................................ 197

7.    The Guilty Plea............................................................................................................ 198

8.    Disclosure of Possible Expert Testimony.................................................................. 199

9.    The Request for Self-Representation, and The Absence of Competency Proceedings ................................................................................................................... 201

10.    The *Pro Se* Sentencing Trial, and The Death Penalty ............................................... 201

11.    The Evidence that Could Have Been Presented ........................................................ 205

12.    The Absence of Appellate Review .............................................................................. 206

B.   Legal Principles.......................................................................................................................... 206

C.   Conclusion .................................................................................................................................. 208

XIV.    CLAIM 12:  THE FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL ................................................................................................................. 211

# TABLE OF AUTHORITIES

**Federal Cases**

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ........................................................................ 136

*Ariz. v. Fulminante*, 499 U.S. 279 (1991) ....................................................................... 38, 39

*Beck v. Alabama*, 447 U.S. 625 (1980) ................................................................... 52, 53, 166

*Betterman v. Montana*, 136 S. Ct. 1609 (2016) ..................................................................... 135

*Boykin v. Alabama*, 395 U.S. 238 (1969) ...................................................................... 46, 185

*Brewer v. Williams*, 430 U.S. 387 (1977) ............................................................................. 116

*Britt v. North Carolina*, 404 U.S. 226 (1971) ........................................................................ 52

*Chapman v. Cal.*, 386 U.S. 18 (1967) .................................................................................... 38

*Chatwin v. United States*, 326 U.S. 455 (1946) .................................................................... 174

*Chrzanoski v. Ashcroft*, 327 F.3d 188 (2d Cir. 2003) ........................................................... 174

*Clemons v. Mississippi*, 494 U.S. 738 (1990) ....................................................................... 207

*Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602 (1993) .................. 154

*Descamps v. United States*, 133 S. Ct. 2276 (2013) .............................................................. 172

*Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015) ................................................... 168, 169, 170

*Dobbert v. Florida*, 432 U.S. 282 (1977) ............................................................................. 145

*Dobbs v. Kemp*, 790 F.2d 1499 (11th Cir. 1986) ..................................................................... 52

*Douglas v. California*, 372 U.S. 353 (1963) .......................................................................... 135

*Draper v. Washington*, 372 U.S. 487 (1963) ........................................................................... 52

*Drope v. Missouri*, 420 U.S. 162 (1975) ............................................................................... 121

*Duncan v. United States*, 2016 U.S. LEXIS 1258 (U.S. Feb. 29, 2016) ......................... 12, 210

*Dusky v. United States*, 362 U.S. 402 (1960) ........................................................................ 121

*Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) ................................................................... 218

*Eun Kyung Park v. INS*, 252 F.3d 1018 (9th Cir. 2001) ........................................................ 171

*Evans v. Zych*, 644 F.3d 447 (6th Cir. 2011) ........................................................................ 171

*Evitts v. Lucey*, 469 U.S. 387 (1985) .................................................................................... 135

*Faretta v. Cal.*, 422 U.S. 806 (1975) ..................................................................... 116, 136, 137

*Faretta v. California*, 422 U.S. 806 (1975) ........................................................................... 135

*Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121 (9th Cir. 2006) ................................................ 173

*Furman v. Georgia*, 408 U.S. 238 (1972) ........................................................................ *passim*

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979) ................................................................. 135

*Garcia v. Gonzales*, 455 F.3d 465 (4th Cir. 2006) ............................................................... 173

*Gardner v. Florida*, 430 U.S. 349 (1977) ...................................................... 52, 135, 138, 206

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ........................................................................... 39

vi   *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

*Gilmore v. Utah*, 429 U.S. 1012 (1976) ............................................................................... 183

*Glossip v. Gross*, 135 S. Ct. 2726 (2015) ........................................................................... 213

*Godinez v. Moran*, 509 U.S. 389 (1993) ..................................................................... 116, 187

*Gregg v. Georgia*, 428 U.S. 153 (1976) ............................................................ 206, 207, 208

*Griffin v. Illinois*, 351 U.S. 12 (1956) .................................................................................. 52

*Guam Inv. Co. v. Cent. Bldg., Inc.*, 288 F.2d 19 (9th Cir. 1961) ........................................ 114

*Hardy v. United States*, 375 U.S. 277 (1964) ...................................................................... 53

*Hill v. Lockhart*, 474 U.S. 52 (1985) ................................................................................. 144

*Hodges v. Easton*, 106 U.S. 408 (1882) ............................................................................ 116

*Hopt v. Utah*, 110 U.S. 574 (1884) ................................................................................... 138

*In re Murchison*, 349 U.S. 133 (1955) .............................................................................. 207

*In re Oliver*, 333 U.S. 257 (1948) ..................................................................................... 207

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66 (2d Cir. 1998) ......... 113

*Irvin v. Dowd*, 366 U.S. 717 (1961) ........................................................................... 144, 207

*Jimenez-Gonzalez v. Mukasey*, 548 F.3d 557 (7th Cir. 2008) ............................................. 173

*Jobson v. Ashcroft*, 326 F.3d 367 (2d Cir. 2003) ............................................................... 173

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ...................................................... 168, 170

*Johnson v. United States*, 559 U.S. 133 (2010) ................................................................. 172

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ..................................................................... 185, 187

*Jurek v. Texas*, 428 U.S. 262 (1976) ................................................................................. 207

*Kelly v. California*, 555 U.S. 1020 (2008) .......................................................................... 162

*Kinsella v. United States ex rel. Guagliardo*, 361 U.S. 234 (1960) ...................................... 53

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991) ................................................ 113

*Lafler v. Cooper*, 566 U.S. 156 (2012) ......................................................................... 45, 47

*Lee v. City of L.A.*, 250 F.3d 668 (9th Cir. 2001) ............................................................... 113

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ............................................................................... 170

*Lockett v. Ohio*, 438 U.S. 586 (1978) ................................................................................ 155

*M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483 (9th Cir. 1983) .................... 113-114

*Martinez v. Court of Appeal*, 528 U.S. 152 (2000) ..................................................... 135, 136

*Mason ex rel. Marson v. Vasquez*, 5 F.3d 1220 (9th Cir. 1993) .......................................... 186

*Massie v. Sumner*, 624 F.2d 72 (9th Cir. 1980) ..................................................... 183, 184, 185

*McKaskle v. Wiggins*, 465 U.S. 168 (1984) .............................................................. 136, 137

*Murphy v. Florida*, 421 U.S. 794 (1975) ........................................................................... 145

*Northcross v. Bd. of Educ.*, 412 U.S. 427 (1973) ............................................................... 169

*Old Chief v. United States*, 519 U.S. 172 (1997) ............................................................... 167

*Oyebanji v. Gonzales*, 418 F.3d 260 (3d Cir. 2005) ........................................................... 173

Corrected Defendant's Motion for Collateral Relief          vii          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

*Paridy v. Caterpillar Tractor Co.*, 48 F.2d 166 (7th Cir. 1931) ............................................................ 114

*Parke v. Raley*, 506 U.S. 20 (1992) ................................................................................................ 116

*Parker v. Dugger*, 498 U.S. 308 (1991) ............................................................................................ 207

*Pate v. Robinson*, 383 U.S. 375 (1966) ............................................................................................ 125

*Patton v. Yount*, 467 U.S. 1025 (1984) ............................................................................................ 145

*Porter v. McCollum*, 558 U.S. 30 (2009) .......................................................................................... 109

*Proffitt v. Florida*, 428 U.S. 242 (1976) ........................................................................................... 207

*Rees v. Peyton*, 384 U.S. 312 (1966) ................................................................................................ 186

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ........................................................................................ 144

*Ring v. Arizona*, 536 U.S. 584 (2002) ....................................................................................... 211, 213

*Rodriguez-Castellon v. Holder*, 733 F.3d 847 (9th Cir. 2013) ....................................................... 170

*Rothgery v. Gillespie County*, 554 U.S. 191 (2008) ............................................ 121, 123, 124, 125, 126

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410 (3d Cir. 1999) .. 113

*Smith v. City of Jackson*, 544 U.S. 228 (2005) ............................................................................... 169

*Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003) ..................................................................... 162-163

*Stephens v. Zant*, 631 F.2d 397 (5th Cir. 1980) ................................................................................ 52

*Strickland v. Washington*, 466 U.S. 668 (1984) ......................................................................... 38, 207

*Stringer v. Black*, 503 U.S. 222 (1992) ............................................................................................ 166

*Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) ....................................................................... 187

*Tumey v. Ohio*, 273 U.S. 510 (1927) ......................................................................................... 39, 207

*United States v. Acosta*, 470 F.3d 132 (2d Cir. 2006) .................................................................. 171, 172

*United States v. Amparo*, 68 F.3d 1222 (9th Cir. 1995) ................................................................. 171

*United States v. Arlt*, 41 F.3d 516 (9th Cir. 1994) .......................................................................... 116

*United States v. Battle*, 264 F. Supp. 2d 1088 (N.D. Ga. 2003) ..................................................... 156

*United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) ..................................................................... 173

*United States v. Butler*, 496 F. App'x 158 (3d Cir. 2012) ............................................................... 171

*United States v. Carrillo*, 902 F.2d 1405 (9th Cir. 1990) ................................................................. 52

*United States v. Chapa-Garza*, 243 F.3d 921 (5th Cir. 2001) ......................................................... 173

*United States v. Cochran*, 770 F.2d 850 (9th Cir. 1985) ................................................................ 187

*United States v. Cronic*, 466 U.S. 648 (1984) ........................................................................... 39, 136

*United States v. Davis*, 285 F.3d 378 (5th Cir. 2002) ...................................................................... 133

*United States v. Diaz*, 2007 WL 656831 (N.D. Cal. Feb. 28, 2007) ............................................... 153

*United States v. Duncan*, 599 F. App'x 679 (9th Cir. 2015) ...................................................... 12, 210

*United States v. Egbert*, 562 F.3d 1092 (10th Cir. 2009) ................................................................ 171

*United States v. Farhad*, 190 F.3d 1097 (9th Cir. 1999) ............................................................ 116, 121

*United States v. Fell*, 360 F.3d 135 (2d Cir. 2004) ...................................................... 156, 158, 159, 160

*United States v. Fuertes*, 2015 U.S. App. LEXIS 14475 (2015) ......................................................... 171

*United States v. Garcia*, 606 F.3d 1317 (11th Cir. 2010) ................................................................. 173

*United States v. Gilbert*, 120 F. Supp. 2d 147 (D. Mass. 2000) ....................................................... 148

*United States v. Gomez-Leon*, 545 F.3d 777 (9th Cir. 2008) ........................................................... 169

*United States v. Gonzalez*, 2004 WL 1920492 (D. Conn. Aug. 17, 2004) .................................... 153-154

*United States v. Green*, 521 F.3d 929 (8th Cir. 2008) ..................................................................... 171

*United States v. Hicks*, 103 F.3d 837 (9th Cir. 1996) ..................................................................... 174

*United States v. Hoog*, 504 F.2d 45 (8th Cir. 1974) ....................................................................... 174

*United States v. Johnson*, 239 F. Supp. 2d 924 (N.D. Iowa 2003) ................................................. 156

*United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005) ............................................... 166

*United States v. Jones*, 29 F.3d 1549 (11th Cir. 1994) ................................................................... 113

*United States v. Leon*, 468 U.S. 897 (1984) .................................................................................... 166

*United States v. Matthews*, 246 F. Supp. 2d 137 (N.D.N.Y. 2002) ................................................. 156

*United States v. Melton*, 970 F.2d 1328 (4th Cir. 1992) ................................................................. 174

*United States v. Mendez*, 992 F.2d 1488 (9th Cir. 1993) ................................................................ 171

*United States v. Murdoch*, 98 F.3d 472 (9th Cir. 1996) ............................................................ *passim*

*United States v. Naughton*, 2015 U.S. App. LEXIS 15592 (4th Cir. Sept. 2, 2015) .............................. 171

*United States v. Perez-Vargas*, 414 F.3d 1282 (10th Cir. 2005) ..................................................... 174

*United States v. Portela*, 469 F.3d 496 (6th Cir. 2006) .................................................................. 173

*United States v. Rodriguez*, 389 F. Supp. 2d 1135 (D.N.D. Sept. 27, 2005) ................................... 148

*United States v. Royal*, 731 F.3d 333 (4th Cir. 2013) ..................................................................... 172

*United States v. Sablan*, 2008 WL 700172 (D. Colo. 2008) ............................................................ 148

*United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004) ............................................ 148, 162

*United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007) .................................................................. 166

*United States v. Serafin*, 562 F.3d 1105 (10th Cir. 2009) .............................................................. 172

*United States v. Taveras*, 488 F. Supp. 2d 246 (E.D.N.Y. 2007) .............................................. 162, 166

*United States v. Taylor*, 303 F.2d 165 (4th Cir. 1962) ..................................................................... 51

*United States v. Tocco*, 135 F.3d 116 (2d Cir. 1998) ...................................................................... 174

*United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012) ................................................ 172, 174

*United States v. Torres-Villalobos*, 487 F.3d 607 (8th Cir. 2007) ................................................... 173

*United States v. Wilson*, 16 F.3d 1027 (9th Cir. 1994) .................................................................. 51-52

*United States v. Young*, 512 F.2d 321 (4th Cir. 1975) .................................................................... 173

*United States v. Zuniga-Soto*, 527 F.3d 1110 (10th Cir. 2008) ....................................................... 173

*Wheat v. United States*, 486 U.S. 153 (1988) ............................................................................ *passim*

*Woodson v. North Carolina*, 428 U.S. 280 (1976) .................................... 136, 137, 138, 166, 207

**Federal Statutes**

18 U.S.C. § 2 .......................................................................................... 6, 7, 36, 194

18 U.S.C. § 3 ...................................................................................................... *passim*

18 U.S.C. § 4 ...................................................................................................... *passim*

18 U.S.C. § 5 .......................................................................................... 5, 193, 194

18 U.S.C. § 6 ................................................................................................... 123

18 U.S.C. § 7 ................................................................................................... 123

18 U.S.C. § 8 ................................................................................................... 175

18 U.S.C. § 9 .......................................................................... 4, 115, 176, 192, 193

18 U.S.C. § 10 ................................................................................................. 176

18 U.S.C. § 11 ................................................................................... 176, 182, 193

18 U.S.C. § 12 ..................................................................... 11, 33, 123, 177

18 U.S.C. §§ 13-14 ......................................................................................... 177

18 U.S.C. §§ 14-15 ......................................................................................... 178

18 U.S.C. § 16 ................................................................................................. 169

18 U.S.C. § 16(b) ............................................................................................ 169

18 U.S.C. § 17 ................................................................................................. 179

18 U.S.C. § 18 ................................................................................................. 179

18 U.S.C. § 20 ................................................................................................. 180

18 U.S.C. § 21 ........................................................................................... 11, 34

18 U.S.C. §§ 59-60 ......................................................................................... 115

18 U.S.C. § 924(c) ............................................................ 167, 169, 171, 173, 174

18 U.S.C. § 924(e) ........................................................................................... 168

18 U.S.C. § 924(j) ............................................................. 167, 171-172, 174

18 U.S.C. § 1201 ..................................................................................... 168, 173

18 U.S.C. § 1201(a) ................................................................................. 172, 173

18 U.S.C. § 3005 ....................................................................................... 3, 191

18 U.S.C. § 3006A ............................................................................................ 13

18 U.S.C. § 3591(a)(2) ..................................................................................... 167

18 U.S.C. § 3593(c) ................................................................................. 155, 166

18 U.S.C. § 3593(e) ........................................................................... 10, 32, 205

18 U.S.C. § 3594 ................................................................................ 10, 32, 205

18 U.S.C. § 4241 ................................................................................... 122, 123

18 U.S.C. § 4241(a) ......................................................................................... 114

28 U.S.C. § 16(b) ............................................................................ 169, 170, 171

28 U.S.C. §§ 23-24 ............................................................................................................ 216

28 U.S.C. §§ 31-32 ............................................................................................................ 216

28 U.S.C. § 40 ................................................................................................................... 217

28 U.S.C. § 42 ................................................................................................................... 217

28 U.S.C. § 56 ................................................................................................................... 217

28 U.S.C. § 753 .................................................................................................................. 51

28 U.S.C. § 753(b) ....................................................................................................... 51, 52

28 U.S.C. § 924(c) ........................................................................................... 168, 170, 173

28 U.S.C. § 924(c)(3) ........................................................................................................ 167

28 U.S.C. § 924(c)(3)(A) ................................................................................................... 172

28 U.S.C. § 924(c)(3)(B) ................................................................................... 168, 169, 171

28 U.S.C. § 924(j) .............................................................................................................. 167

28 U.S.C. § 1113 ................................................................................................................ 170

28 U.S.C. § 1201 ......................................................................................................... 173, 174

28 U.S.C. § 2255 ............................................................................................................. 1, 215

28 U.S.C. § 3593(c) ...................................................................................................... 148, 156

**State Cases**

*People v. Dabb*, 32 Cal. 2d 491 (1948) ...................................................................... 163-164

**Other**

David Hennes, Comment, *"Manufacturing Evidence for Trial: The Prejudicial Implications of Videotaped Crime Scene Reenactments, "* 142 U. Pa. L. Rev. 2125 (1994) .......................................... 163

Douglas, Lyon & Ogloff, *The Impact of Graphic Photographic Evidence on Mock Jurors' Decisions in a Murder Trial: Probative or Prejudicial*, 21 Law & Hum. Behav. 485 (1997) ....................................... 164

G. Strafer, *"Volunteering for Execution: Competency, Voluntariness and the Propriety of Third Party Intervention, "* 74 J. Crim. L. & Criminology 860, 862 (1983) ................................................. 183

Stanley M. Kaplan & Carolyn Winget, *The Occupational Hazards of Jury Duty*, 20 Bull. Am. Acad. Psychiatry & L. 325 (1992) ........................................................................................ 165

COMES NOW defendant JOSEPH E. DUNCAN, III, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence. Through counsel, Mr. Duncan states the following grounds for granting this motion:

## I.   INTRODUCTION

From January 8, 2013 to February 14, 2013, this Court presided over 23 days of testimony regarding Mr. Duncan's mental functioning. The court heard from experts in psychiatry, neurology, neuropsychology and psychology. Although the Court found Mr. Duncan competent to waive his appeal there was no dispute that he suffers from a mental disease, disorder or defect and that his neurological, neuropsychological and psychological functioning is highly abnormal, even if not psychotic. The Court heard some of the available evidence regarding Mr. Duncan's childhood, which prompted the Court to remark, "[t]he Defendant's background, history, experiences, actions, and the whole picture of the Defendant portrays an individual who has endured great suffering in his life from an early age and is clearly disturbed by those events." Mitigation was not the hearing's focus, but mitigating evidence nonetheless emerged; Mr. Duncan's life history is rife with mitigation.

Yet, during the entire August 2008 sentence trial not a single word of mitigation was uttered. During the pretrial and trial proceedings, the scales, already weighted heavily in the Government's favor, were tipped overwhelmingly toward death by a constellation of errors that stripped away every true element of adversarial testing, one after another. During all stages of the pretrial proceedings the defense was beset by problems that prevented an adequate pretrial investigations and preparations. The deficiencies of the defense led to the reigns being handed to

a defendant determined to communicate "Truth" though silence and to present a no-defense defense, which he believed would lead the jurors to reach an Epiphany similar to his own.

As a result, the jury heard nothing to counterbalance the aggravating evidence the Government present, much of which as alleged in the claims which follow, was improperly admitted. The jury heard much about the crimes and abuses committed by Mr. Duncan, but nothing about the suffering and abuse he endured as a child, adolescent and young adult. Mr. Duncan and his siblings were subject to severe violence and physical abuse as children.  He was sexually abused on repeated occasions, both in childhood and later in a variety of institutional settings.  Mr. Duncan's background as a victim of childhood sexual abuse, which was perpetrated upon him by multiple individuals throughout his development, was significant information that the jury never heard to help them understand how Mr. Duncan himself became a sex offender capable of inflicting such suffering on others.

Further, the jury heard nothing of Mr. Duncan's mental illness, organic brain damage, neurological deficits and the like.  Even though the Court was persuaded that the prosecution's experts – who concluded Mr. Duncan was not psychotic but merely "highly extreme" – had the better case, all of the experts, defense and prosecution alike, had opinions highly relevant to sentencing and almost universally mitigating.  The mere exploration of the Epiphany that occurred at the retrospective competency hearing, despite questions whether it was rooted in delusion or a mere sudden realization that killing was wrong and acceptance of responsibility is preferable, was an exploration into mitigation.  Had Mr. Duncan understood, though the adequate advice of counsel, that the sentencing trial might have included the same kind of analysis of his Epiphany as did the retrospective competency hearing, he very likely would not have sought to wrest the case away from counsel and everything about the sentencing proceeding would have been different.

For more than four decades the Supreme Court has charged the lower courts with observing procedural protections intended to insure reliability, rationality and non-arbitrariness in the administration of the death penalty.  The constellation of errors, omissions, and constitutional violations set forth below resulted in a proceeding that from initial stages to dismissal of an appeal side-stepped virtually every check on the wanton imposition of a sentence of death.

## II.    STATEMENT OF THE CASE

### A.  Federal Trial Proceedings

#### 1.  Federal Indictment and Initial Defense Team

On January 18, 2007, the Government obtained a ten count indictment against Mr. Duncan charging him with murder and other offenses related to the kidnapping and abuse of two juveniles, S.G. and D.G., in 2005. Doc. 1.  The federal charges were preceded by Idaho state court proceedings on related charges.  The Idaho state case was resolved by guilty plea and a sentence of life imprisonment in October 2006.  Roger Peven, Executive Director of Federal Defenders of Eastern Washington and Idaho, Inc., was appointed for defense counsel for Mr. Duncan prior to the return of the federal indictment when it first became evident federal charges would be filed.  Shortly after the federal indictment issued, Seattle based attorney Mark Larranaga joined the case as learned capital counsel pursuant to 18 U.S.C. § 3005.  Doc. 13 [sealed].  A third lawyer, Thomas Monaghan of the Federal Defender in Boise, was assigned to act as local counsel.  Because Mr. Duncan was being held at the Idaho Maximum Security Prison, there was a recognized need that someone maintain regular contact with Mr. Duncan.  With Mr. Peven located several hours away in Spokane and Mr. Larranaga located in Seattle, Mr. Monaghan served as the main point of contact with the client.

In accord with local practice, an initial trial date was set for three months out from the indictment at March 20, 2007. Doc. 9. Just after the indictment, the Government filed a six page Notice of Aggravating Factors and Intent to Seek the Death Penalty. Doc. 11. The Government filed an initial request for a continuance to July 9, 2007. Doc. 22. The defense moved for a continuance to August 18, 2008, based on its need to adequately prepare for trial. Doc. 24. Thereafter, the Court reset the trial date for January 28, 2008. Doc. 32. The Court's determination of a new trial date was partially premised on the presumption that Mr. Peven's purported involvement in the Idaho State proceedings would accelerate the defense's ability to prepare for trial. *Id.* at 9. As described in detail, *infra*, the Court's presumption about Mr. Peven's involvement in the state case, particularly with regard to the way that involvement would facilitate preparations for the federal trial, was misplaced. So too was the Court's subsequent reliance on Mr. Peven's purported work on the federal case.

### 2.   Five Months Before Trial – Lead Counsel Seeks to Withdraw

On August 8, 2007, Mr. Peven sent Mr. Larranaga an email stating he was contemplating withdrawing from the case. Doc. 80 [Declaration of Mark Larranga] at 11. The email did not provide any reason, and Mr. Larranga could not reach Mr. Peven to discuss the matter further. *Id.* By August 17, Mr. Peven apparently had decided that he would move to withdraw and asked Mr. Larranaga to alert the court at the next status conference, which was scheduled for August 22, 2007. *Id.*

An unrecorded, *ex parte* conference took place on August 28, 2007, during which Mr. Peven asked to meet privately with the district court in chambers. 8/28/07 RT 1. Mr. Larranga's request to attend the meeting was denied. *Id.* at 3-4. After approximately 15 minutes, Mr. Larranaga was summoned to chambers and was informed that Mr. Peven would not be

Corrected Defendant's Motion for Collateral Relief          4          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

withdrawing but would be taking on the role of "advisory counsel" for Mr. Duncan. Doc. 179 at 3-4. The court instructed Mr. Peven to prepare a sealed *ex parte* declaration describing the in chambers proceeding. *Id.* at 4.

On September 7, 2007, Mr. Peven filed a sealed declaration "in support of appointment of attorney" which was written to "memorialize information I provided to the Court during a private off the record meeting ... on Tuesday, August 28, 2007, and to detail some of the resulting impact of the personal and professional pressures I am experiencing." Doc. 68 at 1. Mr. Peven then detailed a number of personal and professional disasters that had befallen him, beginning in February 2007, and which had prevented him from fulfilling his obligations in this case. *Id.* at 5. In the concluding paragraph, Mr. Peven stated that he had advised the court that "[n]ew counsel need to be appointed to meet the necessary responsibilities of investigation and preparing the case for trial," but inasmuch as "I have a good relationship with Mr. Duncan and have built credibility with the victim's family, I advised the court I can remain in an advisory capacity to the defense team." *Id.*

Neither the declaration nor the record as a whole discloses whether taking an advisory capacity role was something Mr. Peven had requested, or something to which he had acquiesced upon being denied leave to withdraw. The declaration also fails to describe any discussion regarding whether new counsel would or would not be able to obtain a continuance of the trial date in order to prepare. However, following the hearing Mr. Peven told Mr. Larranaga that his request had been for leave to withdraw entirely, but that the court had assigned him the role of advisor to any new counsel and the remainder of the team. Doc. 179 at 8.

On September 11, 2007, the defense filed a motion to have Judy Clarke of Federal Defenders of San Diego, Inc. appointed to replace Mr. Peven as counsel of record and to have

Corrected Defendant's Motion for Collateral Relief         5         *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

Federal Defenders of San Diego, Inc. take over responsibility for funding the case. Doc. 69. In a September 17, 2007, sealed order the District Court appointed Ms. Clarke, not in Mr. Peven's stead, but in addition to him, citing the need for Mr. Peven to "reduce his involvement in the matter." Doc. 70. The order also transferred the funding authority for the case to Federal Defenders of San Diego, as the motion requested. *Id.* at 2.

On October 3, 2007, the defense filed a 19-page motion, Doc. 74, supported by the sealed declarations of Mr. Larranaga and others, Doc. 80, requesting a one year continuance of the trial date, until January 2009. The defense relied on the "numerous obstacles" that the defense had encountered after the Court established the January 2008 trial date. A hearing was held on October 12, 2007, at which the court denied a continuance explaining *inter alia* that Mr. Peven had not been allowed to withdraw from the case and that "[h]e is a valuable tool to the defense because of the information he had prior to present counsel entering the case." 10/12/07 RT 41.

On October 25, 2007, Mr. Peven filed a motion, which was prompted by the court's comments about him, "formaliz[ing] and renew[ing] [his previous] unrecorded request of this Court to withdraw as counsel." Doc. 89. The motion was supported by a declaration filed under seal describing Mr. Peven's psychological problems as far more severe than previously disclosed to the court. Doc. 90. On November 1, 2007, the district court entered a sealed order denying the motion. Doc. 104. The Court wrote that during their private in-chambers meeting Mr. Peven had not asked to withdraw but only to reduce his involvement and the Court had advised Mr. Peven that any attorney coming into the case due to Mr. Peven's reduced involvement "would have to know up front" that the Court would not continue the trial date. The court also wrote that there was nothing in Mr. Peven's declaration "that would suggest that the difficulties Mr. Peven is undergoing would prevent him from assisting the defense team in [] a limited capacity [in that] Mr.

Corrected Defendant's Motion for Collateral Relief     6     *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

Peven has been and remains the Executive Director of the Federal Defenders of Eastern District of Washington and Idaho." *Id.* at 2-3.

On or about November 13, 2007, the President of the Board of Directors of Federal Defenders of Eastern Washington and Idaho, Inc., wrote to the Court that after meeting with the Executive Committee of the Board on November 8, 2007, Mr. Peven had been put on indefinite leave of absence based on information set forth in declarations executed by several senior staff members of the organization. The declarants had sworn that Mr. Peven had been virtually incapacitated by psychiatric problems for a considerable time. On November 20, 2007, Stephen Hormel, Acting Executive Director of the Federal Defenders of Eastern Washington and Idaho, Inc., followed up on the November 13th letter with a motion for the agency to be relieved as counsel for Mr. Duncan. Docs. 173; 174.

On November 5, 2007, the defense filed a motion to extend the time to file its Fed.R.Crim.P. 12.2 notice of expert testimony, Doc. 117, because "inadequate work has been completed to provide reliable or accurate notice." More specifically, the motion stated that "to date, appropriate experts have not been retained, and what may be necessary evaluation and/or testing has not been completed." *Id.* at 2. On November 21, the district court denied the motion. Doc. 175.

On November 24, 2007, the defense filed a motion to clarify what had occurred during the August 28, 2007, private in-chambers meeting with Mr. Peven. Doc. 179. The motion recited that at various times the court had stated that the meeting with Mr. Peven was limited to personal issues not affecting the case, while the November 1, 2007, order denying the motion to continue said something quite different. The motion pointed out that the record was unclear as to what assurances Mr. Peven had made to the court and what conditions were placed on his being

"advisory counsel." In particular, the defense noted that Mr. Peven had never told Ms. Clarke or other members of the team that he had requested merely a reduced role in the case and with that role he could insure the case could go forward on the same time table. *Id.* at 8.

On November 28, 2007, the district court denied the motion to clarify, Doc. 185, stating that there was no ambiguity in the record as to what had occurred and chiding counsel for implying otherwise. The court reiterated that Mr. Peven had only asked to have a reduced role and that the court had made clear at that time (and thereafter) that any new counsel coming into the case in light of Mr. Peven's reduced role "would have to be apprised of the trial date so that he or she would know of the time requirements that would apply." *Id.* at 3.

### 3. Mr. Duncan Pleads Guilty to all Charges and the Sentencing Trial is Reset for April 2008

On December 3, 2007, with no agreement in place, Mr. Duncan entered a plea of guilty to each of the ten charges alleged in the indictment, whereupon the previously-selected January 28, 2008, trial date was confirmed as the date the penalty trial would begin. Doc. 189. On December 5, the Government moved to continue the trial date until April 7, 2008—the estimated date on which the sentencing hearing would have begun had the guilt phase gone to trial—in return for a defense stipulation that S.G.'s testimony could be presented through the statements she made to law enforcement officers at the time of Mr. Duncan's arrest. Doc. 192 at 5. On the same day, the defense filed a motion to continue the trial date, with a requested date of September 15, 2008. Doc. 193. The defense motion stated that twice before the defense had "sought sufficient time to investigate and prepare this capital case for trial, and now seeks again to persuade this court of the need for additional time, to provide this Court with new information and to challenge the assumptions relied on by the Court in denying a continuance." Doc. 193 at 1-2. On December 12, 2007, the court granted the Government's request and denied the Defense's; setting trial for April

Corrected Defendant's Motion for Collateral Relief          8          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

14, 2008.

### 4.  Expert Disclosures Under Fed.R.Crim.P. 16(b)(1)(C) and 12.2

At a February 12, 2008, status conference, the court set March 12, 2008, as the due date for the defense's written summary of expert witness testimony under Fed.R.Crim.P. 16(b)(1)(C). Doc. 266 (minute order).  On February 2008, the district court issued orders authorizing the defense to conduct medical and psychological tests and examinations of Mr. Duncan.  Docs. 273, 274.  On March 12, the defense filed a sealed "Status Report and Notice of Defense Experts," Doc. 306, stating that only limited information regarding defense experts could be provided because

> Experts who have been retained (1) have not completed their review of materials, (2) have not had an opportunity to interview potential witnesses regarding Mr. Duncan's genetic and developmental history, including critical developmental years in prison as well as others relevant to an understanding of Mr. Duncan's life, and/or (3) have not been able to review and interpret testing that has recently been completed.

Doc. 306 at 3. The notice did indicate, however, that psychologist Ruben Gur, Ph.D., may offer an opinion interpreting neuropsychological testing that was in progress at the time of the notice, and that psychiatrist and neurologist James Merikangas, M.D. may offer an opinion regarding Mr. Duncan's neurological, physical, genetic and psychiatric impairments after reviewing test results likely to be unavailable for another month.  *Id.* at 6-8.

On March 20, the Government moved to bar the testimony of Drs. Gur and Merikangas on the ground that their opinions seemed to relate to a mental disease or defect, and as such the defense had been obligated, but had failed, to make the required Fed.R.Crim.P. 12.2 disclosures on November 5, 2007, as ordered by the Court.  Doc. 322.  On March 25, the defense filed a response conceding that Drs. Gur and Merikangas would be testifying about a mental disease or defect and that the Court had never extended the November 7, 2007, Rule 12.2(b) deadline.  The

defense explained that this was the inevitable result of the Court's prior denials of the defense's motions to continue.  Doc. 330 at 3-4 (citing Docs. 193; 194 (sealed, *ex parte*); 239; 240-242 (sealed, *ex parte*)).

### 5. Mr. Duncan Requests to Proceed *Pro Se*, Which the Court Allows, Resulting in Mr. Duncan Being Sentenced to Death

Jury selection began on April 14, 2008.  On April 16, the second day of jury selection, Mr. Duncan advised the court that he would waive counsel and proceed *pro se*.  The question of Mr. Duncan's competency to represent himself was raised by the court *sua sponte* and by defense counsel in various pleadings.  On July 24, 2008, after reviewing the reports of three defense experts who concluded that Mr. Duncan was incompetent, and of two court appointed experts holding the contrary view, the district court, without holding a hearing, found Mr. Duncan competent to proceed and to represent himself.  Doc. 493 [sealed version]; 494 [redacted public version].

Thereafter, the Court allowed Mr. Duncan to represent himself, over defense counsel's objections.  Mr. Duncan proceeded to inquire almost nothing of the prospective jurors and, after trial began, almost nothing of the Government's witnesses.  He put on no evidence in mitigation.  On August 27, 2008, the jury returned verdicts recommending a sentence of death on each of Counts One, Five and Seven. 18 U.S.C. § 3593(e).  The court then imposed the death sentences as required under 18 U.S.C. § 3594.  Doc. 598.  On November 3, 2008, the court sentenced Mr. Duncan on the remaining seven counts of the indictment to which the defendant had pled guilty.  Doc. 601.

### 6. Mr. Duncan Equivocates Regarding His Appeal

On November 17, 2008, standby counsel filed a notice of appeal.  Doc. 605.  On November 19, 2008, the Government filed a motion to strike the notice of appeal for lack of Mr. Duncan's authorization, Doc. 606, which was supported by an FBI Agent's affidavit describing

Corrected Defendant's Motion for Collateral Relief          10          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

portions of a number of recent interviews with Mr. Duncan.  On November 20, 2008, the district court set a hearing for November 24, 2008, to determine whether or not Mr. Duncan was "knowingly and voluntarily waiving his right to appeal." Doc. 609.  Standby counsel filed an objection to the scheduling of a status conference on the ground that the court lacked jurisdiction to inquire into the validity of the notice of appeal.  Doc. 610.

At the outset of the November 24, 2008 hearing, the court overruled the objection to the hearing and engaged in a colloquy of sorts with Mr. Duncan regarding his right to an appeal and whether or not he wished to waive that right. 11/24/08 RT 5. After a series of rambling and confusing exchanges, Mr. Duncan eventually stated that he understood what others may call the right to an appeal and that he did not chose to participate in it.  Ms. Clarke alleged that the FBI had likely influenced Mr. Duncan in his decision not to participate in an appeal during the many hours of interviews it conducted with him and by its tendency to provide small gifts and favors at the jail.  *Id.* at 3-4.  The court declined to inquire into issues of inducement other than to ask Mr. Duncan whether he was "making [his] decision voluntarily and of [his] own free will?" *Id.* at 12.

The court did not inquire into the reasons for Mr. Duncan's decision, and consistently discouraged Mr. Duncan from expressing them when he frequently sought to do so throughout the hearing.  At the conclusion of the hearing, the court found that "your choice to forego your right to file an appeal is the product of a free and deliberate choice.  It is made knowingly and intelligently.  You have clearly expressed your understanding of the significance and consequences of your decision to waive appeal and, nevertheless, desire to do so." *Id.* at 21; *see also* Minutes, 11/24/08, Doc. 612 ("The Court finds the defendant's waiver is a free and deliberate choice.").  Despite the fact that Mr. Duncan's responses tended to indicate not that he objected to any appeal being taken but only that he wished to do nothing to authorize or endorse any appeal, the court never advised

Corrected Defendant's Motion for Collateral Relief     11     *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

him that as a matter of law his refusal to endorse an appeal of the conviction and sentence would itself constitute the legal authorization for an appeal of the issues of competency and waiver.

### 7. The Appeal of the District Court's Order

Stand by counsel appealed the district court's order to the Ninth Circuit Court of Appeals. The Circuit held that the district court was wrong about what the record revealed, that a competency hearing was required, and reversed the district court's waiver finding with instructions to conduct a retrospective competency hearing. *United States v. Duncan*, 643 F.3d 1242, 1250 (9th Cir. 2011). The district court appointed new counsel on remand. Docs. 698; 703.

### 8. The Retrospective Competency Hearing and Subsequent Related Proceedings

Over 23 days in January and February 2013, the court conducted a retrospective competency hearing, during which both sides presented lay and expert testimony. In sum, the evidence showed that Mr. Duncan's view of the world is at least "highly extreme," and in the unanimous opinion of all defense experts plainly delusional. No expert for either side contended that Mr. Duncan's views were insincere or his symptoms feigned, or that he was in any way malingering. Prosecution experts conceded that the issue of competency was very "thorny," that Mr. Duncan's presentation was "extreme," and whether his unusual beliefs were sufficient to "rise to the level" of delusions was critical.

The testimony and the court's findings are discussed in detail in Claim __ of this motion. The Court of Appeals affirmed the Court's order on March 27, 2015. *United States v. Duncan*, 599 Fed. Appx. 679 (9th Cir. 2015). The United States Supreme Court subsequently denied Mr. Duncan's Petition for Writ of Certiorari. *Duncan v. United States*, 2016 U.S. Lexis 1258 (U.S. Feb. 29, 2016).

III.   **CLAIM 1:  MR. DUNCAN WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006A AND THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND HIS RIGHT TO A RELIABLE DEATH JUDGMENT AS GUARANTEED BY THE EIGHT AMENDMENT TO THE UNITED STATES CONSTITUTION BY THE MULTIPLE PREJUDICIAL ERRORS AND OMISSIONS OF TRIAL COUNSEL, ALL OF WHICH WERE EXACERBATED BY THE ERRONEOUS AND PREJUDICIAL RULINGS OF THE COURT**

As the detailed factual allegations below demonstrate, throughout the period of the appointment of Roger Peven to the appointment of Judy Clarke, Mr. Duncan was denied his constitutional and statutory rights to the effective assistance of counsel by virtue of Mr. Peven's incapacitation by psychological problems and alcoholism, his refusal and/or inability to perform any meaningful work on the case, his obstruction of the work of others, and his concealment of his problems and attitude toward the case from other members of the defense team.  By the time Ms. Clarke was appointed the damage had already been done, and the court remained steadfast in its belief that additional time was not necessary.

In a desperate atempt to obtain a modicum of additional time to prepare a sentencing presentation, the defense encouraged Mr. Duncan to enter a plea of guilty, something he had contemplated from the start but from which he had always been easily dissuaded.  Due to lack of preparation, defense counsel were unable fully to advise Mr. Duncan of the advantages and disadvantages of waiving trial in that they were unable to—and in fact did not—discuss with him potential defenses, or even that the trial could be a vehicle for the airing of his personal story turmoil and redemption that he so earnestly wanted the public to understand.  As ill-advised as the decision to encourage Mr. Duncan to plead was, it ultimately ended as an exercise in futility.  Instead of providing additional time for preparation, it resulted in an even more ill-advised decision by Mr. Duncan to waive both counsel and opportunity to present mitigating evidence.

The representation by counsel fell below prevailing standards of reasonableness and the problems in the representation were exacerbated by the court's denial of a reasonable opportunity to prepare.  The errors and omissions were prejudicial and rose to the level of multiple structural errors as described below.

### A. Lead Counsel, Roger Peven's, Dysfunction and the Devastating Effects it had on Counsel's Capacity to Provide Constitutionally Adequate Counsel

#### 1. July 2005 to October 2006

In July, 2005 Mr. Duncan was arrested and charged in Idaho state court with multiple felony charges, including kidnapping and murder.  It was anticipated that Mr. Duncan would also be charged in federal court with related offenses that occurred in the Lolo National Forest outside of Regis, Montana.  Based on that assumption, Roger Peven, then Executive Director of the Federal Defender for Eastern Washington and Idaho (FDEWI), sought and received a pre-indictment  appointment as counsel for Mr. Duncan.  During the latter part of 2005 and early 2006 Peven had intermittent dealings with the state defense team.  Peven's singular goal throughout that time period was to reach a global settlement agreement wherein Mr. Duncan would plead guilty to state and federal charges in exchange for life sentences.  Peven's primary role in facilitating such a settlement was to spend time with Mr. Duncan, establishing the necessary trust and rapport for purposes of resolving the case.

Also during this pre federal-indictment phase of the case, FDEWI investigator Bill Proctor was assigned to work on the case.  Proctor had only recently finished another federal capital case and upon being assigned Mr. Duncan's case, he sought to assemble a formidable defense team for Mr. Duncan, as had been done in the case he'd just finished.  As Proctor explained in his declaration:

Of particular concern to me was putting together a mitigation team, which is an absolute necessity in capital cases. Just before being assigned to Mr. Duncan's case I had spent two years working on the Alabama federal capital trial case of Eric Rudolph. . . In 1998 Mr. Rudolph was placed on the FBI's Ten Most Wanted list, and he remained at large until he was arrested in May 2003 . . . federal capital charges were brought against him in both Alabama and Georgia. . . In April of 2005 our defense team worked out a global settlement in Mr. Rudolph's cases, coordinating closely with Mr. Rudolph's Georgia counsel.

The settlement of Mr. Rudolph's cases was a substantial undertaking, requiring the work of more than a dozen people over a two-year period. Mr. Rudolph pled guilty to the bombing of an Alabama abortion clinic that resulted in the death of an off duty police officer and severe injuries to a nurse working at the clinic. He also pled guilty to the 1996 Olympic bombing in Atlanta that killed two people and two other Atlanta area bombings in 1997, one at an abortion clinic in [Georgia] and another at . . . [an Atlanta area] a lesbian nightclub. As a result of his various bombings, more than 100 people were injured. Rudolph was a highly complex and highly aggravated case. The multiple bombings and the extended time that he remained at large terrorized those communities. We worked around the clock on his case for two years . . .

Taking my experience and knowledge from the Rudolph case, I sought to build a similarly strong team for Mr. Duncan's case. I started by enlisting Scarlet Nerad, who I knew to be an excellent mitigation investigator from my experience working with her in the Rudolph case, followed by Jimmy Lohman and Rachel Rogers, two mitigation specialists based in Texas. Jimmy, Rachel and Scarlet worked with me off and on during the early stages of Mr. Duncan's case, but I was unable to take anything close to full advantage of their abilities.

The foundation I was trying to build for Mr. Duncan's case rumbled before the federal indictment even issued. (Exh. 10, Declaration of Billy L. Proctor, Jr., at 80-82).

As Proctor made clear, the reason his efforts fell flat were attributable almost entirely to Roger Peven:

No matter how hard I tried to explain the critical importance of early and comprehensive investigative efforts to my boss, Roger Peven, he wouldn't buy into it. In his entire career, Roger had never prepared for a penalty phase in a federal death penalty case. He was worse than skeptical about mitigation; he was downright dismissive and eventually removed Jimmy,

Corrected Defendant's Motion for Collateral Relief          15          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

Rachel and Scarlet from the case.[1]  Roger thought there was no point to working up a culpability phase defense, but neither did he believe mitigation efforts would produce anything worthwhile.  (*Id.* at 3).

The other members of the defense team looked at Peven by necessity, both because he was de facto lead counsel at that point and also because, as Executive Director, he controlled the case budgeting.  Proctor admitted the rest of the team was "spinning [their] wheels" and that their "early investigative efforts died on the vine, with almost nothing to show for the many months" they'd had the case.  *Id.*

### 2.   October 2006 to September 2007

On October 16, 2006 Mr. Duncan pled guilty to all charges in his state court proceedings. Immediately thereafter, Mr. Duncan was transferred from the Kootenai County jail to the Idaho Maximum Security Institution ("ISMI"), approximately seven hours away, in Boise.  With Mr. Duncan then several hundred miles away, Peven arranged for a Boise Assistant Federal Defender, Thomas Monaghan, to begin visiting Mr. Duncan.  Monaghan was permitted to spend no more than 50% of his time on Duncan.  Almost all of that was consumed with visits to Mr. Duncan. Exh. 8, Declaration of Thomas Monaghan, at 61.[2]

On January 18, 2007, a federal indictment issued, charging Mr. Duncan with ten counts, including aggravated sexual abuse of a minor, kidnapping, and murder.  Doc. 1.  Shortly thereafter, Seattle based attorney Mark Larranaga was appointed as "learned counsel" in Mr. Duncan's case. Neither Peven nor Monaghan met the criteria to be designated as learned counsel.  Peven had

---

[1] *See* Exh. 40, Mark Larranaga email regarding continuance preparation August 10, 2007 and Doc. 80, Attach. 3, Declaration of Debra Garvey (sealed).
[2] This remained the case until approximately April 2007.  Exh. 8, Declaration of Thomas Monaghan, at 62-64.

Corrected Defendant's Motion for Collateral Relief                16          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

never prepared for a capital penalty phase and Monaghan had only had the most passing exposure to capital litigation. *See* Exh. 8, Declaration of Thomas Monaghan, at 62. Thus, Larranaga brought much-needed capital experience to the case. *Id.* Larranaga dedicated his skills and his time to trying to prepare for trial. However, almost from the beginning, Larranaga faced significant resistance from his co-counsel, Peven. Larranaga has described the problems he encountered with Peven as follows:

> Mr. Peven was appointed prior to issuance of a federal indictment due to the clear potential for federal capital charges. As I learned when I came onto the case, he had initial been working with and assisting the Kootenai County Public Defender's office in pursuit of a global settlement of all potential state and federal charges. According to Mr. Peven, once it became clear that there would not be global settlement, he shifted his focus to assisting state counsel with resolving that case. Although I have no way of knowing precisely just how involved Mr. Peven was at the state level I can say unequivocally that within weeks of my coming onto the case, it was clear very little had been done that would be of any use to us in the federal case. Moreover, by his own admission, between the time of Mr. Duncan's October, 2006 plea in Kootenai County until the federal indictment issued in January, 2007, neither he nor anyone else in the Spokane office was working on Mr. Duncan's case. Mr. Peven specifically stated that the only thing he did relating to Mr. Duncan's case during that four-month period was "maintaining contact with him."

> Having to deal with Mr. Peven on this case was the most frustrating and disappointing experience I have ever had working with another lawyer. From very early on in my involvement, Mr. Peven was unengaged and unresponsive. That was, of course, frustrating as a general matter, but also had very specific implications for our ability to work on Mr. Duncan's case. Mr. Peven's attitude towards me and others working on the case, Ms. Garvey included, was nothing short of hostile at times. Though ostensibly I had been appointed to partner on the case with Mr. Peven and contribute my skills as a capital litigator, Mr. Peven alternated between dismissive and antagonistic when I sought to engage him about the case and certainly when I asked anything of him.

> This lack of professionalism had a particularly devastating impact on our ability to obtain the assistance of expert witnesses in the case, in a case where expert assistance was clearly of paramount importance. The defense team met of May 31, 2007 for the express purpose of discussing potential experts in the case. During that meeting we identified various potential areas of

Corrected Defendant's Motion for Collateral Relief          17          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

expertise and experts that might be helpful. However, we remained unable to retain experts for two primary reasons: 1) we had yet to do sufficient investigation to identify the best-suited experts or provide the same with the type of materials necessary for their review and 2) Mr. Peven would not approve funds directly resulting in our inability to obtain approval and funding for experts once identified. The authority to approval and fund experts rested solely with Mr. Peven. (Exh. 7, Declaration of Mark Larranaga, at 52-53).

Others similarly attest to the stalemate between Peven and Larranaga:

Important tasks were being ignored and Roger's attitude seemed to be that there was no point to preparing for either the guilt/innocence or the penalty phase. As such, other team members, Mark Larranaga and Deb Garvey[3] especially, who were attempting a meaningful preparation for Mr. Duncan's trial, did not receive the support they needed to prepare the case properly. (Exh. 8, Declaration of Thomas Monaghan, at 63).

Mark was diligent in his own work and dogged in his efforts to get Roger to work on the case. Nevertheless, the friction between Roger and Mark grew over time. Eventually, when Mark would inquire about funding for experts in the case, Roger would become nonresponsive . . . There were instances where I voiced support for something that Mark advocated for in the case. Not only did Roger have a negative, knee jerk reaction to Mark's recommendations, but he seemed to feel somehow betrayed by my support for Mark's position. (*Id.* at 64).

During May or June of 2007, I specifically recall attempting to help staff get expert witness engagement letters completed for Duncan. I was aware from speaking to staff that co-counsel, Mark Larranaga, was trying to get this task completed. I also recall Roger halting those efforts in spite of Mark's drive to get experts on the case. It was during this time that Roger openly talked about his strategy to do nothing for the guilt phase, plead Duncan guilty, and then go from there. (Exh. 5, Declaration of Stephen R. Hormel, at 36-37).

I had some knowledge of the communications between Mark Larranaga and Roger from comments made by Roger to me. At some point after Mark joined the case, I recall Roger expressing a serious displeasure at

_____

[3] Debra Garvey was the capital case coordinator, for the Federal Defender for the Central District of California. Ms. Garvey was "loaned out" by her office to assist the Duncan defense team, beginning in early 2007. Doc. 80 at 1-4 (sealed).

Mark's attempts to prepare the case.  Roger expressed how Mark was persistent in emails to try to get Roger to engage specific tasks in the case. Roger became openly hostile and disparaging, complaining about Mark's emails and stating that Mark "was the most passive aggressive person not in prison." (*Id.* at 37-38).

Within weeks of Mr. Duncan's arraignment, I began to hear concerns about Mr. Peven's personal health and well-being and, relatedly about difficulties various team members were having working with him on the case.  On several occasions during February 2007, Ms. Garvey expressed concerns about the case being highly disorganized and that Peven was not well. Around that same time, I heard from Dick Rubin, the chief federal defender in Boise, that Peven's wife was leaving him.  (Exh. 1, Declaration of Judy Clarke, at 4-5).

Around this same time, Mark Larranaga, whom I did not previously know, contacted me and asked for help in working with Mr. Peven.  Mr. Larranaga was extremely frustrated and concerned that Mr. Peven seemed unable or unwilling to meaningfully engage with him about the case.  Mr. Larranaga was particularly anxious about delays in funding and staffing for the case and his inability to get experts retained.  (*Id.* at 5).

\* \* \* \* \*

Around May 2007, I learned that Mr. Peven had decided that the defense should not conduct any investigation into any guilt phase issues in the case. This surfaced after Mr. Larranaga drafted case budgeting documents for the Administrative Office of the U.S. Courts that included funding related to investigating culpability issues, and Mr. Peven asked him to remove those funding requests from the draft budget.  There was marked disagreement among the team about the issue.  Because Mr. Larranaga was primarily responsible for the penalty phase investigation and penalty phase experts, Mr. Peven's decision that there should be no guilt phase investigation was essentially a decision that he, personally, needed to do little work on the case.  (*Id.* at 5-6).

The frustration felt by those dealing with Peven and the myriad ways Peven's lack of responsiveness and cooperation impacted the rest of the team's ability to make progress on the case are documented throughout counsel's file.  *See* Exh. 26, Mark Larranaga email regarding agenda April 27, 2007, at 227, 229-232, 235-236; Exh. 27, Debra Garvey memorandum regarding proposed investigation plan May 2, 2007; Exh. 29, Thomas Monaghan emails regarding budget

Corrected Defendant's Motion for Collateral Relief       19       *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

May 8, 2007, at 245-246; Exh. 30, Mark Larranaga emails regarding supplemental budget May 14, 2007; Exh. 31, Mark Larranaga emails regarding team additions May 14, 2007; Exh. 36, Team emails June 2007 at 261, 265-266, 274, Exh. 37, Judy Clarke email July 17, 2007.

The failure of others to sound the alarm when it began to become apparent that Peven was woefully neglecting his responsibilities as counsel for Mr. Duncan is partly explained—though not justified—by Peven's prior, good reputation and by the pre-existing relationships that many of the people involved had with him.  During the spring of 2007, Capital Resource Counsel Judy Clarke, who was acting as a consultant of the case, explained:

> Throughout the spring of 2007, I continued to receive reports about Mr. Peven's lack of attention to the case. While I took [the] concerns seriously, my response to them was tempered by the fact that I had known Mr. Peven for many years and I knew him to be a talented trial lawyer.  Moreover, Mr. Peven repeatedly reassured me that things were on track in the case.  I took Mr. Peven at his word, relying on his past performance as a capable attorney and on our longstanding collegial relationship. . . At that time, I simply did not appreciate the severity of Mr. Peven's personal problems and health. (Exh. 1, Declaration of Judy Clarke, at 5).

As Ms. Clarke explained in her declaration, her initial consultation on *Duncan* was prompted in large part by her "long-standing relationship with FDEWI and Roger Peven" who she had personally hired at that office in 1992 when she was FDEWI's Executive Director.  Exh. 1, Declaration of Judy Clarke, at 2.  Peven also had long-standing relationships with Stephen Hormel, then Chief Trial Attorney and First Assistant at the FDEWI, Bill Proctor, then Chief Investigator at the FDEWI, and Tom Monaghan, Chief Trial Attorney for the Federal Defender Services of Idaho in Boise.  *See* Exh. 5, Declaration of Stephen R. Hormel, at 36; Exh. 10, Declaration of Billy L. Proctor, at 80, 83; and Exh. 8, Declaration of Thomas Monaghan, at 61, 63.  Hormel had known Peven even before he began his employment at FDEWI in 1993 and they had worked closely together and enjoyed a friendship for more than 20 years.  Exh. 5, Declaration of Stephen

R. Hormel, at 36. Peven and Proctor both started at FDEWI in 1992 and were, for many years, best friends. Exh. 10, Declaration of Billy L. Proctor, at 80, 83, see also Exh. 1, Declaration of Judy Clarke, at 2. Peven had been an early mentor to Monaghan, who began working at FDEWI in 1996, before eventually moving to the Yakima branch and then the Defender's office in Boise. Exh. 8, Declaration of Thomas Monaghan, at 61, 63.

All four of these people shared a common experience: each had known Peven for many years, and known him to be a solid and dedicated trial lawyer. Each of them also had experiences with Peven during the course of Mr. Duncan's pretrial proceedings that bore little resemblance to anything they had experienced in all the preceding years. See Exh. 8, Declaration of Thomas Monaghan, at 65; Exh. 5, Declaration of Stephen Hormel, at 36, 39-40; Exh. 10, Declaration of Billy L. Proctor, at 83; and Exh. 1, Declaration of Judy Clarke, 1-2, 5. The faith instilled by past performance and fond feelings apparently blinded these key individuals to what should have been signs of substantial impairment. Additionally, Peven engaged in a campaign of misdirection, telling people at his office that he couldn't deal with various administrative responsibilities because he was working on *Duncan*, and telling other members of the *Duncan* defense team that he was busy with his administrative duties as Executive Director.

During the summer of 2007 Peven's level of dysfunction became undeniable. As Mr. Larranaga notes in his declaration:

> As a direct result of Mr. Peven's failure to fulfill his responsibility, I drafted a supplemental budget in July of 2007, outlining the critical need for additional staffing and funding for experts and submitted it to Mr. Peven. His failure to respond was exceedingly alarming, and I gave serious consideration to going directly to the district court for the funding. Finally, at the end of July, Mr. Peven submitted a supplemental budget, which was both inadequate and incomplete. (Exh. 7, Declaration of Mark Larranaga, at 53).

Additionally, as Judy Clarke attests:

> [S]taff in Mr. Peven's office in Spokane began to be vocal about their concerns about Peven's absences from the office, and his inability to make decisions for his office. Senior attorneys in the Spokane Federal Defender office encouraged Mr. Peven to get off the case, and to take care of the crises in his personal life. Spokane office staff members described him as exhausted, always tired, distracted, and dealing with a potential divorce. (Exh. 1, Declaration of Judy Clarke, at 6).

By August, 2007, things reached a crisis point. After months of friends and colleagues imploring Peven to withdraw from *Duncan* and, further, to take steps to address his personal issues, he finally acknowledged that he should withdraw from Mr. Duncan's case. Mr. Larranaga recounts the events unfolding as follows:

> After months of little to no communication from Mr. Peven, I received an email from him on August 8, 2007 indicating, for the first time, that he was considering withdrawing off Mr. Duncan's case. In an email to Tom Monaghan and me, Mr. Peven wrote, "I am gone from the office this week. I have not fully made up my mind but I (sic) fairly certain I will be asking the Court to allow me to withdraw from the case for personal reasons. I will let you know (sic) later today for sure." Mr. Peven provided no further explanation for this and my attempts to reach him to find out what had prompted him to do so were unsuccessful. After a little more than a week had passed, Mr. Peven indicated he did, in fact, intend to withdraw from the case and, with it, terminate his office's involvement in the case. Mr. Peven asked that I inform the court at the upcoming status hearing (which Mr. Peven stated he could not attend) about his intentions.
>
> On August 22, 2007, co-counsel Tom Monaghan and I, advised the Court of Mr. Peven's intention to withdraw from the case. During that status conference, the government expressed its concern over the apparent lack of progress by the defense in preparing for trial. The government specifically noted that there had been no attempts to view the physical evidence or interview crime scene witnesses despite its communications months prior to Mr. Peven to let him know about available times to do so. About that time, Mr. Peven finally began to reveal to the rest of us what had actually been going on. In the days leading up to the *ex parte* meeting between Mr. Peven and Judge Lodge, Mr. Peven revealed certain personal things to the other defense team members that provided some explanation as to his erratic behavior and failure to perform work on Mr. Duncan's case over the preceding months. According to Mr. Peven, his behavior was due to a combination of a failing marriage, health problems of his elderly

parents, a cancer scare, and overwhelming responsibilities at work, outside of the *Duncan* case. I was later to learn that there were additional problems about which he was much less forthcoming at the time: he was suffering from crippling alcoholism, which eventually led to him being directed by his Board to enter residential treatment.

We (Tom Monaghan, Judy Clarke – who was advising us in her role as Capital Resource Counsel, - and I) expressed our concerns that given the personal and embarrassing nature of some of Mr. Peven's revelations, there would seem to be a real risk that Mr. Peven would come up short in terms of being as forthcoming as he should be about the extent of his personal issues and the devastating effect they were having on his ability to provide constitutional representation to Mr. Duncan.

Approximately one week later, on August 28, 2007, I met with Mr. Peven at the Federal courthouse in Coeur d'Alene to discuss the reasons for his withdrawal. While it had been my initial understanding that Mr. Peven and I would meet jointly with the court, Mr. Peven told me he preferred to meet with Judge Lodge alone. I was reluctant to agree to that because Mr. Peven's behavior up to that point had given me serious reasons to question his reliability. Therefore, when Mr. Peven told Judge Lodge's clerk that he wanted to speak privately I told the clerk I wanted to be present.

The clerk returned a short time later to announce that Judge Lodge wanted to meet privately with Mr. Peven. In the lead up to this meeting, Mr. Peven had made some frank and embarrassing admissions to the other defense team members about his personal situation and his related professional failings. Mr. Peven had also intimated to Tom Monaghan, and Judy Clarke and me that he intended to seek leave to withdraw completely from Mr. Duncan's case. Given Judge Lodge's refusal to meet with me, I hoped that Mr. Peven would be candid with Judge Lodge and state unequivocally that he needed to withdraw from the case. In my view, Mr. Peven's involvement in the case had been extremely detrimental, and I viewed his withdrawal as a necessary first step to getting the case on track.

Mr. Peven's August 28, 2007 meeting with Judge Lodge took place in chambers and off the record. After approximately 15 minutes, I was summoned to the chambers. Judge Lodge said his discussion with Mr. Peven was limited to private matters and did not include any discussion of the case. Judge Lodge further indicated that Mr. Peven would not be removed from the case but would be assuming role of some sort of "advisory counsel" going forward.

I was aghast at this outcome. Mr. Peven said his intent was to be removed from the case entirely. The court's proclamation that Mr. Peven would remain involved in an "advisory" capacity, which suggested to me that Mr.

Peven was in agreement, was entirely inconsistent with my understanding of what would occur. (Exh. 7, Declaration of Mark Larranaga, at 53-54).

Tom Monaghan and Resource Counsel Judy Clarke were also surprised and disturbed by the outcome of Peven's unrecorded conference with the Court, as well the Court's persistent refusal to make allowances for Peven deceiving the Court and co-counsel for months regarding his purported work on Mr. Duncan's case. In reference to Peven's *ex parte* meeting with the Court, Ms. Clarke stated that Peven requested the meeting be private "even though Mr. Larranaga and I had both talked with him about the importance of Larranaga's presence at any meeting with Lodge." Exh. 1, Declaration of Judy Clarke, at 7. Clarke added, "after the meeting was over, Mr. Peven claimed that he had asked to be removed from the case." *Id.* Monaghan observed that Roger Peven had become "a liability" to the case, but noted that "[u]nfortunately, Judge Lodge adhered to the view that Roger's past contributions to the case had been valuable; therefore, he could be some kind of use to us. Judge Lodge refused to allow Roger to completely withdraw and, more importantly, rejected our pleas for a continuance." Exh. 8, Declaration of Thomas Monaghan, at 65.

### 3. September 2007 to December 3, 2007

With the curtain pulled back at last, Peven's anemic contribution to *Duncan* began to become clear. Monaghan and Larranaga pleaded with Clarke to step in and replace Peven on the case. Clarke reluctantly agreed and arranged for the funding of the case to be transferred to her "host" office, the Federal Defenders of San Diego, Inc. In her declaration, Ms. Clarke describes the state of things when she joined the case in September 2007:

> The case file was disorganized and little progress beyond the bare minimum accomplished by the state defense team had been made at investigating Mr. Duncan's life history. No experts had been retained, and indeed Mr. Peven had not approved retainer letters drafted by Mr. Larranaga. It was clear from the condition of the file and the lack of work product that Mr. Peven

Corrected Defendant's Motion for Collateral Relief       24       *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

had not worked on the case since the conclusion of the state case, and had impeded other team members in their efforts to prepare the case.

At the time of my appointment as counsel for Mr. Duncan in September 2007, it was inescapable that a massive amount of work remained to be done. No one had yet even reviewed the physical evidence, several dozens of witnesses remained to be interviewed, many legal issues had not been researched much less litigated, and experts needed to be retained. The case involved an obvious history of trauma and abuse, yet, nine months into the federal case, no mental health experts had been retained. Based on my experience in capital cases, I knew there was no way we could adequately prepare for the guilt/innocence and the penalty phases in the time remaining before the then scheduled (January 2008) trial date.

The major difficulty we faced on such a short schedule was securing and preparing experts who might evaluate Mr. Duncan's history and mental condition and testify at trial. Many of those who Mr. Larranaga had contacted earlier in 2007 were no longer available or not willing to become involved in the case given that only a few months remained. Mr. Larranaga had been unable to engage the services of necessary experts until the funding for the case was transferred to my office in San Diego. Before then, Mr. Peven had the exclusive authority to approve and fund experts and he repeatedly refused to do so – or often simply failed to respond to funding requests, much to the consternation of his co-counsel.

Plea discussions, in which the defense sought life sentences in lieu of the death penalty, had gone nowhere. The prosecution repeatedly officered to agree to a guilty plea with conditions, but would not drop the death penalty. Toward the middle to end of November 2007, out of time to retain experts in time for a January 2008 trial and with no continuance in sight, our team discussed advising Mr. Duncan to enter guilty pleas in exchange for an agreement by the prosecution to join in a request for a continuance of the penalty phase. The Court's denial of a continuance, and denial of an extension of time to file a Rule 12.2 notice (expert mental health evidence) left us with an untenable Hobson's choice: prepare inadequately for both the guilt/innocence and the penalty phase with only weeks remaining and no chance of a continuance or have Mr. Duncan plead guilty, obtain the Government's cooperation in extending the date to commence the penalty phase, and shift all focus entirely to preparation of the penalty phase. Given the work that remained to be done, we opted to abandon the culpability issues as well as the rights afforded to Mr. Duncan were he to proceed to a full trial. This was triage, pure and simple, motivated exclusively by our need for more time to prepare.

(Exh. 1, Declaration of Judy Clarke, at 7-9). On December 3, 2007, Mr. Duncan pled guilty to all

Corrected Defendant's Motion for Collateral Relief                    25                    *Joseph Edward Duncan, III v. United States of America,*
                                                                                                      *Case No.2-07-cr-00023-EJL*

charges.  Although the defense was acutely aware of Mr. Duncan's peculiarities, due to their unpreparedness, they did not realize that at the time of the plea that much of what they had been documenting in their interactions with him would in the hands of an appropriate expert turn into strong evidence of psychosis.  As a result they unreasonably failed to declare a doubt as Mr. Duncan's competency to proceed at the time of the plea.

### 4.   December 4, 2007 to April 16, 2008

On December 5, 2007, the defense sought to continue the sentencing trial until September 15, 2008.  Doc. 193 at 16.  In their motion, the defense attempted to debunk several assumptions upon which the Court relied in its denial of prior continuance motions.

First, the defense contested the view that Mr. Peven was "a valuable tool to the defense because of the information that he had prior to present counsel entering into this case and he has assured the Court that information would be available to the defense." Doc. 193 at 3, quoting Tr. October 12, 2007 at 41.  The defense noted that information which came to light in late October 2007 and early November 2007, brought "clarity to the reasons the defense preparation and investigation has been delayed, and is not nearing completion . . . [and] also makes clear that Mr. Peven is not only currently unavailable to the defense team, but that he has been essentially unavailable since the time of the return of the federal indictment."  The defense went on to state "Mr. Peven is not currently 'available and assisting' the defense, and he has not been able to do so for many months."  Doc. 193 at 4-5.  The information the defense was referring to included several documents filed regarding Mr. Peven.  One document was the November 13, 2007 declaration of Stephen Hormel.  *See* Doc. 174.  In relevant part, Hormel stated:

> As early as February, 2007, Roger discussed and contemplated the need to withdraw as lead counsel from the Duncan case.  I fully supported that decision, however Roger decided against it.

> Between February and May, 2007, Roger could compose himself enough at times to engage in administrative matters, however, his ability to maintain any amount of focus for a period of time was extremely impaired. When Roger was in Spokane, his time in the office had diminished to only one to two hours a day, rarely more than four hours was spent at work in a day. He often spent this time with his office door shut, resting or reading on his couch . . . In late-May, 2007, Roger's ability to focus on any administrative matter was so impaired that he commonly responded to office concerns by merely saying to me and our office administrator, Lisa Werner, "whatever you decide."

* * * * *

> By July, 2007, Roger was so impaired that his attention to the office was essentially non-existent . . . My concern for Roger's well-being reached a critical point during the first week of August, when, on August 4, my wife and I invited Roger to our home for dinner. Throughout the evening, Roger was detached and wept much of the evening. During that last hour he maintained a "fetal position" on our couch. I was so concerned that I made him promise he would step down from the Duncan case immediately which he promised he would contact Judge Lodge for that purpose. That was not done and over the next two weeks, Roger continued to deteriorate.

Doc. 174, Declaration of Stephen Hormel, November 13, 2007 at 2-3. In Hormel's supplemental declaration of November 20, 2007, he added:

> On November 8, 2007, the Executive Committee of the Board of Directors appointed me as Acting Executive Director of the Federal Defenders. This action was precipitated by Roger's indefinite leave of absence from his duties and responsibilities as Executive Director of this office.

> On November 12, 2007, the Board of Director's President, John Maurice sent a letter advising the Court of the decision to place Roger on an indefinite leave and designate [me] acting Executive Director of the organization. The chief judges of both Eastern Washington and Idaho were also advised of this action.

* * * * *

> On November 8, 2007, Roger was admitted to an inpatient substance abuse and dual diagnosis facility for a complete battery of testing and evaluations to determine if he should be admitted for treatment. On November 16, upon completion of the inpatient testing and evaluations, the facility recommended that Roger remain and complete their 28 day inpatient program . . . Roger has remained in the inpatient program.

Corrected Defendant's Motion for Collateral Relief          27          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

> On November 19, 2007, the Board of Directors held an emergency Board meeting.  At the meeting, the Board recommended that I ask this Court to remove the Federal Defenders as counsel recommended that I ask this Court to remove the Federal Defenders as counsel for Mr. Duncan.  The Board recommended such action based on the fact that Roger is unable to assist in Mr. Duncan's defense in any capacity and the Federal Defenders do not have the resources to offer legal or investigative assistance.

Doc. 174, Declaration of Stephen Hormel, November 20, 2007 at 2-3.   In addition to Mr. Hormel, several others detailed Peven's progressive deterioration that began sometime in 2006, accelerated in early 2007, and reached a breaking point over the summer of 2007.  *See* Doc. 174, Declaration of Christina Hunt  (Peven neglecting administrative duties, exhibiting emotional volatility, and drinking excessively) and Declaration of Lisa Werner (providing detailed documentation regarding Peven's frequent absences, neglecting of administrative duties—including his responsibilities surrounding the *Duncan* case budget, and incapacity to perform his job since February, 2007).

Second, the defense addressed the Court's belief that federal counsel were the beneficiaries of the prior state defense preparation.  Although federal counsel had received some ac raw material from the state court lawyers, such as records and information pertaining to certain witnesses, there remained much work to be done.  In particular, federal counsel noted that state counsel had only done preliminary investigation into Mr. Duncan's mental health.  Doc. 193 at 7.  Counsel noted that at the time of the December 5, 2007 continuance motion, no attorney—state or federal—had "pursued anywhere near competent investigation of Mr. Duncan's mental, physical, emotional or psychiatric condition sufficient to either understand these conditions, much less present the information to a jury."  Doc. 193 at 8.

Third, the Court repeatedly emphasized the "number and experience" of defense counsel in denying prior continuance motions.  However, as federal counsel explained:

Corrected Defendant's Motion for Collateral Relief    28    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

> It is precisely that experience that causes counsel to seek a continuance. Counsel know full well that the mitigation investigation is far from complete; that Mr. Duncan's developmental history has only been partially explored; that the facts and impact of the lengthy incarceration and programs Mr. Duncan was exposed to from a very young age has not been adequately explored; that Mr. Duncan's very serious, and apparently long term, mental health issues have not been adequately explored; and that events in Mr. Duncan's life that preceded criminal conduct have not been explored or yet understood by counsel. All of this history, and these events, must be explored and understood before counsel can present a case in mitigation to a jury.

Doc. 193 at 9. Federal counsel attested that since Ms. Clarke had joined the case and funding had been transferred to the Federal Defenders of San Diego the reconstituted defense team had been working "non stop . . . to catch up for lost months of work," but noted that nevertheless, much work remained. *Id.* at 10.

Fourth, the Court assumed this case was not "factually complex." Federal counsel pointed out several factors showing that assessment to be inaccurate. These included that the government had noticed 15 experts, was intending to introduce evidence of a prior conviction as well as multiple unadjudicated homicides, and took more than three months to issue the federal indictment following resolution of the state case. The court also believed that Mr. Duncan's 20-year incarceration simplified preparations. However, as the defense counsel explained, that did nothing to simplify the tasks before them. As counsel noted:

> Mr. Duncan lived in 13 different locations during the first 16 years of his life, he attended 7 different schools before high school, and was treated by medical doctors during his young life. He served time in 16 different correctional facilities. Something resulted in Mr. Duncan, as a 16 year old child, being tried as an adult, and ending up as a 6', 132 lb. high school sophomore in a sex offender program for adults. This "something" is years old and must be explored by the defense, and explored in the multiple locations where he lived and went to school. Potential witnesses from this time period have to be identified, located and interviewed. Records must still be obtained. Mr. Duncan's life of being raped and assaulted in prison must be explored. Inmates, counselors and correctional officers had to have observed what led to those events, the cause and the effects, and they must

Corrected Defendant's Motion for Collateral Relief    29    *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

be located and interviewed. The story of Mr. Duncan's life is not rendered any less complex because he spent years in prison – he still crossed paths with dozens of people who have moved, and must be located and interviewed. The story of Mr. Duncan's life in prison is not told by prison records. His life up to the time of the crimes alleged in the federal indictment, must be first understood by the defense team, and then explained coherently and in context.

*Id.* at 10-16.

Fifth, the Court's belief that federal counsel had been retaining experts, because the court had reminded counsel of the importance of doing so, was misplaced. Although Larranaga was well aware of the need to arrange for expert services and repeatedly tried to do so, his efforts were stymied by Peven's "unavailability and then inexplicable reluctance to timely retain such experts." *Id.* at 11. By the time of the December 5, 2007 continuance motion, many of the experts identified by Larranaga were no longer available given the abbreviated time that remained before trial was scheduled to start. *Id.*

The Government filed a competing motion the same day, requesting a trial date of April 7, 2008. Doc. 192 at 1. The Government noted that April 7 was "the approximate date on which the United States anticipated any capital sentencing hearing would have begun if a trial on the merits were to have begun on January 28, 2008." *Id.*

On December 12, 2007, the Court, rejecting the reasons put forth by the defense for why a significant continuance was critically necessary to properly preparing for a sentencing trial, reset the trial date in accordance with the Government's request, setting it for April 14, 2008. Doc. 202 at 7. In the Court's view "for the defense to continue to argue that it has been so hamstrung by the personal issues of Mr. Peven that they are still unprepared to go forward in this matter any earlier than next fall indicates either a lack of diligence or gamesmanship on the part of the defense." *Id.* at 5.

Following the Court's order setting the sentencing trial for April, the defense team continued their scramble to prepare for a penalty phase. While the defense had identified several potential key issues relevant to a mental state defense and/or mitigation, they were far from prepared for trial by the time of Mr. Duncan's guilty plea. Exh. 1, Declaration of Judy Clarke, at 10. From the time Ms. Clarke joined as co-counsel and rerouted the funding of the case to the Federal Defenders of San Diego until the time of Mr. Duncan's guilty plea less than three months later, the reconstituted defense team sought to make up for lost time. *See* Exh. 101, Defense Investigation Memoranda, December 1, 2007 – April 15, 2008; Exh. 59, Mark Larranaga notes regarding interview of Dr. Becker December 10, 2007; Exh. 60, Mark Larranaga email regarding expert contact updates December 13, 2007; Exh. 61, Judy Clarke email regarding team meeting follow up conference call December 21, 2007; Exh. 62, Transfer of funding and appointment of Federal Defender San Diego Inc. 2008; Exh. 63, Judy Clarke letter regarding expert materials to J.R. Merikangas January 8, 2008; Exh. 64, Judy Clarke email regarding neuropsych records January 16, 2008; Exh. 65, Emails Gur regarding neuropsych records January 22, 2008; Exh. 67, Judy Clarke email regarding Dr. Becker January 31, 2008; Exh. 68, Emails Gur regarding Duncan February 4, 2008; Exh. 69, Emails regarding Lisak February 13, 2008; Exh. 71, Judy Clarke letter regarding expert materials to J.R. Merikangas February 26, 2008; Exh. 72, Judy Clarke letter regarding case resolution February 29, 2008; Exh. 73, Debra Garvey email regarding Lisak witness list and contact information March 15, 2008; Exh. 74, Judy Clarke letter regarding expert materials to J.R. Merikangas March 21, 2008; Exh. 76, Debra Garvey letter regarding expert materials to J.R. Merikangas March 25, 2008; Exh. 77, Letter Providing expert materials to J.R. Merikangas April 1, 2008; Exh. 78, Debra Garvey letter regarding expert materials to Merikangas April 2, 2008.

In February 2008, the defense retained the services of Dr. David Lisak. Exh. 70, Dr.

Lisak, retainer letter February 14, 2008.  Dr. Lisak is a clinical psychologist whose research background and clinical experience includes the study of sex offenders and the impact of sexual victimization, particularly in men.  Exh. 13, Report of Dr. David Lisak, at 94.  Trial counsel enlisted Dr. Lisak for purposes of investigating and assessing Mr. Duncan's background, particularly with regard to childhood trauma.  *Id.* at 96.  From the time he was initially retained by federal trial counsel in February 2008 until his work on the case became moot in July 2008, Dr. Lisak reviewed extensive materials relating to Mr. Duncan, as well as conducted multiple interviews of witnesses.  *Id.* at 96-98.

Jury selection for the sentencing trial began on April 14, 2008.  On April 16, 2008, Mr. Duncan announced his intention to proceed *pro se.*  Doc. 391.

### 5.  April 17, 2008 to November 24, 2008

Mr. Duncan's proclamation that he would represent himself in the sentencing trial, prompted a furious round of litigation between the parties.  *See* Docs. 400-04, 415, 417-27, 431-32, 434-44, 446-49, 451-55, 473-77, 479-90, 497-500.  As alleged in more detail in Claims 3 and 4, *infra*, the Court, *sua sponte*, and the defense raised the question of Mr. Duncan's competency to represent himself.  On July 24, 2008, the district court, without holding a hearing, found Mr. Duncan competent to proceed and to represent himself.  Doc. 493 (sealed version); 494 [redacted public version].

As a result of the court's ruling, Mr. Duncan represented himself at the sentencing trial with former counsel in a standby role.  Mr. Duncan did next to nothing on his own behalf during the trial.  On August 27, 2008, the jury returned verdicts recommending a sentence of death on each of Counts One, Five and Seven. 18 U.S.C. § 3593(e).  On November 3, 2008, the Court imposed the death sentences as required under 18 U.S.C. § 3594, and sentenced Mr. Duncan on

the remaining seven counts of the indictment to which the defendant had pled guilty. Docs. 598; 599; 600. The Court entered an amended judgment on November 13, 2008. Doc. 602.

On November 17, 2008, standby counsel filed a notice of appeal. Doc. 605. On November 19, 2008, the Government filed a motion to strike the notice of appeal for lack of Mr. Duncan's authorization, Doc. 606, which was supported by an FBI Agent's affidavit describing portions of a number of recent interviews with Mr. Duncan. On November 20, 2008, the district court set a hearing for November 24, 2008, to determine whether or not Mr. Duncan was "knowingly and voluntarily waiving his right to appeal." Doc. 609.

On November 21, 2008, standby counsel filed an objection to the scheduling of a status conference on the ground that the court lacked jurisdiction to inquire into the validity of the notice of appeal. Doc. 610. Mr. Duncan's assertions that the defense had met with him to encourage him to appeal notwithstanding, the defense inadequately advised him as to the consequences of his attempt to waive. In particular, they did not advise him that even if he opted to waive appeal, they as counsel had the right to initiate and prosecute an appeal regarding competency to waive appeal.

At the outset of the November 24, 2008 hearing, the Court overruled the objection to the hearing and engaged in a colloquy of sorts with Mr. Duncan regarding his right to an appeal and whether or not he wished to waive that right. 11/24/08 RT 5. After a series of rambling and confusing exchanges, Mr. Duncan eventually stated that he understood what others may call the right to an appeal and that he did not chose to participate in it. Ms. Clarke alleged that the FBI had likely influenced Mr. Duncan in his decision not to participate in an appeal during the many hours of interviews it conducted with him and by its tendency to provide small gifts and favors at the jail. *Id.* at 3-4. The court declined to inquire into issues of inducement other than to ask Mr. Duncan whether he was "making [his] decision voluntarily and of [his] own free will?" *Id.* at 12.

Corrected Defendant's Motion for Collateral Relief          33          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

The Court made no inquiry into the reasons for Mr. Duncan's decision, and consistently discouraged Mr. Duncan from expressing them when he frequently sought to do so throughout the hearing.   At the conclusion of the hearing, the Court granted the Government's motion to strike standby counsel's notice of appeal, telling Mr. Duncan "your choice to forego your right to file an appeal is the product of a free and deliberate choice.  It is made knowingly and intelligently.  You have clearly expressed your understanding of the significance and consequences of your decision to waive appeal and, nevertheless, desire to do so." *Id.* at 21; *see also* Minutes, 11/24/08, Doc. 612 ("The Court finds the defendant's waiver is a free and deliberate choice.").  Despite the fact that Mr. Duncan indicated his objection was not to there being an appeal but only to the requirement that he personally endorse it, the court never advised him that as a matter of law his refusal to endorse an appeal of the conviction and sentence would itself constitute the legal authorization for an appeal of the issues of competency and waiver.

### B.  The Trial Court's Role in Compounding the Problems Permeating Mr. Duncan's Defense Team

The problems of Peven's dysfunction and its continuing prejudice to the defense and its ability to prepare for trial was exacerbated by the Court's refusal to either to acknowledge the problem or to respond accordingly.  Had the Court afforded defense counsel the necessary time to adequately prepare for trial, the damage resulting from counsel's shortcomings prior to Ms. Clarke coming onto the case in September 2007 would have been substantially repaired.  The Court had a critical role in overseeing these proceedings and a concomitant responsibility to take necessary remedial measures in order to ensure Mr. Duncan was afforded a fair trial.  The Court was on notice as of late August 2007 that there were significant problems affecting the functioning of the defense team.  The Court nevertheless discounted that information and the additional, related information that followed in the weeks thereafter, concluding that the issues raised by the defense

Corrected Defendant's Motion for Collateral Relief          34          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

did not amount to "an extreme circumstance," and thus did not justify additional time.  10/12/2007 RT at 45.

Shortly after Mr. Peven moved to withdraw and Ms. Clarke substituted in for him, the reconstituted team filed a continuance motion, in which they laid out the impediments to preparing in time for the then scheduled January 2008 trial date.  Docs. 74 and 80.  On October 12, 2007, the Court held a hearing to address the continuance motion.  At that hearing the defense made their case for a continuance and the Government argued against it.  Also in attendance was the Federal Defender for the Boise office, Richard Rubin.  Mr. Rubin addressed the Court, stating the following:

> I can tell the Court that what  I see is regardless of where the fault lies, who should have done what and when, it seems to me that what is clear is that the client is not receiving fair representation in a case of this magnitude.  I think that is what it boils down to.
>
> My concern is having our office involved in this case as the Federal Defender Services of Idaho and providing counsel that is ultimately rendered ineffective for reasons we had no control over, I think that is detrimental to our attorneys, I think it is detrimental to our organization and I think it is extremely detrimental to Mr. Duncan.

10/12/2007 RT at 31.

The record below strongly suggests that the Court gave significant weight to the fact that, apparently during numerous status conferences between March 2007 and late August of that year, there was no indication that the case was "not on track for a January 22, 2008 trial date." 10/12/2007 RT at 38-39.

Additionally, despite much evidence to the contrary, the Court continued in its view that Peven was a "valuable tool to the defense."  10/12/2007 RT at 41.  At the conclusion of the hearing, the Court stated:

> I have tried to accommodate counsel in any way that I can with more

> frequent status conferences, if necessary.  I think that I would try to assist in any way I could to make everyone comfortable that they are well prepared. I don't buy for a minute that counsel will be able to argue ineffective assistance of counsel.  I know that is a red herring that is thrown out many times, but that is just not true in this case.  Counsel are extremely qualified . . .
>
> So my judgment is that while it is a difficult situation, it is a complex situation, it is not an extreme circumstance, so I am staying with the trial date of January 20.

RT 10/12/2007 at 45.  Thereafter, the Court denied the defense's motion.  Doc. 85.  The Court's denial of the requested continuance was decisive to defense counsel's advice to Mr. Duncan to plead guilty.  *See* Exh. 1, Declaration of Judy Clarke, at 9.[4]

Following Mr. Duncan's December 3, 2007 guilty plea, the defense once again pleaded with the Court for sufficient time to adequately prepare for Mr. Duncan's sentencing trial.  Doc. 193.  Specifically, the defense requested that the sentencing trial be set for September 2008.  *Id.* at 2.  The Government also filed a motion, asking for the sentencing to be set for April 2008.  Doc. 192 at 1.  The Court, siding with the Government's view, reset the sentencing trial for April.  Doc. 202 at 7.

As a result of the trial court's denial of the time requested by the defense, by the time jury selection began on April 14, 2008, there remained much work to be done.  *See* Exhs. 59-74; 76-80; 82; 101 and Doc. 240 and Attach. 1 to Doc. 240, Declarations of Mark Larranaga and Russell Stetler, (sealed).  Further, because of the work that remained to be done, counsel was not in a position to convey to their client what they could present to the jury at sentencing.  Among other

---

[4] *See also* Claim 3.C regarding counsel's ineffectiveness in the context of Mr. Duncan pleading guilty.

deficits in their case preparation, counsel did not yet have an assessment from their expert, Dr. Lisak, whom they retained for purposes of exploring Mr. Duncan's history of trauma. Indeed, much of Dr. Lisak's work in this case occurred after the start of jury selection and, more critically, Dr. Lisak was never permitted to present a completed assessment to the jury because two days into jury selection, Mr. Duncan declared he wished to proceed *pro se*. *See* Exhs. 13 at 96; 70; 73; 82.

As detailed, *supra*, the Court decided, without holding a hearing, that Mr. Duncan was competent to represent himself. Doc. 500. That decision decimated defense counsel's role in helping to ensure that Mr. Duncan obtained a constitutional trial. Following a one-sided sentencing trial and the subsequent death sentence, the Court perpetuated its interference in defense counsel's efforts to protect Mr. Duncan's rights, striking the notice of appeal filed by counsel. Doc. 612. *See* Claims 3, 4 and 10.

### C. The Impact of Mr. Duncan's Significant Mental Illness of the Proceedings

Were it not for Mr. Duncan's pronounced mental illness, there is little question this entire case would have proceeded differently. Mr. Duncan's mental illness permeates every aspect of the case, from the offenses themselves, to his interactions with his defense team, the Government, and the Court, to Mr. Duncan's "decisions" to plead guilty and proceed *pro se* at sentencing. As detailed in Claims 3 and 4, Mr. Duncan was incompetent to enter a plea of guilty, as well as to waive his Sixth Amendment right to counsel, and to represent himself. Additionally, as described in *infra*, the Court's refusal to conduct a competency hearing violated Mr. Duncan's right to procedural due process, and Mr. Duncan's purported waiver of appeal was not knowing, voluntary, and intelligent.

**D. The Deprivation of the Effective Assistance of Counsel Rendered Mr. Duncan's Proceedings Unconstitutional**

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The Supreme Court has reaffirmed this right time and again, explaining that the right to counsel is the right to *effective* counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). The acts and omissions described herein fell below prevailing professional norms of capital defense practice. But for those acts and omissions, there is a reasonable probability that Mr. Duncan would not have pled guilty, or represented himself at sentencing. Further, had Mr. Duncan proceeded to trial with competent, adequately prepared counsel, there is a reasonable probability that he would have received a sentence of less than death.

**1. The Breakdown of the System in Mr. Duncan's Case, Including But Not Limited to the Deprivation of His Sixth Amendment Right to Counsel, Constituted Structural Error**

While constitutional trial errors do not generally require automatic reversal, *see Chapman v. California*, 386 U.S. 18 (1967), there is a class of errors which provide an exception to the general rule. As the Supreme Court has made clear, "structural" errors are fundamentally different than "trial" errors. *See Arizona v. Fulminante*, 499 U.S. 279, 309 (1991). "Trial" errors are those which occur during the course of trial "and which may therefore be quantitatively assessed in the context of other evidence" to determine if the error was harmless. *Id.* at 307-08. By contrast, "structural" errors are "defects in the constitution of the trial mechanism . . . [that affect] the entire conduct of the trial from beginning to end." As such, structural errors are not subject to a harmless error analysis. *Id.* at 309. When the fairness of a criminal proceeding has been undermined as a whole, it can be said that the proceeding involved structural error. In such instances, it is not required that a defendant show a reasonable probability that the error affected

Corrected Defendant's Motion for Collateral Relief    38    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

the proceedings. Rather, prejudice is presumed. *See id. at* 309-310.

Two structural error violations recognized by the Supreme Court, which are not subject to harmless error analysis, are reflected by the Court's opinions in *Gideon v. Wainwright*, 372 U.S. 335 (1963) and *Tumey v. Ohio*, 273 U.S. 510 (1927). *Gideon*, which involved the total deprivation of the Sixth Amendment right to counsel, and *Tumey*, which involved a judge who was not impartial, both involved "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless error' standards." *Fulminante*, 499 U.S. at 309. Such errors require reversal per se because "[w]ithout these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Id.* at 310 (citing *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)). Trial errors, by contrast, are errors which occur "during the presentation of the case to the jury and may therefore be assessed in the context of other evidence presented in order to determine whether the evidence's admission was harmless beyond a reasonable doubt." *Id.* at 307-08.

In *United States v. Cronic*, 466 U.S. 648 (1984), the Supreme Court identified three circumstances involving the Sixth Amendment right to counsel which were "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658-59. Those circumstances were 1) the complete denial of counsel; 2) if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and 3) where counsel is tasked with providing assistance under circumstances where competent counsel very likely could not. *Id.* at 659-62. Under all these circumstances, the ordinary requirement that the defendant show that his proceedings were affected by counsel's errors is not imposed. *Id.* An improper waiver of counsel is no less structural than a denial of counsel.

To be sure, Mr. Duncan's case included trial errors. However, those errors were preceded

by other, structural errors. This Court must address the structural errors that infected this case before trial began as well as address the trial errors that permeated the case thereafter.

### 2. Had There not Been a Breakdown of the Adversarial System a Significantly Different Picture of Mr. Duncan Would Have Emerged

As set forth in detail in Claim 3, Mr. Duncan is a person who has suffered greatly in his life and has been clearly affected by his past. He is mentally ill, even if not psychotic, and his thought processes are at least at the level of delusions. Had the trial team not undergone the difficulties, set forth above, a wealth of mental health and other mitigating evidence, somewhat similar to what was presented at the retrospective competency hearing, would have been presented at trial. Had simply Dr. Lisak's testimony been presented a very different trial would have resulted.

Had Dr. Lisak been consulted in sufficient time to be of use, he could have provided compelling testimony about Mr. Duncan's life history. Such testimony, while not excusing the harm caused to the victims in this case, would have placed those acts into the broader context from which Mr. Duncan developed into a person capable of committing them.

Dr. Lisak did perform meaningful work on this case at the pre-trial stage, but it came too late. Dr. Lisak was retained by the defense after Mr. Duncan's guilty plea and, even more significant, much of his work took place after Mr. Duncan announced his decision to proceed *pro se*. *See* Exh. 13, Report of Dr. Lisak at 96. Had that work occurred in time to be of use, the jury would have learned that Mr. Duncan was born into a family with multi-generation psychiatric problems and a history of sexual, physical, and emotional abuse. *See* e.g., Exhibit 9, Declaration of Allen Parks at 76; Exhibit 13, Report of Dr. David Lisak at 99-101; Exhibit 88, Miscellaneous documents related to Teena Novotney at 455; Exhibit 101, Defense Investigation Memoranda at 878-881, 914-919, 944-946; Exhibit 102, Defense Investigation Memoranda at 1097-1099, 1102-1103, 1111-1112; Exhibit 110, Miscellaneous records relating to Bruce Duncan at 5927, 5932,

5958, 5963; Exhibit 111, Social Security Administration Records regarding Joseph Duncan, Jr. at 6033, 6058; Exhibit 115, Miscellaneous documents regarding to Robert Freed at 7085-7086, 7091, Exhibit 117, Mifflin County court records regarding Brice Hook at 7384, Exhibit 119, Miscellaneous Court files regarding Rupert Rapp at 7790, 7849, 7954, Exhibit 126, Military/mental health records of Joseph Duncan, Jr. at 10656; Exhibit 129, Madigan Army Medical Center records of Lillian Duncan at 11150, 11556, 11894, 11971, 12082, 12103; Exhibit 130, Individual support plan records, Public Welfare, Pennsylvania regarding Anna Freed at 12250; Exhibit 131, Lewistown Hospital Records regarding John Freed, Jr. at 12273-12274; Exhibit 132, Miscellaneous records regarding Robert Hetrick at 12279-12280, 12283; Exhibit 134, Miscellaneous records regarding Mary Musser at 12386, 12391, 12393, 12418, 12420, 12449, 12451; Exhibt 136, Lewistown Hospital Records regarding Naomi Narehood at 16988-16990; Exhibit 137, Miscellaneous medical records relating to Rupert Rapp at 17038, 17043, 17094-17095. The jury could have been presented with such information with the help of an expert like Dr. Lisak, as well as through family members and other witnesses who could have helped describe the incredible dysfunction and abuse to which Mr. Duncan was subjected to throughout his childhood.

As Dr. Lisak noted in his report prepared in connection with the instant proceedings:

> It is frequently the case that when there is some form of severe abuse in a home, there are multiple forms. Severe abuse is often a index of extreme dysfunction, and extreme dysfunction often yields multiple forms of abuse and violence. Such was the case with Mr. Duncan's childhood home.

> Mr. Duncan's sister, Cheri, testified at Mr. Duncan's competency hearing in 2013 and provided direct-witness testimony of the violence and physical abuse that both she and Mr. Duncan suffered as children. She described it as "very severely" physically abused.

*Id.* at 99. Dr. Lisak underscored Cheriis report of a particular incident of abuse meted out by their

mother, Lillian, when Mr. Duncan was approximately three-years-old:

> . . . I remember one incident, we were just little kids, I don't think he was even three years old yet. She lined us all up in the hallway, except for the baby [Bruce], and she started systematically beating us, one hit each. Then it was two hit (sic) each. Then it was three hit (sic) each. I think we got up to 10 or 11 hits, until Susan finally took the blame for what was wrong. And it wasn't her, it was me. I was the one that did it. But she took the blame for it. And I don't think [Mr. Duncan] was even three or four years old. He was just a baby. I remember that.

* * * * *

> Somebody was getting a beating at least two or three times a week. If it was not one thing, it was another. Someone was also getting a beating.

*Id.* at 99-100, *quoting* RCHT at 2372-73. Dr. Lisak noted the significance of both Cheri's descriptions of the psychological and physical abuse Mr. Duncan was subjected to as well as the disclosures that the only other boy in the family besides Mr. Duncan, his younger brother, Bruce, made to a family member before Bruce passed away. When Bruce was in his late teens, he went to stay with his paternal aunt, Jeanne Litten. Exh. 102 at 1097. Dr. Lisak interviewed Jeanne Litten on May 28, 2008 and again on July 15, 2008. Exh. 13 at 96; *see also* Exh. 102 at 1097-1100 and 1111-12. During his interviews with Ms. Litten, Dr. Lisak learned critical information that helped bring to light the foundation of Mr. Duncan's trauma history, particularly as it pertained to maternal, sexual abuse.

Bruce Duncan confided in his Aunt Jeanne that, for years, he and his brother – Mr. Duncan – were the victims of ritualistic sexual abuse by their mother. Ms. Litten reported the following to Dr. Lisak:

> In the beginning, when Bruce was a little kid, Lillian joined a Baptist church where the parishioners spoke in tongues and acted like holy rollers. Lillian then changed churches and began practicing Wicca. Lillian recruited Bruce and Jet to sit in a circle at their home, possibly at Ft. Ord and later at Ft. Lewis, naked, with candles lit, chanting. Jeanne said Bruce was intent on describing the surroundings in detail. He told her there was an altar and

that Lillian used a scepter.  The girls were always gone when this occurred. Jeanne could not remember how often Bruce told her this occurred or how long the abuse lasted, but it was a number of years. . . Bruce told Jeanne how Lillian planned everything out.  He described it as being very ritualistic. According to Bruce, Lillian thought she was doing Bruce and Jet[5] a favor; that she was teaching them to become men.  Lillian forbid Jet and Bruce from telling anyone about what she was doing because they would be taken away if they told.  Lillian threatened them a couple of times with the scepter she used in the rituals.  She also used this tool to penetrate them.  Once she hurt one of the boys so badly he ended up bleeding, but she refused to take him to the doctor for treatment . . .

Lillian would tie Jet and Bruce to a bed. She raped them.  Lillian forced the boys to perform oral sex on her.  Bruce told Jeanne that the boys were instructed by Lillian that they were not to derive any pleasure from this sexual contact.  Bruce described Lillian violating he and Jet anally with a broomstick.  Bruce cried when he described to Jeanne how Lillian penetrated him.

* * * * *

Jet was in prison when Bruce came to live with Jeanne.  Jeanne knew that Jet had molested a boy at knife point and that's why he was in prison. Jeanne thought that what Jet had done might be connected to what Lillian had done to Bruce and Jet when they were children.

Exh. 102 at 1097-99.  Dr. Lisak notes that Mr. Duncan's background as a victim of childhood sexual abuse, which was perpetrated upon him by multiple individuals throughout his development, including but not limited to his own mother, is clinically significant to understanding how Mr. Duncan himself became a sex offender.

Dr. Lisak explained that in his own interviews with Lillian Duncan he confronted her about her son Bruce's disclosures and asked her directly whether she had sexually abused her sons.  Exh. 13 at 108.  Unsurprisingly, Mrs. Duncan denied having done so.  However, Dr. Lisak notes that

---

[5] Mr. Duncan has been known as "Jet" since early childhood.

Corrected Defendant's Motion for Collateral Relief          43          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

Bruce's disclosures to his aunt bear certain indicia of reliability:

> For one, there is no apparent secondary gain for Bruce to make such a graphic, disturbing disclosure, something that virtually all men experience as overwhelmingly humiliating and shameful. After making his disclosure, Bruce swore his aunt to secrecy, so it is hard to see what he gained from the disclosure other than an unburdening of a secret he had harbored for many years.

Exh. 13 at 108. Additionally, there are several other references throughout Mr. Duncan's records which, if not directly corroborating the maternal incest, are highly suggestive that such abuse featured in his background and related to his subsequent sex offender behavior. *Id.* at 108-14. In addressing the "profound damage this type of sexual abuse" can have Dr. Lisak states:

> Very few men disclose it. Very few seek treatment. However, I have encountered mother-son incest in more than a dozen forensic cases over the past 25 years. One of the most notable findings in these cases is the profound disorganization it produces. Maternal incest can, and often does, undermine the very foundations of its victims; the building blocks of identity. In doing so, it can produce spectacularly idiosyncratic thought patterns and beliefs which, I believe, can mimic some of the thought disorder symptoms commonly seen in psychosis.

*Id.* at 114. Of course, as Dr. Lisak also noted, Mr. Duncan's mother was not the only person to subject him to sexual abuse. *See* Exhibit 9, Declaration of Allen Parks at 69, 77-78; Exhibit 13, Report of Dr. David Lisak at 119; Exhibit 103, Classification file of Joseph Duncan, III at 1156-1158, 1161; Exhibit 104, Custody/Prison file of Joseph Duncan, III at 1486, 1498, 1519, 1523, 1610-1611, 1956. Dr. Lisak concluded that the "kind of extensive and protracted sexual abuse" that Mr. Duncan suffered:

> [O]ften produces lifelong legacies; functional, behavioral, psychological and psychiatric. Among these legacies are two that very clearly afflicted Mr. Duncan: confusion about his sexual identity, and a propensity for reenacting the abuse that he suffered. There may also be a third legacy: a level of identity and cognitive disorganization that can appear quite psychotic.

Exh. 13 at 120.

### 3.   Counsel's Ineffectiveness Set the Stage for Mr. Duncan's Invalid Guilty Plea

The Sixth Amendment guarantees a defendant the right to counsel "at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (quoting *United States v. Wade*, 388 U.S. 218, 227-28 (1967).  The plea-bargaining process is one such critical stage.  *See Missouri v. Frye*, 566 U.S. 134, 144 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); and *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010).  *Strickland's* two-prong test is the appropriate measure for evaluating trial counsel's performance as it relates to encouraging Mr. Duncan to plead guilty.  Moreover, the fact that an individual is guilty, does not negate his Sixth Amendment right to effective assistance of counsel in the plea context.  *Lafler*, 566 U.S. at 169.

Where, as here, the sole motivating factor for advising their client to plead guilty was to focus all energies towards preparation for the penalty phase for the few remaining months until trial was set to begin, counsel cannot be said to have provided constitutionally adequate advice.  As Ms. Clarke makes clear in her declaration:

> Toward the middle to end of November 2007, out of time to retain experts in time for a January 2008 trial and with no continuance in sight, our team discussed advising Mr. Duncan to enter guilty pleas in exchange for an agreement by the prosecution to join in a request for a continuance of the penalty phase.  The court's denial of a continuance, and denial of an extension of time to file a Rule 12.2 notice (expert mental health evidence) left us with an untenable Hobson's choice: prepare inadequately for both the guilt/innocence and the penalty phase with only weeks remaining and no chance of a continuance or have Mr. Duncan plead guilty, obtain the Government's cooperation in extending the date to commence the penalty phase, and shift all focus entirely to preparation of the penalty phase.  Given the work that remained to be done, we opted to abandon the culpability issue as well as the rights afforded to Mr. Duncan were he to proceed to a full trial.  This was triage, pure and simple, motivated exclusively by our need for more time to prepare.

Exh. 1, Declaration of Judy Clarke, at 9.

In contemplation of a possible guilty plea, counsel must advise their client about the

Corrected Defendant's Motion for Collateral Relief              45              *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

possible risks and benefits of entering a guilty plea.  No meaningful discussion took place between Mr. Duncan and his trial attorneys.  Admitting that they were motivated entirely by a desperate need to put all resources towards preparing for the penalty phase, Mr. Duncan's trial counsel, "did not share that motivation with Mr. Duncan." Exh. 1, Declaration of Judy Clarke, at 9.  Counsel noted that:

> Mr. Duncan had expressed an interest in pleading guilty, which we capitalized on when it became clear that we had little choice other than a guilty plea if we were to obtain the desperately needed time to prepare for the penalty phase.  Because of that desperation, we advised Mr. Duncan to plead guilty, with no meaningful discussion as to the pros and cons involved in his doing so or of possible defenses we might raise.  At the time, we had no idea whether Mr. Duncan would have any mental state defenses or any expert testimony regarding his mental condition that would be admissible during a guilt phase of the case.  Indeed, at the time, we were concerned about Mr. Duncan's competency, but had no mental health expert evaluating him or guiding us, or helping us understand the bizarre conversations we routinely had with Mr. Duncan.  We agreed that in responding to the inevitable questions about whether we had discussed potential defenses, or whether there was any reason Duncan should not plead guilty, our only response would be "to the best of our knowledge."

Exh. 1, Declaration of Judy Clarke, at 9-10.

Critical to the assessment of whether a guilty plea is valid is the question of whether a defendant's guilty plea is knowing, voluntary and intelligent.  *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969).[6]  While determining whether a defendant's decision rests fundamentally with the trial court, counsel also has duties to both inform their client about the risks and benefits of a guilty plea and to be informed enough about the bases for their client's decision to advise the Court regarding any issues potentially impacting the validity of a plea.

---

[6] Mr. Duncan's challenge to the validity of his guilty plea is specifically addressed in Claim 3.

Trial counsel performed deficiently under *Strickland's* first prong in failing to accurately inform, educate, and advise Mr. Duncan as to the potential risks and benefits associated with pleading guilty. *Lafler v. Cooper*, 566 U.S. 156 (2012). As admitted by Ms. Clarke, counsel was not even in a position to provide such information to Mr. Duncan in order for him to make an informed decision about whether or not to plead, because at the time, there remained substantial work to be done. Many witnesses had yet to be interviewed, myriad documents had either not been obtained or not reviewed, and despite ongoing concerns about Mr. Duncan's competency, no mental health expert had evaluated him in order to assess competency. Exh. 1, Declaration of Judy Clarke, at 9-10.

Additionally, because counsel had yet to complete a thorough assessment of Mr. Duncan's mental health issues, though they had reason to believe those issues were significant, they were ill-equipped to advise the Court about whether Mr. Duncan was capable of entering into a knowing, voluntary, and intelligent plea, or whether he was even competent to plead. Under these circumstances, counsel's advice cannot be understood to have been sound and strategic. Rather, it was advice born out of desperation. *Id.* But for counsel's uninformed, desperation-driven advice to Mr. Duncan, there is a reasonable probability that he would not have pled guilty.

### E. Conclusion

For all the reasons stated above, Mr. Duncan was deprived of his statutory and constitutional rights to the effective assistance of counsel. But for counsel's deficient performance, there is a reasonable probability that Mr. Duncan would not have pled guilty and, thereafter, would not have decided to proceed pro se at his sentencing trial.

IV.    **CLAIM 2:  THE TRIAL COURT'S REFUSAL TO ALLOW MR. LARRANGA TO ATTEND THE AUGUST 28, 2007 STATUS CONFERENCE AND REFUSAL TO HAVE THE PROCEEDINGS RECORDED AND ITS SUBSEQUENT RELIANCE ON THE PROCEEDINGS TO DISALLOW A REASONABLE TIME FOR PREPARATION VIOLATED MR. DUNCAN'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

This court violated Mr. Duncan's rights under the Fifth, Sixth and Eighth amendments by meeting privately with Mr. Peven, over the objection of Mr. Larranaga, in an unrecorded conference regarding matters that were critical to the defense.  At that juncture, Mr. Peven was representing his own interests, not Mr. Duncan's; Mr. Larranaga's presence was essential to preserving Mr. Duncan's right to effective assistance of counsel; and the lack of a transcript or otherwise adequate record of the proceeding which was pivotal to all subsequent matters concerning timing and funding of the case deprived Mr. Duncan of his statutory rights and right to fundamental fairness.  The facts in support of this claim include the following:

All allegations in support of Claim ___ are incorporated by express reference as though fully set forth herein.

For several months prior to August 8, 2007, Larranaga, other members of the defense team, AND Peven's FDEWI collegues hagrined by Peven's inattention to and obstruction of Mr. Duncan's case had implored him to seek leave to withdraw.  Then on August 8, 2007, Peven emailed Larranaga to say he was contemplating withdrawing from the case.  Doc. 80, Declaration of Mark Larranga, at 11.  Peven did not state his reasons, and Larranaga was unable to reach him to discuss the matter.  By August 17, Peven's contemplation had ripened into a decision and he asked Larranaga to so inform the court at the next status conference, which was scheduled for August 22, 2007.  *Id.*

At that status conference, which was unrecorded, Larranaga advised the Court that Peven wanted to speak privately to the court about needing to withdraw from the case.  *Id.* at 11.  With a

Corrected Defendant's Motion for Collateral Relief          48          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

trial date just five months away, the Government expressed concern over the apparent lack of investigation by the defense, including Peven's failure to review the physical evidence despite a Government email indicating that it had been available for months. *Id.*

An *ex parte* conference was arranged for August 28, 2007, at the beginning of which Peven asked to meet privately with the district court in chambers. 8/28/07 RT 1. Mr. Larranga's request to attend the meeting was denied, as was his request that the proceeding be recorded. *Id.* at 3-4. After approximately 15 minutes, the court summoned Larranaga to chambers and informed him Peven would not be withdrawing but would be taking on the role of "advisory counsel" for Mr. Duncan. Doc. 179 at 3-4. The Court instructed Peven to prepare a sealed *ex parte* declaration describing the in chambers proceeding. *Id.* at 4.

On September 7, 2007, Peven filed a sealed declaration "in support of appointment of attorney" which was written to "memorialize information I provided to the Court during a private off the record meeting ... on Tuesday, August 28, 2007, and to detail some of the resulting impact of the personal and professional pressures I am experiencing." Doc. 68 at 1. Peven then detailed a number of personal and professional disasters that had befallen him, beginning in February 2007, and which had prevented him from fulfilling his obligations in this case. *Id.* at 5. In the concluding paragraph, Peven stated that he had advised the court that "[n]ew counsel need to be appointed to meet the necessary responsibilities of investigation and preparing the case for trial," but inasmuch as "I have a good relationship with Mr. Duncan and have built credibility with the victim's family, I advised the court I can remain in an advisory capacity to the defense team." *Id.* Neither the declaration nor the record as a whole discloses whether assumption of an advisory capacity role was something Peven had requested, or something to which he had acquiesced upon being denied leave to withdraw. The declaration also fails to describe any discussion regarding whether new

Corrected Defendant's Motion for Collateral Relief                49         *Joseph Edward Duncan, III v. United States of America,*
                                                                                      *Case No.2-07-cr-00023-EJL*

counsel would or would not be able to obtain a continuance of the trial date in order to prepare.

However, following the hearing, Peven told Larranaga that his request had been for leave to withdraw entirely, but that the court had assigned him the role of advisor to any new counsel and the remainder of the team. Doc. 179 at 8. In describing the in-chambers conversation to Larranaga, Peven also said nothing about a preemptive denial of a continuance by the court. Since Peven and Larranaga had previously discussed the need for a continuance, Larranaga's understanding was that nothing had occurred in chambers that would preclude a continuance. *Id.*

On November 24, 2007, the defense filed a motion to clarify what had occurred during the August 28, 2007, private in-chambers meeting with Peven. Doc. 179. The motion recited that at various times the court had stated the meeting with Peven was limited to personal issues not affecting the case, while a November 1, 2007, order denying a motion to continue said something quite different. The motion pointed out that the record was unclear as to what assurances Peven had made to the court and what conditions were placed on his being "advisory counsel." In particular, the defense noted that Peven had never told Clarke or other members of the team that he had requested merely a reduced role in the case and with that role he could insure the case could go forward on the same time table. *Id.* at 8.

On November 28, 2007, the district court denied the motion to clarify, Doc. 185, stating that there was no ambiguity in the record as to what had occurred and chiding counsel for implying otherwise. The Court reiterated that Peven had only asked to have a reduced role and that the court had made clear at that time (and thereafter) that any new counsel coming into the case in light of Peven's reduced role "would have to be apprised of the trial date so that he or she would know of the time requirements that would apply." *Id.* at 3.

In so doing the Court subsequently relied upon the unrecorded *ex parte* proceeding – which included material false or misleading statements about the degree of preparedness of the defense and ability and preparedness of Peven to continue assisting -- to bind the defense to an unreasonable trial and pretrial schedule.  As a result of a conflict of interest, an additional and denial-fueled exercise in wishful thinking, or both, Peven minimized his degree of incapacitation, resulting in judicial decisions based on erroneous factual understandings.

The Court's refusal to allow Larranaga to participate in the conference between the Court and Peven deprived Mr. Duncan of his right to counsel with undivided loyalties able to protect his right to a fair, appropriate and reliable outcome.

The Court's denial of the request for a verbatim record of proceedings denied Mr. Duncan his rights under 28 U.S.C. § 753, to fundamental fairness, and to an adequate record for review. Title 28 U.S.C. § 753(b) provides in relevant part:

> Each session of the court and every other proceeding designated by rule or order of the court or by one of the judges shall be recorded verbatim by shorthand, mechanical means, electronic sound recording, or any other method, subject to regulations promulgated by the Judicial Conference and subject to the discretion and approval of the judge. ... Proceedings to be recorded under this section include (1) all proceedings in criminal cases had in open court; (2) all proceedings in other cases had in open court unless the parties with the approval of the judge shall agree specifically to the contrary; and (3) such other proceedings as a judge of the court may direct or as may be required by rule or order of court as may be requested by any party to the proceeding.

"The provisions of § 753(b) are designed to preserve a correct and authentic record of criminal proceedings free from the infirmities of human error and they provide a safeguard to which not only the court but also the defendant is entitled in the preservation of his rights." *United States v. Taylor*, 303 F.2d 165, 169 (4th Cir. 1962).  A criminal defendant has a right to a record on appeal which includes a complete transcript of the proceedings at trial. *United States v. Wilson*, 16 F.3d

1027, 1031 (9th Cir. 1994). This right is guaranteed by the § 753(b), and a court reporter's failure to record all proceedings verbatim require reversal where specific prejudice results therefrom. *United States v. Carrillo,* 902 F.2d 1405, 1409-10 (9th Cir. 1990).

A criminal defendant is entitled to a record on appeal that is adequate to permit meaningful review. *Griffin v. Illinois,* 351 U.S. 12, 20 (1956); *Draper v. Washington,* 372 U.S. 487, 496-499 (1963). The Supreme Court has stated that a record which will permit a meaningful and effective presentation of an appellant's claims is a "basic tool" for adequate appeal in all criminal cases. *Britt v. North Carolina,* 404 U.S. 226, 227 (1971).

The right to an adequate appellate record is also specifically guaranteed in capital cases by the Eighth Amendment, which requires a record sufficient to ensure that there is no substantial risk of an arbitrarily imposed sentence of death. *Stephens v. Zant,* 631 F.2d 397, 402-404 (5th Cir. 1980), *modified,* 648 F.2d 446, *cert. denied,* 454 U.S. 1035 (1981); *see also Dobbs v. Kemp,* 790 F.2d 1499, 1514 (11th Cir. 1986). This is particularly so as to omissions involving the appellate record. "Since the State must administer its capital sentencing procedures with an even hand it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." *Gardner* v. *Florida,* 430 U.S. 349, 361 (1977) (citations omitted). Otherwise, the "capital sentencing procedure would be subject to the defects which resulted in the holding of unconstitutionality in *Furman* v. *Georgia* [408 U.S. 238 (1972)]." *Id.* at 361. Due Process requires a that the record of the proceedings be sufficient to permit adequate and effective appellate review. *Griffin v. Illinois,* 351 U.S. 12, 20 (1956); *Draper v. Washington,* 372 U.S. 487, 496–499 (1963).

Each of the foregoing federal constitutional protections is also magnified by the Eighth Amendment's requirement of heightened reliability in capital cases. *See Beck* v. *Alabama,* 447

Corrected Defendant's Motion for Collateral Relief          *52*          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

U.S. 625, 638 and n. 13 (1980); *see also McElroy v. United States ex rel. Guagliardo,* 361 U.S. 249, 255 (1960) (Harlan, J., dissenting). As applied to the specific situation in this case, a complete and thorough transcription of the trial proceedings is a prerequisite to the effective representation on appeal that is guaranteed by both the due process clause and by the Sixth Amendment right to counsel. "When, as here, new counsel represents the indigent on appeal, how can he faithfully discharge the obligation which the court has placed on him unless he can read the entire transcript?" *Hardy v. United States,* 375 U.S. 277, 280 (1964).

The exclusion of Larranaga from the proceedings to speak clearly and affirmatively on Mr. Duncan's behalf and the lack of a record of proceedings were individually and collectively prejudicial and material. The representations made by Peven, as understood and subsequently represented by the court, were materially incorrect both as to his prior level of involvement and preparedness in the case and as to his prospective ability to be of any assistance whatsoever to the defense. The false understanding of Peven's ability to contribute led to the denial of fundamental fairness with regard to the allowance of adequate time for defense preparation of an extraordinarily complex and difficult case. *See* Claims 1 and 11.

V.    CLAIM 3: AS A RESULT OF MENTAL DISEASE, DISORDER OR DEFECT, MR. DUNCAN WAS INCOMPETENT TO PLEAD GUILTY AND HIS PLEA WAS NOT A KNOWING, INTELLIGENT AND VOLUNTARY WAIVER OF HIS RIGHT TO STAND TRIAL

Mr. Duncan's conviction and sentence were obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution in that he was incompetent to enter a plea of guilty, his trial attorneys failed to present the court with evidence sufficient to raise a bona fide doubt as to his competency to plead guilty, and did not knowingly, intelligently and voluntarily relinquish his right to stand trial. The facts in support of this claim, among others to be adduced at an evidentiary hearing, include the following:

## A.  The Retrospective Competency Hearing – The "Thorny" Waiver Issue

The Court conducted 23 days of hearings from January 8, 2013, to February 14, 2013. Both sides presented lay and expert testimony.  In general, the evidence showed that Mr. Duncan's view of the world is at least "highly extreme," and in the unanimous opinion of all defense experts plainly delusional.  No expert for either side contended that Mr. Duncan's views were insincere or his symptoms feigned, or that he was in any way malingering.  Prosecution experts conceded that the issue of competency was very "thorny," that Mr. Duncan's presentation was "extreme," and whether his unusual beliefs were sufficient to "rise to the level" of delusions was critical.

All witnesses agreed that his views regarding appealing his conviction and sentence spring from an Epiphany he experienced that provided him a singular understanding of the "Truth" and all sentient beings' relationship to it.  According to his beliefs, the Truth cannot be described or taught, but can be discovered only experientially.  Free choice is a delusion, but everyone nonetheless is faced with the fundamental – and singular – choice whether to pursue or forsake the Truth.  Attempting to turn from Truth is the root cause of all evil and injustice and is a sin far worse than any crime defined by the "System," including murder.

The overwhelming weight of the evidence adduced at the hearing establishes that Mr. Duncan's beliefs are delusional, that his thought processes result from psychosis, and that was incompetent at the time of trial.

### 1.  Defense Experts

#### a.  Dr. James R. Merikangas

Dr. James R. Merikangas is a board certified neurologist and psychiatrist.  RCHT 2912. He has served on the faculty of the medical schools at the University of Pittsburgh and Yale University.  Currently, he is a clinical professor of psychiatry and behavioral science at George

Washington University School of Medicine. RCHT 2915. He met with Mr. Duncan on eight occasions from 2008 – 2012, for a total of twenty-one hours. Retrospective Comptency Exhs. I-37, I-34; RCHT 2990-91. He conducted a neurologic examination, a physical examination, and psychiatric interviews in order to evaluate Mr. Duncan's mental and neurological condition. RCHT 2930. Among the voluminous materials he reviewed was a transcript of a 2005 FBI interview of Mr. Duncan, RCHT 2932, the transcripts of his November 24, 2008, colloquy with the court, RCHT 3027-28, and the transcript of the four hour interview with Dr. Roesch. RCHT 3020.

Dr. Merikangas testified that Mr. Duncan suffers from a "mental disorder [that] substantially affects his capacity to make decisions in this case from his appeal, to his pleas, to dismissing his lawyers, to acting *pro se*...." RCHT 3139. Dr. Merikangas testified Mr. Duncan was "incompetent ... from the beginning, from 2005 through when I saw him in this report in September of 2012." RCHT 3025. From the initial interviews, "the content of [Mr. Duncan's] speech and the content of his thinking, [and] the content of his writing" pretty well established that he was psychotic. RCHT 2964. The signs of a serious thought disorder and psychosis included poverty of content of speech, tangential and circumstantial speech, derailment of ideas, perseveration, pressured speech, and grandiose and paranoid ideation. RCHT 2991-92. Dr. Merikangas explained the same symptoms were exhibited during the FBI interviews, RCHT 2997, the interview by Dr. Roesch, RCHT 2994-95, 3144-45, and the transcripts of the federal proceedings. RCHT 3027-30.

Mr. Duncan's medical history included two reported and documented significant head injuries, including being hit in the head with a pick axe and being in a car accident, RCHT 3026. His social history included significant physical and sexual abuse. *Id.* Dr. Merikangas ordered an

Corrected Defendant's Motion for Collateral Relief          55          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

MRI and a PET scan to try to find a physical cause for Mr. Duncan's psychosis.  RCHT 2964.

The MRI and the PET revealed "functional and anatomical abnormalities" which are probably

related to the psychosis.  RCHT 3027.  Mr. Duncan had too many insults to his brain

development to pinpoint which accounted for the abnormalities.  *Id.*  Neuropsychological data

provided by Drs. Gur and Beaver corroborated Dr. Merikangas's conclusions about a physical

cause of Mr. Duncan's psychosis.  RCHT 3136.

### b.  Dr. Ruben Gur

Dr. Ruben Gur has been a full professor of neuropsychology in the University of

Pennsylvania medical school since 1986.  RCHT 3481.  He directs the Center for Neuroimaging

in Psychiatry, RCHT 3491, where the study of psychosis is a major focus of his work.  RCHT

3493.  He has published 360 peer reviewed articles.  RCHT 3696.  He interviewed Mr. Duncan

twice for a total of six-and-one-half hours.  Retrospective Competency Exhs. F-38, F-221-331; Exh.

G; RCHT 3518, 3626.

During Dr. Gur's 2008 clinical interview, Mr. Duncan articulated an elaborate delusional

system and manifested thought disorder.  RCHT 3608-09.  "He described his experiences in the

mountain and the epiphany that he had and believes that, because of that epiphany, he is different

from everybody else.  And his role in life is to make everybody else have that epiphany, and that

that epiphany cannot be communicated with words."  RCHT 3609.  According to Dr. Gur, Mr.

Duncan "believes that all of us here are doing things that we are supposed to do, but they are really

not very relevant to him," which is "not a good foundation to waive your right for appeal in a

capital case." RCHT 3820.

Detailed and "remarkably accurate" notes of that 2008 interview were taken by members of

the defense team.  Retrospective Competency Exh. GG, RCHT 3773-75, 3785.  Another interview

Dr. Gur conducted in 2012 was recorded, RCHT 3606, and the content of the two interviews was "substantially the same." RCHT 3786. Dr. Gur had reviewed the recording of Mr. Duncan's interview with Dr. Roesch prior to testifying, and Mr. Duncan's disordered thinking was evident there as well. RCHT 3634-38.

Dr. Gur corroborated his findings with the results of sophisticated diagnostic studies. Dr. Gur explained that in his imaging center, he performs quantitative analyses of MRI's and PET scans. RCHT 3538. Almost all of the patients he evaluates have normal studies by clinical readings, but when they undergo quantitative analysis abnormalities that escaped visual detection are revealed. *Id.* Dr. Gur's quantitative analysis of the MRI, the PET, and neuropsychological testing conducted by Dr. Craig Beaver, consistently showed left temporal lobe damage, and reduced volume, and reduced metabolism, in Mr. Duncan's hippocampus. RCHT 3608. The bioimaging analysis helps locate areas of impairments, RCHT 3821, and addresses the cause of psychosis, not its existence. RCHT 3815. Clinical interviews are the "gold standard" for determining whether a patient is psychotic. *Id.*

Dr. Gur did a quantitative analysis of Dr. Beaver's neuropsychological data and the MRI results. RCHT 3569. Although Dr. Gur identified specific examples of Mr. Duncan's psychotic thinking in his 2012 recorded interview, *e.g.*, RCHT 3627-28 (showing that "the trial we are going through is what has to happen in order for his epiphany to be communicated with the rest of the world, and then we will all realize that we are not doing the right thing and not asking the right questions"), RCHT 3629-30 (showing "very good example of derailment, loose associations, and disordered thinking"), Dr. Gur repeatedly stated the full flavor of Mr. Duncan's insanity comes through only by listening to the entire interview. RCHT 3630-31, 3637. Dr. Gur explained Mr. Duncan's view is that "he basically lives in a different universe. He -- his universe interacts with

Corrected Defendant's Motion for Collateral Relief    57    *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

ours, but what he's going through and what we are going through are somewhat tangentially related. In his mind, because of his role in the world is to have the epiphany and communicate it to the rest of the world.  And that is very important so that the world changes." RCHT 3817.

### c.  Dr. George W. Woods

Psychiatrist George W. Woods, M.D., interviewed Mr. Duncan six times over seven years for more than fourteen hours.  Retrospective Competency Exh. C-1356; RCHT 671-74.  During the first interview, he saw signs of "philosophical ideas that may or may not have been just the thinking of a philosophical person, but [also] that his language processes were impaired."  RCHT 5678.  He was circumstantial, often adding irrelevant detail.  *Id.*  There were "certain recurring things that allowed me over time to realize that he had what we call a poverty of language content." *Id.*  There were "recurring themes of being insane, of there being something wrong with his mind, of the system being criminal, of there being a singular truth that he had a special privy to, a number of what I believe to be delusional precepts over time that began to populate his language." *Id.* Dr. Woods believed Mr. Duncan was not the type of individual who could be assessed in just a couple of hours.  RCHT 5686.

In ensuing interviews, Dr. Woods was struck by the fact that when asked to explain his philosophical ideas, *e.g.*, "God requires that we love him according to our own free will," Mr. Duncan was unable to do so, stating that "words can't express what I mean."  RCHT 5692.  Dr. Woods began more strongly to suspect psychosis when Mr. Duncan insisted that he and S.G. "became the same" person.  RCHT 5696, 5698.  During the third interview, Mr. Duncan told Dr. Woods that he was the "instrument of the ultimate vehicle.  God was driving," which Dr. Woods saw as a delusion of grandeur.  RCHT 5701-02.  By the fourth interview, Mr. Duncan was more willing to talk about his psychotic thoughts and delusions due to the rapport they had developed.

RCHT 5720.

In 2012, Dr. Woods reinterviewed Mr. Duncan about his apparent refusal to endorse an appeal. Mr. Duncan described it as a decision that was not a rational decision but came from the unconscious. RCHT 5778-79. Dr. Woods saw "psychotic ambivalence" in Mr. Duncan's statements that "I don't know I withdrew the appeal. I was convincing myself. I was believing in the delusion that I wanted to act. I was trusting in that ability that didn't exist." RCHT 5786. Mr. Duncan also described his action of retracting the waiver as a "decision made beyond reason." RCHT 5786. Mr. Duncan told Dr. Woods that objecting to the notice of appeal and requesting to reinstate the notice of appeal both went against his "belief of noninterference." RCHT 5798.

Dr. Woods testified that the testing of Drs. Merikangas, Gur and Beaver revealed brain damage that could account for Mr. Duncan's psychosis. RCHT 5811. Dr. Woods also testified that the neuropsychological deficits established by Dr. Beaver's test results were in the specific areas that are found to be impaired when someone has psychotic thoughts. RCHT 5814. He noted as possible contributing factors a family history of mental illness, a father that had past PTSD and a history of depression, a mother that appears to have had certain mental problems, and other family members' disabilities that range from intellectual disabilities to seizures. RCHT 5811-12. Dr. Woods reviewed the verbatim record of the interviews conducted by Drs. Roesch and Gur and found the symptoms Mr. Duncan displayed there were consistent with his own findings. RCHT 5814-15.

### d. Dr. Ari Kalechstein

Dr. Ari Kalechstein evaluated Mr. Duncan in connection with Mr. Duncan's California case, and updated his evaluation to take into account Dr. Roesch's recorded interview. RCHT 5067, 5076. He has worked on about 20 capital cases and 15-20 percent of his forensic work is

done for the prosecution. RCHT 5068-69. He testified that in his opinion "Mr. Duncan suffers from mental illness, and specifically he suffers from a thought disorder. And as a result of that condition, Mr. Duncan was unable to represent himself at the time of the hearing that was conducted in Riverside back in 2009." RCHT 5076. He also testified that "to a reasonable degree of psychological certainty, [Mr. Duncan] suffers from a thought disorder. And specifically the symptoms that were most present were delusions, including, but not limited to, paranoid delusions." RCHT 5077.

Dr. Kalechstein explained that Mr. Duncan's documented statements evidenced delusions of various types, including delusions of grandeur, in that

> Mr. Duncan has this special knowledge that he must spread to the world. And that somehow only he, he talks about, ... cannot see what the Bible talks about, but he, as a result of his epiphany, he can see it. And he also wants to convey somehow that society in general is sick and he is the person alone who understands that.

RCHT 5084. Dr. Kalechstein described Mr. Duncan's bizarre delusions that "children are false gods or he talks about the idea that somehow -- he talks about the fact that the crimes that he perpetrated were somehow less severe or less meaningful than the way children are treated every day." RCHT 5115-16.

> He also believes the idea that the truth can be silently communicated. And this is a centerpiece of his bizarre delusional thinking, which is that somehow the idea that the truth of the epiphany demonstrate that people can communicate without actually sharing any words.

*Id.* Dr. Kalechstein also described how Mr. Duncan's superficial treatment of complex subjects shows disordered thinking.

> And so what this really characterizes, as it relates to Mr. Duncan, is that when you talk to him about topics and you ask him initially what he thinks, I believe that he can provide a comment that sounds well reasoned. But when you probe more deeply into how he thinks, then his reasoning starts to break down and he either says things that are not true or he cannot

Corrected Defendant's Motion for Collateral Relief          60          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

actually articulate the reasons that underlie the decisions or comments that he makes.

\* \* \* \* \*

From my perspective, because Mr. Duncan is relatively verbal, I think his ability to provide initial comments serves to mask the level of anosognosia that he experiences. ..I think the problem is when you try to drill down into it and you get him to explain what the problems are, he can't do it. Not only with those issues, but again, as I said, with the truth or the epiphany. So what happens is if you only take his statements at face value and do not probe at greater depth, then it is not apparent just how lacking in insight he is.

RCHT 5122-23.

### e. Dr. Xavier Amador

Dr. Xavier Amador, Ph.D., is an Adjunct Professor in Clinical Psychology, Columbia University, Teachers College.  As a member of the incident review committee and medical review committee at Columbia's Department of Psychiatry, he has extensive experience evaluating whether psychiatric diagnoses rendered by others are reliable and valid.  He has conducted more than 6,000 such reviews since 1990.  RCHT 4004-05.  As co-chair of the text revision of the DSM-IV, he made sure that all of the text in the DSM-IV was not just opinion, but reflected scientific consensus.  His committee drafted the definitions of psychosis and delusion, and revised the glossary for the DSM-IV-TR, which was then peer-reviewed by a panel of experts to determine whether those definitions reflected both clinical and scientific consensus.  RCHT 4010-11.  Dr. Amador was also the co-chair of the text revision of the "Schizophrenia and other Psychotic Disorders" section of the DSM-IV.  RCHT 4044.

Dr. Amador wrote a section for the "associated features" section of the new DSM-V about the scientific consensus on "anosognosia," RCHT 4011-12, a "syndrome, a symptom of [a patient's] unawareness of illness that we see in psychotic disorders." RCHT 3999.  Dr. Amador has published roughly 35 peer-reviewed papers on anosognosia.  RCHT 4021-23.

Corrected Defendant's Motion for Collateral Relief      61      *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

Related to his research on anosognosia, Dr. Amador has training and experience in evaluating individuals of normal, above-normal, and high intelligence, for psychotic symptoms. Many intelligent individuals who do not believe they are ill can disguise their delusions as abstract, philosophical or even political positions. RCHT 4024-26. Intelligence, coupled with a desire to appear normal, results in abstract explanations of delusions that are highly intellectualized. If taken in short snippets instead of the broader context, these "explanations" may appear nondelusional or nonpsychotic. RCHT 4029-30.

In Dr. Amador's opinion, it is unlikely that an evaluator who spends all of their time with a prison population would come across many high functioning psychotics. RCHT 4027-28. In his experience, highly intelligent anosognosic psychotics may go undetected because they have the wherewithal to hide, normalize, and intellectualize, explaining away delusional thinking. Their evaluators will hear philosophy, political positions and miss the underlying psychotic thinking. RCHT 4033-34.

Dr. Amador opined that a lack of understanding of anosognosia was a significant problem in the opinions expressed by Dr. Low. RCHT 4021, which are discussed *infra*. Moreover, he found a number of statements in the reports of Dr. Low and others that were inconsistent with the conclusions stated therein. RCHT 4047. Among other things, Dr. Amador noted that Dr. Low purported to rely on Dr. Engle's MMPI profile, even though it contained elevated paranoia and schizophrenia scales. RCHT 4136. According to Dr. Amador, Dr. Low's opinion that there are no signs, symptoms, or records which show a psychosis or thought disorder, was an incorrect interpretation of the facts and of Dr. Engle's data. "She selectively quotes Dr. Engle and -- no, it is incorrect." RCHT 4136-37. Once Dr. Amador was informed that the elevations on the paranoia and schizophrenia scales were as high as 94 and 74, respectively, his opinion was even stronger.

RCHT 4135-36.

### f.  Dr. Michael First

Dr. Michael First is a board certified psychiatrist and Professor of Clinical Psychiatry, Department of Psychiatry, Columbia University College and Physicians and Surgeons.  In his forensic work, he is retained by both the defense and the Government.  RCHT 3167.  Dr. First is the editor of the DSM-IV, and the DSM-IV-TR.  RCHT 3157-58.  Dr. First is also the lead author on the Structured Clinical Interview for the DSM-IV ("SCID"), the most widely used diagnostic assessment tool in psychiatry.  RCHT 3158.

Dr. First explained the importance of distinguishing a delusion from an "overvalued idea," and that the DSM provides guidelines for doing that.  RCHT 3162-63.  The SCID also provides guidance on how to distinguish between a delusion and an overvalued idea.  RCHT 3163.  The principal distinguishing feature is the strength of the person's conviction in his or her idea in the face of evidence to the contrary.  Where the idea at issue is a religious one, a different analysis is required because a religious belief is not an evidence based belief, and one cannot actually produce evidence to the contrary.  The DSM's guidelines provide that to assess whether religious ideas are delusions is to "figure out how the person came to [the religious] idea," and to "look at their cultural and religious background to see whether or not that idea is consistent with the belief system that [the] person has subscribed to as part of being part of a cultural group or subgroup." RCHT 3164-66.

### g.  Dr. Craig Beaver

Dr. Craig Beaver is a licensed psychologist who specializes in clinical neuropsychology and forensic psychology.  Dr. Beaver met with Mr. Duncan ten times between July of 2005 and February of 2008, during which he interviewed the Mr. Duncan administered tests.  The

Government's objection to Dr. Beaver testifying about Mr. Duncan's mental status during the examination, based on an alleged defense discovery violation, was sustained, and the court limited Dr. Beaver's testimony to his neuropsychological testing. RCHT 3281. The testing indicated that although Mr. Duncan's IQ was well above average, he had "some core areas of difficulty that were consistent across several different types of tests." RCHT 3232. He had trouble with " higher level kind of abstract organizational skills, that kind of upper level of being able to deal with language and understand it." RCHT 3273. "[W]ith Mr. Duncan, we have a bright individual, but we have a consistent emerging pattern of difficulties in certain areas, primarily involving that left frontal temporal area" of the brain. RCHT 3279. Dr. Beaver recommended a neuroradiological study to follow up on the areas of impairment, but that was never done at the state court level. RCHT 3249-50.

### 2. Prosecution Experts

The prosecution presented the testimony of five psychologists: Robert Engle, Cynthia Low, Craig Rath, Patricia Kirkish, and Ronald Roesch. Drs. Engle and Low had been involved at the *Faretta* stage of this case. Drs. Rath and Kirkish had evaluated Mr. Duncan with respect to competency to stand trial in the California case. Dr. Roesch, a Canadian psychologist, was retained specifically for the retrospective competency hearing. The prosecution presented no experts in psychiatry or neurology, and none of the prosecution experts, with the possible except of Dr. Roesch, whose testimony was disregarded by the court, had education, training and expertise on a par with the defense experts.

Dr. Kirkish also evaluated Mr. Duncan in connection with the California proceedings and not in the federal proceeding or on remand. She conducted one interview with him. RCHT 1116. She discussed his epiphany with him and concluded it was *not* just an "a-ha" moment as Dr.

Rath believed (*see* below), but that it was something that transformed him fundamentally.  RCHT 1256. "[H]e believed he had come to some realization, some truth with a capital T, that was -- that had freed him from this rampage of revenge, that if he could communicate that, if he could disengage with this judicial power struggle, which is how he characterized it, that somehow walking that walk -- those were his words, 'walking that walk' -- would be an example to others."  RCHT 1137.  He considered the system an independent entity capable of exercising power over him if he in any way were to fight it.  RCHT 1257.  At the heart of it was his belief that S.G. loved him.  RCHT 1171.  Dr. Kirkish found him to have a unique and "highly extreme," (RCHT 1172) belief system, "amalgamating some aspects of psychology and philosophy and various religions and the concept of love and oneness and cosmic consciousness."  RCHT 1287, 1172.  She considered it very difficult to decide whether his beliefs were delusional or merely idiosyncratic.  RCHT 1168.  She felt that reasonable minds could differ on the question.  RCHT 1169.  She testified that as to a number of things he reportedly said to other evaluators, "to the degree that those were accurate descriptions, I would certainly say, 'Well, that certainly looks delusional to me.'"  RCHT 1170.

Dr. Rath was appointed in March 2009 in the California case to evaluate Mr. Duncan for the purpose of determining his competency to represent himself.  RCHT 839-40.  He also did not evaluate Mr. Duncan during the federal case or on remand.  His interview lasted only two hours, and he said this was enough time because the evaluation was "relatively focused."  RCHT 854-55.  The "main focus" of his evaluation "really had to do with his ability to cooperate with an attorney," RCHT 851, not the question on remand.  Dr. Rath found Mr. Duncan's discourse "[a]bstract, complicated, metaphorical at times, but always goal-directed and illustrating a point."  RCHT 856.  Because Mr. Duncan's speech was "intellectualized," "individuals of low intelligence ... wouldn't understand what he was saying."  *Id.*  From Mr. Duncan's description of his epiphany, Dr. Rath

gleaned that "[h]e had basically been involved with the child.  He, I suppose the best way to put it is, identified with her in the sense that she had been -- had a rough time in life and yet seemed pure and innocent.  And he had what psychologists refer to as an 'ah-ha moment' -- A-H, separate word, H-A -- ah-ha moment, where you have a sudden insight that he was wrong in doing this, and he had a problem." RCHT 864.  Dr. Rath's understanding of Mr. Duncan's beliefs regarding "truth" was that he wanted the jury to have a truthful account of what he had done.  RCHT 922.  Dr. Rath was aware the Mr. Duncan wanted to be found competent.  RCHT 924.  Mr. Duncan told Dr. Rath that "he had curbed his delusional process when he was interviewed by Dr. Engle" and that was why Mr. Duncan believed Dr. Engle had found him competent.  RCHT 943.

Dr. Engle met with Mr. Duncan on three occasions for a total of three and one half hours. RCHT 227, 324.  He did not consider his evaluation "a comprehensive psychological evaluation" RCHT 326, but one focused on a "very specific question" of competency to stand trial.  *Id.*  He saw some symptoms associated with psychosis, *i.e.*, circumstantial and tangential speech, RCHT 240-41, 254, but not at a level he would expect to see with a "more severe psychosis individual." RCHT 242.  Dr. Engle had difficulty following parts of what Mr. Duncan said.  RCHT 254.  As a subjective matter, RCHT 374, he felt that when Mr. Duncan talked about his epiphany the ideas did not rise to the level of a delusion.  RCHT 255.  Dr. Engle administered an MMPI-2, "the gold standard for psychologists in assessing personality," RCHT 265, and he wrote in his report that

> [m]any people with a similar profile manifest clearly psychotic behavior. Their thinking may be described as autistic, fragmented, tangential, and circumstantial; and thought content may be bizarre, difficulties in concentrating and attending, and deficits in memory are common. Affect may be blurred, and speech may be rapid and at times in incoherent.

RCHT 391.  Dr. Engle testified that many people who are mentally ill attempt to mask their symptoms, RCHT 348, and one of Mr. Duncan's test results shows that he was not disclosing

Corrected Defendant's Motion for Collateral Relief                66                *Joseph Edward Duncan, III v. United States of America,*
                                                                                                    *Case No.2-07-cr-00023-EJL*

himself fully. *Id.*

Dr. Low met with Mr. Duncan on a single occasion for 75 minutes, RCHT 559, 561. Mr. Duncan was very hesitant during that meeting, "saying that he probably would not be cooperating because he felt as though our agenda was different from his." RCHT 573. She tried to meet with him again several times, but he refused, and she was unable to complete her interview protocol. RCHT 573-74. Dr. Low said Mr. Duncan had a good understanding of the purpose of the evaluation, RCHT 587, and he resented his attorneys for questioning his competency. RCHT 588. She did not see anything unusual about Mr. Duncan in any way. RCHT 578. Mr. Duncan told her about having "a connection with the girl, a unity, but that was really it. There was no mention of an epiphany, per se." RCHT 588. In her report to the court she stated her limited contact precluded asserting an expert opinion with any reasonable certainty, but in court she said despite that statement she had rendered an opinion with a reasonable degree of scientific certainty. RCHT 631, 633-34.

The prosecution's final expert was Dr. Roesch. He testified in part that although he had urged the prosecution to obtain authorization for him to examine Mr. Duncan, the examination was not nearly as useful as he had anticipated. RCHT 1951. During cross-examination the defense attempted to show that Mr. Duncan was demonstrably psychotic during the interview and that this was the reason Dr. Roesch disclaimed reliance on it.

### 3. Lay Witnesses

The defense presented defendant's sister, Cheri Cox, who described the severe abuse suffered by Mr. Duncan as a child, prompting the District Court to comment that Mr. Duncan is "an individual who has endured great suffering in his life from an early age and is clearly disturbed by those events." Doc. 843 at 33.

The defense also presented the testimony of 17 investigators and attorneys who had been part of the defense teams in the Idaho state case, the instant trial case, the Riverside County, California case, and the prior federal appeal.  Their testimony provided a remarkably consistent description of Mr. Duncan as obsessed with having a mission to silently communicate a universal Truth to society as a result of having achieved a unique and momentous sudden understanding that rape and murder are wrong, but not as wrong as turning away from the Truth.  They described his long-winded, largely meaningless philosophical ramblings that were different if not impossible to understand.

For instance, lead federal trial counsel Judy Clarke testified that Mr. Duncan's predominant theme

> was the discussion of the truth. And I say the truth with a capital T that had some special meaning. It was an entity or it was a thing or it was something that came to people.
>
> He was just further along the path to understanding the truth. But the truth was a big thing. It was not the truth in terms of accuracy of fact necessarily; it was a being, a source. There was a lot of defaulting to or discussion of being one, we were all one. We were not separate individuals, there was a oneness quality to us.
>
> There was -- the epiphany was a rather consistent discussion, the epiphany on the mountain. And [S.G.] was a constant topic. The pure love that came from this enlightened child who taught Jet so many things by her purity.

RCHT 5453-54.  She further explained that, according to Mr. Duncan

> our ultimate problem [was] that the legal process was an impediment to the truth in Jet's world. The words impeded the path to the truth. That people were to come to their own epiphany. That in the courtroom the jurors would have this epiphany. That, in fact, it would be an epiphany for mankind. It was large. But we would destroy that by words and the court process.

RCHT 5454-55.

Co-counsel Mark Larranaga testified that "the major epiphany happened on the

mountain....Mr. Duncan believed he found the truth, a higher purpose in which we all become one was from the mountain, from the returning of the young girl." RCHT 3949. "The epiphany and the truth would be hindered or thwarted by words. So lawyers, for example, or this process may be thwarted if we were to continue to represent him for example." RCHT 3949-50. He did not use truth in the normal sense. "It was a truth of a oneness, of a -- of a super being, a super understanding that each and every one of us should try to strive for, according to Mr. Duncan. Yet we have to get there on our own." RCHT 3950. It was not a simple awakening to the fact that killing was wrong, "but, really, it was a realization that his thought process and thought patterns were shattered, and he had now come to a different revelation, a different understanding of truth and oneness." RCHT 4459-60.

Tom Monaghan testified that Mr. Duncan's epiphany "was that he had learned the living truth of existence. He described that as the fact that we were all part of a living singular consciousness that binds us all together. He would refer to that as oneness or connectedness." RCHT 4786-87.

> The system he described as the antithesis of the world of truth. The system was based on fear and deception and reason. It was basically something that obscures or hides the truth. It was the situation of people who are not enlightened as to the truth such as him were part of that system.

> In fact, his position was that I and others involved in the case, because we were not enlightened to the truth, were part of that system. And in fact, at times he would remind us or tell us that he had to remind himself that we were part of the system and, therefore, his enemy.

> He would talk about how the system cannot be fought directly because it strengthens the system.

RCHT 4787.

Members of the California trial team had similar experiences. Mark Johnson, who represented Mr. Duncan prior to being appointed to the Riverside County Superior Court,

Corrected Defendant's Motion for Collateral Relief          69          *Joseph Edward Duncan, III v. United States of America,*
                                                                        *Case No.2-07-cr-00023-EJL*

testified that Mr. Duncan:

> impressed me as somebody who had some huge religious experience that had totally influenced everything he believed and wanted to talk about. All he wanted to talk about was this epiphany. And, at least in talking with him, he impressed me as someone who, at least how he acted, who had an awakening spiritual experience that was all-consuming with him. That's all he wanted to talk about with me. And he didn't want me to do anything, because my -- I was corrupt because I was part of the system and I was going to get in the way of delivering this.

RCHT 2319.

> It was something that I -- everyone had to get this message on their own. And if you didn't somehow get it on your own, you weren't going to get it ever. So they had -- we had to just sit there at the defense table, do nothing, and allow the jury to soak this in.

> He seemed to -- when I talked to him, he made comments, he made comments that, like he was anointed by God or somehow to present this message. So it wasn't like me sitting there trying to give out the message. This was going to be Joseph Duncan who had had this spiritual experience who would be sitting there and had some heightened ability to deliver this to a jury through some type of osmosis. So that, that was it.

> But the bottom line, what was I supposed to do? I wasn't supposed to do anything, because that would get in the way of the message because I was corrupt.

RCHT 2320-21.

Richard Verlato, who took over from Johnson, testified that Mr. Duncan believed that S.G.

> had shown him love, the love of God. At various times he described her as a perfect Buddha or symbol of purity. These are his words, not mine.

> The interesting thing is, I know I am describing all these different things. You have to remember, in the terms of thought derailment, he slips from topic to topic in a way that can be illogical and nonsensical, depending on the topic upon which he touches his description of this sometimes had changes and kind of subtle differences, but it always was a very, according to him, profound experience that led him to have an understanding of the, quote, truth, this very important set of principles to him that he believed were revealed to him at that moment, a moment where he was about to kill [S.G.], and revealed to him that, no, he should not kill [S.G.], he should bring her home.

RCHT 2163.  Verlato further explained

> He told me he was the only person that understood this truth, that knew this truth, and could convey his truth. Nobody else could do it for him, and really nobody else had this knowledge that he had received during this epiphany, and to the exclusion, basically, of even his attorneys couldn't exercise or explain this in court....[T]he system was evil, and in the courtroom the process of court did not lead to the truth and could not lead to the truth. Again, his definition of the truth.

> Because of this, no attorney could ever get to the truth in a court of law. And the way that he described it was, as a lawyer I was deluded, I didn't know the truth, only he did, and any effort that I made for him in court would not lead to the truth.

RCHT 2168-69.

Defense investigator Debra Garvey testified:

> The epiphany was on the mountaintop when he was able to decide -- to recognize that [S.G.] had forgiven him, and he was able to decide not to kill her. And that brought him to a higher truth, to a different spiritual plane where truth could be found in all kinds of life experiences if people would just get out of the way of their judgments of things, of their preconceived notions about people, and let the truth come in.

RCHT 4667.

Defense investigator David Freedman testified that Mr. Duncan's

> motivation was to open -- to allow humanity to gain what he had gained. He thought it was his mission and his task to bring the epiphany to others; that he was given a huge responsibility to allow others to experience the epiphany that he had experienced.

> And all of the -- I would put it in quotes, but decision-making that he was engaged in, all of the things that he talked about during the preparation of the case, were about how to allow humanity to have the epiphany. That was the motivation. That was the fundamental piece of his behavior as far as the case was concerned, was to act in a way that allowed the epiphany to occur for others. And that was his -- he was especially chosen to do that, and he had a responsibility to do that.

RCHT 1698-99.

Defense investigator Jennifer Davis explained that Mr. Duncan:

> would incorporate thoughts he had about books he was reading, television programs that he saw, things other people had told him about or just had read in the paper. And he would weave them all into an epiphany that occurred on the mountain and with one of the child victims in this case. And each time an element or elements of the weaving in of the stories could change, but they all led to the same epiphany.
>
> And it was a stream of consciousness on Joseph Campbell, Carl Sagan. It could be any number of things that he had read or seen. I have to admit, they didn't make a lot of sense to me.

RCHT 3375. Several other witnesses provided similar testimony.

The prosecution presented a number of lay witnesses who described Mr. Duncan as polite, communicative, and intelligent. They testified that he acted and spoke appropriately for the specific situation of their encounters with him.

### 4. The Court's Prior Order

In finding Mr. Duncan competent to waive appeal, the Court wrote:

> This Court has observed first-hand the Defendant's demeanor and conduct and has itself interacted with the Defendant for quite some time throughout these entire proceedings; including the particular time period in question. During this time, the Court personally engaged the Defendant in regards to his decision to waive his appeal as well as other matters and viewed his responses to the same. Having this first-hand, in-person view of the Defendant, the Court found him to be competent at the time and is now even more firmly convinced that the Defendant understood his legal options. This Court's own impressions of the Defendant are that he was clear in his thoughts, intelligent, had a complete understanding and knowledge of the proceedings and his options, and that he understood his legal position and the options available to him.

Doc. 843 at 49. As to the question of the existence of a mental illness, the Court noted the testimony was "somewhat varied." *Id.* at 8. The Court identified the question of what Mr. Duncan means by "Truth" and oneness as central, "the most critical subject matter relating to Defendant's mental health," *id.* at 29, and credited Dr. Rath's opinion that the "Defendant's Epiphany was not

a delusion" but merely a "'sudden insight' or 'realization.'" *Id.* at 33.  The Court found the "evidence regarding brain damage ... to be interesting but, in the end, not determinative of the question of whether the Defendant suffered from a mental disease or defect." *Id.* at 35.  Thus, the Court found that "at most, the Defendant suffers from a mental disease or defect to the degree of a personality disorder as concluded by the court-appointed experts, but not a *major* mental disease or defect." *Id.* at 36 (emphasis added).

The Court noted that the expert witnesses on both sides agreed that Mr. Duncan was of higher than average intelligence and possessed a factual understanding of the nature of the proceedings.  *Id.* at 37-38, 48-49.  The Court credited the testimony of various jailers and law enforcement personnel that Mr. Duncan was "polite, communicative, intelligent, and understanding of his circumstances" and that "he acted and spoke appropriately for the specific situation of their encounter with him." *Id.* at 42.

As to the testimony of the "former attorneys, mitigation specialists, and defense investigators," *id.* at 42, the Court found that "isolated comments in the notes about dreams, aliens, religion and the like, as relayed by the mitigation investigators, are not overly compelling because the drafters of the notes and their recollections are somewhat biased, incomplete, and without context." *Id.* at 42-43.  The Court did not doubt the "sincerity of the investigators or any of the defense team," (Doc. 843 at 44), but felt that they were less credible because their focus was on documenting the information that "would weigh in favor of mitigation and avoid the death penalty." Although there was contemporaneous documentation in the form of "notes [that] were taken for legitimate use by the defense attorneys," (*id.* at 44, n. 27), "the notes are certainly not a full and complete record of what was said both by the Defendant as well as others present at the meetings." *Id.*

### B.  The Unresolved Question of Mr. Duncan's Competency to Plead Guilty

In the retrospective competency order the Court expressly limited its findings to the question of competency at the time of the appellate waiver.  At the same time the court said in dictum,  "Even if this Court were to have concluded the Defendant was neither competent to waive his appeal nor to represent himself, based on the record and, in particular the plea hearing transcript, the Court would still find the Defendant was competent to plead guilty and that the plea was knowingly and voluntarily entered." *Id.* at 50 n. 32.  The clear weight of the evidence established the contrary.  The reasons the prior ruling is not dispositive and/or should be reconsidered include the following:

1.  **The Evidence Clearly Establishes that Mr. Duncan has a Mental Disease, Disorder, or Defect.**

In the retrospective competency order the Court explained that "there exists a broad spectrum of possible mental diseases or defects ranging from minor personality disorders to more severe and extreme major mental illnesses and brain defects.  Individuals may fall anywhere within that spectrum and experts may disagree as to where on the spectrum a person's mental condition falls." *Id.* at 31-32.[7] In fact, the court later stated that all of the testifying experts in the case "offered varying diagnoses, with *each testifying that the Defendant may very well have had a mental disease or defect.*" Doc. 843 at 48 (emphasis added).  Indeed, three times in the order, the court characterized the defense expert testimony that Mr. Duncan's disorders were more severe than the

---

[7] What the Court meant by "major" mental illness is not entirely clear, as that phrase was never defined by any of the witnesses. It appears that the Court was likely referring to an "Axis I" diagnosis, which Dr. Rath – but none of the other experts – contended was a necessary predicate for an incompetency finding. RCHT 884-85. That, however, is not a correct statement of applicable law. *See United States v. Murdoch*, 98 F.3d 472 (9th Cir. 1996).

prosecution's experts considered them as "interesting." Doc. 843 at 25, 35, 48.

The testimony suggests the absence of any clear line dividing major mental illness from mere personality disorder. Dr. Engle saw symptoms in Mr. Duncan that are typically associated with psychosis, *i.e.*, circumstantial and tangential speech, (RCHT 240-41, 254), but not at a level he would expect to see with a "more severe psychosis individual." RCHT 242. Dr. Engle had difficulty following parts of what Mr. Duncan had to say. RCHT 254. As a subjective matter, RCHT 374, he felt that when Mr. Duncan talked about his epiphany the ideas did not rise to the level of a delusion. RCHT 255. Dr. Engle administered an MMPI-2, "the gold standard for psychologists in assessing personality," RCHT 265, and he wrote in his report that "[m]any people with a similar profile manifest clearly psychotic behavior. Their thinking may be described as autistic, fragmented, tangential, and circumstantial; and thought content may be bizarre, difficulties in concentrating and attending, and deficits in memory are common. Affect may be blurred, and speech may be rapid and at times in incoherent." RCHT 391.

Dr. Low testified that at age 19 Mr. Duncan was diagnosed with sexual sadism and passive-aggressive personality, with schizoid features, RCHT 597, and that schizoid personality is "considered to be along [the] spectrum" of delusional disorder or schizophrenia. RCHT 661. She wrote in her report to the court that Mr. Duncan's refusal to cooperate with her precluded an opinion to a reasonable degree of scientific certainty, but in court she nonetheless opined that Mr. Duncan had been competent to stand trial. RCHT 631, 633-34.

Dr. Kirkish found Mr. Duncan to have a unique and "highly extreme" belief system, RCHT 1172, "amalgamating some aspects of psychology and philosophy and various religions and the concept of love and oneness and cosmic consciousness." RCHT 1287, 1172. She considered it very difficult to decide whether his beliefs were delusional or merely idiosyncratic. RCHT 1168.

She felt that reasonable minds could differ on the question. RCHT 1169. Dr. Kirkish testified that "there are aspects of his personality that are certainly problematic features" with regard to symptoms of a mental disorder. RCHT 1133. She testified that "there certainly are features that I found consistent" with "schizotypal personality disorder." RCHT 1177-78. Reading from the DSM definition, she indicated that such "individuals may be superstitious or preoccupied with paranormal phenomena that are outside the norms of their subculture," and they have "ideas of reference," incorrectly interpreting "casual incidents and external events as having a particular and unusual meaning specifically for that person." RCHT 1175-76. Individuals with schizotypal personality disorder are often suspicious and may have paranoid ideation, which, Dr. Kirkish agreed, are at the very heart of a competency determination. RCHT 1181.

Dr. Rath did not make a formal diagnosis because "the psychotic condition and exact diagnosis underlying a finding of incompetence would not be as important as how any mental illness reflects upon his functioning." RCHT 910. Significantly the Court's lack-of-psychosis conclusion was expressly tied to Dr. Rath's plainly defective view of Mr. Duncan's belief system: the mere "a-ha moment." In rejecting the expert opinion testimony that Mr. Duncan was delusional, the Court expressly found that "[t]he Defendant's Epiphany was not a delusion but was instead, as Dr. Rath testified, a 'sudden insight' or 'realization.'" Doc. 843 at 33. Similarly, with regard to testimony regarding organic brain dysfunction, which the Court termed "interesting," Doc. 843 at 35, the Court rejected the hard science of its existence in favor of the circumstantial evidence that if he possessed such deficits the prosecution experts would have seen the signs and symptoms of it, *id., i.e.,* they would have found him delusional.

## 2.  Competency Can Vary Over Time

One of the reasons the Court discounted the defense experts' evaluations as to competency to waive appeal was that they were less timely than the other evaluations.  *See* Doc. 843 at 12 (Dr. Engle's "observations of the Defendant occurred at the very time period at issue."); *id.* at 13 ("Dr. Engle's conclusion that the Defendant had no present psychological symptoms that would affect his competency to be well founded, timely, and correct"); *id.* at 18 ("While the time period of the Riverside proceeding was some months later than the time the Defendant waived his right to appeal in November of 2008, the mental issue in question at that proceeding encompassed the time period relevant to this case."); *id.* at 32 (the prosecution experts "reports and interactions with the Defendant occurred closest to the time period in question on this retrospective competency hearing.")

The court appointed experts testified that competency can vary over time.  RCRT 445 (Dr. Engle).  The Government conceded on appeal that "[c]ompetency issues may develop and change over time." Appellee's Brief, Nin Cir. No. 13-99011 at 40.  Thus "evidence of the defendant's competency closest in time to his appeal waiver on November 24, 2008, is [the] most probative." *Id.  See also id.* at 40 -41 ("No defense expert evaluations and reports were as close in time [as the prosecution experts'].... It thus made sense and was far from error for the district court to credit opinions that were closer in time to the defendant's waiver of appeal.")

The defense evaluations are as fully contemporaneous with the plea as the other evaluations.  Mr. Duncan entered his guilty plea on December 3, 2007.  Defense expert James Merikangas interviewed Mr. Duncan on February 6, 7 and 8, 2008, and again on April 1 and 2, 2008 for a total of approximately 15 hours over those five days.  Doc. 415, Attach. 3.  Defense expert George Woods, M.D., who had previously interviewed Mr. Duncan four times during late

2005 and early 2006, evaluated Mr. Duncan on April on April 27. 2008.  Doc. 415, Attach. 2.

Defense expert Ruben Gur interviewed Mr. Duncan for three hours on April 28, 2008.  Doc. 415, Attach. 1.

Court appointed expert Robert Engle saw Mr. Duncan on April 23, 24 and 28, 2008, and Low evaluated him in May and June, 2008.  Bureau of Prisons psychologist Cynthia Low met with Mr. Duncan 75 minutes on May 23, 2008, and he thereafter refused to meet with her.  She had brief, nonclinical interactions with him on six subsequent occasions over an approximately four-week period.  All other evaluations occurred substantially later.

Thus, on the question of competency to plead guilty, the prosecution experts have no chronological advantage.

### 3. The Court's Description of Mr. Duncan's In Court Statements As Rational and Coherent Is Contrary to the Verbatim Record and the Uncontroverted Expert Opinion

The competency finding gives substantial weight to the Court's personal observations and descriptions of Mr. Duncan's in-court behavior and statements.  In a section entitled "Defendant's Conduct in Court in November 2008," *id.* at 55-60, the Court wrote:

> The Defendant understood his legal position and the options available to him and he was not prevented by any mental disease or defect from making a rational choice among his options. The Defendant's ideology and choice to not participate in the system as expressed in his Post-Conviction Affidavits is consistent with the discussions he had with his counsel, mitigation investigators, FBI agents, and the various mental health experts who interviewed him.

*Id.* at 59-60 (footnote omitted).  *See also id.* at 49 ("This Court's own impressions of the Defendant are that he was clear in his thoughts, intelligent, had a complete understanding and knowledge of the proceedings and his options, and that he understood his legal position and the options available to him.").

The overwhelming weight of the evidence is to the contrary.  Mr. Duncan's interactions and verbalizations are clearly symptomatic of a severe thought disorder.  The reductionist paraphrase of Mr. Duncan's statements pales in comparison to Mr. Duncan's own words, which vividly illustrate his psychotic thinking.  Extracting *any* logical explanation from his tangential and circumstantial flight of ideas is challenging at best.  Mr. Duncan stated *inter alia*:

> Not attempting to influence society's choice is important to me since I have realized that the choices we make are our own, and no one outside of ourselves under any circumstance (or delusion) is responsible for the choices we make. Nobody and no circumstance can "make us" choose anything, though we can allow ourselves to be deceived (i.e. deceive ourselves).

* * * * *

> As a matter of clarification, I should establish that I did in fact bring [S.G.] home and deliberately surrender myself to the police. The reason that I did so is not entirely clear even to myself and is certainly beyond my own ability to rationally explain. But I can say that I came to realize that there is an active intelligence far greater than my own intelligence that is not just involved but in full control of our lives. I have tried to explain this realization with words over and over and have repeatedly failed to satisfy what I now recognize to be the Living Truth within my being.

* * * * *

> I woke up to the miracle of life and died to the deception of death. But these are merely words that do not truly even begin to reflect the experience that caused me to give up my quest for what society now calls "justice" (when it is officially sanctioned) but what I knew even then to be vengeance, no matter what other names it may go by (i.e. "justice," "punishment," "retribution," "retaliation," etc ... )

* * * * *

> I focus my energy and attention on my inner self, because I know that as a limited being I am a reflection of this world, and this society. And as a reflection the only power I have to change the world is the power to change myself-if the reflection changes, then what is reflected must also change. What the "Church of American Justice" (or the so called "Criminal Justice System") does to fight "evil" is trivial by comparison to this task, and most of the time even contrary to it. This is why I pay little heed to the plethora

of documents and proceedings that use my name in their attempts to further justify the system's own delusional murderous rampage (i.e. "insanity").

\* \* \* \* \*

Rape and murder are no more than symptoms of the one true crime; the crime of denying the truth within ourselves. \* \* \* Capital punishment-what society calls justice-is nothing more than the result of the same delusional thinking-and just another reflection of the greater crime-only much worse than even murdering children, because it affects the conscience of so many more people, not to mention ultimately resulting in more children being raped and murdered, or even worse ... led away from the Living Truth within their own being! (The very crime that I believe the legendary man/god Jesus was referring to when he spoke of leading children to harm).

Mr. Duncan's disordered thinking was manifested during the November 24, 2008, hearing, which was also excerpted by the court, despite the court's unsuccessful effort to keep Mr. Duncan on topic. Responding to the court's questioning of his understanding of appeal, Mr. Duncan stated:

I understand it I think as it was meant to be understood. In other words, Your Honor, I have – I don't know what the word for it is, but philosophical reservations about my understanding that extend beyond the intended understanding. In other words, my understanding goes beyond the intended understanding rather than below.

\* \* \* \* \*

The affidavit that I wrote that I intended to file that is only missing a cover page right now, it states in there, I don't know, I was talking to the attorneys about it earlier, I don't know if it is clear or not, but to me it seemed clear that what I was trying to say is that in my opinion this whole proceeding is criminal, and as a criminal proceeding, any appeal doesn't make any sense.

And so I understand the intention and I understand the criminal mind you might say of society. But in that regard I understand the intention of the appeal, the philosophy behind the appeal, the theory behind the appeal. You know, I know a lot. I am an educated person—well, I'm not saying I know everything, but I know enough to have an opinion about, you know, what the appeal means, which it goes beyond the normal opinion of what the appeal means.

Not surprisingly, the Court needed clarification of this, and Mr. Duncan responded:

I want to be as clear as possible. You have to excuse me if I am not being

clear. But I don't believe that this Court has the authority to grant such a right or a right as that. And so on the surface I can say honestly that I understand your intention of granting me that, what you call a right, but— and I accept your intention. I'm not opposed to your intention. I accept that. That is your view, that is your world, that is your law, but it is not mine and I don't accept it.

But at the same time I don't reject it. I am neutral. I wish to allow you to do what you feel you need to do. I will allow the attorneys to do what they feel they need to do.

Now, to answer your question, I want to get back to it, I am not avoiding your question or evading it. I will answer your question. And my answer is in that context my answer is I certainly understand my right, my right in quotes, and I have no desire, as I mentioned in the letter I wrote to you, to invoke it.

11/24/08 RT at 10-11.  He soon followed up with:

I consider the system criminal, but at the same time I'm not in a position to judge the system. So in other words, that is why I must allow the system to do what it needs to do, that it feels is the correct thing to do, without judging it.

In other words, what I am saying is that my view is that— well, I'm not going to say what my view is because that is not what is important. What I am saying now is my view is my view and I recognize it as my view, and my view is limited and has a clear history of being in error. Therefore, I have to acknowledge that my view is not the end all, my view is not, you know, but at the same time I have to take responsibility for my view. I have to own my view. I have to be—that is all I have is my view and that is what I am saying.

But at the same time what I am trying to say is I respect your view, and I respect my attorneys' view, and I respect the prosecutors' view, and I respect society's view. That doesn't mean I agree with it, you know, but I respect it and I allow you to have that view. I think that is important to understand also.

*Id.* at 13-14. He continued:

I understand the process, I understand the law, I understand the history of the law, where it comes from going all the way back to Rome and before that, the beginning of mankind. I'm not saying my understanding is perfect, but in other words, I have an extensive understanding of the whole process.

Corrected Defendant's Motion for Collateral Relief      81      *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

But the reason I chose to represent myself, the reason why I asked my counsel to step down and allow me to make some decisions in this case is not because I wanted to participate, but because I didn't want to participate.

I want you, I want the Court, I want society, I want the prosecutors, I want my attorneys, I want everyone to do this without me. I want you to make your choices. I don't want to be a part of that decision-making process.

That is why I defended myself the way I defended myself, by not defending myself. My answer to the Court was my argument is no argument, Your Honor. I don't want to argue. I don't want to get involved in the rationalization process of killing again. And so it becomes philosophical and I apologize for that.

My position is that the system has a choice to make. I've made my choices and now you have to make yours as a system, as society or whatever you want to call it. And I want to allow and I want to accept that choice, but I don't want to participate in it.

*Id.* at 16-17.

To be sure, Mr. Duncan's statement touches on some reasonably identifiable themes about process, non-interference, and the like. But to cherry-pick a few such statements and to rearrange them into an ostensibly coherent narrative suppresses the otherwise unmistakable evidence of psychosis.

The defense experts presented detailed testimony regarding the signs and symptoms of disordered thinking in Mr. Duncan's speech and writings, including circumstantiality, tangentiality, flight of ideas, derailment and poverty of content. They also explained that the fact that Mr. Duncan's thinking is disordered needs to be taken into account in assessing whether his world view is delusional or merely idiosyncratic. The question has to be answered in the context of a person with a thought disorder expressing the views he holds, not the context of an otherwise normal person expressing some unusual ideas. The examples they discussed included the same in-court statements the court cited to support of its claim of Mr. Duncan's rationality.

For example, Dr. Kalechstein was asked on cross-examination to consider the quality of Mr. Duncan's responses to judicial inquiries, and he responded:

> [W]hen I look at that snippet compared to the transcript from 11/24/08, and I did have that transcript, and from my perspective it shows that when you look at how he reasons overall beyond just saying "yes" or "no," from my perspective, it is not just whether he makes the decision, it is how he arrives at the decision.
>
> And I think that the transcript that I did look at from 11/24/2008 was crucial in that regard because it shows that he can answer the question, but when he tries to elaborate the rationale for his decisions, well, then you can see the illogical thinking and incoherence there. So the point being, he offered the opinion in 11/24/08 just like he offered a decision right there. And I'm not disagreeing that he did offer an answer in response to the question, but I am saying if you look at 11/24/08, it offers you more of a window into how he comes to making those sorts of decisions.

RCHT 5270-71.

Dr. Merikangas discussed the November hearing and the pro se affidavit at length during his testimony. *See* RCHT 3028-36. When asked about Mr. Duncan's statement that he understood an appeal, but that his "understanding goes beyond the intended understanding rather than below," Dr. Merikangas explained that this was "consistent with his psychosis and thought disorder" because "it doesn't make sense." RCHT 3028-29.

> [I]t is incoherent and it is relating to his delusion about his understanding that goes beyond the attendant understanding. In other words, he is referring to his knowledge of the universe, and the will that is the universe, and his particular idiosyncratic delusions of the universe, and what it means. He is not able to just answer this with "yes" or "no."

RCHT 3029. "[A]fter talking to him for 15 to 18 hours and hearing the same kinds of things being stated all along, and understanding the elements of his psychosis with his rambling, flight of ideas, tangentiality, circumstantiality, and his paranoia, and his hallucinations, his delusions, that this is all part of the same thing." RCHT 3030. With regard to Mr. Duncan's statement that he knows "enough to have an opinion about, you know, what the appeal means, which it goes beyond a

normal opinion of what the appeal means," RT (11/24/08) at 9-10, Dr. Merikangas explained:

> It is symptomatic of his psychotic thought process and shows he doesn't understand what is going on. He thinks his role is to help the Court make a decision when he is simply being asked what his decision is.

RCHT 3031-32. As to the *pro se* affidavit and the statement that "I'm not attempting to influence society's choice...no one outside of ourselves under circumstance or delusion is responsible for the choices we make," Dr. Merikangas testified: "It is symptomatic of his psychotic thought process, it is irrational, and it is based upon his delusional system." RCHT 3035-36.

Dr. Woods also reviewed these portions of the record. Like Dr. Merikangas, he noted that Mr. Duncan believed that it was for the court and the attorneys to decide whether there would be an appeal in a "convoluted [and] very disjointed way of thinking." RCHT 5806. As to Mr. Duncan's statement, "I don't want to argue. I don't want to get involved in the rationalization process of killing again. And so it becomes philosophical, and I apologize for that," Dr. Woods explained:

> Mr. Duncan has the ability to see his language become derailed. And you see in numerous interviews, as well as in this one, when his language starts to get somewhat derailed, he'll say, "All right. I know that I'm going too far." Or there will be times he will say, "What was I talking about?" And that could be anybody. We all kind of, from time to time, forget what we were discussing; some of us more frequently than others. And so we see that with him. But what has happened also is in the court records he uses this term "philosophical" as a way to basically say: Here I go again. Here I go off into this other discussion. He is aware of it, and he uses that term; and over time, he uses it more frequently.

RCHT 5810.

A detailed analysis of many of Mr. Duncan's in-court statements is set forth in Dr. Woods' 10/01/12 report (Retropspective Competency Exh. J at 81-106). In his forensic summary, he stated:

> Mr. Duncan's language impairment reflects his deep psychosis and its delusional cover. He admits that he didn't have the words during the hearing to waive his appeals. "I didn't have the words. Was filtered through our delusions. Supplied by our national structures that aren't real. .. What's important is that people acknowledge this reality." Dr. Merikangas and Dr. Gur both describe derailment of thought and language when interviewing Mr. Duncan. Mr. Duncan described his difficulty discussing his beliefs with Judge Lodge, and describes the interaction as "futile conversation." This difficulty, in Mr. Duncan's mind, stemmed from " ... infinite course equals infinite consequences ... I believed the appeal interferes with society's innocence ... I do not buy into this reality that I subscribed to .. .if you bring me another reality, I am willing to adjust my perspective.

*Id.* at 103.

The experts also analyzed the recorded interviews with Drs. Roesch and Gur.  Dr. Gur played portions of his interview and then commented on how

> Well, it sounds [like] what it is; loose associations. It is basically trying to explain that this other medium that you can communicate with is sort of lost through the socialization process. Children learn to not use it; and at the end, we are -- we have real difficulty understanding those kinds of communications because we only believe in rational language.

RCHT 3629.

In contrast with these specific analytical references to verbatim statements, the prosecution experts simply testified to a subjective conclusion that they did not detect signs of "telling speech" (or in those instances where they did detect tangentiality and circumstantiality, not to an extent that would cause concern).

### 4.   The Evidence Establishes that Mr. Duncan's Belief System is a Delusion, Not a Rational Insight

Again normalizing Mr. Duncan's statements and beliefs, the Court has described Mr. Duncan's Epiphany as follows:

> Generally, to the Defendant, the Truth is something that can only be found by silence when one reaches their own epiphany or enlightenment without any interference. The Defendant stated that words and his participation in the court system would impede the path to the Truth. (Dkt. 613.) The Truth

Corrected Defendant's Motion for Collateral Relief          85          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

was more important to the Defendant than the outcome of this case. The Epiphany is what the Defendant experienced while he was on the mountain with the surviving victim. (Dkt. 613.) While at the campsite, the Defendant intended to kill the lone remaining victim. Mere seconds before he was about to deliver the fatal blow with a large rock, the Defendant stated he had the Epiphany and realized what he was doing was wrong. As a result of this awareness, the Defendant decided to return the victim to her home and turn himself in. The Defendant stated his hope or belief is that everyone, including the jurors, would experience their own epiphany during the trial and, thereby, attain the Truth.

Doc. 843 at 9.

Despite the manifest need for further exploration, the Court displayed a remarkable reluctance to conduct it.  According to the Court,

[t]he Defendant's Epiphany was not a delusion but was instead, as Dr. Rath testified, a "sudden insight" or "realization." In making this statement, Dr. Rath recognized that "[n]obody who was reasonable would disagree that the Defendant has problems." The Court finds this statement to be accurate in describing the Defendant in this case.

Doc. 843 at 33 (record citations omitted).  The Court even went so far as to suggest that contrary characterizations were woven from isolated statements taken out of context.  *See* Doc. 843 at 16 (claiming that Dr. Amador's critique of Dr. Low was based on "isolated phrases as evidence of delusions and thought disorders not recognized by Dr. Low as such."); *id.* at 42 ("As the expert witnesses for both sides made clear, however, isolated statements do not, in and of themselves, show a person's mental state.  The experts agreed that context is important when determining whether a particular statement by an individual may be a delusion or other evidence of a mental disease or defect.  Here, isolated comments in the notes about dreams, aliens, religion and the like, as relayed by the mitigation investigators, are not overly compelling...").

Multiple unimpeachable sources of information clearly belie the view that Mr. Duncan merely came to recognize that to kill S.G. would be wrong.  The record of Mr. Duncan's own statements to the trial court that existed before the matter was remanded strongly undermines this

simplistic view.  The record that was amassed on remand, including the consistent detailed accounts of numerous members of consecutive defense teams, the recorded interviews with experts, hired by both the prosecution and the defense, and the detailed notes of interviews by defense experts overwhelmingly refutes it.

A careful review of Doc. 613 reveals the inaccuracy of the Court's attempt to distill a rational narrative.  Whereas the court said Mr. Duncan stated that "[m]ere seconds before he was about to deliver the fatal blow with a large rock, the Defendant ... had the Epiphany and realized what he was doing was wrong.  As a result of this awareness, the Defendant decided to turn himself in." Doc. 843 at 9. This is an *interpretation* of document 613, but one that lends it a level of coherence and rationality it plainly lacks.  As to the act of bringing S.G. back, Mr. Duncan wrote:

> For the sake of those who are still incapable of perception beyond tangible human language, I will say that while on the mountain with [S.G.] I "realized" that what I was doing was "insane," ... so I stopped doing it. Or if you prefer more philosophical terminology, I could also say that I woke up to the miracle of life and died to the deception of death. But these are merely words that do not truly even begin to reflect the experience that caused me to give up my quest for what society now calls "justice" (when it is officially sanctioned) but what I knew even then to be vengeance, no matter what other names it may go by (i.e. "justice," "punishment," "retribution," "retaliation," etc ... ).

As to representing himself, which Mr. Duncan implied was why he would not try to "prolong[] the process by appealing," *id.* at 2, the court characterized Mr. Duncan as saying that "words and participation in the court system would impede the path to the Truth." Doc. 843 at 9. The only sentence in Doc. 613 that bears any resemblance to this simple declarative statement is: "I have pleaded guilty unconditionally to all charges, and have chosen to represent myself in the Federal case against me in order to minimize my participation in society's decision to continue murdering, and also to minimize other people's involvement as well." (Doc. 613 at 1.) The rest of the document relates in some way to the path to Truth, but plainly not with the logical goal-

Corrected Defendant's Motion for Collateral Relief                87                *Joseph Edward Duncan, III v. United States of America,*
                                                                                    *Case No.2-07-cr-00023-EJL*

directed coherence of the Court's distillation.

Nobody and no circumstance can "make us" choose anything, though we can allow ourselves to be deceived (i.e. deceive ourselves). The true consequences of the choices we make fall back upon the ones making the choice, always, without exception. So society must be allowed to choose for itself, so it, as a whole, can learn this valuable truth.

\* \* \* \* \*

So this is why I focus my energy and attention on my inner self, because I know that as a limited being I am a reflection of this world, and this society. And as a reflection the only power I have to change the world is the power to change myself-if the reflection changes, then what is reflected must also change. What the "Church of American Justice" (or the so called "Criminal Justice System") does to fight "evil" is trivial by comparison to this task, and most of the time even contrary to it. This is why I pay little heed to the plethora of documents and proceedings that use my name in their attempts to further justify the system's own delusional murderous rampage (i.e. "insanity").

\* \* \* \* \*

Rape and murder are no more than symptoms of the one true crime; the crime of denying the truth within ourselves. And this is why (or at least the best simile of why that my words can represent) that I have objected to nearly every piece of litigation filed in this case by the people who have been appointed to represent me. They are caught up in the illusion that the Truth is something that exists outside of themselves and that it can be manipulated to represent their own view of how things should be. Capital punishment-what society calls justice-is nothing more than the result of the same delusional thinking-and just another reflection of the greater crime-only much worse than even murdering children, because it affects the conscience of so many more people, not to mention ultimately resulting in more children being raped and murdered, or even worse....

So clearly, I view the system's desire to kill me as a crime far worse than my own, yet stemming from the same root cause. I understand what brings such "evil" into this world (I generally equate the word "evil" with the word "deception"), and I know that it cannot be overcome by fighting it on its terms. So I refuse to "defend" myself in the public arena called a courtroom (where deception ("evil") has the advantage) much as early Roman Christian's refused to defend themselves in the public arenas of their day

(which were also thought of as perfectly reasonable "Criminal Justice Systems").

* * * * *

I will no longer condemn society even as it condemns me. No man, no church, and no government has the authority to judge another living being. We are each given only the authority to judge ourselves (if we so choose), and when we seek to judge others it is only ourselves that we are judging. Someday all people will understand and cherish this Truth. And I know in my own heart that even if my words are mocked today, someday they will be heard by people who know and honor this Truth. These people will be (and already are) my brothers and sisters, and no amount of time, or space, or even death can separate me from them.

Doc 613 2, 5-7. Defense experts spent dozens of hours talking with Mr. Duncan, and they analyzed what he said to them. They also analyzed what he said to others where those accounts were supported either by a verbatim record or reliable documentation. Issues of the court's attempt to discount their testimony on the basis of supposed bias will be address in subsequent sections. For present purposes, the discussion of what Mr. Duncan said he believes is limited to statements documented by contemporaneous notes, and more importantly, the verbatim accounts.

From contemporaneous notes, Dr. Woods explained the delusional content of Mr. Duncan's epiphany. He saw an erotomanic delusion, defined as a delusion of love, in Mr. Duncan's statement to him: "And I loved, but I had to kill her." RCHT 5693. In referring to S.G., Mr. Duncan said to Dr. Woods, "She and I were the same. Nirvana." RCHT 5696.

He then goes on to talking about S.G. "I saw that she was me." "My importance is through others." He then goes on -- so, again, we see this kind of both erotomanic, but this kind of loss of boundaries where "she is me," "we are one." We see these kind of psychotic collapsing of boundaries.

RCHT 5727. As an example of both a delusion of grandeur and a delusion concerning lack of volition, Dr. Woods pointed to Mr. Duncan's statement, "I was the instrument of the ultimate vehicle. God was driving." RCHT 5701.

Contemporaneous notes of Dr. Gur's interview reveal that Mr. Duncan told Dr. Gur, "It would make no sense to execute him because he has so much to offer as a result of his epiphany and special experiences that the world could learn from." RCHT 3772. The accuracy of the notes were confirmed on cross-examination, RCHT 3769-76, and they reveal that Mr. Duncan also said:

> On the mountain he had his epiphany - he saw things in a light that he had never seen them before and that made things clear to him even though he can't articulate it - when he tried right after being arrested to articulate what the epiphany was, it was all gibberish - he could not articulate the wonderful things that happened on the mountain or what he saw and how it changed everything.
>
> For instance, when be read the Bible before the epiphany, he saw it as just stories with many contradictions in it - where Jesus says one thing in one part but something contradictory in another. But after the epiphany, he realized that there are no contradictions and he began to understand the truth - when he meditates, first emptying his mind and then letting things come back into his mind after, he sees the answers more clearly and he has answers - for instance he has found references to evolution in the Bible - Jesus talks about evolution - so despite what many Christians think about what the Bible says, it actually describes evolution - the epiphany is also described in the Bible and the theory of relativity (which is in John) but he has also read the Koran and Jung and John Lennon songs and it is an the same, it is the epiphany described before and after - it is even in the song "shock the monkey" - he also was knocked out of a tree on the mountain and the tree was the delusional world he was living in, the constructs that society made got cleared away and the base of the very complex structure that he held was broken down - it is very hard for him to describe - but it was a sophisticated raise model of god which he no longer has.

Retrospective Competency Exh. GG at 1.

Dr. Gur testified that on the basis of the **recorded interview he conducted** with Mr. Duncan it is Mr. Duncan's belief that

> he basically lives in a different universe. He -- his universe interacts with ours, but what he's going through and what we are going through are somewhat tangentially related. In his mind, because of his role in the world is to have the epiphany and communicate it to the rest of the world. And that is very important so that the world changes.
>
> And whatever happens to him in this trial is some sort of a -- he characterizes

it as a farce. It is some sort of procedures or proceedings that really have not, not -- they have no important relevance to him.

\* \* \* \* \*

[T]hat no matter what happens, he's too important to be executed. And that even if they sentence him to death, this is only one death and there are other deaths.

And that in reality, in his reality, he cannot be -- he cannot be -- he cannot be really dead since he has that connection with the upper intelligence that loves him and will protect him.

RCHT 3817-18. At the beginning of the recorded interview Mr. Duncan

articulated his delusion that the question of competency is not important. He conceded that the question of why he did what he did is more important, but he didn't think that even that question was the most important question. And it all relates to the epiphany.

From his angle, the trial we are going through is what has to happen in order for his epiphany to be communicated with the rest of the world, and then we will all realize that we are not doing the right thing and not asking the right questions.

That was, as he explained to me, the main question; and that was, from his angle, the whole purpose of this trial.

RCHT 3628-29. This was similar to a passage of the recorded interview with Dr. Roesch, which

Dr. Gur explained as follows:

If you go to page 79, he explains what would be the kind of rational decision he will make. And he says, "It's something that the world let me know through the way the world communicates, which is not, obviously not with words." And then he said, "I said, you know, it just said, 'Hey, it's time.'" And further down, "I recognize reason and rationale as a valuable tool, but it definitely is not useful for making decisions that are important."

So if there is a question, can he make rational decisions, his response will be this, this, this is not how I make my decisions, this is the least important aspect of the decision-making process.

He says, "The whole system is ludicrous because it's trying to apply reason to justice, to morality. You can't. That's one thing that reason doesn't care

Corrected Defendant's Motion for Collateral Relief    91    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

about and cannot do." So in his world view, reason has nothing to do with the proceedings here.

RCHT 3636-37.

While testifying, Dr. Kalechstein reviewed the verbatim record of Mr. Duncan's interview with Dr. Roesch and explained how his statements regarding his decisions reflected nothing like the rational judgment that killing is reprehensible and acceptance of responsibility admirable. Dr. Kalechstein pointed to Mr. Duncan's statement to Dr. Roesch that

> "The choice to return [S.G.] came from someplace other than myself. And I recognized fully that it wasn't my choice." That would be an example of a control-type delusion. ... [H]e talks about not taking credit for the decision. It was something that was prearranged.

> Something better that as a society we decided. So the idea, once again, is that his behavior is in the control of a powerful entity rather than himself.

RCHT 5207. *See also* RCHT 5205-06 (statements to Dr. Roesch that the system "is a living being and entity that has intelligence of its own"). As to S.G. herself, Dr. Kalechstein relied on the statements to Dr. Roesch that in particular,

> "With her the barriers broke down and it became much, much more immediate. Where suddenly everything I knew, she knew."

> And it goes to his general thing that somehow people can communicate without words and that somehow he communicated with [S.G.] without words ever having been exchanged

> \* \* \* \* \*

> He talked about his belief that, quote, [S.G.] had not been, quote, "passed through that fire," end quote. And quote, "not been taught to deceive," end quote. And then, quote, "was a natural child," end quote.

RCHT 5211.

As to the effects of the trial, Dr. Kalechstein pointed to Mr. Duncan's interview with Dr. Roesch:

Corrected Defendant's Motion for Collateral Relief 92 *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

"I had hoped that the trial might be a platform that the truth would use through me. But in order for that to happen, I would have to clear the way in myself, my mental blocks that I have alluded to several times in this conversation, that prevent me from being Jesus."

RCHT 5210.

Even Mr. Duncan's statements to the F.B.I, support this view.  During his FBI interviews he said the follow:

My only responsibility, this is my responsibility in trial, my responsibility throughout all this and what I have come to understand, is simply honoring the truth and then letting the truth take care of everything else.

Retrospective Compency Exh. 2 at 4034.

And that's, and that's kind of my, my thing is that, why I try to, my lawyers keep saying, "Well, how are people going to know?" And I'm, I'm like, "Well, how are they not going to know?" Ya know, it's like, it's like, it's like what they're saying to me is like, I guess one way to try to put it to 'em, and I told them this too. I said it's like, it's like I'm explaining to you about gravity, I'm, I'm Newton, and I'm telling you about gravity and your first question is, - Oh my God we've gotta tell the world, everybody's gotta know or else it's gonna fall apart. "No, it's not." It's already there and it works and it does a beautiful job and it does what it's supposed to do.

Retrospective Compency Exh. 2 at 4249-50.

It's not gonna learn it by me fighting in trial. It's not gonna learn it by me appealing my case. It's not gonna learn it by me standing up and preaching to people about it. The only way that society is going to learn it is if I step back and say, I'm sorry. That's what [S.G.] did for me. You know, I attacked her. I wanted her to fight me. Dylan fought me.

Retrospective Compency Exh. 2 at 4361.

J.D .... the thing that, the context that's missing, in, in, in both cases, you know, whether it's me being convinced by my experience or you being convinced by yours, is, uh, is what's outside of our experience. And that is where you have to go to really be able to understand what deception, what self-deception is about. You know, because if you don't go outside your own experience you will never get past your own self-deception. Because, uh, almost invariably, all deception is supported by a person's experience. But unconsciously, and this is where the mind is a, is a, is a really, a devil, you know, is, uh, is we unconsciously, uh, our, uh, create our experiences. And,

uh, to support ...... our release. And this is a very well known phenomenon. But it's a very under-estimated power. It's a very underestimated, uh, phenomena also, about how much it prevents us from being able to see things in a truer light. In a, in a, in a more, uh, uh, meaningful, uh way of looking at things. And anyway, um, what, so what I'm tryin', and it's hard to say, it's hard to really kind of, that's generally what I'm, general terms that I'm using right now. I, like to try to, to, to try to get as specific as I can, even if it doesn't make any sense right now, maybe someday later on it might make some sense to you. Um, or maybe it's just total b.s. and I, and I can admit that too. I'm just saying that based my experience, which is limited, you know, I, I acknowledge that.

Retrospective Compency Exh. 2 at 4421.

The "a-ha moment" or "sudden insight" theory is unsustainable in light of all the evidence. But even if that were not the case, it is inherently incredible. The Court and Dr. Rath would treat Mr. Duncan's self-proclaimed epiphany as if it were simply the morally correct decision, emerging from a final round of premeditation and deliberation, to withdraw from the previously-conceived murderous course of action. There is, however, nothing in Mr. Duncan's account that suggested an appreciation that it is and was at all times self-evident that murder is wrong, or that somehow he had regrettably lost sight of that moral truism. Quite the contrary. In determining that it would be wrong to kill S.G., Mr. Duncan came upon some unique knowledge that if only the rest of humanity could come to understand – and understand only if Mr. Duncan chose not to lead humanity to that understanding with words – an utter transformation of society might emerge.

On top of that, all of his repeated attempts to describe a precept so easily grasped that most kindergartners could state it plainly, *i.e.*, murder is wrong, are fundamentally vacuous. That Mr. Duncan's change of heart was not borne from a moment of clarity is obvious from the fact that there is nothing clear about it. As Dr. Kalechstein explained:

> The other issue or another factor that reflects delusional thinking rather than an elaborate rationalization [sic: realization] is the fact that the things Mr. Duncan says really don't make sense. Once again, no one really knows what the epiphany is; no one really knows what the truth is.

> And when you look at the illogical thinking, his inability to explain these concepts, along with the evidence of different kinds of thought-disordered thinking, it makes it more, from my perspective, more reasonable to interpret Mr. Duncan's statements from the perspective of that of an individual who is experiencing a thought disorder rather than a person who is just creating an elaborate rationalization [sic: realization]

RCHT 5226-27.

Similarly, Mr. Duncan told Dr. Roesch: "I had hoped that the trial might be a platform that the truth would use through me.  But in order for that to happen, I would have to clear the way in myself, my mental blocks that I have alluded to several times in this conversation, that prevent me from being Jesus." *See* RCHT 5210 (Dr. Kalechstein quoting interview).

As to the supposed realization that his prior criminal behavior was wrong – a realization that the "moment of clarity" theory presupposes – he told Dr. Roesch,

> The system is deluded. The reason I went and did the crimes I did is because I suffer from the same delusions. But the delusions that I was given were given to me to cause me to do what I did, and the delusions that are given to you to cause you to do what you do. You know, but we work together. You know, you can't have one without the other. There has to be criminals in order for there to be good people.

RCHT 5217 (Dr. Kalechstein quoting Dr. Roesch interview).

It was not only the defense witnesses who disagreed with Dr. Rath's characterization, but one of the prosecution witnesses as well.  Dr. Kirkish conceded that the epiphany was not an ah-ha moment but something that transformed Mr. Duncan in a very fundamental sense.  RCHT 1256.  At the heart of it was the girl who he believed loved him.  *Id.* By bringing her back, he was trying to learn to love the System the way she loved him.  RCHT 1257.  During the recorded interview with Dr. Roesch, Mr. Duncan talked in detail about the epiphany without prompting.  Mr. Duncan came back to it in response to almost every topic Roesch asked about, referring to it obsessively.  RCHT 2110-11.

Corrected Defendant's Motion for Collateral Relief     95     *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

The evidence summarized above demonstrates the utter unreasonableness of treating **Mr.** Duncan's belief system as a sudden insight akin to finally understanding (apparently for the first time at age 42) that murder is a sin and honesty is the best policy. Not only is it disingenuous to try to peel away every florid detail (*e.g.*, S.G. and he became one, the greatest sin is turning away from Truth, Truth cannot be communicated with words, but only demonstrated) but even this hollow shell bespeaks utter irrationality.

Mr. Duncan has no quarrel with the notion that a person experiencing second thoughts and remorse might rationally chose to surrender and accept responsibility. Try as Dr. Rath and this court might, that is not the experience Mr. Duncan described. What the rest of us see as self-evident moral axioms, he sees as his own discovery, not experienced or yet learned by others and imbued with a level of meaning and paramount significance that only those at his level could comprehend. He believes that rape and murder pale in comparison to the deification of children as false gods, and even more so in comparison to the failure to pursue Truth. Only by attempting to take no action that might tend to lead society toward Truth can he help society attain it. He believes the only way he can help society discover truth is to do nothing intended to provide that help. This is insane.

No one could—and at the hearing no one did--disagree with the observation that Mr. Duncan's decision to abandon his plan to murder S.G. was a good thing. *See* Doc. 843 at 34. The evidence shows, however, that Mr. Duncan's morally correct action resulted from a completely irrational thought process. More importantly, it is not the conviction to bring S.G. back that is in question. It is the conviction that society's fate hangs in the balance of his decision whether or not to endorse an appeal.

The overwhelming weight of uncontradicted evidence is that Mr. Duncan's belief that his noninterference will result in a transformation of society's awareness is at the root of his prior refusal to endorse an appeal.  It leaps from the pages of his pro-se Affidavit, summarized above.  It is the predominant theme of his responses to the Court's inquiry at the waiver hearing.  *See* Claim 10.  The Court ignored all this evidence and more.

The defense experts described how Mr. Duncan's prior refusal to endorse the appeal was based on his beliefs that it could help advance civilization.  In the recorded interview with Dr. Gur, Mr. Duncan describes his realization that he and S.G. "were the same person."   Retrospective Competency Exh. F (unredacted) at 284.  Describing how his words (e.g., an appeal in his name) would lead Society off the path to understanding, he "explained":

> You have to come to that understanding through your own means. And unless you come to that understanding by your own means, it's meaningless, which is the problem with modern religions in the world is you have all these people who think they know about heaven and god and Jesus because of what they were told. But not a single one of them have ever experienced it directly. I have. I know what the Bible talks about. I know what Buddha means. I know what Ghandi meant. [¶] I know what John Lennon meant in his songs, and all these other people and this book I'm reading by the Gopi Krishna character about the Kundalini and about Carl Jung when he wrote about it in scientific terms. I know what they're talking about. They knew what they were talking about because they experienced it. I know what I'm talking about because I experienced it. My problem is that I have a hard time putting it into words, which is why I think about it and read about it and try to study it so that I can better put it into words so that other people might be able to understand that they don't know.

*Id.* at 30.

In conversation with Dr. Woods, Mr. Duncan explained his doctrine of noninterference:

> I believe the appeal interferes with society's innocence. It allows everybody involved to do what they are doing. The appeal process allows the individual," which is what he is against. "The real reason is infinite. Infinite cause with infinite consequences."

RCHT 5797.

Even the prosecution experts acknowledged the connection between the belief system and his desire not to affect the course of proceedings. *See, e.g.,* RCHT 1128 (Dr. Kirkish testifying that "he would not participate in a defense where he would couch or obscure things that he had done in order simply to save himself.  The higher order for him at this point was to share these insights.")  Indeed, Mr. Duncan told Dr. Kirkish that his plan for non-participation was predetermined by the epiphany.  RCHT 1269.  He said, "I don't fight the system, and so it is childish and I won't fight it.  If I fight it, it will give it power.  Trying to forgive this entity.  Tried to love it the way she [the little girl] loved me. . .If I can bring this to the world's attention, I can change the world."[8] Mr. Duncan told her it was his mandate to share this epiphany.  RCHT 1274.

Dr. Roesch agreed that there was a connection between Duncan's views and the decisions he made in this case, including whether to represent himself and whether to appeal, and said that the basic dispute is whether Mr. Duncan's belief system is delusional, which even he concluded was a fairly difficult distinction to make.  RCHT 1903-04.[9]

### 5.  The Court Overstated the Importance of Areas of Strengths

Notwithstanding the court's extreme emphasis on particular examples of seemingly rational goal-directed behavior, their bearing on the issue of impaired rationality as to the particular question whether to appeal is marginal at best.  The defense never contended that all of Mr. Duncan's actions bore the hallmarks of psychosis.

---

[8] At that point in the interview, Dr. Kirkish wrote in her notes "1368," the California Penal Code section regarding incompetency. RCHT 1251.

[9] Elsewhere Dr. Roesch testified that there was no causal link between Mr. Duncan's belief system and his decision, RCHT 1857, but his testimony was rejected by the court.

Dr. Kalechstein explained that Mr. Duncan's

> thought processes and thought content were] variable.... [W]hen he discussed relatively neutral topics, they were logical and goal—oriented. In contrast, when discussing his offenses, formative sexual experiences, and his epiphany, his thought processes were disjointed and his thought content was bizarre

Retrospective Compentency Exh. H at 27.  Even Dr. Low admitted that there are people with paranoid delusions "who can maintain functional intelligence in kind of a circumscribed way" and that she had even "seen some of those people." RCHT 1244.  Similarly, Dr. Engle testified that there is no real connection between mental illness and IQ.  RCHT 343.

The Court repeatedly referred to Mr. Duncan's above-average intelligence to counter the claim of incompetency.  *See, e.g.,* Doc. 843 at 13, 15, 37-38, 39, 42, 49.  At the same time, the court barely mentioned the testimony of Dr. Amador at all, let alone his detailed explanation of the ability of high functioning, intelligent psychotic patients to appear normal.

Dr. Amador explained that patients who are intelligent and do not believe they are ill can explain away delusional thinking as abstract, philosophical or even political positions.  RCHT 4024-25.  Intelligence, coupled with a desire to appear normal, results in abstract explanations of delusions that are highly intellectualized.  If taken in short snippets instead of the broader context, they may appear nondelusional or nonpsychotic.  A person presently suffering from a thought disorder is not necessarily incapable of clear and intelligent articulation.  Psychosis is not mental retardation or developmental disability.  RCHT 4029-30.  Some individuals have not only the ability to hide psychiatric symptomatology but also to exhibit exceptional functioning in some domains, despite the mental illness.  Dr. Amador gave the example of John Nash, the schizophrenic professor at Princeton who won the Nobel Prize in mathematics.  He is the subject of the book and the movie "A Beautiful Mind." RCHT 4063-64.  Dr. Amador has seen similar

patients in his own practice but could not provide details due to doctor-patient privilege.

Dr. Merikangas similarly testified that one can be psychotic and have a high IQ. RCHT 3012-13 (testifying that saying "he is intelligent, sounds intelligent, is [not] a rule-out for a diagnosis of psychosis or psychotic symptoms") Dr. Engle agreed. RCHT 342-43 (stating that he was unaware of any relationship between mental illness and intelligence, other than extreme mental illness tending to cause intelligence to deteriorate.)

It is clear time and again that what is most critical to the court is Mr. Duncan's ability to function well in some environs. *See, e.g.*, Doc. 843 at 37 ("lengthy discussions with the Defendant reveals he was well read and intellectual in his ability to think, plan, communicate, and write"); *id.* ("the Court finds the fact that the Defendant was remarkably consistent in the ideology he expressed to others to be demonstrative of his intelligence and the amount of thought he gave to the subject. This coupled with the amount of detail and thought the Defendant put into planning and executing his crimes, as evidenced in his interviews with law enforcement, the Court finds, reveals the Defendant's acute ability to prepare, plan, think, react, and reason within at least a normal/average level of rationality"); *id.* at 41 (viewing Dr. Gur's opinion "carefully and find[ing] it does not take into account the entire context of the Defendant's conduct, behavior, and statements in light of all the circumstances in this case – *particularly when the Defendant was in court.*") (emphasis added); *id.* (Dr. Gur "did not actually observe the Defendant's conduct at the trial and hearings in this case."); *id.* at 42 ("These [lay] witnesses, the Court finds, were credible in their testimony and generally described the Defendant during the relevant time period consistently as polite, communicative, intelligent, and understanding of his circumstances. All of these witnesses testified that the Defendant acted and spoke appropriately for the specific situation of their encounter with him."); *id.* at 43 ("The staff where the Defendant was housed in 2008 all

consistently described the Defendant as behaving rationally, being cooperative, and able to respond appropriately to their questions. Although brief, the prison staff interacted with the Defendant face to face and on a regular basis."); *id.* at 45 ("The Court itself has observed the Defendant throughout these proceedings and finds his behavior evidences his understanding and ability to assist and confer with counsel. The Defendant was attentive and participated throughout the proceedings."); *id.* at 48 ("The record shows that the Defendant understands the legal process involved in charging a person with a crime, the Government's burden of proof, and his constitutional rights in the process - including his right to counsel, his right to represent himself, and his right to appeal. The Defendant demonstrated time and time again in this case that he had a firm understanding of his legal options and the impact of waiving his appeal.")

> This Court has observed first-hand the Defendant's demeanor and conduct and has itself interacted with the Defendant for quite some time throughout these entire proceedings; including the particular time period in question. During this time, the Court personally engaged the Defendant in regards to his decision to waive his appeal as well as other matters and viewed his responses to the same. Having this first-hand, in-person view of the Defendant, the Court found him to be competent at the time and is now even more firmly convinced that the Defendant understood his legal options. This Court's own impressions of the Defendant are that he was clear in his thoughts, intelligent, had a complete understanding and knowledge of the proceedings and his options, and that he understood his legal position and the options available to him. Based on the foregoing, the Court concludes that any mental diseases and/or defects suffered by the Defendant did not prevent him from understanding his legal position and the options available to him in 2008 when he waived his right to appeal. The Defendant had both a factual and rational understanding of the legal proceedings against him as well as the options available to him.

*Id.* at 49.

> The Court finds some of the best evidence of the Defendant's ability to make a rational choice among his options are his own words concerning his purpose, state of mind, and detailed/thorough planning of his actions; all of which he was able to skillfully carry out in committing these grizzly crimes. The Defendant himself stated his motivation for choosing to commit these crimes was the abuse he received in prison and his desire to seek revenge

against society for his having suffered that abuse. (RCHT, Day 1 at 73.) He carefully planned in intricate detail the crimes he would commit to seek his revenge so as to avoid detection by law enforcement and not be apprehended. (RCHT, Day 1 at 94-102, 136-138, 143-144.)

*Id.* at 50-51.

### 6. Even the Supposed Assessments of Credibility Themselves Fail to Withstand Scrutiny

As noted previously, the Court put great emphasis on its personal assessment of witness demeanor. The Court emphasized the importance of hearing live testimony, Doc. 843 at 7-8, but in the final analysis admitted to learning nothing of value in the process despite hearing from more than *two dozen* defense witnesses. In the Court's view, none of what *any* of these witnesses said was anything more than "interesting."

The Court wrote that the Government's lay witnesses "law enforcement officers, jail deputies, prison intake personnel, and [prison] mental health clinicians" gave an "accurate and unbiased view of the Defendant." *Id.* at 41-42. In the Court's view these prison and law enforcement officials "had no motivation one way or another in regards to their interactions with and observations of the Defendant." *Id.* at 44. As to the Government's experts, the court noted that "[t]hey were not hired by either party in this case but were instead independent experienced court-appointed competency evaluators." *Id.* at 32.

On the other hand, the Court credited *none* of the witnesses called by the defense. The Court found Dr. Gur's testimony "interesting, but his conclusions somewhat questionable." Doc. 843 at 25. Dr. Woods' testimony was "perhaps less reliable than other witnesses" because he "clearly was a part of the defense team from early on." *Id.* at 31. Although the Court did not "doubt the sincerity of the mitigation investigators or any of the defense team," it rejected, or at least discounted, their testimony because they were working "to detail and record anything that

would weigh in favor of mitigation and avoid the death penalty," *id.* at 44, *i.e.*, doing the work they had been appointed to do. Their contemporaneous notes were deemed "skewed" even though they were not made "primarily anticipation of them becoming evidence in the case" but "were written as summaries of the defense team's discussions with the Defendant as they perceived them to be." *Id.* at 45 n. 28.

As described below, the Court clearly erred by not simply taking the defense experts' testimony with a grain of salt – as it was clearly entitled to do – but by ultimately rejecting *everything* they said under the guise of needing to handicap their opinions for potential exaggeration.

In general terms, the Court summed up its credibility findings as follows:

> [T]he Court finds the testimony of Dr. Engle, Dr. Low, Dr. Rath, and Dr. Kirkish to have been unbiased and the most credible. Those experts concluded that the Defendant did not suffer from a mental disease or defect aside from a possible personality disorder. Most notable was the compelling testimony of these witnesses' on cross examination where they provided reasoned and sound basis for their analysis and conclusions regarding the Defendant. The testimony and reports of these court-appointed experts demonstrated that they had interviewed the Defendant, considered a voluminous amount of material from both sides, and had sufficient time to complete their evaluations. They were not hired by either party in this case but were instead independent experienced court-appointed competency evaluators. Furthermore, their reports and interactions with the Defendant occurred closest to the time period in question on this retrospective competency hearing.

Doc. 843 at 32 (record citations omitted).

Mr. Duncan submits the Court's analysis was erroneous for the reasons set forth below:

### a. The "Compelling" and "Sound" Opinions Defended On Cross-Examination Hinge on an Objectively Erroneous View of the Facts

What the Court found most persuasive were the opinions that: (1) Mr. Duncan's Epiphany was nothing more than an a-ha moment of recognition; and (2) the abnormal thought processes

evidenced by his tangential and circumstantial speech does not rise to the level of a thought disorder. *See, e.g.,* Doc. 843 at 32 (finding the testimony of Dr. Engle, Dr. Low, Dr. Rath, and Dr. Kirkish "that the Defendant did not suffer from a mental disease or defect aside from a possible personality disorder" to have been "the most credible.").

> The Court also finds the conclusions of these experts that the Defendant was not suffering from delusions, hallucinations, telling speech patters [sic], or other symptoms of a major mental disease or illness to be well supported in the record and credible. In particular, the Court agrees with their conclusions as to the Defendant's ideology and beliefs. The Defendant's Epiphany was not a delusion but was instead, as Dr. Rath testified, a "sudden insight" or "realization." In making this statement, Dr. Rath recognized that "[n]obody who was reasonable would disagree that the Defendant has problems." The Court finds this statement to be accurate in describing the Defendant in this case.

Doc. 843 at 33 (footnote and record citations omitted).

Thus, the prosecution's expert opinion evidence, and the Court's reliance thereon, depends on the validity of the underlying premises – that the Epiphany involves no distorted fantastical world view and that Mr. Duncan's speech patterns reveal no disordered thinking.

### b.  The Prosecution Experts Conceded the Issue was "Thorny"

The Court emitted from its order a thorough discussion of how close many of the prosecution's experts considered the questions presented.  Dr. Engle conceded that Mr. Duncan's speech pattern "could be" indicative of a mental disorder.  RCHT 241.  In response to a series of hypotheticals, Dr. Engle agreed that many of the things Mr. Duncan is reported to have said to others would be consistent with a variety of types of delusions.  RCHT 375-80.

Dr. Low initially contended that Mr. Duncan's refusal to be interviewed precluded her from rendering an opinion to a reasonable degree of medical certainty, but ultimately recanted that statement – rather unconvincingly – on the stand.  As the Court noted, Dr. Low was questioned about whether particular statements Mr. Duncan was reported to have made to others evidenced

delusionality, and "she responded repeatedly that more context and/or questioning would be needed to determine whether the statement was a delusion or not," Doc. 843 at 17, acknowledging thereby that the statements could be delusional.

Dr. Kirkish testified that the case presented a close question, saying that "it's very difficult" and "very thorny" to decide whether Mr. Duncan's highly idiosyncratic belief system was delusional or not. RCHT 1168-69. She said that although Mr. Duncan's ideas "occur in some pretty mainstream religions and philosophies, the way he had put them together and what he had done, the behavior that had manifested was highly extreme." RCHT 1171-72. Dr. Kirkish did not disagree that Mr. Duncan's reported statements to the defense experts were delusional, RCHT 1169-71, but because Mr. Duncan did not say similar things to her, she disregarded what he told everyone else, including doctors and law enforcement personnel, in forming her opinions. RCHT 1228. When Dr. Kirkish reviewed the printout of Mr. Duncan's MMPI just before she testified she saw the paranoia elevation and said to herself "Oh, my gosh. This is almost 100 T-score. *This is very high.*" RCHT 1204-05, emphasis added.) She testified in Riverside that her notes "are quite -- are a bit jumbled because he would bring things in that were relevant to him at that moment but were not perhaps restricted to the specific focus of the question." He would raise topics that were not necessarily relevant to her question. RCHT 1219-20.

Dr. Roesch gave similar testimony. *See, e.g.,* RCHT 1904-05 (Dr. Roesch agreeing that determining whether a belief system is delusional or not can be difficult and reasonable minds can differ whether an idiosyncratic belief system is delusional or not.) He said that there are "gray-area cases" in which a clear decision about competency or incompetency could not be made. That would possibly include a case like Duncan's, given the symptom presentation. RCHT 2114-15.

c.   *In Clear Contrast to the Defense Experts, the Prosecution Experts Testified as to Subjective, Unverifiable Conclusions Not in accord with Prevailing professional norms.*

According to Dr. Engle the reason Mr. Duncan's very unusual beliefs should not be deemed a delusion is because they simply did not "rise" to the level of delusions.  RCHT 256 (" I didn't think that the parts of what he said and the way he said it rose to the level of a delusion.  It is somewhat difficult to understand..."); 458 ("There were parts of what he said about [his Epiphany] that I did not -- that I did not fully understand, but I didn't think it rose -- I didn't think that what the Defendant said rose to the level of a delusion"), 373 ("I didn't think that his narcissism rose to the level of a delusion, no."); 373-74 (his inflated sense of worth was "Not to the level that would constitute a delusion.")

Dr. Low's testimony was similar.  She too contended that determining whether a belief system is delusional is essentially a subjective call.  RCHT 716 ("There are no step-by-step cookbooks, so to speak, to guide us towards what is a delusion and what is simply narcissism... I wouldn't say it is a completely subjective type of process.  But definitely in the field of psychology there are going to be different opinions.  And there is a lot of overlap between different diagnoses, and that is what makes it difficult.") *Accord* RCHT 718 (stating that the is no objective way for one evaluator to be right compared to another evaluator when they look at the same records and guidelines).

Drs. Amador and First, who wrote the book on delusions, established that this testimony was flat out wrong.  Dr. Amador testified that the standards are not subjective, but instead are "objective, clearly defined standards." RCHT 4042.  Dr. First testified that if an expert subjectively comes to the opinion that a patient has extreme and somewhat idiosyncratic beliefs, but it cannot reach the level of a true delusion because some other people have similar views, he would say that

under the objective criteria, "there is a question of some faulty [expert] judgment there." RCHT 3205.

Dr. First explained that the question of religious beliefs

comes up all the time. The DSM is used internationally and an individual clinician or psychiatrist is going to be confronted with a patient who has a different religious belief than their own. Most psychiatrists are at least somewhat familiar with the religious beliefs in the United States, but if you had a patient from an African country that had a very unusual religion and they say, I have been possessed by the devil, whether or not that is a delusion requires you to understand where that person came from, what their religious background of their cultural subgroup is to allow you to evaluate whether or not that belief is considered to be a delusion or not.

So that is the basic process. It is something we teach all the time. For any type of belief that can't be proven true or false, you need to use a methodology like this to be able to see whether or not it is a delusion or merely a strongly-held religious idea.

RCHT 3165-66.

Drs. Kirkish and Rath took slightly different approaches, but also with a non-standardized way of purporting to rule out delusions. According to Dr. Kirkish because Mr. Duncan was able to say that people might not believe him he was not suffering from a delusion. RCHT 1137-38 ("He was able to detach himself, put himself in another person's shoes and reflect on what was going on. My experience with delusions is that a person is not able to do that. A person who is actually experiencing a delusion, it is a held fast, immutable. No matter what, this is the way it is."). Dr. Rath thought the ability to suppress thoughts or "turn off" delusions would mean a person is not mentally ill, or at least not incompetent. RCHT 1002 ("[I]n terms of competency ...[i]f a person -- if a defendant has symptoms but can control them, then that, again, is volitional.").

Dr. Amador described in detail how high functioning psychotics are commonly fully aware that their beliefs may seem odd to others and will adjust their behaviors accordingly, as to not appear mentally ill. Although the Court wrote "[t]his testimony by Dr. Amador, however, was not

effective or persuasive," Doc. 843 at 16, its reasoning was specious. The Court acknowledged that "Dr. Amador undoubtedly is well educated in the field of psychology," but took issue with the fact that he never examined Mr. Duncan and "his review of the record and materials relevant to the Defendant was not as comprehensive or unbiased" as the prosecution experts. *Id.* Dr. Amador, however, was not retained to evaluate Mr. Duncan, but rather to examine the prosecution experts' evaluations and to explain their failure to adhere to professional norms. That is one of his main areas of specialization, RCHT 4002-05, and evaluating the methodology of another expert does not require an evaluation of the patient himself. *See* RCHT 4004 (describing his experience in assessing whether "recognized procedures in our field that ensure reliability and validity of a diagnosis have been followed. I don't evaluate evaluators; I evaluate the process.")

### d.  The Defense Experts' Opinions Were Based on Reliable, Objectively Verified Data

The Court viewed the defense expert testimony with skepticism, because those experts worked primarily for the defense, in general.

> On cross examination the Government also revealed that Dr. Merikangas' work involves a fair amount of lectures to the defense bar since at least 1999, most of his testimony in murder/death penalty proceedings were for the defense, and he has consulted on the subject of prosecutorial misconduct in death penalty cases. Dr. Merikangas estimated having testified in approximately 100 murder proceedings since 1998, most of which were death penalty cases. In all but two of those cases, Dr. Merikangas testified for the defense.

Doc. 843 at 21 (record citations omitted).

> On cross examination, the Government elicited testimony that Dr. Woods was a part of the defense team, or at least a consultant to the team, in 2005 when he was initially hired. The Government also pointed out other factors showing Dr. Woods' work has been mainly defense-oriented. For instance, he has, on occasion, spoken on behalf of the defense bar since 1993, and he shares office space with the defense counsel appointed in this retrospective competency hearing. Dr. Woods estimated that 85-90 percent

> of his criminal work is on capital cases, but that he has never been retained by the Government in a capital case or in any criminal case.

Doc. 843 at 30-31 (record citations omitted).

> The Court views Dr. Woods' testimony as somewhat skewed and perhaps less reliable than other witnesses. Dr. Woods was clearly a part of the defense team from early on who's [sic] mission was to keep the Defendant from receiving a death sentence. The defense's purpose for employing Dr. Woods in this matter evolved over time from a consultant early on, to a role more akin to a competency expert later on in 2008.

Doc. 843 at 31.

> At the same time, the Court ascribed no potential pro prosecution bias to Dr. Low, a full time employee of the U.S. Bureau of Prisons. Nonetheless, Mr. Duncan does not deny that the defense witnesses' prior employment is a relevant inquiry. The court's inclination to view their testimony critically is legitimate and appellant welcomes that scrutiny.

The court failed to meaningfully address the substantive testimony given by Drs. Gur, Woods and Merkiangas.  This was clear error.  *Cf. Porter v. McCollum*, 558 U.S. 30, 42-43 (2009) (the Florida Supreme Court unreasonably failed to give "any consideration" to petitioner's expert testimony in its *Strickland* prejudice analysis; while "the State's experts ... perceived problems with the tests [the defense expert] used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge").

> e.  *Because the Prosecution Experts Spent Little Time Together With Mr. Duncan Their Failure to Observe Signs of Psychosis is of Limited Probative Value*

All experts agree that Mr. Duncan is high functioning and intelligent, but believes that society, not he, is mentally ill, and he does not want to be labeled incompetent.  He has the wherewithal and motivation to mask the signs and symptoms of his disorder, so to accurately assess his functioning requires time and special expertise.  It is not surprising that the prosecution experts

missed his psychotic symptomatology during their relatively brief interactions with him.

Dr. Amador described the difficulties in evaluating intelligent, high functioning psychotic subjects.

> If they are motivated to appear normal, it will keep them from disclosing, unless their guard is down, thoughts that they recognize other people will think are, quote, "crazy." ...The clinician needs to understand that person then, especially if they are highly intelligent, is likely to hide evidence of their mental disease or defect because they really do not believe there is anything wrong with them.

RCHT 4016. "[W]hen someone is intelligent, what can be delusional thinking, especially if they ... they don't believe they are ill, can be articulated and explained away as abstract, philosophical or even political positions." RCHT 4026.  That this was true of Mr. Duncan was suggested by Dr. Engle's testing showing that Mr. Duncan was not fully disclosing his symptoms.  RCHT 349, 409. One of the tests he administered showed a tendency of avoiding self-disclosure.  RCHT 409.

All of the experts agreed that Mr. Duncan attempts to appear more intelligent than he is by using complicated language and making abstract, albeit hard to follow or nonsensical philosophical and literary references.  The experts similarly agreed that developing rapport is important in trying to overcome these defense mechanisms.  *See, e.g.*, RCHT 230 (Dr. Engle); RCHT 1106 (Dr. Kirkish); RCHT 4105 (Dr. Amador); RCHT 5687 (Dr. Woods).

The defense experts spent the time they needed to establish the amount of rapport necessary to allow Mr. Duncan to reveal himself.  Dr. Merikangas interviewed Mr. Duncan eight times for a total of 21 hours.  Retrospective Compentency Exhs. I-37, I-34; RCHT 2990-91.  Dr. Woods interviewed Mr. Duncan six times over a seven year period for more than 14 hours. Retrospective Competency Exh. C-1356; RCHT 5671-74.  Dr. Gur interviewed Mr. Duncan twice for a total of six-and-one-half hours.  Exhs. F-38, F-221-331, G; RCHT 3518, 3626.  Dr. Kalechstein interviewed Mr. Duncan twice for a total of six hours.  Retrospective Compentency

Corrected Defendant's Motion for Collateral Relief                110          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

Exh. H-23; RCHT 5074.

The prosecution experts spent much less time with Mr. Duncan. Dr. Engle met with Mr. Duncan on three occasions for a total of three and one half hours. RCHT 227, 324. Dr. Low was able to interview Mr. Duncan on a single occasion in 75 minutes before he refused to cooperate further. RCHT 559, 561. Dr. Kirkish interviewed Duncan once for four hours. RCHT 1149. Dr. Rath met with Duncan just once for two hours. RCHT 909. He considered that amount of time adequate due to the "narrow" scope of his evaluation.

The purported failure of the prosecution experts to observe signs of psychosis must be viewed in this context. No one saw signs of malingering or a complete absence of psychiatric symptoms. Despite the relatively limited contact, much of what they saw was indicative of mental problems. Dr. Engle observed tangential and circumstantial speech indicative of psychotic thought processes, although only to a "very mild" degree. RCHT 242. Dr. Kirkish thought Mr. Duncan had issues consistent with a "schizotypal personality disorder," RCHT 1177, and noted his unique belief system, which depending upon how you looked at it could either be delusional or merely idiosyncratic. RCHT 1287.[10]

Moreover, the prosecution experts lacked experience assessing high functioning psychotics. Dr. Kirkish has no experience with high IQ schizophrenics. RCHT 1243. Dr. Amador testified that in his experience evaluators in the criminal justice system do not frequently see highly intelligent subjects, RT4028, and that "intelligent, articulate, rational communication is common in patients with delusions and, of course, does not rule out delusions." RCHT 4031. Dr. Kirkish

---

[10] That Dr. Low did not see signs of psychosis is hardly surprising in that Mr. Duncan did not even discuss his epiphany with her. RCHT 588.

agreed that one way for an evaluator to overcome this tendency is to spend more time with the person. She felt that Mr. Duncan was not guarded with her, but admitted it was possible that she had not spent enough time with Duncan. RCHT 1223-27.

Dr. Amador described in detail Dr. Low's failure to discern the diagnostic significance of facts contained in her report. RCHT 4118-23. Dr. Kirkish was candid that her problem was that Mr. Duncan did not say to her what the defense doctors claimed he said to them. "I can't remember which doctor gave quotations from him. But to the degree that those were accurate descriptions, I would certainly say, 'Well, that certainly looks delusional to me.'" RCHT 1170. *See also* RCHT 375-79 (Dr. Engle indicating in response to a series of hypothetical questions that Mr. Duncan's reported statements were suggestive of delusions).

With their education, training, and experience, as detailed in their C.V.s, Retrospective Competency Exhs. I-1-28, F-1-34, and J-1-16, Drs. Merikangas, Gur and Woods, are preeminent in their field, as this Court acknowledged in the prior appeal. *United States v. Duncan*, 643 F. 3d at 1249 (describing the three defense experts as "all well established and highly regarded in the field of neuropsychiatry."). They had the training, experience, and expertise not to be fooled by his effort to appear philosophical.

Simply stated, the testimony of the prosecution experts was thoroughly unreliable because it was based on a watered-down, normalized view of Mr. Duncan's belief system that bore little resemblance to what he actually believes.

### 7. The Court Erred By Relying on the Riverside County Proceedings In Assessing Credibility

In the course of expressing a preference for the testimony of the prosecution experts over the defense experts, the Court repeatedly relied on the outcome of the Riverside County case. *See*

Doc. 843 at 18,[11] 30,[12] and 50.[13] To do so, was error.

While a federal court may take judicial notice of documents from, or an opinion of, another court it may do so only to establish the existence of such litigation and related filings, not to establish the truth of the disputed matters asserted in the other litigation. *Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991). "[W]hen a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (*quoting Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999). "If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994). The underlying facts adjudicated in another case do not meet the test of indisputability contained in Rule 201. *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A.*, 146 F.3d 66 (2d Cir. 1998); *M/V American Queen v. San Diego Marine Constr.*

[11] "Furthermore, Drs. Rath and Kirkish testified concerning the Defendant's competency in the Riverside case where the jury found the Defendant to be competent. While the time period of the Riverside proceeding was some months later than the time the Defendant waived his right to appeal in November of 2008, the mental issue in question at that proceeding encompassed the time period relevant to this case."

[12] "Dr. Woods testified in the Riverside case that the Defendant was not competent to represent himself in those proceedings; the jury in Riverside, however, found otherwise."

[13] "All of the courts who have considered the question of this Defendant's competency have uniformly concluded that he is, in fact, competent. Moreover, in the Riverside case against the Defendant, both a jury and a judge found him to be competent after hearing the medical and factual evidence. That case began approximately five months after the sentence was imposed in this case."

*Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983).

> The reason for the rule above referred to is that the decision of a cause must depend upon the evidence introduced. If the courts should recognize judicially facts adjudicated in another case, it makes those facts, though unsupported by evidence in the case in hand, conclusive against the opposing party; while if they had been properly introduced they might have been met and overcome by him. So, on a plea of res adjudicata, a court cannot judicially notice that the matters in issue are the same as those in a former suit.

*Guam Inv. Co. v. Central Bldg., Inc.*, 288 F.2d 19, 23 (9th Cir. 1961) (*quoting Paridy v. Caterpillar Tractor Co.*, 48 F.2d 166, 169 (7th Cir. 1931)).

## C. Trial Counsel's Failure to Declare a Doubt as to Competency to Plead Guilty Constituted Ineffective Assistance of Counsel

The allegations of Claim 1 are incorporated by express reference as if fully set forth herein.

Despite Mr. Duncan's obvious mental illness his defense attorneys did not bring their concerns to the Court's attention at the appropriate time. They unreasonably and prejudicially allowed him to enter a plea of guilty when they harbored substantial and bona fide doubt as to his competency, and should have raised that doubt in open court.

In the retrospective competency order, the court wrote:

> The Court recognizes its own duty in this regard to assure itself of the Defendant's competency if there is reasonable cause to believe and/or a genuine doubt as to the Defendant's competency. *See* 18 U.S.C. § 4241(a); *Dreyer*, 705 F.3d at960-62. In this case, there was no indication in the record that the Defendant's competency was in question until it was raised by stand-by counsel well after the plea hearing. The initial filings by the defense that made reference to mental health experts and possible mental health issues was presented to the Court as relating to the need to compile mitigation evidence, social histories, and background. *See e.g.* (Dkt. 193, 194, 218, 239.) Such filings made general reference to the need for mental health experts, investigators, and additional time so that the defense could investigate, compile, and prepare the mitigation materials for this case. There were no competency issues raised to the Court until April of 2008, when voir dire had begun and the Defendant made his oral request to go forward *pro se*. Although the defense has maintained throughout this retrospective competency hearing that the Defendant exhibited obvious

Corrected Defendant's Motion for Collateral Relief    114    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

> symptoms of a serious mental disease or disorder since well before this case began, in all of the proceedings before this Court the Defendant himself did not exhibit any signs that raised a genuine doubt in this Court's mind that the Defendant was anything but competent.

Doc. 843 at 51, n. 33.

As the court noted, Mr. Duncan's trial attorneys, investigators, and paralegals all testified that from their first meeting with him they considered him seriously mentally ill. See, e.g., RCHT 3946 ("I knew it existed probably the first time I met Mr. Duncan.") Their failure to do so was attributable to the constellation of errors, omissions and commissions set forth in detail in Claim 1, *supra*. Had the defense not suffered the variety of setbacks described therein, they would have been armed with expert opinion evidence of incompetency at the time of the plea and would have and should have moved for the requisite competency determinations. See RCHT 4901 ("I would not have let him plead guilty if I didn't think [he was competent. Although we still did not have all the information about his mental health at that time.") Absent such opinion testimony, counsel should nonetheless have questioned Mr. Duncan's competency to enter a pleas, especially in light of the court's direct inquiry.

Counsel's failure "to appreciate ... at the time, that he was pleading guilty because of his belief system," not because there was a "good reason to plead guilty," RCHT 5450, fell below the standard of reasonable competence and prejudiced the defense.

### D.  Even if Competent, the Plea Was Not Knowing, Intelligent, and Voluntary

Based on the change of plea colloquy the Court previously found Mr. Duncan's guilty plea was entered knowingly, intelligently, and voluntarily. That finding was predicated, however, on the belief that the reasons for the plea were rational – "to avoid the victim having to testify," Doc. 843 at 62, to acknowledge that "what he [had done] was wrong," *id.* at 9, and to effectuate the simple "choice to not participate in the system," *id.* at 59-60. Although Mr. Duncan made isolated

Corrected Defendant's Motion for Collateral Relief          115          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

comments to that effect, the full and fair description of the motives underlying his plea set forth above are utterly irrational.

"A finding that a defendant is competent ... is not all that is necessary before he may be permitted to plead guilty or waive his right[s]. ... In addition to determining that a defendant is competent ..., a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Godinez v. Moran*, 509 U.S. 389, 400-401 (1993) (*citing Parke v. Raley*, 506 U.S. 20 517 (1992); *Faretta v. California*, 422 U.S. 806 (1975). The federal courts are required to indulge every reasonable presumption against waiver of fundamental constitutional rights. *See Hodges v. Easton*, 106 U.S. 408 (1982); *United States v. Arlt*, 41 F.3d 516, 520 (9th Cir. 1994) (*citing Brewer v. Williams*, 430 U.S. 387 (1977)). Because of this, only clear and unequivocal waivers may be accepted. *See United States v. Farhad*, 190 F.3d 1097, 1099 (9th Cir. 1999) (waiver of right to counsel).

Mr. Duncan's irrational belief – whether or not it rises to the level of a full blown delusion – that his decision whether to engage with the System by exercising his trial rights may determine the society's ultimate fate is fundamentally inconsistent with a knowing, intelligent, and voluntary decision. Evidence that was not in the record at the time the Court accepted the plea demonstrates the plea was invalid despite the superficial contrary appearances of the Rule 11 colloquy.

Mr. Duncan's decision – based on sincere but irrational beliefs about the transformative effects on Society of pleading guilty – was not knowing, intelligent, and voluntary. There is compelling, credible information from a variety of sources that he believed that by remaining silent and declining to contest the prosecution's case, he would communicate a Truth that would be obscured by the use of words, a Truth with transformative effects on humanity's evolution. That he may have on occasion invoked a more prosaic explanation – *e.g.*, that he did not want his

lawyers attempting to "save his skin" -- does not show a lack of magical, irrational thought.

### E.  Mr. Duncan was Denied Effective Assistance of Counsel at the Retrospective Competency Hearing and the Hearing, Despite its Length, Was Not Full and Fair

The evidence at the retrospective competency hearing is not conclusive and the proceeding should not be treated as full and fair due to the unreasonable errors and omissions of defense counsel at that hearing, relating to the handling of experts.

On July 25, 2012, the Court ordered that disclosure and exchange of all expert reports be completed by October 1, 2012.  Doc. 708.  In accord with that order, the defense disclosed the opinions of its proposed experts including Drs. Michael First and Xavier Amador, and provided notice it would be calling Dr. Craig Beaver but provided no report.  Anticipating that the defense would seek to present testimony from Drs. First and Amador beyond what was disclosed in their reports, and noting that it had received no report from Dr. Beaver, the government filed motions *in limine* to exclude testimony.  Doc. 724.  The Court granted the motion in part, deferring some matters for determination at the hearing.  Doc. 733.

Following a number of objections, the defense was precluding from having Dr. First testify that the prosecution experts were wrong in how they made their determinations as to why Mr. Duncan's beliefs were not delusional.  RCHT 3168 – 71.

Similarly, there was considerable debate whether the defense would be allowed to present testimony from  Dr. Amador about the prosecution experts' lack of expertise dealing with high functioning psychotics and whether reviewing another expert's diagnosis is a separate area of expertise.  *See, e.g.*, RCHT 4034-38, 4045.  The prosecution succeeded in limiting Dr. Amador's testimony, largely because he had not seen Mr. Duncan, had engaged in only limited review of materials, and had not provided a comprehensive report.  In its order the Court noted:

> The Court recognizes that Dr. Amador reviewed some materials before he issued his short written report and then, prior to his testimony, reviewed additional materials about which he was questioned. (RCHT, Day 16 at 4116-4138.) The Court finds Dr. Amador's testimony concerning his review of these materials to be of little value as his record review was made only for the purpose of discrediting Dr. Low's report. Dr. Amador gave no testimony concerning his review of the materials independent from his critique of Dr. Low's report leaving the Court to find Dr. Amador's review to have been less substantial than that of Dr. Low's and lacking in credibility.

Doc. 843 at 16 n. 9.

Thus, Dr. Amador was precluded from providing testimony that could have harmonized the reports of observations of Drs. Engle, Low, Kirkish and Rath with that of Drs. Woods, Merikangas, and Gur. Intead of a choice between experts who the court noted appeared fair minded and neutral – in that they admitted that Mr. Duncan presented a close case for competency – against expert the court considered plainly overzealous, Mr. Duncan would have presented testimony that balanced some seeming normalcy against the underlying psychotic thought process as did the prosecution's case.

As a result of the defense discovery violation, Dr. Beaver's testimony was limited to foundational matters only. He was allowed to provide no opinion as to competency, nor was he allowed to state that he had observed psychotic symptomatology during his 2005 interview with Mr. Duncan. RCHT 3283-85. As the Court stated in its order:

> Although he did not prepare a written report in this case, Dr. Beaver was qualified as an expert in neuropsychology but his testimony was limited in that he was not allowed to give any opinions about competency, mental disorders, or symptoms of mental disorders. Dr. Beaver was allowed to testify regarding his neuropsychological testing of the Defendant. (RCHT, Day 13 at 3281-3289.) The Court has discussed Dr. Beaver's testimony in this section because it provided background for the other expert's testimony.

Doc. 843 at 25 n. 19.

The exclusion of opinion evidence by Dr. Beaver prejudiced the defense. The defense was not allowed to show that psychotic symptomatology predating any defense claim of incompetency had been documented by an expert with some experience testifying for the prosecution. *See* RCHT at 3211.

Similarly, the defense presented no expert opinion testimony to explain Mr. Duncan's unsual presentation, over which there was much dispute as to the presence and severity of any signs of psychosis, to his history of victimization at home and in prison, his history of traumatic physical abuse at the hands of his caretakers and neighbors, and the familary history of sexual abuse and incest. As explained in the attached report of Dr. David Lisak, male victims of familiar sexual abuse can present with highly atypical psychiatric and psychological symptomatology. Exh. 13 at 114 ("Maternal incest can, and often does, undermine the very foundations of its victims; the building blocks of identity. In doing so, it can produce spectacularly idiosyncratic thought patterns and beliefs which, I believe, can mimic some of the thought disorder symptoms commonly seen in psychosis.").

Defense counsel also failed to have Drs. Woods, Merikangas, or Gur review and consider the retrospective competency testimony of Mr. Duncan's sister, Cheri Cox. Knowing that the expert debate would be whether someone with the presentation described by the defense experts could ever present with a relative lack of symptomatology, the defense made a wholly inadequate effort to address the issue.

In addition to the prejudicial errors and omissions of defense counsel, Mr. Duncan was additionally deprived a full and fair determination based on all available and admissible evidence due to the government's withdrawal of Dr. Roesch's testimony. Although the Court and prosecution wanted nothing to do with Dr. Roesch after the defense was finished cross-examining

him, the defense wanted to rely on Dr. Roesch's interviewed, and it was entitled to have those interviews considered.  The interviews strongly support the case for incompetency.

For instance, in response to Dr. Roesch's statement that Mr. Duncan had "objected" to an appeal, Mr. Duncan launched into a seven-page monolog that began:

> Not an objection. I just wanted, as a courtesy to the judge -- again, I was interested in the same thing that the jury -- when I was selecting the jury, I was concerned about -- you know, I wanted to - I wanted -- I wanted -- I wanted -- this game that was being played was causing -- had real consequences that the players weren't aware of.

> And the consequences were not my death. They were not prison. They were not all of the things that it [the System] thinks the consequences are.

> The consequence is separation from the truth; separation from God; you know, this tearing away from the source of our being. You know? That, to me, is a very serious consequence. So the things that I did were geared toward trying to lessen those consequences. One of the ways you get torn away from God is by being manipulated.

> You know, when I manipulate you, I am tearing you -- I am trying to tear you away from God. If you allow me to manipulate you, that means you are letting me tear you away. That's how it all works. So, in my mind, what my attorneys were doing was they were manipulating the judge by filing this document implying that I was consenting to this appeal.

Retrospective Competency Exh. II at 174-75.  When Dr. Roesch asked about his renewed desire to appeal, Mr. Duncan gave an eight-page answer, in which he stated:

> It's difficult to say why because it wasn't really a decision that I made in the normal sense of a decision. In other words, I didn't think about it. I wasn't thinking about it when I changed my mind.

> It was just, all of the sudden, I realized that this is what I had do. It was the same way that, all of the sudden, I realized that I had to bring the little girl home.

> It was the same way that, all of the sudden, I realized that I had to represent myself. All of these decisions aren't really decisions. These are just things that I knew I had to do. And I was talking to some investigators and –and I

was -- along with -- when I told my attorneys -actually, when I first told my attorneys that I couldn't agree with the appeal, I remember saying to Judy – I think she was the lead attorney.

I remember saying to her once, "You know what? I might have changed my mind and decided to allow the appeal. But if I do, it will be for some reason that I cannot say, that I cannot put my finger on."

*Id.* at 75-76.  Minutes later he said:

But it wasn't my decision. It was a decision that came from outside of me. It was a decision that came from this living consciousness, this living truth that I avow to, that I try to -- that I try to avow to. I don't always succeed.

I'm - you know, I'm still a very confused and flawed person, but I no longer -- I think -- like I said a moment ago, I know I'm confused; and I accept it. I accept that I probably will be until the day I die.

And that's okay. I can deal with it. I'm okay with that. I don't need to know anymore. I don't need to understand this universe anymore because I know something about it that most people in their entire lives don't get to know. You know?

And that is that -- I don't know how to say this because it sounds corny -- but that it loves me. You know?

*Id.* at 81.

## VI.    CLAIM 4:  EVEN ASSUMING MR. DUNCAN WAS COMPETENT TO PLEAD GUILTY, HE WAS INCOMPETENT TO REPRESENT HIMSELF

Petitioner's death sentence was obtained in violation of his rights under federal law and the Fifth, Sixth, and Eighth Amendments to the United States Constitution in that he was incompetent to represent himself, *Drope v. Missouri*, 420 U.S. 162 (1975), *Dusky v. United States*, 362 U.S. 402 (1960), and *Indiana v. Edwards*, 554 U.S. 208 (2008), and the court permitted him to represent himself and restricted the authority of advisory counsel without conducting a hearing regarding his competency.

Petitioner incorporates by reference, II (Statement of Case) and all factual allegations and legal contentions set forth in Claims 3-5, supra, as if fully set forth herein.

Corrected Defendant's Motion for Collateral Relief          121          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

Jury selection began on April 14, 2008.  On April 16, 2008, prior to the Court's commencement of individual *voir dire* for the capital sentencing trial, Mr. Duncan requested to waive his right to representation by counsel and to proceed *pro se.*  The Court deferred the matter until April 18, 2008, whereupon the Court decided to have Mr. Duncan's competency evaluated before ruling on the request for self-representation.  The Court ordered Dr. Robert Engle to conduct an evaluation for the court.  The Court memorialized its ruling in writing on April 21, 2008.  Doc. 404.

On May 2, 2008, the defense filed a motion requesting the court to find Mr. Duncan incompetent or, alternatively, to hold a competency hearing under 18 U.S.C. § 4241.  Doc. 415. With the motion, the defense submitted the reports of three experts, George W. Woods, M.D., James R. Merikangas, M.D., and Ruben Gur, Ph.D., all of whom concluded that Mr. Duncan was incompetent to proceed.  On May 7, 2008, the Government filed a motion seeking a government-sponsored competency examination and also initially opposed the defense motion regarding Mr. Duncan's competency.  Doc. 418.

On May 8, 2008, after having been provided with the defense expert reports, Dr. Engle submitted his report finding Mr. Duncan competent to proceed *pro se.*  Doc. 420.  On May 12, 2008, the Government filed a motion to withdraw its request for a competency examination by its own expert.  Doc. 422.  On May 13, 2008, pursuant to 18 U.S.C. §§ 4241 and 4247(b), the Court issued an order committing Mr. Duncan to the Federal Detention Center at SeaTac for a mental competency evaluation.  Doc. 427.  The Court took the defense motion to declare Mr. Duncan incompetent under advisement.

On June 16, 2008, the Court issued an order extending Mr. Duncan's competency evaluation at the FDC by an additional 15 days, based on a request by the Bureau of Prisons

(BOP). Doc. 434. On July 2, 2008, in response to a second BOP request, the court granted another extension of time, directing BOP to submit its competency evaluation of Mr. Duncan by July 16, 2008. Doc. 452. The court also indicated that any competency hearing deemed necessary would likely be conducted the week of August 4, 2008. *Id.* On July 17, 2008, a status conference was held, at which the defense received the report generated by the BOP. Doc. 485.

On July 24, 2008, the Court issued an order denying the defense motion to find Mr. Duncan incompetent or alternatively to hold a hearing to determine competence under 18 U.S.C. § 4241. Doc. 493 [sealed version]; 494 [redacted public version]. In declining to hold a competency hearing, the Court wrote that there "is no bona fide doubt or reasonable cause to believe the Mr. Duncan is incompetent." *Id.* at 6. Moreover, the Court wrote that "there is no evidence that Mr. Duncan suffers from a mental disease or defect which renders him incompetent to waive his right to counsel." *Id.* at 7. The Court wrote that it found "the reports and conclusions of Dr. Engle and BOP to be more credible and afforded greater weight," noting:

> Dr. Engle utilized standardized psychological testing instruments. BOP, who regularly conducts these types of evaluations, had the benefit of observing Mr. Duncan consistently over a period of at least forty-five days. Notably, the reports of Dr. Engle and BOP applied the appropriate statutory standard whereas two of the three defense experts arguably did not.

*Id.* at 12.

Upon writing that Mr. Duncan was competent to proceed, the Court turned its attention to whether he "lacks the mental capacity to conduct his trial defense unless represented by counsel." Doc. 493 at 16 [also 494 at 15]; *Indiana v. Edwards*, 554 U.S. 208 (2008). Relying on the *Edwards* opinion, the court framed the inquiry as follows: "If it is determined that he still desires to do so [proceed *pro se*], the Court may then set a limited competency hearing to determine whether Mr. Duncan should be allowed to represent himself with standby counsel or if it is necessary to order

Corrected Defendant's Motion for Collateral Relief    123    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

that he proceed with counsel to ensure the integrity and efficiency of a fair trial." *Id.* at 16. On July 28, 2008, the Court conducted a hearing "to determine, and make it very clear on the record that you are fully aware of the hazards and disadvantages of self-representation, and that you are capable of representing yourself without the assistance of counsel." VII RT 725.

At the hearing, Mr. Duncan said he understood the proceedings "[i]n layman's terms, yes." *Id.* at 726. He said he was unfamiliar with the Federal Rules of Evidence and the Federal Rules of Criminal Procedure. *Id.* at 728. The court urged Mr. Duncan not to represent himself and then asked:

> Thinking about that very carefully and all the consequences that might occur from that, in light of the possibility that you may be sentenced to death on three of the counts, and face other serious penalties on the remaining seven counts, and in light of all the difficulties of representing yourself, do you honestly feel that you can represent yourself and give up your right to be represented by a lawyer?

VII RT 730. Mr. Duncan answered "Yes, I do." The Court inquired into whether the decision was knowing, intelligent and voluntary, and satisfied with the answers stated:

> based upon your representations to the Court, and this is the second time we have gone through these, your education and the findings that I made last week, the Court feels that you do have a Sixth Amendment right to elect to represent yourself. I found that you are competent to make that decision, and now that you are competent to waive your right to counsel.

> The Court finds that Mr. Duncan has knowingly and voluntarily waived his right to counsel. The Court also finds the Defendant's waiver is unequivocal and intelligently made. I am going to grant that oral motion to represent yourself.

*Id.* at 735-36. The Court made no inquiry or findings as to Mr. Duncan's competency, mental or otherwise, to represent himself as distinct from his competency to waive his Constitutional rights.

Mr. Duncan was incompetent to waive his Sixth Amendment right to counsel, was incompetent to represent himself within the meaning of *Indiana v. Edwards, supra,* and the Court's

Corrected Defendant's Motion for Collateral Relief          124          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

refusal to conduct a competency hearing violated his right to procedural due process under *Pate v. Robinson,* 383 U.S. 375 (1966). That the information before the court at the time of the Court's denial of a competency hearing was sufficient to raise a bona fide doubt as to Mr. Duncan's competency, *United States v. Duncan,* 643 F.3d 1242 (2011), is law of the case.

This Court's retrospective determination of Mr. Duncan's competency as of November 2008 is neither curative of the procedural due process violation nor dispositive of the substantive incompetency question. In the retrospective competency order, the Court expressly declined to inquire into Mr. Duncan's competency as of the time of the *Faretta* waiver. Doc. 843 at at 66 (having found Mr. Duncan competent to waive appeal, "the Court need not go on to determine whether the Defendant competently waived his right to counsel before the Penalty Phase hearing."). Moreover, the Court's findings repeatedly emphasize the importance of evaluating competence as to the particular time in question. *See, e.g.,* Doc. 843 at 32 (noting that the Court appointed experts "interact[ed] with the Defendant occurred closest to the time period in question."); *id.* at 12 (commenting that Dr. Engle's "examination, evaluation, and observations of the Defendant occurred at the very time period at issue"); *id.* at 18 (observing that mental issue in question in the Riverside case "encompassed the time period relevant to this case").

Furthermore, the court failed to conduct the necessary independent analysis whether Mr. Duncan was competent to represent himself even if he was competent to waive his constitutional rights. It is well-recognized that one may be competent to stand trial without being competent to proceed without the assistance of counsel. In *Indiana v. Edwards, supra,* the Supreme Court held that the question of mental competence for self-representation "calls for a different standard" than the question of mental competence for assistance of counsel at trial. 554 U.S. at 175. The Court therefore recognized "a mental-illness-related limitation on the scope of the self-representation

right." *Id.* at 171.

In its written order granting Mr. Duncan *pro se* status, the Court attempted to address the competency issue as follows:

> Unlike in the case of *Indiana v. Edwards* where the defendant was termed a "grey-area defendant," in this case, Mr. Duncan is fully competent and able to knowingly, voluntarily, and intelligently waive his right to counsel and elect to exercise his Sixth Amendment right to represent himself. Multiple mental evaluations were conducted and considered in addition to a barrage of other information supplied by the parties in reaching this conclusion. *See e.g.* (Dkt. Nos. 493, 494).

Doc. 502 at 6. That analysis does not survive the Ninth Circuit's conclusion in *United States v. Duncan*, 643 F.3d 1242 (2011), that the documents upon which the court relied were not sufficient to establish his competency to proceed. The expert evaluations, incomplete as they were for determining competency to proceed, did not address competency to engage in self-representation, and the district court's conclusion that Mr. Duncan was not even a "grey-area" defendant, as discussed below, was shown by all the evidence at the retrospective competency hearing to be clearly erroneous.

Mr. Duncan's disordered belief system, whether or not it rose to the level of psychosis, had a catastrophic impact on his ability to conduct a defense on his own behalf. As the case proceeded to the sentencing trial, Mr. Duncan was without any legally pertinent objective related to self representation. He had no interest in defending the case, and had no theory of defense either colorable or frivolous. Neither was his goal to be sentenced to death. His objectives, such as they were, were entirely extrajudicial. As a result of his delusional beliefs about the System, Truth, and the transformational significance of his case, he considered the trial to be a teaching experience for the jurors and, by extension, to society writ large.

At a minimum, the Court's observations of Mr. Duncan's manner of conducting the sentencing trial were sufficient to alert the court to the need to revisit the question of his competency to represent himself. Mr. Duncan did next to nothing at the trial, and not for the purpose of agreeing with the government's case. Most of his statements were limited to "no questions," "pass," "so stipulated," all of which he said hundreds of times. When he did do more, it was mostly nonsensical.

When the Court asked Mr. Duncan about his request to conduct *voir dire* himself, Mr. Duncan stated:

> If I chose to, I probably could at least make an idiot of myself trying to. I can get the gist of the intentions, but obviously I don't have the experience, I don't have the legalese background, I don't have any of the -- I'm not a lawyer, you know. My request to want to do voir dire is based --an extension of my request to want to proceed pro se insofar as I am here -- I don't want to get into the philosophy -- but it is based on the same thing. Andso if I do the voir dire, just for practical explanation, I probably will not ask questions simply because, to me, that is the most sensible thing to do.
>
> If I was being asked to paint a painting, I would say, hey, I'm leaving the brush on the pallet. That is not something I do.
>
> But at the same time, you know, I'm not going to -- I don't feel it is proper for me to impose my philosophy upon other people. And that is essentially what -- the reason for my request. Now, if you want to tell them to do it, that's -- you are the Court and you can do that. That is an arrangement that you have with them. But if I am asked, I am saying no, I don't want them to do it.

RT 843.

Mr. Duncan did next to nothing during the trial. For most of the witnesses he had no questions at all; when he did examine it was rare to ask more than a handful of questions. *See e.g.*, 8/20/08 RT 2543-44, 2620; 8/21/08 RT 2702 (2 questions); 8/26/08 RT 3112 (1 question), 3234 (1 question). Some of these questions were limited to some tangential matter that was immaterial to the proceeding but of some undisclosed personal importance. *See, e.g.*, RT 1635 (asking Denny's

employee whether Denny's serves milkshakes with a long handled spoon).

After the Government rested, Mr. Duncan called himself as a witness, and the following transpired:

> THE COURT:  You may proceed.
> MR. DUNCAN:  I have no statement prepared.  I was just intending to sit and answer whatever questions the Government might have.
> THE COURT:  You have nothing to testify to?
> MR. DUNCAN:  No.
> THE COURT:  No questions?
> MR. MOSS:  No, Your Honor.

8/21/08 RT 2635-36.  Mr. Duncan then rested his case.

The testimony and findings from the retrospective proceedings strongly support Mr. Duncan's claim of incompetency to engage in self-representation.  In the retrospective competency findings, Doc. 843, the court acknowledged Mr. Duncan's "strange statements," *id.* at 33, but ultimately found that his mental disorders should not be characterized as "major."[14] Doc. 843 at 32, 35; *see also id.* at 64 ("The Defendant is likely suffering from a mental disease or defect to the extent discussed in this Order.") The Court explained,

> there exists a broad spectrum of possible mental diseases or defects ranging from minor personality disorders to more severe and extreme major mental illnesses and brain defects. Individuals may fall anywhere within that spectrum and experts may disagree as to where on the spectrum a person's mental condition falls.

*Id.* at 31-32.  In fact, the Court later stated that all of the testifying experts in the case "offered

---

[14] What the court meant by "major" mental illness is not entirely clear, as that phrase was never defined by any of the witnesses. It appears that the court was likely referring to an "Axis I" diagnosis, which Dr. Rath – but none of the other experts – contended was a necessary predicate for an incompetency finding. RCHT 884-85. That, however, is not a correct statement of applicable law. *See United States v. Murdoch*, 98 F.3d 472 (9th Cir. 1996).

Corrected Defendant's Motion for Collateral Relief          128          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

varying diagnoses, with *each testifying that the Defendant may very well have had a mental disease or defect.*" Doc. 843 at 48 (emphasis added).

The testimony suggests the absence of any clear line dividing major mental illness from mere personality disorder. All of the prosecution witnesses considered it a close question whether Mr. Duncan was competent even to stand trial, and three times this court characterized as "interesting" the defense expert testimony that Mr. Duncan's disorders were more severe than the prosecution's experts considered them. Doc. 843 at 25, 35, 48.

Dr. Engle, one of the prosecution experts, saw symptoms in Mr. Duncan that are typically associated with psychosis, *i.e.*, circumstantial and tangential speech, RCHT 240-41, 254, but not at a level he would expect to see with a "more severe psychosis individual." RCHT 242. Dr. Engle had difficulty following parts of what Mr. Duncan had to say. RCHT 254. As a subjective matter, RCHT 374, he felt that when Mr. Duncan talked about his epiphany the ideas did not rise to the level of a delusion. RCHT 255. Dr. Engle administered an MMPI-2, "the gold standard for psychologists in assessing personality," RCHT 265, and he wrote in his report that "[m]any people with a similar profile manifest clearly psychotic behavior. Their thinking may be described as autistic, fragmented, tangential, and circumstantial; and thought content may be bizarre, difficulties in concentrating and attending, and deficits in memory are common. Affect may be blurred, and speech may be rapid and at times in incoherent." RCHT 391. Dr. Engle conceded that Mr. Duncan's speech pattern "could be" indicative of a mental disorder. RCHT 241. In response to a series of hypotheticals, Dr. Engle agreed that many of the things Mr. Duncan is reported to have said to others would be consistent with a variety of types of delusions. RCHT 375-80.

Dr. Low, another prosecution expert, testified that at age 19 Mr. Duncan was diagnosed with sexual sadism and passive-aggressive personality, with schizoid features, RCHT 597, and that

schizoid personality is "considered to be along [the] spectrum" of delusional disorder or schizophrenia. RCHT 661. She wrote in her report to the court that Mr. Duncan's refusal to cooperate with her precluded an opinion to a reasonable degree of scientific certainty, but in court, she nonetheless opined that Mr. Duncan had been competent to stand trial. RCHT 631, 633-34.

Dr. Kirkish, yet another prosecution expert, found Mr. Duncan to have a unique and "highly extreme" belief system, RCHT 1172, "amalgamating some aspects of psychology and philosophy and various religions and the concept of love and oneness and cosmic consciousness." RCHT 1287, 1172. She considered it very difficult to decide whether his beliefs were delusional or merely idiosyncratic. RCHT 1168. She felt that reasonable minds could differ on the question. RCHT 1169. Dr. Kirkish testified "there are aspects of his personality that are certainly problematic features" with regard to symptoms of a mental disorder. RCHT 1133. She testified "there certainly are features that I found consistent" with "schizotypal personality disorder." RCHT 1177-78. Reading from the DSM definition, she indicated that such "individuals may be superstitious or preoccupied with paranormal phenomena that are outside the norms of their subculture," and they have "ideas of reference," incorrectly interpreting "casual incidents and external events as having a particular and unusual meaning specifically for that person." RCHT 1175-76. Individuals with schizotypal personality disorder are often suspicious and may have paranoid ideation, which, Dr. Kirkish agreed, are at the very heart of a competency determination. RCHT 1181.

Dr. Kirkish testified that the case presented a close question, saying that "it's very difficult" and "very thorny" to decide whether Mr. Duncan's highly idiosyncratic belief system was delusional or not. RCHT 1168-69. She said that although Mr. Duncan's ideas "occur in some pretty mainstream religions and philosophies, the way he had put them together and what he had

Corrected Defendant's Motion for Collateral Relief          130          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

done, the behavior that had manifested was highly extreme." RCHT 1171-72.  Dr. Kirkish did not disagree that Mr. Duncan's reported statements to the defense experts were delusional, RT 1169-71, but because Mr. Duncan did not say similar things to her, she disregarded what he told everyone else, including doctors and law enforcement personnel, in forming her opinions.  RCHT 1228.  When Dr. Kirkish reviewed the printout of Mr. Duncan's MMPI just before she testified she saw the paranoia elevation and said to herself "Oh, my gosh.  This is almost a 100 T-score. *This is very high.*" RCHT 1204-05, emphasis added.) She testified in Riverside that her notes "are quite -- are a bit jumbled because he would bring things in that were relevant to him at that moment but were not perhaps restricted to the specific focus of the question." He would raise topics that were not necessarily relevant to her question.  RCHT 1219-20.

Dr. Rath, another witness for the prosecution, did not make a formal diagnosis because "the psychotic condition and exact diagnosis underlying a finding of incompetence would not be as important as how any mental illness reflects upon his functioning." RCHT 910.  Significantly, the court's lack-of-psychosis conclusion was expressly tied to Dr. Rath's plainly defective view of Mr. Duncan's belief system: the mere "a-ha moment." In rejecting the expert opinion testimony that Mr. Duncan was delusional, the court expressly found that "[t]he Defendant's Epiphany was not a delusion but was instead, as Dr. Rath testified, a 'sudden insight' or 'realization.'" Doc. 843 at 33.  Similarly, with regard to testimony regarding organic brain dysfunction, which the court termed "interesting," Doc. 843 at 35, the Court rejected the hard science of its existence in favor of the circumstantial evidence that if he possessed such deficits the prosecution experts would have seen the signs and symptoms of it, *id.*, *i.e.*, they would have found him delusional.

Dr. Roesch gave similar testimony.  *See, e.g.*, RCHT 1904-05 (Dr. Roesch agreeing that determining whether a belief system is delusional or not can be difficult and reasonable minds can

differ whether an idiosyncratic belief system is delusional or not.) He said that there are "gray-area cases" in which a clear decision about competency or incompetency could not be made. That would possibly include a case like Duncan's, given the symptom presentation. RCHT 2114-15. As a result, even the court struggled with the question whether Mr. Duncan has any mental disease, disorder or defect and is emblematic of the problem. *See, e.g.*, Doc. 843 at 8 ("On the question of whether the Defendant suffered from a mental disease or defect, the conclusions or diagnosis of the experts were somewhat varied."); *id.* at 11-12 (quoting Dr. Engle's opinion that Mr. Duncan was not "suffering from a mental disease or defect *rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings* against him or to assist properly in his defense." Doc. 843 at 11-12, (quoting Gov. Retrospective Compency Exh. 22 at 9-10) (emphasis added)).

As the foregoing facts demonstrate, as a result of mental illness, disorder, or defect Mr. Duncan was patently unable to conduct his "defense" in a manner directed at any jurisprudential goal -- he was incompetent to represent himself. The Court conducted no hearing and engaged in no independent analysis regarding whether Mr. Duncan was competent to represent himself, even assuing he was competent to waive his constitutional rights. The resultant death sentence was obtained in violation of the fundamental fairness and the guarantees of the Fifth and Eighth Amendments.

## VII.   CLAIM 5:  EVEN ASSUMING MR. DUNCAN WAS COMPETENT TO REPRESENT HIMSELF, ALLOWING HIM TO DO SO WAS FUNDAMENTALLY ERRONEOUS

Even if Mr. Duncan was competent to represent himself, the court committed fundamental error resulting in a miscarriage of justice by allowing Mr. Duncan to waive counsel and represent himself. The right to self-representation does not extend to a capital sentencing trial. Even if it

did, on the facts of this case, the societal interest in insuring reliability in capital sentencing would take precedence. The Court's action violated federal law and the Fifth, Sixth, and Eighth Amendments of the Constitution. The facts supporting this claim include the following:

The allegations set forth in Claims 3, 4 are incorporated by express reference as if fully set forth herein.

Jury selection for the sentencing trial in this case commenced on April 14, 2008, following Mr. Duncan's plea of guilty. On the second day of jury selection, Mr. Duncan requested to represent himself. Mr. Duncan's request was not motivated by a desire to receive a death sentence, but by Mr. Duncan's belief that refusing to engage the System with words would somehow facilitate a great societal awakening. In an initial order regarding the request, the Court stated that the Sixth Amendment right to self representation "exists for the penalty phase of a capital trial." Doc. 404 at 2 (citing *United States v. Davis*, 285 F.3d 378 (5th Cir. 378).).

On May 2, 2008, defense counsel moved for an order finding Mr. Duncan incompetent or, in the alternative, for a competency hearing. On July 24, 2008, after again remarking that the "right to self-representation exists during the penalty phase of a capital case, *see United States v. Davis*, 285 F.3d 378 (5th Cir. 2002)," Doc. 494 at 3, the Court denied defense counsel's motion and indicated Mr. Duncan would be allowed to proceed without counsel.

Jury selection resumed on August 13, 2008. The Government spent ten days presenting its evidence. Mr. Duncan asked only a handful of questions of any of the prosecution's witnesses. After the government rested, Mr. Duncan called himself as his only witness. When the Government indicated that it had no questions, Mr. Duncan left the stand and rested his case. He presented a closing argument that addressed none of the legal issues in the case and drifted into irrelevant tangents. The Court interrupted several times. Mr. Duncan summed up his position as

follows:

> I will wrap this up. I should actually thank the Government for helping me to get my eye for an eye by showing you the evidence that you have seen, by showing you the videos, by telling you about my rampage, about my revenge. Helping me to take away your heart and your innocence.
>
> THE COURT: Mr. Duncan --
> MR. DUNCAN: This is my conclusion. I'm sorry.
> THE COURT: Mr. Duncan, excuse me?
> MR. DUNCAN: This is my conclusion. I'm just saying -- I'm just saying what the evidence shows.
> THE COURT: Go ahead and conclude it.
> MR. DUNCAN: Okay.
>
> I'm just saying that the evidence shows, the evidence they presented, that's what it has done, that's what they have accomplished, and I should thank them. But I won't because despite the plans that my evidence -- that the evidence has clearly showed, the meticulousness, the spite, the hatred that my journal entries show, that my actions have shown, despite the heinousness of all my crimes, and the sickness, the insanity, the evidence shows clearly that completely contrary to all my life experience, something happened.
>
> And that's the reason that I'm here. Not because I was caught, not because the system worked, but because an eight-year-old little girl refused to judge me and allowed me to see the truth. And having seen the truth, the evidence again shows that I am compelled to honor it, as I have been since my arrest. And the evidence shows and indicates clearly that I will continue to do so. And this is not for my own salvation, but it's for the hope of yours and all of us together.
>
> That's all. Thank you.

RT 2818-19.  Although the argument was certainly not helpful, it is clear Mr. Duncan was not attempting to receive a death sentence.  As he stated to the Court, "My argument essentially, Your Honor, is no argument.  If that helps."  RT 2814.

The Court's initial decision to allow self representation knowing that Mr. Duncan intended neither to seek death nor to participate in any meaningful way violated fundamental fairness and the Sixth and Eighth Amendments.  Contrary to the Court's understanding, the Sixth Amendment

did not accord Mr. Duncan even a conditional right to represent himself at the sentencing trial.

The Sixth Amendment guarantees various trial rights, including the right to a speedy trial and the assistance of counsel, to an "accused." In *Betterman v. Montana*, 136 S.Ct. 1609 (2016), the Supreme Court underscored the significance of this language "—'accused' as distinct from 'convicted,' and 'trial' as separate from 'sentencing'—," *id.* at 1614, and held that the Sixth Amendment right to a speedy trial "detaches upon conviction, when [the trial] stage ends." *Id.* at 1613.

In *Martinez v. Court of Appeal of California*, 528 U.S. 152 (2000), the Supreme Court held that there exists no Sixth Amendment right to counsel on appeal, and consequently no constitutional right to insist on self-representation. The right to counsel on appeal is grounded not in the Sixth Amendment, but on Due Process and Equal Protection. *See Evitts v. Lucey*, 469 U.S. 387 (1985); *Douglas v. California*, 372 U.S. 353 (1963).

The Sixth Amendment right to self-representation recognized in *Faretta* v. California, 422 U.S. 806 (1975) arose in the context of the second phase of the "criminal prosecution," and was based on "that respect for the individual which is the lifeblood of the law." *Faretta*, 422 U.S. at 834 (citation omitted). It is intended to protect a defendant's autonomy. *Martinez*, 528 U.S. at 160-161. But upon conviction, a defendant's interest in autonomy is diminished. *Id.* at 162-163. On the other hand, Society has an especially strong interest in the fairness of the penalty phase. *Gardner v. Florida*, 430 U.S. 349, 357-358 (1977). "In an adversary system of criminal justice, the public interest in the administration of justice is protected by the participants in the litigation." *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 382-383 (1979). Society's interest in a fair adversarial process outweighs a convicted murderer's interest in self-representation.

Applying the methods of constitutional construction employed in *Betterman* and *Martinez*—history and purposes to be served -- confirms that the *Faretta* right detaches upon conviction. First, there is no historical analog for the modern penalty phase. At the time of the adoption of the Sixth Amendment, the sentence to be imposed for the offense of conviction was virtually automatic. *Apprendi v. New Jersey*, 530 U.S. 466, 479, 480 (2000) ("The substantive criminal law tended to be sanction-specific; it prescribed a particular sentence for each offense."). In contrast, in our time, an automatic death sentence for capital murder would be unconstitutional. *Woodson v. North Carolina*, 428 U.S. 280 (1976). History therefore offers no direct guidance. *Faretta* found it significant that "No State or Colony had ever forced counsel upon an accused; no spokesman had ever suggested that such a practice would be tolerable." 422 U.S. at 832. But the lack of commentary or cases on a species of proceeding that did not exist --- the modern penalty phase --- proves nothing. *Martinez,* 528 U.S. at 159 (Finding the "[h]istorical silence" *Faretta* deemed significant has "no probative force" in the appellate context because there was no long-established right to appeal).

Second, the purpose of the Sixth Amendment right to the assistance of counsel is "to ensure fairness in the adversarial process." *United States v. Cronic,* 466 U.S. 648, 656 (1984). The purpose of the *Faretta* right to self-representation, on the other hand, is "to affirm the accused's dignity and autonomy." *McCaskle v. Wiggins,* 465 U.S. 168, 178 (1984). The *Faretta* right exists "in the larger context of a criminal trial designed to determine whether or not a defendant is guilty of the offense with which he is charged." *Id.* at 177, n.8. These purposes, supposedly stemming from the same constitutional provision, tend to be at cross-purposes even in that context. This, the majority in *Faretta* acknowledged:

> There can be no blinking the fact that the right to an accused to conduct his
> own defense seems to cut against the grain of this Court's decisions holding

Corrected Defendant's Motion for Collateral Relief     136     *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

> that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel. For it is surely true that the basic thesis of those decisions is that the help of a lawyer is essential to assure the defendant a fair trial. And a strong argument can surely be made that the whole thrust of those decisions must inevitably lead to the conclusion that a State may constitutionally impose a lawyer upon even an unwilling defendant.

422 U.S. at 832-833. The Court nevertheless concluded that "although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Id.* at 834.

The balance *Faretta* struck in favor of affirming autonomy over safeguarding fairness makes less sense in the context of the penalty phase of a capital murder trial. On the one hand, requiring representation promotes the fairness and reliability of "a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson* 428 U.S. at 304. On the other hand, there is *Faretta*'s purpose of affirming the "dignity and autonomy of the accused." *Wiggins, supra.* A contemporary dictionary defined "dignity" as "Inherent nobility and worth." *The American Heritage Dictionary of the English Language*, 369 (1973). The inherent nobility and worth of the convicted capital murder is best affirmed in the penalty phase by the presentation of his individualized circumstances as envisioned by *Woodson,* not by guaranteeing a right to prevent that presentation. Affirming the dignity of the individual must above all be affirming respect for the very life of the individual. The "respect for the individual which is the lifeblood of the law" must, above all else including dignity and autonomy, be respect for the very life of the individual, even for one who has no such respect.

Recognizing that "death is a different kind of punishment," the Supreme Court has elaborated:

> From the point of view of the defendant, it is different in both its severity and its finality. *From the point of view of society,* the action of the sovereign

> in taking the life of one of its citizens also differs dramatically from any other legitimate state action.  It is of vital importance to the defendant *and to the community* that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

*Gardner* 430 U.S. at 357-358 (1977)(emphasis added).  Yet the principle that it is not the defendant "alone [who] is concerned with the mode by which he may be deprived of his life" is not merely some new-fangled notion in the wake of *Furman v. Georgia,* 408 U.S. 238 (1972).  After citing Blackstone over a century ago, the Supreme Court recognized:  "The public has an interest in his life and liberty."  *Hopt v. Utah,* 110 U.S. 574, 579 (1884).  Indeed, the Eighth Amendment itself must be understood as affirming an interest of Society, not merely for the benefit of the convicted.

The decision to impose the death penalty is a moral judgment, not a factual determination.  *California v. Brown*, 479 U.S. 538, 545 (1987) ("[S]entence imposed at the penalty phase should reflect a reasoned *moral* response." (O'Connor, J., concurring) (emphasis in original).  Unlike a determination of guilt, it is not supposed to be a required conclusion based on proof of certain allegations.  *See Woodson, supra.*  Where the defendant admits to facts constituting guilt, there is no need to present either evidence or argument on the issue.  When the issue is what sentence to impose, however, a reasoned moral judgment involves consideration of any case for mitigation or aggravation.  If there is a case to be made for life, Society's interest in the fair administration of justice, in the "integrity of and public confidence in the system," in "justice," is not served where a defendant is allowed to prevent the sentencing body from hearing it.  While it is reasonable to rely on a defendant's decision to admit to facts comprising elements of an offense, it is not reasonable to rely on a defendant's moral judgment of whether a case for life exists, or of what it consists.

Even if there is a Constitutional right to self-representation in the penalty phase, the trial court's "independent interest" in "the rendition of [a] just verdict[]" outweighed Mr. Duncan's

Corrected Defendant's Motion for Collateral Relief          138          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

interest in self-representation.  *Wheat*, 486 U.S. at 160.  Wheat wanted to be represented by the same lawyer who represented two co-defendants in the same case.  *Id.* at 154-155.  The government objected on grounds it would create a conflict of interest for the lawyer.  *Id.* at 155.  Wheat responded there would be no conflict because the theory of defense would not entail impeaching counsel's former clients.  Moreover, all three defendants offered to waive any conflict, and Wheat argued that the reason for the government's opposition to the lawyer of his choice was the lawyer's effectiveness in representing his co-defendants.  *Id.* at 156-157.  The trial court denied the defendant his choice of counsel.  *Id.* at 157.  The Supreme Court acknowledged the "Sixth Amendment right to counsel of one's own choice," but found it was circumscribed in several respects, including by an "independent interest" of the courts in "ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  *Id.* at 159-160.  Because of this interest, "the trial courts, when alerted by objection from one of the parties, have an independent duty to ensure that criminal defendants receive a trial that is fair."  *Id.* at 161.

The principles of *Wheat*, applied to the issue presented here, compel the conclusion that the court should have disallowed Mr. Duncan's request for self-representation.  It was clear that Mr. Duncan had no actual desire to represent himself.  As he said repeatedly, his "defense" was "no defense not because he wanted to facilitate the government's efforts to obtain a death sentence, but because he wanted the proceeding to be nonadversarial.  His "purpose" ran directly contrary to the societal interest in ensuring the reliability of death judgments.

## VIII.    CLAIM 6:  MR. DUNCAN'S TRIAL COUNSEL FAILED TO REQUEST A CHANGE OF VENUE IN VIOLATION OF MR. DUNCAN'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL

### A.  Introduction

Mr. Duncan was deprived of a fair and reliable proceeding as a result of defense counsel's failure to move for a change of venue.  This case garnered an extraordinary amount of press coverage, beginning even before Mr. Duncan's arrest – because it involved three initial homicides, two missing children, and the passage of several weeks.  The coverage continued throughout the pendency of Mr. Duncan's Idaho state court proceedings, which resolved via a plea bargain, and the subsequent federal capital trial proceedings.  Virtually all of the jurors in the federal proceedings had been inundated with various forms of media by the time they were chosen to sit in judgment of Mr. Duncan.  Moreover, many of the jurors had formed opinions based on what they had read, seen, or heard, such that they ought to have been kept off the jury.

Following a change in counsel in September 2007, Mr. Duncan's reconstituted defense team filed a motion to amend scheduling order and continue the trial date on October 3, 2007.  Doc. 74.  The Court denied the request in a minute entry order entered on October 12, 2007.  Doc. 85.  On November 5, 2007, the deadline established by the Court for filing pretrial motions, the defense filed several motions, Docs. 132 – 142, including a motion for leave to file additional motions.  Doc. 143.  In that motion, the defense noted it was "not adequately prepared to file a motion to change venue." *Id.* at 2.  The Court denied the motion to continue, rejecting the defense argument that extraordinary and emergency circumstances affected the defense team's ability to investigate and prepare its defense in this case.  Doc. 157 at 4.

### 1. Facts Supporting a Change of Venue

The publicity in this case began before Mr. Duncan was even arrested. *See* Exh. 109, Media, at 3863–77: *Detectives Seek Search Warrants Before Entering Home*, May 17, 2005; *Two Kids Missing from Murder Scene, Deputies ID victims, Still Mum on Case*, May 18, 2005; *Murder Victim Called Caring, Concerned Mother*, May 19, 2005; *Coroner: Wolf Creek Victims Clubbed to Death,* May 20, 2005*; Steve Groene Thinks He's a Suspect, Dad Says FBI Thinks He knows More Than Saying*, May 23, 2005; *Judge Furloughs Man for Funeral, Jesse Groene Allowed to Grieve With His Family*, May 24, 2005; *Investigators to Search Fighting Creek Landfill for Evidence this Week*, May 24, 2005; *Police Say No One Truly Ruled Out as Potential Suspect*, May 27, 2005*; Investigators Say Tips Have Flooded in Over Murders*, May 28, 2005; *Possible Sighting of Kids in Oregon, Caller Said Saw Children in Idaho Plated Pickup Truck*; June 1, 2005; *Murder Probe Centers on Big Box, FBI Visits Coeur d'Alene Lowe's About Zip Ties*, June 2, 2005; *Billboard Company Donates Space, Pictures of Missing Kids Going Up Along US 95 in Spokane*, June 3, 2005; *Students Plant Tree in Memory of Groene Kids*, June 8, 2005; *A Month Later, Still No Killer, Still No Kids*, June 16, 2005; *Local Committee Calls for Return to Regional Amber Alert Protocol*, June 16, 2005; *Deaths Spur Change in Groene Son, Jesse Groene Says Drugs Possible Factor in Killings*, June 29, 2005; *Homicide Suspect in Deaths of Three Bodies Found in House at Wolf Lodge Bay Show Signs of Trauma Authorities Say*, May 17, 2005) and 3882-85.

Following Mr. Duncan's arrest on July 2, 2005, there was a new flurry of press relating to the recovery of S.G, the death of her brother, D.G., and Mr. Duncan's arrest. *See Id.* at 3887-3906. The press from early July 2005 included references to Mr. Duncan's sex offender history, including that he had an outstanding warrant on a child molestation charge in Minnesota at the

Corrected Defendant's Motion for Collateral Relief          141          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

time of his arrest, that Mr. Duncan had been classified as a "level-3" sex offender (meaning that authorities believed he was likely to re-offend), and that he had served 14 years in prison for "the rape of a 14-year-old" boy in Washington state. *Id.* at 3887, 3897.

Between Mr. Duncan's arrest in July 2005 and the resolution of his state case, there remained a steady stream of press coverage. A sizable portion of that coverage included highly inflammatory and prejudicial characterizations. *See, e.g.,* Exh. 109 at 3889 ("*Hammer was murder weapon, sex was the motive, killings were planned out*"); 3890 ("*[S.G.] goes home: Love, mental wounds await 8-year-old as she deals with kidnapping, killings*"); 3894 ("*Duncan went hunting for kids: Prosecutor files 6 new counts of murder, kidnap*"). Those tactics were effective. In one article, the reporter quoted from several community members' letters to the editor, including:

> "[Duncan should get] life in prison with 'two bubbas'"

> \* \* \* \* \*

> "Duncan should get worse than death . . . the death penalty is the easy way out for him . . .a sick freak like himself should be tortured in the sickest, most unearthly way imaginable."

> \* \* \* \* \*

> "God's law says pedophiles like Joseph Duncan should have been dead a long time ago, [b]ut morons in the legal system says he has rights, the right to serve some years in prison, the right to parole, the right to kill, the right to kidnap children, the right to molest children, the right to kill the children he kidnapped, the right to rape little kids.

> God's law says Duncan should have a millstone tied around his neck and thrown in the sea – permanently cures child molesters, rapists and child murderers. I personally believe in God's laws, and if someone should end this vicious criminal's existence on the face of this earth, that person should receive a standing ovation and be given the key to the city."

Exh. 109, Media, at 3899.

The media coverage ranged far and wide. In addition to local coverage in Coeur d'Alene and Boise, there was state and national coverage. *See* Exh. 109 at 3863-77, 3891, 3892, 3911-12, 3918-19. Before S.G. was recovered and Mr. Duncan arrested in July 2005, one Idaho paper dedicated its entire front page to the story, leading with this headline: "We have national coverage. We have a nation looking for kids" and "What's next? Profilers join investigation." *Id.* at 3966. While the search for S.G. and D.G. remained underway, it was reported that there were "40 investigators . . . chasing hundreds of potential leads." *Id.*

Even the press itself noted the risk that Mr. Duncan could not receive a fair trial. *See* Exh. 109 at 3898-99 ("*Lawyers Say They'll Do Everything To Assure Duncan A Fair Trial, Can Duncan Receive A Fair Trial? Lynch Mob Attitude Is Looming*"). Understandably, Mr. Duncan's state counsel amassed thousands of pages of press coverage in preparation for a venue challenge.

### 2. Counsel's Ineffectiveness Deprived Mr. Duncan of a fair tribunal comprised of jurors untainted by the barrage of inflammatory publicity the permeated the community.

There is no question that the media saturation surrounding this case, the related Idaho state case, and the additional child homicide cases linked to Mr. Duncan in California and Washington was overwhelming.

Counsel was well aware of the extensive press coverage of this case, as well as the community outrage directed at Mr. Duncan. *See* Exhs. 109 and 97. Additionally, counsel recognized that a change of venue might indeed be necessary in order that Mr. Duncan obtain a fair trial. *See* Doc. 143. However, as a result of counsel's lack of preparedness, compounded by the Court's unwillingness to extend counsel additional time to file a motion for change of venue, the issue was never litigated. *Id.* Notably, Mr. Duncan's state counsel *did* request a change of venue. Exh. 100. While the trial court in Kootenai County denied the motion, it did so without

prejudice. *Id.* The record makes clear, the issue was far from over. As lead state counsel John Adams attested:

> Six hundred potential jurors were summoned for the trial and I believed that jury selection would have taken approximately 3 months. I anticipated, based upon juror questioners (*sic*), that a Motion for Change of Venue may have been granted during or immediately following the jury selection process.

Doc. 194 at 1 (sealed).

To establish a valid claim for ineffective assistance of counsel, Mr. Duncan must establish that his "counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hill v. Lockhart*, 474 U.S. 52, 57 (1985) (*quoting Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984)). Where, as here, defense counsel failed to file for a motion for change of venue despite being on notice that the ability to obtain a fair jury in light of the media saturation across the state was bound to be difficult if not impossible, and despite having identified it as a legitimate issue to raise, their performance fell below the *Strickland* standard.

The Sixth Amendment and Due Process require that a defendant be tried by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). In instances where a trial court is unable to seat an impartial jury because of prejudicial publicity or an inflamed community atmosphere, due process requires a change of venue in order to protect a defendant's federal constitutional rights. *See Rideau v. Louisiana,* 373 U.S. 723, 726 (1963). If a juror "can lay aside" impressions, gleaned from media exposure, for example, than the presumption of juror impartiality remains intact. 366 at 723. However, "[a]t the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the

defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy v. Florida*, 421 U.S. 794, 800 (1975) (*quoting Irvin v. Dowd*, 366 U.S. at 723). The Supreme Court has noted that in the context of a request for a change of venue, prejudice may be presumed when the "trial atmosphere [is] utterly corrupted by press coverage," *Dobbert v. Florida*, 432 U.S. 282, 303 (1977), or when "a wave of public passion . . . makes a fair trial unlikely by the jury . . ." *Patton v. Yount*, 467 U.S. 1025, 1040 (1984).

Due to trial counsel's ineffectiveness, the Court failed to consider, much less address, the overwhelming negative publicity that infected Mr. Duncan's trial. Had counsel mounted a worthy challenge to the presumptive venue where, as here, almost every prospective juror admitted prolonged exposure to prejudicial pretrial publicity, there is a reasonable probability that such a motion would have been granted.

### 3. The Court Failed to Adequately Protect Mr. Duncan's Right to a Fair and Impartial Jury

In light of counsel's failure to move for a change of venue, as well as counsel's failures that contributed to Mr. Duncan proceeding *pro se*, it fell to this Court to safeguard Mr. Duncan's rights to a fair and impartial jury.

Ten of the 12 seated jurors in Mr. Duncan's trial admitted to having read, seen or heard about this case before being called to jury duty. *See* Exhs. 138, at 17252; 142, at 17485-86; 144, at 17596; 145, at 17658-59; 146, at 17725; 147, at 17796; 148, at 17852-53; 149, at 17910-11; and 151, at 18035. Three of the seated jurors admitted to having discussed Mr. Duncan's case, including one juror who had discussed "what should be done to him – days of lynch mob." Exh. 142 at 17486l; *see also* Exhs. 145 at 17659 and 148 at 17853. The Court engaged in some questioning of the prospective jurors as it related to their exposure to media. Specifically, the Court referenced additional, ongoing coverage of the case between the time they had filled out

Corrected Defendant's Motion for Collateral Relief        145        *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

their questionnaires and the resumption of proceedings several months later.  The following limited exchange is typical of the Court's inquiry:

> THE COURT: There has been considerable media coverage since you were released, but nothing there that has come to your attention that would affect your qualifications to serve as a juror?
> PROSPECTIVE JUROR: No

Exh. 138 at 17278.  The Court's questions stopped short of probing for any detail as to what the jurors had been exposed to or including open-ended questions which could have revealed the ways in which the jurors might have been influenced by press accounts regarding Mr. Duncan and/or his case.  Exhs. 138 at 17278; 139 at 17345-46; 142 at 17505.

### 4.  Conclusion

The circumstances at issue in this case give rise to a presumption that Mr. Duncan could not obtain a fair and impartial jury in the charging district.[15]  This is a case where the state and national media pieces numbered in the thousands (Exh. 109), where community members took it upon themselves to produce bumper stickers stating **"Set Duncan Free, LET US GET HIM!"** and **"KILL DUNCAN!,"** and where one local business displayed this message: **"DUNCAN, WELCOME TO IDAHO A DEATH PENLATY STATE, MAY YOU GET YOUR WISH AND DIE."** Exh. 97.

There is a substantial risk that one or more of the jurors who sat in judgment of Mr. Duncan was swayed towards death as a result of the extreme press coverage.  Counsel were aware of that risk, but for the reasons previously explained, *see supra,* Doc. 143; *see also* Claim 1, they

---

[15] The court's order prohibiting juror interviews (Doc. 479) has precluded Mr. Duncan from investigating whether the media exposure or other factors about the case produced a jury that was biased in fact.  Consequently, the instant claim is necessarily limited to presumptive prejudice.

unreasonably and prejudicially failed to raise the issue.  As a result, Mr. Duncan's constitutional rights to effective assistance of counsel and a fair trial before an impartial tribunal were violated.

IX.   CLAIM 7:  THE ADMISSION OF FUTURE DANGEROUSNESS EVIDENCE, THE PROSECUTION'S ARGUMENTS, AND THE COURT'S INSTRUCTIONS VIOLATED THE FIFITH AND EIGHTH AMENDMENTS AND AND RESULTED IN A FUNDAMENTAL MISCARRIAGE OF JUSTICE

In its January 23, 2007, "Notice of Aggravating Factors and Intent to Seek the Death Penalty, "Doc. 10,  the Government alleged two non statutory aggravating circumstances the Government intended to prove at the selection phase of trial:  victim impact and future dangerousness.  As to future dangerousness, the notice alleged that the defendant is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others as evidenced by, at least, one or more of the following: (a) a continuing pattern of violence, attempted violence, and threatened violence, including, at least, the crimes in the instant case; (b) the prior murders of three other children; and (c) risk of flight.  Doc. 10 at 5-6.

On November 5, 2007, the defense filed a "Motion to Declare the Federal Death Penalty Act Unconstitutional [and] to Dismiss the Aggravators and Death Notice," Doc. 139, contending *inter alia* that using unadjudicated prior criminal conduct at the selection phase is unconstitutional, that questions of dangerousness not limited to serious violence in prison is irrelevant, and that predications of future dangerousness are notoriously unreliable.  Doc. 139-2 at 34-48.  As to the final point, the defense expressly requested the prosecution be required to demonstrate the scientific validity of a future dangerousness assessment before being allowed to proceed.  *Id.* at 48 ("If, as the literature suggests, neither professionals nor lay people 'get it right' when it comes to an assessment of future dangerousness, a sentence of death predicated on a finding of future danger would be the product of what amounts to little more than a guessing game.  Accordingly, unless the

Government is prepared to demonstrate at a hearing, or otherwise, that a jury of lay persons is capable of accurately distinguishing those defendants convicted of capital murder who present a future danger from those who do not, this court should strike the factor from the notice and bar the government from endeavoring to prove future dangerousness.")

On March 14, 2008, the Court rejected the defense's constitutional challenges, stating it could find "no reason" to disagree with the courts "that have uniformly upheld the use of future dangerousness as a non-statutory aggravating factor. *See United States v. Rodriguez*, 389 F.Supp.2d 1135, 1144 (D.N.D. Sept. 27, 2005) (citing *[United States v.] Bin Laden*, 126 F.Supp.2d [290] at 303-04 [(S.D.N.Y. 2001)] (citations omitted))." Doc. 313 at 20. The court nonetheless agreed that "the Government's evidence as to the non-statutory aggravating factor of future dangerousness in this case [should be limited] to the context of life imprisonment." *Id.* at 21.

On April 15, 2008, the defense filed a motion to exclude prejudicial evidence unrelated to future danger in prison. Doc. 381. The defense argued:

> Evidence surrounding decade old unadjudicated allegations of prior acts against children is simply not relevant to a jury determination of whether Mr. Duncan will pose a danger within the walls of prison.
>
> For whatever probative value this non-prison setting evidence may have, it is outweighed by the danger of unfair prejudice. § 3593(c). These allegations that the government seeks to introduce to establish future danger in prison arc very remote in time (over ten years) and therefore not particularly probative. *See United States v. Sablan*, 2008 WL 700172 (D.Colo. 2008) (the court excluded evidence of a prior conviction of aggravated assault because the incident was 12 years before and thus too remote in time); *United States v. Gilbert*, 120 F.Supp.2d 147, 153 (D.Mass.2000) (finding a prior act unreliable, based in part on the fact that it occurred so long before the homicide .. "[a]ny testimony about the incident thirteen years after the fact is not reliable enough to be used at a capital sentencing hearing"); *United States v. Sampson*, 335 F.Supp.2d 166, 225 (evidence of future dangerousness was too remote in time that its probative value was outweighed by its prejudice).

> Moreover, to permit evidence of unadjudicated allegations of killing children when the underlining [sic] offense also involves children is prejudicial and consequently increases the risk that the jury will make its decision on an improper basis.

Doc. 381 at 21.

On August 25, 2008, at the start of the selection phase, Mr. Larranaga renewed the motion to exclude, arguing:

> What we have is ten-year-old unadjudicated allegations against children is simply not relevant to the potential of future dangerousness in the prison context. Instead it is highly prejudicial and should be barred under 3593(c) and this Court's prior ruling that evidence must be reliable, relevant and not prejudicial in the context of a prison setting. Allowing it to be presented in this phase and somehow think it is going to be cured by a limited instruction will not reduce the effect of the prejudicial impact. In essence, what it will do is reduce this Court's ruling to no ruling at all.
>
> We have set forth in our April pleading these more detailed bases for why this information is not relevant, and extremely prejudicial, and should be excluded under 3593(c) and this Court's prior ruling that information regarding future dangerousness must be limited to the prison context.

RT 2867.  The Court ruled:

> In this case if the evidence was being presented to show that Mr. Duncan was a pedophile and that his dangerousness was only as to children, the Court would agree with the Defense that under the heightened level of scrutiny, the evidence would be more prejudicial than probative and would not be allowed even though the Rules of Evidence do not apply in the selection phase. The similarity of the crimes would certainly be a factor in deciding whether it was too prejudicial or not.
>
> The evidence, however, in this case is, in my judgment, is highly relevant in that it corroborates the Government's argument that it shows a pattern of violence throughout Mr. Duncan's adult life. The evidence shows that while in a prison context one would not expect guns or knives to be readily available, Mr. Duncan's choice of weapons has largely been blunt-force trauma, and that may be available from time to time in any prison setting. Society's standards of decency do not stop at the prison gates.

RT 2874-75.

On September 15, 2008, the Court issued a written order further elaborating its reasons:

> [T]he information regarding these unadjudicated crimes was relevant as it was probative of Mr. Duncan's future dangerousness in the prison context given the violent nature of the unadjudicated crimes. Although the alleged crimes were committed against minor victims who Mr. Duncan will not be exposed to in prison, the evidence shows Mr. Duncan's pattern of violence based on the manner in which the unadjudicated criminal offenses were committed.

> As the Court stated at the hearing, unadjudicated conduct in crimes may be considered and many courts have specifically recognized the relevancy of such information to a jury when considering the future dangerousness factor. Here, if the evidence were being presented to show that Mr. Duncan was a pedophile and that his dangerousness was only as to children, the Court would agree with the defense that under the heightened level of scrutiny the evidence would be more prejudicial than probative and the evidence would not be allowed. The evidence in this case, however, is highly relevant in that it shows a pattern of violence throughout Mr. Duncan's adult life. While in a prison context one would not expect guns or knives to be readily available, the evidence relation to these prior uncharged crimes shows Mr. Duncan's choice of weapons has largely been blunt-force trauma which may be available in the prison setting.

Doc. 590 at 10.

The presentation of selection phase evidence then commenced and continued for two days. The majority of the Government's case consisted of corroborating Mr. Duncan's admission to having killed three children previously. The Government presented the testimony of 15 witnesses to the events concerning the prior homicides and their testimony comprises approximately 300 pages of the transcript.

In contrast, the evidence of the only other matter at the selection phase – victim impact – involved five witness and fewer than 80 pages of the transcript. Thus, almost 80% of the testimony was devoted to proof of the prior murders. The only evidence of "violence" in prison was from a single witness who authenticated two prison infraction reports indicating that Mr. Duncan on one occasion threw a plastic garbage can lid like a Frisbee, striking a guard with it, and on another had

taken antenna wire, radio jacks, a baseball, and other items suspected to be stolen from the prison electronics shop. RT 3108; Trial exhibits 178a, 178b. He received only a reprimand for the garbage can incident. Trial exhibit 178a. For the theft incident, he was placed in ten days administrative segregation, the "normal sanction for this type of infraction." Trial exhibit 178b.

The prosecution devoted nine pages of its closing argument to the issue of future dangerousness, most of which emphasized the prior acts of violence against children. RT 3256-65. The government attempted to tie acts of pedophilia to the risk of serious violence in a maximum security facility by arguing the evidence showed that "this Defendant can act in any manner and he can act on impulse, he can have a plan or he can spend months making a substantial plan, patiently waiting." RT 3262. He is "able to improvise and adapt," RT 3263, and "[h]e is resourceful and he lets nothing stand in his way." RT 3264.

The government did not limit its argument regarding other crimes to the issue of future dangerousness, however. In arguing that Mr. Duncan's background in and of itself merited a sentence of death, it argued:

> Well, we know that he committed a violent crime in 1980 and went to prison, was paroled and killed two children. We know that he returned to prison, but was paroled again and at that time he killed another child, A.M.M. How did he get there to do that? His girlfriend, Dee Ellis, had a car that she let him use and he took the car and he took it from Seattle, and he took it from Washington, and he went to southern California in her car and killed A.M.M. He is manipulative. He used Dee Ellis's car.

RT 3266-67.

At the close of the evidence the court instructed the jury:

> The Government has alleged two non-statutory aggravating factors as to each of Counts One, Five, and Seven. The two non-statutory aggravating factors alleged are: (1) victim impact, in committing the offenses Mr. Duncan caused emotional trauma to the victim D.G.'s family; and (2) future

dangerousness of Mr. Duncan. Mr. Duncan is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others.

In determining the sentence to impose, these two non-statutory aggravating factors alleged by the Government are the only ones you may consider as non-statutory aggravating factors, and you may only consider them in your sentencing determination if you unanimously find that they have been established beyond a reasonable doubt.

*  *  *  *  *

As to the second non-statutory aggravating factor alleged by the Government, you heard testimony regarding the likelihood that Mr. Duncan will commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others. This evidence is limited to the prison context and the likelihood of future violence by Mr. Duncan in prison. You may only consider the non-statutory aggravating factor of future dangerousness in the context of the mandatory life sentence without the possibility of release that the Court must impose if Mr. Duncan is not sentenced to death.

The Government has introduced evidence of unadjudicated criminal conduct by Mr. Duncan. Unadjudicated criminal conduct is criminal conduct that has not previously been the subject of a criminal proceeding resulting in a criminal conviction. You may consider such evidence of unadjudicated criminal conduct if the Government has proven such evidence beyond a reasonable doubt, and only insofar as it is relevant to prove the non-statutory aggravating factor of future dangerousness and not for any other purpose. If you unanimously find that the Government has proven the non-statutory aggravating factor of future dangerousness beyond a reasonable doubt, you may also consider the unadjudicated criminal conduct to determine the weight you give to the non-statutory aggravating factor of future dangerousness as part of your determination of the appropriate sentence.

RT 3231-3234.

The submission of other crimes evidence to the jury, the prosecution's argument and the Court's instructions denied Mr. Duncan fundamental fairness, due process and resulted in a manifest miscarriage of justice. Mr. Duncan reasserts all of the constitutional challenges to the general use of other crimes evidence asserted in his pretrial motions. Additional the record of the trial as it actually unfolded reveals the following deprivations of fundamental fairness and due

process.

On the facts of this case, there is no possibility the jurors could have understood or followed a limiting instruction to consider other crimes evidence solely as to the question whether Mr. Duncan would pose a serious threat to the safety of others in a maximum security prison. Social science research has demonstrated that jurors, in general, do not understand sentencing phase instructions. See *United States v. Fell*, 5:01-cr-00012-gwc (D. Vt. Dec. 13, 2016) Doc. 1025 at 16 ( "CJP studies demonstrated that many jurors fail to understand and therefore apply the distinctions between the burden of proof and requirements of unanimity which distinguish aggravating and mitigating factors. Nearly half of the jurors did not understand that they must consider relevant mitigating evidence. Two-thirds did not understand that a mitigating factor did not need to be found unanimously. Half did not understand the lower standard of proof for mitigating factors and nearly one-third did not understand the burden of proof for aggravating factors.")

In a case involving the murder of a child, the notion that jurors would not consider extensive evidence to which more than three-quarters of the selection phase was devoted that the defendant had killed three other children in similar ways strains credulity. *See United States v. Diaz*, 2007 WL 656831 (N.D. Cal. Feb. 28, 2007) (the unadjudicated murders sought to be proven at the penalty phase, while distinct and unrelated to the underlying murder ... , are based on fact patterns similar to that of the underlying crime, further increasing the risk that the jury will use its guilt phase findings of guilt in its adjudicatory penalty phase deliberations); *United States v. Gonzalez*, 2004 WL 1920492 (D. Conn. Aug. 17, 2004) (finding that defendant would be "uniquely prejudiced" by the introduction of evidence of four unadjudicated murders as aggravating factors because of the nature of the murders and the similarity to the underlying capital

murder.) This is especially true given the prosecution's explicit argument the other crimes should be considered on their merits, not just as to the issue of future dangerousness.

Beyond that, the instructions were hopefully vague and confusing. First, the jury was instructed to determine whether the likelihood of something had been shown beyond a reasonable doubt. The notion of proving a probability beyond a reasonable doubt remains fundamentally "incoherent," as the United States Supreme Court has recognized in a different context:

> But to say . . . that one must demonstrate that something is more probably clearly erroneous than not or more probably than not unreasonable is meaningless. One might as intelligibly say, in a trial court, that a criminal prosecutor is bound to prove each element probably true beyond a reasonable doubt. The statute is thus incoherent with respect to the degree of probability of error required of the employer to overcome a factual conclusion made by the plan sponsor.

*Concrete Pipe and Products of California v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 625 (1993).

Additionally, the instructions provide inadequate guidance as to the level of risk required, but only whether he is "likely" to commit "criminal acts of violence in the future." Is it simply a reasonable probability as in "substantial," "serious," or "well-founded"? Or rather is a a "high probability of occurring or being true: very probable," *Merriam Webster's Collegiate Dictionary* (10th ed. 2000) at 673. An unabridged dictionary defines "likely," first, as "of such a nature or so circumstanced as to make something probable," and, second, as "having a better chance of existing or occurring than not." *Webster's 3d New Internat. Dict.* at 310 (1965). S*ee also Black's Law Dictionary* at 925 (6th ed. 1990) ("probable and having better chance of existing or occurring than not.")

The other crimes evidence as clearly more prejudicial than probative. The lip-service to future dangerous notwithstanding, it is clear the Government's efforts were directed toward giving

the jury a clear and graphic view of Mr. Duncan as a multiple child murderer, not merely a view through the lens of future dangerousness. The length and detail of its evidence, the highly tenuous theory of relevance, and its explicit invitation to consider the evidence for its direct aggravating value makes that conclusion inescapable. To be sure, Mr. Duncan has admitted to crimes that involved substantial planning, all of which were directed at children. The evidence of his "resourcefulness" is not probative of the question whether he is resourceful enough to escape from handcuffs to assault an officer or to achieve access to another inmate in a solitary confinement maximum security institution.

Mr. Duncan's history in custody, like all others convicted of offenses against children, is of being a victim not a victimizer. With all of its access to years' worth of prison records, the most serious in-custody infractions the government could find was throwing a plastic garbage can lid like a Frisbee and hoarding pilfered supplies from his job in the prison electrical shop. In that neither of those infractions were significantly violent, if violent at all, those too were erroneously admitted.

Information submitted in the penalty phase must be relevant to the aggravating factors, and its probative value may not be outweighed by the danger of creating unfair prejudice. 18 U.S.C. § 3593(c). In addition, the information must satisfy the "heightened reliability" requirements of capital sentencing, in light of the finality of the penalty. *See., e.g., Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Although the court required the government to proffer its evidence of other crimes for the purposes of determining whether the evidence of other crimes was likely to be reliable, the proffer did nothing to insure that the evidence would provide any reliable basis for deciding whether or not Mr. Duncan would like pose a serious danger to staff or inmates at a maximum security prison.

Corrected Defendant's Motion for Collateral Relief    155    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

The FDPA does not

> alter or "eliminate the constitutional baseline for the admissibility of evidence in a criminal trial." *United States v. Matthews,* 246 F.Supp.2d 137, 144-45 (N.D.N.Y.2002). To the contrary, under the FDPA Standard, "judges continue their role as evidentiary gatekeepers and[, pursuant to the balancing test set forth in § 3593(c),] retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair." *United States v. Battle,* 264 F.Supp.2d 1088, 1106 (N.D.Ga.2003); *see also United States v. Johnson,* 239 F.Supp.2d 924, 946 (N.D.Iowa 2003) (holding that the FDPA "expressly supplants only *the rules of evidence,* not constitutional standards .... [The trial court] retains the authority under the statute to impose upon the parties any standards of admissibility *or fairness* dictated by the Fifth and Sixth Amendments").

*United States v. Fell,* 360 F.3d 135, 145 (2d Cir. 2004) (emphasis in original. The Court was obligated under the FDPA and constitution to exclude the evidence of the unadjudicated prior homicides, notwithstanding the attempt to limit consideration to future dangerousness.

## X.    CLAIM 8:  THE ADMISSION OF GRUESOME VIDEOGRAPHIC EVIDENCE VIOLATED THE FIFTH AND EIGHTH AMENDMENTS AND RESULTED IN A FUNDAMENTAL MISCARRIAGE OF JUSTICE

The admission of graphic videotapes depicting child sexual abuse, torture and attempted murder violated Mr. Duncan's right to a fundamental fairness, due process and a reliable death sentence. This evidence was introduced over Mr. Duncan's personal objection to victimizing the jurors. The evidence was guaranteed to, and did in fact, evoke a strong visceral sense of revulsion and unfair prejudice far outweighing any probative value. The facts supporting this claim include the following:

On July 2, 2005, Mr. Duncan was arrested at the Denny's restaurant in Coeur d'Alene, and law enforcement retrieved electronic media, including a Dell laptop computer and a four gigabyte Microdrive, from the Jeep he had been driving. Through forensic analysis, the Government recovered various previously erased video footage and still photographs from this electronic media. Three recovered videos, dubbed "On Bench in Cabin," "On Floor in Cabin," and "Hanging in

Cabin" by the forensic examiner, are highly graphic and disturbing depictions of the horrific sexual abuse and attempted murder of D.G.

On December 3, 2007, Mr. Duncan entered a plea of guilty to all offenses charged in the Indictment.  During the change of plea hearing, Mr. Duncan admitted that on June 22, 2005, in an old wooden cabin in the Lolo National Forest, he videotaped sexual acts in which D.G. was forced to engage, that he saved the video to a four gigabyte microdrive, that he purchased the video camera and four gigabyte microdrive at a Best Buy in Fargo, North Dakota, in April of 2005 and that he purchased other equipment he used to produce the June 22, 2005, videos at a K-mart in Fargo, North Dakota.  The Government indicated to the defense that it intended to use the videos and a number of still images at the sentencing trial.

In response, on February 6, 2008, Mr. Duncan filed a "Motion to Exclude Graphic and Horrific Images in Penalty Phase."  He argued the videos and still photographs at issue were not probative as to the issues to be tried at the eligibility and selection phases, that the images were unavoidably and excessively prejudicial, and that the court needed to view the images itself to adequately understand the extent of the prejudice.  On February 11, 2008, the Government filed an opposition, Doc. 264, in which it argued that the images were relevant to the statutory threshold intent factors, and to the statutory and non-statutory aggravating factors, and that as direct, reliable evidence of Mr. Duncan's actions there could be no risk of "unfair," *i.e.*, misleading or dishonest, prejudice.  On February 19, 2008, Mr. Duncan filed a reply.  Doc. 272.

On March 17, 2008, the Court issued an order directing the government to submit copies of the images for the court's in camera review.  Doc. 317.  On March 19, 2008, Mr. Duncan moved for an in limine ruling prohibiting the government not only from introducing the actual images in question during the sentencing capital proceeding, but also all other evidence relating to

the sexually exploitative conduct depicted therein. Doc. 319. On March 25, 2008, the Government filed a response, Doc. 331, in which it argued, "There is no question that any human being who gains a complete understanding of what the defendant did to D.G. may have an emotional response. There is also no question, however, that the FDPA requires the jury to understand the manner in which the defendant committed his offense in order to perform its essential function." Doc. 331 at 4.

On March 26, 2008, the Court heard argument on the pending motions. Ms. Clarke was absent due to a family emergency. Mr. Monahan argued:

> And I think it is fair to say in this case that there are many alternatives. The Government has no dearth of evidence in this case. We understand their concern about wanting to present a full picture to the jury.
>
> But on the other side of the equation, we are concerned that showing this material, because of its horrendous nature, it would simply make it impossible for any juror to act reasonably and to focus on the aggravating factors that they must to channel their discretion.

03/26/08 RT at 4. Mr. Moss argued:

> I think it is important to point out that the evidence we are talking about is the crime occurring. When you talk about prejudice as it relates to relevance and reliability, you first look at relevance and reliability to determine whether it is relevant and reliable evidence.
>
> This isn't another case that may be similar to our case where we are showing a pattern or plan. That's not it. This is the evidence of our case. And it is ugly. It is disgusting. It is very, very sad, but it is what happened in our case.

*Id.* at 6.

In ruling on the motion, the Court then ruled as follows:

> Well, to give you the heads-up, Counsel, the Court has, of course, reviewed the images as well. Obviously the Court is of the same opinion as counsel, they are very graphic, but I am inclined to agree with the Government. They speak for themselves. They are images of what was occurring at the time. They were done by the Defendant, so obviously they are relevant and they are probative of many of the issues that the Government has to prove.

> *While it is going to be very difficult for the jury in the first instance to be able to put the proper weight that they may ultimately be required to give to those images, I think by the time that the Defense has put on their mitigating evidence that the jurors will be in a better position to act as jurors and judges and give it the proper weight that it deserves.*
>
> It is evidence of the crime as it was occurring, and in my judgment is certainly probative of the relevant facts in this case. It was taken at the time of the incident and by the Defendant himself. So while it is a discretionary call by the Court, I think that my position would be that I would admit them into evidence.

*Id.* at 9-10 (emphasis added).

Unbeknownst to the court at the time of its ruling, there was destined to be no case in mitigation to provide an emotional buffer between the courtroom the jury room. Mr. Duncan was permitted to represent himself and, consistent with his "no defense" defense, presented no mitigating evidence. He did, however, object to the admission of the videos.

Near the end of the sixth day of the government's eligibitiy phase evidence, the following transpired:

> THE COURT: Mr. Moss, is the video the next matter?
> MR. MOSS: Yes, Your Honor. It will be presented through the next witness, yes.
> THE COURT: I just want to alert the people in the back of the courtroom that it is the Court's understanding there may be some graphic videos and/or pictures being presented in this next period of time.
>
> In order to protect the impartiality of the jury, you are instructed to control your emotions and/or reactions to that evidence. If you do not feel you can view the evidence or are not certain that you will be able to control your emotions, please leave the courtroom.
>
> You are specifically admonished that there will be no recording or camera devices allowed in the courtroom and the Marshal Service is instructed to enforce the same. If you return to the courtroom, heed that admonition. Of course, if you do not, that will not be a problem.
>
> We are going to recess for ten minutes.

Corrected Defendant's Motion for Collateral Relief    159    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

(Whereupon, recess taken.)

(Outside presence of the jury.)

THE COURT: For the record, I want the record to show the Court is aware of the motion that was filed on behalf of the family asking the Court to reconsider its previous Order and the response by the media. The Court has respectfully considered the same. This morning I issued a written Order that addresses the matter, but the Court is respectfully denying the motion.
MR. DUNCAN: Your Honor, can I address the Court real quick?
THE COURT: Yes.
MR. DUNCAN: I have never filed any motions or anything in regard to this video. And I would just like to state for the record, before the jury comes in so that it won't be prejudicial, that I strongly object. And I feel like basically this video will be turning the jurors into my victims so that I will be tried not by a jury of peers, but a jury of victims.

That is all.

THE COURT: Objection noted, denied.

RT 2703 -05.

Mr. Duncan again objected when Exhibit Nos. 73, 74, and 75, were offered and admitted. RT 2719. Media coverage of the proceeding was vivid. The *Spokesman-Review* reported, "Nothing previously presented in court could have prepared viewers for the level of violence in the videos . . . As the videos played, one juror turned away and shielded her eyes with her hand, looked back and again and then turned away again, her face contorted. Another covered her mouth with a tissue, sobbing silently." Exh. 98 at 600a. An article in the *Press-Tribune*, with a headline reading "Jurors cringe at graphic videos in Duncan Sentencing" said, "Jurors cringed, cried and some desperately looked away as they were shown a series of deeply disturbing and graphic videos taken by convicted child killer Joseph Edward Duncan III as he tortured, sexually abused and nearly killed a 9-year-old boy." Exh. 98 at 593. "Duncan covered his face during parts of the video, and jurors frequently shot him looks. Two of Duncan's standby attorneys also avoided looking at the screen." *Id.* An article on the KULR website said, "Jurors could be seen

Corrected Defendant's Motion for Collateral Relief     160     *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

wiping their eyes with tissue as the tape was played, some turning their heads during the most graphic parts. Others looked at Duncan during the tape. Duncan didn't watch the beginning of the most graphic part of the video, but watched with a blank stare as the video continued." Exh. 98 at 595.

An October 2008 AP story said that "During the federal trial, jurors watched a video made by Duncan of him molesting and torturing [D.G.]. The case was so graphic that jurors were offered counseling afterward." Exh. 13 at 596. A February 2013 article in the *Idaho Statesman* reported that the jurors were still haunted by what they had seen and heard.

> [M]ore than four years after a federal jury of 12 sentenced Duncan to death, four of the people who served told the Idaho Statesman that they're still haunted by the case and horrified that other citizens might be subjected to what they had to sit through if Duncan gets a new trial.
>
> They share a bond that leads them to meet regularly for dinner or other activities.
>
> We liken it to somebody who's gone to war," said Susan, a bookkeeper in her 50s. "You don't have to talk about it. You just know where you've been."

Exh. 98 at 598.

Although it was undoubtedly unnecessary to say anything about the vidoes in closing, the Government did so, arguing:

> And you saw those horrific, terrifying, horrible details of the video, and the videos that were Exhibit 73, 74 and 75, that the Defendant chose to take and to stage and record of his sexual assault and attempted murder by hanging of D.G..

RT 2786.

> The Defendant was able to physically and sexually abuse him in any way that he saw fit. You saw that in the videos, and the photos, and the attempted hanging at the cabin in -- the hanging and the attempted murder at the cabin on June 22, 2005. And you saw that in all of that, D.G.'s mere nine years, his youth, made him particularly vulnerable.

RT 2807.

In an age of viral videos and reality television, the impact of videographic material cannot be denied.  When comparing hours, days and weeks of dry, often boring, testimony against even an innocuous video, let alone a horrifically impactful one, a jury risks erring in its assessment of proper weight.  The Court acknowledged this when anticipating that the mitigating evidence that was expected to come later in the trial – but never did – might blunt some of the video's force.

Thus, in deciding whether to allow victim impact videos courts have recognized the need to proceed with caution.  *See, e.g., United States v. Sampson*, 335 F. Supp. 2d 166, 191 (D. Mass. 2004) (excluding video of memorial service featuring numerous photographs of victim set to music, which "created a danger of provoking undue sympathy and a verdict based on passion as opposed to reason.")

> [W]hen victim impact evidence is enhanced with music, photographs, or video footage, the risk of unfair prejudice quickly becomes overwhelming. While the video tributes at issue in these cases contained moving portrayals of the lives of the victims, their primary, if not sole, effect was to rouse jurors' sympathy for the victims and increase jurors' antipathy for the capital defendants. The videos added nothing relevant to the jury's deliberations and invited a verdict based on sentiment, rather than reasoned judgment.

*Kelly v. California*, 555 U.S. 1020 (2008) (Stevens, J, dissenting from the denial of certiorari).

Courts also proceed with caution in case involving attempts to introduce gruesome crime scene photographs.  *See, e.g., United States v. Taveras*, 488 F.Supp.2d 246, 254 (E.D.N.Y. 2007) ("The danger of allowing evidence of post-mortem dismemberment is that the jurors may react with such disgust at the defendant's repugnant actions, that they will be unable to carefully weigh the factors necessary to determine a fair sentence.").  *See also Spears v. Mullins*, 343 F.3d 1215, 1227-29 (10th Cir. 2003) (affirming district court's grant of habeas relief on defendants' death sentences based on trial court's admission of six gruesome photographs depicting victim's injuries;

where the photographs were offered in support of a heinous, atrocious or cruel aggravator, which focused on the victim's conscious suffering, and the evidence showed the victim died or lost consciousness early on in his beating, admission of these "highly inflammatory" photographs depicting his numerous post-mortem stab wounds, including large gash wounds, exposed intestines, and swollen face and black eye rendered his penalty phase fundamentally unfair).

The prejudice here is vastly greater than in either the case of victim impact videos or gruesome photographs. The videos here are substantially and qualitatively more shocking and horrifying than gruesome images courts are typically required to confront and evaluate. Additionally, the videos at issue are together, nearly thirty minutes long. These images are not merely photographs of crime scenes or autopsies, depicting victims of completed violent crimes, but rather a live video of the immense physical and psychological suffering of a nine-year-old boy. As such, they are far more powerful because they cause the viewer to relive the child's agony and trauma, as it is happening to him. The experience is excruciating, even for those conditioned to see images of sexual abuse and violence, much less jurors from other walks of life.

The emotional impact of evocative images on the viewer is well documented. *See, e.g.*, Ed S. Tan, Emotions and the Structure of Narrative Film: Film as an Emotion Machine (1996); Gregory Smith and Carl Plantinga, Passionate Views: Thinking About Film and Emotion (1998). Studies have shown that visual presentations account for the vast majority of the information retained by jurors. David Hennes, Comment, "Manufacturing Evidence for Trial: The Prejudicial Implications of Videotaped Crime Scene Reenactments," 142 U. Pa. L. Rev. 2125, 2173 & fn. 292. (1994). "A television videotape, much more than other forms of demonstrative visual evidence, leaves a lasting impression on jurors' mental processes, since its vividness dictates that it will be readily available for cognitive recall." *Id.* at 2180; *see also People v. Dabb*, 32 Cal.2d 491,

498 (1948) (recognizing "the forceful impression made upon the minds of the jurors" by motion pictures).

Research confirms that few studies have been done to measure the prejudicial impact of graphic photographic evidence on jurors' decisions.  *See* Douglas, Lyon & Ogloff, *The Impact of Graphic Photographic Evidence on Mock Jurors' Decisions in a Murder Trial: Probative or Prejudicial*, 21 Law and Human Behavior 485 (1997).  The Douglas, Lyon & Ogloff study investigated the reactions of mock jurors in a murder trial in connection with three different scenarios: (1) participants viewed color photographs depicting an actual homicide victim's injuries; (2) participants viewed black and white photographs depicting the same victim's injuries; and (3) a control group in which no photos were provided, but instead the mock jurors had to rely only on the medical examiner's graphic description of the victim's body that was contained in the transcript provided to all three groups.  *Id.* at 490.

The results of the study showed that those who viewed the photographs of the body, whether color or black and white, were "more likely to report feeling anxious, anguished, disturbed, and shocked" than those in the control group who did not view such photos.  *Id.* at 492.  Those in the control group indicated being significantly less affected emotionally than those who viewed the photographs.  *Id.*  Those who viewed the photos were almost twice as likely to find the accused guilty versus those in the control group.  *Id.* Despite this, there were no differences between the groups when asked if they felt they acted in a fair and unbiased manner in this mock trial.  *Id.* at 494.

Although the participants reported no significant distinctions in recommended sentences, *see id.* at 497, it must be emphasized that impact on sentencing was not the focus of this study.  Moreover, unlike Mr. Duncan's case, the mock jurors were not presented with a situation where

the defendant had already conceded guilt, and their only decision was the type of punishment to impose.  What is striking is the manner in which study participants had their impartiality and neutrality compromised, even unconsciously, when asked to view such graphic photos.

Tied into this notion of unavoidable prejudice to a defendant from the admission of graphic imagery during a capital proceeding is the trauma inflicted on the jurors themselves when required to view such material.  A study of forty jurors involved in four different criminal trials revealed that twenty-seven  reported having discomforting physical and/or physiological symptoms. Stanley M. Kaplan & Carolyn Winget, *The Occupational Hazards of Jury Duty*, 20 Bull. Am. Acad. Psychiatry L. 325 (1992).  Those symptoms ranged from gastrointestinal distress, nervousness, nightmares, heart palpitations, and depression to overt illnesses including increased alcohol intake, hives, peptic ulcer reactivation, anxiety state, and post-traumatic stress disorder.  *Id.* Evidence relating to a murder trial involving a nineteen year old pretty young woman produced the most symptoms among jurors.  *Id.* at 327.  Some comments from interviewed jurors focused on the brutal nature of the explicit photographs viewed during the trial, and how those affected their health.  *Id.* at 328, 332.

The videos and photographs that were introduced in Mr. Duncan's penalty phase were, as is clear from reports of the jurors reactions and the court's decision to offer counseling, even more traumatizing than those addressed in the cases cited in this study.  The content of these images inflicted physical, psychological, and emotional distress on jurors who viewed them.  Jurors who are exposed to such materials are virtually guaranteed to be unable to weigh the evidence fairly are rationally.  They can be expected to do nothing other than express their sentiments and trauma by concluding that death as the only appropriate sentence for Mr. Duncan.

The Federal Death Penalty Act (FDPA) provides that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence al criminal trials, except that information may be excluded if its probative value is *outweighed by the danger of creating unfair prejudice*, confusing the issues, or misleading the jury." *See* 18 U.S.C. §3593(c) (emphasis added). This standard is more demanding than that set forth in Fed.R.Evid. 403, which permits exclusion if the probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury .... " (emphasis added). *See United States v. Sampson*, 486 F.3d 13, 42 (1st Cir. 2007) (recognizing that while Rule 403 requires that probative value be substantially outweighed by the danger of unfair prejudice before evidence may be excluded, the FDPA omits this substantiality requirement and directs that exclusion may result if the scales tip, even slightly, in favor of unfair prejudice); *United States v. Taveras*, 488 F.Supp.2d 246, 250 (E.D.N.Y. 2007) (noting that the "FDPA raises the bar for the admission of prejudicial evidence"); *United States v. Johnson*, 362 F.Supp.2d 1043, 1105 (N.D. Iowa 2007).

The Eighth Amendment also imposes an exacting standard for evidence presented during the penalty phase because of the heightened concern for reliability in death penalty cases. *See Stringer v. Black*, 503 U.S. 222, 230 (l 992); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see also Beck v. Alabama*, 447 U.S. 625, 637-638 (1980) ("[d]eath is a different kind of punishment from any other which may be imposed in this country .... From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion"), *quoting Gardner v. Florida*, 430 U.S. 349, 357-58 (1977)); *Johnson v. Mississippi*, 468 U.S. 957 (1988) (reliance on invalid aggravating factors violates the Eighth Amendment).

Mr. Duncan's guilty plea to all counts of the indictment, and his admission that he intentionally killed D.G., conclusively established Mr. Duncan's intent to kill as required under 18 U.S.C. § 3591(a)(2) and destroyed any reasonable argument that the videos were necessary to demonstrate his intent to kill D.G. *See* Doc. 264 at 8. *See also Old Chief v. United States*, 519 U.S. 172, 184 (1997) (noting that when conducting the probative value/prejudice analysis, district courts may include in their calculations the "evidentiary alternatives" that exist, including a party's willingness to concede the issue to which the challenged evidence pertains). A narrative description of the contents of the video would have been chilling enough to more than adequately make the government's point about moral culpability.

## XI.   CLAIM 9:  THE STATUTE UNDER WHICH MR. DUNCAN WAS CONVICTED DOES NOT CONSTITUTE A "CRIME OF VIOLENCE" AND CANNOT SERVE AS THE BASIS FOR THE DEATH SENTENCE THAT WAS IMPOSED ON HIM UNDER COUNT 7 OF THE INDICTMENT

### A.   Introduction

Mr. Duncan's death sentence on Count 7 of the Indictment was obtained in violation of the laws and Constitutional of the United States in that death is an unauthorized sentence under an unconstitutionally vague statute. The facts in support of this claim are as follows:

The death sentence on Count 7 of the Indictment was imposed under 18 U.S.C. § 924(j). A death sentence under § 924(j) requires a conviction for a "crime of violence" as defined by 18 U.S.C. § 924(c).

Section 924(c)(3) defines "crime of violence" in either of two ways. It must be a felony that:

> (A) Has as an element the use, attempted use, or threatened use of physical force against the person or property of another [the "force" clause], *or*

(B) By its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense [the "residual" clause].

The "crime of violence" alleged in Count 7 was kidnapping as defined by 18 U.S.C. § 1201, which pertains to anyone who "seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds" another person.

The Supreme Court has held language substantially identical to the § 924(c)(3)(B) "residual clause" to be unconstitutionally vague. *Johnson v. United States,* 135 S. Ct. 2551 (2015) (interpreting the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e)). By parity of reasoning the Ninth Circuit has held the § 924(c) residual clause involved herein to be void for vagueness. *Dimaya v. Lynch*, 803 F.3d 1110, 1111 (9th Cir. 2015), *cert. granted sub nom. Lynch v. Dimaya*, 137 S. Ct. 31 (2016).

Recent case law has changed the definition of a "crime of violence" such that kidnapping does not qualify either under the "force clause" or the "residual clause." Under the force clause, courts have concluded that a crime is "violent" only if the most *innocent* conduct penalized by a statute is necessarily a "crime of violence." Moreover, the violence element requires conduct that is intentional and force that is strong, physical, and capable of causing physical pain or injury. Kidnapping under 18 U.S.C. § 1201 requires none of these elements. As such, Mr. Duncan's death sentence on Count 7 must be vacated.

**B. Mr. Duncan's Offense Cannot be Deemed a Crime of Violence under the Residual Clause Because that Clause is Unconstitutionally Vague.**

The Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), contains a residual clause that is nearly identical to the residual clause defined in § 924(c)(3)(B). Recently, in *Johnson v. United States,* 135 S. Ct. 2551 (2015), the Supreme Court held that ACCA's "residual clause" definition of a "violent felony" is unconstitutionally vague. The ACCA provision defined a "violent

Corrected Defendant's Motion for Collateral Relief          168          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

felony" as "any crime punishable by imprisonment for a term exceeding one year [i.e., a felony] ... that ...*involves conduct that presents a serious potential risk of physical injury to another.*" 18 U.S.C. § 924(e)(2)(B)(ii)(emphasis added).

Subsequent to *Johnson*, the Ninth Circuit held in *Dimaya v. Lynch, supra*, 803 F.3d at 1111, that, in the immigration context, the "crime of violence" definition in 18 U.S.C. § 16(b) "suffers from the same indeterminacy as ACCA's residual clause" and is therefore also unconstitutionally vague in violation of the Due Process Clause.  Title 18 U.S.C. § 16(b) defines "crime of violence" in language that is substantially identical to that of § 924(c)(3)(B), as an offense "that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  Indeed, while litigating *Johnson*, the Solicitor General acknowledged that the wording of 18 U.S.C. § 16(b) is "equally susceptible to [the] central objection to the residual clause." *Johnson v. United States*, S. Ct. No. 13-7120, Supplemental Brief of Respondent United States at 22-23 (available at 2015 WL 1284964 at *22-*23).

Because the residual clause found in § 924(c)(3)(B) is identical to that found in 18 U.S.C. § 16(b), it is just as susceptible to a finding of unconstitutionality for vagueness.  Under principles of statutory construction, a term is given the same meaning "when Congress uses the same language in two statutes having similar purposes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion); *see also Northcross v. Board of Ed. of Memphis City Schools*, 412 U.S. 427, 428 (1973) (*per curiam*); *Gomez-Leon*, 545 F.3d 777, 788 (9th Cir. 2008) (definitions of "crime of violence" using the same language are subject to the same construction).  The statutes at issue here—18 U.S.C. § 924(c) and 18 U.S.C. § 16—serve the same purpose of identifying violent crimes and subjecting defendants who commit them to harsher sanctions.

In *Dimaya*, 803 F.3d at 1114, the Ninth Circuit explained why § 16(b), as incorporated into the Immigration and Nationality Act, is—like the ACCA's residual clause— unconstitutionally vague:

> Importantly, both the provision at issue here and ACCA's residual clause are subject to the same mode of analysis. Both are subject to the categorical approach, which demands that courts "look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." *Leocal v. Ashcroft*, 543 U.S. 1, 7 [] (2004). Specifically, courts considering both § 16(b) and the residual clause must decide what a "'usual or ordinary' violation" of the statute entails and then determine how great a risk of injury that "ordinary case" presents. *Rodriguez–Castellon v. Holder*, 733 F.3d 847, 854 (9th Cir. 2013)(quoting *United States v. Ramos–Medina*, 706 F.3d 932, 938 (9th Cir. 2013)).

The *Dimaya* court noted the Supreme Court's recognition of "two features of the ACCA's residual clause that 'conspire[d] to make it unconstitutionally vague.'" 803 F.3d at 1115 (citing *Johnson*, 135 S. Ct. at 2557). First, the clause left "'grave uncertainty' about 'deciding what kind of conduct the 'ordinary case' of a crime involves,'" and thus "'denie[d] fair notice to defendants and invite[d] arbitrary enforcement by judges' because it 'tie[d] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements.'" *Id.* Second, the "ACCA's residual clause left 'uncertainty about how much risk it takes for a crime to qualify as a violent felony.'" *Id.* (citing *Johnson*, 135 S. Ct. at 2558). The *Dimaya* court held that "because of the same combination of indeterminate inquiries, § 16(b) is subject to identical unpredictability and arbitrariness as ACCA's residual clause" and is therefore also void for vagueness. *Id.* As the *Dimaya* court concluded, these vagueness concerns rise to the level of a Due Process violation in the immigration context because of the harsh consequences of deportation. *Id.* at 1113. Due Process concerns, however, are even more pronounced in the context of a criminal statute like § 924(c), under which a conviction subjects the defendant to a complete deprivation of liberty. *Johnson*, 135 S. Ct. at 2557.

Courts interpret § 924(c)(3)(B) in exactly the same manner as they interpret § 16(b) in the immigration context. *See Park v. INS*, 252 F.3d 1019, 1021-22, 1025 (9th Cir. 2001) (relying on § 924(c)(3)(B) case, *United States v. Springfield*, 829 F.2d 860 (9th Cir. 1987), in holding that an offense is a crime of violence under § 16(b) as incorporated into the INA), *overruled on other grounds, Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121 (9th Cir. 2006). Indeed, the Ninth Circuit has held § 16(b) is the "equivalent" of § 924 (c)(3)(B). *See United States v. Mendez*, 992 F.2d 1488, 1492 (9th Cir. 1993).

As with § 16(b), courts use the categorical approach to determine as a matter of law whether an offense qualifies as a crime of violence under § 924(c)(3)(B). Both § 16(b) and 924(c)(3)(B) require courts to discern what the ordinary case of a crime is by examining the elements using a categorical approach. *See, e.g., United States v. Butler*, 496 Fed. Appx. 158, 161 n. 4 (3d Cir. 2012); *Evans v. Zych*, 644 F.3d 447, 453 (6th Cir. 2011); *United States v. Serafin*, 562 F.3d 1104, 1108 (10th Cir. 2009); *United States v. Green*, 521 F.3d 929, 932 (8th Cir. 2008); *United States v. Acosta*, 470 F.3d 132, 134 (2d Cir. 2006); *United States v. Amparo*, 68 F.3d 1222, 1225 (9th Cir. 1995).

Courts may not consider the factual means of committing any given offense, but must consider the nature of the offense in the "ordinary case," regardless of whether § 924(c)(3)(B), § 16(b), or the ACCA is at issue. *See, e.g., United States v. Fuertes*, 2015 U.S. App. LEXIS 14475. *28-*30 (4tn Cir. Aug. 18, 2015); *United States v. Naughton*, 2015 U.S. App. LEXIS 15592 ,*14-*19 (4th Cir. Sept. 2, 2015).

Accordingly, the "residual" clause found in 18 U.S.C. § 924(c) must be deemed unconstitutionally vague and cannot support a finding that the crime for which Mr. Duncan was convicted was a "crime of violence" subject to the enhanced punishment of death under 18 U.S.C.

Corrected Defendant's Motion for Collateral Relief    171    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

§ 924(j).

### C. Kidnapping, As Defined by 18 U.S.C. § 1201 (a), Is Not a Crime of Violence Under the "Force" Clause of § 924(c)(3)(A), Because It Does Not Have As An Necessary Element, the Use, Attempted Use, or Threatened Use of Physical Force Against the Person or Property of Another.

#### 1. The principles of analysis

To determine whether a crime constitutes a "crime of violence," such that it may be subject to enhanced sentencing, courts must adhere to the following fundamental principles: First, the courts apply a "categorical" approach to determining whether a crime is or is not a crime of violence. It makes no difference how the crime was actually committed in the particular case. The court may only look to whether the crime's _elements_ require the use of force. *See Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013); *United States v. Royal*, 731 F.3d 333, 341-42 (4th Cir. 2014); *see also United States v. Serafin*, 562 F.3d 1105, 1107-08 (10th Cir. 2009); *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006). This approach requires that courts "look only to the statutory definitions – *i.e.,* the elements – of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a "crime of violence." *Descamps*, 133 S. Ct. at 2283 (citation omitted); *Royal*, 731 F.3d at 341-42; *Serafin*, 562 F.3d at 1107; *Acosta*, 470 F.3d at 135.

Second, under the categorical approach, an offense can only qualify as a "crime of violence" if the most innocent conduct encompassed by the elements constitutes a "crime of violence." *United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012).

Third, the force contemplated by the statute is "physical force." "Physical force" has been interpreted by the courts to mean "*violent* force" – that is "strong physical force," which is "capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (emphasis in original).

Corrected Defendant's Motion for Collateral Relief     172     *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

Fourth, the use of force must be intentional.  Indeed, every circuit has held this to be the case.  Thus, if one can violate the statute by using force in a manner that does not require intentionality, the crime does not constitute a crime of violence for purposes of 18 U.S.C. § 924(c).  The Courts of Appeals have almost uniformly held that recklessness is not sufficient.  *See United States v. Palomino Garcia*, 606 F. 3d 1317, 1335-1336 (11th Cir.2010); *Jimenez- Gonzalez v. Mukasey*, 548 F. 3d 557, 560 (7th Cir. 2008); *United States v. Zuniga-Soto*, 527 F. 3d 1110, 1124 (10th Cir. 2008); *United States v. Torres-Villalobos*, 487 F. 3d 607, 615-616 (8th Cir. 2007); *United States v. Portela*, 469 F. 3d 496, 499 (6th Cir. 2006); *Fernandez-Ruiz v. Gonzales*, 466 F. 3d 1121, 1127-1132 (9th Cir. 2006) (*en banc*); *Garcia v. Gonzales*, 455 F. 3d 465, 468-469 (4th Cir. 2006); *Oyebanji v. Gonzales*, 418 F. 3d 260, 263-265 (3d Cir. 2005) (Alito, J.); *Jobson v. Ashcroft*, 326 F. 3d 367, 373 (2d Cir. 2003); *United States v. Chapa-Garza*, 243 F. 3d 921, 926 (5th Cir. 2001).  *But see United States v. Booker*, 644 F. 3d 12, 19-20 (1st Cir. 2011) (noting that the First Circuit had not resolved the recklessness issue).

Mr. Duncan was charged in Count 1 with the commission of a kidnapping under 18 U.S.C. § 1201 (a) that resulted in death.  Because that offense does not have as a necessary element the intentional use, attempted use, or threatened use of strong physical force against a person or property of another, it is not a "crime of violence" within the meaning of § 924(c).

### 2.   Kidnapping does not require the use of force

Title 18 U.S.C. § 1201 applies to anyone who "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person."  At common law, kidnapping involved a taking by use of force, but that is not the definition used by § 1201.  *United States v. Young*, 512 F.2d 321, 323 (4th Cir. 1975). "Comprehensive language was used to cover every possible variety of kidnaping followed by

Corrected Defendant's Motion for Collateral Relief                173                *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

interstate transportation." *Chatwin v. United States*, 326 U.S. 455, 463, (1946). Section 1201 applies to kidnappings accomplished solely by the "seduction of victims," *i.e.,* by the inveigling or decoying of kidnapping victims. In *United States v. Hoog*, 504 F.2d 45 (8th Cir. 1974), the court held that kidnapping victims who accepted ride from person who led them to believe that he would take them to their desired destinations were "inveigled" or "decoyed" into accepting rides within meaning of federal kidnapping statute.

Similarly, kidnapping where death results does not require the use force. In *United States v. Torres–Miguel*, 701 F.3d 165 (4th Cir. 2012), the Fourth Circuit held that "[a]n offense that *results* in physical injury, but does not involve the *use or threatened use* of force, simply does not meet the Guidelines definition of crime of violence." *Id.* at 168 (emphasis added). According to *Torres-Migues*, "a crime may result in death or serious injury without involving use of physical force." *Id. See also, Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d Cir. 2003); *United States v. Perez-Vargas*, 414 F.3d 1282, 1287 (10th Cir. 2005).

Statutes providing for *enhanced* penalties where "death results" from the offense do not require an intent to kill. *United States v. Hicks*, 103 F.3d 837, 848–49 (9th Cir. 1996). *See also United States v. Tocco*, 135 F.3d 116, 130–31 (2d Cir. 1998); (interpreting federal sentencing guidelines); *United States v. Melton*, 970 F.2d 1328, 1334 (4th Cir. 1992).

### D. Conclusion

For all the foregoing reasons, Mr. Duncan's convictions do not qualify as "crimes of violence" under 18 U.S.C. § 924(c). Hence, they cannot be used as sentence enhancers under 18 U.S.C. § 924(j). Accordingly, Mr. Duncan's death sentence, which was imposed pursuant to 18 U.S.C. § 924(j), must be deemed invalid and vacated.

## XII.  CLAIM 10:  THE COURT VIOLATED MR. DUNCAN'S RIGHT TO DUE PROCESS BY ACCEPTING A WAIVER OF APPEAL THAT WAS NEITHER CLEAR AND UNEQUIVOCAL NOR KNOWING, INTELLIGENT OR VOLUNTARY

On remand from the Ninth Circuit, the Court found Mr. Duncan had been competent at the time he purportedly waived his appeal, and repeated its statement made at the conclusion of the November 24, 2008 hearing that the waiver was knowing, intelligent, and voluntary.  Doc. 843 at 59 n. 6, 63.

The record of the November 24, 2008 hearing, viewed in light of the totality of evidence at the retrospective competency hearing, including the testimony of the experts called by the prosecution, establishes the invalidity of Mr. Duncan's purported waiver.  The Court began the November 24, 2008, hearing by announcing its intent to inquire of Mr. Duncan "for the Ninth Circuit to understand exactly what your position is." 11/24/08 RT 7. Mr. Duncan's disordered thinking immediately became an obstacle to any such understanding.  In response to the simple yes-or-no question, "Mr. Duncan, do you understand you have a right to file an appeal?," Mr. Duncan responded:

> I understand it I think as it was meant to be understood. In other words, Your Honor, I have – I don't know what the word for it is, but philosophical reservations about my understanding that extend beyond the intended understanding. In other words, my understanding goes beyond the intended understanding rather than below.

*Id.* at 8.

Not surprisingly, the Court sought a more direct answer and tried again:  "[Y]ou have a right to have that sentence reviewed by the Court of Appeals, if you desire to do so, in its entirety. That is what I am asking you.  Do you understandthat?"  Mr. Duncan replied:

> I think at this point I should be as clear as possible because I realize the decision you are trying to make and I want to help you make that decision as best as I can by letting you know my position. If I get out of line, of course,

Corrected Defendant's Motion for Collateral Relief       175       *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

> I will try and curb my comments. But the affidavit that I wrote that I intended to file that is only missing a cover page right now, it states in there, I don't know, I was talking to the attorneys about it earlier, I don't know if it is clear or not, but to me it seemed clear that what I was trying to say is that in my opinion this whole proceeding is criminal, and as a criminal proceeding, any appeal doesn't make any sense.
>
> And so I understand the intention and I understand the criminal mind you might say of society. But in that regard I understand the intention of the appeal, the philosophy behind the appeal, the theory behind the appeal. You know, I know a lot. I am an educated person—well, I'm not saying I know everything, but I know enough to have an opinion about, you know, what the appeal means, which it goes beyond the normal opinion of what the appeal means.

*Id.* at 9-10.

The Court responded by saying that "[w]hether [the death judgment] is a continuation of a crime in your mind is not the issue," *id.* at 10, and asked once again whether "you understand you have a right to that [appellate] process." *Id.*

> MR. DUNCAN: I want to be as clear as possible. You have to excuse me if I am not being clear. But I don't believe that this Court has the authority to grant such a right or a right as that. And so on the surface I can say honestly that I understand your intention of granting me that, what you call a right, but—and I accept your intention. I'm not opposed to your intention. I accept that. That is your view, that is your world, that is your law, but it is not mine and I don't accept it.
>
> But at the same time I don't reject it. I am neutral. I wish to allow you to do what you feel you need to do. I will allow the attorneys to do what they feel they need to do.
>
> Now, to answer your question, I want to get back to it, I am not avoiding your question or evading it. I will answer your question. And my answer is in that context my answer is I certainly understand my right, my right in quotes, and I have no desire, as I mentioned in the letter I wrote to you, to invoke it.

*Id.* at 9-10 (emphasis added).

The Court then told Mr. Duncan that "we are going to have to get away from the theoretical or how you view it in your own mind," *id.* at 11, and then asked again whether he

Corrected Defendant's Motion for Collateral Relief                176                *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

understood he had a right to an appeal. Finally, Mr. Duncan answered simply, "Yes." *Id.* at 12.

With that hurdle cleared, eliciting a waiver of that right was initially less problematic

> THE COURT: [I]s it your decision not to appeal or is your position that you want to appeal the verdicts of the jury as well as the sentence of the Court?
> MR. DUNCAN: My choice is to not appeal.

*Id.*

Despite the fact that Mr. Duncan had just said that he "was neutral" regarding an appeal and "will allow the attorneys to do what they feel they need to do," the court did not ask Mr. Duncan to elaborate on what he meant by his "choice." But, the proceedings nevertheless soon hit another hurdle—Mr. Duncan was not so easily quieted. After the court told Mr. Duncan that for a few more days he could still change his mind, Mr. Duncan asked:

> MR. DUNCAN: Your Honor, can I say one more thing real quick?
> THE COURT: Certainly.
> MR. DUNCAN: Just to clean up some of the things I said. I consider the system criminal, but at the same time I'm not in a position to judge the system. So in other words, that is why I must allow the system to do what it needs to do, that it feels is the correct thing to do, without judging it.
>
> In other words, what I am saying is that my view is that— well, I'm not going to say what my view is because that is not what is important. What I am saying now is my view is my view and I recognize it as my view, and my view is limited and has a clear history of being in error. Therefore, I have to acknowledge that my view is not the end all, my view is not, you know, but at the same time I have to take responsibility for my view. I have to own my view. I have to be—that is all I have is my view and that is what I am saying.
>
> But at the same time what I am trying to say is I respect your view, and I respect my attorneys' view, and I respect the prosecutors' view, and I respect society's view. That doesn't mean I agree with it, you know, but I respect it and I allow you to have that view. I think that is important to understand also.

*Id.* at 13-14. Faced with this perplexing equivocation, the court tried to lead Mr. Duncan back to a simple yes-or-no response:

THE COURT: I do not feel it is appropriate or even necessary for the Court to try to get into some kind of philosophical argument or discussion with you. Again, we have to come back around to the fact that you, just like everybody else in the United States under the United States Constitution, has a right to have these matters reviewed and appealed to a circuit court that reviews the entire record and makes their own individual judgments concerning whether there was error by this Court, or that something was not properly handled by the Court, or that the jury's verdict was not supported by the evidence. So it is again a completely independent review of the record and you have a right to that, as the Court has explained previously.

You have a right, however, to waive that right so long as it is done unequivocally and knowingly and voluntarily. That is what I am trying to make sure the record is clear on so that it does not have to go up to the Ninth Circuit and then be sent back because it is unclear as to what your position was.

So while you may not agree with the system or you feel the system is committing some separate crime on its own, we are not talking about those matters, we are just simply talking about your right to have this matter appealed and reviewed by the Ninth Circuit. What I believe you have told me is that you have made up your mind that you do not desire to appeal this issue or these matters and that you are doing that voluntarily and of your own free will, but I don't want to put words in your mouth.

Is that what you are telling me or are you telling me that you do desire to have this reviewed independently by the Ninth Circuit Court?

*Id.* at 14-15.

The following then transpired:

MR. DUNCAN: Your Honor, can I confer with counsel for one moment?
THE COURT: Certainly.
(Conferring with standby counsel.)
THE COURT: Mr. Duncan, you have had a chance to confer with counsel. What is it you would like to say to the Court?
MR. DUNCAN: I guess there is some concern about – I realize the purpose of this hearing is not to get into a philosophical discussion and I am trying to avoid that, I really am. At the same time I do want the Court to understand where I am coming from, how I feel about appealing.

To answer your question directly, my answers are very clear: I do not have any intention of appealing. I understand the process, I understand the law, I understand the history of the law, where it comes from going all the way back to Rome and before that, the beginning of mankind. I'm not saying

my understanding is perfect, but in other words, I have an extensive understanding of the whole process.

But the reason I chose to represent myself, the reason why I asked my counsel to step down and allow me to make some decisions in this case is not because I wanted to participate, but because I didn't want to participate.

I want you, I want the Court, I want society, I want the prosecutors, I want my attorneys, I want everyone to do this without me. I want you to make your choices. I don't want to be a part of that decision-making process.

That is why I defended myself the way I defended myself, by not defending myself. My answer to the Court was my argument is no argument, Your Honor. I don't want to argue. I don't want to get involved in the rationalization process of killing again. And so it becomes philosophical and I apologize for that.

My position is that the system has a choice to make. I've made my choices and now you have to make yours as a system, as society or whatever you want to call it. And I want to allow and I want to accept that choice, but I don't want to participate in it.

*Id.* at 16-17.

The Court then asked Mr. Duncan whether he had authorized counsel to file the notice of appeal, to which he responded:

MR. DUNCAN: No, I did not. That needs to be clarified, too. We had a discussion on it. And I didn't -- in the discussion I told them, "You do what you feel you need to do. You know my position and my position is I do not want to appeal. But if you feel that you need to do something, you know, I don't want to get in your way and I don't want to interfere," and they took that as permission.

*Id.* at 17-18.

The Court then asked again whether Mr. Duncan had given counsel permission to file an appeal. *Id.* at 18. In response to Mr. Duncan's request to confer with counsel, the court told him, "I just want an answer, yes or no." *Id.* Mr. Duncan said, "No." *Id.*

In response to the court's follow-up question, "Do you want to appeal this matter or do you not?," Mr. Duncan responded "I do not" and the Court immediately found that Mr. Duncan had

competently and unequivocally waived his right to appeal.  The Court also found that the waiver was knowing and intelligent because "the Court has informed you of the serious ramifications of your decision [and] you acknowledge that standby counsel have also counseled you." *Id.* at 20-21. The same day, Mr. Duncan filed an affidavit attempting to further explain his position.  It provides in relevant part:

> Up until now I have personally filed no litigation or other documents in regard to this case. All filings have been executed by the attorneys who were assigned to represent either the government or the "defendant" (myself) and in any case I have generally been opposed to all filings and have consistently expressed my opinion accordingly, though I have never asserted my opinion in any other way (i.e. by attempting to prevent filings that I was opposed to, with the exception of informing the court that I do not wish to appeal). My position has been, and remains, that this case is more about them (and society in general) than it is about me, so I should allow them (and society in general) to do as they think they should so that they can learn from their own mistakes as I have learned from mine.
>
> After reviewing some of the numerous documents that have been filed I've decided that it is in the interest of the Truth (my best interest) to file at least one document stating my position in this matter as clearly as literarily (s*ic*) possible. I feel now is the time for such a document to be filed since society by-and-large has already made its decision and I have no intention of prolonging the process by appealing, so my words should have no bearing on the choice that society has made in this matter.
>
> (Not attempting to influence society's choice is important to me since I have realized that the choices we make are our own, and no one outside of ourselves under any circumstance (or delusion) is responsible for the choices we make. Nobody and no circumstance can "make us" choose anything, though we can allow ourselves to be deceived (i.e. deceive ourselves). The true consequences of the choices we make fall back upon the ones making the choice, always, without exception. So society must be allowed to choose for itself, so it, as a whole, can learn this valuable truth.)
>
> * * * * *
>
> So this is why I focus my energy and attention on my inner self, because I know that as a limited being I am a reflection of this world, and this society. And as a reflection the only power I have to change the world is the power to change myself--if the reflection changes, then what is reflected must also change. What the "Church of American Justice" (or the so called "Criminal

Justice System") does to fight "evil" is trivial by comparison to this task, and most of the time even contrary to it. This is why I pay little heed to the plethora of documents and proceedings that use my name in their attempts to further justify the system's own delusional murderous rampage (i.e. "insanity").

\* \* \* \* \*

I have learned that the true heinousness of my crimes was far worse than merely murdering children; it was murdering the Living Truth within my being. In fact, the act of murdering children was a mere shadow--or reflection--of this greater crime. This is why I have said in open court that "You people really don't have any clue yet of the true heinousness of what I have done ..." because if you did you could not possibly be so eager to do the same thing yourselves. Rape and murder are no more than symptoms of the one true crime; the crime of denying the truth within ourselves. And this is why (or at least the best simile of why that my words can represent) that I have objected to nearly every piece of litigation filed in this case by the people who have been appointed to represent me. They are caught up in the illusion that the Truth is something that exists outside of themselves and that it can be manipulated to represent their own view of how things should be. Capital punishment--what society calls justice--is nothing more than the result of the same delusional thinking--and just another reflection of the greater crime--only much worse than even murdering children, because it affects the conscience of so many more people, not to mention ultimately resulting in more children being raped and murdered, or even worse ... led away from the living Truth within their own being! (The very crime that I believe the legendary man/god Jesus was referring to when he spoke of leading children to harm).

So clearly, I view the system's desire to kill me is a crime far worse than my own, yet stemming from the same root cause. I understand what brings such "evil" into this world (I generally equate the word "evil" with the word "deception"), and I know that it cannot be overcome by fighting it on its terms. So I refuse to "defend" myself in the public arena called a courtroom (where deception ("evil") has the advantage) much as early Roman Christian's refused to defend themselves in the public arenas of their day (which were also thought of as perfectly reasonable "Criminal Justice Systems").

\* \* \* \* \*

I will no longer condemn society even as it condemns me. No man, no church and no government has the authority to judge another living being. We are each given only the authority to judge ourselves (if we so choose), and when we seek to judge others it is only ourselves that we are judging.

Corrected Defendant's Motion for Collateral Relief          181          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

> Someday all people will understand and cherish this Truth. And I know in my own heart that even if my words are mocked today, someday they will be heard by people who know and honor this Truth. These people will be (and already are) my brothers and sisters, and no amount of time or space, or even death can separate me from them.

Doc. 613.

Because the matter had been remanded only as to the competency question, no direct evidence or argument on the related questions was presented. However, in clinical interviews conducted by the expert witnesses who testified on remand, Mr. Duncan explained he wrote the court as a "courtesy" to let the court know that the notice of appeal filed in his name was not at his behest. His letter was an attempt "not to interfere" so that the court would not be "deluded." Retrospective Competency Exh. II at 170, 174-75, 178. Mr. Duncan did not expect the court to "cancel the appeal" in response to his letter. *Id.* at 11.

Mr. Duncan's equivocal and ambiguous responses to the district court's questions whether he wished to appeal his conviction and sentence are described in detail *supra*. The proceeding brought out no clear, unequivocal and voluntary relinquishment of a known right. Despite the district court's considerable effort to squelch discussion of Mr. Duncan's irrational, deluded thought process, his disordered ruminations pervade the record. To the extent that Mr. Duncan made anything clear it was simply that he wished not to do anything to facilitate an appeal in order to leave it solely up to the "System" whether there would be an appeal. Neither this Court nor anyone else ever advised Mr. Duncan that his failing to participate in an appeal of the conviction and sentence is precisely what would authorize an appeal of the competency and purported appeal waiver proceedings. *See Mason ex rel. Marson, supra,* 5 F.3d 1220. Thus, Mr. Duncan's "choice" not to authorize an appeal that he attempted to exercise at the hearing was uninformed and unintelligently made.

## A. Mr. Duncan Expressed No Clear and Unequivocal Desire That His Conviction and Sentence Not Be Appealed

Mr. Duncan's prior, now-rescinded, statement of desire not to endorse an appeal is atypical not only because it was the result of a psychotic thought process, but also because of his stance in general. He is not one of those individuals to which the literature refers as a "volunteer" for execution. Such individuals usually fall into one of two categories: "(1) those suffering from psychological illnesses characterized by suicidal impulses who, for whatever reasons, are unable to commit the act themselves and seek the State's assistance through the death penalty; and (2) those suffering, both physically and psychologically, from the combined stress of being condemned to die at some indefinite point in the future while being confined for prolonged periods in brutalizing and dehumanizing conditions on 'death rows' across the country." G. Strafer, "*Volunteering for Execution: Competency, Voluntariness and the Propriety of Third Party Intervention*," 74 J. Crim. L. & Criminology 860, 862 (1983); *see e.g.*, *Gilmore v. Utah*, 429 U.S. 1012, 1015 (1976) (quoting Mr. Gilmore's statement that "he did not 'care to languish in prison for another day'"); *Massie v. Sumner*, 624 F.2d 72, 73 (9th Cir. 1980) (noting that Mr. Massie found "execution preferable to spending a lengthy period incarcerated on death row"). Mr. Duncan has been incarcerated for most of his life, and his stated goal is neither to escape confinement nor to die. In the FBI interviews that were used to support the Government's motion to strike the notice of appeal, he specifically stated:

> It's like I said, it's not that I want to die. I don't want to die, so if my attorneys want to file an appeal, and I told them this too, just to be honest. You know I told them, "If you want to file an appeal, if you can find some way to file an appeal without my permission, then I'm not going to try to stop you. Go right ahead."

Doc. 606 (Gneckow affidavit at 4.) Little else about the "waiver" or its reasons is as clear.

This equivocal and unreliable shift pervades the entire proceeding. "[M]y words [regarding the

Corrected Defendant's Motion for Collateral Relief    183    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

appeal] should have no bearing on the choice that society has made in this matter." Doc. 613. "I want the Court, I want society, I want the prosecutors, I want my attorneys, I want everyone to do this without me. I want you to make your choices. I don't want to be a part of that decision-making process." 11/24/08 RT 17. "I've made my choices and now you have to make yours as a system, as society or whatever you want to call it. And I want to allow and I want to accept that choice, but I don't want to participate in it." *Id.* "I am neutral [regarding an appeal]. I wish to allow you to do what you feel you need to do. I will allow the attorneys to do what they feel they need to do." *Id.* at 11. "I told [the attorneys], 'If you want to file an appeal, if you can find some way to file an appeal without my permission, then I'm not going to try to stop you. Go right ahead.'" Doc. 606.

Mr. Duncan was agnostic about an appeal until he was cornered. It is true that he ultimately stated that it was his desire that there not be an appeal. This was only the result, however, of the Court's insistence that he not elaborate, confer with counsel, or answer anything but "yes" or "no." The district court's error of attempting to isolate Mr. Duncan's final response from "the philosophical arguments you have been making," 11/24/08 RT 20, or from "how you view it in your mind," *id.* at 11, was fundamental. Having repeatedly stated that the lawyers were free to do as they chose provided he did not have to give his personal authorization, the only possible answer—whether truthful or not—to the follow-up question of whether that statement should be construed as his personal authorization was "no."

This philosophical view of the act of *authorizing* an appeal, as opposed to merely *having* an appeal, makes this case unlike any other of which counsel is aware. Even before he decided to authorize an appeal, Mr. Duncan did not express a wish to be put to death, did not accept the appropriateness of the punishment, and appeared not to object to there being an appeal. His

Corrected Defendant's Motion for Collateral Relief          184          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

position was simply philosophical, a refusal to give affirmative authorization. This refusal was based on an entirely delusional belief that such refusal will bring about a worldwide epiphany of Truth, including truth that all killing, even state-sanctioned killing, is wrong. He has a grandiose delusion that he is on a higher plane of understanding which he wants the rest of the world to attain, but it could do so only if he declined to interfere with the world's spiritual evolution.

### B. The Record Establishes that the Purported Waiver Was Anything But Knowing, Intelligent and Voluntary

The record is replete with statements indicating that Mr. Duncan's view of an appeal bears little resemblance to reality. *See e.g.,* 11/24/08 RT at 10 ("... I don't believe that this Court has the authority to grant such a right [to appeal] or a right as that. And so on the surface I can say honestly that I understand your intention of granting me that, what you call a right, but -- and I accept your intention. I'm not opposed to your intention. I accept that. That is your view, that is your world, that is your law, but it is not mine and I don't accept it."); *id.* at 9 ("I don't know if it is clear or not, but to me it seemed clear that what I was trying to say is that in my opinion this whole proceeding is criminal, and as a criminal proceeding, any appeal doesn't make any sense.") A waiver "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *Boykin v. Alabama,* 395 U.S. 238, 243 (1969) (*citing Johnson v. Zerbst,* 304 U.S. 458, 466 (1938)). Mr. Duncan's statements revealed an insufficient rational and factual understanding of the consequences of waiving review. The record on remand makes clear that he did not understand that death would be the likely outcome of a decision not to authorize an appeal, and, unlike the majority of inmates involved in waiving review, he provided no reassuring statement that death was his ultimate goal.

Instead, he said that what he sought was the world's enlightenment, an event dependent not on whether he lives or dies but only on his steadfast adherence to a principle of non-interference,

*i.e.*, his belief that we can only reach a state of enlightenment if he refuses to lead the way. As such, his actions could not be based on a knowing and intelligent choice made voluntarily, but only one entirely dictated by his delusional belief system in the service of a delusional goal. In the parlance of *Rees v. Peyton*, 384 U.S. 312, 314 (1966) rather than making a knowing, intelligent, and voluntary choice, he was reacting to "a mental disease, disorder, or defect which [was] substantially affect[ing] his [decisional] capacity."

### C.  Neither the Court Nor Counsel Adequately Advised Mr. Duncan that Appellate Proceedings Would be Initiated Whether or Not He Stated He Wanted to Appeal

To the extent that any clear position eventually emerged from hearing, it was one of indifference to whether an appeal would be prosecuted on his behalf. All that mattered to Mr. Duncan, as he indicated, was that he personally take no action to endorse or facilitate such appeal, because to him all litigation was antithetical to Truth. Having received enlightenment, he no longer concerned himself with attempting to influence the actions of others. In his view others should be free to do as they chose, even if it leads them to turn from Truth in a deluded belief that any of this matters.

Neither the court nor counsel ever advised Mr. Duncan that his choices were limited to: (1) authorizing an appeal of the conviction and sentence on the one hand by endorsing counsel's notice of appeal; or (2) authorizing an appeal of the flawed competency proceeding and purported appellate waiver by disavowing counsel's notice of appeal. Mr. Duncan clearly expressed a willingness to have counsel appeal if they could do so despite his desire not to participate. He was advised, as he should have been, that under *Mason ex rel. Marson v. Vasquez*, 5 F.3d 1220, 1225 (9th Cir. 1993), counsel would be entitled to file an appeal not *in spite of* his non-authorization, but *because of* his non-authorization. Mr. Duncan was therefore unaware that the consequences of his "choice" not to participate in appeal were the exact opposite of what he supposedly hoped to

accomplish.

The purported waiver was therefore invalid. "Because a waiver is an 'intentional relinquishment or abandonment of a known right,' a trial court should make sure that a defendant knows what the right guarantees before waiving it." *United States v. Cochran*, 770 F.2d 850, 852 (9th Cir. 1985) (*quoting Johnson v. Zerbst, supra*, 304 U.S. at 464.).  As explained by the Supreme Court, the purpose of the "'knowing and voluntary' inquiry ... is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision." *Godinez v. Moran, supra*, 509 U.S. 389, 401 n.12 (1993) (emphasis in original).  An uninformed waiver decision is not knowing and intelligent.  *See Summerlin v. Schriro*, 427 F.3d 623, 639 (9th Cir. 2005).

Mr. Duncan's purported waiver of appeal was invalid.  It was neither knowing nor intelligent.

### D.  Subsequent to the Invalid Acceptance of Waiver and Prior to the Nunc Pro Tunc Competency Finding, Mr. Duncan Repeatedly Sought to Invoke His Right to Appeal

On or about December 9, 2010, Mr. Duncan wrote to the Ninth Circuit to state that he wished to repudiate his statements regarding an appeal of his conviction and sentence that the district court construed as an appellate waiver.  *United States v. Duncan*, No. 08-99031, Doc. 76-2 ("I hereby inform you, and any others concerned, that I withdraw my waiver of appeal, and consent fully to all efforts and advice given by my attorneys to appeal.")  The record in this case shows that he has continued in his approval of appeal since then.  *See* RCHT 2025-31 (Testimony of Dr. Roesch); RCHT 5788-5801 (Testimony of Dr. Woods, M.D.); Retrospective Competency Exh. JJ (Transcript of Videotaped Proceedings) at 75-78.

In its subsequent decision of counsel's appeal, the *United States v. Duncan*, 643 F.3d 1242, 1247 (9th Cir. 2011), which found this Court's acceptance of the appellate waiver to have been

Corrected Defendant's Motion for Collateral Relief    187    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

improper, the Court wrote:

> Shortly before argument, standby counsel informed us that Defendant ... now wishes to endorse this appeal. We need not decide whether a defendant may withdraw his waiver of appeal... Standby counsel may press [that] argument[] if, after the competency hearing for which we remand, they deem it appropriate to do so.

*Id.* at 1247 n. 2.

On appeal of this Court's retrospective competency finding, Mr. Duncan did so by means of a "Motion to Reinstate Appeal of Judgment of Conviction and Sentence," filed in Ninth Circuit Case No. 13-99011 on November 26, 2014 (9th Cir. Doc. 40). In response to a motion filed by the Government, the Ninth Circuit directed the parties to be prepared to discuss the motion at oral argument. Following oral argument, the court denied the motion without explanation. The ruling on the motion read in its entirety: "Defendant's motion to reinstate his appeal, filed initially in this court on December 24, 2010, and renewed on November 24, 2014, is DENIED." (9th Cir. Doc. 55-1 at 4.)

The Court made no mention of Mr. Duncan's argument that a failure of the court to conduct appellate review of the sentence would render the FDPA unconstitutional as applied to Mr. Duncan.

### E.  Conclusion

As a result of all of the foregoing facts, and related facts set forth elsewhere in this application, Mr. Duncan was unconstitutionally denied his right to appellate review and his Eighth Amendment right to a reliable determination of sentence.

## XIII.   CLAIM 11:  THE COMBINATION OF PROBLEMS AT EVERY STEP OF THE PROCEEDINGS, DEPRIVED MR. DUNCAN OF FAIR AND RELIABLE PROCEEDINGS AND THE DUE PROCESS TO WHICH HE WAS ENTITLED

A constellation of interlocking errors, some of which are set forth herein as separate and independent constitutional violations, resulted in a death sentence that was produced without meaningful adversarial testing or compliance with procedural protections recognized as fundamental to Eighth Amendment and Due Process requirements.  Each event before, during and after the trial combined to strip away, one by one, the procedural safeguards intended to insure the reliability of death sentencing procedures.  Virtually everything that could have gone wrong did go wrong.  As a result Mr. Duncan's trial proceedings were fundamentally, fatally flawed.

As set forth in more detail in Claims 1, 2, and 3, from the appointment of Roger Peven to the appointment of Judy Clarke, Mr. Duncan was denied his constitutional and statutory rights to the effective assistance of counsel by virtue of Mr. Peven's personal and professional problems, including depression and alcoholism.  By the time of Ms. Clarke's appointment as counsel she was unable to repair the damage, especially in light of the Court's refusal to allow adequate time to prepare.  In total desperation, the defense encouraged Mr. Duncan to plead with the hope of gaining additional time to prepare a case in mitigation of penalty.

Instead, in the face of serious questions about his competency to proceed, let alone represent himself, the Court permitted Mr. Duncan to waive counsel and engage in his irrational "no defense defense" by which he sought to demonstrate to Society that "Truth" was best communicated through silence.  But the opportunity to present the heartrending facts of this case against no defense was not enough for the Government.  The case was tried to a jury strongly in favor of the death penalty in general and whose *voir dire* revealed even stronger support for death on the type of facts involved in this case.  Although the Court excluded some of the Government's

evidence, the inflammatory nature of the cumulative and unnecessarily evidence ran to the extreme. The Government was permitted to introduce evidence that Mr. Duncan had previously murdered three other children, purportedly to show that Mr. Duncan would pose a danger to other inmates or staff at a maximum security prison. The Government was also permitted to show the jury a vividly horrific half-hour long video whose prejudicial effect vastly outweighed its probative value. Although the Court somewhat curtailed the Government's effort to exceed the permissible bounds of victim impact evidence, in a case where the victim was anything but a "faceless stranger" to the proceeding, the Government was nonetheless allowed to present far more than a "brief glimpse of the life" that was extinguished.

Then, when questions were raised about Mr. Duncan's appellate desires, instead of accepting Mr. Duncan's responses that he was "neutral" regarding an appeal and was willing to have his attorneys do what they felt best, the Court insisted on a yes-or-no answer. Not surprisingly, as is true in the case of so many "volunteers" for execution, his thought of waiving appeal was fleeting and he has since repeatedly stated his purported waiver was ill-conceived. Yet the Ninth Circuit, in an unexplained order, denied his request to rescind his waiver, even though he attempted to do so while the question whether this Court properly accepted the waiver was still open. As a result, his sentence did not receive even a modicum of appellate review.

For all these reasons, which are set forth in more detail below and throughout this application, Mr. Duncan's death sentence cannot stand.  The relevant procedural trial facts can be stated as follows[16]:

### A.  Facts in Support & Procedural History

**1.  Pre-plea Proceedings: The Incapacity of Lead Defense Counsel, The Court's Unrecorded Refusal to Consider Requests for Any Continuance, and Defense Efforts to Obtain Adequate Time to Prepare**

On January 18, 2007, the Government obtained a ten count indictment against Mr. Duncan charging him with murder and other offenses related to the kidnapping and abuse of two juveniles, S.G. and D.G., in 2005.  Doc. 1.  The federal charges followed Idaho State proceedings on related charges, which were resolved by a guilty plea and a sentence of life imprisonment. Roger Peven, Executive Director of Federal Defenders of Eastern Washington and Idaho, Inc., was appointed prior to the return of the federal indictment when it first became evident federal charges would be filed.

**2.  The Setting of a Trial Date**

Mr. Duncan had his initial appearance in federal court on January 19, 2007.  In accord with local practice, a trial date a mere three months away—March 20, 2007—was set at that time. Doc. 9.  On January 23, 2007, the Government filed a six page Notice of Aggravating Factors and Intent to Seek the Death Penalty (Doc. 11), and on January 26, Seattle attorney Mark Larranaga joined the case as learned capital counsel pursuant to 18 U.S.C. § 3005.  Doc. 13 (sealed).

---

[16] Many of the following facts are set forth in more detail elsewhere in this application.  They are set forth in abbreviated form herein for the convenience of the reader and to avoid unnecessary cross references.

On March 7, the Government moved for a brief continuance of the trial date until July 9, 2007. Doc. 22. The next day, the defense moved for a continuance until August 18, 2008, based on its need to review the voluminous discovery recently provided, to interview potential witnesses, to gather documents and compile the client's life history, to investigate several prior unadjudicated offenses asserted in the notice of aggravating evidence, and to retain and consult with experts. Doc. 24.

A hearing was held and on March 22, 2007, the Court set January 28, 2008 — the precise mid-point between the dates requested by the Government and defense — as the date for trial. Doc. 32. The Court selected the January 2008 trial date based on the presumption that Mr. Peven's prior involvement in the Idaho State proceedings would speed defense team readiness for trial. *Id.* at 9 (noting that Mr. Peven's prior involvement would be "invaluable in pursuing the preparation required for this case.")

As the defense would later explain to the Court, Mr. Peven's involvement in the state case had been limited to "work[ing] with this very complex, mentally ill client to prepare him for the possibility of a guilty plea in state court." Doc. 68 [Declaration of Roger Peven] at 2. As the Court would later learn, approximately a month after Mr. Larranaga was appointed, events occurring in Mr. Peven's life made it impossible for him to fulfill any meaningful defense responsibilities.

### 3. Mr. Peven's Issues Are Brought to the Court's Attention, New Counsel is Appointed

On August 8, 2007, Mr. Peven sent Mr. Larranaga an email stating he was contemplating withdrawing from the case. Doc. 80, October 3, 2007 Declaration of Mark Larranaga, at 11. The email did not provide any reason and Mr. Larranaga could not reach Mr. Peven to discuss the matter further. *Id.* By August 17, Mr. Peven apparently had decided that he would move to withdraw and asked Mr. Larranaga to alert the Court at the next status conference, which was

Corrected Defendant's Motion for Collateral Relief      192      *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

scheduled for August 22, 2007. *Id.*

At that status conference, which was unrecorded, Mr. Larranaga advised the Court that Mr. Peven wanted to speak privately to the Court about needing to withdraw from the case. *Id.* at 11. With a trial date just five months away, the Government expressed concern over the apparent lack of investigation by the defense, including Mr. Peven's failure to review the physical evidence despite a Government email indicating that it had been available for months. *Id.*

An *ex parte* conference was arranged for August 28, 2007, at the beginning of which Mr. Peven asked to meet privately with the Court in chambers. 8/28/07 RT 1. Mr. Larranga's request to attend the meeting was denied. *Id.* at 3-4. After approximately 15 minutes, Mr. Larranaga was summoned to chambers and was informed that Mr. Peven would not be withdrawing but would be taking on the role of "advisory counsel" for Mr. Duncan. (Doc. 179 at 3-4.) The court instructed Mr. Peven to prepare a sealed *ex parte* declaration describing the in-chambers proceeding. *Id.* at 4.

On September 7, 2007, Mr. Peven filed a sealed declaration "in support of appointment of attorney" which was written to "memorialize information I provided to the Court during a private off the record meeting ... on Tuesday, August 28, 2007, and to detail some of the resulting impact of the personal and professional pressures I am experiencing." Doc. 68 at 1. Mr. Peven then detailed a number of personal and professional disasters that had befallen him, beginning in February 2007, and which had prevented him from fulfilling his obligations in this case. *Id.* at 5. In the concluding paragraph, Mr. Peven stated that he had advised the court that "[n]ew counsel need to be appointed to meet the necessary responsibilities of investigation and preparing the case for trial," but inasmuch as "I have a good relationship with Mr. Duncan and have built credibility with the victim's family, I advised the court I can remain in an advisory capacity to the defense

Corrected Defendant's Motion for Collateral Relief          193          *Joseph Edward Duncan, III v. United States of America,
Case No.2-07-cr-00023-EJL*

team." *Id.*

Neither the declaration nor the record as a whole discloses whether assumption of an advisory capacity role was something Mr. Peven had requested, or something to which he had acquiesced upon being denied leave to withdraw. The declaration also fails to describe any discussion regarding whether new counsel would or would not be able to obtain a continuance of the trial date in order to prepare. However, following the hearing, Mr. Peven told Mr. Larranaga that his request had been for leave to withdraw entirely, but that the Court had assigned him the role of advisor to any new counsel and the remainder of the team. Doc. 179 at 8. In describing the in-chambers conversation to Mr. Larranaga, Mr. Peven also said nothing about a preemptive denial of a continuance by the court. Since Mr. Peven and Mr. Larranaga had previously discussed the need for a continuance, Mr. Larranaga's understanding was that nothing had occurred in chambers that would preclude a continuance. *Id.*

Accordingly, on September 11, 2007, the defense filed a motion to have Judy Clarke of Federal Defenders of San Diego, Inc. appointed to replace Mr. Peven as counsel of record and to have Federal Defenders of San Diego, Inc. replace Federal Defenders of Eastern Washington and Idaho, Inc. as the institution responsible for funding the case. Doc. 69. In a September 17, 2007, sealed order the Court appointed Ms. Clarke, not in Mr. Peven's stead, but in addition to him, citing the need for Mr. Peven to "reduce his involvement in the matter." Doc. 70. The order also transferred the funding authority for the case to Federal Defenders of San Diego, as the motion requested. *Id.* at 2.

### 4. New Counsel's Request for a Continuance

On October 3, 2007, the reconstituted defense team filed a detailed motion, (Doc. 74), supported by the sealed declarations of Mr. Larranaga and others (Doc. 80), requesting a one (1)

year continuance of the trial date, until January 2009.  The defense relied on the "numerous obstacles" that the defense had encountered after the Court established the January 2008 trial date. The defense described the substantial difficulties it had encountered in distributing the enormous amount of discovery materials to the members of the team.  As a result, defense investigators were unable until late June 2007 to begin interviewing Mr. Duncan's relevant life history witnesses, the number of which was staggering.  The motion noted that there had been no investigation of the guilt phase, no defense investigation into the Government's allegations in the Notice of Intent to Seek the Death Penalty, and no defense experts had been identified, let alone retained, despite an impeding due date for the filing of the defense's Fed.R.Crim.P. 12.2 notice of expert evidence of a mental condition.  Mr. Larranaga's sealed declaration detailed many of the difficulties he had encountered attempting to have Mr. Peven secure adequate funding for experts and investigators. For instance:

> During late June and early July 2007, I sent drafts of a supplemental budget to Mr. Peven, but often numerous days would pass before I received any response. Although I inquired, I was never provided a complete explanation for the reasons for the lack of communication or why there were delays in submitting a supplemental budget to the Administrative Office of the Courts. Out of frustration and desperation, I contemplated seeking the appropriate funds through the District Court since I—as a CJA attorney—did not have access to funding directly from the Administrative Office of the Courts.

Doc. 80 at 9. Notably, Mr. Larranaga advised the Court that until he received Mr. Peven's September 7, 2007 declaration, he had been unaware that Mr. Peven had been neglecting the defense for which he was responsible.  *Id.* at 11-12.  Mr. Larranaga explained:

> While I was primarily focused on getting the "life history" investigation started, I was led to believe that other investigation and preparation was being done by [Mr. Peven's] Office. However, promised work, including production of witness lists and files, discovery summaries, and investigation of factors related to the guilt phase and aggravation was not being done, and largely remains at this time not even a work in progress.

Corrected Defendant's Motion for Collateral Relief          195          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

*Id.* at 3. The defense explained, "It is not Mr. Peven's withdrawal from the case that affects the trial date; it is the state of the defense preparation prior to that withdrawal that drives this request to vacate the current trial date." *Id.* at 6 n. 6.

### 5.   The Court's Revelation that the Entry of New Counsel Had Been Premised On Counsel Not Seeking a Continuance

A hearing was held on October 12, 2007, at which the Court denied a continuance explaining *inter alia* that Mr. Peven had not been allowed to withdraw from the case and that "[h]e is a valuable tool to the defense because of the information he had prior to present counsel entering the case." 10/12/07 RT 41.  Regarding the need to investigate the Court stated, "[M]y judgment is that while it is a difficult situation, it is a complex situation, it is not an extreme circumstance, so I am staying with the trial date of January 20." *Id.* at 45.  Even though the motion had explained that funding for experts had been unavailable through Mr. Peven's office, the Court ordered:

> the defense is going to have to disclose its expert witnesses in accordance, at least give notice of those experts, pursuant to Rule 12.2 and then comply with Rule 16 as far as the summary of the testimony and experience is concerned. So there is going to have to be a disclosure of those witnesses as well and that is within the deadline set for the motions. So that is November 5, [2007] as well.

*Id.* at 47.

On October 25, 2007, Mr. Peven filed a motion, which was prompted by the court's comments about him, "formaliz[ing] and renew[ing] [his previous] unrecorded request of this Court to withdraw as counsel."  Doc. 89.  The motion was supported by a declaration filed under seal describing Mr. Peven's psychological problems as far more severe than previously disclosed to the Court.  Doc. 90.

On November 1, 2007, the Court entered a sealed order denying the motion.  Doc. 104. The Court wrote that during their private in-chambers meeting Mr. Peven had not asked to withdraw but only to reduce his involvement and the Court had advised Mr. Peven that any attorney coming into the case due to Mr. Peven's reduced involvement "would have to know up front" that the Court would not continue the trial date.  The Court also wrote that there was nothing in Mr. Peven's declaration "that would suggest that the difficulties Mr. Peven is undergoing would prevent him from assisting the defense team in a limited capacity [in that] Mr. Peven has been and remains the Executive Director of the Federal Defenders of Eastern District of Washington and Idaho." *Id.* at 2-3.

### 6.  Defense Counsel Peven's Incapacity

On or about November 13, 2007, the President of the Board of Directors of Federal Defenders of Eastern Washington and Idaho, Inc., wrote to the Court that after meeting with the Executive Committee of the Board on November 8, 2007, Mr. Peven had been put on indefinite leave of absence based on information set forth in declarations executed by several senior staff members of the organization.  The declarants had sworn that Mr. Peven had been virtually incapacitated by personal problems for a considerable time.  On November 20, 2007, Stephen Hormel, Acting Executive Director of the Federal Defenders of Eastern Washington and Idaho, followed up on November 13th letter with a motion for the agency to be relieved as counsel for Mr. Duncan.  Docs. 173 and 174.

On November 5, 2007, the defense filed a motion to extend the time to file its Fed.R.Crim.P. 12.2 notice of expert testimony (Doc. 117), because "inadequate work has been completed to provide reliable or accurate notice." More specifically, the motion stated that "to date, appropriate experts have not been retained, and what may be necessary evaluation and/or

Corrected Defendant's Motion for Collateral Relief          197          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

testing has not been completed." *Id.* at 2.  On November 21, 2007, the Court denied the motion. Doc. 175.  On November 24, 2007, the defense filed a motion to clarify what had occurred during the August 28, 2007, private in-chambers meeting with Mr. Peven.  Doc. 179.  The motion recited that at various times the Court had stated that the meeting with Mr. Peven was limited to personal issues not affecting the case, while the November 1, 2007, order denying the motion to continue said something quite different.  The motion pointed out that the record was unclear as to what assurances Mr. Peven had made to the Court and what conditions were placed on his being "advisory counsel." In particular, the defense noted that Mr. Peven had never told Ms. Clarke or other members of the team that he had requested merely a reduced role in the case and with that role he could insure the case could go forward on the same time table.  *Id.* at 8.

On November 28, 2007, the Court denied the motion to clarify (Doc. 185), stating that there was no ambiguity in the record as to what had occurred and chiding counsel for implying otherwise.  The court reiterated that Mr. Peven had only asked to have a reduced role and that the Court had made clear at that time (and thereafter) that any new counsel coming into the case in light of Mr. Peven's reduced role "would have to be apprised of the trial date so that he or she would know of the time requirements that would apply." *Id.* at 3.

### 7. The Guilty Plea

On December 3, 2007, without the benefit of any plea agreement, Mr. Duncan entered a plea of guilty to each of the ten charges alleged in the indictment.  Doc. 189.  On December 5, the Government moved to continue the trial date until April 7, 2008 — the estimated date on which the sentencing hearing would have begun had the guilt phase gone to trial — in return for a defense stipulation that S.G.'s testimony could be presented through the statements she made to law enforcement officers at the time of Mr. Duncan's arrest.  Doc. 192 at 5.  On the same date, the

Corrected Defendant's Motion for Collateral Relief          198          *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

defense filed a motion to continue the trial date to September 15, 2008. Doc. 193. The defense motion stated that twice before the defense had "sought sufficient time to investigate and prepare this capital case for trial, and now seeks again to persuade this Court of the need for additional time, to provide this Court with new information and to challenge the assumptions relied on by the Court in denying a continuance." Doc. 193 at 1-2.

By order entered December 12, 2007 (Doc. 202), the Court granted the Government's request and denied the defense's; setting Mr. Duncan's sentencing trial for April 14, 2008. The Court expressed great irritation with the defense, *see e.g., id.* at 3-4 (characterizing the defense arguments concerning the magnitude of necessary preparations as the "marching out once again the Sixth Amendment"), criticizing them for "placing blame for their alleged unpreparedness upon not only Mr. Peven but also with the Court." *Id.* at 4. Although the issues regarding Mr. Peven were only one of the many grounds argued by the defense, the Court stated that "[f]or the defense to continue to argue that it has been so hamstrung by the personal issues of Mr. Peven that they are still unprepared to go forward in this matter any earlier than next fall indicates either a lack of diligence or gamesmanship on the part of the defense." *Id.* at 5. Despite the history of having refused to allow the defense any additional time as a result of Mr. Peven's disability, the Court also stated: "The issues surrounding Mr. Peven have been utilized to the fullest by the defense and do not justify any further basis for delay. The issue is closed." *Id.*

### 8. Disclosure of Possible Expert Testimony

At a February 12, 2008, status conference, the Court set March 12, 2008, as the due date for the defense's written summary of expert witness testimony under Fed.R.Crim.P. 16(b)(1)(C). Doc. 266 (minute order). On February 20, the Court issued orders authorizing the defense to conduct medical and psychological tests and examinations of Mr. Duncan. Doc. 273, 274. On

March 12, the defense filed a sealed "Status Report and Notice of Defense Experts" Doc. 306, stating that only limited information regarding defense experts could be provided because

> Experts who have been retained (1) have not completed their review of materials, (2) have not had an opportunity to interview potential witnesses regarding Mr. Duncan's genetic and developmental history, including critical developmental years in prison as well as others relevant to an understanding of Mr. Duncan's life, and/or (3) have not been able to review and interpret testing that has recently been completed.

Doc. 306 at 3. The notice did indicate, however, that psychologist Ruben Gur, Ph.D., may offer an opinion interpreting neuropsychological testing that was in progress at the time of the notice, and that psychiatrist and neurologist James Merikangas may offer an opinion regarding Mr. Duncan's neurological, physical, genetic and psychiatric impairments after reviewing test results likely to be unavailable for another month. *Id.* at 6-8.

On March 20, the Government moved to bar the testimony of Drs. Gur and Merikangas on the ground that their opinions seemed to relate to a mental disease or defect, and as such the defense had been obligated, but had failed, to make the required Fed.R.Crim.P. 12.2 disclosures on November 5, 2007, as ordered by the Court. Doc. 322. On March 25, the defense filed a response conceding that Drs. Gur and Merikangas would be testifying about a mental disease or defect and that the court had never extended the November 5, 2007, Rule 12.2(b) deadline, but asserting that since that time it had twice sought to continue the trial date on grounds that included a detailed account of its problems retaining experts. Doc. 330 at 3-4 (citing Docs. 193, 194 (sealed, *ex parte*); 239, 240-242 (sealed, ex parte). Before the Court could rule on issues relating to mental health expert testimony at the penalty trial, the case took the different direction described below.

### 9.  The Request for Self-Representation, and The Absence of Competency Proceedings

From the end of March to mid-April 2008, both sides filed various motions regarding the procedures for selecting the sentencing trial jurors and conducting the sentencing trial.  Jury selection began on April 14, 2008.  On April 16, Mr. Duncan announced that he would waive counsel and proceed *pro se.*  The question of Mr. Duncan's competency to represent himself had been raised by the Court *sua sponte* and by defense counsel in various pleadings.

On July 24, 2008, after reviewing the reports of three defense experts, including Drs. Gur and Merikangas, concluding that Mr. Duncan was incompetent, and of two court-appointed experts holding the contrary view, the Court, without holding a hearing, found Mr. Duncan competent to proceed and to represent himself.  Doc. 493 (sealed version); 494 (redacted public version).

The errors involving these rulings, which include but are not limited to the failure to determine Mr. Duncan's mental competence to represent himself and the assumption that *Faretta* rights apply to a sentencing trial, are set forth herein as Claims 4, and 5.  All allegations in support of those claims are incorporated by express reference as if fully set forth herein.

### 10. The *Pro Se* Sentencing Trial, and The Death Penalty

As set forth in Claim 6, incorporated herein by express reference, the extent of pretrial publicity made the selection of a fair and impartial jury, an otherwise difficult task in a case such as this, a virtual impossibility.  During *voir dire*, the Court needed to excuse a number of pro-death jurors who expressed in open court an inability to fairly consider sentencing Mr. Duncan to life imprisonment.  Several were excused in response to defense challenges, *e.g.*, RT 66, 109, 264, 314, some were in response to prosecution challenges, *e.g.*, RT 873, 897, 970, 1076, 1094, 1174, 1291, 1394, 1398, and one was on the Court's own motion, RT 1068.  That nonetheless left Mr.

Duncan with a remarkably death-prone jury, and one with a significant likelihood of prejudging the case. Each and every juror acknowledged prior awareness of the facts. One indicated having discussed whether Mr. Duncan "should by lynched." *See* Exh. 142 at 17486. On a question asking how strongly the juror favored or disfavored the death penalty, several gave the highest possible favorable rating.

On a series of questions testing pro death attitudes, no juror strongly disagreed with any pro death statement. Many jurors agreed strongly with all or most of the statements, and the rest "somewhat agreed' with the pro death statements. There was only one "somewhat disagree" response to a pro death statement among all questions answered by any seated juror. Exh. 138 at 17257. Four of the seated jurors "strongly agree[d]" that "*anyone* who sexually abuses and murders children should get the death penalty." *See* Exhs. 145 at 17664; 149 at 17916; 151 at 18041; and 152 at 18105 (emphasis added). On questions involving Mr. Duncan's life sentences in Idaho state court, one seated juror responded "enough is enough." Exh. 151 at 18043. Another responded, "He needs to be judged." Exh. 147 at 17804. That same juror twice wrote on the questionnaire, "an eye for an eye." *Id.* at 17798. Another wrote, "We need to have the death penalty." One juror wrote twice that she would have to "hear a very strong argument" to vote for life, that when a law is broken that warrants a death sentence, "we need to follow through," and he could think of no argument against the death penalty. Exh. 142 at 17488.

A number of seated jurors had close friends or relatives who had been abused or the victims of violent crime. *See, e.g.,* Exh. 142 at 17473; Exh. 144 at 17584; Exh. 145 at 17643; Exh. 146 at 17713; Exh. 149 at 17895, 17898. One had been a grand juror on child molestation cases. Exh. 138 at 17239. As to related attitudinal indicators, several had religious or other opposition to homosexuality (Exh. 142 at 17467-68; 145 at 17640-41; 147 at 17778-79; 148 at

17834), including one who acknowledged using referring to them as "fags." *Id.* at 17235. On questions about most and least admired public figures five listed Bill and/or Hillary Clinton as least admired, in some instances grouping them with Osama bin Laden (Exh. 152 at 18085), "terrorists," (Exh. 138. at 17238) and Warren Jeffs (Exh. 144 at 17582). The most admired picks for one of the jurors were Clint Eastwood, John Wayne and Charles Bronson. Exh. 139 at 17302. Other top picks included Harrison Ford, Charlton Heston, and Sammy Hagar. Exh. 152 at 18085. One juror reported being "neutral" (as opposed to "no opinion") as to the White Aryan Nation and the KKK. Exh. 150 at 17948. [17]

As set forth in Claims 7 and 8, incorporated herein by express reference, the Court's evidentiary rulings further tipped the scaled in the Government's direction. Despite motions *in limine* and Mr. Duncan's personal objection, the Government was allowed to display for the jury a shocking and horrific video that eliminated any reasonable likelihood that the verdict could be rendered on any basis other than passion. The prejudice from playing the video was vast. The press reported jurors crying and turning away in horror. The experience was excruciating even for those conditioned to see images of sexual abuse and violence, much less jurors from other walks of life.

It is difficult to imagine a situation where the victim would be less of a "faceless stranger" warranting the use of victim impact evidence to provide a "brief glimpse" of the life that was extinguished. Yet the Government was nonetheless permitted as a result of the denial of other

---

[17] Those individual characteristics must be viewed in context of social science research showing that half of capital jurors decided on the death penalty or a life sentence before determining hearing the evidence.

motions *in limine, see* Docs. 238, 250, 256, 340, 367, and 197, to present *five* witnesses to describe D.G.'s characteristics. The transcript reveals an aunt who, understandably, was overcome by emotion throughout her testimony. *See, e.g.,* RT 3217 ("Take a breath up there"); RT 3221 ("Take a breath" and "Just stick with me. Just a few more questions, okay?"). A video of a school performance was admitted, RT 3243, as were several photos. *See* RT 3182 (trial exhibit 204a) RT 3187 (trial exhibit 204b); RT 3181 (trial exhibit 204d).

As if that were not enough, the Court allowed the Government to spend a day and half presenting the testimony of sixteen witnesses to show that Mr. Duncan had murdered children in the past. Although the Court instructed the jury to limit its consideration of these other crimes to the question whether Mr. Duncan would pose a future danger in a maximum security setting, for the reasons set forth in Claim 7, incorporated herein by express reference, those instructions must be presumed ineffective and the evidence far more prejudicial than probative.

In the face of all this overwhelmingly inflammatory evidence, Mr. Duncan did next to nothing on his own throughout the sentencing trial. For most of the witnesses he had no questions at all; when he did examine it was rarely to ask more than a handful of questions. *See, e.g.,* RT 2543-44, 2620; RT 2702 (2 questions); RT 3112 (1 question), RT 3234 (1 question).

After the Government rested, Mr. Duncan called himself as a witness, and the following transpired:

> THE COURT: You may proceed.
> MR. DUNCAN: I have no statement prepared. I was just intending to sit and answer whatever questions the Government might have.
> THE COURT: You have nothing to testify to?
> MR. DUNCAN: No.
> THE COURT: No questions?
> MR. MOSS: No, Your Honor.

RT 2635-36. Mr. Duncan then rested his case.

Corrected Defendant's Motion for Collateral Relief      204      *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

On August 27, 2008, the jury returned verdicts recommending a sentence of death on each of Counts One, Five and Seven. 18 U.S.C. § 3593(e). The Court then imposed the death sentences as required under 18 U.S.C. § 3594. Doc. 598. On November 3, 2008, the Court sentenced the defendant on the remaining seven counts of the indictment to which the defendant had pled guilty. Doc. 601. The Court entered written judgments on the capital counts on November 3 and on the remaining aspects of sentencing on November 5. The Court entered an amended judgment on November 13, 2008. (Doc. 602.)

### 11. The Evidence that Could Have Been Presented

As stated in the introduction and in Claim 1.D.2, had Mr. Duncan not represented himself at the sentencing trial a vastly different array of considerations would have been presented to the jury. Instead of Mr. Duncan being defined solely by the totality of his wrong doings, the jury would have seen a person who also had been greatly wronged by many throughout his life, a person shaped by abuse and violence perpetrated upon him. A victim of violence, not just a perpetrator of violence.

Expert witnesses like Drs. Woods, Merikangas, Gur, Beaver and Kalechstein could have testified about his developmental, neurological, neuropsychological and psychological deficits and could have rendered opinions about his mental illnesses and behavior. Even generally unfavorable experts, such as Drs. Engle, Low, Kirkish and Rath, had mitigating evidence to provide.

Mr. Duncan's sister and others could have described the tragic abuse Mr. Duncan and his siblings endured at the hands of caretakers, guardians and neighbors. Evidence concerning the grotesquely inappropriate placement of Mr. Duncan as a juvenile offender in an adult sex offender program, where he was preyed on by others, provided by Dr. Lisak and various lay witnesses would have helped the jury see Mr. Duncan's frailty and humanity, in contrast to the unmitigated

aggravation presented by the Government for eleven days in 2008.

The jurors were provided so little insight into Mr. Duncan as a fellow human being that even the one undeniably mitigating fact before them – Mr. Duncan's decision not to kill S.G. but rather to return her and to surrender himself to the authorities – was seen as an insincere manipulation. *See* Seattle Times, *Jury Foreman Still Haunted by Evidence at Duncan Trial* (Exh. 98 at 597) (foreman "had the sense that Duncan was trying to fool them by hinting that he wanted to die as 'his way to manipulate us into not giving him what he wanted.'").

### 12. The Absence of Appellate Review

As alleged in Claim 10, incorporated herein by express reference, notwithstanding the retrospective competency order (Doc. 942), the finding of an appellate waiver was improper. Even if the waiver had been properly accepted, Mr. Duncan invoked his right to appeal at a time, and under such circumstances, that reinstatement of appellate rights could have, and should have, properly been allowed. The Ninth Circuit disallowed the request without explanation, failed to address Mr. Duncan's contention that appellate review of the sentence was required despite the purported waiver, and conducted no review. In light of all of the foregoing facts demonstrating repeated and catastrophic breakdowns of the adversarial process and ever juncture, appellate review of the appropriateness of the death sentence – far from sufficient to provide the requisite Eighth Amendment indicia of reliability – was at a minimum an absolute necessity under the Eighth Amendment.

### B. Legal Principles

The United States Supreme Court has long recognized that the death penalty is different both in its severity and finality. *Gardner v. Florida*, 430 U.S. 349 (1977); *see also Gregg v. Georgia*, 428 U.S. 153 (1976). The death penalty must be based on reason and cannot be

imposed in an arbitrary or capricious manner. *Id.* Moreover, as the Court has made clear, there is a "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The denial of constitutionally adequate counsel implicates not only the Sixth Amendment right to counsel, but the Eighth Amendment right to a reliable and non-arbitrary proceeding. When the trial court impedes defense counsel's ability to provide constitutionally adequate counsel, that too implicates a defendant's constitutional rights, specifically those provided by the Fifth, Sixth, and Eighth Amendments.

The Sixth Amendment requires that defendants be afforded a fair and impartial jury (*Irvin v. Dowd*, 366 U.S. 717 (1961)), and the effective assistance of counsel (*Strickland v. Washington*, 466 U.S. 668 (1984)). Further, when a defendant is deprived of a fair hearing, due process is violated. *In re Oliver*, 333 U.S. 257 (1948); *Tumey v. Ohio*, 273 U.S. 510; *In re Murchison*, 349 U.S. 133 (1955). To be consistent with the Eighth Amendment, a capital sentencing scheme must provide some measure of reliability–*i.e.*, some way of ensuring that only those as to whom death is the legally appropriate penalty are in fact executed. The Supreme Court has articulated this requirement, in part, through its consistent holdings that the Eighth Amendment requires a capital sentencing scheme to provide for meaningful appellate review. The Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991). *See also Clemens v. Mississippi*, 494 U.S. 738, 749 (1990); *Gregg v. Georgia*, 428 U.S. 153, 204-06 (1976); *Proffitt v. Florida*, 428 U.S. 242, 253 (1976); *Jurek v. Texas*, 428 U.S. 262, 276 (1976). Indeed, in *Gregg*, *Proffitt*, and *Jurek*–the first three cases following *Furman v. Georgia*, 408 U.S. 238 (1972), in which the Supreme Court found the death penalty to be constitutional–the Court upheld the capital

Corrected Defendant's Motion for Collateral Relief    207    *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

sentencing schemes of Georgia, Florida, and Texas, respectively, in large part because those states' statutes required in-depth appellate review of every death sentence. *Gregg*, 428 U.S. at 198.

### C. Conclusion

Despite the case's exceptional complexity, the Court gave the shattered defense only 12 months to prepare for trial. The schedule, unusually prompt for a capital case, was based on the Court's assumptions that an adequate defense investigation had taken place during the prior state-court proceedings and that Mr. Peven's prior participation in the state-court plea negotiations would substantially benefit the federal defense effort. Both assumptions were false. The state-court defense investigation was scant. Within thirty days after Mr. Duncan's indictment in federal court, Mr. Peven began suffering a series of personal tragedies that prevented him from fulfilling his professional obligations. *See* Exh. 1, Declaration of Judy Clarke, at 5, 7-8; Exh. 5, Declaration of Stephen Hormel, at 36-38; Exh. 8, Declaration of Thomas Monaghan, at 36-66; Exh. 10, Declaration of Billy L. Proctor, at 82-85. Instead of timely notifying co-counsel so that alternate arrangements could be made, Mr. Peven covered up his failure to perform for six months, leaving the remainder of the defense team still at the starting gate with only five months left to prepare.

With four months left at that point, Ms. Clarke, believing that she would be allowed sufficient time to prepare, agreed to take over the lead counsel role and was so appointed. Despite repeated efforts and an extraordinary showing of need, the Court refused to allow any additional time to prepare for the guilt trial. The Court continued to maintain that Mr. Peven was able to assist the defense in some capacity, even though his Board of Directors had removed him from his position at the Federal Defender office. The Court also repeatedly invoked assurances made by Mr. Peven (or alternatively warnings given to him) during their private in-chambers meeting as grounds for denying continuances, even though there is no record of that conversation, Mr. Peven

Corrected Defendant's Motion for Collateral Relief     208     *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*

never suggested to the other trial participants that any such matters were discussed, and Ms. Clarke was not so advised.

In any event, the Court was advised that funding for experts was unavailable until Ms. Clarke was appointed.  The Court refused even to extend the deadline for providing the reports of designated defense experts, even though Ms. Clarke was appointed only seven weeks before the reports were due.  The expert evaluations of Mr. Duncan did not occur until well after the due date had past.  Because defense counsel were so utterly unprepared, they allowed Mr. Duncan to plead guilty in the hopes of getting additional time to prepare for the sentencing phase.  Mr. Duncan was first seen by experts retained for the federal proceedings after the guilty plea, and they promptly concluded that Mr. Duncan was incompetent to represent himself due to an inability to think rationally about his case.

The Court viewed the expert opinions with skepticism, based in part on the defense's failure to raise the issue earlier, and concluded that Mr. Duncan was competent to "represent" himself, *i.e.*, by declining to present a defense case and doing nothing of any significance to challenge the prosecution's case.  Armed only with the Government's case for death, the jury voted to sentence Mr. Duncan to death.

Thereafter, Mr. Duncan equivocated regarding whether he wished to appeal the death sentence.  The Government seized on that equivocation, obtaining a hearing to inquire whether Mr. Duncan had authorized his stand-by counsel to file a notice of appeal on his behalf.  Although Mr. Duncan did not express any wish to be executed, the Court accepted his equivocal, rambling, delusional statements as a knowing, intentional, and voluntary waiver of appeal.  Mr. Duncan subsequently attempted to revoke the appeal waiver and endorse the previously-filed notice of appeal, to no avail.

New counsel was appointed. The Court of Appeals reversed this Court's order accepting the waiver, remanding the matter for a competency determination. *United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011) ("*Duncan I*"). Despite extensive evidence presented in support of a determination that Mr. Duncan did not, indeed could not, execute a knowing and voluntary waiver of his automatic appeal, this Court concluded that Mr. Duncan was competent to waive his appeal. Doc. 843 n. 6, 63-64. On appeal from that order, Mr. Duncan challenged the competency finding. Mr. Duncan also argued that the 2008 waiver hearing actually demonstrated that Mr. Duncan did not intend to waive his appeal; that his purported waiver was not knowing, intelligent, and voluntary, but rather was the result of coercion by the Court; and that the Federal Death Penalty Act of 1994 requires appellate review. Ten days after oral argument, the Court of Appeals issued a four-page disposition affirming the Court's retrospective competency finding. The circuit did not address Mr. Duncan's other arguments beyond concluding that Mr. Duncan's "motion to reinstate his appeal, filed initially in this court on December 24, 2010, and renewed on November 24, 2014, in DENIED." *United States v. Duncan*, 599 Fed. Appx. 679 (9th Cir., March 27, 2015) (unpublished). The Supreme Court subsequently denied Mr. Duncan's petition for writ of certiorari, which raised whether 1) a federally death-sentenced person, recognized by all experts to be seriously mentally ill, who initially, ambiguously, purports to waive an appeal, but later unequivocally seeks to appeal, can be denied an appeal of a sentence of death; and 2) whether the Eighth Amendment and Federal Death Penalty Act nonetheless requires appellate review in order to evaluate the appropriateness of his death sentence given the lack of adversarial testing at trial? *Duncan v. United States*, 2016 U.S. Lexis 1258 (February 29, 2016).

The cumulative effect of all of the errors that have occurred in Mr. Duncan's case, combined with the lack of process, served to eliminate any meaningful check on the Government's

power to obtain a death judgment in this case. Thereafter, Mr. Duncan was unconstitutionally deprived of any appellate review of the judgment. For all of the foregoing reasons, this Court should reverse Mr. Duncan's conviction and death sentence.

## XIV.   CLAIM 12:  THE FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL

The month after Mr. Duncan entered his guilty plea, the defense filed a series of motions challenging the Federal Death Penalty Act ("FDPA") as unconstitutional. Doc. 116.

In a "Motion to Declare the Federal Death Penalty Act Unconstitutional and to Strike the Death Penalty Notice for Inadequate Notice," Doc. 116, the defense contended that the FDPA gives constitutionally inadequate notice of special findings, statutory aggravating factors, and nonstatutory aggravating factors. On March 6, 2008, finding that adequate notice of each of the factors alleged, with the exception of victim impact evidence, had been provided, the Court denied the defense's request to strike and/or dismiss the death penalty notice. Doc. 294 at 15. The court directed the government to provide an outline of its intended victim impact evidence but otherwise denied relief.

In the "Motion to Declare the Federal Death Penalty Act Unconstitutional and to Dismiss the 'Special Findings' From the Indictment, and to Strike the Notice of Intent to Seek Death," Doc. 135, the defense contended that the FDPA is unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002), and that the indictment was improperly obtained. On February 26, 2008, the Court issued a Memorandum Order denying that motion. Doc. 283.

In a "Motion to Declare the Federal Death Penalty Act Unconstitutional Due to Improper Capital Sentencing Procedures," Doc. 136, the defense contended that modern social science research, mostly conducted by the Capital Jury Project, on jury deliberations demonstrates modern death penalty statutes violate *Furman v. Georgia*, 408 U.S. 238 (1972). In opposition, the

Corrected Defendant's Motion for Collateral Relief          211          *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

Government argued that the social science research might provide a basis for requesting certain voir dire procedures and jury instructions but do not warrant declaring the PFDPA unconstitutional.  Doc. 168 at 14.

In a "Motion to Declare the Federal Death Penalty Act Unconstitutional as Arbitrary; Violating the Evolving Standards of Decency; and Notions of Fundamental Fairness," Doc. 137, the defense contended that federal death sentences are imposed more rarely that in pre-Furman times, based on evidence that as of 2006 death had been considered in almost 2,400 cases but had been imposed in only 50.  Doc. 137-2 at 7.  As to evolving standards of decency, the defense relied on evidence that 13 states and the District of Columbia do not have the death penalty, the number of executions in 2006 (53) was the lowest since 1996 and in 2006 the number of death sentences imposed was the lowest in 30 years, with Illinois, New York, and New Jersey having placed a general hold on executions and 20 states placing a hold on executions based on questionable methods used.

On February 26, 2008, the Court issued a four-page Memorandum Order, Doc. 284, denying motions 136 and 137.  As to the Capital Jury Project research, the court noted that the arguments "are not particular to the facts of this case or even to this District," Doc. 284 at 3, and that other district courts had rejected similar arguments.  *Id.*  As to the evolving standards of decency argument, the Court wrote:  "The question of whether or not the United Sates should continue to utilize the death penalty in this country, though an interesting question, is not one for this judicial body to decide.... The FDPA satisfies the constitutional requirements, unlike the death penalty statute rejected in *Furman*."  *Id.* at 4.

In the "Motion to Declare the Federal Death Penalty Act Unconstitutional, to Dismiss the Aggravators and the Death Notice," Doc. 139, the defense presented a number of constitutional

challenges involving allegations that the aggravating factors fail to perform their constitutionally mandated narrowing function, that nonstatutory aggravating factors fail to limit and guide the discretion of capital juries, and other matters. On March 14, 2008, the Court issued a Memorandum Order, Doc. 313, holding that the FDPA fulfills the requisite narrowing function by "requiring the jury to find beyond a reasonable doubt the existence of a gateway mental state factor and at least one statutory aggravating factor." *Id.* at 4. The court then concluded that the alleged factors were not vague, overbroad or duplicative, rejected challenges involving *Ring v. Arizona*, 536 U.S. 584 (2002), victim impact evidence, and other matters, and denied the requested relief with the exception of ordering that future dangerousness evidence be limited to dangerousness in a prison setting. *Id.* at 21-22.

The legal and factual landscape has changed since 2008. The factual and legal landscape has changed since then. In 2015, the U.S. Supreme Court issued its decision in *Glossip v. Gross*, 135 S. Ct. 2726 (2015). The case concerned challenges under the Eighth Amendment to execution by lethal injection of four defendants sentenced to die by state courts in Oklahoma. Justice Breyer, joined by Justice Ginsburg, issued a dissent calling "for full briefing on a more basic question: whether the death penalty violates the Constitution." *Id.* at 2755. The dissent identified a series of systemic shortcomings in the administration of the death penalty in the United States, especially as it is applied by the states. It divided these into four categories: "(1) serious unreliability, (2) arbitrariness in application, (3) unconscionably long delays that undermine the death penalty's penological purpose [and] (4) most places in the United States have abandoned its use." *Id.* at 2756.

Justice Breyer's concerns were largely empirical, which prompted the district court in *United States v. Fell* (D. Vt.), to conduct a hearing in order to develop a factual record based on

Corrected Defendant's Motion for Collateral Relief       213       *Joseph Edward Duncan, III v. United States of America, Case No.2-07-cr-00023-EJL*

live testimony and supporting exhibits in an attempt to determine whether the constitutional requirements for a death penalty statute set out in *Gregg* have been met in practice. The court in Fell concluded that the FDPA "falls short of the standard required in *Furman v. Georgia*, 408 U.S. 238 (1972), and in *Gregg* for identifying defendants who meet objective criteria for imposition of the death penalty. Like the state statutes enacted after *Furman*, the FDPA operates in an arbitrary manner in which chance and bias play leading roles." *United States v. Fell*, 5:01-cr-00012-gwc (D. Vt. Dec. 13, 2016) Doc. 1025 at 3.

The *Fell* court explored the following issues (some of which were raised by counsel herein and some which were not):

I. Unreliability
    A. Mistaken Conviction and Exoneration
    B. Bias Through "Death Qualification" of the Pool of Prospective Jurors
    C. Flawed Forensic Testimony
    D. Identifiable Rate of Erroneous Conviction
II. Arbitrariness
    A. Rarity and "Freakish" Imposition of the Death Penalty
    B. Continuing Impact of Race, Gender and Geography
    C. Underfunding of Capital Defense
    D. Political Pressure on Elected Judges
    E. Systemic Failure to Identify the "Worst of the Worst" Defendants
III. Excessive Delay
    A. 18 - 25 Year Delays Between Conviction and Execution
    B. Solitary Confinement and Uncertainty of Outcome
    C. Volunteering for Death and Rates of Suicide on Death Row
    D. Undermining of the Penological Rationales of Deterrence and Retribution
IV. Unusual- Decline in Use of the Death Penalty
    A. Reduction in Annual Death Sentences and Executions
    B. State-Wide Abolishment Through Legislative Change
    C. State-Wide Lack of Use
    D. Concentration of Death Sentences in a Few States and Counties
    E. Direction of Change at the Level of the States
    F. Declining Public Support
    G. Practice by Other Nations

The *Fell* court noted that through the two weeks of hearings, only three issues were

contested: (1) bias arising from the race of the victim; (2) the effects of solitary confinement on death row; and (3) the statistical evidence of a deterrent effect on the murder rate achieved through capital punishment. "In all other areas, however, the evidence was one-sided and came only from the defense." *Id.* at 6.

Several of the findings are notable here. As to juries, the court found:

> the evidence introduced at the hearing supports a finding that the procedures for conducting jury trials mandated by the *Gregg* decision have not cured systemic shortcomings in jury selection and jury deliberations. The death qualification process continues to weight jury panels in favor of conviction and in favor of the death penalty through the exclusion of a large portion of the community which holds views opposed to the death penalty. When surveyed, jurors who actually served in capital cases had great difficulty in following the trial courts' instructions. It is an inadequate response to presume that juries follow our instructions when the evidence is to the contrary. The evidence introduced at the hearing demonstrates that despite efforts to create a more just death penalty regime, the FDPA--like the very similar state death penalty statutes enacted after *Furman*--remains inherently unreliable as it seeks to identify those cases in which death is the just outcome.

*Id.* at 22. The "infrequency" data previously submitted to this court by defense counsel has grown since then.

> Since enactment of the FDPA in 1988 and current as of September 2015, the Attorney General has authorized the government to seek the death penalty in 503 cases. These cases were drawn from a larger group of 3,470 completed cases which [were] identified as potentially subject to the death penalty as of June 2016. These cases have resulted in 154 life sentences and 81 death sentences. Other defendants avoided a capital trial by entering a plea or through withdrawal of the capital authorization, or a judicial dismissal decision barring the death penalty. Three defendants have been tried and sentenced to death twice. Since 1988, three have been executed, most recently in 2003. Excluding clemency, death while awaiting execution, retrials following appeals, or relief under §2255, fifty-nine defendants remained on federal death row in July 2016. Because the Government continues to authorize and seek the death penalty, the numbers change very
>
> slightly over time, but the extreme rarity of the imposition of the death penalty and actual executions has been present since enactment of the

FDPA.

> Although the Attorney General authorizes the death penalty on a national basis through a capital review committee, federal death penalty cases since 1988 have been concentrated in three states (Virginia, Texas, and Missouri) in a pattern consistent with the concentration of state death penalty cases. The most likely explanation is that although death penalty authorization occurs at the national level, the request for authorization originates with local U.S. Attorneys offices and reflects the legal culture of the states in which they are located. A review of racial characteristics of death penalty authorizations and death sentences shows that cases involving white female victims are disproportionately represented in both groups.

*Id.* at 23 -24 (citations and footnote omitted.).  As to arbitrariness, the court found:

> the death penalty continues to be imposed in an arbitrary manner. The state in which a crime occurs is the strongest predictor of whether a death sentence will result. Whether the murder victim is white is also a significant predictor. These findings are as true of cases brought under the FDPA as they are for state death sentences. When large groups of cases which qualified for the FDPA but did not result in death sentences are compared with the much smaller groups which did, it is not possible to identify principled distinctions  between the groups. The imposition of the death penalty through the FDPA remains arbitrary despite the efforts of the prosecution and the courts to impose legal standards to guide the decisions leading to a death sentence.

*Id.* at 31-32.

As to evolving standards of decency, trends have continued since the time the matter was previously litigated in this court.  As noted by trial counsel, the rate of executions hit a peak in the 1990's.  Since 2000 it has dropped to 28 in 2015 which was  the last complete calendar year available as of the time of the *Fell* hearing.  As the Fellcourt further noted,

> Thirty-one jurisdictions in the United States, including 28 states, the federal government, the military, and the District of Columbia, have not conducted an execution in ten years. Only six states conducted executions in 2015. Nineteen states and the District of Columbia have formally abolished the death penalty- nineteen by legislative action and one (Connecticut) through a decision by the state supreme court. One state which had repealed the death penalty by legislation (Nebraska) recently voted by referendum to restore it.  Governors in four more states with death penalty statutes on the books have imposed moratoria on capital punishment.

> Of the 31 death penalty states, only about half continue to impose the penalty on a regular basis and in these states, the number of death sentences has dropped greatly over the last decade. In 2015, there were 49 death sentences nationally. This number is down from a peak of 315 in 1996. California (14), Florida (9) and Alabama (6) accounted for more than half. These states were followed by Arizona (3), Oklahoma (3), and Texas (2). Eighteen death penalty states imposed no death sentences in 2015. These states included Georgia, Missouri and Virginia which continue to carry out executions.

*Id.* at 40 (citations omitted). Experts on both sides agree that "public support for the death penalty has dropped from 80% in 1985 to 61% in 2016." *Id.* at 42. Ultimately, the Vermont court denied relief, however, stating:

> The time has surely arrived to recognize that the reforms introduced by *Gregg* and subsequent decisions have largely failed to remedy the problems identified in *Furman*. Institutional authority to change this body of law is reserved to the Supreme Court. For this reason, the trial court is required to deny the defense motions related to the constitutionality of the death penalty.

*Id.* at 56.

This court should not follow *Fell*'s view that the lower courts may only develop, but not act on, empirical evidence demonstrating that *Gregg*'s promise remains unfulfilled. That the death penalty may not be imposed in the arbitrary manner the facts show is not a new legal development but is inherent in the most basic notions of due process and fair punishment embedded in the core of the Eighth Amendment. *See Furman*, 408 U.S. at 274–77 (Brennan, J., concurring) (describing the principle that "the State must not arbitrarily inflict a severe punishment" as "inherent in the [Cruel and Unusual Punishment] Clause" and tracing its application in Anglo–American jurisprudence); *see also id.* at 2426 (Douglas, J., concurring) ("There is evidence that the provision of the English Bill of Rights of 1689, from which the language of the Eighth Amendment was taken, was concerned primarily with selective or irregular application of harsh penalties and that its

aim was to forbid arbitrary and discriminatory penalties of a severe nature."). This rule is one "so deeply embedded in the fabric of due process that everyone takes it for granted," *Dyer v. Calderon,* 151 F.3d 970, 984 (9th Cir.1998) (en banc), and as such is a rule upon which relief should be granted.

Date:  February 28, 2017                        RESPECTFULLY SUBMITTED,

                                                HEATHER E. WILLIAMS
                                                Federal Defender

                                                */s/ Lindsay Bennett*
                                                LINDSAY BENNETT
                                                Assistant Federal Defender

                                                */s/ Mark E. Olive*
                                                MARK E. OLIVE

                                                Attorneys for Petitioner,
                                                JOSEPH EDWARD DUNCAN, III

## CERTIFICATION PURSUANT TO RULE 2(b)(5)
## OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS

The undersigned, being authorized to sign for the movant, declares under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: March 1, 2017

                                                */s/ Lindsay Bennett*
                                                LINDSAY BENNETT

Corrected Defendant's Motion for Collateral Relief          218          *Joseph Edward Duncan, III v. United States of America,*
                                                                         *Case No.2-07-cr-00023-EJL*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of February, 2017, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

Large documents and documents submitted for filing under seal have been served by depositing this date with Federal Express for overnight delivery to the following party:

Rafael M. Gonzalez, Jr.
United States Attorney's Office
Washington Group IV
800 Park Blvd., Suite 600
Boise, Idaho 83712

*/s/ Lindsay Bennett*
LINDSAY BENNETT

Corrected Defendant's Motion for Collateral Relief    219    *Joseph Edward Duncan, III v. United States of America,*
*Case No.2-07-cr-00023-EJL*