BART M. DAVIS, IDAHO STATE BAR NO. 2696
UNITED STATES ATTORNEY
SYRENA C. HARGROVE, IDAHO STATE BAR NO. 6413
KATHERINE L. HOLEY, OKLAHOMA STATE BAR NO. 30110
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE:  (208) 334-1211
FACSIMILE:  (208) 334-1413
E-MAIL:  syrena.hargrove@usdoj.gov; katherine.holey@usdoj.gov

JEFFREY B. KAHAN, PENNSYLVANIA BAR NO. 93199
TRIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE, CAPITAL CASE SECTION
1331 F. STREET, NW; 6TH FL
WASHINGTON, DC 20530
TELEPHONE:  (202) 305-8910
FACSIMILE:  (202) 353-9779
E-MAIL:  jeffrey.kahan@usdoj.gov

Attorneys for United States of America


UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


| | |
|---|---|
| JOSEPH EDWARD DUNCAN, III,<br><br>Movant,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | Case No.  2:17-CV-00091-EJL<br>2:07-CR-00023-EJL<br><br>**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF** |

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................. i
TABLE OF AUTHORITIES ........................................................................................ iv
BACKGROUND FACTS ............................................................................................ 1
    District court proceedings ..................................................................................... 2
    Duncan's waiver and counsel's appeal ................................................................ 5
    Retrospective competency hearing ...................................................................... 7
    Duncan's appeal of the retrospective competency determination ....................... 9

FEDERAL COLLATERAL REVIEW OF PRESUMPTIVELY FINAL CRIMINAL
JUDGMENTS.............................................................................................................. 10
    A.    Cognizable claims ................................................................................... 10
    B.    Time barred claims ................................................................................. 11
    C.    Procedurally defaulted claims ................................................................ 11
    D.    Relitigation and the law of the case doctrine ........................................ 12
    E.    New rule of criminal procedure ............................................................. 13
    F.    Evidentiary development and harmless error ........................................ 14

I.    DUNCAN'S COUNSEL PROVIDED EFFECTIVE ASSISTANCE UNTIL HE
    ELECTED TO FIRE THEM AND PROCEED PRO SE. .................................. 14
    A.    Factual background ................................................................................. 15
        1.    The defense teams ...................................................................... 15
        2.    Pre-trial proceedings and delays ............................................... 19
        3.    Guilty plea and penalty phase trial ............................................ 27
    B.    Duncan has presented procedurally defective claims of judicial error in the
        guise of an attack on the adequacy of counsel. .................................... 33
    C.    Duncan's counsel performed adequately. .............................................. 35
        1.    The adversarial system functioned properly. ............................ 35
        2.    Counsel adequately investigated and advised Duncan ahead of
            his plea. ...................................................................................... 37
        3.    Counsel adequately prepared for the penalty phase trial. ................... 43

II.    THE COURT PROPERLY MET WITH PEVEN OUTSIDE THE PRESENCE OF
    DUNCAN'S OTHER ATTORNEYS. .............................................................. 50
    A.    Procedural bar ........................................................................................ 50
    B.    Even if Duncan's claims were not procedurally defaulted, they would fail. ........ 50
        1.    The Court's discussion with Peven respected Duncan's Sixth
            Amendment and statutory rights. ............................................... 52
        2.    The Court's private discussion with Peven did not violate
            Duncan's due process rights. ...................................................... 55
        3.    The Court's private discussion with Peven did not create a
            substantial risk that Duncan's death sentence was imposed in
            an arbitrary and capricious manner, in violation of the Eighth
            Amendment. ............................................................................... 57

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - i**

III. & IV.  DUNCAN WAS COMPETENT TO PLEAD GUILTY AND PROCEED IN PROPRIA PERSONAM.................................................................................. 58

    A.  Duncan's non-ineffective assistance of counsel claims are procedurally barred. ............................................................................................................ 60

        1.  Duncan procedurally defaulted on his non-ineffective assistance of counsel claims by voluntarily waiving his direct appeal. ........................................................................................... 60

        2.  Duncan also procedurally defaulted on his non-ineffective assistance of counsel claims by failing to raise them in the district court. ................................................................................... 61

    B.  All of Duncan's claims fail on their substance. ...................................... 61

        1.  The record supports finding Duncan competent at all relevant times. ............................................................................................ 62

        2.  Duncan's evidentiary arguments also fail. ......................................... 67

        3.  Duncan received the assistance of effective counsel at the retrospective competency hearing. ................................................ 69

        4.  Duncan was competent to represent himself throughout. .................. 73

        5.  The procedural due process violation Duncan alleges has already been remedied. ...................................................................... 76

V.  THE COURT PROPERLY PERMITTED DUNCAN TO REPRESENT HIMSELF. .... 77

    A.  Procedural bar .......................................................................................... 78

    B.  Courts may not interfere with proper invocations of the right to self-representation. ........................................................................................ 79

VI.  DUNCAN'S COUNSEL APPROPRIATELY OMITTED ANY CHALLENGE TO VENUE, AND DUNCAN HAS NO LEGAL RIGHT TO COMPLAIN ABOUT THE ADEQUACY OF VOIR DIRE THAT HE CONDUCTED. ........................................... 84

    A.  Counsel properly omitted a meritless challenge to venue. ................... 84

    B.  Duncan had an adequate opportunity to select his jury. ...................... 87

        1.  Procedural default ............................................................................ 88

        2.  Duncan's responsibilities as a pro se defendant ................................ 88

VII.  THE COURT PROPERLY ADMITTED EVIDENCE OF DUNCAN'S FUTURE DANGEROUSNESS. ....................................................................................... 91

    A.  Procedural bar .......................................................................................... 91

    B.  The penalty phase consideration of unadjudicated offenses was entirely appropriate. ............................................................................................. 92

        1.  Admission of other crimes evidence ................................................. 92

        2.  Reliability of jury instructions ......................................................... 96

        3.  Alleged prosecutorial misconduct.................................................... 100

    C.  *Teague* bar .............................................................................................. 103

VIII.  THE COURT PROPERLY ADMITTED VIDEO OF DUNCAN'S CRIMES.............. 103

    A.  Procedural bar. ......................................................................................... 104

    B.  This Court properly admitted the video evidence................................... 104

IX.   CONGRESS VALIDLY DEFINED THE OFFENSE UNDERLYING DUNCAN'S CONVICTION AND SENTENCE FOR FIREARM-USE MURDER (Count 7).......... 110

     A.  *Johnson* should not extend to § 924(c) for the same reasons it should not extend to § 16(b). ............................................................................. 112

         1.  No problematic enumerated offenses clause exists in § 924(c), thus distinguishing it from ACCA. ................................................ 113

         2.  Section 924(c) does not go beyond the elements of the offense to consider potential extra-offense conduct. ...................................... 115

         3.  The Supreme Court has not "repeatedly" failed to construe § 924(c); nor have lower courts. ........................................................ 117

     B.  Even if *Johnson* is extended to § 16(b) under *Dimaya*, it should still not be extended to § 924(c)....................................................................... 119

X.   THE COURT PROPERLY ACCEPTED DUNCAN'S WAIVER OF APPEAL. ......... 120

     A.  Procedural bar .................................................................................. 121

     B.  Unequivocal, voluntary and intelligent waiver .................................... 122

         1.  Unequivocal intention ...................................................... 123

         2.  Knowing, intelligent and voluntary waiver ........................ 125

         3.  Adequate advisement ...................................................... 126

     C.  Failed revival of appeal..................................................................... 127

     D.  The requested relief is unavailable. .................................................... 128

XI.   THERE ARE NO ERRORS TO ACCUMULATE. ....................................... 129

XII.   THE DEATH PENALTY REMAINS CONSTITUTIONAL. ...................................... 129

     A.  Procedural bar .................................................................................. 130

     B.  Issue reserved to the Supreme Court ................................................. 131

CONCLUSION.................................................................................................... 132

# TABLE OF AUTHORITIES

## CASES

*Adams v. Carroll*, 875 F.2d 1441 (9th Cir. 1989) ............................................................ 123, 125

*Ainsworth v. Calderon*, 138 F.3d 787 (9th Cir. 1998) ....................................................... 85

*Allen v. Mullin*, 368 F.3d 1220 (10th Cir. 2004) ............................................................... 41

*Allen v. Woodford*, 395 F.3d 979 (9th Cir. 2005) ............................................................. 103

*Arave v. Hoffman*, 552 U.S. 117 (2008) ............................................................................ 44

*Avila v. Galaza*, 297 F.3d 911 (9th Cir. 2002) ................................................................. 36

*Avincola v. Stinson*, 60 F. Supp. 2d 133 (S.D.N.Y. 1999) ............................................... 101

*Babbitt v. Calderon*, 151 F.3d 1170 (9th Cir. 1998) ......................................................... 102

*Battle v. United States*, 419 F.3d 1292 (11th Cir. 2005) ................................................... 11

*Baze v. Rees*, 553 U.S. 35 (2008) ....................................................................................... 131

*Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998) ............................................................. 70

*Beard v. Banks*, 542 U.S. 406 (2004) ..................................................................... 13, 83, 103

*Bell v. Cone*, 535 U.S. 685 (2002) ............................................................................... 36, 53

*Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003) (en banc) ................................... 1, 16

*Blackledge v. Allison*, 431 U.S. 63 (1977) ........................................................................ 107

*Bobby v. Van Hook*, 558 U.S. 4 (2009) ............................................................................... 48

*Bonin v. Vasquez*, 807 F. Supp. 589 (C.D. Cal. 1992) ...................................................... 106

*Bousley v. United States*, 523 U.S. 614 (1998) ......................................... 11, 12, 50, 60, 88, 122

*Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005) ................................................................. 46

*Boyde v. California*, 494 U.S. 370 (1990) .......................................................................... 101

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ..................................................................... 14

*Britt v. North Carolina*, 404 U.S. 226 (1971) ................................................................... 56

*California v. Ramos*, 463 U.S. 992 (1983) ........................................................................ 97

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ........................................................... 51-52

*Cheney v. Washington*, 614 F.3d 987 (9th Cir. 2010) ........................................................ 36

*Clay v. United States*, 537 U.S. 522 (2003) ....................................................................... 11

*Clemons v. Mississippi*, 494 U.S. 738 (1990) .................................................................... 57

*Coal. for a Healthy Cal. v. FCC*, 87 F.3d 383 (9th Cir. 1996) ........................................ 45

*Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers*, 508 U.S. 602 (1993) ................ 99

*Crowe v. Smith*, 151 F.3d 217 (5th Cir. 1998) ................................................................... 51

*Cunningham v. Wong*, 704 F.3d 1143 (9th Cir. 2013) ....................................................... 102

*Darden v. Wainwright*, 477 U.S. 168 (1986) ..................................................................... 101

*Davis v. Ayala*, 135 S. Ct. 2187 (2015) ............................................................................. 57

*Davis v. United States*, 417 U.S. 333 (1974) ......................................................... 14, 55, 57

*Delgado-Hernandez v. Holder*, 697 F.3d 1125 (9th Cir. 2012) .................................... 1, 111

*Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015) ........................................................ 4, 111

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) .............................................................. 101

*Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003) ....................................................... 4

*Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005) ............................................................... 46

*Eggleston v. United States*, 798 F.2d 374 (9th Cir. 1986) ................................................. 42

Ellesha LeCluyse, Note, *The Spectrum of Competency: Determining a Standard of Competence for Pro Se Representation*, 65 Case W. Res. L. Rev. 1239, 1247 (Summer 2015) ......... 74

*Elmore v. Sinclair*, 799 F.3d 1238 (9th Cir. 2015) ........................................................... 42

*Estes v. Texas*, 381 U.S. 532 (1965) .................................................................................. 85

*Eutzy v. Florida*, 471 U.S. 1045 (1985) ............................................................. 97

*Evitts v. Lucey*, 469 U.S. 387 (1985) ................................................................. 55

*Fairbank v. Ayers*, 650 F.3d 1243 (9th Cir. 2011) ........................................... 40

*Faretta v. California*, 422 U.S. 806 (1975) ..................................... 44, 77, 79, 90, 122

*Fid. Expl. & Prod. Co v. United States*, 506 F. 3d 1182 (9th Cir. 2007) ......... 131-132

*Fields v. Brown*, 431 F.3d 1186 (9th Cir. 2005) ............................................... 101

*Gardner v. Florida*, 430 U.S. 349 (1977) ....................................................... 57, 58

*Glossip v. Gross*, 135 S. Ct. 2726, (2015) ................................................... 130, 131

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ......................................................... 57

*Godinez v. Moran*, 509 U.S. 389 (1993) ......................................................... 1, 73

*Gregg v. Georgia*, 428 U.S. 153 (1976) ....................................................... 57, 105

*Griffin v. Illinois*, 351 U.S. 12 (1956) ............................................................. 55

*Gustave v. United States*, 627 F.2d 901 (9th Cir. 1980) .............................. 63, 65

*Hamilton v. United States*, 67 F.3d 761 (9th Cir. 1995) .................................. 10

*Hammond v. United States*, 408 F.2d 481 (9th Cir. 1969) ............................... 12

*Hardy v. United States*, 375 U.S. 277 (1964) .................................................. 54

*Harrington v. Richter*, 562 U.S. 86 (2011) ...................................................... 36

*Hayes v. Ayuers*, 632 F.3d 500 (9th Cir. 2011) ............................................... 85

*Higginbotham v. Louisiana*, 817 F.3d 217 (5th Cir. 2016) ............................ 54

*Hill v. Lockhard*, 474 U.S. 52 (1985) ........................................................... 38, 42

*Hill v. United States*, 368 U.S. 424 (1962) ..................................................... 122

*Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006) ................................................. 53

*Hurles v. Ryan*, 752 F.3d 768 (9th Cir. 2014) .................................................. 73

*In re Synder*, 472 U.S. 634 (1985) ................................................................. 51

*Indiana v. Edwards*, 554 U.S. 164 (2008) ................................... 73, 74, 75, 82, 83

*Irvin v Dowd*, 366 U.S. 717 (1961) ................................................................ 89

*Jackson v. United States*, 881 F.2d 707 (9th Cir. 1989) .................................. 51

*James v. Borg*, 24 F.3d 20 (9th Cir. 1994) ................................................... 36, 84

*James v. United States*, 550 U.S. 192 (2007) ................................................. 114

*Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002) .................................... 39

*Johnson v. United States*, ___ U.S. ___, 135 S. Ct. 2551 (2015) ........ 110, 112, 114, 114-115, 115, 116, 117, 118

*Jones v. Barnes*, 463 U.S. 745 (1983) .......................................................... 40, 41

*Jones v. United States*, 527 U.S. 373 (1999) .............................................. 61, 109

*Jurek v. Texas*, 428 U.S. 262 (1976) ............................................................. 97

*Kennedy v. Lockyer*, 379 F.3d 1041 (9th Cir. 2004) ....................................... 52

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ............................................... 87

*Knowles v. Mirzayance*, 556 U.S. 111 (2009) ................................................. 36

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................................... 36

*Lafler v. Cooper*, 566 U.S. 156 (2012) ........................................................... 42

*Lee v. United States*, 137 S. Ct. 1958 (2017) ................................................. 43

*Lefrak v. Arabian Am. Oil Co.*, 527 F.2d 1136 (2d Cir. 1975) ......................... 51

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ......................................................... 116

*Locks v. Sumner*, 703 F.2d 403 (9th Cir. 1983) .......................................... 90, 124

*Lynch v. Dimaya*, 137 S. Ct. 31 (Sept. 29, 2016) ......................................... 111

*Lynch v. Dimaya*, No. 15-1498, 2016 WL 6768940 (U.S. Nov. 14, 2016) ........ 111

*Madera v. Risley*, 885 F.2d 646 (9th Cir. 1989) ............................................ 56

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - v**

*Maldonado v. Morales*, 556 F.3d 1037 (9th Cir. 2009) ................................ 39
*Marshall v. United States*, 576 F.2d 160 (9th Cir. 1978) .............................. 14
*Massaro v. United States*, 538 U.S. 500 (2003) .......................................... 12
*Mayer v.* City of *Chicago*, 404 U.S. 189 (1971) ......................................... 56
*Mayle v. Felix*, 545 U.S. 644 (2005) .......................................................... 11
*Mempa v. Rhay*, 389 U.S. 128 (1967) ......................................................... 53
*Moncrieffe v. Holder*, 133 S. Ct. 1678 (2013) ...................................... 116-117
*Moran v. Godinez*, 40 F.3d 1567 (9th Cir. 1994) ....................................... 62
*Morris v. California*, 966 F.2d 448 (9th Cir. 1992) .................................... 71
*Murray v. Carrier*, 477 U.S. 478 (1986) ................. 12, 34, 35, 60, 79, 88, 92, 122, 131
*Murray v. Giarratano*, 492 U.S. 1 (1989) ................................................. 55
*Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976) ................................ 85
*Nichols v. United States*, 511 U.S. 738 (1994) .......................................... 94
*Odle v. Woodford*, 238 F.3d 1084 (9th Cir. 2001) .................................. 76, 77
*Odom v. United States*, 455 F.2d 159 (9th Cir. 1972) ............................. 12, 60
*Old Chief v. United States*, 519 U.S. 172 (1997) ..................................... 108
*Olivero v. Foulk*, 2015 WL 366031 (C.D. Cal. Jan. 27, 2015) ................... 101
*Ovalles v. United States*, 861 F.3d 1257 (11th Cir. 2017) ......................... 118
*O'Dell v. Netherland*, 521 U.S. 151 (1997) ........................................... 13, 58
*Padilla v. Kentucky*, 559 U.S. 356 (2010) ................................................ 37
*Pagtalunan v. Galaza*, 291 F.3d 639 (9th Cir. 2002) ................................. 55
*Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002) ...................................... 36
*Premo v. Moore*, 562 U.S. 115 (2011) ...................................................... 38
*Randall v. Brigham*, 74 U.S. 523 (1869) .................................................. 51
*Rees v. Peyton*, 384 U.S. 312 (1966) ...................................................... 125
*Reina-Rodriguez v. United States*, 655 F.3d 1182 (9th Cir. 2011) .......... 13, 37
*Rideau v. Louisiana*, 373 U.S. 723 (1963) ............................................... 85
*Ring v. Arizona*, 536 U.S. 584 (2002) ...................................................... 81
*Roadway Exp., Inc. v. Piper*, 447 U.S. 752 (1980) .................................... 51
*Robi v. Five Platters, Inc.*, 838 F.2d 318, 326 (9th Cir. 1988) ................... 62
*Romano v. Oklahoma*, 512 U.S. 1 (1994) ............................................... 104
*Rompilla v. Beard*, 545 U.S. 374 (2005) .............................................. 45, 81
*Rose v. United States*, 513 F.2d 1251 (8th Cir. 1975) ............................ 68, 69
*Sassounian v. Roe*, 230 F.3d 1097 (9th Cir. 2000) ................................... 103
*Schriro v. Summerlin*, 542 U.S. 348 (2004) ..................... 13, 110, 118, 131
*Sheppard v. Maxwell*, 384 U.S. 333 (1966) .............................................. 85
*Shuti v. Lynch*, 828 F.3d 440 (6th Cir. 2016) ......................................... 119
*Silagy v. Peters*, 905 F.2d 986 (7th Cir. 1990) ..................................... 79-80
*Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002) ...................................... 38
*Simmons v. Blodgett*, 110 F.3d 39 (9th Cir. 1997) .................................... 14
*Sivak v. Hardison*, 658 F.3d 898 (9th Cir. 2011) ...................................... 58
*Skilling v. United States*, 561 U.S. 358 (2010) ................................ 85, 86, 89
*Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003) .............................. 108, 109
*Stafford v. Saffle*, 34 F.3d 1557 (10th Cir. 1994) ..................................... 85
*Stenson v. Lambert*, 504 F.3d 873 (9th Cir. 2007) .................................... 95
*Strickland v. Washington*, 466 U.S. 668 (1984) ............ 35, 38, 45, 49, 70, 71, 73, 81
*Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) (en banc) .................. 46

*Sykes v. United States*, 564 U.S. 1 (2011) ............................................................ 117

*Teague v. Lane*, 488 U.S. 288 (1989) .................................................................... 128

*Teague v. Lane*, 489 U.S. 288 (1989) ..................................... 10, 13, 75-76, 83, 92, 103, 109

*Torrey v. Estelle*, 842 F.2d 234 (9th Cir.1988) .................................. 126, 126-127

*United States v. Addonizio*, 442 U.S. 178 (1979) .......................................... 10, 93

*United States v. Alexander*, 106 F.3d 874 (9th Cir. 1997) .................... 13, 93, 125, 126

*United States v. Arlt*, 41 F.3d 516 (9th Cir. 1994) ............................................ 79

*United States v. Ash*, 413 U.S. 413 (1973) ........................................................ 53

*United States v. Basham*, 789 F.3d 358 (4th Cir. 2015) .................................... 11

*United States v. Benlian*, 63 F.3d 824 (9th Cir. 1995) ...................................... 53

*United States v. Berry*, 624 F.3d 1031 (9th Cir. 2010) ................. 10, 11, 93, 104, 105, 109

*United States v. Bolinger*, 940 F.2d 478 (9th Cir. 1991) ................................. 127

*United States v. Braswell*, 501 F.3d 1147 (9th Cir. 2007) ............................... 50

*United States v. Brownlie*, 915 F.2d 527 (9th Cir.1990) ................................ 126

*United States v. Campa*, 459 F.3d 1121 (11th Cir. 2006) ............................... 85

*United States v. Cardena*, 842 F.3d 959 (7th Cir. 2016) ............................... 118

*United States v. Castro-Verdugo*, 750 F.3d 1065 (9th Cir. 2014) ................... 11

*United States v. Cazares*, 788 F.3d 956 (9th Cir. 2015) ............................... 129

*United States v. Charles*, 581 F.3d 927 (9th Cir. 2009) ........................ 122-123

*United States v. Corley*, 519 F.3d 716 (7th Cir. 2008) ............................ 94, 95

*United States v. Cote*, 51 F.3d 178 (9th Cir. 1995) .................................... 121

*United States v. Cronic*, 466 U.S. 648 (1984) ............................................. 36

*United States v. Davis*, 285 F.3d 378(5th Cir. 2002) .................................... 80

*United States v. Davis*, 677 F. App'x 933 (5th Cir. Jan. 31, 2017) ............... 118

*United States v. Diaz*, 2007 WL 656831 (N.D. Cal. Feb. 28, 2007) ............... 94

*United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011) ................. 95, 96, 121

*United States v. Duncan*, 2008 WL 711603 (Mar. 14, 2008) ............... 79, 80, 99

*United States v. Dunham*, 767 F.2d 1395 (9th Cir. 1985) ........................... 50

*United States v. Eshetu*, 863 F.3d 946 (D.C. Cir. 2017) ............................. 118

*United States v. Evans*, 333 U.S. 483 (1948) ............................................. 118

*United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016) .............. 98, 130, 131

*United States v. Ferguson*, 560 F.3d 1060 (9th Cir. 2009) ............... 74, 76, 123

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) ....................... 129

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008) ............................. 100

*United States v. Frady*, 456 U.S. 152 (1982) ......... 11, 12, 33, 34, 60, 61, 78, 88, 91, 92, 104, 130

*United States v. Gabrion*, 648 F.3d 307 (6th Cir. 2011) .............................. 94

*United States v. Gabrion*, 719 F.3d 511 (6th Cir. 2013) (en banc) ............... 80

*United States v. Garrett*, 680 F.2d 64 (9th Cir. 1982) .............................. 126

*United States v. Gianelli*, 543 F.3d 1178 (9th Cir. 2008) ........................... 93

*United States v. Gilbert*, 807 F.3d 1197 (9th Cir. 2015) ............................. 11

*United States v. Gomez–Norena*, 908 F.2d 497 (9th Cir.1990) ..................... 91

*United States v. Gonzalez*, 2004 WL 1920492 (D. Conn. Aug. 17, 2004) ........ 94, 95

*United States v. Guess*, 203 F.3d 1143 (9th Cir. 2000) ................... 12, 60, 104

*United States v. Gullion*, 575 F.2d 26 (1st Cir. 1978) ................................ 85

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013) ....................... 97, 100

*United States v. Hammer*, 404 F. Supp. 2d. 676 (M.D. Pa. 2005) .......... 11, 122

*United States v. Hammer*, 2011 WL 6020164 (M.D. Pa. Dec. 1, 2011) ........... 98

*United States v. Hayes*, 231 F.3d 1132 (9th Cir. 2000)  ..................................... 90

*United States v. Hein*, 769 F.2d 609 (9th Cir. 1985) ........................................... 55

*United States v. Hernandez*, 203 F.3d 614 (9th Cir. 2000) ........................... 123, 129

*United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) ...................................... 80, 120

*United States v. Hill*, 832 F.3d 135 (2d Cir. 2016)  ........................................... 118

*United States v. Howard*, 381 F.3d 873 (9th Cir. 2004) ......................................... 14

*United States v. Hubbard*, 96 F.3d 1223 (9th Cir. 1996)  ...................................... 81

*United States v. Jingles*, 702 F.3d 494 (9th Cir. 2012) ..................... 12, 13, 58, 60, 120

*United States v. Johnson*, 610 F.3d 1138 (9th Cir. 2010)  ................................. 74, 83

*United States v. Johnson*, 988 F.2d 941 (9th Cir. 1993)  ....................................... 10

*United States v. Kaiser*, 545 F.2d 467 (5th Cir. 1977)  ....................................... 105

*United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000)  ................................ 121

*United States v. Kenney*, 911 F.2d 315 (9th Cir. 1990)  ........................................ 56

*United States v. Kienenberger*, 13 F.3d 1354 (9th Cir. 1994)  ............................... 124

*United States v. Kirk*, 844 F.2d 660 (9th Cir. 1988)  ........................................... 57

*United States v. Lujan*, 603 F.3d 850 (10th Cir. 2010) ........................ 94, 105, 106, 107

*United States v. McDowell*, 814 F.2d 245 (9th Cir. 1987) ................................. 44, 90

*United States v. McMullen*, 98 F.3d 1155 (9th Cir. 1996) .................................. 11, 14

*United States v. Mendez*, 992 F.2d 1488 (9th Cir. 1993)  .................................... 116

*United States v. Mendez-Sanchez*, 563 F.3d 935 (9th Cir. 2009)  ........................... 125

*United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007)  ........................... 81, 105, 109

*United States v. Montalvo*, 331 F.3d 1052 (9th Cir. 2003)  ..................................... 14

*United States v. Nagra*, 147 F.3d 875 (9th Cir. 1998) ........................................... 38

*United States v. Nguyen*, 235 F.3d 1179 (9th Cir. 2000)  ..................................... 123

*United States v. Olano*, 507 U.S. 725 (1993) ...................................................... 97

*United States v. Parker*, 241 F.3d 1114 (9th Cir. 2001)  ........................................ 88

*United States v. Perez-Gonzalez*, 445 F.3d 39 (1st Cir. 2006)  ......................... 107, 109

*United States v. Peterson*, 538 F.3d 1064 (9th Cir. 2008)  ..................................... 91

*United States v. Petrillo*, 332 U.S. 1 (1947)  ..................................................... 117

*United States v. Pickett*, 839 F.3d 697 (8th Cir. 2016)  ....................................... 118

*United States v. Pirro*, 104 F.3d 297 (9th Cir. 1997) ............................................ 12

*United States v. Rahman*, 642 F.3d 1257 (9th Cir. 2011)  .................................... 123

*United States v. Rewald*, 889 F.2d 836 (9th Cir. 1989)  ........................................ 86

*United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004)  ............................... 80, 120

*United States v. Robinson*, 844 F.3d 137 (3d Cir. 2016) ..................................... 119

*United States v. Ross*, 511 F.3d 1233 (9th Cir. 2008) ........................................... 41

*United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007) .................................. 106, 108

*United States v. Sampson*, 2015 WL 7962394 (D. Mass. Dec. 2, 2015)  .................... 98

*United States v. Self*, 100 F. Supp. 3d 773 (D. Ariz. 2015)  ................................. 122

*United States v. Sherwood*, 98 F.3d 402 (9th Cir. 1996) ....................................... 85

*United States v. Skurdal*, 341 F.3d 921 (9th Cir. 2003)  ........................................ 12

*United States v. Span*, 75 F.3d 1383 (9th Cir. 1996) ........................................... 36

*United States v. Taveras*, 488 F. Supp. 2d 246 (E.D.N.Y. 2007)  ............................ 108

*United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016) ......................................... 118

*United States v. Tirouda*, 394 F.3d 683 (9th Cir. 2005) ....................................... 100

*United States v. Wade*, 388 U.S. 218 (1967)  ..................................................... 52

*United States v. Walker*, 234 F.3d 780 (1st Cir. 2000) .......................................... 88

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - viii**

*United States v. Webster*, 421 F.3d 308 (5th Cir. 2005) ................................ 11
*United States v. Weisz*, 718 F.2d 413 (D.C. Cir. 1983) ................................ 109
*United States v. Wilson*, 16 F.3d 1027 (9th Cir. 1994) ................................ 54
*United States v. Withers*, 638 F.3d 1055 (9th Cir. 2011) ........................ 12, 14, 50, 100
*United States v. Wunsch*, 84 F.3d 1110 (9th Cir. 1996) ................................ 51
*United States v. Yousef*, 327 F.3d 56 (2nd Cir. 2003) ................................ 85
*Vandergrift v. United States*, 313 F.2d 93 (9th Cir. 1963) ................................ 69
*Waddington v. Sarausad*, 555 U.S. 179 (2009) ................................ 101
*Walker v. Martel*, 709 F.3d 925 (9th Cir. 2013) ................................ 36, 37
*Walle v. Sigler*, 456 F.2d 1153 (8th Cir. 1972) ................................ 105
*Walls v. Bowersox*, 151 F.3d 827 (8th Cir. 1998) ................................ 41
*Washington v. Recuenco*, 548 U.S. 212 (2006) ................................ 14
*Weeks v. Angelone*, 528 U.S. 225 (2000) ................................ 101
*Welch v. United Stat*es, 136 S. Ct. 1257 (2016) ................................ 118
*Wheat v. United State*s, 486 U.S. 153 (1988) ................................ 82
*Wiggins v. Smith*, 539 U.S. 510 (2003) ................................ 46, 81
*Williams v. New York*, 337 U.S. 241 (1949) ................................ 94
*Wilson v. Parker*, 515 F.3d 682 (6th Cir. 2008) ................................ 44, 49
*Wong v. Belmontes*, 558 U.S. 15 (2009) ................................ 48, 48-49
*Yagman v. Republic Ins.*, 987 F.2d 622 (9th Cir. 1993) ................................ 51

## STATUTES

18 U.S.C. § 16 ................................ 111
18 U.S.C. § 924 ................................ 2, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120
18 U.S.C. § 1201 ................................ 2
18 U.S.C. § 2312 ................................ 3
18 U.S.C. § 3005 ................................ 19
18 U.S.C  § 3591 ................................ 80, 106, 108
18 U.S.C. § 3592 ................................ 104, 105, 106, 107, 119, 120
18 U.S.C. § 3593 ................................ 104, 105, 109
18 U.S.C. § 3595 ................................ 128
18 U.S.C. § 4241 ................................ 6, 7
18 U.S.C. §§ 3591-99 ................................ 3, 104
18 U.S.C. §§ 3591 ................................ 80
26 U.S.C. § 5861 ................................ 3
28 U.S.C. § 753 ................................ 54, 55
28 U.S.C. § 1861 ................................ 89
28 U.S.C. § 2255 ................................ 10, 11, 12, 14, 16, 32, 50, 63, 86, 92, 93, 100, 110, 122

## RULES

Fed. R. App. P. 4 ................................ 128
Fed. R. App. P. 10 ................................ 56
Fed. R. Crim. P. 35 ................................ 93
Fed. R. Crim. P. 52 ................................ 61

## BACKGROUND FACTS

In April 2005, Duncan left North Dakota on a cross-country road trip.  (CR Dkt. 843 at 52.)  The purpose of Duncan's journey was to identify children he could abduct, rape, and murder as "revenge" for the perceived wrongs he had suffered in his life.  (*Id*. at 33-34, 52-53.)  Duncan used sophisticated surveillance techniques to stalk possible victims over the course of several weeks, focusing specifically on "homes with small children."  (*Id*. at 52.)  Duncan also spent time exploring isolated campsites where he could torment and kill his victims without being detected.  (*Id*.)

Early in the morning of May 16, 2005, Duncan broke into a rural home in the Wolf Lodge area of Coeur d'Alene, Idaho, intending to kidnap two children who lived there.  (*United States v. Duncan*, Appeal No. 08-99031, ECF No. 86-1 at 9243.)  Duncan had conducted surveillance and knew that the children—nine-year-old D.G., a boy, and eight-year-old S.G., a girl—were inside the home with their mother, Brenda G., their mother's boyfriend, Mark M., and their 13-year-old brother, Sl.G.  (*Id*.)  Duncan wore a hat, mask, and gloves; he was armed with a hammer and a loaded sawed-off shotgun; and he brought duct tape, night-vision goggles, and a package of zip ties.  (*Id*.)

Duncan woke Brenda at gunpoint and forced her to take him to the bedrooms, where he collected the remaining family members and led them to the living room.  (*Id*.)  Duncan forced all of the family members to lie face down on the living room floor, and he bound their hands and feet with duct tape and zip ties.  (*Id*.)  Duncan then took D.G., S.G., and Sl.G. outside.  After forcing D.G. and S.G. to lie on the grass, Duncan used his hammer to bludgeon Sl.G. until he believed the child was dead.  (*Id*.)  Duncan then returned to the house and used the hammer to bludgeon Brenda and Mark.  (*Id*.)  After checking on Sl.G., Brenda, and Mark, and delivering additional blows, Duncan satisfied himself that they were dead.  He loaded D.G. and S.G. into a

stolen rental car, and drove the siblings to a secluded campsite in the Lolo National Forest in Montana.  (*Id.*)

Duncan held D.G. and S.G. at his camp for almost seven weeks, during which he repeatedly raped and tortured the children and made video recordings of his crimes.  (*Id.*)  On or about June 22, 2005, Duncan murdered D.G. by shooting him with the sawed-off shotgun.  (*Id.* at 9243-44.)  Duncan kept S.G. at the campsite and continued to abuse her for another ten days before taking her back to Coeur d'Alene to eat at a restaurant.  (*Id.* at 9244.)  An employee and a customer recognized the girl and called the police.  Duncan was arrested.  (*Id.*)

**District court proceedings**

Duncan was charged in Idaho state court with multiple counts of kidnapping and murder, to which he pleaded guilty.  (*Id.*)  Additionally, a federal grand jury indicted Duncan on ten counts related to the kidnapping and abduction of D.G. and S.G., and the death of D.G., including three death-eligible counts (which are in bold):

**Count 1**:  kidnapping a minor resulting in death, in violation of 18 U.S.C. § 1201(a)(1) and (g)

Count 2:  kidnapping a minor, in violation of 18 U.S.C. § 1201(a)(1) and (g);

Counts 3 and 4:  each for aggravated sexual abuse of a minor, in violation of 18 U.S.C. § 2241(c);

**Count 5**:  sexual exploitation of a child resulting in death, in violation of 18 U.S.C. § 2251(a) and (e);

Count 6:  possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1);

**Count 7**:  using a firearm during and in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), (B)(i), and (j)(1);

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 2**

Count 8:  transportation of a stolen firearm, in violation of 18 U.S.C. § 922(i);

Count 9:  possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d); and

Count 10:  transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312.

(CR Dkt. 602 at 1-2).

With the advice of counsel, Duncan pleaded guilty to the federal charges on December 3, 2007. (*United States v. Duncan*, Appeal No. 08-99031, ECF No. 86-1 at 9244.)

Pursuant to the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. §§ 3591-99, this Court empaneled a jury to determine whether Duncan should be sentenced to death or life imprisonment.  (*United States v. Duncan*, Appeal No. 08-99031, ECF No. 86-1 at 9244.)  On April 16, 2008, the second day of jury selection, Duncan informed the Court that he wished to represent himself.  (*Id.* at 9244-45.)  The Court held a hearing to consider that motion and examined Duncan about his motivations and his mental competency.  (*Id.*)  After that hearing, this Court ordered that Duncan should be evaluated by a psychologist to determine whether he was competent to represent himself.  (*Id.* at 9244-45.)  Over the course of the next three months, Duncan was evaluated by two court-appointed psychologists, including an intensive review of his history and current mental condition at the Bureau of Prisons.  (*Id.* at 9245-46; CR Dkt. 843 at 14-16.)

Both court-appointed psychologists concluded that Duncan was competent.  (*Id.*)  The first psychologist concluded that, although Duncan's thoughts were "somewhat unusual," he was fully capable of understanding his conduct and the proceedings against him; he could properly assist in his own defense; and he knowingly, intelligently, and voluntarily wished to represent himself.  (*Id.* at 9245.)  The second psychologist concluded that, although Duncan had "very strong spiritual and ideological viewpoints regarding religion," such views were "not uncommon" among devoutly religious people and did not cast doubt on Duncan's competence.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 3**

(*Id.* at 9246.)  Duncan's attorneys, however, independently engaged three mental health experts, each of whom concluded that Duncan was incompetent.  (*Id*. at 9245.)

After reviewing the competency evaluations, this Court concluded that there was "no good faith doubt that [Duncan was] competent to proceed."  (CR Dkt. 494 at 12.)  The Court found that the reports and conclusions of the Court-appointed experts were "more credible" than those of the defense experts, whose conclusions the Court-appointed experts had considered in their analyses.  (*Id.* at 11.)  The Court further noted that Duncan had never exhibited irrational behavior during the state or federal proceedings, nor had his attorneys raised any concerns about his competence until he tried to dismiss them.  (*Id.* at 7-9.)  Duncan had also consistently displayed, in the Court's judgment, "a level of intelligence more than sufficient to evidence his understanding of [the] proceeding and his competency to proceed."  (*Id.* at 9.)

After conducting a further hearing on Duncan's request to proceed pro se, this Court ruled that Duncan's waiver of his right to counsel was knowing, intelligent, and voluntary.  (CR Dkt. 502 at 3-4.)  The Court accordingly allowed Duncan to represent himself during the penalty phase.  The Court appointed Duncan's attorneys to act as standby counsel for the purpose of assisting Duncan in obtaining "discovery and defense materials," but forbade them from sitting at counsel table or participating at the sentencing hearing "unless otherwise permitted by the Court."  (*Id.* at 8-10.)

Following the sentencing hearing, a jury unanimously recommended that Duncan be sentenced to death on Counts 1, 5, and 7.  (CR Dkt. 598 at 1-2.)  This Court sentenced him in accordance with the jury's recommendation on August 27, 2008.  (*Id.*); *see* 18 U.S.C. § 3594. The Court also imposed a consecutive term of life imprisonment on Count 4, concurrent terms of life imprisonment on Counts 2 and 3, and concurrent terms of 120 months of imprisonment on each of the remaining counts.  *See* (CR Dkt. 602 at 3.)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 4**

**Duncan's waiver and counsel's appeal**

Duncan informed the Government that he did not wish to appeal his conviction or sentence.  *See* (CR Dkt. 606 at 5.)  He also expressed concern that standby counsel would attempt to file an appeal without his permission.  (*Id.*)  This Court subsequently received a letter from Duncan that read as follows:  "This is to inform the Court that if any appeal is initiated on my behalf it is done contrary to my wishes."  (CR Dkt. 607 at 1.)  When Duncan's standby counsel attempted to file a notice of appeal on Duncan's behalf, the Government moved to strike the notice.  (CR Dkt. 606.)

On November 24, 2008, this Court held a hearing and examined Duncan to determine whether he understood his right to appeal and the consequences of his waiver.  (*United States v. Duncan*, Appeal No. 08-99031, ECF No. 86-1 at 9246-47; Sealed CR Dkt. 637.)  Duncan responded that he "certainly underst[oo]d" his right to appeal but had "no desire . . . to invoke it."  (*United States v. Duncan*, Appeal No. 08-99031, ECF No. 86-1 at 9247.)  The Court explained to Duncan the ramifications of waiving his right to appeal, including the fact that his conviction and sentence would become final, and Duncan replied that he understood the consequences and still wished to forgo an appeal.  (Sealed CR Dkt. 637 at 11-21.)  Duncan also confirmed that he had discussed the matter with standby counsel and understood their position, but had made a conscious decision not to follow their advice.  (*Id.* at 12-13.)  Duncan explained, orally and in a written affidavit, that his decision not to appeal was based on his philosophical and religious views concerning the proceedings, his criminal conduct, and his desire not to contest the jury's verdict.  (*Id.* at 9-11, 13-14, 17; CR Dkt. 613.)

When questioned by this Court about whether he truly wanted to forgo appeal, Duncan stated that his position was "very clear":  "I understand the process, I understand the law, I understand the history of the law," and "I do not have any intention of appealing."  (Sealed CR

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 5**

Dkt. 637 at 16.)  Duncan explained that he had decided to represent himself and reject standby counsel's advice because he did not "want to get involved in the rationalization process of killing again" and had "no argument" to make against the jury's verdict.  (*Id.* at 17.)  In Duncan's view, "I've made my choices and now you have to make yours as a system, as society . . . . I want to allow and I want to accept that choice, but I don't want to participate in it."  (*Id.*)

This Court ruled that Duncan was competent to represent himself and had knowingly, intelligently, and voluntarily waived his right to appeal.  (*Id.* at 19-22.)  The Court therefore struck the notice of appeal filed by standby counsel.  (*Id.* at 22; CR Dkt. 612.)  Standby counsel nevertheless transmitted their notice of appeal to the court of appeals, which issued an order to show cause why the appeal should not be dismissed for lack of jurisdiction.  (*United States v. Duncan*, Appeal No. 08-99031, ECF No. 4.)  On December 14, 2010, shortly before oral argument on the order to show cause, and more than two years after he waived his right to appeal, Duncan submitted a handwritten letter to the court in which he reiterated his reasons for not wanting to appeal.  (*Id.* at ECF No. 76-2.)  Nonetheless, Duncan stated that he had come to believe that it would be "detrimental" to "impose" his desire not to appeal "onto other people," particularly his mother, and thus he wished to "withdraw [his] waiver of appeal."  (*Id.* at 1-2.)  Despite having earlier argued that Duncan was delusional and not competent to make decisions concerning whether to appeal, standby counsel argued that Duncan's letter rendered moot any jurisdictional issues or competency concerns and that the court of appeals should therefore accept Duncan's withdrawal of his waiver of appeal and schedule merits briefing on Duncan's direct appeal.  (*United States v. Duncan*, Appeal No. 08-99031, ECF No. 76-1 at 3-4.)

The court of appeals denied standby counsel's motion, but remanded the case to this Court with instructions to hold a retrospective competency hearing under 18 U.S.C. § 4241 to determine whether Duncan was competent at the time he waived his right to appeal.  (*United*

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 6**

*States v. Duncan*, Appeal No. 08-99031, ECF No. 86-1 at 9254.)[1]  The court acknowledged that

"retrospective assessments of a defendant's competence" are disfavored, (*id.* at n.3 (citing *Pate*

*v. Robinson*, 383 U.S. 375, 387 (1966))), but concluded that the record in this case was

sufficiently developed to permit such an assessment but that more facts concerning Duncan's

competence were necessary to permit the Court to determine whether Duncan had validly waived

his right to appeal.  (*Id.* at 9252-54.)

       In a petition for a writ of certiorari in the Supreme Court, counsel argued that the Eighth

Amendment required the court of appeals to accept Duncan's belated request to withdraw his

appeal waiver and rendered moot any question about his competence to forgo appeal.  (Pet. for

Writ of Cert. at 12-23, *Duncan v. United States*, Supreme Court No. 11-7523, (Nov. 16, 2011).)

In opposing the petition, the Government argued that review was not warranted in light of the

interlocutory posture of the case, (United States Br. in Opp'n 13-15, *Duncan v. United States*,

Supreme Court No. 11-7523 (Feb. 22, 2012)), and, in the alternative, that Duncan's contentions

lacked merit.  (*Id.* at 15-23.)  The Supreme Court denied the petition.  *See* (CR Dkt. 676; *Duncan*

*v. United States*, Supreme Court No. 11-7523.)

       **Retrospective competency hearing**

       Duncan's retrospective competency hearing began on January 8, 2013, and consumed 23

days, during which this Court heard testimony from a Government expert, four defense experts,

numerous lay witnesses (including Duncan's previous defense counsel), and four Court-

appointed expert witnesses who had thoroughly evaluated Duncan.  (CR Dkt. 843 at 8, 41-42,

---

[1]       Section 4241(a) requires a court to hold a competency hearing whenever there is
"reasonable cause to believe that the defendant may presently be suffering from a mental disease
or defect" that renders him "unable to understand the nature and consequences of the
proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a).  The court
must appoint counsel to represent the defendant at such a hearing and must afford the defendant
an opportunity to testify, present evidence, and subpoena witnesses.  18 U.S.C. §§ 4241(c),
4247(d).

63.)  Based on that evidence, and the Court's own interactions with Duncan throughout the proceedings, (*id.* at 50-51, 63), the Court issued a 66-page opinion finding that Duncan had competently waived his right to appeal.  (*Id.* at 1-66.)

This Court found, in accord with the unanimous conclusion of all four Court-appointed experts, that Duncan was a pedophile and a narcissist who exhibited signs of a "personality disorder," but that he did not suffer from any "major mental disease or defect."  (CR Dkt. 843 at 10-18, 31-36.)  The Court also concluded that there was no evidence that Duncan was delusional or hallucinatory.  (*Id.* at 33-34.)  The Court reviewed at length the contrary findings of the defense experts and determined that they were not credible.  (*Id.* at 19-36.)  In addition, the Court did "not place[] any weight" on the testimony of the sole Government expert.  (*Id.* at 19.)

This Court further found that, "[e]ven if [Duncan's] mental disease or defect is more severe than determined by the Court here," (*id.* at 36), it "clearly" did not interfere with his competence to waive appeal.  (*Id.* at 37.)  The Court found that Duncan was "highly intellectual" and possessed "more than sufficient cognitive capacity" to make informed and rational decisions about his case.  (*Id.* at 37-38, 48-49.)  The Court concluded that throughout the proceedings, Duncan was "clear in his thoughts, intelligent, had a complete understanding and knowledge of the proceedings and his options, and . . . understood his legal position and the options available to him."  (*Id.* at 49.)  The Court thoroughly reviewed the expert and lay testimony on this issue and found the testimony and conclusions of the Court-appointed experts—all of whom concluded that Duncan was competent—to be more credible than the contrary conclusions of defense witnesses.  *See* (*id.* at 39-45, 53, 60.)

This Court reconsidered the record of Duncan's initial waiver hearing, *see* (*id.* at 6-7), in light of its findings at the retrospective competency hearing. It concluded that Duncan had "clearly and unequivocally waived his right to file an appeal [after] having been fully advised of

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 8**

the consequences of that decision and knowing full well the ramifications of doing so." (*Id.* at 63.)  Duncan's decision reflected "a rational choice based on [Duncan's] acknowledgment of his guilt for the crimes charged and his decision to no longer participate in the process." (*Id.*)  The Court acknowledged that "[s]tand-by counsel clearly did not agree with [Duncan's] choices," but found that Duncan made a "knowing, voluntary, and rational choice" not to follow their advice, was competent to do so, and thus validly waived his right to appeal.  (*Id.* at 45-46, 62-65.)  The Court therefore reinstated its order striking standby counsel's notice of appeal.  (*Id.* at 66.)

**Duncan's appeal of the retrospective competency determination**

On March 27, 2015, the court of appeals affirmed this Court's retrospective competency decision.  *See* (CR Dkt. 860; *United States v. Duncan*, Appeal No. 13-99011, ECF No. 55-1 at 2-5.)  The court concluded that each of this Court's factual findings, including its findings that Duncan was not delusional and that Duncan was competent to waive appeal, was based on "valid reasons" that were "supported by evidence in the record."  (*United States v. Duncan*, Appeal No. 13-99011, ECF No. 55-1 at 2-4.)  The court of appeals further held that this Court had applied the correct legal standard for determining competence and that, in any event, its findings were sufficient to establish Duncan's competence under any standard.  (*Id.* at 3.)  The court of appeals held that "[b]ecause [Duncan] was competent" when he "validly and affirmatively waived his right to file an appeal," the notice of appeal filed by standby counsel "was a nullity."  (*Id.*)  Duncan's letter purporting to "withdraw" his two-year old waiver was untimely under the FDPA and the Federal Rules of Appellate Procedure, the court of appeals reasoned, and thus provided no basis for allowing standby counsel's appeal to proceed.  (*Id.* at 4-5 (citing 18 U.S.C. § 3595(a); FED. R. APP. P. 4(b)(1)(A)).)

The Supreme Court denied Duncan's petition for certiorari on February 29, 2016.  *See* (*United States v. Duncan*, Appeal No. 13-99011 at ECF No. 62-1; CR Dkt. 866.)  Acting through

counsel, Duncan timely filed his 28 U.S.C. § 2255 motion on February 28, 2017.  (CV Dkt. 4;

CR Dkt. 867.)

## FEDERAL COLLATERAL REVIEW OF PRESUMPTIVELY FINAL CRIMINAL JUDGMENTS

Collateral review under 28 U.S.C. § 2255 provides a narrower vehicle for relief than a

direct appeal.  *United States v. Addonizio*, 442 U.S. 178, 184 (1979).  With limited exceptions, a

§ 2255 litigant may not successfully press claims based on (1) simple trial error, (2) a

procedurally defaulted ground, (3) a previously rejected appellate contention, (4) a new

procedural rule as defined by *Teague v. Lane*, 489 U.S. 288 (1989), or (5) an error that did not

have a substantial and injurious effect on the verdict.

### A.      Cognizable claims

Although § 2255 provides a comprehensive remedy, "it does not encompass all claimed

errors."  *Addonizio*, 442 U.S. at 185; *see Hamilton v. United States*, 67 F.3d 761, 763 (9th Cir.

1995).  Once a defendant has exhausted or waived an appeal, courts may properly "'presume he

stands fairly and finally convicted.'"  *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir.

1993) (quoting *United States v. Frady*, 456 U.S. 152, 164 (1982)).  Thus, errors do not provide a

basis for collateral relief unless they "constitute[] a 'fundamental defect which inherently

result[ed] in a complete miscarriage of justice.'"  *Addonizio*, 442 U.S. at 185 (quoting *Hill v.

United States*, 368 U.S. 424 (1962); *see, e.g.*, *United States v. Berry*, 624 F.3d 1031, 1039-40

(9th Cir. 2010).  Stated another way, trial errors do not offend due process, or merit collateral

relief, unless they converted an otherwise fair trial into a proceeding that was "repugnant to an

enlightened system of justice."  *Vandergrift v. United States*, 313 F.2d 93, 96 (9th Cir. 1963); *see

United States v. Timmreck*, 441 U.S. 780, 783-84 (1979).

### B.     Time barred claims

Federal prisoners have one year from final criminal judgments to seek collateral review.

28 U.S.C. § 2255(f); *United States v. Castro-Verdugo*, 750 F.3d 1065, 1071 (9th Cir. 2014).

Judgments become final for purposes of the limitations period on the day the Supreme Court

denies certiorari or affirms the merits.  *Clay v. United States*, 537 U.S. 522, 527 (2003).  The

limitations period bars belated amendments that do not relate back to a timely-filed claim.  *See*

*Mayle v. Felix*, 545 U.S. 644, 649-50 (2005).  An amendment does not relate back if it relies on

"facts that differ in both time and type from those set forth in the original pleading."  *Id.* at 650.

Litigants may justify untimely § 2255 pleadings by demonstrating a need for equitable tolling, a

remedy the courts reserve for extraordinary circumstances beyond the movant's control.  *See*

*United States v. Gilbert*, 807 F.3d 1197, 1201-02 (9th Cir. 2015).

### C.     Procedurally defaulted claims

Collateral review may not "'do service for an appeal.'"  *Bousley v. United States*, 523

U.S. 614, 621 (1998) (quoting *Reed v. Farley*, 512 U.S. 339, 354 (1994)).  Thus, the procedural

default doctrine bars consideration of claims the movant omitted to raise appropriately on appeal.

*Frady*, 456 U.S. 165 (1982); *United States v. McMullen*, 98 F.3d 1155, 1157 (9th Cir. 1996); *see*

*also Berry*, 624 F.3d at 1038 (holding "§ 2255 may not be used as a chance at a second appeal").

By extension, defendants who waive their appeals default any issue under § 2255 that they could

have presented on direct review.  *United States v. Hammer*, 404 F. Supp. 2d 676, 800 (M.D. Pa.

2005).  The default doctrine applies equally in capital and non-capital cases.  *See, e.g.*, *United*

*States v. Basham*, 789 F.3d 358, 376-79 (4th Cir. 2015); *United States v. Webster*, 421 F.3d 308,

310-11 & n.7 (5th Cir. 2005); *Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005).  An

exception to the doctrine lies for claims of ineffective assistance of trial counsel, which should be

raised in a collateral attack rather than a direct appeal. *See United States v. Pirro*, 104 F.3d 297, 299 (9th Cir. 1997); *see also Massaro v. United States*, 538 U.S. 500, 504-05 (2003) (expressing a preference for ineffectiveness claims presented in collateral actions).

Courts may adjudicate the merits of otherwise defaulted claims in two instances. First, they may consider such claims when a movant demonstrates "he was 'actually innocent' of . . . the crime for which he was indicted." *United States v. Guess*, 203 F.3d 1143, 1145 (9th Cir. 2000) (citing *Bousley*, 523 U.S. at 622). Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice. *Guess*, 203 F.3d at 1145. To demonstrate cause, a movant must show that "some objective factor external to the defense" impeded compliance with a procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *United States v. Skurdal*, 341 F.3d 921, 925 (9th Cir. 2003). The cause standard is not met by a showing of counsel's inaction, unless it amounted to constitutional ineffectiveness. *Murray*, 477 U.S. at 488; *Skurdal*, 341 F.3d at 925-26. Having met the cause threshold, a movant must also establish prejudice by demonstrating that errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170; *see United States v. Withers*, 638 F.3d 1055, 1065 (9th Cir. 2011).

### D.    Relitigation and the law of the case doctrine

As with issues omitted on appeal, a § 2255 movant may not relitigate a matter decided adversely on direct review, absent changed circumstances of fact or law. *Odom v. United States*, 455 F.2d 159, 160 (9th Cir. 1972) (per curiam); *Hammond v. United States*, 408 F.2d 481, 483 (9th Cir. 1969); *see also United States v. Jingles*, 702 F.3d 494, 498 (9th Cir. 2012) (construing the relitigation bar within the law of the case doctrine). As in other legal arenas, § 2255 courts are "ordinarily precluded from reexamining an issue previously decided by the same court, or a

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 12**

higher court, in the same case." *Jingles*, 702 F.3d at 499 (internal quotation marks omitted).  The

bar applies to issues that "have been decided explicitly or by necessary implication in the

previous disposition." *Id.* (internal quotation marks omitted).  Courts have discretion to permit

relitigation if:  "1) the first decision was clearly erroneous; 2) an intervening change in the law

has occurred; 3) the evidence on remand is substantially different; 4) other changed

circumstances exist; or 5) a manifest injustice would otherwise result."  *United States v.*

*Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).

   **E.**  **New rule of criminal procedure**

   Collateral relief is also limited to claims based on established law.  *Teague*, 489 U.S. at

310; *see Reina-Rodriguez v. United States*, 655 F.3d 1182, 1187 (9th Cir. 2011).  When the

Supreme Court announces a new rule of law, it "applies to all criminal cases still pending on

direct review.  As to convictions that are already final, however, the rule applies only in limited

circumstances."  *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted).  Only new

substantive doctrines (those that alter the range of punishable conduct or the class of punishable

offenders) apply retroactively; new procedural rules do not.  *Id.* at 351-52.

   Courts employ a three-step analysis to ascertain whether a rule of criminal procedure

applies.  *Beard v. Banks*, 542 U.S. 406, 411 (2004).  First, they determine when the judgment

became final.  *Id.*  Second, they decide whether the pertinent rule of law was "new" at the time of

finality by determining whether a "court considering the defendant's claim at the time his

conviction became final would have felt compelled by existing precedent to conclude that the

rule he seeks was required by the Constitution."  *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997)

(internal quotation marks omitted).  Third, courts consider if the new procedural rule is one of

"watershed" magnitude, and therefore exempt from *Teague*.  *Beard*, 542 U.S. at 417.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL**
**RELIEF - 13**

F.        **Evidentiary development and harmless error**

After reviewing the Government's answer and any pertinent records, courts adjudicating

motions to vacate must determine if an evidentiary hearing is warranted under Rule 8 of the

Rules Governing § 2255 Proceedings.  No hearing is necessary if the movant's allegations,

viewed against the record, fail to state a claim for relief or "are so palpably incredible or patently

frivolous as to warrant summary dismissal."  *McMullen*, 98 F.3d at 1159 (internal quotation

marks omitted); *see also United States v. Howard*, 381 F.3d 873, 879 (9th Cir. 2004) (holding

that bald, conclusory or inherently incredible allegations do not support a hearing).  At a hearing,

the movant bears the burden of establishing factual allegations by a preponderance of the

evidence.  *See Simmons v. Blodgett*, 110 F.3d 39, 41 (9th Cir. 1997).

Assuming the movant can establish legal error, relief is automatic only for a limited pool

of "structural" errors.  *See Washington v. Recuenco*, 548 U.S. 212, 218 (2006); *see, e.g., Withers*,

638 F.3d 1055, 1065 (9th Cir. 2011).  For all other error, relief may lie only if it "had substantial

and injurious effect or influence" in determining the outcome of the case.  *Brecht v. Abrahmson*,

507 U.S. 619, 637 (1993) (internal quotation marks omitted); *see United States v. Montalvo*, 331

F.3d 1052, 1058 (9th Cir. 2003) (holding *Brecht* harmless error standard applicable to § 2255

proceedings).  Accordingly, and as previously noted, a § 2255 movant may obtain relief only by

identifying a "fundamental defect which inherently results in a complete miscarriage of justice."

*Davis v. United States*, 417 U.S. 333, 346 (1974) (internal quotation marks omitted); *Marshall v.*

*United States*, 576 F.2d 160, 162 (9th Cir. 1978).

I.     **DUNCAN'S COUNSEL PROVIDED EFFECTIVE ASSISTANCE UNTIL HE
       ELECTED TO FIRE THEM AND PROCEED PRO SE.**

Duncan claims he received ineffective assistance of trial counsel prior to his decision to

represent himself.  From the outset of his argument, Duncan attempts to lay the blame for every

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 14**

asserted error at the feet of Roger Peven, the attorney initially appointed to lead the defense. After Peven revealed personal and substance abuse issues that had affected his ability to represent Duncan, the Court permitted him to withdraw as lead counsel.  But Duncan never wanted for attorneys, and enjoyed the services of the nation's most celebrated capital-defense lawyer, Judy Clarke, as an advisor to his team of lawyers and eventually, in Peven's stead, as lead counsel.  Still, Duncan complains that absent counsel's errors, he would not have pleaded guilty, nor would he have subsequently decided to represent himself during the penalty phase trial.  (CV Dkt. 4 at 13-47.)  The record does not support these assertions.  Though he casts blame widely, Duncan cannot overcome the fact that he decided to plead guilty on the sound advice of counsel, and that the Government would have convicted him of all the charged offenses had he done otherwise.  Duncan's complaints about the efforts of his attorneys to uncover penalty phase evidence are entirely moot, given that he fired the lawyers and decided—against the advice of counsel—to forgo a case in mitigation.  Even if Duncan had presented a justiciable claim in that regard, he has not identified a meritorious one: he cannot show that any marginal difference in the mitigation evidence he elected to suppress from view would have altered the penalty verdict.

   A.    **Factual background**

      1.    **The defense teams**

   On July 29, 2005, this Court appointed Roger Peven, the Spokane Federal Public Defender, to represent Duncan in the impending federal case.  (CR Dkt. 22-1.)  Peven requested pre-indictment appointment so that he could begin negotiations with the United States with the aim of avoiding the death penalty.

   Upon his appointment, which occurred fifteen months before Duncan's federal

indictment, Peven began assembling a team to represent Duncan in federal court.  By August

2005, within a month of Duncan's arrest, Peven had arranged for the involvement of three

mitigation specialists, two investigators, and a victim outreach specialist.  Additionally, he

retained neuropsychiatrist George Woods to consult on mental health issues.  (CR Dkt. 824, Vol.

18, at 4557.)[2]

     In December 2005, Judy Clarke, a lawyer heralded as the nation's premier capital defense

attorney,[3] joined the federal defense team as an advisor on potential defenses and mitigation

tactics.  (CR Dkt. 816, Vol. 10, at 2579.)  Clarke and Peven met with the U.S. Attorney's Office

to argue against pursuit of the death penalty.  (Sealed CR Dkts. 23-4, 23-13.)  Clarke strategized

with the defense team on an ongoing basis, speaking to such issues as mental health and

competency.  *See* (Sealed Gov't Attach. 7.)

     To develop and maintain a relationship with Duncan, members of the defense team met

with him almost daily.  (CR Dkt. 819, Vol. 13, at 3474, CR Dkt. 824, Vol. 18, at 4550; Sealed

Gov't Attach. 3.)  For instance, mitigation expert Scarlet Nerad visited Duncan forty to fifty

times between September 2005 and March 2006.  (CR Dkt. 824, Vol. 18, at 4550.)  During

---

[2]    Duncan's current counsel have agreed that all competency evidence, whether admitted or offered, may be used in this proceeding regardless of any previously asserted privilege.  The agreement aside, the evidence also falls within an implied privilege waiver, given its relevance to the § 2255 claims.  *See Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003) (en banc).

[3]    Clarke has represented several notorious capital defendants:  Theodore Kaczynski (E.D. Cal. case no. 2:96-cr-00259-GEB), Buford Furrow (C.D. Cal. case no. 2:99-cr-00838-NM), Eric Rudolph (N.D. Ala. case no. CR-00-0422-S), Jared Loughner (D. Ariz. case no. 2:11-cr-00187), and Dzhokhar Tsarnaev (D. Mass. Crim. No. 13-10200-GAO).  Her efforts have attracted a great deal of notice.  *See, e.g.*, Patrick Radden Keefe, *The Worst of the Worst*, THE NEW YORKER, Sept. 14, 2015 ("Clarke may be the best death-penalty lawyer in America."); William Glaberson, *Loughner's Lawyer is Called a Master Strategist*, N.Y. TIMES, Jan. 10, 2011, at A17; Alan Abrahamson, *Picking Fights for the Good of the People*, L.A. TIMES, Mar. 4, 1990 ("Clarke has made a career of defending her clients to the limit.").

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 16**

hours-long interviews, she and Duncan candidly discussed his past and his crimes.  (CR Dkt.

816, Vol. 10, at 2630.)  From the outset, however, Duncan repeatedly expressed a desire to forgo

mitigation evidence.  *See, e.g.*, (Sealed Gov't Attach. 3 at 13 (Duncan "didn't want his family to

testify b/c they are also 'victims'"), 62 (Duncan did not want his past experiences presented as an

"excuse for his behavior"), 64 (Duncan expressed sentiment that abuse he suffered was

"irrelevant" and should not be raised), 89 (Duncan did not want to be presented as "crazy"); CR

Dkt. 825, Vol. 19, at 4888.)  Duncan likewise made clear his intention to proceed pro se.  *See,*

*e.g.*, (CR Dkt. 823, Vol. 17, at 4394-95 (testimony concerning counsel's recognition of Duncan's

desire to represent himself); Sealed Gov't Attach. 3 at 60 ("[Duncan] said that he still sometimes

thinks about his position, when he had stated he would ask to have us removed").)

  Hoping they would overcome their client's resistance to mitigation, the defense team

extensively documented interviews with Duncan and developed evidence of his family history,

his "confusing relationship" with his mother, his experience in the Western State Hospital Sex

Offender Treatment Program ("WSH"), and the sexual abuse he had suffered at the hands of

relatives and fellow prisoners.  (Sealed Gov't Attach. 12.)  The defense built its case by

obtaining evidence to corroborate Duncan's accounts and of his mental health symptoms.  (CR

Dkt. 819, Vol. 13, at 3474.)

  Alongside the federal team, the Kootenai County Public Defenders built a defense for

Duncan on his state charges.[4]  Like its federal counterpart, the state team immediately began

building a relationship with Duncan, developing his life history, and investigating potential

---

[4]  The state team included three mental health experts:  neuropsychologist Dr. Craig
Beaver, sexual deviancy specialist Dr. Judith Becker, and neuropsychiatrist Dr. George Woods.
It also included a mitigation specialist, Joyce Naffziger, and two investigators, Mary Fisher and
Mark Durant.  (CR Dkt. 816, Vol. 10, at 2413, 2647-48, 2650, 2575, 2577; CR Dkt. 817, Vol.
11, at 2669-70; CR Dkt. 824, Vol. 18, at 4534; Sealed CR Dkt. 29 at 2; Sealed CR Dkt. 194 at 2.)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL**
**RELIEF - 17**

defenses and mitigating evidence.  *See* (CR Dkt. 816, Vol. 10, at 2580-81, 2587, 2593, 2595, 2616-17.)  By March 2006, the state team had amassed a substantial case based on "voluminous" records and extensive interviews of Duncan and other witnesses.  (CR Dkt. 816, Vol. 10, at 2587; CR Dkt. 817, Vol. 11, at 2585-87.)

From the beginning, the two teams coordinated efforts.  *E.g.*, (CR Dkt. 817, Vol. 11, at 2666 (noting August 29, 2005 meeting among teams to discuss strategy and potential mental health experts), 2669 (noting September 12, 2005 teleconference with Dr. Woods, Ms. Davis, Mr. Lohman, Ms. Rogers), 2675 (noting October 19, 2005 call between Ms. Naffziger and Ms. Nerad), 2675 (noting November 3, 2005 state team receipt of materials from Ms. Krause, Mr. Whitman, and Mr. Lohman), 2675-76 (noting November 14, 2005 teleconference with Mr. Lohman, Ms. Rogers, and Ms. Naffziger).)  This coordination continued as the federal defense team grew.  (CR Dkt. 817, Vol. 11, at 2720-22.)  On March 8, 2006, Joyce Naffziger, Jimmy Lohman, Rachel Rogers, Roger Peven, Mary Fisher, Mark Durant, John Adams, Lynn Nelson, Scarlet Nerad, Dr. Woods, and Judy Clarke conferred about the teams' efforts in building a defense, a discussion that embraced competency and other mental health issues.  (CR Dkt. 816, Vol. 10, at 2649; CR Dkt. 17 Vol. 11, at 2720-22; CR Dkt. 824, Vol. 18, at 4524.)

While the federal team could not secure a global settlement that would avoid exposing Duncan to the death penalty, the state agreed that if Duncan pleaded guilty, it would abate sentencing on its death-eligible charges until the completion of federal proceedings.  By that point, Duncan had, in the presence of counsel, described the kidnappings and murders to state investigators.  (Sealed CR Dkt. 640, Vol. XIV, at 1597-1601.)  On October 16, 2006, pursuant to the agreement, Duncan pleaded guilty to the Idaho state charges arising from the Wolf Lodge murders. (*Id.* at 1590-96.)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 18**

Aware that the state conviction would result in Duncan's incarceration at a prison in Boise, Peven requested the appointment of a local federal public defender.  Peven made the request because he was located in Spokane, Washington, and wanted to ensure frequent contact with Duncan.  (Sealed CR Dkt. 77 at 2.)  Four days after Duncan entered his state plea, this Court granted Peven's request, and appointed Tom Monaghan.  (*Id.*)  Over the next two years, Monaghan diligently visited Duncan for several hours every week.  (CR Dkt. 825, Vol. 19, at 4782; Sealed CR Dkt. 77 at 2-3; *see also* (Gov't Attach. 14; Sealed Gov't Attach. 3 (between 2006 and 2008, Monaghan visited Duncan at least 87 times).)

On January 18, 2007, a federal grand jury indicted Duncan on ten counts arising from the kidnapping of S.G. and D.G., and the murder of D.G.  Five days later, the Government filed a notice of intent to seek the death penalty.  In response, Peven moved for the appointment of a third lawyer "learned in the law of capital cases" under 18 U.S.C. § 3005.  (Sealed CR Dkt. 78 at 2.)  The Court appointed Mark Larranaga, a Seattle-based attorney.[5]

In January 2007, Debra Garvey joined the team.  A licensed attorney, Garvey was the capital case coordinator and head of mitigation investigations at the Central District of California's Federal Public Defender.  (Sealed CR Dkt. 75 at 1.)  One of the state investigators told Garvey that he considered the mitigation investigation largely complete.  (Sealed CR Dkt. 75 at 3.)  Garvey concluded more mitigation work should be done.  (Sealed CR Dkt. 75 at 4-5.)

## 2.    Pre-trial proceedings and delays

The Court initially calendared trial for March 2007.  The parties agreed about the need for a continuance in principle.  But, while the Government requested four months' delay, the

---

[5]    Larranaga served as Director of the Capital Resource Center from 2001 to 2006.  (CR Dkt. 821, Vol. 15, at 3926-28.)  In that role, he supervised and trained lawyers on capital-defense issues, including mental health, competency, and mitigation.  (*Id.* at 3928-29.)

defense asked for seventeen, despite Duncan's private resistance to any continuance.  (CR Dkt. 24; Sealed Gov't Attach. 3 at 15 (noting Duncan's begrudging acquiescence to delay); Sealed Gov't Attach. 3 at 16 (concerning Duncan's friction with his attorneys over the continuance); Sealed Gov't Attach. 9 at 044993) (reflecting Duncan's sense that he was denied a speedy trial).) The Court granted a ten-month trial continuance, to January 22, 2008, warning the parties that it would not permit further delay "absent a showing of extreme circumstances."  (CR Dkt. 32.)

Following the continuance, the defense team resumed its investigation into potential defenses and mitigation evidence.  In March and April of 2007, defense team members met with Duncan's relatives.  *E.g.*, (CR Dkt. 88 at 21 (Larranaga visited Duncan's mother).)  By May 2007, Garvey had reviewed all the state mitigation work and prepared her own plan, which involved interviews of twenty more people and continued records collection.  (Sealed CR Dkt. 75 at 7.)  In total, Garvey personally identified 375 potential witnesses.  (*Id.*)  By May 2007, the defense had identified six mitigation themes arising from Duncan's life history:  incest, abuse, family dysfunction, brain damage, imprisonment in a failed system, and youthful placement in a sex offender program.  *See* (Sealed Gov't Attach. 5); *see also* (Sealed Gov't Attach. 3 at 2, 12-13, 20, 25 (noting potentially mitigating incidents); Sealed Gov't Attach. 12 (Nerad's mitigation notes).)  To execute its ambitious plan, the defense hired three additional investigators.  (Sealed CR Dkt. 75 at 6; Sealed CR Dkt. 80 at 10 (noting three categories of mitigation investigation: childhood, incarceration, and post-incarceration).)  The team also sought the assistance of state mitigation expert Naffziger.  (CR Dkt. 816, Vol. 10, at 2582.)  In August 2007, Naffziger delivered ten banker boxes of previously-collected records to Larranaga.  (*Id.* at 2585.)

The defense continued coordinating with Dr. Woods.  *See* (CR Dkt. 823, Vol. 17, at 4439-41 (regarding meeting with Woods and his impending evaluation of Duncan).)  But the

team also sought to retain other mental health experts.  (CR Dkt. 821, Vol. 15, at 3977; CR Dkt. 825, Vol. 19, at 4843.)  In March 2007, Peven reported to the Court that he had successfully proposed a $66,000 budget to the Committee for Defender Services to hire a neuropsychologist and a psychiatrist to perform 160 hours of collective work.  *See* (Sealed CR Dkt. 29-1 at 3-4.)  In late May 2007, the defense team, including Woods, met to discuss potential experts and potential mental health defenses and mitigation.  (Sealed CR Dkt. 80 at 9; CR Dkt. 821, Vol. 15, at 3979; CR Dkt. 823, Vol. 17, at 4401.)  To protect the confidentiality of this investigation, the defense successfully moved to seal prison visitation logs from Government view.  (Sealed CR Dkt. 44; CR Dkt. 64 at 7.)

    In August 2007, Peven told the defense team he was considering withdrawal from the case to address personal problems.  (CV Dkt. 868-2; Sealed CR Dkt. 80 at 11.)  On August 7, he asked Larranaga and Monaghan to inform the Court of his intent to withdraw at an upcoming status conference.[6]  They did so, and informed the Court that Clarke would step in as lead counsel.  (CR Dkt. 73 at 4.)  Co-counsel also relayed Peven's desire to appear personally and relay this information.  (Sealed CR Dkt. 80 at 11.)  On August 28, during an ex parte status conference, Peven discussed his personal difficulties and the need to replace him as lead counsel.  (Sealed CR Dkt. 187, at 2.)  Previously unaware of Peven's personal problems, the Court agreed to discuss those matters privately, without touching on the substance of the case.  (Sealed CR Dkt. 185 at 2; Sealed CR Dkt. 187 at 2.)  Larranaga, however, unsuccessfully asked to attend the

---

[6]     The Court conducted informal, off-the-record, status conferences to ensure timely trial preparation.  (Sealed CR Dkt. 185 at 4.)  The conferences were held at the request, and with the consent, of all parties.  (*Id.*); *see* (CR Dkt. 868-4 at 000264.)  No substantive rulings, arguments, or contested motions were discussed.  (CR Dkt. 185, at 4.)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 21**

private conference.  (Sealed CR Dkt. 187, at 2.)

During the ensuing fifteen-minute discussion, Peven privately relayed his difficulties to the Court.[7]  Afterward, the Court brought Larranaga into chambers to discuss Peven's diminished role, as of that time.  (Sealed CR Dkt. 185 at 2.)  The Court noted that defense counsel could request a fourth lawyer.  (*Id*. at 2-3.)  But it reiterated that no continuance would be granted, and conditioned the appointment of fourth counsel on that understanding.  (*Id*. at 3-4.)  On September 11, 2007, Larranaga and Monaghan moved for Clarke's appointment as lead counsel, which this Court granted on September 17.  (CR Dkts. 69, 70.)  Ten days later, Clarke entered her appearance.  (CR Dkt. 72.)

The transfer of the defense team's leadership did not affect the hiring of investigators and experts.  By September 2007, the team had added mitigation specialist Jennifer Davis, who had extensive experience researching the Washington State Department of Corrections, where Duncan had spent approximately twenty years.  (CR Dkt. 819, Vol. 13, at 3370-71.)  The team hired her to investigate Duncan's reports of abuse.  (*Id*. at 3356-57.)  Over the course of at least twelve interviews with Davis, Duncan shared detailed information about abuse he suffered at WSH and Dyslin Boy's Ranch.  (*Id*. at 3358-61.)  He also told Davis that he and his brother had been molested by their mother.  (*Id*. at 3366.)  She worked to corroborate his accounts with school, medical, and other records.  (*Id*. at 3360, 3361, 3364.)  She also interviewed Duncan's cellmates, relatives, and former custodians.  (*Id*. at 3373.)

In October 2007, private investigator Karen Sanderson joined the team.  (CR Dkt. 817,

---

[7]      On September 22, 2007, at the Court's direction, Peven filed a sealed declaration recounting his personal difficulties, as represented to the Court on August 28. (Sealed CR Dkt. 68.)  Recognizing that new lead counsel was appropriate, Peven indicated he could remain in an advisory role, given his lengthy relationship with Duncan and unique knowledge of the early proceedings.  (*Id*. at 4.)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 22**

Vol. 11, at 2819.)  Primarily, she visited with Duncan and his mother, Lillian Duncan, whom she met with six or seven times.  (*Id*. at 2820-22.)  Additionally, she collected pertinent mitigation records and conducted a dozen interviews of Duncan's teachers, neighbors, and acquaintances. (*Id*. at 2820-21.)

By November 5, 2007, the deadline for giving notice of its intent to present mental health mitigation evidence, the defense had contacted neurologist and psychiatrist Dr. James Merikangas.  (*Id*. at 2911-12; CR Dkt. 818, Vol. 12, at 2933.)  It asked Merikangas to review "voluminous" medical, educational, and mental health records for Duncan, and medical records for several of his relatives.  (CR Dkt. 818, Vol. 12, 2933-38; Sealed Gov't Attach. 6 at 29-30.) Concerned about their client's competency, Clarke and other team members met with Dr. Merikangas in December 2007 to discuss Duncan's ability to make rational choices and aid the defense.  (CR Dkt. 818, Vol. 12, at 2928-29.)  Shortly thereafter, the team retained Dr. Merikangas as a consultant and asked him to evaluate Duncan.  (*Id*. at 2930.)  Before February 2008, Clarke contacted Dr. Ruben Gur, an expert in neuropsychology and neuroimaging.  (CR Dkt. 820, Vol. 14, at 3481, 3516-19; Sealed Gov't Attach. 4.)  As with Dr. Merikangas, the defense team asked Dr. Gur to review records and provide an opinion on mental health issues. (CR Dkt. 820, Vol. 14, at 3521.)

The defense also enlisted David Freedman, a psychiatric epidemiologist who frequently worked with Clarke.  (CR Dkt. 813, Vol. 7, at 1160-63 (noting Freedman was retained before Duncan's plea but visited with him afterward).)  Freedman worked with the team to overcome "barriers" with Duncan, (*id.* at 1670), who had continued to maintain his desire to plead guilty, represent himself, and forgo mitigation evidence.  (Sealed Gov't Attach. 3 at 21, 27, 30-31.))  In a February 27, 2007 letter to his sister, Duncan expressed his disdain for mitigation:

> [T]his has nothing to do with how I was "abused as child" or our family in any way . . . . My lawyers have no business putting you or anyone who once cared about me (or otherwise "knew" me) on the witness stand for the defense.  If anything, you should be called to testify <u>against</u> me, because of the pain I caused you. I will do everything in my power (within the confines of respect for life and Truth) to keep you, mom, or anyone from even being at my trial, much less to testify "for" me.  You <u>can't</u> testify "for" me because there simply is no excuse or "mitigating evidence" to justify or minimize what I did.

(Sealed Gov't Attach. 9 at 043904.)  Nine months later, Duncan remained steadfast, writing to his mother, "There is still a very real chance I may fire my attorneys and ask to represent myself, especially if the attorneys try to put you, or anyone I know personally, on the witness stand. . . . And I do not want you anywhere near Boise during the trial itself."  (Sealed Gov't Attach. 1 at 048397-98.)  Duncan also resisted defense efforts to exclude evidence.  *See, e.g.*, (Sealed Gov't Attach. 3 at 21.)  The defense visited Duncan on November 2, 2007, to discuss the motions deadline, which fell three days later.  (Sealed Gov't Attach. 3 at 43.)  He reiterated his desire to plead guilty and represent himself, indicating that motions to exclude evidence would upset him.  (Sealed Gov't Attach. 3 at 43-44.)

The defense team members remained unmoved, informing Duncan they bore a duty—independent of his desires—to investigate his case.  (CR Dkt. 825, Vol. 19, at 4820.)  The defense filed multiple motions to suppress evidence.  (CR Dkt. 106, 110, 120, 132, 133, 134, 135, 136, 137, 138 & 139.)  The motions increased tension between Duncan and his lawyers.  *See* (CR Dkt. 825, Vol. 19, at 4856, 4871, 4997.)  Believing the motions conflicted with his desire to passively resist the charges, Duncan reiterated his intent to self-represent.  (Sealed Gov't Attach. 3 at 45 (noting Duncan characterized the motions as dishonest and threatened to seek their withdrawal), 44 (noting Duncan wanted to "fire" his attorneys), 47 (reflecting dissatisfaction with the motions), 55 (reiterating concerns with motions).)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 24**

The defense team continued to interview witnesses, subpoena potential mitigation records, and create a genogram illustrating a family predisposition toward violence, mental illness, and brain damage.  (Sealed CR Dkt. 99 (subpoenaing records regarding the WSH); CR Dkt. 824, Vol. 18, at 4649, 4631; Sealed Gov't Attach. 5 (detailing mitigation themes and investigation).)  At the same time, the defense worked to prepare for trial on the charged offenses.  It hired a crime scene expert and a computer specialist to assist in reviewing physical evidence.  (CR Dkt. 74 at 8.)  It also worked with the Government to schedule a three-day review of the crime scenes and physical evidence held by the FBI.  (CR Dkt. 73-2); *see* (Sealed Gov't Attach. 3 at 36) (discussing investigator schedule to visit Montana crime scenes).)

Rather than carry through with the investigation of physical evidence, however, the defense cancelled its meetings and moved to continue trial.  (Sealed CR Dkt. 73-2.)  On October 3, 2007, it requested a one-year delay, asserting that discovery issues and Peven's personal problems had prevented adequate preparation for trial.  *See* (CR Dkt. 74; Sealed CR Dkt. 75 (detailing the delay in moving discovery onto defense team laptops);[8] Sealed CR Dkt. 76 (further detailing efforts to disseminate discovery); Sealed CR Dkt. 77 (detailing Monaghan's competing obligations and alleging inadequate defense preparation); Sealed CR Dkt. 80.)  At an October 12, 2007 hearing, counsel stated that, despite diligent effort, unforeseen circumstances required more time for them to fulfill their constitutional duties.  *See* (Sealed CR Dkt. 88 at 28, 26.)  The Court disagreed, noting that four attorneys and a team of investigators had been working on Duncan's case.  (*Id.* at 41, 43.)  After voicing "absolute confidence" in counsel, the Court denied a continuance.  (*Id.* at 45.)  In a subsequent order, the Court specifically noted the number and

---

[8]     Because counsel worked in separate cities, Peven had requested funding for three laptop computers to review discovery.  By March 2007, the laptops were loaded with the records.  (Sealed CR Dkt. 78 at 7.)  By April, each defense attorney had one.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 25**

expertise of counsel.  (CR Dkt. 157 at 3-4.)

On October 25, 2007, Peven moved to withdraw from his advisory role.  *See* (Sealed CR Dkt. 89.)  He attached a declaration stressing that personal problems and the "traumatic stress of the case" required his removal.  *See* (Sealed CR Dkt. 90 at 1.)  He also advocated further delay to prepare a defense.  (*Id*. at 2.)  The Court denied his request.  (Sealed CR Dkt. 104.)  In so doing, it found that Peven's prior interactions with Duncan and the state defense team were valuable resources for the future.  (*Id*. at 2.)  It also found counsel "skilled and particularly experienced to represent" a capital defendant.  (*Id*.)

Undeterred, the defense pressed for delay.  The team sought, unsuccessfully, to extend the deadline for additional motions and expert notices, stating its ongoing "investigation is . . . focused on areas central to an understanding of the defendant's mental health."  (Sealed CR Dkt. 117; CR Dkt. 175 at 2-3.)  In late November, it moved to clarify the record of the private conversation with Peven, identifying two purported ambiguities:  (1) whether Peven had asked to withdraw; and (2) whether the Court had veered into substantive issues when it conditioned Peven's "less active role" on an assurance that no continuance would be requested if another attorney was appointed.  (Sealed CR Dkt. 178.)  The Court denied any ambiguity existed, noting as to the first claim that Peven first moved to withdraw on October 25, not before.  (Sealed CR Dkt. 185 at 1, 3.)  As to the second supposed ambiguity, the Court reiterated that all counsel had been repeatedly informed that the trial date would not be continued and "if new counsel was to be brought in, that he or she would have to be apprised of the trial date so that he or she would know of the time requirements that would apply."  (*Id*. at 3.)  Furthermore, the Court stated that "[a]ll counsel were made aware of this [condition] in the status conferences as well."  (*Id*.)

The defense found itself in a difficult position:  simultaneously preparing for trial while

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 26**

attempting to maintain a working relationship with a client who wished to plead guilty, withdraw any motions to exclude evidence, and forgo all mental health mitigation.  (Sealed Gov't Attach. 3 at 50-51 (during a November 20 meeting, Duncan indicated he "remain[ed] consistent that he wants to plead").)  Faced with Duncan's insistence on accepting responsibility, along with his earlier admissions and state plea, the defense team agreed Duncan should plead guilty in federal court.  This decision had a strategic advantage:  it gave counsel more time to prepare for and focus on the penalty trial.  (CR Dkt. 868-1 at 000001-000013; CR Dkt. 822, Vol. 16, at 4163-64 (Larranaga testifying that a "primary reason[]" for having Duncan plead guilty was to gain time to prepare for the penalty phase)).  After negotiations, the Government indicated it would agree to continue the penalty phase if Duncan pleaded guilty.  (CR Dkt. 822, Vol. 16, at 4169.)

### 3.        Guilty plea and penalty phase trial

On December 3, 2007, Duncan pleaded guilty in the presence and with the assistance of his attorneys.  (CR Dkt. 204 at 1.)  The Court questioned Duncan about the basis for his plea and the adequacy of the representation he had received; he affirmed that he understood counsel's advice, had adequate time to meet with them, and felt fully satisfied with their services.  (*Id*. at 6.)  Duncan subsequently agreed with the prosecutor's factual statement, acknowledging that the United States would obtain convictions on each charge.  (*Id*. at 24-25.)  When questioned, counsel offered no reason why Duncan should have insisted on trial:

> THE COURT:        Counsel, you also agree that there is both a
>                                  proper factual and legal basis for the entry of
>                                  pleas?
>
> MR. MONAGHAN:  Yes, Your Honor.
>
> THE COURT:        You feel you have discussed any and all
>                                  potential defenses that you are aware of with
>                                  Mr. Duncan?

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 27**

MR. MONAGHAN:     To the best of our knowledge, yes, Your
                  Honor.

THE COURT:        Whether the Court has asked it or not, do
                  you know of any reason why Mr. Duncan
                  should not be allowed to enter pleas of
                  guilty to each of these charges?

MR. MONAGHAN:     To the best of our knowledge, no, Your
                  Honor.

(*Id*. at 25.)  Relying on the representations of the defendant and his counsel, the Court

accepted Duncan's plea.  (*Id.* at 28.)

Two days later, the defense moved to continue the penalty phase from January to

September 2008.  (CR Dkt. 193.)  Attributing the failure to complete necessary work to Peven's

personal problems, the defense sought more time to fully investigate Duncan's life history and

obtain mental health experts.  (*Id.*)  The defense also asserted that the parties had agreed S.G.

would not testify, obviating concern about a prolonged delay.  (*Id*. at 2); *but see* (CR Dkt. 825,

Vol. 19, at 5014 (withdrawing from agreement to forgo S.G.'s testimony).)  The Government

asked that the trial begin in April 2008.  The Court rejected any continued references to Peven's

personal life, finding those issues "ha[d] been utilized to their fullest . . . and d[id] not justify

further basis for delay."  (CR Dkt. 202 at 5.)  It noted that Monaghan and Larranaga (the team's

learned counsel) had been working on the case for almost a year.  As the Court explained, any

lack of preparation was indicative of "a lack of diligence or gamesmanship."  (CR Dkt. 202 at 5.)

The Court scheduled the sentencing trial for April 2008, cautioning counsel that it would not

delay the matter absent "extremely limited" circumstances.  (*Id*.)

The defense continued preparing for sentencing by focusing on mental health.  *See, e.g.*,

(Sealed CR Dkt. 206 (subpoena regarding a WSH incident); Sealed CR Dkt. 209 (subpoena of

mental health records)); *see also* (Sealed Gov't Attach. 3 at 69, 73, 76-77 (meeting with Duncan

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 28**

to discuss acquaintances), 72 (reviewing documents with Duncan), 83-84 (discussing computer evidence).)  Counsel's efforts reflected an exhaustive approach to preparation: at one juncture, the defense sought funding for an investigator to conduct "follow[ ] up" interviews of relatives who *might* have additional information about Duncan's mental health.  (Sealed CR Dkts. 224, 233 at 8; CR Dkt. 249.)

In early January, the defense asked permission for Dr. Merikangas to visit Duncan. (Sealed CR Dkt. 217.)  The next month, Merikangas conducted interviews, a physical exam, a neurologic exam, and psychological tests on Duncan.  (CR Dkt. 818, Vol. 12, at 2930.)  He then ordered an MRI, PET scan, and blood tests to document potential brain damage.  (*Id*. at 2960-61; Sealed Gov't Attach. 6 at 33-36.)  The defense thus retained Dr. Beaver, who had worked on the state case, to perform an MRI, PET scans, and neuropsychological testing.  (Sealed CR Dkt. 269; CR Dkt. 819, Vol. 13, at 3237; CR Dkt. 827, Vol. 21, at 5508-09; Sealed Gov't Attach. 11.)  In the spring, Dr. Merikangas diagnosed Duncan with psychosis.  (CR Dkt. 823, Vol. 17, at 4377; Sealed Gov't Attach. 3 at 120.)

To obtain more time for its increasingly redundant investigation, the defense filed a second motion to continue, requesting that the sentencing phase begin in September 2008. (CR Dkt. 239.)  The defense asserted that it could not fulfill its constitutional duties because a life historian, Craig Haney, was unavailable.  (*Id*. at 4-5.)  They further asserted that none of six other expert life historians were available.  (*Id*. at 5.)  Without one of these experts, defense counsel argued, they could not adequately present a mitigation defense.  (*Id*. at 2.)  The Court disagreed and denied the continuance.  (CR Dkt. 265 at 2-3.)

In March 2008, the defense noticed six experts:  Dr. Gur, Dr. Merikangas, Dr. David Lisak, Dr. John Edens, Dr. Fred Berlin, and James Aiken.  (CR Dkt. 306.)  Several of the experts

were offered to present evidence of sexual abuse, as uncovered during the defense investigation. *See, e.g.*, (Sealed Gov't Attach. 3 at 20-21 (Duncan's admission to Oedipal relationship with his mother), 53 (concerning mother's response to Duncan kissing a girl), 74 (Duncan described his mother's attempt to kiss him intimately)); *see, e.g.*, (Sealed Gov't Attach. 5 at 2 (noting family reports of incest and molestation).)  In particular, Dr. Lisak was noticed as an expert who would testify to the effects of "trauma experienced by Mr. Duncan," including sexual abuse.  (CR Dkt. 306 at 7.)

Duncan remained resistant to mitigation evidence.  *See* (Sealed Gov't Attach. 3 at 13, 62, 64; CR Dkt. 824, Vol. 18, at 4677.)  As noted, he opposed any portrayal of himself as mentally ill.  *See* (Sealed Gov't Attach. 3 at 12, 89.)  Duncan was conscious of Ted Kaczynski, a capital defendant who resisted mental health evidence but was not allowed to represent himself because he only belatedly asserted his right of self-representation.  Duncan sought to ensure he would timely request pro se status by repeatedly asking counsel to inform him of impending forfeiture.[9]  (Sealed Gov't Attach. 3 at 89); s*ee* (CR Dkt. 822, Vol. 16, at 4189-90 (writing of a likelihood he would go pro se, "They tell me that I can request to represent myself at the very last moment . . . so there is no need to do it now."); CR Dkt. 823, Vol. 17, at 4362.)  Throughout their representation of Duncan, counsel worked to persuade him not to exercise his right to appear pro se.  *See* (Sealed Gov't Attach. 3 at 31.)

As trial approached, however, Duncan increasingly struggled with counsel's actions.  (Gov't Attach. 3 at 60 (noting Duncan expressed frustration about motions).)  He wanted to

---

[9]     The day that Duncan learned Judy Clarke would be lead counsel, he requested that counsel warn him before he waived this right.  (Sealed Gov't Attach. 3 at 31.)  Duncan knew that Judy Clarke had represented Kaczynski who also objected to the presentation of mental-health mitigation.  *See* (*id.* at 120); *see also supra* n.3.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 30**

prevent S.G. from testifying.  *See, e.g.*, (Sealed Gov't Attach. 5 at 1; Sealed Gov't Attach. 3 at

25; Sealed Gov't Attach. 9 at 043945; Sealed Gov't Attach. 3 at 17, 25, 51, 55.)  Counsel

reached an agreement with the Government that would forestall the surviving victim's

appearance in court after having moved to exclude portions of her previously-recorded

testimony.  *See* (CR Dkt. 823, Vol. 17, at 4262; CR Dkt. 193, at 2 (noting the stipulation); Sealed

Gov't Attach. 3 at 57 (noting Duncan's satisfaction with the stipulation).)  But counsel later

reneged on that agreement.  (CR Dkt. 825, Vol. 19, at 5014); *see* (CR Dkt. 193 at 2.)  On March

28, less than three weeks before trial, counsel told Duncan they intended to present mental-health

mitigation evidence.  *See* (Sealed Gov't Attach. 3 at 120.)

      On April 16, two days into jury selection, Duncan elected to represent himself.  (Sealed

CR Dkt. 625, Vol. 2, at 17-18; CR Dkt. 398; s*ee* CR Dkt. 823, Vol. 17, at 4361 (describing

counsel as "thwarting" Duncan's beliefs); CR Dkt. 825, Vol. 19, at 5014.)

      Initially, Duncan accepted counsel's continued representation for purposes of jury

selection.  (Sealed CR Dkt. 625, Vol. 2, at 19.)  On the fourth day of voir dire, however, Duncan

took control of his defense, conducted voir dire, and empaneled the jury.  *See* (Sealed CR Dkt.

632, at 845-46, 625, 626; Sealed CR Dkt. 633, Vol. X, at 1019; Sealed CR Dkt. 639, XIII, at

1407-12 (exercising peremptory challenges).)

      For the balance of trial, Clarke, Monaghan, and Larranaga appeared as standby counsel.

(Sealed CR Dkt. 630, Vol. VII, at 741-42; Sealed CR Dkt. 639, VXIII, at 1428.)  With the case

in his personal control, Duncan promptly stipulated to the admission of S.G.'s recorded

statement.  (CR Dkt. 550; CR Dkt. 823, Vol. 17, at 4271.)  During trial, the Government called

over sixty witnesses to detail the crime and its planning.  *See, e.g.*, (Sealed CR Dkt. 641, Vol.

XV, at 1860-83 (Duncan's preparations)); *see also* (Gov't Attach. 15 (spreadsheet weighing plan

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 31**

to "live out [his] fantasies"); Sealed CR Dkt. 641, Vol. XV, at 1881-83 (diary discussing "good

target"), 1909-83 (documentation of supply purchases); Sealed CR Dkt. 642, Vol. XVI, at 2025-

40 (car rental), 2050 (hammer), 2052-2202 (GPS tracking data); Sealed CR Dkts. 642-643, Vol.

XVI-XVII, at 2252-2309 (preparation of potential campsite); Sealed CR Dkt. 643, VXVII, at

2385-2415 (evidence of Wolf Lodge murders and recorded interview of S.G.); Sealed CR Dkt.

644, VXVIII, at 2500-12 (disposal of D.G.'s remains); Sealed CR Dkt. 645, VXIX, at 2654-73

(crime scene evidence), 2703-19 (videos of offenses).)   The Government also presented evidence

of a rape and three previous murders Duncan had committed.  (Sealed CR Dkt. 648, Vol. XXI, at

2879-2968 (evidence of 1997 murder); Sealed CR Dkt. 648, Vol. XXII, at 3085-3175 (evidence

of two 1998 murders); Sealed CR Dkt. 645, Vol. XIX, at 2720-33 (evidence of 1980 rape).)

        Duncan actively participated in his trial, despite announcing at the outset that he would

remain passive.  (CR Dkt. 819, Vol. 13, at 3406 (informing counsel he planned to "sit silently"

without calling witnesses).)  Duncan cross-examined witnesses when he believed they misstated

relevant facts.  *See, e.g.*, (Sealed CR Dkt. 640, Vol. XIV, at 1661-62; Sealed CR Dkt. 641, Vol.

XV, at 1908-09; Sealed CR Dkt. 642, Vol. XVI, at 2163; Sealed CR Dkt. 644, Vol. XVIII, at

2454-59, 2619; Sealed CR Dkt. 645, Vol. XIX, at 2702; Sealed CR Dkt. 648, Vol. XXII, at 3160,

3168, ,3202-07; Sealed CR Dkt. 649, Vol. XXIII, 3234.)  Duncan also objected to some evidence

as irrelevant and prejudicial.  *E.g.*, (Sealed CR Dkt. 641, Vol. XV, at 1935; Sealed CR Dkt. 644,

Vol. XVIII, at 2512, 2538; Sealed CR Dkt. 645, Vol. XIX, at 2659.)  In particular, Duncan

objected to playing a video of him abusing D.G.—the "Cabin Video"—a subject addressed in

Claim 8 of his § 2255 Motion.  Duncan unsuccessfully argued the inflammatory nature of the

recording would render the jurors his "victims."  (Sealed CR Dkt. 645, Vol. XIX, at 2704-05,

2707, 2719.)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 32**

When the prosecution rested its eligibility case, Duncan took the stand to "answer whatever questions the Government might have." (Sealed CR Dkt. 645, Vol. XIX, at 2736.) The Government had none, and Duncan rested. (*Id.*) During closing argument on eligibility, Duncan "clarif[ied]" some perceived inaccuracies, confessed his plan to go on a "rampage," and told the jurors that they "really [did not] have any clue yet of the true heinousness of what [he had] done." (Sealed CR Dkt. 646, Vol. XX, at 2811-19.) The jury found him eligible for the death penalty. (*Id.* at 2822-25.) During the selection phase, Duncan asked standby counsel to argue matters beyond his ken, specifically issues concerning the exclusion of future-dangerousness evidence. (Sealed CR Dkt. 647, Vol. XXI, at 2865-77.) Duncan could have called the mitigation experts, who were present during trial. (CRT Dkt. 827, Vol. 21, at 5528-29 (Judy Clarke testifying the defense was prepared to present compelling mitigation).) Duncan did not change his mind about psychological mitigation, however. He chose to present none. (Sealed CR Dkt. 649, Vol. XXIII, at 3280-87.)

**B.     Duncan has presented procedurally defective claims of judicial error in the guise of an attack on the adequacy of counsel.**

Under separate point headings, Duncan attacks this Court's refusal to grant continuances for counsel, or to conduct competency hearings when he pleaded guilty and moved to represent himself. As to his second point, Duncan now asserts that he was incompetent when he entered his guilty plea. (CV Dkt. 4 at 34-37.) Duncan could have raised his claims about the Court's actions on appeal, but chose to waive direct review. He, thus, defaulted those claims. *United States v. Frady*, 456 U.S. 152, 165 (1982). Even if Duncan could properly attack the Court's decisions, and demonstrate the merit of those claims, his arguments would tend to relieve counsel of any alleged ineffectiveness. This Court evaluates counsel's performance based on the actual circumstances confronting them, which include the Court's decisions. Accordingly, his

defaulted contentions undermine his efforts to demonstrate, by procedurally acceptable means, that trial counsel performed ineffectively.

In arguing that the Court erroneously denied continuances and failed to grant a competency hearing, Duncan relies entirely on facts within the record.  He could have raised these issues on appeal, but did not.  Instead, as fully discussed below, he voluntarily waived his appeal, *see* (Section X), overcoming the efforts of his standby counsel to demonstrate his lack of competence to forgo the proceeding.  *See generally* (*United States v. Duncan*, Appeal No. 13-99011 at ECF No. 55-1 (affirming competence determination following earlier remand for a retrospective competency hearing).)  Having elected to relinquish direct review of the judgment, Duncan omitted any appellate challenge to the Court's management of its calendar and of its decisions whether to conduct competency proceedings.  He thus defaulted the issues for purposes of § 2255 review.  *See Frady*, 456 U.S. at 165.

Duncan makes no effort to demonstrate that his claims fall within an exception to the default doctrine, nor could he succeed in doing so.  First, he cannot establish his actual innocence of the charged crimes, to which he confessed and pleaded guilty.  Second, Duncan makes no effort to excuse his default through a showing of cause and prejudice.  He might have asserted the alleged invalidity of his appellate waiver as the basis for a finding of cause.  *See* (CV Dkt. 4 at 175-88.)  But, the Ninth Circuit approved this Court's acceptance of Duncan's waiver.  *See* (*United States v. Duncan*, Appeal No. 13-99011, ECF 55-1 at 3-4.)  Given that Duncan's personal waiver of appeal resulted in *default*, he simply cannot satisfy the "cause" standard, which turns on factors external to the defense.  *Cf. Murray v. Carrier*, 477 U.S. 478, 485-86 (1986).  Under the circumstances confronting them, Duncan's counsel performed adequately, as

fully discussed below, and their actions will not support a showing of cause.[10]  Even if Duncan

could establish cause, he could not demonstrate prejudice, as he has not identified a meritorious

claims, much less some action by this Court that infected his entire trial with error of

constitutional dimensions.

### C.  Duncan's counsel performed adequately.

Duncan claims that the Court improperly permitted him to waive his right to counsel,

rendering any earlier error by his lawyers per se prejudicial.  (CV Dkt. 4 at 38-40.)  In particular,

he goes on to argue that counsel belatedly retained a mental health expert, David Lisak, who

developed significant mitigation evidence, but did so too late for its presentation at trial.  (*Id*. at

40-44.)  Duncan also contends that his attorneys improperly advised him to plead guilty.  (*Id*. at

45-47.)  Duncan has not identified any error that would merit the imposition of a per se standard

of ineffectiveness.  Indeed, he has not shown that his counsel's performance fell below

prevailing professional norms that prejudiced the outcome of his case.

### 1.  The adversarial system functioned properly.

Duncan asserts that an "improper waiver of counsel is no less structural than a denial of

counsel."  (CV Dkt. 4 at 38-39.)  Based on that unsupported legal premise, Duncan argues that

this Court should presume counsel's conduct prejudiced him at trial.  (*Id*.)  But Duncan's

argument relies on a groundless attempt to extend inapposite Supreme Court authority.

Courts typically review claims of ineffective assistance of counsel under a familiar two-

prong test that requires the defendant to establish both deficient performance and prejudice.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Defendants bear the burden of

---

[10]      Despite the procedural defects in these issues, the Government addresses their merits
below.  *See* (Section XI.)

demonstrating that counsel's performance fell below prevailing professional norms. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *Cheney v. Washington*, 614 F.3d 987, 994 (9th Cir. 2010). In so doing, they must overcome a strong presumption that counsel's actions fell within the "wide range" of reasonable assistance. *Harrington v. Richter*, 562 U.S. 86, 104 (2011); *United States v. Span*, 75 F.3d 1383, 1387 (9th Cir. 1996). Conclusory assertions will not suffice. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). The prejudice prong is heavier than the harmless error test applied on direct appeal. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995); *Pirtle v. Morgan*, 313 F.3d 1160, 1173 n.8 (9th Cir. 2002). Under the prejudice standard, the defendant must show that, absent his attorneys' error, a reasonable probability exists that he would have received a more favorable outcome. *See Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 694).

Courts may dispense with *Strickland* and presume prejudice only when the circumstances of a prosecution "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic*, 466 U.S. 648, 658 (1984). The Supreme Court has identified just three situations in which a defendant becomes entitled to this presumption: (1) the "complete denial of counsel," including absences of counsel at critical stages of the proceedings; (2) situations in which defense counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) situations in which "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate." *Cronic*, at 659-60; *see Bell v. Cone*, 535 U.S. 685, 695-96 (2002) (Stevens, J., dissenting) (identifying the three circumstances permitting a finding of ineffectiveness absent prejudice). Precluding any doubt as to the precise confines of this exception to *Strickland*, the Ninth Circuit has clearly stated, "[t]here are only three types of cases

in which . . . prejudice is presumed." *Walker v. Martel*, 709 F.3d 925, 941 (9th Cir. 2013).

Duncan does not argue that his case comes within the ambit of the three circumstances prescribed by *Cronic*. Instead, he characterizes his waiver of counsel as invalid and argues it "is no less structural than a denial of counsel." (CV Dkt. 4 at 39.) Duncan's argument fails on three grounds. First, it does not facially satisfy the three limited circumstances that would give rise to a one-prong analysis of counsel's actions. *Walker*, 709 F.3d at 941. Second, any attempt to extend *Cronic* to this situation would require a retroactive application of a new rule of law, forbidden by *Teague v. Lane*. *See Reina-Rodriguez v. United States*, 655 F.3d 1182, 1187 (9th Cir. 2011). Third, if the Court erroneously accepted a waiver of counsel, its actions would have no impact on counsel's performance *beforehand*, and would necessarily prevent any subsequent performance thereafter that a court could assess, with or without consideration of prejudice. The validity of Duncan's waiver of counsel should not, therefore, support application of the one-pronged *Cronic* test, in which prejudice is assumed. Duncan must meet both *Strickland* prongs to establish that his attorneys' assistance were ineffective.

## 2. Counsel adequately investigated and advised Duncan ahead of his plea.

Duncan argues that counsel failed to properly investigate guilt-phase evidence, competency, and mental defenses before advising him to plead guilty. He further claims that counsel failed to advise him of the risks and benefits of a plea. (CV Dkt. 4 at 45-47.) Duncan's conclusory arguments fail to demonstrate inadequate performance or prejudice. Appointed counsel reasonably investigated guilt-phase evidence, competency, and potential defenses before advising him to plead guilty. Moreover, Duncan made clear from the day of his arrest that he intended to plead guilty, precluding the present effort to blame counsel for that decision.

A defendant is entitled to the effective assistance of competent counsel before deciding to

plead guilty. *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010).  A defendant who pleaded guilty on the advice of counsel may attack only the voluntary and intelligent character of the plea by establishing that counsel's advice prejudicially fell below the competence required of criminal defense attorneys. *See Hill v. Lockhard*, 474 U.S. 52, 56 (1985).  The deference accorded counsel applies with particular force when a defendant seeks to set aside a guilty plea after sentencing. *See Premo v. Moore*, 562 U.S. 115, 125 (2011); *United States v. Nagra*, 147 F.3d 875, 880 (9th Cir. 1998).  Counsel is not expected to foresee facts or circumstances not apparent to a competent attorney when advising a defendant about a plea. *Premo*, 562 U.S. at 141.

Before allowing a capital defendant to plead guilty, counsel has a duty to investigate guilt- and sentencing-phase issues, including a defendant's mental state if evidence suggests impairment. *See Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003); *Strickland*, 466 U.S. at 691.  Even when a client forecloses certain avenues of investigation, counsel's duty requires that they seek alternative sources of information. *See Silva v. Woodford*, 279 F.3d 825, 842, 847 (9th Cir. 2002) (holding it "equally clear" that "during either the guilt phase or the sentencing phase of a capital trial" counsel has a duty to investigate mental health).

When he pleaded guilty, Duncan appeared with Clarke, Monaghan, and Larranaga as counsel.  Clarke and Monaghan had begun working on the case even before indictment.  (Sealed CR Dkts. 23-4, 23-13; Dkt. 77 at 2; CR Dkt. 821, Vol. 15, at 3931.)  All three attorneys had met with Duncan repeatedly,[11] diligently reviewed evidence, and pursued independent investigation.  (CR Dkt. 821, Vol. 15, at 3960, 3982; CR Dkt. 827, Vol. 21, at 5450; CR Dkt. 821, Vol. 15, at

---

[11]    Counsel unquestionably visited with Duncan: Monaghan visited at least 87 times, Clarke visited at least 11 times, and Larranaga visited at least 19 times. *See* (Gov't Attach. 14; Sealed Gov't Attach. 3.)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 38**

3965-66); *see also* (Sealed Gov't Attach. 3 at 5, 7, 38-39, 48-49, 52-53 (discussing the crimes

with Duncan), 20 (discussing defenses with Duncan), 36 (referencing crime scene investigation),

65 (discussing the need to confirm information from Duncan).)  Indeed, counsel worked to

prepare a defense and explored guilt-phase strategies,[12] despite Duncan's repeatedly-expressed

desire to plead guilty.  *See* (CR Dkt. 824, Vol. 18, at 4534; CR Dkt. 825, Vol. 19, at 3951.)  All

the while, counsel worked to persuade Duncan not to plead guilty.  *See* (CR Dkt. 827, Vol. 21, at

5469 (Clarke testifying about team-wide efforts to persuade Duncan to go to trial); (Sealed Gov't

Attach. 3 at 2, 10, 14, 51) (noting Duncan's intent, as of November 19, 2007, to plead guilty).)

Counsel only advised Duncan to plead guilty after reaching an agreement with the

Government to continue the sentencing-phase trial.  *See* (CR Dkt. 827, Vol. 21, at 5583 (Clarke

testifying that the defense team's "tactical reason" for advising Duncan to plead guilty was "to

buy some time").)  This was sound strategy.  Counsel knew the evidence of guilt was

overwhelming.  *See* (CR Dkt. 825, Vol. 19, at 5017.)  The crime was recounted by S.G., whose

recollections were memorialized in a statement made immediately after her return.  (CR Dkt.

643, Vol. XXIII, at 2382-88, 2403, 2408-12.)  Her memories were corroborated by physical

evidence.  *See, e.g.*, (Sealed CR Dkt. 643, Vol. XVII, at 2518-37.)  The Government had

---

[12]     In a passing fillip, Duncan claims counsel failed to sufficiently investigate mental health
defenses.  *See* (CV Dkt. 4 at 31, 46.)  The brief effort, bereft of detail, is inadequate.  *See
Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009).  In any event, the assertion is
untrue.  Counsel reviewed Duncan's past health evaluations and discussed the merits of raising
mental defenses among themselves, in consultation with Dr. Woods, and with Duncan.  *See*
(Sealed Gov't Attach. 5 at 1-2); s*ee* (CR Dkt. 641, Vol. 15, at 3937, 3972); *see* (Sealed Gov't
Attach. 3 at 14, 20, 120.)  Duncan fails to show that counsel ever omitted to investigate or assert
any viable mental health claim or defense prior his decision to represent himself.  *See Jennings v.
Woodford*, 290 F.3d 1006, 1015-16 (9th Cir. 2002) (holding counsel have no obligation to raise a
mental health defense of which they are unaware).

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 39**

recovered D.G.'s bone fragments in the location his sister identified.  (Sealed CR Dkt. 644, Vol. at XVIII, at 2554-73.)  Additionally, investigators had recovered Duncan's semen at the site of abuse, (Sealed CR Dkt. 645, Vol. XIX, at 2654-73), D.G.'s DNA on Duncan's jacket, (Sealed CR Dkt. 640, Vol. XIV, at 1710-11), and video evidence documenting Duncan's abuse of the children, (Sealed CR Dkt. 645, Vol. XIX, at 2703-19).  Furthermore, Duncan had repeatedly, and consistently, confessed, and he does not challenge the admissibility of those statements.  *See, e.g.*, (Sealed Gov't Attach. 13; Sealed CR Dkt. 644, Vol. XVIII, at 2497-2500; Gov't Attachs. 16-18; Sealed Gov't Attach. 1.)  The evidence all but ensured conviction following what would have been a graphic and emotionally wrought trial on guilt.  Duncan would have secured no advantage from such a proceeding and his attorneys might well have advised a plea to maintain the defense's credibility with the jury that would decide Duncan's sentence.  *See Fairbank v. Ayers*, 650 F.3d 1243, 1255 (9th Cir. 2011) (rejecting an ineffectiveness claim regarding counsel whose argument did not paint the defendant in a sympathetic light, as the attorney had no obligation to engage in a "useless charade").

Putting aside the fact that a trial would have provided only a theoretical likelihood of acquittal, Duncan had long insisted he would plead guilty—a decision entirely within his personal discretion.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (recognizing that "the accused has the ultimate authority" to decide whether to plead guilty).  The plea forestalled the jury's exposure to some especially damaging evidence, a fact counsel acknowledged.  *See* (CV Dkt. 4; CV Dkt. 2-4, Exh. 29 at 244) (Peven discussing "incredibly damaging" evidence that "may well not" "come in" after a guilty plea).)  For example, the Court excluded gruesome photos of the Wolf Lodge murders as more prejudicial than probative during the penalty phase, thereby shielding the jurors from horrible images of Duncan's meticulously planned crime.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 40**

(Sealed CR Dkt. 640, Vol. XIV, at 1510-11.)  But the probity of the photos would have favored admission during the guilty phase.

During the change of plea hearing, counsel affirmed that they had conferred with Duncan about all known defenses.  *See* (CR Dkt. 204 at 25).  Duncan likewise confirmed he had spoken with counsel, that he had adequate time to do so, and that he understood their advice.  (*Id*. at 6); *see United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008) (holding defendant's statements during a guilty plea hearing carry a strong presumption of veracity).  Counsel subsequently testified that they knew of and fulfilled their duty to advise Duncan about his plea.[13]  (CR Dkt. 823, Vol. 17, at 4352, 4395-97; *see also* CR Dkt. 822, Vol. 16, at 4163, 4165, 4184 (Larranga); Sealed CR Dkt. 647, Vol. XXI, at 5443-46 (Clarke).)

Counsel made no effort to question Duncan's competency during the change of plea. Rather, they assured the Court that they knew of no reason to reject Duncan's plea.  *See* (CR Dkt. 204 at 25.)  Duncan nevertheless claims the attorneys advised the plea despite concerns about his competence.  (CV Dkt. 4 at 114.)  But counsel had consulted extensively with a mental health expert about competency.  (CR Dkt. 821, Vol. 15, at 3356.)  In 2005 and 2006, Dr. Woods interviewed and tested Duncan.  He also reviewed materials, including medical records of a head injury.  (CR Dkt. 824, Vol. 18, at 4524-45; CR Dkt. 817, Vol. 11, at 2671, 2677.)  Dr. Woods did

---

[13]     Clarke recently declared that counsel did not adequately advise Duncan.  (CV Dkt. 2 at 1-13.)  But even she has admitted that "there had been discussions with [Duncan]" regarding his guilty plea "shortly before the plea was actually entered" that included counsel's request for penalty-phase continuance.  (CR Dkt. 827, Vol. 21, at 5443-46.)  Clarke's recently submitted declaration is not decisive because the reasonableness of performance is a question for the Court. *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998); *see also Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004) ("[Counsel's] "about-face . . . strongly suggests a willingness to 'fall on the sword' in order to derail a death sentence.  The motive is transparent, if not misguided."). And, the record proves otherwise: counsel's notes evidence their months' long discussion with Duncan about pleading guilty.  *See* (Sealed Gov't Attach. 3 at 2, 10, 12, 14, 25, 37, 44, 51, 55.)

express some concerns about competence.  *See* (Sealed Gov't Attach. 7 at 1.)  But as counsel

knew, questioning a client's fitness can undermine the attorney-client relationship.  *See* (CR Dkt.

827, Vol. 21, at 5515-17, 5640.)  Rather than invite conflict on a topic for which they possessed

incomplete evidence, counsel continued to gather information for use in asserting a colorable

competency challenge.  *See* (*id.* at 5440 (counsel testifying that the strategy of approaching

competency would be to continue making observations to "see where [it] went"), 5580.)

Counsel did not seek a competency evaluation until Duncan elected to proceed pro se, when they

believed they had the "missing link" demonstrating his decisions were the product of delusions.

*See* (*id.* at 5511.)  They did not act ineffectively in omitting to raise the point earlier.

Faced with overwhelming evidence and a client strongly inclined to avoid trial, counsel

reasonably advised a tactical plea that obviated a pointless and graphic evidentiary exploration of

the crimes, while providing additional time to prepare for the penalty phase.  The decision was in

keeping with the defendant's desires and best interests.  Given this, Duncan cannot succeed in

characterizing counsel's advice as unreasonable or ill-informed.  *See Elmore v. Sinclair*, 799

F.3d 1238, 1246-47 (9th Cir. 2015); *see also Eggleston v. United States*, 798 F.2d 374, 376 (9th

Cir. 1986) ("[I]neffective assistance claims based on a duty to investigate must be considered in

light of the strength of the government's case.").

Even if counsel had erred, Duncan cannot establish prejudice.  To do so, he would have

to show that he would not have pleaded guilty, absent his attorneys' alleged errors.  *See Hill*, 474

U.S. at 59; *Lafler v. Cooper*, 566 U.S. 156, 163 (2012).  But as noted, Duncan had steadfastly

maintained a desire to plead guilty from the time of his arrest.  *See, e.g.*, (Sealed Gov't Attach.

13 at 42-43 ("I've already told my attorneys . . . I'm pleading guilty."); CR Dkt. 816, Vol. 10, at

2644-45; CR Dkt. 824, Vol. 18, at 4598-99 (mitigation expert, Nerad, testifying that Duncan

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 42**

wanted to plead and never denied his crimes in over 40 meetings); CR Dkt. 825, Vol. 19, at 4811 (Monaghan testifying that Duncan had wanted to plead guilty at the first hearing)); *compare Lee v. United States*, 137 S. Ct. 1958, 1966 (2017) (instructing courts to "look to contemporaneous evidence to substantiate a defendant's expressed preferences" when assessing prejudice).

Indeed, Duncan interrupted his initial appearance in an effort to enter a guilty plea.  (CR Dkt. 459 at 7.)  Only after counsel instructed him, "[t]hat's the only plea [the Magistrate Judge] can accept," did Duncan allow the hearing to proceed.  *See* (*id.* at 7-8.)  Throughout his discussions with counsel, Duncan emphasized his desire to take responsibility for his actions.[14] (CR Dkt. 825, Vol. 19, at 4855 (telling counsel he wanted to plead guilty); CR Dkt. 816, Vol. 10, at 2644 (telling the state mitigation expert, Naffziger, that he would plead guilty); CR Dkt. 822, Vol. 16, 4162 (telling counsel he "remained consistent that he wanted to plead"); CR Dkt. 827, Vol. 21, at 5446 (Clarke acknowledging Duncan's desire to plead guilty).)  During the plea hearing, Duncan reiterated that he had "never attempted to deny responsibility or to conceal anything that [he] [had] done concerning these charges."  (CR Dkt. 204 at 4.)

Accordingly, Duncan cannot establish a reasonable probability that he would not have pleaded guilty had counsel acted differently.

### 3.    Counsel adequately prepared for the penalty phase trial.

Duncan claims his trial counsel ineffectively prepared for the penalty phase trial, asserting that "had [the] work occurred in time to be of use, the jury would have learned that Mr. Duncan was born into a family with multi-generation psychiatric problems and a history of

---

[14]     During a July 19, 2005 FBI interview, Duncan reported that he had told his attorneys of his plan to plead guilty to the Wolf Lodge Murders.  *See* (Sealed CR Dkt. 109.)  He later did so in Idaho state court.  Likewise, Duncan pleaded guilty to California charges arising from another child's murder.  (CR Dkt. 817, Vol. 11, at 2781; CR Dkt. 815, Vol. 9, at 2230.)

sexual, physical, and emotional abuse." (CV Dkt. at 40.)  Duncan mooted this claim when he elected to fire his attorneys at the outset of trial and proceed through the penalty phase without their representation.  Assuming, arguendo, the attorneys' conduct remained a matter of any import, given that they did not act as Sixth Amendment counsel, they fully discharged their professional obligations to prepare for trial.  Ironically, the adequacy of their preparations to present mental health evidence led, in part, to Duncan's decision to represent himself.  *See, e.g.*, (Sealed Gov't Attach. 3 at 62, 120.)

### a.   Mootness

Duncan's decision to forgo a mitigation case moots his claim of ineffective assistance in investigating that evidence.  A defendant's procedural decisions may moot relief as to a claim of ineffective assistance of counsel.  *See Arave v. Hoffman*, 552 U.S. 117, 117-18 (2008) (per curiam) (holding a defendant's decision to forgo pursuit of an appellate argument mooted a specific ineffectiveness claim).  "The Sixth Amendment . . . grants to the accused personally the right to make his defense."  *See Faretta v. California*, 422 U.S. 806, 819 (1975).  While a defendant may challenge the effectiveness of his representation, once he elects to proceed pro se, he forfeits such claims as to his own actions.  *Faretta*, 422 U.S. at 834 n.46; *see also United States v. McDowell*, 814 F.2d 245, 251 (9th Cir. 1987) (extending the Supreme Court's reasoning in *Faretta* "to preclude . . . [a] 'fair trial' claim" as well).  In a case involving a defendant who represented himself and omitted penalty phase evidence, the Sixth Circuit Court of Appeals implied that a defendant could not legally establish prejudice: "The evidence [of guilt] . . . was overwhelming . . . . [and] leads us to conclude that Wilson cannot demonstrate prejudice from [counsel's] pre-waiver conduct."  *Wilson v. Parker*, 515 F.3d 682, 699 (6th Cir. 2008).

Here, Duncan elected to represent himself and to omit mitigation, mooting any inquiry

into the quality of counsel's work in preparing such evidence.  In essence, Duncan seeks a prohibited advisory opinion about the quality of counsel's efforts to develop evidence he intentionally and purposefully suppressed from view.  *See Coal. for a Healthy Cal. v. FCC*, 87 F.3d 383, 386 (9th Cir. 1996) (observing "federal courts have never been empowered to issue advisory opinions").  Significantly, Duncan did not object to mitigation evidence because he failed to appreciate its importance, due to an error of counsel's.  Rather, he sought to forestall the evidence *precisely because* he understood it might shield him from punishment.  *See, e.g.*, (Sealed Gov't Attach. 3 at 62 (Duncan did not want his past experiences to be presented as an "excuse for his behavior").)

This Court should not engage in a hypothetical dispute about any failure on the part of trial counsel to develop evidence that Duncan personally refused to present.

### b.    Counsel's actions

Even if Duncan had presented a cognizable claim, he has not presented a meritorious one. Duncan asserts that despite his counsel's exhaustive efforts, they nevertheless failed to uncover a "wealth of mental health and other mitigating evidence."  Pointing only to Dr. Lisak's "meaningful work," Duncan argues that counsel failed to sufficiently investigate maternal incest and abuse.  (CV Dkt. 4 at 40-42.)  Ultimately, Duncan does not identify any prejudicial failing by counsel.  There is no doubt that counsel investigated the incest evidence.  His assertion is only that the investigation was not thorough *enough*.  (*Id.* at 40-44.)  His claim lacks merit.

Counsel have a duty to reasonably investigate mitigating evidence and to make reasonable decisions to forgo particular lines of inquiry.  *Strickland*, 466 U.S. at 691; *Douglas*, 316 F.3d at 1090.  This duty has limits.  *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005). "[R]easonably diligent counsel may draw a line when they have good reason to think further

investigation would be a waste." *Id.* Counsel need not interview every "conceivable witness" or unearth information that they have no reason to know. *Douglas*, 316 F.3d at 1088. The adequacy of an investigation is "heavily fact-dependent." *Earp v. Ornoski*, 431 F.3d 1158, 1176 (9th Cir. 2005). The ineffectiveness inquiry focuses on whether the investigation "supporting counsel's decision . . . was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Counsel also have a separate duty to present mitigating evidence. *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005). This duty includes "sufficient . . . preparation to be able to present and explain the significance of all the available mitigating evidence." *Summerlin v. Schriro*, 427 F.3d 623, 630-31 (9th Cir. 2005) (en banc) (quotation and alterations omitted).

In this case, counsel fully investigated mitigation before Duncan elected to proceed pro se. Indeed, counsel pursued mitigation evidence while also attempting to persuade Duncan to allow its presentation. (CR Dkt. 822, Vol. 16, at 4194.) Beginning on the day of Duncan's arrest, the defense worked to develop mitigating information about his life. *See, e.g.*, (CR Dkt. 824, Vol. 18, at 4665 (mitigation specialist discussing the team's organized approach to visiting Duncan).) Early on, the defense identified mental health as a potential mitigator.[15] (CR Dkt. 827, Vol. 21, at 5440; CR Dkt. 824, Vol. 18, at 4600.) In so doing, it carried on "what [Ms. Clarke thought] most good capital lawyers do, and that is to work on understanding the life history, the course, the life course, doing the social history workup so that experts would have some reliable foundation upon which to help understand [Duncan], and continue to work on the relationship with him." (CR Dkt. 827, Vol. 21, at 5440-41.) Counsel hired specialized

---

[15]     As discussed, counsel quickly retained Dr. Woods as a consultant. (CR Dkt. 821, Vol. 15, at 3944; CR Dkt. 823, Vol. 17, at 4399.) Hiring him in that capacity avoided potential friction with Duncan and reduced the defense's discovery burdens. *See* (CR Dkt. 44-1 at 12.)

mitigation team members to focus on thematic areas. *See, e.g.*, (CR Dkt. 819, Vol. 13, 3370 (Jennifer Davis hired to investigate incarceration).) While the team's personnel changed over time, its members utilized earlier work to maintain investigative momentum. *See, e.g.*, (CR Dkt. 819, Vol. 13, at 3392 (discussing the sharing of information).)

Counsel continued to investigate after discovering helpful information. Based on information gleaned in interviews with Duncan, the defense gathered materials that corroborated descriptions of incest, childhood abuse, sexual abuse in custody, and injuries that may have caused brain damage. *See* (CR Dkt. 827, Vol. 21, at 5517 (acknowledging Duncan assisted the investigation by signing releases); CR Dkt. 819, Vol. 13, 3360-65, 3373; CR Dkt. 817, Vol. 11, at 2820; Sealed Gov't Attach. 3 at 13, 36, 46, 52, 69, 72, 73, 76-77); *see also* (CV Dkt. 2-17, Sealed Exh. 101 at 880 (referencing interviews of Cheri Duncan, Duncan's sister).) The defense provided material to its mental health experts. *See* (CR Dkt. 819, Vol. 13, at 3376 (mitigation specialist testifying that she "conveyed" the mitigation information she prepared to "a variety of neuropsych experts, trauma and abuse experts"); CR Dkt. 818, Vol. 12, at 3088, 3091 (Dr. Merikangas discussing injuries from shovel and car accident); CR Dkt. 818, Vol. 12, at 3102 (Dr. Merikangas concluding genetics did not cause Duncan's mental illness)); *see also* (CR Dkt. 817, Vol. 11, at 2677 (Dr. Woods evaluating Duncan's medical records related to a head injury)); *see generally* (Sealed Gov't Attach. 10 at EXPMAT000836-43 (Dr. Gur's opinion based on a review of MRI, PET results, and "records provided . . . by the attorneys").)

After nearly two years of investigation, the defense had amassed substantial evidence, including a history of familial sexual abuse. Early in the case, the defense knew incest, including maternal incest, was an issue in Duncan's life. *See, e.g.*, (Sealed Gov't Attach. 5 at 2 (noting incest with other family members and that Duncan and his brother were molested).) For

instance, Jeanne Litten, Ducan's paternal aunt, interviewed with a defense investigator and provided the same information that Duncan claims his counsel failed to find.  *Compare* (CV Dkt. 4 at 42 (noting Litten provided information about Duncan's trauma history, especially maternal sexual abuse)); *with* (CV Dkt. 2-6, Exh. 73 at 381.)  Armed with this knowledge, counsel pursued corroboration and retained experts to present the evidence.  *See, e.g.*, (CR Dkt. 819, Vol. 13, at 3364-65, 3376 (Davis explaining her investigation of corroborating information, which was conveyed to experts).)  As trial approached, the defense was ready to present its case, including mental health experts.  (CR Dkt. 823, Vol. 17, at 4276 (counsel planned to call Drs. Gur and Merikangas); Sealed CR Dkt. 627, Vol. IV., at 666 (Clarke stating "[w]e were working very diligently towards trying to prepare a case in mitigation").)  In their pre-trial notice of experts, defense counsel specified that Dr. Lisak would testify on the effects of "various trauma experienced by Mr. Duncan."  (Sealed CR Dkt. 306 at 7.)

On this record, the defense team was prepared to present evidence of Duncan's abusive and dysfunctional upbringing, as well as his mental health.  *See* (Sealed Gov't Attach. 3 at 120.) It fully discharged its duty to perform a reasonable investigation, including evidence of incest.

Assuming, arguendo, that counsel insufficiently investigated mitigation evidence of incest, and Duncan did not moot the entire inquiry by personally choosing to forgo mitigation evidence, no reasonable likelihood exists that their error prejudiced the outcome of the case.  To establish prejudice based on the inadequacy of penalty phase investigation, a defendant must show a reasonable likelihood that had newfound mitigation evidence been presented, the penalty phase verdict would have been different.  *See Wong v. Belmontes*, 558 U.S. 15, 19-20 (2009) (per curiam).  In assessing prejudice, the court considers all the relevant evidence—including the facts of the crime, the strength of the aggravating evidence, and all mitigating evidence.  *See*

*Bobby v. Van Hook*, 558 U.S. 4, 12-13 (2009) (per curiam); *Belmontes*, 558 U.S. at 26 (noting that the defendant was "convicted on extremely strong evidence that he committed an intentional murder of extraordinary brutality" and "overwhelming" aggravating evidence).

In this case, as trial approached, counsel were prepared to present the extensive mitigation evidence they had laboriously developed over three plus years of investigation. How that presentation would have unfolded is unknown: Duncan took control of his defense and elected to forgo that evidence, forestalling any prejudice from counsel's actions. *See Wilson*, 515 F.3d at 699. Despite counsel's willingness to assist in their standby roles, Duncan remained determined that no mitigation evidence be presented, as he consistently stated. *See, e.g.*, (Sealed Gov't Attach. 3 at 13 (Duncan "didn't want his family to testify b/c they are also 'victims'"), 62 (Duncan did not want his past experiences to be presented as an "excuse"), 64 ("[Duncan] emphasized that [abuse] that happened at Dyslin's Boy's Ranch or abuse during his childhood is 'irrelevant' and should not be raised.").) In particular, Duncan adamantly opposed mental health mitigation. *See, e.g.*, (*id.* at 12, 120 (Duncan did not want to be presented as "sick"); Sealed Gov't Attach. 8 at 9 ("[R]egarding the expert testimony of Dr. Ruben Gur, Dr. James Merikangas, or Dr. George Woods; I will <u>not</u> be offering their testimony at any phase of the sentencing trial.").) Duncan also had to contend with overwhelming evidence of guilt, including his own confessions and video evidence. Additionally, the Government presented evidence that these were not isolated acts, but part of a long pattern of violent and deviant behavior targeting children. Whether Duncan's waiver of counsel bars a finding of prejudice as a matter of law under *Wilson*, 515 F.3d at 682, or the Court considers the context of the supposedly undiscovered evidence under *Strickland*, 466 U.S. at 668, the fact remains he cannot establish a reasonable likelihood that he would have received a more favorable verdict had his counsel undertaken any

other effort to prepare for a trial in which they did not participate.

## II.   THE COURT PROPERLY MET WITH PEVEN OUTSIDE THE PRESENCE OF DUNCAN'S OTHER ATTORNEYS.

On August 28, 2007, this Court conducted a private, fifteen-minute discussion with Roger Peven, who was then lead defense counsel, concerning the personal problems that had led him to request withdrawal from his role.  Seeking to recast the nature of this discussion, Duncan now claims that the private, fifteen-minute conversation violated:  (1) his Sixth Amendment rights to counsel and to an adequate record; (2) his Fifth Amendment due process right to a record on appeal; and (3) his Eighth Amendment right against arbitrary and capricious enforcement of the death penalty.  (CV Dkt. 4 at 48-53.)  All the claims are procedurally defaulted.  They also fail on the merits.

### A.   Procedural bar

Having waived his direct appeal, Duncan failed to raise the statutory and constitutional violations he now alleges in his § 2255 motion.  They are thus procedurally defaulted.  *See United States v. Dunham*, 767 F.2d 1395, 1397 (9th Cir. 1985) ("Section 2255 is not designed to provide criminal defendants repeated opportunities to overturn their convictions on grounds which could have been raised on direct appeal.").

Duncan fails to establish, or even to argue, that cause and prejudice excuse his default.  *See Bousley v. United States*, 523 U.S. 614, 622 (1998); *see United States v. Withers*, 638 F.3d 1055, 1065-66 (9th Cir. 2011).  Accordingly, the violations asserted in his second claim are barred.  *See United States v. Braswell*, 501 F.3d 1147, 1149-50 (9th Cir. 2007).

### B.   Even if Duncan's claims were not procedurally defaulted, they would fail.

Duncan's claims of error all rely on his view of the Court's fifteen-minute conversation with Peven as a portion of his criminal case.  But the Court's discussion is more accurately cast

as an exercise of the Court's inherent power to regulate the conduct of attorneys who practice

before it. *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980) ("The power of a court over

members of its bar is at least as great as its authority over litigants."); *see Jackson v. United

States*, 881 F.2d 707, 710 (9th Cir. 1989).  The inherent power of federal courts over those who

practice before it includes all inquiries and decisions "necessary to the exercise" of that power,

including a determination of whether conduct is sufficiently unbecoming (or violative of a local

rule of professional conduct) to warrant contempt, sanctions, or disbarment.  *See In re Synder*,

472 U.S. 634, 645 & n.6 (1985) (defining "unbecoming" conduct); *Yagman v. Republic Ins.*, 987

F.2d 622, 628 (9th Cir. 1993) (acknowledging the power to sanction).  District courts have the

power to discipline attorneys for unprofessional conduct within and without the course of

litigation.  *See United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir. 1996); Idaho Rules of

Prof'l Conduct 8.4 (2004).

When exercising this inherent power, courts have discretion to determine the method of

assessing a bar member's conduct.[16]  *See Lefrak v. Arabian Am. Oil Co.*, 527 F.2d 1136, 1140

(2d Cir. 1975) (holding the method of inquiry "is within the discretion of the judge"); *see also

Crowe v. Smith*, 151 F.3d 217, 234-35 (5th Cir. 1998) (recognizing the court's authority to

communicate ex parte with the prosecution regarding defense counsel's unprofessional conduct);

---

[16]     The Supreme Court has long recognized the lower courts' discretion in exercising
inherent authority to oversee counsel:

> It is not necessary that proceedings against attorneys for malpractice, or any
> unprofessional conduct, should be founded upon formal allegations against them.
> Such proceedings are often instituted upon information developed in the progress
> of a case; or from what the court learns of the conduct of the attorney from its own
> observation. . . . *The manner in which the proceeding shall be conducted, so that it
> be without oppression or unfairness, is a matter of judicial regulation.*

*Randall v. Brigham,* 74 U.S. 523, 540 (1869) (emphasis added).

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 51**

*cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (recognizing "a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud").

Knowing only that Peven had requested a private opportunity to discuss something personal, this Court agreed to meet with him one-on-one.  *See* (Sealed CR Dkt. 185 at 2 & n.1; Sealed CR Dkt. 187 at 3 ("I am kind of at a loss to know exactly what the Court is going to hear, but I think procedurally it would be appropriate that Mr. Peven talk to the Court in private, and then if the Court feels uncomfortable about anything or it in any way relates to the Duncan matter, then, of course, we are going to come back on the record.").)  It allowed the private discussion, in part, out of respect for Peven's rights, as it did not know if he would divulge criminal behavior or liability.  *See* (Sealed CR Dkt. 185 at 2.)  Accordingly, the Court invoked its broad authority to conduct a private inquiry.  Given the Court's discretion in this regard, this private discussion was wholly proper.  It violated none of the four rights Duncan asserts.

### 1.    The Court's discussion with Peven respected Duncan's Sixth Amendment and statutory rights.

Duncan implies that this Court's discussion with Peven violated his Sixth Amendment rights to have an attorney present during "critical proceedings" and to an adequate record on appeal.  (CV Dkt. 4 at 51, 53.)  Neither assertion warrants collateral relief.

### a.    The brief conversation was not a "proceeding," much less a critical one.

A defendant has the right to be represented during all critical stages of a criminal proceeding.  *See United States v. Wade*, 388 U.S. 218, 224-25 (1967).  "Proceedings" include "parties' motions, and the court rulings thereon, as well as opening statements and closing arguments," and the jury instructions.  *See Kennedy v. Lockyer*, 379 F.3d 1041, 1046-47 (9th Cir.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 52**

2004).  A critical stage is "every stage of a criminal proceeding where substantial rights of a criminal accused may be affected," such as arraignment, entry of a guilty plea, and sentencing. *See Mempa v. Rhay*, 389 U.S. 128, 134 (1967); *Bell v. Cone*, 535 U.S. 685, 696 (2002).  Whether a proceeding constitutes a "critical stage" depends upon whether:  (1) "'the failure to pursue strategies or remedies results in a loss of significant rights,' (2) 'skilled counsel would be useful in helping the accused understand the legal confrontation,' and (3) 'the proceeding tests the merits of the accused's case.'"  *Hovey v. Ayers*, 458 F.3d 892, 901 (9th Cir. 2006) (quoting *Menefield v. Borg*, 881 F.2d 696, 698-99 (9th Cir. 1989)).

The private discussion between this Court and Peven was not a proceeding, much less a critical one.  *See United States v. Benlian*, 63 F.3d 824, 827 (9th Cir. 1995) (recognizing that a presentence interview was not a critical stage).  The discussion dealt solely with the personal troubles that required Peven to take a less active role in Duncan's case—it did not venture into any legal argument regarding Duncan's case.  (Sealed CR Dkts. 68, 185.)

Even if the discussion could be characterized as a "proceeding," it was not a critical one. It did not raise concerns regarding the failure to pursue strategy or remedies resulting in the loss of significant rights.  *See Hovey*, 458 F.3d at 901-02 (holding that a hearing regarding counsel's competency to represent the defendant was not a critical stage).  In fact, at the time of this discussion, Duncan had three appointed counsel, two of whom were present during the August 28, 2007 ex parte conference that preceded the private conversation.  All counsel agreed that Peven should take a reduced role in the case and that a fourth counsel was needed.  The off-the-record discussion simply informed the Court of the nature of Peven's personal problems and the need for new lead counsel.  The discussion did not involve a confrontation that required skilled counsel to assist Duncan with complex legal problems or test the merits of his case.  *United*

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 53**

*States v. Ash*, 413 U.S. 413, 309 (1973).

Duncan attempts to obscure the limited scope and nature of the Court's discussion with Peven by incorrectly alleging that the Court relied on Peven's "false or misleading statements about the degree of preparedness" to "bind the defense to an unreasonable trial and pretrial schedule." (CV Dkt. 4 at 51.)  This Court has already rejected these allegations, however.   In the months following the private discussion, counsel moved for a continuance, attaching numerous declarations regarding Peven and the state of defense preparation.  *See* (CR Dkt. 69, 72, 74; Sealed Dkts. 75-77, 80.)  Shortly thereafter, counsel also moved for clarification of the record regarding Peven's statements to the Court, which he had described in an affidavit.  *See* (Sealed CR Dkt. 178 at 5; CR Dkt. 185.)  The Court rejected the defense's characterization of any ambiguity and denied the motion.  (CR Dkt. 185.)  Duncan's counsel thus long ago remedied any possible Sixth Amendment violation from the Court's denial of Larranaga's request to be present during the Court's private discussion with Peven.

> **b.      The private discussion did not violate any right to effective appeal or the Court Reporters Act.**

Duncan next asserts that the lack of a transcript of the Court's private discussion with Peven violated his Sixth Amendment right to effective appellate counsel.  (CV Dkt. 4 at 53.) Duncan relies on the Supreme Court's holding in *Hardy v. United States*, 375 U.S. 277 (1964), to support his assertion that an adequate record is required to satisfy the Sixth Amendment. Duncan's reliance on *Hardy* is misplaced.  That case recognized that newly appointed appellate counsel are entitled to trial transcripts to discharge their duties.  *Hardy*, 375 U.S. at 280.  The Court did not find that the Constitution gave rise to that right.  It explicitly limited its ruling to the rights afforded by the Court Reporters Act, 28 U.S.C. § 753.  *Hardy*, 375 U.S. at 282; *see also United States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir. 1994); *Higginbotham v. Louisiana*,

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 54**

817 F.3d 217, 222 n.6 (5th Cir. 2016) (per curiam).  Accordingly, it announced no constitutional

right that would support Duncan's argument.

The Ninth Circuit has interpreted the Court Reporters Act to exclude pretrial conferences

taking place in chambers, not in court.  *See United States v. Hein*, 769 F.2d 609, 610-11 (9th Cir.

1985) (per curium).  Likewise, the Court Reports Act requires recordation at the request of a

party.  28 U.S.C. § 753(b).  Here, counsel requested that the discussion be off the record.

(Sealed CR Dkt. 187 at 2-3.)  Thus, no statutory violation occurred here, much less "a

fundamental defect which inherently results in a complete miscarriage of justice."  *Davis v.*

*United States*, 417 U.S. 333, 346 (1974).

Even supposing Duncan's appellate counsel were entitled, under the Sixth Amendment,

to a transcript of the Court's private conversation with Peven, Duncan's claim would fail.

Duncan waived his right to appeal.  He cannot demonstrate that alleged deficiencies in the record

infringed upon a right to appellate counsel that he did not exercise.  *See* (CV Dkt. 4 at 53.)

Duncan also cannot successfully argue that the absence of a transcript of the Court's discussion

with Peven violated any Sixth Amendment right to counsel on § 2255 review.  The Sixth

Amendment right to counsel does not extend to collateral review.  *See Pagtalunan v. Galaza*,

291 F.3d 639, 643 n.2 (9th Cir. 2002); *see also Murray v. Giarratano*, 492 U.S. 1, 10 (1989).

>   **2.      The Court's private discussion with Peven did not violate Duncan's**
>   **        due process rights.**

Duncan also cannot establish that the absence of recordation violated his due process

rights.  The Constitution does not provide a right to appeal, and only mandates that a system

allowing for appeal must comply with due process.  *See Evitts v. Lucey*, 469 U.S. 387, 392

(1985).  Thus, the Supreme Court has held that due process and equal protection are violated

when an indigent defendant is denied free copies of transcripts of their criminal proceedings for

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 55**

use in subsequent criminal proceedings.  *See Griffin v. Illinois*, 351 U.S. 12, 15 (1956).  The right

to a sufficient record, including certain transcripts, serves to ensure that a defendant can prepare

an "effective defense."  *Britt v. North Carolina*, 404 U.S. 226, 227 (1971).  Still, "a record of

sufficient completeness does not translate automatically into a complete verbatim transcript."

*See Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971) (internal quotation marks omitted)).  To

determine whether a transcript is needed for an effective appeal, two factors are considered:  "(1)

the value of the transcript to the defendant in connection with the appeal or trial for which is

sought, and (2) the availability of alternative devices that would fulfill the same functions of a

transcript."  *Britt*, 404 U.S. at 227; *see Madera v. Risley*, 885 F.2d 646, 648 (9th Cir. 1989).

Here, Duncan fails to show that he is entitled to relief under either *Britt* factor.  A

verbatim transcript of the 15-minute discussion with Peven would have provided no value to the

defense.  First, Duncan waived direct appeal, depriving himself of any arguable need for the

transcript and the appropriate procedural vehicle in which to challenge the adequacy of the

record.[17]  Second, no substantive rulings or arguments occurred during the discussion that

Duncan could have challenged on appeal.  Moreover, Duncan had a record of the 15-minute

discussion—Peven's declaration, which was wholly sufficient for purposes of appeal because it

described a meeting that had no impact on his rights.  *See* (CR Dkts. 74, 157; Sealed CR Dkts.

68, 75-77, 80, 90, 104, 178, 185.)  Accordingly, neither *Britt* factor weighs in favor of Duncan's

assertion that a verbatim transcript was required to satisfy his due process rights.

Even if Duncan could satisfy the *Britt* factors, he cannot establish prejudice.  As noted,

---

[17]     A direct appeal would have provided an opportunity to "clarify" the record.  Rule 10(c)
of the Federal Rules of Appellate Procedure, permits supplementation of a record on appeal by
means of a statement prepared by parties' memories.  *See* FED. R. APP. P. 10(c); *see United
States v. Kenney*, 911 F.2d 315, 318 (9th Cir. 1990).

Duncan must demonstrate "a fundamental defect which inherently results in a complete miscarriage of justice" to warrant relief.  *Davis*, 417 U.S. at 346.  Duncan cannot establish any prejudice, let alone prejudice resulting in a miscarriage of justice.  As previously discussed, Duncan's counsel vigorously pursued ambiguities in the record, and the Court was well aware of these purported problems, but rejected them.  *See* (Section II.B.1.a); *compare Davis v. Ayala*, 135 S. Ct. 2187, 2206 (2015) ("That Ayala's attorney did not have the opportunity to repeat this same argument . . . does not create grave doubt about whether the trial court would have decided the issue differently.").  Nor can Duncan seriously maintain that the personal information Peven relayed to the Court would call into "grave doubt" the jury's verdict, especially given that Duncan chose to represent himself at trial.  *See United States v. Kirk*, 844 F.2d 660, 663 (9th Cir. 1988) (per curiam).  Moreover, Duncan waived any due process argument based on the unrecorded, private discussion with Peven by waiving his right to a direct appeal.

> **3.    The Court's private discussion with Peven did not create a substantial risk that Duncan's death sentence was imposed in an arbitrary and capricious manner, in violation of the Eighth Amendment.**

A defendant who faces capital punishment has a constitutional right against "substantial risk that the [penalty is being] inflicted in arbitrary and capricious manner."  *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980).  Accordingly, a capital defendant has the right to be sentenced in a non-arbitrary fashion under the Eighth Amendment.  *See Gregg v. Georgia*, 428 U.S. 153, 188 (1976).  The Supreme Court encourages "meaningful appellate review of death sentences" to promote "reliability and consistency."  *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990).

With virtually no discussion, Duncan suggests that *Gardner v. Florida*, 430 U.S. 349 (1977), supports his contention that his Eighth Amendment rights were violated.  *See* (CV Dkt. 4 at 52.)  His reliance is misplaced.  In *Gardner*, the defendant had never been allowed to see a

presentence report on which his death sentence was partially based. A plurality and a concurrence by Justice White[18] recognized that the secret presentence report violated due process. *Gardner*, 430 U.S. at 358, 362-64.

     *Gardner* actually undermines Duncan's claim. The discussion between Peven and the Court had nothing to do with the basis for imposing the death sentence. (Sealed CR Dkts. 68, 185.) Moreover, the discussion *was* memorialized by Peven in his declaration and in subsequent motion practice. *See* (CR Dkts. 74, 157; Sealed CR Dkts. 68, 75-77, 80, 90, 104, 178, 185.) What is more, the subject matter of that discussion was no secret: all defense counsel knew that Peven intended to, and did in fact, discuss his personal problems with the Court. *See* (Sealed CR Dkt. 187 at 2.) None of those problems were presented to the jury as justification for imposition of a death sentence. The entire sentencing phase of Duncan's trial, and the bases for the jury's imposition of death, were recorded in twenty-three volumes of verbatim transcripts of the sentencing-phase trial. Even assuming Duncan had not waived his appeal, he could not show error, much less a prejudicial error, under *Gardner*.

## III. & IV.    DUNCAN WAS COMPETENT TO PLEAD GUILTY AND PROCEED IN PROPRIA PERSONAM.

     This Court's finding that Duncan was competent in November 2008 to waive his right to appeal was affirmed on direct appeal, (*United States v. Duncan*, Appeal No. 13-99011 at ECF Nos. 1-4.), and, therefore, may not be re-litigated. *See United States v. Jingles*, 702 F.3d 494, 499-500 (9th Cir. 2012). Recognizing this fact, Duncan does not directly challenge this Court's finding that he was competent to waive his right to appeal in November 2008. Instead, Duncan

---

[18]    Since *Gardner* was issued, the Supreme Court has recognized that Justice White's concurrence, not the plurality opinion, is the controlling decision. *See O'Dell v. Netherland*, 521 U.S. 151, 162 (1997); *see also Sivak v. Hardison*, 658 F.3d 898, 922-23 (9th Cir. 2011).

argues that he was not competent to plead guilty in December 2007 or to represent himself

during the penalty phase in August through November of 2008.  Specifically, Duncan raises the

following competence-related claims, with a host of sub-claims:[19]

Claim 3:  Duncan's conviction was obtained in violation of his constitutional rights because he was incompetent to plead guilty in December 2007.  (CR Dkt. 867 at 53-121.)

    A.  This Court incorrectly decided all the facts leading to its finding after the retrospective competency hearing that Duncan was competent to waive his right to appeal in November 2008.  Notwithstanding the fact that the court of appeals affirmed this Court's competency determination, this Court should now find on the same evidence that Duncan was not competent in December 2007 to plead guilty and/or was unable to do so knowingly, intentionally, and voluntarily.  (CR Dkt. 867 at 74-114, 115-17.)
        1.  The Court erred in considering the Riverside Proceeding when it considered Duncan's competence.  (CR Dkt. 867 112-14.)
    B.  By excluding some evidence, the district court rendered the retrospective competency hearing not full and fair.  (CR Dkt. 867 at 117-20.)
    C.  Duncan's counsel rendered ineffective assistance by failing to declare a doubt as to competence at the time of the guilty plea.  (CR Dkt. 867 at 114-15.)[20]
    D.  Duncan's counsel at the retrospective competency hearing was ineffective.  (CR Dkt. 867 at 117-20.)

Claim 4: Duncan was incompetent to represent himself in August through November 2008.

    A.  The Court violated procedural due process by failing to hold a full competency hearing at the time Duncan decided to waive counsel and represent himself.  (CR Dkt. 867 at 125.)

All but Duncan's two ineffective assistance sub-claims (Claims 3C and 3D) are procedurally

barred.  In addition, all the claims and sub-claims—including Duncan's ineffective assistance

sub-claims—fail on their substance.[21]

---

[19]    As discussed in the response to Claim 5, that claim may be considered competence-related as well.  It is not addressed in this section, however.

[20]    This sub-claim is addressed earlier in this brief as part of Duncan's ineffective assistance of counsel claims.

[21]    Duncan incorporates all his arguments regarding Claims 3-5 into all three claims.  *See* (CR Dkt. 867 at 121.)  The Government likewise incorporates its responses into all three claims.

A.     **Duncan's non-ineffective assistance of counsel claims are procedurally barred.**

1.     **Duncan procedurally defaulted on his non-ineffective assistance of counsel claims by voluntarily waiving his direct appeal.**

By waiving his right to a direct appeal, Duncan procedurally defaulted all the issues he raises in Claims 3 and 4 except ineffective assistance of counsel (subparts 3C and D listed above).  *See United States v. Frady*, 456 U.S. 152, 165 (1982.)

Duncan does not argue that either exception to this procedural bar applies.  He does not attempt to demonstrate his actual innocence.  *See United States v. Guess*, 203 F.3d 1143, 1145 (9th Cir. 2000).  Nor could Duncan plausibly do so because he has consistently acknowledged his guilt since he was first arrested.

Duncan also does not attempt to demonstrate cause and prejudice for his default.  (CR Dkt. 867 at 53-139.)  To do so, he would first have to show that "some objective factor external to the defense" impeded compliance with the procedural rule that he raise all possible issues on direct appeal.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Bousley v. United States*, 523 U.S. 614, 621 (9th Cir. 1998).  In his § 2255 motion, Duncan does not even acknowledge this threshold requirement.

Duncan's failure to acknowledge the cause and prejudice requirement with respect to Claims 3-4 likely reflects the impossibility of satisfying the requirement.  Given that Duncan's personal waiver of appeal resulted in default, he cannot satisfy the "cause" standard, which requires a showing of factors external to the defense.  *Cf. Murray*, 477 U.S. at 485-86.  And Duncan's competence to waive appeal has already been decided and affirmed.  It is now law of the case.  It may not be relitigated.  *See Jingles*, 702 F.3d at 498; *Odom v. United States*, 455 F.2d 159, 160 (9th Cir. 1972) (per curiam).

Further, even if Duncan could articulate and demonstrate cause, he would not be able to show prejudice because, as discussed below, all of the issues Duncan raises in Claims 3 and 4 fail on their merits.  Accordingly, this Court should dismiss Claims 3 and 4 (except subparts C and D) because they are procedurally barred.  And it should deny all claims on the merits.

> ## 2.    Duncan also procedurally defaulted on his non-ineffective assistance of counsel claims by failing to raise them in the district court.

When issues not raised in the district court are raised for the first time on direct appeal, they are reviewed for plain error.  *See* FED. R. CRIM. P. 52(b); *Jones v. United States*, 527 U.S. 373, 388 (1999).  When they are not raised before the district court and not raised on direct appeal, however, they are doubly defaulted.  *See Frady*, 456 U.S. at 162-63, 167.  That is the situation with all but the ineffective assistance sub-parts of Claim 3.

Neither Duncan nor his defense counsel ever asserted that he was incompetent to plead guilty to the district court. (CR Dkt. 204 at 25; CR Dkt. 843 at 51 & n.24; CR Dkt. 827, Vol. 21, at 5448, 5562.)  To the contrary, Duncan's defense counsel have asserted that he was competent to plead guilty and did so on the advice of counsel.  (CR Dkt. 189 and 191 at 3.)

Similarly, neither Duncan nor his defense counsel ever asserted to the Court that Duncan's guilty plea was not knowing, intelligent, and voluntary.  To the contrary, Duncan's defense counsel acknowledged that Duncan understood the rights he was surrendering.  *See* (CR Dkt. 827, Vol. 21, at 5579-85.)  Thus, this claim is doubly defaulted.  *Frady*, 456 U.S. at 162-63, 167.  Duncan again does not even attempt to satisfy the exception doctrine under *Frady*.  *See* (CR Dkt. 867 at 53-121.)  Accordingly, these claims are doubly procedurally barred.

> ### B.    All of Duncan's claims fail on their substance.

If the Court reaches the substance of these procedurally-barred claims, the record in this case fully supports finding that Duncan was competent at all relevant times.  Duncan points to no

evidence indicating a change in his competency between December 2007 and November 2008.

To the contrary, as discussed below, the defense's own evidence demonstrates a consistent level

of competency throughout the trial proceedings.  Applying the same standard applicable to

competency to plead guilty and to self-represent, the court of appeals affirmed this Court's

decision with respect to Duncan's competence in November 2008.  *See* (*United States v.*

*Duncan*, 13-99011, ECF No. 55-1.)  The court of appeals also favorably cited individual findings

by this Court that apply more broadly than merely to November 2008.  For example, the court of

appeals favorably cited this Court's finding that the epiphany Duncan described having in 2005

was not a delusion.  *See* (*United States v. Duncan*, 13-99011, ECF No. 55 at 2-3.)[22]

> 1.     **The record supports finding Duncan competent at all relevant times.**

At the time of the retrospective competency hearing, the Court was only called upon to

evaluate its earlier determination that in November 2008 Duncan was competent to waive his

right to appeal.  It was not called upon to evaluate its earlier determinations that Duncan was

---

[22]     As a matter of common sense, it seems logical that the Court's findings of competence at the time of Duncan's plea and at the time he decided to represent himself, in combination with the Court's subsequent findings necessary to support its determination of competence in November 2008, should have some *legally* preclusive effect in addition to the logically preclusive effect discussed.  No legal doctrine appears to precisely fit this situation, however. *Robi v. Five Platters, Inc.*, 838 F.2d 318, 326 (9th Cir. 1988) (quoting *Segal v. American Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979) (explaining that issue preclusion "prevents relitigation of all 'issues of fact or law that were actually litigated and *necessarily decided*' in a prior proceeding") (emphasis added); *Jingles*, 702 F.3d at 499-500 (citing *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988) (describing the law of the case doctrine, which precludes a court "from reexamining an issue previously decided by the same court, or a higher court, in the same case"); *Moran v. Godinez*, 40 F.3d 1567, 1573 (9th Cir. 1994), *modified*, 57 F.3d 690 (9th Cir. 1995) (describing the presumption in habeas that trial court fact-finding deserves deference).  Moreover, determining precisely which findings were necessary to the Court's post-retrospective competency decision, and which were not, would be a legal decision that would be easy to challenge.  Accordingly, the Government suggests that the Court primarily rely on the record and on the evidence it heard and examined before, during, and after the retrospective competency hearing to make new factual findings.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 62**

competent to plead guilty and that he did so knowingly, intelligently, and voluntarily,[23] and that

he was competent to represent himself at the sentencing hearing.  (CR Dkt. 843 at 50 n.32.)  The

Court may do so now.  On a § 2255 motion, this Court may "determine the issues and make

findings of fact and conclusions of law with respect thereto."  28 U.S.C. § 2255(b); *see also*

*Gustave v. United States*, 627 F.2d 901, 903-04 (9th Cir. 1980) (affirming district court's

decision to deny a § 2255 motion without a hearing based on the court's "own memory of the

two trials and a review of the record")  In light of all the evidence the Court considered at the

retrospective competency hearing, and the careful evaluation it performed during and after the

hearing, it is in a unique position.  It may use the record, as well as its extensive first-hand

observation of Duncan, to consider Duncan's competency during the two earlier periods.  It

should do so, it should make findings consistent with its previous ones, and it should find him

competent for the reasons discussed below.

---

[23]     Duncan ignores the fact that his competence and the knowing, intelligent, and voluntary
nature of his plea were never in question at the time of his plea.  (CR Dkt. 867 at 74 (describing
"Duncan's competence to plead guilty" as an "unresolved question").)  Counsel affirmatively
represented that they knew of no reason he should not be allowed to enter guilty pleas to each
charge, both at the time of the plea and at the retrospective competency hearing.  (CR Dkt. 204 at
25; CR Dkt. 843 at 51 & n.24; CR Dkt. 827, Vol. 21 at 5448, 5562.)  Moreover, the Court made
the relevant inquiries and findings regarding the knowing, intelligent, and voluntary nature of the
plea.  (CR Dkt. 204 at 6-14, 26.)  And counsel acknowledged at the retrospective competency
hearing that they had no reason to doubt Duncan's competence to plead, and that he understood
the rights he was surrendering.  (CR Dkt. 827 at 5579-85.)  The Court's subsequent findings,
based on the extensive evidence presented at the retrospective competency hearing, strongly
support Duncan's competency and ability to waive his right at the time of the plea.  Indeed, the
Court so noted.  *See* (CR Dkt. 843 at 50 n.32.)

#### a.  All experts agreed on the key features necessary to evaluate competence.

Defense and Court-appointed experts agreed that Duncan's competency turned on whether or not he was delusional, and that determination, in turn, centered on Duncan's stated beliefs about "the Truth" and the Epiphany that Duncan claims to have experienced.  (CR Dkt. 843 at 8-9 (noting the varied nature of the experts' conclusions, but also their common focus on "ideology," and especially on "what the Defendant called 'the Truth' and oneness as well as an Epiphany that the Defendant stated he experienced on the mountain"); CR Dkt. 811, Vol. 5, at 1110-13, 1134-41 (Riverside defense expert Dr. Kirkish describing the "central question" regarding competence as whether Duncan was delusional);  CR Dkt. 843 at 16 (noting that defense expert, Dr. Amador, differed from Court-appointed expert, Dr. Low, because he viewed "isolated phrases as evidence of delusions" while she viewed them, in context, as non-delusional); CR Dkt. 815, Vol. 9, at 2316-17 (state defense counsel describing "the issue" regarding Duncan's competence to defense expert, Dr. Rath, as "whether Duncan is delusional and whether this delusion allows him to cooperate with counsel or to make rational decisions in representing himself");  CR Dkt. 826, Vol. 20, at 5077 (Dr. Kalechstein opining that Duncan's primary symptoms were "delusions, including paranoid delusions").)  Indeed, distinguishing between a delusion and a highly idiosyncratic belief was the "thorny issue" to which Dr. Kirkish referred, (CR Dkt. 811, Vol. 5, at 1169), and the precise point at which defense expert opinion departed from Court-appointed expert opinion.  (CR Dkt. 826, Vol. 20, at 5098-99 (describing different conclusions based on the same observed behavior).)  And it is what both sides focused upon in the hearing.  (CR Dkt. 843 at 8-10.)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 64**

**b.**   **The evidence at the retrospective competency hearing establishes that the key features of Duncan's belief system that were used by the experts to evaluate Duncan's competence remained consistent throughout the federal proceeding.**

The key aspects of Defendant's ideology or belief system, according to all the evidence presented at the retrospective competency hearing, remained consistent throughout the federal litigation and even before and after the proceeding.  (CR Dkt. 843 at 13 (Dr. Engle) and 22 (Dr. Gur); CR Dkt. 811, Vol. 5, at 1106-09, 1126-29, 1226-29 (Dr. Kirkish); CR Dkt. 816, Vol. 10, at 2415-18, 2507-10, 2587-98 (state defense attorneys and mitigation expert discussing behavior in 2005)); CR Dkt. 818, Vol. 12, at 2996-99, 3008-11, 3016-27 (Dr. Merikangas describing Duncan's behavior from 2005, 2008, and through 2012 and opining that he had a "severe" and "stable" psychosis "from 2005 to 2012"); CR Dkt. 809, Vol. 3, at 1713-14, 1731-32 (defense specialist Freedman regarding consistency); CR Dkt. 820, Vol. 14, at 3608-23 (Dr. Gur interview in 2008).)  As defense expert Dr. Kalechstein explained, after reviewing Duncan's "statements over time, and the manner in which he has interacted with the different clinicians who have interviewed him, he says the same things, his stance is the same . . . from as early as the 2005 evaluation and through the 2012 evaluation."  (CR Dkt. 826, Vol. 20, at 5130.)  This consistency led to Dr. Kalechstein's opinion that Duncan's mental state was "chronic and durable," (*id.* at 5130), and underlay the defense's argument that "Mr. Duncan has a long-standing delusional belief system that has originated before this case began and has continued up to the present day." (CR Dkt. 807, Vol. 1, at 25.)

The consistency of the evidence relevant to Duncan's competency led this Court to find, after the retrospective competency hearing, that:  "While the witnesses' perception of the Defendant and his mental state differed, what the Defendant told each of the individuals remained substantially the same."  (CR Dkt. 843 at 38.)  Likewise, on § 2255, Duncan

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 65**

acknowledges the consistency over time of the evidence relevant to his competency.  (CR Dkt. 867 at 55, 68-70 (describing continuity and consistency of Duncan's symptoms throughout the federal proceeding and afterwards).)  Thus, the testimony of Duncan's own experts, and of all the experts and other witnesses, show that he demonstrated the same set of beliefs, consistently, during the entire federal proceeding.  Based on this evidence, this Court found Duncan was competent in November 2008, and the court of appeals affirmed.  *See* (*United States v. Duncan*, Appeal No. 08-99031 at ECF No. 55-1.)  The Court should similarly find him competent throughout the federal proceeding.

### c.   No logical, legal, or factual reason exists to find that Duncan was not competent throughout the federal proceedings.

Duncan correctly asserts that "competency *can* vary over time."  (CV Dkt. 4 at 77-78.)  His assertion that this fact justifies different findings regarding his competence during the federal proceeding fails, however.  There is not a shred of evidence in the record that *his* competency actually varied over the relevant period of time.  Even his own experts emphasized that Duncan's mental state had remained steady for a long period of time.  (CR Dkt. 826, Vol. 20, at 5130.)

Next, Duncan seeks to challenge the foundation of this Court's competency determination:  its credibility determinations.  This Court consistently found the Court-appointed experts who opined Duncan competent to waive his right to appeal in November 2008 were more credible than the defense experts who opined Duncan was not competent.  (CR Dkt. 843 at 12, 15, 18, 24-25, 29-30, 31, 34-36.)  Among many reasons for its finding, the Court noted that the Court-appointed experts had a temporal advantage over the defense experts because their evaluation of Duncan occurred closer in time to Duncan's appeal waiver than the evaluations of the defense experts.  (CR Dkt. 843 at 32.)  Duncan suggests that this Court should reweigh the evidence and find that he was not competent to plead guilty in December 2007 or represent

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 66**

himself in August through November 2008 because the Court-appointed experts have no

"chronological advantage" over defense experts as to these earlier periods.  (CV Dkt. 4 at 78.)

Timing has nothing to do with the bulk of the Court's thorough findings regarding bias and lack

of credibility of defense expert opinions, (CR Dkt. 843 at 16, 20-22, 24, 25, 29, 31, 42-44), and

its positive assessment of Court-appointed experts and Government lay witnesses.  *See, e.g.*, (CR

Dkt. 843 at 12, 15-18, 35, 40, 42-44, 49.)  The elimination of a "chronological advantage" in the

Court-appointed experts, because they interviewed Duncan close in time to his November 2008

waiver, thus has little effect.  This is particularly true in light of Duncan's consistency over time.

After carefully re-evaluating the evidence, this Court should find that Duncan was competent

throughout the federal proceedings.

Finally, as discussed below, the same legal standard applies to competence at all three

time periods at issue (i.e., Duncan's decision to plead guilty in December 2007, self-

representation in August through November 2008, and appellate waiver in November 2008).e

Thus, nothing distinguishes the Court's previous inquiry from its inquiry now.

Accordingly, in light of Duncan's remarkable consistency, and the ample record

developed during the sentencing proceeding and at the retrospective competency hearing, the

Court should find, consistent with its previous findings, that Duncan was competent throughout

the federal proceedings, including when he pleaded guilty and when he represented himself

during the penalty phase.

### 2.    Duncan's evidentiary arguments also fail.

Duncan suggests that two evidentiary errors merit re-visiting the Court's competency

findings or somehow rendered the retrospective competency hearing less than full and fair.

Specifically, Duncan argues that:  (a) the Court erred by taking judicial notice of the Riverside

Proceedings, (CV Dkt. 4 at 12-14); and (b) it improperly did not consider an interview of Duncan conducted by a government expert, Dr. Roesch. (CR Dkt. 4; CR Dkt. 867 at 117-20.) Both arguments fail because the Court did not err.

Duncan's first evidentiary argument fails because it rests on the incorrect premise that this Court took judicial notice of the Riverside Proceeding. (CR Dkt. 867 at 113.) To the contrary, the parties stipulated to the introduction of the transcripts from the Riverside Proceeding, which were introduced as a defense exhibit. (CR Dkt. 807, Vol. 1, at 4.) Moreover, the defense urged the Court to follow an Eighth Circuit case, *Rose v. United States*, 513 F.2d 1251, 1256 (8th Cir. 1975), which held that prior and subsequent findings of competence, while not determinative in a *res judicata* sense, were "evidence, to be weighed with other evidence on the question of competency." (CR Dkt. 720 at 10 (quoting *Rose*, 513 F.2d at 1256-57 & nn.5-6).) This is precisely what the Court did in its decision. (CV Dkt. 4 at 112-13 (citing CR Dkt. 843 at 18, 30, 50).) The Court properly considered testimony and findings from the Riverside proceeding not as determinative of facts at the federal proceeding, but as pieces of evidence that it weighed alongside the other evidence at the hearing. (CR Dkt. 843 at 18 (finding Drs. Rath and Kirkish credible, based especially on their response to intense cross-examination, and then noting the two experts' opinions and the resulting finding of competency at the Riverside proceeding).) Accordingly, Duncan's first evidentiary argument fails.

Duncan's second evidentiary argument also rests on an incorrect premise. Contrary to Duncan's assertion, the Court permitted the parties to use Dr. Roesch's interview of Duncan. (CR Dkt. 867 at 119-21.) Although defense counsel repeatedly sought to exclude all evidence from Dr. Roesch, *see* (CR Dkts. 725 (motion to exclude Dr. Roesch) and 839 at 29-30 (renewing motion to exclude)), the Court never granted their requests. (CR Dkt. 843 at 19.) It allowed Dr.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 68**

Roesch's report and testimony; it even admitted his interview into evidence when offered by the defense.  (CR Dkt. 814, Vol. 8, at 1967-68.)  Indeed, the defense used the interview extensively on cross-examination, playing portions of it and contrasting them to Dr. Roesch's conclusions. (*id.* at 1950-52, 1973-78, 1984-89; CR Dkt. 827, Vol. 21, at 5508-10.)  Ultimately, and probably in light of defense counsel's skillful cross-examination, the Court decided that Dr. Roesch's report and testimony simply were not "useful or reliable in addressing the issue presented," (CR Dkt. 843 at 19), and thus placed no weight on them.  (CR Dkt. 843 at 19.)  Duncan's assertion that he was deprived of evidence thus makes no sense.

Even if Duncan's assertions of error were valid, trial errors do not offend due process, or merit collateral relief, unless they convert an otherwise fair proceeding into one that was "repugnant to an enlightened system of justice."  *Vandergrift v. United States*, 313 F.2d 93, 96 (9th Cir. 1963).  Duncan has not, and cannot, show that either error meets this standard.

### 3.  Duncan received the assistance of effective counsel at the retrospective competency hearing.

Duncan offers minimal support, and no real argument in favor of, his brief assertion that counsel at the retrospective competency hearing were ineffective.  *See* (CR Dkt. 867 at 117-21.) Further, his argument that his counsel were ineffective at the retrospective competency hearing is in tension with his previous arguments.  For example, he describes counsel's successful cross-examination of Government expert Dr. Roesch on the same page and in the same section in which he asserts counsel were ineffective.  (CV Dkt. 4 at 119.)  And, in arguing that the Court should find Duncan incompetent to plead guilty and to represent himself, he relies on the reliability and interlinking nature of the extensive evidence adduced by his attorneys at the retrospective competency hearing.  (*Id.* at 54-64.)  He cannot simultaneously extol and reply upon the multiple virtues of his attorneys' representation while maintaining that they

"undermined the proper functioning of the adversarial process" to such a degree that they denied him a fair hearing. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). In any case, the facts speak for themselves. The hearing lasted twenty-three days. Duncan's two learned counsel, who were appointed on recommendations to the Court, called more than twenty-five witnesses, including five experts who, as Duncan's brief well establishes, were exceedingly well qualified and who offered interlinking testimony. *See* (CR Dkt. 843 at 3, 19-31; CR Dkt. 867 at 54-64.)

Duncan also argues that his counsel rendered ineffective assistance by not specifically asking the experts to review Duncan's sister's testimony regarding the abuse and incest in Duncan's family history. While the Ninth Circuit has recognized a duty for trial counsel to provide adequate information to expert witnesses before calling them to the stand, *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998), Duncan's argument fails because, contrary to Duncan's suggestion, the experts were well aware of the abuse and incest in Duncan's family history. (CV Dkt. 4 at 119.) *See* Section I.C.3. Early on, the defense team identified the incest, abuse, and family dysfunction covered in his sister's testimony as "themes" from Duncan's life history. (Sealed Gov't Attach. 5; Sealed Gov't Attach. 3 at 2, 12-13, 20, 25 (noting potentially mitigating incidents); Sealed Gov't Attach. 12 (Nerad's mitigation notes).) The team compiled materials that corroborated descriptions of incest and abuse. (CR Dkt. at 827 at 5517 (acknowledging Duncan assisted the investigation by signing releases); Sealed Gov't Attach. 3 at 13, 36, 46, 52, 69, 72, 73, 76-77)); *see also* (CV Dkt. 2-17, Sealed Exh. 101 at 880 (referencing interviews of Cheri Duncan).) Further, the defense experts had planned to testify at the sentencing hearing about the sexual abuse Duncan had suffered, as discovered during the extensive defense investigation. (Sealed Gov't Attach. 3 at 20-21 (Duncan admission to Oedipal

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 70**

relationship with his mother); 52 (concerns about mother's response to Duncan kissing a girl); 74 (Duncan described his mother's attempt to kiss him intimately); Sealed Gov't Attach. 5 at 2 (noting family reports of incest).)  Indeed, the outlines of this history were included in the mental health records first reviewed when Duncan was sent to SeaTac for examination.  *See* (CR Dkt. at 812, Vol. 6, at 1574, 1577-78.)  Ultimately, defense experts used the information to explain the "etiology of [Duncan's] impairment" at the retrospective competency hearing.  (CR Dkt. 818, Vol. 12, at 3026-27.)  Whether or not they were specifically asked to review Duncan's sister's testimony, the experts were well aware of the underlying issues and incorporated their knowledge into their opinions and testimony.

Accordingly, even if Duncan could show deficient performance of counsel (which he cannot), he has not and cannot establish the second requirement:  prejudice.  *See Strickland*, 466 U.S. at 693-94.

Duncan further claims that his attorneys provided ineffective representation by failing to have Drs. First or Amador produce more complete expert reports for the retrospective competency hearing.  (CV Dkt. 4 at 117-18.)  According to Duncan, such reports would have allowed the experts to testify more broadly.  Along the same lines, Duncan complains that counsel failed to produce any expert report for Dr. Beaver.  (CV Dkt. 4 at 118-19.)  These arguments lack merit, as Duncan cannot show that counsel's conduct was unprofessional or prejudicial.  To the contrary, when examined in context, counsel's decisions appear strategic. *See Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1992).

Doctors Amador and First were part of the defense team at sentencing, and had documented their opinions when Duncan wished to represent himself, around April 2008.  *See* (CR Dkt. 827, Vol. 21, at 5525-26.)  Thus, their reports were from 2008.  This was helpful to the

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 71**

defense:  the reports were closer in time to Duncan's decisions to plead guilty, to represent

himself, and to waive appeal than any new reports from 2013 would be.  And the Court's inquiry

was retrospective.  (CR Dkt. 843 at 2 (noting that the Court's inquiry would focus on Duncan's

competency in November 2008 and, possibly, in April of 2008).  Furthermore, in 2013,

Duncan's counsel could not go back in time to ask the experts to expand their reports.  At most,

they could have asked the experts to create 2013 supplements to the reports.  But supplements

attempting to expand upon 2008 opinions would have been of little value.  The original reports

were of far more value.  Counsel made a valid decision to use them.

Dr. Beaver was a mitigation expert who was part of the State of Idaho defense team, and

had done his work significantly before the federal prosecution.  He did not produce a report.

(CR Dkt. 843 at 25 n.19; CR Dkt. 819, Vol. 13, at 3285-86.)  Thus, there was no report that

counsel could have produced.  And again, a 2013 supplement would not have been of much

value to a retrospective determination of Duncan's competency in November 2008.  In addition,

defense counsel *did* succeed in offering Dr. Beaver's testimony regarding the neuropsychological

testing he performed on Duncan.  (CR Dkt. 843 at 25 n.19.)  And the other defense experts tied

that testing into their opinions.  *See, e.g.*, (CR Dkt. 820, Vol. 14, at 3530, 3564-65, 3567-68; CR

Dkt. 821, Vol. 15, at 3793-94, 3819-20; CR Dkt. 828, Vol. 22, at 5810-11, 5908, 5913.)

Defense counsel's reliance on reports prepared close in time to Duncan's waiver of

appeal, and their examination of Dr. Beaver regarding the extensive testing he performed before

the sentencing hearing, show that they provided effective assistance of counsel.  They produced

and used reports and testimony that were directly relevant to the court's inquiry, which was

retrospective in nature.  Indeed, they cite the timing of these reports and the experts' underlying

examinations as a positive factor in their current briefing.  (CR Dkt. 867 at 77-78.)  Thus,

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL**
**RELIEF - 72**

Duncan cannot show deficient performance, much less prejudice.  His counsel were thoughtful and strategic, and used the best evidence they had for the retrospective inquiry.  *See Strickland*, 466 U.S. at 691-92; *Hurles v. Ryan*, 752 F.3d 768, 779 (9th Cir. 2014).

### 4.    Duncan was competent to represent himself throughout.

Duncan argues that the legal standard the Court correctly applied when it found he was competent to waive his appeal in November 2008 differs from the legal standard it must now apply to determine whether he was competent to represent himself in August through November 2008.  (CR Dkt. 867 at 124-25.)  Under established law, however, the same standard applies to competency determinations to waive appeal, to plead guilty, to waive the right to counsel and— with one small wrinkle—to represent one's self.  In *Godinez*, the Supreme Court expressly "reject[ed] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard." *Godinez v. Moran*, 509 U.S. 389, 398 (1993) (citing *Dusky v. United States*, 362 U.S. 402 (1960)).  Thus, there can be no argument (and Duncan makes no argument in Claim 3) that a different standard applies to a guilty plea, a waiver of counsel, and an appeal waiver.

Duncan overstates the holding of *Indiana v. Edwards*, 554 U.S. 164 (2008), however, when he describes it as providing a "higher standard" for evaluating a defendant's competency to represent himself (Claim 4).  *See* (CR Dkt. 867 at 125-200.)

In *Indiana v. Edwards*, the Supreme Court merely recognized that states (and courts) have discretion "to insist upon representation by counsel for those competent to stand trial under *Dusky* but who still suffer from mental illness to the point where they are not competent to conduct trial proceedings by themselves."  *Edwards*, 554 U.S. at 178.  Likewise, the *Edwards* Court noted, states have discretion to "permit a gray-area defendant to represent himself."  *Id.* at

173 (describing the "constitutional holding" of *Godinez*).  *Edwards* did not address whether the

Constitution ever *requires* a court to exercise its discretion one way or another.  *See United*

*States v. Johnson*, 610 F.3d 1138, 1145 (9th Cir. 2010).  And courts and commentators have

repeatedly noted that the Supreme Court's decision did not establish any new, higher, substantive

standard to replace *Dusky*.  *United States v. Ferguson*, 560 F.3d 1060, 1067-68 (9th Cir. 2009);

Ellesha LeCluyse, Note, *The Spectrum of Competency: Determining a Standard of Competence*

*for Pro Se Representation*, 65 Case W. Res. L. Rev. 1239, 1247 (Summer 2015).  Thus, the only

"higher standard" the Supreme Court recognized in its holding in *Edwards* was a state or court's

discretion to impose, or not to impose, an attorney.  *Edwards*, 554 U.S. at 174.

          This is not a case to which the *Edwards* standard applies.  The Court's factual findings

after the retrospective competency hearing establish that Duncan was not a "gray-area"

defendant "competent enough to stand trial under *Dusky* but who still suffer[ed] from severe

mental illness to the point where [he is] not competent to conduct trial proceedings by

themselves."  *Edwards*, 554 U.S. at 178.  To the contrary, Duncan was a defendant who carefully

and strategically planned and executed a crime, who carefully and strategically determined—

with advice of counsel—when he should move to go pro se, who successfully established points

he wished to make on cross-examination, enlisted his standby counsels' help when he wished to

do so, etc.  (CR Dkt. 843 at 47, 53-55.)  And, while Dr. Kirkish acknowledged that

distinguishing between firmly held, highly ideological beliefs and delusions can be a thorny

issue, *see* (CV Dkt. 4 at 104-06), all the Court-appointed experts opined that, in this case,

Duncan was not delusional.  (CR Dkt. 843 at 39-40.)  Moreover, the Ninth Circuit specifically

noted that this Court's decision that Duncan was not delusional was supported by testimony in

the record.  (*United States v. Duncan*, Appeal No. 13-99011 at ECF Nos. 2-3.)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL**
**RELIEF - 74**

In addition, as the Court of Appeals noted with approval, the Court's factual findings in this case "went beyond the question whether Defendant's mental disease or defect 'prevented' him from understanding the options available to him or from choosing rationally among them." (*Id.* at ECF No. 3.)  The Court affirmatively found that "Defendant had the capacity to make a rational choice," that any mental disease or defect he had "'did not impact' his ability to understand his legal options," and did not "motivate, drive, or cause him" to make legal decisions.  (*Id.*)  These findings go well beyond *Dusky* and satisfy the dicta from *Edwards* on which the Defendant relies.  *Compare* (CV Dkt. 4 at 125 (citing *Edwards*, 554 U.S. at 175)), *with Edwards*, 554 U.S. at 175-76 (citing academic study suggesting that competence to assist counsel is separate from competence to make decisions, and that both may differ from competence to understand, reason, and appreciate criminal charges).  The Court's retrospective competency hearing findings thus support the conclusion that Duncan was not a "gray-area" defendant.  Moreover, as explained above, in light of the evidence in this case, no facts regarding Duncan's belief system or behavior distinguish these findings regarding November 2008 from earlier periods of the federal proceedings.  Nothing triggers the discretion that constitutes the "higher standard."  *Edwards*, 554 U.S. at 1778.[24]

To the extent Duncan suggests that any standard of competence greater than that recognized in *Edwards* applies (that is, a district court's discretion, based on its own observations of a gray-area defendant, to impose or not to impose counsel), such a suggestion runs afoul of *Teague*'s limitation of collateral relief to established law.  *See Teague v. Lane*, 489 U.S. 288, 310

---

[24]   Even if Duncan could be considered a "gray-area defendant," the Court's findings regarding Duncan's competence and its observations of him amply justify an exercise of discretion to allow him to represent himself.

(1989).  No higher standard has been developed or adopted.  *See, e.g.*, *Ferguson*, 560 F.3d at

1067-68 (noting that the *Edwards* Court did not adopt a new, "specific standard," but instead

merely recognized "the discretion of the trial judge").

> **5.     The procedural due process violation Duncan alleges has already been remedied.**

Duncan also argues for a violation of procedural due process stemming from the Court's

denial of a full competency hearing when he expressed his desire to proceed pro se.  (CV Dkt. 4

at 125.)  When Duncan sought to represent himself, the Court had Duncan evaluated by Court-

appointed experts, who affirmed Duncan's competence to represent himself.  The Court thus

denied defense counsel's request for a competency hearing.  As Duncan notes, the Ninth Circuit

found fault with that decision, holding that a "bona fide doubt" regarding Duncan's competence

existed at that time and that it was error not to hold a hearing.  (*United States v. Duncan*, Appeal

No. 08-99031, ECF No. 86-1 at 9251-52.)  Thus, the Court of Appeals identified a procedural

due process issue.

That issue was remedied by the Ninth Circuit's 2008 decision and this Court's

retrospective competency hearing, and no further process is due, or even possible.  *See Odle v.

Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001).  The retrospective competency hearing included

evidence from every important point in the federal proceeding, and even evidence from before

and after it.  (CR Dkt. 843 at 13, 22; CR Dkt, 811, Vol. 5, at 1106-09, 1126-29, 1226-29; CR

Dkt. 816, Vol. 10, at 2415-18, 2507-10, 2587-98; CR Dkt. 818, Vol. 12, at 2996-99, 3008-11,

3016-27; CR Dkt. 809, Vol. 3, at 1713-14, 1731-32; CR Dkt. 820, Vol. 14, at 3608-23.)  The

evidence showed (and the experts agreed on the existence of) a tremendous consistency in

Duncan's belief system from before the federal indictment until well after the relevant date.  *See*

(Sections III and IV.B.1.b.)  Moreover, the Court's findings strongly support its earlier decision

that Duncan was competent to represent himself.  It would be an academic exercise, and a complete waste of resources, to hold a second retrospective competency hearing to address Duncan's competency to plead guilty in December 2007 and to represent himself in August through November 2008.[25]  The Court's factual findings supporting its post-retrospective competency hearing determination that Duncan was competent to waive appeal in November 2008 (and the significant process afforded by that hearing), coupled with the fact of Duncan's remarkable consistency, support the Court's findings that Duncan was competent to represent himself during the penalty phase in August through November 2008.

To the extent Duncan argues that due process required the Court to hold a hearing or make specific findings to determine, under *Indiana v. Edwards*, whether it should exercise its discretion to force counsel upon him, (CV Dkt. 7 at 121, 124), the argument fails for all the reasons discussed above.  No such right to process has ever been recognized.

## V.     THE COURT PROPERLY PERMITTED DUNCAN TO REPRESENT HIMSELF.

As noted in response to Duncan's competency claims, *see* (Sections III and IV), Duncan exercised his right to represent himself after he pleaded guilty and proceeded to a trial on penalty alone.  *See generally Faretta v. California*, 422 U.S. 806, 819-20 (1975) (recognizing the Sixth Amendment right to appears pro se).  Having claimed he lacked capacity to waive counsel, Duncan further argues the Court erred in permitting him to do so because the right to self-representation does not extend to penalty phase hearings.  He further contends that if the law did entitle capital defendants to proceed pro se, a societal interest in the reliability of the penalty

---

[25]     Duncan does not suggest that a contemporaneous competency hearing was necessary to avoid structural error.  Nor can he.  Retrospective competency hearings suffice, when the circumstances allow, as the Ninth Circuit noted in its 2008 decision.  *See* (*United States v. Duncan, Appeal No.* 08-99031, ECF No. 86-1 at 9252 n.32); *Odle*, 238 F.3d at 1089-90.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 77**

phase proceedings would still have required denial of the request.  (CV Dkt. 4 at 132-39.)

Duncan's claim is procedurally barred, as he could have raised it on the direct appeal he

voluntarily abandoned.  In any event, he cannot demonstrate that the Constitution forbids capital

defendants from representing themselves during penalty phase proceedings.  Having failed to

identify any existing rule of law to support his position, Duncan cannot obtain collateral relief on

the basis of the novel legal proposition he attempts to infer from existing jurisprudence.

### A.      Procedural bar

In arguing that the Constitution and the societal interest in penalty phase trials forbade the

trial court from permitting him to represent himself, Duncan relies entirely on facts within the

four corners of the record.  Duncan could have raised this issue on appeal, but did not.  Instead,

as set forth above, he voluntarily waived his appeal, *see* (Section X), overcoming the efforts of

his standby counsel to demonstrate his lack of competence to forgo the proceeding.  *See*

*generally* (*United States v. Duncan*, Appeal No. 13-99011 at ECF No. 55-1 (affirming

competence determination following earlier remand).)  Having elected to relinquish direct review

of the judgment, Duncan necessarily omitted any appellate challenge to the legality of his pro se

status.  He thus defaulted the issue for purposes of § 2255 review.  *See United States v. Frady*,

456 U.S. 152, 165 (1982).

Duncan cannot demonstrate that his claim falls within some exception to the default

doctrine that might permit collateral review.  First, he cannot establish his actual innocence of

the charged crimes, to which he provided confessions and pleaded guilty.  Second, Duncan

makes no effort to excuse his default through a showing of cause and prejudice.  He might have

asserted the alleged invalidity of his appellate waiver as the basis for a finding of cause.  *See* (CV

Dkt. 4 at 175-88.)  But, as the Government argues below, the Court properly accepted Duncan's

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 78**

waiver.  *See* (Section X.)  Given that Duncan's waiver of appeal resulted in *default*, he simply cannot satisfy the "cause" standard, which turns on factors external to the defense.  *Cf. Murray v. Carrier*, 477 U.S. 478, 485-86 (1986).  Even if Duncan could establish cause, he cannot demonstrate prejudice, because the Court would have infected the trial with constitutional error only if it denied the requested self-representation, as more fully explored below.  *See United States v. Arlt*, 41 F.3d 516, 524 (9th Cir. 1994) (holding a court commits per se error by denying an unequivocal *Faretta* request following advice of rights and waiver of pitfalls).  Because Duncan cannot show that the Court's actions worked to his actual and substantial disadvantage, any argument concerning prejudice would fail.

### B.      Courts may not interfere with proper invocations of the right to self-representation.

Assuming, arguendo, Duncan could raise this procedurally-barred claim, it would fail under the overwhelming weight of authority.  Indeed, relief under Duncan's theory would require resort to a previously unannounced procedural rule.

The Sixth Amendment guarantees people accused of crimes a personal right to defend themselves:  "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails."  *Faretta*, 422 U.S. at 819-20.  Though defendants may undermine their own interests by abandoning counsel, the "choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'"  *Id.* at 834 (quoting *Illinois v. Allen*, 397 U.S. 337, 350-351 (Brennan, J., concurring)).  As this Court has observed, "This right to self-representation exists during the penalty phase of a capital case."  (*United States v. Duncan*, No. CR-07-23-N-EL, 2008 WL 2954976, at *1 (D. Id. July 29, 2008) (citing *United States v. Davis*, 285 F.3d 378 (5th Cir. 2002)), *rev'd on other grounds*, 543 F.3d 1242 (9th Cir. 2011));  *see also Silagy v. Peters*, 905 F.2d 986, 1007-08 (7th Cir. 1990) (holding the right to self-

representation applies in capital sentencing proceedings).  The right of self-representation manifests an individual's authority to control his or her own case, regardless of whether society might benefit from a different evidentiary presentation.  United States v. *Davis*, 285 F.3d 378, 385 (5th Cir. 2002) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984)).

Lacking any direct authority to support his contention that *Faretta* does not apply to penalty phase trials, Duncan argues that his conviction of the charged offenses extinguished his right of self-representation.  He analogizes the sentencing hearing to an appeal because the proceeding commences after conviction.  He attempts to distinguish the penalty phase from the guilt phase by observing that the decision to impose the death penalty is a moral, not factual, determination.  Duncan's argument ignores the extensive fact finding required by the FDPA as a prerequisite to the consideration of sentence.  Indeed, the sentencing jury cannot exercise its discretion without first finding beyond a reasonable doubt the defendant's age at the time of the crime, at least one threshold intent factor, and at least one statutory aggravator.  *See* 18 U.S.C. §§ 3591(a)(2) & 3592(c); *United States v. Gabrion*, 719 F.3d 511, 532-33 (6th Cir. 2013) (en banc) (discussing factual and moral findings required in penalty phase hearing).

The FDPA-mandated preconditions to sentencing operate like elements of a crime,[26] a fact that undermines any attempt to analogize the penalty phase to an appeal.  *See United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004); *United States v. Higgs*, 353 F.3d 281, 298 (4th Cir. 2003) (holding "intent and aggravating factors . . .  are the functional equivalent of elements of the capital offenses").  Since the enactment of the FDPA, the Supreme Court announced in *Ring v. Arizona* that defendants have a Fifth Amendment right to jury determinations of those

---

[26]     Duncan previously argued that even non-statutory aggravators constitute elements of the offense.  *See United States v. Duncan*, No. CR07-23-N-EJL 2008 WL 711603, at *9 (Mar. 14, 2008).

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 80**

facts necessary for imposition of the death penalty, further cementing the notion that penalty phase defendants remain within the ambit of trial rather than appeal. *See Ring v. Arizona*, 536 U.S. 584 (2002). While *Ring* and the FDPA require penalty phase fact finding, a reviewing court can neither consider facts anew nor revisit the discretionary sentencing choices of the jury. *Cf. United States v. Mitchell*, 502 F.3d 931, 980 (9th Cir. 2007) (recognizing the FDPA's constitutionality though it does not require proportionality review); *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996) (describing the limited role of appellate courts in reviewing factual findings). Accordingly, Duncan's efforts to analogize the penalty phase to an appeal cannon succeed.

In an attempt to escape the reach of *Faretta*—a case animated by the Sixth Amendment—Duncan implies that Fifth Amendment due process guarantees penalty phase counsel. Under Duncan's theory, conviction for the underlying crime extinguishes the Sixth Amendment right that attaches during the trial on guilt. *See* (CV Dkt. 4 at 135.) But as the Supreme Court recognized in its seminal Sixth Amendment opinion, *Strickland v. Washington*, "[a] capital sentencing proceeding . . . is sufficiently like a trial . . . that counsel's role in that proceeding is comparable to counsel's role at trial . . . [and] therefore, [a] capital sentencing proceeding need not be distinguished from an ordinary trial," for purposes of assessing a claim of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686–87 (1984); *see also, e.g., Rompilla v. Beard*, 545 U.S. 374, 377 (2005) (stating that the case, which concerned allegedly ineffective penalty phase representation required "application of the standard of reasonable competence required . . . by the Sixth Amendment"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (holding that penalty phase counsel provided ineffective assistance in violation of the Sixth Amendment). Given the overwhelming authority establishing the Sixth Amendment as the

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 81**

source of the right to penalty phase counsel, Duncan cannot succeed in arguing that the corollary right to self-representation does not, likewise attach.

Arguing that society's interest in the regularity of death penalty proceedings mandated denial of his *Faretta* request, Duncan cites the Supreme Court's inapposite decision in *Wheat v. United States* and claims that courts have a duty to ensure a fair trial by selecting counsel over a defendant's objections.  (CV Dkt. 4 at 139 (citing *Wheat v. United States*, 486 U.S. 153, 154-61 (1988)).)  *Wheat* stated that the Sixth Amendment's guarantee of counsel serves "'simply to ensure that criminal defendants receive a fair trial.'"  *Wheat*, 486 U.S. at 159 (quoting *Strickland*, 466 U.S. at 689).  The opinion continued, "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate."  *Wheat*, 486 U.S. at 159.  But *Wheat* speaks only to defendants who choose representation in the first instance, and specifically catalogues the advocates who cannot serve as counsel despite the wishes of the accused:  non-lawyers, unwilling lawyers, or lawyers so conflicted by competing professional obligations they manifestly cannot fulfill their duties. *Id.* at 159, 163.  By its own terms, *Wheat* does not speak to the right of self-representation:  "Our holding in *Faretta v. California*, . . . that a criminal defendant has a Sixth Amendment right to represent *himself* if he voluntarily elects to do so, does not encompass the right to choose any advocate if the defendant wishes to be represented by counsel."  *Id.* at 159 n.3.  Wheat does not assist Duncan's argument which otherwise lacks any doctrinal support.

Duncan does not cite the Supreme Court case most pertinent to Claim 5,  *Indiana v. Edwards*, 554 U.S. 164 (2008), in his argument on that cliam.  There, the Court held that the Constitution "permits States to insist upon representation by counsel for those competent enough

to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings themselves." *Id.* at 178. *Edwards* involved the intersection of a defendant's *Faretta* rights and the court's duty to ensure a fair trial. *See id.* at 176-77. A citation of *Edwards* would have, however, underscored the fact that no established law *requires* a court to impose counsel on a *Dusky*-competent defendant who wishes to represent himself, much less to impose counsel on a more-than-*Dusky*-competent defendant, like Duncan. *See United States v. Johnson*, 610 F.3d 1138, 1145 (9th Cir. 2010) (noting *Edwards* was limited to the constitutional permissibility of a decision to impose counsel and did not address whether, and if, a court might have to impose counsel on a *Dusky*-competent defendant); (*United States v. Duncan*, Appeal No. 13-99011, ECF No. 55 at 3 (noting that the district court went well beyond the minimal standard and made affirmative findings that Duncan had the capacity to understand his legal options and make rational choices).)

Given Duncan's failures of reasoning and authority, this Court should reject his argument that it erred in permitting him to represent himself. Indeed, having failed to identify any existing authority to support his arguments, Duncan necessarily premises his request for relief on a newly-conceived rule of criminal procedure prohibited by *Teague v. Lane*, 489 U.S. 288, 310 (1989). Courts employ a three-step analysis to ascertain whether a rule of criminal procedure applies: determining when the judgment became final, deciding whether the pertinent rule was "new" at the time of finality, and deciding if the rule is one of "watershed" magnitude, exempting it from *Teague*. *Beard v. Banks*, 542 U.S. 406, 411 (2004). Here, no authority compelled Duncan's proposed rule at the time this case became final. Indeed, the present legal landscape bars relief, and the law will continue to do so absent some unforeseen Supreme Court action that curtails the right announced in *Faretta*. Given the absence of any existing rule to

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 83**

support Duncan's claim, he could not obtain relief unless the Supreme Court announced some new watershed rule between now and the time this Court rules.

## VI.   DUNCAN'S COUNSEL APPROPRIATELY OMITTED ANY CHALLENGE TO VENUE, AND DUNCAN HAS NO LEGAL RIGHT TO COMPLAIN ABOUT THE ADEQUACY OF VOIR DIRE THAT HE CONDUCTED.

Duncan claims his trial attorneys ineffectively omitted to move for a change of venue on the basis of pre-trial publicity.  He further contends the trial court failed to conduct adequate voir dire to ensure an impartial jury, in view of the extensive negative publicity surrounding the case. (CV Dkt. 4 at 140-47.)  Duncan cannot demonstrate that his lawyers bore any obligation to make a futile challenge to venue.  The absence of such a quixotic motion could not have prejudiced the outcome of the case.  The Court amply discharged its duties during voir dire.  And, as a pro se defendant, Duncan was responsible for effectively questioning jurors and gleaning any evidence of bias.  If he did not do so, he cannot deflect that failure onto any other participant in his trial. In any event, he has defaulted any claim he might have about the adequacy of the jury selection proceedings afforded to him.

### A.     Counsel properly omitted a meritless challenge to venue.

Duncan catalogs a litany of press coverage stemming from his crimes.  (CV Dkt. 4 at 141-43.)  He argues that his attorneys should have moved to change venue because the pre-trial publicity created a presumption of prejudice.  He further notes that his state attorneys had sought to change venue from Coeur d'Alene, albeit unsuccessfully.  (CV Dkt. 4 at 143-45.)  But trial counsel had no professional responsibility to make a futile motion in this case.  *See James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994).  The quality and quantity of the publicity were insufficient to create a presumption of prejudice supportive of a request to try Duncan elsewhere.

The Supreme Court has held that "pretrial publicity[—]even pervasive, adverse publicity[—]does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976); *accord Hayes v. Ayuers*, 632 F.3d 500, 508 (9th Cir. 2011) (holding pretrial news coverage does not, by itself, infringe a defendant's due process rights).  Due process requires a venue change only when the prejudicial publicity has made it "impossible to seat an impartial jury." *Ainsworth v. Calderon*, 138 F.3d 787, 795, *amended*, 152 F.3d 1223 (9th Cir. 1998).  Normally, screening questionnaires and voir dire "detect and defuse juror bias" and ensure a fair trial. *See Skilling v. United States*, 561 U.S. 358, 381, 385 (2010).  Accordingly, when a defendant alleges that pretrial publicity will prevent a fair trial, courts enjoy discretion to proceed to voir dire and thereby ascertain the effect of the press coverage. *United States v. Campa*, 459 F.3d 1121, 1145, 1146-47 (11th Cir. 2006); *accord United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978); *United States v. Yousef*, 327 F.3d 56, 155 (2nd Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire.").

To succeed on a motion for change of venue, a defendant must show actual or presumed prejudice. *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996) *as amended* (Oct. 28, 1996).  But the presumption attaches only in rare instances. *Id.* at 410; *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994); *Campa*, 459 F.3d at 1143.  The Supreme Court has presumed prejudice in just three cases, which involved combinations of small communities, circus atmospheres, or the broadcasting of the defendant's confession. *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). The Court has made clear the presumption will not flow from pretrial publicity absent equivalent circumstances. *See Skilling*, 561 U.S. 375-76.  *Skilling* involved the well-publicized prosecution of Enron's former CEO.  Though the defense extensively documented media coverage of the

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 85**

case, the trial court held that Skilling had not "establish[ed] that pretrial publicity and/or community prejudice raise[d] a presumption of inherent jury prejudice" such that "questionnaires and voir dire . . . [could not] ensure an impartial jury." *Id*. at 372-73.  The Supreme Court agreed, distinguishing *Rideau*, *Estes*, and *Sheppard*, based on community size, lack of coverage concerning a confession, and the time between crime and trial.  *Id*. at 382-83.

In this case, Duncan fails to show that trial counsel could have persuasively argued that pre-trial publicity demanded a presumption of prejudice and a change of venue without at least attempting voir dire.  Boise is, admittedly, only a moderate-sized city, but it sits much further from the scene of the crimes than any of the cases in which courts have properly presumed prejudice.  The pre-trial publicity that Duncan cites in support of his § 2255 motion originated in Coeur d'Alene and Spokane.  *See* (CV Dkt. 4 at 141 and Exh. 109.)  The reportage was also generally limited to the time of the crime, several years before Duncan's trial.  *See United States v. Rewald*, 889 F.2d 836, 864 (9th Cir. 1989) (noting that complained-of press coverage was attenuated by time and distance).  In short, Duncan does not identify any pre-trial publicity relevant to the time and place of his trial that might have supported a request to change venue.

Putting aside the irrelevant, albeit voluminous, news coverage from the northern region of the state, Duncan otherwise premises his claim of ineffectiveness on the fact that his state lawyers moved for a change of venue.  (CV Dkt. 4 at 143-44 (citing CV Dkt. 2-16 at Exh. 100).) This is strange medicine: Duncan argues that his federal lawyers were ineffective for failing to request a change of venue from Boise because his state attorneys made a motion that might well have resulted in a trial in Boise.  *See* (Gov't Attach. 19 (Local general order excluding northern Idaho from southern Idaho jury pool).)  His contention does not demonstrate ineffectiveness. Rather, it underscores the fact that counsel are judged based on the circumstances confronting

them.  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).  The circumstances confronting

federal counsel, two years and hundreds of miles removed from their state counterparts, did not

support a request for a change of venue, and Duncan has not shown otherwise.

Significantly, Duncan concedes he cannot demonstrate actual prejudice from the news

coverage, a fact he attributes to an order precluding him from interviewing jurors.  (CV Dkt. 4 at

146 n.15.)  Duncan's failure is telling – despite extensive jury selection that involved voir dire

and a lengthy questionnaire, he still cannot show any actual impact from the press coverage that

he claims should have motivated his attorneys to seek different venue.  Because the record does

not demonstrate actual prejudice, much less support a presumption of it, Duncan cannot show

that a request to change venue would have succeeded.  In short, he cannot establish that counsel

could or should have successfully prognosticated a showing of bias that he cannot establish with

the inestimable benefit of hindsight.  Counsel had no burden to make an unsuccessful motion,

and Duncan cannot establish that their conduct fell below the prevailing standard of

professionalism or prejudiced him in any way.

> **B.     Duncan had an adequate opportunity to select his jury.**

In a parting complaint about the circumstances of his sentencing trial, Duncan contends

the Court was obligated to safeguard his right to an impartial jury.  Duncan's assertion,

unsupported by any citation to authority, implies that the Court had a duty to conduct voir dire on

his behalf, rather than to ensure a fair trial for both parties.  (CV Dkt. 4 at 145-46.)  Duncan has

procedurally defaulted any claim about the adequacy of this Court's regulation of the jury

selection.  In any event, his claim has no merit:  the Court presided over a lengthy and searching

jury selection proceeding in which Duncan, as a pro se litigant, was responsible for the quality of

the defense voir dire.

### 1.      Procedural default

Any argument about the adequacy of the court's jury selection proceedings relies on facts within the record.  Duncan could have raised the issue on appeal, but did not.  Instead, as previously discussed, he voluntarily waived his appeal and thereby defaulted this issue for purposes of § 2255 review.  *See United States v. Frady*, 456 U.S. 152, 165 (1982). [27]

Duncan makes no effort to show that his claim falls within an exception to the default doctrine.  *Bousley v. United States*, 523 U.S. 614, 622 (1998).  He cannot establish actual innocence of the crimes, to which he has confessed and pleaded guilty.  He does not attempt to excuse his default through a showing of cause and prejudice.  Typically, a defendant might try to premise a showing of cause on the alleged ineffective assistance of appellate counsel.  But, given Duncan's personal waiver of appeal, he cannot do so, as cause requires factors external to the defense.  *Cf. Murray v. Carrier*, 477 U.S. 478, 485-86 (1986).  Even if Duncan could establish cause, he cannot demonstrate prejudice, because his claim of error relies on a legal nullity – the Court's supposed, but non-existent, obligation to have conducted voir dire on his behalf.

### 2.      Duncan's responsibilities as a pro se defendant

To the extent Duncan can present any procedurally-cognizable challenge to the fairness of the Court's actions, he cannot succeed.  Courts have a duty to ensure the fairness of the proceedings before them.  *United States v. Walker*, 234 F.3d 780, 787 (1st Cir. 2000); *see United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001) (noting a judge "is more than a moderator or umpire").  This Court fully discharged its responsibilities to ensure Duncan received a fair trial, and did so with obvious awareness of the media's interest in the case.  It summoned 327

---

[27]      Duncan has likewise defaulted any latent claim that the Court failed to change venue on its own motion.

venire members from southern Idaho.  (Sealed CR Dkt. 624, Vol. I, at 5-6); *see* 28 U.S.C.

§ 1861.  Each potential juror answered a 126-question survey prepared by the parties.  (Sealed

CR Dkt. 625, Vol. II, at 39 (describing the questionnaire as "long or longer than any

questionnaire [the Court] [had] seen in any other case").)  The questionnaire inquired into media

exposure and any conclusions drawn by the venire members. [28]  (CV Dkt. 2-18, Sealed Exh. 138

at 017252); *cf. Skilling*, 561 U.S. at 388 (recognizing that courts "consider the . . . questionnaire

in assessing the quality of voir dire as a whole" (quotation omitted)).

From the outset of voir dire, the Court recognized that many potential jurors had likely

been exposed to media coverage, and pressed each one to ask him or herself, "Can I set that

aside?  Can I listen to the evidence with an open mind?  Can I make a decision totally on the

evidence that is presented in this courtroom?"  (Sealed CR Dkt. 625, Vol. II, at 22.)  In

subsequent days, the potential jurors were individually questioned about their fitness to serve,

including queries about exposure to the media and how it would affect their service as jurors.

*See, e.g.*, (Sealed CR Dkt. 625, Vol. II, at 27, 54, 91, 96, 151, 224, 308; Sealed CR Dkt. 626,

Vol. III, at 346-47, 499, 594, 616; Sealed CR Dkt. 632, Vol. IV, at 799, 803-04, 813-14, 849,

877-78, 886, 892, 925, 955; Sealed CR Dkt. 633, Vol. X, at 986, 991, 1018, 1037, 1051, 1057,

1066, 1091, 1112; Sealed CR Dkt. 634, Vol. XI, at 1129-30, 1134, 1161, 1176, 1179, 1201,

---

[28]     In an effort to challenge the fairness of the proceeding, Duncan cites a single juror
questionnaire.  (CV Dkt. 4 at 145.)  The highlighted questionnaire ambiguously indicated that the
juror had overheard or engaged in a conversation about the case.  (CV Dkt. 2-18, Sealed Exh.
142 at 17485-86.)  Asked to describe the conversation, the juror wrote, "When he was caught.
What should be done to him.  Days of a lynch mob."  (*Id.*)  The juror's voir dire, however, put to
rest any concern about bias:  "Q.  Was there anything specific about what you saw or heard that
has caused you to make up your mind ahead of time about what the outcome in the case should
be? [¶] A.  No."  (Sealed CR Dkt. 632, Vol IX, at 911.)  This record falls far short of
demonstrating pervasive, media-driven bias.  *See Irvin v Dowd*, 366 U.S. 717, 723 (1961)
(holding, "It is sufficient if the juror can lay aside his impression or opinion and render a verdict
based on the evidence.").

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL**
**RELIEF - 89**

1213, 1298, 1342, 1346; Sealed CR Dkt. 635, Vol. XII, at 1353, 1354-55, 1356, 1360-61, 1364-65.)  Given the efforts made by the Court to ensure against the seating of jurors biased by pretrial media exposure, Duncan could not establish any error or omission that affected the fairness of his trial, assuming he could raise such a claim.

In view of the Court's devotion to ensuring a fair trial, Duncan is left to argue the Court owed him something more than impartiality.  Duncan represented himself during much of the jury selection.  (Sealed CR Dkts. 631-635, Vols. VIII-XII.)  Pro se defendants bear the responsibility of presenting their entire defense:  "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense."  *See Faretta v. California*, 422 U.S. 806, 819 (1975).  Duncan had no Sixth Amendment right to assistance by standby counsel and cannot effectively attribute any omission in voir dire to them.  *See Locks v. Sumner*, 703 F.2d 403, 407-08 (9th Cir. 1983) (holding that the right to advisory counsel is "not of constitutional dimension").  Likewise, he had no right to the Court's assistance with jury selection.  *See United States v. Hayes,* 231 F.3d 1132, 1138-39 (9th Cir. 2000); *see also* (Sealed CR Dkt. 627, Vol. IV, at 672 (admonishing Duncan that he would receive no assistance from the Court); Sealed CR Dkt. 630, Vol. VII, at 727 (same).)

Because Duncan conducted five of the seven days of voir dire as a pro se defendant, he cannot claim his efforts were ineffective or that they undermined the fairness of his trial.[29] *Faretta*, 422 U.S. at 834 n.46; *see also United States v. McDowell*, 814 F.2d 245, 251 (9th Cir. 1987) (extending the reasoning in *Faretta* "to preclude . . . [a] 'fair trial' claim").  Accordingly, his legally and factually vaporous complaints should fail.

---

[29]    Duncan makes no effort to show that counsel ineffectively questioned jurors for bias during the first two days of jury selection, nor could he possibly demonstrate that the Court had a duty to assist the attorneys with voir dire.

## VII.   THE COURT PROPERLY ADMITTED EVIDENCE OF DUNCAN'S FUTURE DANGEROUSNESS.

Duncan argues the trial court erroneously admitted evidence of his future dangerousness, including proof of his prior unadjudicated homicides.  He further contends that the Court inadequately instructed the jury about future dangerousness and that the prosecution improperly argued about his unadjudicated offenses.  (CV Dkt. 4 at 147-56.)  Duncan's tripartite claim is procedurally barred, as he could have raised it on the direct appeal he voluntarily waived.  In any event, he cannot show that the alleged errors offended his rights.  To the extent Duncan proposes that this Court should grant relief on any of theories proposed here, he seeks to rely on a new rule of law forbidden on collateral review.

### A.   Procedural bar

Duncan's various complaints about evidence of unadjudicated crimes rely entirely on facts within the record.  He could have raised his claims on appeal but chose, instead, to waive direct review.  *See generally* (*United States v. Duncan*, Appeal No. 13-99011 at ECF No. 55-1 (affirming determination that defendant could competently waive appeal).)  Accordingly, he defaulted claims concerning evidence, instructions, and argument for purposes of § 2255 review.  *See United States v. Frady*, 456 U.S. 152, 165 (1982).  Indeed, to the extent he failed to interpose timely and specific objections to evidence and instructions he has doubly-defaulted those contentions.  *See id.* at 168; *United States v. Peterson*, 538 F.3d 1064, 1070 (9th Cir. 2008) (requiring plain error review in absence of objection to instruction below); *United States v. Gomez–Norena*, 908 F.2d 497, 500 (9th Cir.1990) (explaining that to preserve an evidentiary issue for appeal, a party must make a timely and specific objection to evidentiary issues before the trial court).

Duncan cannot and does not attempt to show that his defaulted positions fall within an exception that might permit consideration by this Court.  First, he cannot establish his actual innocence of the charged crimes, to which he confessed and pleaded guilty.  Second, he makes no effort to excuse his default through a showing of cause and prejudice.  To press for a showing of cause, Duncan might attempt to rely on his challenge to the acceptance of his appellate waiver.  *See* (CV Dkt. 4 at 175-88.)  But, as the Government demonstrates below, this Court properly accepted that waiver.  *See* (Section X.)  Given that Duncan's personal waiver of appeal resulted in default, he cannot satisfy the "cause" standard, which requires a showing of factors external to the defense.  *Cf. Murray v. Carrier*, 477 U.S. 478, 485-86 (1986).  Even if Duncan could establish cause, he cannot demonstrate prejudice, which would require him to show that the errors complained of "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Frady*, 456 U.S. at 170.  As shown below, Duncan cannot show error and therefore cannot meet the prejudice prong of *Frady*.  Thus, the Court should deny Duncan's claim based on his procedural default of the alleged errors.

> **B.      The penalty phase consideration of unadjudicated offenses was entirely appropriate.**

Assuming, arguendo, Duncan could raise his procedurally-barred contentions about evidence of unadjudicated offenses, his arguments would fail, as he cannot show error, much less error of constitutional dimension that would merit § 2255 relief.  Indeed, relief under Duncan's theory would require resort to a previously-unannounced procedural rule in derogation of *Teague v. Lane*, 489 U.S. 288 (1989).

> **1.      Admission of other crimes evidence**

Duncan asserts the Court made two evidentiary errors.  He argues that it erroneously rejected his pretrial motions attacking other-crimes evidence, and he contends that the admission

of unadjudicated-offenses evidence proffered in support of a future dangerousness aggravator deprived him of due process.

In support of these positions, Duncan argues that the trial court erroneously denied his requests to exclude future dangerousness evidence, generally.  *See* (CV Dkt. 4 at 149-50 (citing Sealed CR Dkt. 647, Vol. XXI, at 2874-75; Sealed CR Dkt. 390 at 10.)  He also reasserts by reference his arguments to the Court regarding other-crimes evidence.  (CV Dkt. 2-3, Exh. 13 at 132.)  His reliance on previously-unsuccessful motions amounts to nothing more than a request for de novo reconsideration of failed positions.  Had Duncan made a similar request for reconsideration during trial, circuit law would have obligated him to show "[a] substantial change of evidence, intervening change of law, other change of circumstances, [a] showing of clear error, or [a] showing of a manifest injustice."  *United States v. Alexander*, 106 F.3d 874, 878 (9th Cir. 1997).  He has made no effort to meet even that standard, much less has he attempted satisfy the standard for § 2255 relief, demonstrating that the allegedly erroneous rulings "constitute[] a fundamental defect which inherently result[ed] in a complete miscarriage of justice."  *United States v. Addonizio*, 442 U.S. 178, 185 (1979), *superseded by statute on other grounds*, FED. R. CRIM. P. 35; *see United States v. Gianelli*, 543 F.3d 1178, 1184-85 (9th Cir. 2008).  This Court should decline Duncan's invitation to revisit earlier evidentiary decisions.

Duncan continues, specifically attacking the decision to permit evidence of three unadjudicated homicides.  (CV Dkt. 4 at 150-56.)  But a § 2255 court may not grant relief on the basis of alleged evidentiary error absent a showing that the admitted material rendered the trial fundamentally unfair.  *See United States v. Berry*, 624 F.3d 1031, 1039-40 (9th Cir. 2010) (citing *Jackson v. Brown*, 513 F.3d 1057, 1082 (9th Cir. 2008)).  Moreover, the Supreme Court has held that a district court may admit evidence of unadjudicated crimes in the penalty phase of a capital

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 93**

trial without violating the Constitution. *Nichols v. United States*, 511 U.S. 738, 747 (1994); *Williams v. New York*, 337 U.S. 241, 244 (1949)); s*ee also United States v. Gabrion*, 648 F.3d 307, 348 (6th Cir. 2011), *rev'd en banc on other grounds*, 719 F.3d 511 (6th Cir. 2013); *United States v. Lujan*, 603 F.3d 850 (10th Cir. 2010) (reversing exclusion by trial court); *United States v. Corley*, 519 F.3d 716, 723-24 (7th Cir. 2008).

Faced with the presumptive admissibility of unadjudicated crimes evidence, Duncan advances an inapposite, unpublished, out-of-circuit district court order as authority for his position. The cited order excluded evidence of unadjudicated homicides to diminish the risk that the jury would improperly rely on the crime of conviction in assessing culpability for the untried offenses. *See* (CV Dkt. 4 at 153 (citing *United States v. Gonzalez*, No. 3:02CR7 (JBA), 2004 WL 1920492, at *6 (D. Conn. Aug. 17, 2004).)[30] The order expressed concern that spillover from the crime of conviction would trench on the defendant's presumption of innocence as to the unadjudicated offenses. It also posited that proof of the uncharged crimes could spill back onto the crime of conviction, affecting the jury's consideration of a residual doubt mitigator. *See Gonzalez*, 2004 WL 1920492, at *6 & n.1. But the presumption of innocence does not obtain during a penalty phase trial about historical conduct: it "attaches [at a trial on guilt] to each element of a particular *offense or charge*, not the conduct underlying the offense." *Lujan*, 603 F.3d at 855 (emphasis in original). Evidence of other criminal conduct presented in a penalty phase hearing serves only to establish aggravators, not to prove the elements of the crimes themselves. *Lujan*, 603 F.3d at 855.

---

[30]     Duncan also purports to rely on a quotation from *United States v. Diaz*, No. CR 05-00167 WHA, 2007 WL 656831, at *20 (N.D. Cal. Feb. 28, 2007). The quoted language comes from *Gonzales*, which the *Diaz* court considered potentially persuasive, but declined to follow. *See id.* (holding "while the *Gonzalez* rationale may be persuasive, it is inappropriate to strike this factor without seeing the government's revised notice").

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 94**

In Duncan's case, the jury did not consider residual doubt, obviating any concern that proof of his unadjudicated homicides spilled over into his case in mitigation. *See* (CR Dkt. 575 at 13-15); *Stenson v. Lambert*, 504 F.3d 873, 890 (9th Cir. 2007) (citing *Oregon v. Guzek*, 546 U.S. 517, 525-26 (2006) for the proposition that "residual doubt is not a proper[] mitigating factor"). Assuming the presumption of innocence had any place in the penalty phase trial, Duncan cannot show any threat to it based on *Gonzalez*.

As noted, the *Gonzalez* court excluded unadjudicated-crimes evidence out of a concern about spillover. In the court's estimation, spillover could result from obvious similarities between the unadjudicated conduct and the crime of conviction. *Gonzalez*, 2004 WL 1920492, at *6. Given the distinctions between Duncan's charged offense and the alleged unadjudicated conduct here, however, the Gonzalez concern does not arise. *See Corley*, 519 F.3d at 725 (distinguishing *Gonzalez* because "[t]he only similarity between the unadjudicated conduct and the capital crime is that they both involved murder"). Duncan's capital offense involved a meticulously-planned abduction, facilitated by the murders of three people, and an interstate transportation of victims to a previously-identified camp site. *United States v. Duncan*, 643 F.3d 1242, 1245 (9th Cir. 2011). Duncan committed the charged murder, by gunfire, after a protracted period of sexual abuse and torture, some of which he recorded on video. *Id.* at 1245. In contrast, Duncan's unadjudicated murders in Washington were crimes of convenience that he committed on the spur-of-the moment after observing the victims in public. He abducted them, took them a short distance, and beat them to death. *See* (Sealed CR Dkt. 647, Vol. XXI, at 2850-58, 2889-99.) Duncan's unadjudicated California murder occurred after he inveigled three young boys to follow him in search of a supposedly lost cat. He eventually isolated one of the children and abducted him to the desert, where he molested him overnight before fatally

bludgeoning him.  *See* (*id.* at 2858-65, 2889-99.)  Like the Washington murders, the California homicide was more improvisational and much less protracted than Duncan's crime of conviction, undercutting any analogy to *Gonzalez*.

Duncan fails to establish error, much less a fundamental defect and miscarriage of justice.

### 2.    Reliability of jury instructions

Relying on social science research, Duncan attacks the jury instructions as generally incomprehensible.  He more specifically contends the instructions inadequately defined the requisite likelihood of future dangerousness and further confused the issue by overlaying the Government's burden of proof beyond a reasonable doubt upon the finding.

In pertinent part, the court instructed the jury as follows:

> As to the second non-statutory aggravating factor alleged by the Government, you heard testimony regarding the likelihood that Mr. Duncan will commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others. This evidence is limited to the prison context and the likelihood of future violence by Mr. Duncan in prison. You may only consider the non-statutory aggravating factor of future dangerousness in the context of the mandatory life sentence without the possibility of release that the Court must impose if Mr. Duncan is not sentenced to death.

> The Government has introduced evidence of unadjudicated criminal conduct by Mr. Duncan.  Unadjudicated criminal conduct is criminal conduct that has not previously been the subject of a criminal proceeding resulting in a criminal conviction. You may consider such evidence of unadjudicated criminal conduct if the Government has proven such evidence beyond a reasonable doubt, and only insofar as it is relevant to prove the non-statutory aggravating factor of future dangerousness and not for any other purpose. If you unanimously find that the Government has proven the non-statutory aggravating factor of future dangerousness beyond a reasonable doubt, you may also consider the unadjudicated criminal conduct to determine the weight you give to the non-statutory aggravating factor of future dangerousness as part of your determination of the appropriate sentence.

(Sealed CR Dkt. 649, Vol. XXIII, at 3233-34; CR Dkt. 575 at 10-11.)

The charge enjoys "'the almost invariable assumption of the law that jurors follow their instructions.'"  *See United States v. Olano*, 507 U.S. 725, 740 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *see Mejia v. Garcia*, 534 F.3d 1036, 1043 n.3 (9th Cir. 2008); *see also Penry v. Johnson*, 532 U.S. 782, 799-800 (2001) (noting that habeas courts apply the presumption that juries follow their instructions).  That presumption is overcome only if there is an "overwhelming probability that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (internal quotation marks omitted).  Accordingly, a flawed jury instruction will support collateral relief only if it infected the entire trial in violation of due process.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *see also United States v. Dunham*, 767 F.2d 1395, 1397 (9th Cir. 1985) (rejecting an instructional error claim due to the absence of prejudice).

Future dangerousness is a legitimate aggravating factor.  *United States v. Hager*, 721 F.3d 167, 199 (4th Cir. 2013); *see California v. Ramos*, 463 U.S. 992, 1001-03 (1983); *Jurek v. Texas*, 428 U.S. 262, 274-76 (1976).  Indeed, "'[p]rediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. . . . And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.'"  *Eutzy v. Florida*, 471 U.S. 1045, 1047–48 (1985) (quoting *Jurek*, 428 U.S. at 275).  The aggravator "is best defined as evidence that a defendant is 'likely to commit criminal acts of violence in the future that would be a threat to the lives and safety of others.'"  *Hager*, 721 F.3d at 199 (quoting *United States v. Basham*, 561 F.3d 302, 331 (4th Cir. 2009)).

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 97**

Though his jury received an almost verbatim recitation of a judicially-approved instruction, Duncan attacks the language as unduly confusing, premising his argument on a Court's observation that social scientists in the Capital Jury Project ("CJP") have voiced concern about jurors' ability to understand their charges in death penalty cases.  *See United States v. Fell*, 224 F. Supp. 3d 327, 339-40 (D. Vt. 2016).  The opinion fails to address substantial flaws in the CJP research that have led other courts to reject it.  For example, the District of Massachusetts found several bases for rejecting the research:

> After considering the CJP studies and other evidence . . . the court finds that it does not show a substantial risk that federal capital jurors do not meet the constitutional requirements of capital sentencing . . . .
>
> First, Sampson's studies "concentrate on state penalty schemes, rather than the FDPA or instructions given in federal capital trials and are therefore unconvincing.". . .
>
> Second, even if the CJP results can be generalized to federal cases, there are flaws in the CJP studies that render their results unpersuasive.  The CJP juror interviews generally took place years after the trial about which the jurors were being interviewed about. . . . the court is not persuaded that this evidence shows that a juror's memory, long after hearing the instructions and deliberating, accurately reflects what occurred during deliberations.
>
> Furthermore, the jurors being interviewed by the CJP did not have three important aids to which deliberating jurors have access. . . . written jury instructions. . . . other jurors who had heard the same instructions. . . . [and the ability to] ask the trial judge questions about the jury instructions.

*United States v. Sampson*, Cr. No. 01-10384-MLW, 2015 WL 7962394, at *23–24 (D. Mass. Dec. 2, 2015) (internal citations omitted); *accord United States v. Hammer*, No. 4:96-CR-239, 2011 WL 6020164, *3 (M.D. Pa. Dec. 1, 2011) and cases cited therein.

The CJP's myriad flaws aside, Duncan fails to explain how its reference provides a meaningful basis for criticizing the future dangerousness charge in this case.  He makes only a passing effort to identify a specific flaw in the instruction, relying on an inapposite case involving a procedural due process challenge to an arbitrator's adjudication of employee benefits.  (CV Dkt. 4 at 154 (citing *Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 625 (1993)).)  There, the Court took issue with a statute that provided deference to some factual findings unless they were proven "by a preponderance of the evidence [to be] unreasonable or clearly erroneous."  *Concrete Pipe*, 508 U.S. at 620-25.  In dicta, the Court remarked, "[o]ne might as intelligibly say, in a trial court, that a criminal prosecutor is bound to prove each element probably true beyond a reasonable doubt."  *Id.* at 625.  The Court's remark simply reiterated "the uncontroversial point that proof of an historical fact . . . should only be measured by the beyond a reasonable doubt standard.  It does not imply that it is illogical or impermissible to require the Government [to] prove the likelihood of a future event to a high degree of certainty."  *United States v. Wilson*, No. 04–CR–1016, 2013 WL 2948034, at *3 n.4 (E.D.N.Y. June 14, 2013).  Accordingly, the cited observations do not demonstrate a flaw in the concept of future dangerousness or the instructions in this case.

Devoid of any persuasive legal authority, Duncan resorts to the dictionary, criticizing the future dangerousness instruction as insufficiently specific given its unadorned use of the word "likely":[31]  "'Mr. Duncan is *likely* to commit criminal acts of violence in the future.'"  (CV Dkt. 4 at 152 (quoting Tr. 3231) (emphasis added).)  But courts have no obligation to define common

---

[31]     The Government presumes that Duncan's argument embraces the jury instructions' use of the word "likelihood." *E.g.*, (Sealed CR. Dkt. 649, Vol. XXIII, at 3233 (stating, "As to the second non-statutory aggravating factor alleged by the Government, you heard testimony regarding the likelihood that Mr. Duncan will commit criminal acts of violence in the future").)

terms in jury instructions.  *See United States v. Tirouda*, 394 F.3d 683, 688-89 (9th Cir. 2005)

(rejecting the need to define "accomplice" and citing, *inter alia*, *United States v. Dixon*, 201 F.3d

1223, 1231 (9th Cir. 2000) (rejecting the need to define "commercial advantage" and "private

financial gain"); *United States v. Moore*, 921 F.2d 207, 210 (9th Cir. 1990) (rejecting the need to

define "violence"); *Walker v. Endell*, 850 F.2d 470, 475 (9th Cir. 1987) (rejecting the need to

define "recklessness")).  The word "likely" is well within the common vernacular.  And several

Circuits have specifically endorsed it.  *See, e.g.*, *Hager*, 721 F.3d at 199 (citing *Basham*, 561

F.3d at 331).  Indeed, the Tenth Circuit has held that the word "likely" is sufficiently specific to

define future dangerousness, stating that the Constitution does not require "a precise level of

probability. . . . We think a commonsense understanding of what is at stake in connection with

this intuitive aggravating circumstance is readily grasped without the articulation of particular

probabilistic formulations."  *United States v. Fields*, 516 F.3d 923, 942 (10th Cir. 2008).

        In short, Duncan fails to identify any error in the Court's jury instructions, much less

does he establish that a flaw in the future dangerousness charge deprived him of due process.

### 3.       Alleged prosecutorial misconduct

        Duncan claims the trial prosecutor committed misconduct in summation, implying the

Government over-emphasized the issue of future dangerousness by dint of the time devoted to

the issue.  He also asserts the prosecutor improperly urged the jury to impose the death penalty

because Duncan committed unadjudicated homicides, not because those homicides supported the

future dangerousness aggravator.

        To forestall summary dismissal of a § 2255 claim, the movant must make specific factual

allegations that, if true, state a contention on which a court might grant relief.  *United States v.

Withers*, 638 F.3d 1055, 1062 (9th Cir. 2011).  Courts analyze § 2255 claims of prosecutorial

misconduct for violations of due process.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

They examine the entire proceeding to determine if the challenged remarks so infected the trial

with unfairness as to render the conviction a denial of due process.  *Donnelly v. DeChristoforo*,

416 U.S. 637, 643 (1974).  Counsel's summations "generally carry less weight with a jury than

do instructions from the court."  *Boyde v. California*, 494 U.S. 370, 384 (1990); *Waddington v.

Sarausad*, 555 U.S. 179, 195 (2009).  As noted, juries are presumed to follow their instructions.

*Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Boyde*, 494 U.S. at 384-85.

Duncan's complaints about the length of the prosecution's future dangerousness

argument fail to state a claim upon which this Court might grant relief.  He fails to identify any

legal theory upon which to premise a claim of error.  *See* (CV Dkt. 4 at 151.)  A prosecutor does

not violate due process by urging a jury to find and give weight to a duly-alleged and factually-

supported aggravating factor.  *See Fields v. Brown*, 431 F.3d 1186, 1206 (9th Cir. 2005), *aff'd on

reh'g in relevant part*, 503 F.3d 755 (9th Cir. 2007); *see also* (CR Dkt. 575 at 27 (explaining the

limited role of argument in the jury's consideration of the case).)  Duncan has only shown that

the prosecutor engaged in appropriate advocacy, devoid of any legal error, and this Court should

reject an attempt to premise error on the length of the argument.  *See Avincola v. Stinson*, 60 F.

Supp. 2d 133, 161 (S.D.N.Y. 1999) (finding a claim conclusory where it did not identify a single

statement alleged to be misconduct); *see, e.g.*, *Olivero v. Foulk*, No. CV 14–2275–CAS(JEM),

2015 WL 366031, at *8 (C.D. Cal. Jan. 27, 2015) (rejecting a misconduct claim "premised on

any disparity in length between the prosecutor's closing and rebuttal argument . . . [as] the Court

is not aware of any Supreme Court decision directly on point.").

Duncan more precisely claims that the prosecutor erred in arguing that his criminal

history alone merited a sentence of death.  (CV Dkt. 4 at 151 (citing Sealed CR Dkt. 649, Vol.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 101**

XXIII, at 3266-67).)  Duncan is incorrect.  In the cited passage, the prosecutor did not urge the

jury to rely in aggravation on unadjudicated homicides without reference to the future

dangerousness allegation.  She relied on Duncan's crimes as proof of his penchant for

manipulation and, thereby, to rebut the notion that mitigation might lurk in the trial evidence:

> [T]here is no evidence which would suggest in fairness that a
> sentence other than death is more appropriate.  The United States
> submits there are no mitigating factors which can be found beyond
> a preponderance of the evidence that has been submitted in this
> case. Let's take a look at some of those factors: His life,
> background, and character, and what we know.
>
> Well, we know that he committed a violent crime in 1980 and went
> to prison, was paroled and killed two children.  We know that he
> returned to prison, but was paroled again and at that time he killed
> another child, A.M.M.  How did he get there to do that?  His
> girlfriend, Dee Ellis, had a car that she let him use and he took the
> car and he took it from Seattle, and he took it from Washington,
> and he went to southern California in her car and killed A.M.M.
> He is manipulative.

(Sealed CR Dkt. 649, Vol. XXIII, at 3266-67.)

The prosecutor remained well within her right to draw a reasonable inference from the

evidence that the record would not support meaningful mitigation.  *See generally Cunningham v.*

*Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (recognizing prosecutors' latitude to draw reasonable

inferences).  Even if the prosecutor had attempted to premise an unalleged aggravator on the

unadjudicated crimes evidence, Duncan fails to demonstrate that such advocacy would constitute

due process error.  *See Babbitt v. Calderon*, 151 F.3d 1170, 1178-79 (9th Cir. 1998) (citing

*Barclay v. Florida*, 463 U.S. 939, 956 (1983) for the proposition that the Constitution does not

prohibit the consideration of non-statutory aggravators).  Assuming, arguendo, some error had

occurred, it was brief, isolated, and remedied by the instruction that "[y]ou are permitted to

consider and discuss only the non-statutory aggravating factors specifically alleged by the

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 102**

Government."  (CR Dkt. 575 at 6-7); *see Sassounian v. Roe*, 230 F.3d 1097, 1107 (9th Cir. 2000) (denying claim of misconduct based on isolated incidents); *see also Allen v. Woodford*, 395 F.3d 979, 1016 (9th Cir. 2005) (rejecting a claim of misconduct based on an instruction that counsel's statements were not evidence).

In short, Duncan has failed to demonstrate error, much less has he shown that the prosecutor's actions infected his trial with unfairness.  Accordingly, the Court should deny the claim of misconduct.

C. *Teague* **bar**

Having failed to identify any existing authority to support his complaints about the other-crimes evidence, the instructions, or the prosecution's argument, Duncan necessarily premises his request for relief on a newly-conceived rule of criminal procedure.  *Teague v. Lane*, 489 U.S. 288, 310 (1989), prohibits this.  As noted, courts apply a tripartite test to determine if a rule of criminal procedure may properly lie on collateral review:  they identify when the judgment became final, decide whether the pertinent rule was "new" at the time of finality, and determine if the rule is one of "watershed" magnitude, exempting it from *Teague*.  *Beard v. Banks*, 542 U.S. 406, 411 (2004).  Here, no existing authority compels a rule that would support Duncan's claims for relief.  Given the absence of any authority to support his claims, Duncan cannot obtain relief or take advantage of any exception to *Teague*.

VIII. **THE COURT PROPERLY ADMITTED VIDEO OF DUNCAN'S CRIMES.**

According to Duncan, showing the jury videos that he took depicting his abuse, torture, and attempt to kill the young victim he later murdered violated his rights to "fundamental fairness, due process, and a reliable death sentence."  (CV Dkt. 4 at 156-67.)  Not only is this argument procedurally defaulted, but it fails on its merits.  The specific nature of a defendant's

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 103**

crimes is precisely what the FDPA, 18 U.S.C. §§ 3591-99, requires capital juries to consider in

order to decide if a defendant should receive the greatest punishment.

A.      **Procedural bar**

Because Duncan elected not to raise this and other issues on appeal, by virtue of his

waiver of appeal, this issue is procedurally barred.  *See United States v. Frady*, 456 U.S. 152,

165 (1982).  In order to overcome the procedural bar and allow the Court to consider this issue,

Duncan would have to satisfy one of two exceptions.  He does not attempt to demonstrate his

actual innocence, *see United States v. Guess*, 203 F.3d 1143, 1145 (9th Cir. 2000), or show cause

and prejudice for his default, however.  *Id.*; (CV Dkt. 4 at 156-67.)  This Court should dismiss.

B.      **This Court properly admitted the video evidence.**

Setting aside the procedural bar, and assuming this Court could reach the substance of

this issue, no error occurred in admitting the videos in the first phase of the sentencing trial,

much less any error of constitutional proportion.  *See, e.g.*, *Romano v. Oklahoma*, 512 U.S. 1, 12

(1994); *United States v. Berry*, 624 F.3d 1031, 1037-38, 1039 (9th Cir. 2010) (explaining that an

"evidence-based claim . . . is not cognizable under § 2255"; an error must render a "trial

'fundamentally unfair,' in violation of [the defendant's] due process rights" to be cognizable).

The FDPA requires that the Government prove any aggravating factor "beyond a

reasonable doubt" to a unanimous jury.  *See* 18 U.S.C. § 3593(c) and (d).  The videos, which

were taken in the days leading up to D.G.'s death, provided highly relevant evidence of all four

of the aggravating factors noticed by the Government:  "Death during commission of another

crime," "Heinous, cruel, or depraved manner of committing offense," "Substantial planning and

premeditation," and "Vulnerability of victim."  *See* 18 U.S.C. § 3592(c) (1), (6), (9), and (11).

The videos were also probative of Duncan's intent, which also had to be proved beyond a

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 104**

reasonable doubt, during the same stage of the sentencing proceeding.  *See* 18 U.S.C. § 3591(a).
The videos provided a direct and individualized understanding of Defendant's crimes, the extent
of his planning, his true intent, the vulnerability of his young victim, and the torture Duncan
imposed on that victim before he killed him.  There was no error in admitting them, much less
any error that rendered the trial "'fundamentally unfair'" in violation of due process.  *Berry*, 624
F.3d at 1039.

The FDPA allows for the discretionary exclusion of evidence, even if relevant to an
aggravating factor, "if its probative value is outweighed by the danger of creating unfair
prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  Courts must
exercise care in excluding penalty phase evidence, however.  "The objective of the sentencing
stage of a capital case is to allow the jury a full appraisal of the defendant."  *United States v.
Lujan*, 603 F.3d 850, 858 (10th Cir. 2010) (reversing capital case on direct appeal based on
district court's exclusion of grisly evidence of defendant's previous crimes).  The jury should
receive "as much information as possible when it makes the sentencing decision."  *Gregg v.
Georgia*, 428 U.S. 153, 203-04 (1976).  "[M]ore evidence, not less, should be admitted on the
presence of aggravating factors."  *United States v. Mitchell*, 502 F.3d 931, 980 (9th Cir. 2007).

In the sentencing context, in which the Government is required to prove statutory
aggravating factors, evidence that is "relevant to a properly identified aggravator" is required.
*See Lujan*, 603 F.3d at 858; 18 U.S.C. § 3592(c).  And such evidence can be expected to be
horrific as it inheres to the nature of the offense.  *See Walle v. Sigler*, 456 F.2d 1153, 1155 (8th
Cir. 1972), *United States v. Kaiser*, 545 F.2d 467, 476 (1977).  Indeed, Congress specified that,
to warrant eligibility for the death penalty under aggravating factor six, evidence must establish
that the defendant "committed the offense in an especially heinous, cruel or depraved manner or

that it involved torture or serious physical abuse to the victim."  18 U.S.C. § 3592(c)(6).  By its

nature, then, evidence of this aggravating factor will be horrific.  But it is vital to the

"individualized determination by the jury of whether . . . a death sentence is appropriate in a

particular case."  *See United States v. Sampson*, 486 F.3d 13, 31 (1st Cir. 2007) (citing *Tuilaepa*

*v. California*, 512 U.S. 967, 973 (1994)); *see also Bonin v. Vasquez,* 807 F. Supp. 589, 613 (C.D.

Cal. 1992), *aff'd*, 59 F.3d 815 (9th Cir. 1995) (explaining that evidence that is "part and parcel of

the circumstances of the crime" is not "unfair").[32]

    Thus, excluding highly relevant evidence on the ground that it is too powerful or too

horrible would prevent the capital jury from fulfilling its essential function—gaining a full

understanding of the defendant's crimes, and the manner in which he carried them out, in order

to identify whether that particular defendant truly merits the most extreme punishment.  *See*

*Lujan*, 603 F.3d at 858 (discussing the "reward" a capital defendant would effectively receive if

the more heinous the crime, the "more likely that the district court would exclude evidence of

those acts at sentencing on the grounds of unfair prejudice").

    The first video, Sealed Exhibit 73, which showed graphic sexual abuse that D.G.

suffered, also showed that D.G. knew that Duncan was videotaping his abuse.  *See* (Sealed CR

Dkt. 246-2 at 7.)  Duncan adjusted the camera, and D.G. watched him.  (*Id.*)  Thus, not only did

the victim suffer the violent physical abuse depicted, but also the knowledge that this abuse was

being recorded.  In the second video, Sealed Exhibit 74, Duncan's depravity and the heinousness

of the abuse is further shown.  (*Id.* at 9.)  In addition to the violent sexual and physical abuse he

---

[32]     Likewise, where the charged crimes include kidnapping and sexual abuse, both resulting
in death, evidence that a defendant attempted to kill his kidnapping victim, while sexually
abusing him, and nearly succeeded in doing so, is highly probative of intent as well as the first
aggravating factor, death during commission of another crime.  *See* 18 U.S.C. §§ 3591(a) and
3592(c)(1).  But again, such evidence will be horrible.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 106**

inflicted, Duncan devised additional methods of layering on shame and horror for his nine-year-old victim.  And in the third video, Sealed Exhibit 75, Duncan sexually abuses the child and attempts to kill him.  He then reviews what has occurred with the child, readjusts the camera to perfect the view, and repeatedly, and falsely, assures the boy he will take him to a hospital.  (*Id.* at 14, 19-20, 27.)  Duncan's torture of D.G. in the course of the child's kidnapping and sexual abuse are thus established in this video.  In addition to the features discussed here, the sealed record and the videos themselves, which the Court viewed and can recall, unequivocally placed Duncan's commission of his crimes within the sixth aggravating factor under the FDPA.  *See Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) (holding that judge properly used his recollection of the events at issue when he sat on § 2255).

Any reaction to the videos was a reaction to Duncan's crimes and the precise manner in which he committed them.  There was nothing unfair about that.  *See Lujan,* 603 F.3d at 858; *United States v. Perez-Gonzalez*, 445 F.3d 39, 47 (1st Cir. 2006) (explaining that the videos of the crime "were prejudicial only in the sense that they were damaging," and distinguishing that damage from unfair prejudice under Federal Rule of Evidence 403).  The videos showed the crimes Duncan committed, the vulnerability of the victim, the many layers of detailed planning that went into Duncan's crimes, his intent to kill the boy—and his intense enjoyment of it—and the truly heinous, cruel, and depraved manner in which he committed his offenses.  *See* 18 U.S.C. § 3592(c)(1) ("Death during commission of another crime"), (c)(6) ("Heinous, cruel, or depraved manner of committing offense"), (c)(9) ("Substantial planning and premeditation"), and (c)(11) ("Vulnerability of victim").  In other words, the videos allowed the jury to evaluate Duncan's crimes, and the aggravating factors, directly.  This is precisely what the FDPA envisions.  *See* 18 U.S.C. §§ 3592, 3593.  The horror of Duncan's crimes and the manner in

which he carried them out, established by the videos, proved the aggravating factors Congress required to make someone eligible for society's most extreme punishment. *See Sampson*, 486 F.3d at 31.[33]

The cases Duncan cites actually support the Court's admission of the videos.  In *Spears v. Mullin,* 343 F.3d 1215 (10th Cir. 2003), for example, the Tenth Circuit distinguished between a properly admitted, grisly crime scene photograph that was probative of an aggravating factor, and other gruesome crime scene photos that were not directly probative and were improperly admitted.  *Id.* at 1227-28 & n.5.  All the photos could be expected to provoke a strong response, but that response was only unfair to the extent it sprang from evidence lacking in probity.  It was the dearth of probative evidence of the relevant aggravating factor in *Spears* that made the error serious enough to address on habeas.  *See id.* at 1228; *cf. United States v. Taveras*, 488 F. Supp. 2d 246, 252 (E.D.N.Y. 2007) (explaining that one gruesome depiction of wounds the victim suffered was "not likely to prevent the jury from making a rational determination of whether the defendant committed the act in a heinous, cruel or depraved manner, since *it speaks directly to the manner in which the crime of killing, murder, was committed*" (emphasis added)).

The evidence in the cases Duncan cites—after-the-fact crime scene photos—was far less probative than the videos in this case.  The videos showed Duncan committing his crimes.  They are thus more akin to the vivid testimony of a witness who survived a violent attack than they are to after-the-fact crime scene photos.  But, unlike testimony, the videos were not as susceptible to

---

[33]     Defendant focuses on the use of the videos to prove his intent, a required threshold factor under § 3591, asserting that they were unnecessary because he had stipulated to his intent to kill the boy.  (CR Dkt 867 at 166-67.)  But the Government was entitled to show the jury "a picture of the events relied on," and to provide a full understanding of Defendant's horrible crimes despite his stipulation.  *See Old Chief v. United States*, 519 U.S. 172, 187-88 (1997).  Moreover, the videos were relevant to far more than the intent factor, as discussed.

the fallibility of human perception or memory.  *See United States v. Weisz*, 718 F.2d 413, 431-32 (D.C. Cir. 1983).  They showed precisely what Duncan did.  Duncan cannot overcome their probative value based on the emotional reaction they may provoke, any more than he could object to the testimony of a victim of sexual abuse describing that abuse.  *See Perez-Gonzalez*, 445 F.3d at 47.  His burden is particularly high where, as here, the evidence was introduced not in the guilt but in the penalty phase.  *See Mitchell*, 502 F.3d at 980.  Thus, there was no error in admitting the videos in this case.  Their extreme probative value far outweighed the danger of any unfair prejudice.  *See* 18 U.S.C. § 3593(c).

Duncan's cited authority fails him in another sense as well – it underscores the fact that, even if he could establish an evidentiary error, he could never establish an error of constitutional magnitude on this record.  There was no dearth of evidence to transform any evidentiary error into one of constitutional proportion.  *See, e.g.*, *Spears*, 343 F.3d at 1227.  Ample evidence established Duncan's intent.  Ample evidence also supported each aggravating factor, the finding of any one of which sufficed to make Duncan eligible for the death penalty.  *See Jones v. United States*, 527 U.S. 373, 402-05 (1999) (noting that any one aggravating factor suffices, but that the jury found multiple factors).  Thus, even if Duncan could show evidentiary error from admitting the videos themselves, he could not show any absence of evidence to elevate the error into one of constitutional dimension.  *Spears*, 343 F.3d at 1227; *Berry*, 624 F.3d at 1039.  Duncan's argument that the Court was somehow obligated to shield the jury from a complete understanding of his crimes, by providing a transcript of the videos, for example, comes close to acknowledging this.  *See* (CV Dkt. 4 at 166-67.)[34]

---

[34]     The argument that, based on potential trauma to the factfinder, the Court should lessen the power of evidence is also a novel argument, and thus not cognizable under *Teague v. Lane*, 489 U.S. 288, 310 (1989).

GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 109

In short, no error occurred, much less any error of constitutional dimension.  This Court

should dismiss this claim based on the procedural bar and rule, in the alternative, that if it could

reach the claim on its merits, it would deny it.

## IX.   CONGRESS VALIDLY DEFINED THE OFFENSE UNDERLYING DUNCAN'S CONVICTION AND SENTENCE FOR FIREARM-USE MURDER (Count 7).

Duncan challenges Count 7, one of the Counts for which he received the death penalty:

Using a firearm during and in relation to a crime of violence resulting in death (18 U.S.C.

§ 924(c) and (j)).[35]  Duncan argues that Count 7 is invalid because the alleged predicate crimes

(Count 1, kidnapping, and Count 2, kidnapping resulting in death*, see* (CR Dkt. 1 at 4-5), cannot

satisfy § 924(c)(3)'s definition of a "crime of violence."  *See* (CV Dkt. 4 at 167-74.)  Although

Duncan did not raise this issue on direct appeal, the Government concedes that no procedural bar

applies.  The case on which Duncan primarily relies, *Johnson v. United States*, 135 S. Ct. 2551

(2015), was decided on June 26, 2015, well after the time he waived his notice of appeal, and his

conviction became final for purposes of the procedural bar.  *See* (CR Dkt. 843 at 66.)   That said,

to be cognizable on Section 2255, Duncan must show that a new and retroactive rule of

constitutional law applies here.  *See, e.g.*, *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004).

Duncan's argument fails because kidnapping and kidnapping resulting in death carry with

them the inherent risk that physical force will be used.[36]  Thus, these two crimes satisfy the

residual clause of § 924(c)(3)(B).  And, as discussed below, that clause is not void for vagueness.

---

[35]     In this Claim, Duncan does not challenge the other two Counts on which death was imposed:  Count 1, kidnapping resulting in death (18 U.S.C. § 1201); and Count 5, sexual exploitation of a child resulting in death (18 U.S.C. § 2251).  Accordingly, even if he were to win this Claim, two independent, alternative Counts support the death penalty in this case.

[36]     Duncan is correct that the other definition of "crimes of violence" in § 924(c)(3), the elements clause, does not apply.  The two predicate crimes can be accomplished, at least in theory, without the use of force.  *See, e.g., Delgado-Hernandez v. Holder*, 697 F.3d 1125, 1127

GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 110

The residual clause of § 924(c)(3)(B) includes in the definition of "crimes of violence" any predicate offense that, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *See* 18 U.S.C. § 924(c)(3)(B).  Duncan does not argue that kidnapping and kidnapping resulting in death do not satisfy this definition, nor could he.  *See, e.g.*, *Delgado-Hernandez v. Holder*, 697 F.3d 1125, 1130 (9th Cir. 2012) (per curiam) (surveying Circuit precedent establishing that kidnapping carries with it sufficient risk of physical force and violence to qualify as a crime of violence under various statutes).  Rather, he argues that the definition itself is invalid.  He asserts that the Supreme Court's decision in *Johnson* requires this conclusion.  This argument fails.  The question of *Johnson*'s applicability to another statute, 18 U.S.C. § 16(b) — is currently in question.  The Supreme Court granted certiorari in *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), the case on which Duncan relies.  *See Lynch v. Dimaya*, 137 S. Ct. 31 (Sept. 29, 2016).  And it heard a second argument on the case this fall.  *Lynch v. Dimaya*, 137 S. Ct. 31 (Sept. 29, 2016), *sub nom. Sessions v. Dimaya*, No. 15-1498, 2017 WL4391279 (U.S. Oct. 2, 2017).  The Government raised a host of reasons that *Johnson*'s reasoning does not logically extend to § 16(b), many of which apply to § 924(c) as well.  *See Lynch v. Dimaya*, No. 15-1498, 2016 WL 6768940 (U.S. Nov. 14, 2016).  Thus, the Supreme Court's resolution of *Dimaya* may well have an effect on this case.

Two additional factors distinguish § 924(c) from *Johnson*, the Armed Career Criminal Act ("ACCA"), and even § 16(b), however.  Thus, even if the Supreme Court affirms *Dimaya*,

---

(9th Cir. 2012) (holding that kidnapping can be committed without the use of physical force because it can occur through trickery and deceit).  And that remains true even when a firearm is involved – it could go unused and even unseen.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 111**

*Johnson* should not be further extended to § 924(c) (and, in turn, to § 924(j)(1), which makes murder by firearm in the course of a § 924(c) offense a separate crime).

> **A.** *Johnson* **should not extend to § 924(c) for the same reasons it should not extend to § 16(b).**

In *Johnson*, the Supreme Court struck down the third clause of ACCA's definition of a violent felony, the residual clause, as unconstitutionally vague. *Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015). ACCA defines a violent felony as "any crime punishable by imprisonment for a term exceeding one year" that meets one of three requirements: (1) "has as an element the use, attempted use, or threatened use of physical force against the person of another"— referred to as the "elements clause"; (2) "is burglary, arson, or extortion, or involves use of explosives"— referred to as the "enumerated offense clause"; or (3) "otherwise involves conduct that presents a serious potential risk of physical injury to another"— referred to as the "residual clause." 18 U.S.C. § 924(e)(2)(B).[37] The residual clause was struck because the "indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges," the Supreme Court held. *Johnson*, 135 S. Ct. at 2557. The Court left the first two clauses intact. *Id.* at 2555, 2563. Accordingly, after *Johnson*, a defendant's conviction qualifies as a violent felony under ACCA only if it satisfies either the enumerated-offense clause or the elements clause.

Duncan's conviction does not stem from ACCA. Rather, his conviction is founded on § 924(c) and in turn, on § 924(j)(1). Subsection (c) states that "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such

---

[37]      Under ACCA, a person convicted of being a felon in possession of a firearm faces a minimum of fifteen years' imprisonment if that person has three previous convictions for serious drug offenses or violent felonies. 18 U.S.C. § 924(e).

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 112**

crime, possesses a firearm" shall be subject to a greater sentence.  18 U.S.C. § 924(c)(1)(A).  As

noted, § 924(c)(3) defines a "crime of violence" as a felony offense that

> (A) has as an element the use, attempted use, or threatened use of
> physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force
> against the person or property of another may be used in the course
> of committing the offense.

18 U.S.C. § 924(c)(3).  Subsection (j)(1) provides that when someone uses a firearm to murder a

person in the course of a subsection (c) violation, they may be punished by death or life in

prison.  18 U.S.C. § 924(j) and (j)(1).

While § 924(c) and ACCA use similar clauses to define a crime of violence and a violent

felony, respectively, three important differences between the two statutes preclude an extension

of *Johnson*'s analysis to § 924(c).  First, the structure of the two statutory definitions differs.  No

problematic enumerated offense clause precedes the residual clause in § 924(c)(3), as it does in

ACCA.  Second, § 924(c) solely considers the risk of conduct during the offense, while ACCA's

residual clause sweeps more broadly.  And third, courts have not "repeatedly failed" to construe

§ 924(c), as they have the ACCA, because the former is so much clearer and narrower.  These

differences support the conclusion that § 924(c)'s residual clause, unlike ACCA's residual

clause, remains constitutional.

### 1.     No problematic enumerated offenses clause exists in § 924(c), thus distinguishing it from ACCA.

Section 924(c)(3)'s definition differs from ACCA's because it does not contain an

introductory list of enumerated crimes that qualifies the risk provision of the residual clause.

*Compare* 18 U.S.C. § 924(e)(2)(B)(ii) ("is burglary, arson, or extortion, involves use of

explosives, or otherwise involves conduct that presents a serious potential risk of physical injury

to another"), *with* 18 U.S.C. § 924(c)(3)(B) ("that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense").  The presence of an enumerated list of offenses in ACCA was a determinative factor in the Supreme Court's *Johnson* decision.  The enumerated list had troubled members of the Court since *James*.  *See James v. United States*, 550 U.S. 192, 215-16, 230 n.7 (2007) (Scalia, J., joined by Stevens and Ginsburg, J.J., dissenting) (stating that comparing a predicate offense with its closest analog among enumerated offenses is an unhelpful test if the analog is not obvious because the listed offenses have little in common).[38]  The Court again struggled with ACCA's enumerated list in *Begay v. United States*, where even the majority was concerned that "the examples are . . . far from clear with respect to the degree of risk each poses."  *Begay v. United States*, 553 U.S. 137, 143 (2008), *abrogated by Johnson*, 135 S. Ct. at 2559, 2562.

The continuing confusion over how to interpret the list, in conjunction with the residual clause, ultimately convinced the *Johnson* Court of ACCA's vagueness.  The interpretive difficulties posed by the list of enumerated crimes pervaded the Court's analysis.  The Court attributed part of the "uncertainty about how much risk it takes for a crime to qualify" to the residual clause's structure, which "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives."  *See Johnson*, 135 S. Ct. at 2558.  The Court again referred to the enumerated crimes in explaining why its decisions in *Begay* and *Sykes* did "not succeed in bringing clarity to the meaning of the residual clause."  *Id.* at 2559 (*Begay*'s test, which turned on similarity of crime to the enumerated offenses, failed because "the enumerated crimes are not much more similar to

---

[38]     The majority decision in *James* was overruled by *Johnson*, and Justice Scalia's dissent was cited extensively.  *See Johnson*, 135 S. Ct. at 2557-59.

one another in kind than in degree of risk posed"); *id.* ("common sense" used in *Sykes* was not reliable criterion because "[c]ommon sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes").  And, critically, the Court distinguished other statutes requiring risk-based assessments in part because they did not "link[] a phrase such as 'substantial risk' to a confusing list of examples."  *Id.* at 2561.

Section 924(c)(3), like the statutes the Court distinguished in *Johnson*, contains no such "confusing list" to cloud its analysis.  Moreover, unlike ACCA, § 924(c)(3) does contain language identical to other federal statutes.  *See, e.g.*, 18 U.S.C. § 521(d)(3)(C) (enhanced sentence for criminal gang members).  Thus, while the *Johnson* Court believed that striking ACCA's residual clause would have little effect on other risk-based statutes, *see Johnson*, 135 S. Ct. at 2561, a decision striking § 924(c) would have a significant impact on other federal laws.

### 2.     Section 924(c) does not go beyond the elements of the offense to consider potential extra-offense conduct.

Another uncertainty about ACCA identified in *Johnson*, but absent from § 924(c), is the necessity for courts to go "beyond evaluating the chances that the physical acts that make up the crime injure someone" and to evaluate the risk of injury even "after" completion of the offense. *Id.* at 2557, 2559 (noting that "remote" risk of physical injury even after the offense could qualify under ACCA, and that the clause does not indicate "how remote is too remote").  The Court explained that ACCA's inquiry into whether a crime "involves conduct" that presents too much risk of injury goes beyond the offense elements.  *Id.* at 2557.  "The inclusion of burglary and extortion among the enumerated offenses," the Court further explained, confirmed that courts assessing risk had to go "beyond evaluating the chances that the physical acts that make up the crime will injure someone."  *Id.*  That was so because risk of injury could arise in a burglary after the breaking and entering had occurred, and an extortionist might become violent

GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 115

after making his demand.  *Id.*  The consideration of post-offense conduct was therefore part of ACCA's indeterminate "wide-ranging inquiry."  *Id.*

In contrast, § 924(c) is significantly narrower.  Unlike ACCA, § 924(c)(3)(B) specifies that the definition applies only when the risk of force occurs "'in the course of committing the offense.'"  *Leocal v. Ashcroft*, 543 U.S. 1, 10 & n.7 (2004) (quoting 18 U.S.C. § 16(b)); *see* 18 U.S.C. § 924(c)(3)(B) (using the same phrase).  This confines a court's assessment under § 924(c)'s residual clause to the risks that arise during the commission of the offense.  *See Leocal*, 543 U.S. at 7 (to determine whether an offense is a crime of violence, a court must "look to the elements and the nature of the offense of conviction"); *cf. Johnson*, 135 S. Ct. 2557 (noting that ACCA requires analysis beyond "the physical acts that make up the crime"). Further, § 924(c)(3)(B) looks at the risk of the "use of force" rather than the ACCA's much broader "risk of injury."  *Compare* 18 U.S.C. § 924(c) *with Johnson*, 135 S. Ct. at 2557.  Section 924(c)'s focus on the use of force during an offense, rather than on the potential risk and effects of the offense, limits the statute's reach and avoids the kind of speculation about extra-offense conduct that *Johnson* denounced.  *See Johnson,* 135 S. Ct. at 2557, 2559.

There is nothing vague or speculative about asking whether an offense "naturally" involves a risk of the use of force during the commission of the offense for purposes of § 924(c). The phrase "by its nature" in § 924(c) simply triggers application of the categorical approach, which, of course, looks at offense elements.  *See United States v. Mendez*, 992 F.2d 1488, 1489-90 (9th Cir. 1993) (employing the categorical approach in light of the phrase "by its nature"). Furthermore, the Supreme Court regularly examines the "nature" of predicate offenses for enhancement purposes.  *See, e.g.*, *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684 (2013) (comparison of predicate offense to its "generic" counterpart requires Court to assess "whether

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 116**

the state statute shares the nature of the federal offense that serves as a point of comparison"). Thus, the Supreme Court's analysis in *Johnson* does not apply here.

###     3.     The Supreme Court has not "repeatedly" failed to construe § 924(c); nor have lower courts.

The third significant difference between ACCA's residual clause, which *Johnson* construed, and § 924(c)'s residual clause, is that § 924(c)'s clause has not resulted in courts' "repeated" inability to develop a "principled and objective standard." *Johnson*, 135 S. Ct. at 2558 (describing the Supreme Court's difficulty in interpreting ACCA's residual clause over the years). This concern, which has never applied to precedent interpreting § 924(c), animated the Court's decision to find ACCA vague. *See id.* at 2559-60 (noting *Johnson* is the Court's "fifth [case] about the meaning of the [ACCA] residual clause" and that the lower courts' disagreements were significant); *see also Sykes v. United States*, 564 U.S. 1, 34 (2011) (Scalia, J., dissenting) (stating that the Court's repeated failure in addressing ACCA is "[w]hat sets ACCA apart" and "confirms" its vagueness). The *Johnson* Court expressed clear frustration that its ACCA decisions had been a "failed enterprise." *Johnson*, 135 S. Ct. at 2560.

Nowhere near the same level of confusion exists among courts about § 924(c) as it did with ACCA. To the extent differences exist, they stem from disagreements about particular offenses. "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *United States v. Petrillo*, 332 U.S. 1, 5 (1947); *see also Johnson*, 135 S. Ct. at 2560 ("[E]ven clear laws produce close cases.") Such disagreements "about whether the residual clause covers this or that crime" were not at issue in *Johnson*. *See Johnson*, 135 S. Ct. at 2560. Rather, the very substance of the definition was at issue.

The three major contextual and linguistic differences between § 924(c) and ACCA

discussed above matter because the Supreme Court expressly held in *Johnson*, and reiterated in *Welch*, that its new rule applied to predicate offenses under only ACCA's residual clause.  *See Welch v. United States*, 136 S. Ct. 1257, 1265 (2016) ("By striking down the residual clause as void for vagueness, *Johnson* changed the substantive reach of the *Armed Career Criminal Act*, altering 'the range of conduct or the class of persons that the [Act] punishes.'" (emphasis added) (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004)).  In fact, the Supreme Court confined its *Johnson* ruling to avoid affecting other provisions of the ACCA under either the enumerated offense or elements clauses—a reflection of the narrowness of its holding.  *Johnson*, 135 S. Ct. at 2561, 2563 ("The Government and the dissent next point out that dozens of federal and state criminal laws use terms like 'substantial risk,' 'grave risk,' and 'unreasonable risk,' suggesting that to hold the residual clause unconstitutional is to place these provisions in constitutional doubt . . . .  Not at all.").  To date, no other Supreme Court case has extended or furthered the *Johnson* ruling to a non-ACCA definition of violent felony.

These distinctions are key to the task at hand:  whether to extend *Johnson*'s holding to § 924(c)'s residual clause.  *See, e.g.*, *United States v. Eshetu*, 863 F.3d 946, 955 (D.C. Cir. 2017) (recognizing that the distinctions between § 924(c)'s and ACCA's residual clauses may seem "subtle" but that "experience confirms their significance").  The *Johnson* Court made clear that "[e]ach of the uncertainties in the [ACCA's] residual clause may be tolerable in isolation, but 'their sum makes a task for us which at best could be only guesswork.'" 135 S. Ct. at 2559-60 (quoting *United States v. Evans*, 333 U.S. 483, 495 (1948)).  Absent the same constellation of uncertainties found in the ACCA's residual clause, extension is unwarranted.[39]  Duncan, whose

---

[39]    The majority of Circuit Courts of Appeals agree that *Johnson*'s holding is limited to the unique uncertainty surrounding ACCA's residual clause and have declined extending *Johnson* to § 924(c)(3)(B).  *See Eshetu*, 863 F.3d at 955; *Ovalles v. United States*, 861 F.3d 1257, 1265-66

conviction under Count 7 stands on § 924(c), cannot prevail based on the Supreme Court's ACCA ruling in *Johnson*.

### B.   Even if *Johnson* is extended to § 16(b) under *Dimaya*, it should still not be extended to § 924(c).

Rather than identify prior convictions that trigger a recidivist enhancement, § 924(c) creates a separate crime when the predicate offense is perpetrated with a sufficient nexus to a firearm.  Likewise, § 924(j)(1) creates a separate crime when murder is committed with a firearm in the course of a subsection (c) offense.  18 U.S.C. § 924(j)(i).  The structure and function of subsections (c) and (j) serves to narrow the class of offenses that could possibly qualify as crimes of violence.  For example, the crime of driving under the influence—which was at issue in *Begay v. United States*, 553 U.S. 137 (2008) under the ACCA—would never give rise to a § 924(c) violation.  Likewise, the fact that the Government proved aggravating factors beyond a reasonable doubt under the FDPA, including the fact that Duncan "committed the offense in an especially heinous or cruel manner in that it involved torture or serious physical abuse," narrows the class of offenses as well.  *See* 18 U.S.C. § 3592(c)(6).

In addition, § 924(c) "asks whether a federal offense that was *contemporaneously* tried with § 924(c) possession may properly serve as a predicate offense."  *United States v. Robinson*, 844 F.3d 137, 141 n.5 (3d Cir. 2016); *see also Shuti v. Lynch*, 828 F.3d 440, 449 (6th Cir. 2016).

---

(11th Cir. 2017) (joining the Second, Sixth, and Eighth Circuits that *Johnson* does not invalidate § 924(c)'s residual clause); *United States v. Davis*, 677 F. App'x 933, 936-37 (5th Cir. Jan. 31, 2017); *United States v. Pickett*, 839 F.3d 697, 699-700 (8th Cir. 2016); *United States v. Hill*, 832 F.3d 135, 145-49 (2d Cir. 2016); *United States v. Taylor*, 814 F.3d 340, 375-79 (6th Cir. 2016). The Circuit Courts are not, however, unanimous on this issue.  *See United States v. Cardena*, 842 F.3d 959, 996 (7th Cir. 2016) (holding that § 924(c)'s residual clause was unconstitutionally vague under *Johnson*).

Likewise, § 924(j) captures the use of a firearm to cause death in the course of a § 924(c)

violation.  18 U.S.C. § 924(j).  Similarly, the FDPA's aggravating factor under § 3592(c)(6)

involves contemporaneous activity.  18 U.S.C. § 3592(c)(6).  It serves as a precondition to

sentencing that operates like an element of a crime.  *See United States v. Robinson*, 367 F.3d

278, 284 (5th Cir. 2004); *United States v. Higgs*, 353 F.3d 281, 298 (4th Cir. 2003).  Thus, no

prior state conviction is being construed.  Rather, a current federal conviction, with the added

requirement of a specific nexus to a firearm (and of murder using that firearm for § 924(j)(1) and

of torture or serious physical abuse under § 3592(c)(6)), is being considered.  This eliminates

vagueness concerns that are certainly present in ACCA, and that could be of concern in § 16(b)

as well.  Thus, § 924(c) and (j) statute differ meaningfully from ACCA, the statute previously

construed by the Supreme Court, and § 16(b), the statute currently under the Supreme Court's

consideration.  Moreover, the FDPA's requirements come into play as well.  Regardless of the

outcome of *Dimaya*, then, this Court may distinguish prior precedent.

## X.      THE COURT PROPERLY ACCEPTED DUNCAN'S WAIVER OF APPEAL.

Duncan cannot challenge his competence or capacity to waive appeal, as both are law of

the case.  *See United States v. Jingles*, 702 F.3d 494, 498 (9th Cir. 2012) and (Section X.B.2),

below.  He does seek to challenge this Court's acceptance of his waiver of appeal, arguing that

his statements did not reflect a voluntary and intelligent abandonment of that right.  He further

contends that his understanding of the waiver was incomplete because he did not receive advice

about standby counsel's right to challenge his competence in an appeal of their own.  Finally, he

asserts that the Court of Appeals erroneously denied his efforts to reinstate his appeal.  (CV Dkt.

4 at 175-88.)  Duncan failed to properly challenge the adequacy of his waiver on appeal, and

thereby defaulted this claim.  While his standby counsel attempted to mount such a challenge,

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL
RELIEF - 120**

they lacked standing to do so, and their effort cannot save the issue from default.  Irrespective of the procedural failings of his claim, Duncan has failed to show that this Court erred in accepting his appellate waiver.

### A.    Procedural bar

Duncan relies entirely on facts within the record in challenging the adequacy of the proceeding in which the Court accepted his appellate waiver, though he personally did not seek direct review of this Court's actions in that regard.  While Duncan's stand-by counsel asserted in their appeals that Duncan had not entered the waiver voluntarily and intelligently, the Court of Appeals did not address the arguments in its opinions.[40]  Because the appellate court recognized that counsel's standing extended only to the issue of competence, Duncan cannot rely on the panel's silence concerning the adequacy of the waiver to demonstrate that it considered and rejected the merits of the argument.  *See* (*Duncan*, Appeal No. 08-99031, ECF No. 86-1 at 9247-51); *see generally United States v. Kellington*, 217 F.3d 1084, 1095-96 & n.12 (9th Cir. 2000) (declining to find that the trial court erred on remand in drawing inferences from silence in earlier appellate opinion); *United States v. Cote*, 51 F.3d 178 (9th Cir. 1995) (holding the law of the case doctrine does not extend to issues the appellate court did not address).  Standby counsel's efforts to challenge the waiver proceeding were a legal nullity.  Their efforts should not permit Duncan to escape the reach of the procedural default doctrine.

When Duncan entered his waiver, the Court admonished him that he had four days in which he could still file a timely notice of appeal, and he acknowledged that.  (Sealed CR Dkt. 637 at 13.)  Given his expressed understanding that his waiver was not yet final, his decision to

---

[40]      *Compare* (*United States v. Duncan*, Appeal No. 08-99031, ECF No. 47-1 at 57-76 and *United States v. Duncan*, Appeal No. 13-99011, ECF No. 17-1 at 109-17); *with* (*United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011) and *Duncan*, Appeal No. 13-99011, ECF No. 55-1.)

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 121**

forgo a timely notice of appeal should bar him from challenging the adequacy of the proceeding at this juncture. *See United States v. Hammer*, 404 F. Supp. 2d, 676, 800 (M.D. Pa. 2005).

Nor does the fact that Duncan could have mooted his current claim by filing a notice of appeal after the hearing have any effect on the application of the procedural default doctrine. The doctrine exists to preserve collateral review as an "extraordinary remedy." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (citing *Reed v. Farley*, 512 U.S. 339, 354 (1994)).  In the face of a rule designed to create an incentive to raise all possible issues on direct review, Duncan's conscious decision to waive appeal both during and after the hearing should not result in a second procedural chance any more than a defendant whose attorney reasonably omitted an appellate claim. *See e.g.*, *United States v. Self*, 100 F. Supp. 3d 773, 814 (D. Ariz. 2015) (holding the defendant could not establish cause and prejudice based on alleged ineffectiveness because the forgone appellate claims lacked merit).  Indeed, given the personal nature of his waiver, Duncan cannot identify any factor external to the defense that could satisfy the cause and prejudice standard. *See Murray v. Carrier*, 477 U.S. 478, 492 (1986) (imposing externality requirement on showing of cause and prejudice); *see also Faretta v. California*, 422 U.S. 806, 835 n.46 (1975) (noting that when a criminal defendant elects to represent himself, he waives his right to complain of ineffective assistance of counsel).

### B.      Unequivocal, voluntary and intelligent waiver

Despite its broad language, § 2255 provides relief only for "fundamental" defects that cause a "complete miscarriage" of justice. *Hill v. United States*, 368 U.S. 424, 428 (1962). "'[A] defendant's waiver of his appellate rights is enforceable if (1) the language of the waiver encompasses his right to appeal on the grounds raised, and (2) the waiver is knowingly and voluntarily made.'" *United States v. Charles*, 581 F.3d 927, 931 (9th Cir. 2009) (quoting *United*

*States v. Jeronimo*, 398 F.3d 1149, 1154 (9th Cir. 2005)).  In determining whether a defendant knowingly and voluntarily waived appeal, courts consider "the express language of the waiver and the facts and circumstances surrounding the signing and entry of the plea agreement." *United States v. Nguyen*, 235 F.3d 1179, 1182 (9th Cir. 2000), *abrogated on other grounds as recognized in United States v. Rahman*, 642 F.3d 1257, 1259 (9th Cir. 2011).  Conditional waivers are not necessarily equivocal ones.  *See Adams v. Carroll*, 875 F.2d 1441, 1445 (9th Cir. 1989) (finding no equivocation in repeated statements that the defendant wanted to represent himself if the only alternative was the appointment of a certain attorney); *see also United States v. Hernandez*, 203 F.3d 614, 621-22 (9th Cir. 2000) (refusing to equate conditionality of request with equivocation), *abrogated on other grounds by Indiana v. Edwards*, 554 U.S. 164 (2008), *as recognized in United States v. Ferguson*, 560 F.3d 1060 (9th Cir. 2009).

### 1.    Unequivocal intention

Duncan concedes that he expressed his desire to waive appeal but maintains his statement reflected equivocation because he made it only after "he was cornered" and instructed not to elaborate or to confer with counsel.  (CV Dkt. 4 at 183-85.)  In truth, Duncan established his desire to abandon the appeal, and explained it in terms of his own philosophical views.

During the hearing, Duncan repeatedly indicated his desire to abandon his appeal.  *E.g.*, (Sealed CR Dkt. 637 at 9 ("in my opinion this whole proceeding is criminal, and as a criminal proceeding, any appeal doesn't make any sense"); *id*. at 12 ("My choice is to not appeal"); *id*. at 16 ("I do not have any intention of appealing").)  After a series of remarks about what he viewed as an invalid system of justice, Duncan unambiguously stated, "I certainly understand my right, my right in quotes, and I have no desire, as I mentioned in the letter I wrote to you, to invoke it."

(Sealed CR Dkt. 637 at 11.)  He then engaged in an extended colloquy, stating his desire to

withdraw standby counsel's previously-filed notice of appeal:

> THE COURT: . . . We, just as a practical matter, need to know and to understand, have the record clear, on the fact that you understand that if you do not file an appeal and your counsel are urging you to do so, but if you do not file that appeal, there will not be a review by any tribunal. Do you understand that?
>
> MR. DUNCAN: Yes.
>
> THE COURT: Do you understand that you have a Sixth Amendment right to file that appeal and that you are in charge of your defense until you request standby counsel to assist you in that appeal?
>
> MR. DUNCAN: Yes.
>
> THE COURT: Again, do you understand that by choosing not to file an appeal, if that would be your position in this case, that there would not be a review and the sentence imposed by the Court would be carried out, including the sentence of death? Do you understand that?
>
> MR. DUNCAN: Yes.
>
> THE COURT: In making that decision, is it your decision not to appeal or is your position that you want to appeal the verdicts of the jury as well as the sentence of the Court?
>
> MR. DUNCAN: My choice is to not appeal.
>
> THE COURT: Are you making that decision voluntarily and of your own free will?
>
> MR. DUNCAN: Yes, I am.
>
> THE COURT: You have conferred with standby counsel and you understand that their position is that you should appeal?
>
> MR. DUNCAN: Yes, I do.

(Sealed CR Dkt. 637 at 11-12.)  After Duncan made further statements of opinion about the

justice system, and had an opportunity to confer with standby counsel,[41] he stated that he had not

given permission to file a notice of appeal and did not want an appeal.  (*Id.* at 18-19.)

---

[41]     Duncan asserts the Court elicited his final answers without permitting him to consult with standby counsel.  (CV Dkt. 4 at 184.)  But the Court had already allowed him to consult with

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 124**

While Duncan explained his desire to abandon his appeal in light of his attitudes about the justice system, his motivation has no bearing on the clarity of his intent.  *See Adams*, 875 F.2d at 1445.  Indeed, the fact that he provided affirmative responses to direct questions (Sealed CR Dkt. 637 at 11-12) weighs on the side of a valid waiver.  *Cf. United States v. Mendez-Sanchez*, 563 F.3d 935, 946 (9th Cir. 2009) (affirming district court's rejection of defendant's waiver as equivocal where defendant did not respond directly to direct questions after several attempts by the district court).

Given Duncan's clear and repeated expressions of desire to abandon his appeal, he cannot succeed in showing that the Court erroneously found the waiver unequivocal.

## 2.    Knowing, intelligent and voluntary waiver

In a recapitulation of arguments made during the competency proceedings, Duncan claims his appellate waiver stemmed from a delusional belief system and goal.  He contends that he expressed his waiver not as a choice but as a product of mental disease within the meaning of *Rees v. Peyton*, 384 U.S. 312, 314 (1966).  (CV Dkt. 4 at 185-86.)  Duncan's argument is barred by the law of the case doctrine.

The law of the case doctrine generally precludes courts from reconsidering previously-decided issues.  *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (citing *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)).  Courts may reconsider previous ruling only upon a change in the controlling law, facts, or other circumstances, the need to correct a clear error, or the need to prevent manifest injustice.  *Alexander*, 106 F.3d at 876.

---

standby counsel and he had done so.  (Sealed CR Dkt. 637 at 16).  Moreover, Duncan can establish no right to consult with standby counsel in any case.  *See Locks v. Sumner*, 703 F.2d 403, 407-08 (9th Cir. 1983) (holding advisory counsel is "not of constitutional dimension"); *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994) (holding that courts have discretion whether to appoint standby counsel).

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 125**

As the Ninth Circuit recognized during standby counsel's second appeal, this Court applied a liberal standard in rejecting the claim that Duncan lacked the capacity to waive appeal, one that contemplated the defendant's motivations and goals: "The court also found that any disease or defect that Defendant suffered did not "motivate[ ], drive [ ], or cause[ ]" him to waive his right to file an appeal." (*Duncan*, Appeal No. 13-99011, ECF No. 55-1 at 3.)  The appellate court unambiguously concluded, "the district court did not err" under any applicable standard, including *Rees*.  *Id.*  This decision forecloses further consideration of the issue, as Duncan has not attempted to show that the earlier ruling was clearly erroneous or manifestly unjust, and therefore outside the law of the case doctrine.

### 3.      Adequate advisement

Duncan asserts his waiver of appeal was invalid because the Court and standby counsel failed to advise him that his actions would result in a third party appeal that challenged his competency.  (CV Dkt. 4 at 186-87.)  Duncan had no right to such advice, but received it nonetheless.

Even when pleading guilty, and waiving the constitutional right to trial, defendants have no right to advisements from a court concerning potential collateral consequences from their actions.  *United States v. Brownlie*, 915 F.2d 527, 528 (9th Cir.1990); *see also Torrey v. Estelle*, 842 F.2d 234, 235 (9th Cir.1988) (courts must inform defendants of only direct, rather than all possible collateral consequences of pleading guilty); *United States v. Garrett,* 680 F.2d 64, 65-66 (9th Cir. 1982) (federal court has no obligation to advise defendant pleading guilty of collateral consequence that conviction could result in sentence enhancement in another case).  Whether a consequence is direct or collateral "turns on whether the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment."  *Torrey*, 842 F.2d at

236 (internal quotation marks omitted) (enumerating examples of direct and consequential consequences; citations omitted).

Duncan makes no effort to show that a defendant waiving a statutory right, like an appeal, would enjoy greater protections than a defendant electing to forgo trial. *See United States v. Bolinger*, 940 F.2d 478, 480 (9th Cir. 1991) (holding the right to appeal is statutory). More specifically, he has not identified any source of right to advice regarding the collateral consequences of an appellate waiver, including the bare possibility of litigation by his standby counsel, whose standing remained in question until the Ninth Circuit issued its opinion. *See* (*United States v. Duncan*, Appeal No. 08-99031, ECF No. 86-1 at 9249-51.)

Assuming, arguendo, the law obligated the Court to inform Duncan of a possible third party appeal, it discharged the responsibility when it informed him, "if standby counsel . . . has some independent right, that is another matter.  That very likely would go before the Ninth Circuit.  That is not before this Court as to whether there is an independent right to appeal either by standby counsel or some third-party."  (Sealed CR Dkt. 637 at 13.)  Given that Duncan cannot show a right to advice about the possibility of standby counsel's appeal, and the fact that he actually received such advice, he can show no basis for collateral relief.

### C.     Failed revival of appeal

Duncan claims that he withdrew the waiver of his appeal, asserting that the Ninth Circuit denied without explanation his request to retract his earlier abandonment of the appeal.  (CV Dkt. 4 at 187-88.)  Once again, the law of the case doctrine bars relief on an argument the appellate court squarely rejected on procedural grounds.

In this case, the Court of Appeals affirmed the denial of Duncan's dilatory withdrawal effort because he filed it long after the due date for a timely notice of appeal.  The Ninth Circuit explained its reasoning for rejecting the withdrawal of his appellate waiver in certain terms:

> Because Defendant was competent in November 2008, the notice of appeal that standby counsel filed on November 17, 2008, was a nullity.  At that time, Defendant had validly and affirmatively waived his right to file an appeal.  His decision to withdraw that waiver, which he made more than two years later, came too late.

(*United States v. Duncan*, Appeal No. 13-99011, ECF No. 55-1 at 3-4 (citing 18 U.S.C. § 3595(a) (requiring the notice of appeal to be filed "within the time specified for the filing of a notice of appeal"); FED. R. APP. P. 4(b)(1)(A) (requiring a notice of appeal in a criminal case to be filed "within 14 days after . . . the entry of . . . the order being appealed").)

Duncan fails to show that the Ninth Circuit erred in its adjudication of the timeliness question, and cannot do so.  *See generally* 18 U.S.C. § 3595(a) (requiring the filing of a notice of appeal "within the time specified for the filing of a notice of appeal"); FED. R. APP. P. 4(b)(1)(A) (requiring a notice of appeal in a criminal case to be filed within 14 days of judgment). Duncan's attempt to retract his waiver of appeal was unquestionably and inexcusably untimely. The Ninth Circuit properly rejected it for that reason.  *See* (*United States v. Duncan*, 13-99011, ECF No. 55-1 at 3-4.)  For want of any demonstrable error or manifest injustice, this Court should refuse to revisit the decision to reject Duncan's belated notice of appeal.

## D.    The requested relief is unavailable.

Assuming, arguendo, Duncan could raise his procedurally-barred and meritless contentions about the waiver of his appeal, relief under his theories would require resort to a previously-unannounced procedural rule in derogation of *Teague v. Lane*, 488 U.S. 288 (1989). To grant relief, this Court would have to rely on a previously-unarticulated rule that required,

inter alia, unconditional statements by a defendant waiving appeal.  Given that such a rule would contradict existing circuit authority, it certainly constitutes a novel legal proposition.  *See Hernandez*, 203 F.3d at 621-22.  Likewise, the Court could grant relief as to the adequacy of the waiver only by applying a more exacting standard than it already used or by ignoring the law of the case doctrine.  Alternatively, relief might hinge on a previously-unannounced right to advice on collateral consequences.  Given the absence of any existing authority to support Duncan's theories, and the omission of any effort by him to identify an exception to the *Teague* bar, relief should not lie.

## XI.    THERE ARE NO ERRORS TO ACCUMULATE.

Duncan argues that even if no single alleged error requires relief, the cumulative effect of the supposed errors does require the Court to grant his Motion.  (CV Dkt. 4 at 189-211.)  As the Government has demonstrated, none of Duncan's contentions have merit, and many are procedurally defective.  Moreover, Duncan has failed to establish prejudice as to any of the claims he raises.  Additionally, he pleaded guilty, and the Government presented a strong case in favor of the death penalty.  Accordingly, this Court should reject his claim of cumulative error. *See United States v. Cazares*, 788 F.3d 956, 990 (9th Cir. 2015) (holding "[r]elief from the effects of cumulative error is appropriate in those cases where government's case is weak and a defendant is more likely to be prejudiced by the effect of cumulative errors"); *United States v. Fernandez*, 388 F.3d 1199, 1256 (9th Cir. 2004) (holding the cumulative error doctrine does not apply in the absence of demonstrated error).

## XII.   THE DEATH PENALTY REMAINS CONSTITUTIONAL.

Noting that he unsuccessfully challenged the constitutionality of the death penalty at the time of trial, Duncan claims that changes in the legal and factual landscape now demand the

conclusion that capital punishment no longer passes muster.  (CV Dkt. 4 at 211-18.)  In support

of his position, Duncan relies primarily upon a dissenting opinion in *Glossip v. Gross*, 135 S. Ct.

2726, 2755 (2015) and a district court decision, *see United States v. Fell*, 224 F. Supp.3d 327,

359 (D. Vt. Dec. 13, 2016), in which the judge determined that he lacked the authority to review

the death penalty.  Duncan's failure to raise this claim on appeal should bar consideration of the

issue on collateral review.  Even if this Court does consider the claim, it should deny relief, as

the jurisprudence cited by Duncan stands for the proposition that the Supreme Court alone may

determine the constitutionality of the death penalty.

###    A.    Procedural bar

Duncan filed several unsuccessful pre-trial challenges to the constitutionality of the death

penalty.  *See* (CV Dkt. 4 at 211-12 (citing CR Dkt. 116, 135, 136, 137 & 139).)  He could have

likewise challenged capital punishment on appeal, but did not do so.  Instead, he waived direct

review entirely.  *See generally* (*United States v. Duncan*, Appeal No. 13-99011 at ECF No. 55-1

(affirming competence determination following earlier remand).)  Having abandoned appeal,

Duncan necessarily defaulted this purely legal challenge for purposes of § 2255 review.  *See*

*United States v. Frady*, 456 U.S. 152, 165 (1982).

Duncan cannot argue that he has premised his current argument on circumstances that did

not exist at the time he waived his appeal, because he expressly asserts the opposite.  According

to Duncan, the fact that "[t]he death penalty may not be imposed [in an] arbitrary manner . . . is

not a new legal development but is inherent in the most basic notions of due process."  (CV Dkt.

4 at 217.)  Simply stated, the premise of Duncan's argument presupposes that the law would

have supported his position at the time he abandoned his appeal.  He should not have the

opportunity to resurrect a position he voluntarily surrendered.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL**
**RELIEF - 130**

Duncan cannot demonstrate that his claim falls within an exception to the default doctrine that might permit its consideration, nor does he try.  First, he cannot establish his actual innocence.  He confessed and pleaded guilty.  Second, he cannot establish cause and prejudice.  Indeed, Duncan voluntarily waived appeal, a fact that precludes any showing of "cause," which must stem from factors external to the defense.  *Cf. Murray v. Carrier*, 477 U.S. 478, 485-86 (1986).  Likewise, Duncan cannot establish prejudice for want of Supreme Court authority declaring the death penalty unconstitutional or ceding to the lower courts the authority to review the question.  *See Glossip*, 135 S. Ct. at 2732-33 ("[B]ecause it is settled that capital punishment is constitutional, '[i]t necessarily follows that there must be a [constitutional]' means of carrying it out") (quoting *Baze v. Rees*, 553 U.S. 35, 47 (2008)); *Fell*, 224 F. Supp. 3d at 359 (holding that the authority to declare the death penalty unconstitutional "is reserved to the Supreme Court").

## B.    Issue reserved to the Supreme Court

The Supreme Court has repeatedly upheld the constitutionality of the death penalty.  *See Glossip*, 135 S. Ct. at 2732; *Baze*, 553 U.S. at 47) (citing *Gregg v. Georgia*, 428 U.S. 153, 177 (1976)).  It alone may revisit this decision.  *See Baze*, 553 U.S. at 83 (holding "in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment"); *Fid. Expl. & Prod. Co v. United States*, 506 F. 3d 1182, 1186 (9th Cir. 2007) (holding that lower courts must abide by controlling Supreme Court precedent); *Fell*, 224 F. Supp. 3d at 358-59.  Given the limits of this Court's authority, it should decline Duncan's invitation to declare the death penalty unconstitutional.[42]

---

[42]    A constitutional repudiation of the death penalty would require a new rule of law, but as a substantive limitation on punishment, it would not implicate *Teague*.  *See Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004).

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 131**

## CONCLUSION

The United States respectfully urges this Court to deny and dismiss Duncan's Motion for Collateral Relief. The following claims should be denied on their merits: Claims III.D. (CV Dkt 4 at 117-20), and Claim IX (CV Dkt 4 at 167-74). In addition, Claim I (CV Dkt. 4 at 13-47) and III.C. (CV Dkt. 4 at 114-15) should be dismissed, at least in part, on the procedural bar, but also denied on the merits. All remaining claims should be dismissed as procedurally barred, but also denied, in the alternative, on the merits.

In addition, except as expressly admitted, the United States denies every allegation of the Motion and specifically denies that Duncan's confinement is in any way improper, that any judgment and commitment underlying Duncan's confinement is in any way improper, and that Duncan's rights are being violated in any way.

Respectfully submitted this 30th day of October, 2017.

BART M. DAVIS
United States Attorney
District of Idaho
By

*/s/ Syrena C. Hargrove*
SYRENA C. HARGROVE
Assistant United States Attorney

*/s/ Katherine L. Holey*
KATHERINE L. HOLEY
Assistant United States Attorney

*/s/ Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 132**

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 30, 2017, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which sent a Notice of Electronic Filing and thereby a copy was served on the following parties or counsel:

| | |
|---|---|
| Lindsay Nicole Bennett<br>Office of the Federal Defender<br>801 I Street, 3rd Floor<br>Sacramento, CA 95814<br>lindsay_bennett@fd.org | ☐ United States Mail, postage prepaid<br>☐ Fax<br>☒ ECF filing<br>☐ E-mail |
| Mark Olive<br>320 W. Jefferson Street<br>Tallahassee, FL 32301<br>meolive@aol.com | ☐ United States Mail, postage prepaid<br>☐ Fax<br>☒ ECF filing<br>☐ E-mail |
| Samuel Richard Rubin<br>Federal Defender Services of Idaho<br>702 W. Idaho Street, Suite 1000<br>Boise, ID 83702<br>dick_rubin@fd.org | ☐ United States Mail, postage prepaid<br>☐ Fax<br>☒ ECF filing<br>☐ E-mail |

/s/ *Syrena C. Hargrove*
SYRENA C. HARGROVE
Assistant United States Attorney

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF - 133**