1   HEATHER E. WILLIAMS, CA Bar No. 122664
    Federal Defender
2   LINDSAY N. BENNETT, GA Bar No. 141641
    Assistant Federal Defender
3   Email:  Lindsay_Bennett@fd.org
    KELLY L. CULSHAW, CA Bar No. 304778
4   Assistant Federal Defender
5   Email:  Kelly_Culshaw@fd.org
    Office of the Federal Defender
6   801 I Street, 3rd Floor
    Sacramento, California 95814
7   Telephone:     (916) 498-5700
    Facsimile:     (916) 498-6656
8
9   Attorneys for Petitioner,
    JOSEPH EDWARD DUNCAN, III
10
11                  **IN THE UNITED STATES DISTRICT COURT**
12
                    **FOR THE DISTRICT OF IDAHO**
13
14  JOSEPH EDWARD DUNCAN, III,        )   Case No.  2:17-cv-00091-EJL
                                      )              2:07-cr-00023-EJL
15                    Petitioner,     )
                                      )   **REPLY TO GOVERNMENT'S RESPONSE**
16                                    )   **IN OPPOSITION TO MOTION FOR**
    v.                                )   **COLLATERAL RELIEF**
17                                    )
    UNITED STATES OF AMERICA,         )
18                                    )
19                    Respondent.     )
                                      )
20  _____)
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.  THE GOVERNMENT'S ASSERTED AFFIRMATIVE DEFENSES SHOULD
     BE REJECTED .......................................................................................................... 1

     A.   Procedural default ............................................................................................ 1

     B.   Non-retroactivity .............................................................................................. 7

III. CLAIM 1: MR. DUNCAN WAS DENIED HIS RIGHT TO EFFECTIVE
     ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006A AND
     THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND
     HIS RIGHT TO A RELIABLE DEATH JUDGMENT AS GUARANTEED BY
     THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY
     THE MULTIPLE PREJUDICIAL ERRORS AND OMISSIONS OF TRIAL COUNSEL,
     ALL OF WHICH WERE EXACERBATED BY THE ERRONEOUS AND
     PREJUDICIAL RULINGS OF THE COURT ........................................................ 13

IV.  CLAIM 2:  THE TRIAL COURT'S REFUSAL TO ALLOW MR. LARRANGA
     TO ATTEND THE AUGUST 28, 2007 STATUS CONFERENCE AND REFUSAL
     TO HAVE THE PROCEEDINGS RECORDED AND ITS SUBSEQUENT RELIANCE
     ON THE PROCEEDINGS TO DISALLOW A REASONABLE TIME FOR
     PREPARATION VIOLATED MR. DUNCAN'S RIGHTS UNDER THE FIFTH,
     SIXTH AND EIGHTH AMENDMENTS ............................................................. 22

V.   CLAIMS 3 AND 4: PETITIONER'S REPLY TO THE GOVERNMENT'S
     ARGUMENTS IN OPPOSITION ........................................................................ 28

     A.   The Claims are Not Procedurally Barred ...................................................... 28

     B.   The Court Should Reject the Government's Merits Arguments ..................... 30

          1.   The current evidentiary record and prior findings are not dispositive of
               the competency claims presented herein ............................................... 31

          2.   Competency Standards Are Varied; Mr. Duncan is Indeed at Least
               a "Gray Area" Defendant Within the Meaning of *Edwards* .............. 31

          3.   Competency Varies at Over Time ........................................................... 34

          4.   The Court's Findings Should Be Reconsidered ...................................... 35

     C.   Mr. Duncan's Evidentiary Contentions Are Meritorious .............................. 37

          1.   The Court Erred in Taking Judicial Notice ............................................ 37

          2.   The Court Erred in Failing to Consider Dr. Roesch's Interviews .......... 39

     D.   Petitioner was Denied Effective Assistance of Counsel at the Retrospective
          Competency Hearing ..................................................................................... 41

          1.   Counsel mishandled the issue of familial abuse and incest .................. 41

          2.   Counsel prejudicially violated the court's discovery order .................. 43

     E.   Respondent Admits the Court Violated Procedural Due Process by Failing to
          Make a Determination of Competency Prior to Accepting the *Faretta* Waiver ....... 46

VI.  CLAIM 5:  THE COURT VIOLATED DUE PROCESS AND THE EIGHTH
      AMENDMENT WHEN IT ERRONEOUSLY ALLOWED PETITIONER TO
      REPRESENT HIMSELF AT THE SENTENCING TRIAL ................................ 47

VII. CLAIM 6: MR. DUNCAN'S TRIAL COUNSEL FAILED TO REQUEST A
      CHANGE OF VENUE IN VIOLATION OF MR. DUNCAN'S FEDERAL
      CONSTITUTIONAL RIGHT TO DUE PROCESS, EFFECTIVE ASSISTANCE
      OF  COUNSEL AND A FAIR TRIAL ........................................................... 55

VIII.CLAIM 7: THE ADMISSION OF FUTURE DANGEROUSNESS EVIDENCE,
      THE PROSECUTION'S ARGUMENTS, AND THE COURT'S INSTRUCTIONS
      VIOLATED THE FIFITH AND EIGHTH AMENDMENTS AND RESULTED
      IN A FUNDAMENTAL MISCARRIAGE OF JUSTICE ..................................... 62

IX.  CLAIM 8: THE ADMISSION OF GRUESOME VIDEOGRAPHIC EVIDENCE
      VIOLATED THE FIFITH AND EIGHTH AMENDMENTS AND RESULTED
      IN A FUNDAMENTAL MISCARRIAGE OF JUSTICE ..................................... 65

X.   CLAIM 9:  THE OFFENSE UNDERLYING MR. DUNCAN'S CONVICTION
      AND SENTENCE FOR FIREARM-USE MURDER IS VOID FOR VAGUENESS......... 72

XI.  CLAIM 10:  THE INVALIDITY OF THE APPELLATE WAIVER AND
      REFUSAL TO ALLOW WITHDRAWAL OF THE WAIVER PRECLUDES THE
      ASSERTED PROCEDURAL DEFAULT .......................................................... 75

   A.   Mr. Duncan's Challenges to the Waiver Proceedings Are Not Procedurally
         Barred ........................................................................................................ 76

   B.   The Purported Waiver Does Not Constitute an Adequate Procedural Bar
         Because It Was Neither Clear and Unequivocal, nor Knowing, Intelligent and
         Voluntary ................................................................................................... 79

      1.   Mr. Duncan Expressed No Clear and Unequivocal Desire That His Conviction
            and Sentence Not Be Appealed ............................................................... 81

      2.   Because Mr. Duncan Was Unaware His Failure to Endorse an Appeal of his
            Conviction and Sentence Would Itself Authorize a Competency Appeal,
            His Actions Cannot be Deemed Knowing and Intelligent ......................... 83

      3.   Mr. Duncan Completely Misapprehended the Long-Term Consequences
            of a Decision Not to Endorse an Appeal ................................................. 86

   C.   Whether Viewed as a Motion to Reinstate his Appeal or A Motion to Withdraw
         His Prior Motion for Voluntary Dismissal, the Ninth Circuit's Decision To Disallow
         Mr. Duncan's Endorsement of Appeal Is Not an Adequate Procedural Bar ................... 89

   D.   The *Teague* Doctrine is Inapplicable ............................................................ 99

XII. CLAIM 11: THE COMBINATION OF PROBLEMS AT EVERY STEP OF
      THE PROCEEDINGS DEPRIVED MR. DUNCAN OF FAIR AND RELIABLE
      PROCEEDINGS AND THE DUE PROCESS TO WHICH HE WAS ENTITLED.......... 100

XIII.CONCLUSION .............................................................................................. 101

1

## TABLE OF AUTHORITIES

2

**Federal Cases**

3

*Ancient Egyptian Arabic Order v. Michaux*, 279 U.S. 737 (1929) ................................. 4

4

*Anderson v. Allstate Ins. Co.*, 630 F.2d 677 (9th Cir. 1980) ........................................ 78

5

*Andrews v. United States*, 373 U.S. 334 (1963) ....................................................... 9

*Barrow v. Falck*, 977 F.2d 1100 (7th Cir. 1992) ................................................. 92, 95

6

*Beck v. Alabama*, 447 U.S. 625 (1980) ................................................................. 71

7

*Becker v. Montgomery*, 532 U.S. 757 (2001) ......................................................... 97

8

*Berman v. United States*, 378 U.S. 530 (1964) ...................................................... 94

9

*Betterman v. Montana*, 136 S. Ct. 1609 (2016) ...................................................... 48

*Bousley v. United States*, 523 U.S. 614 (1998) ....................................................... 1

10

*Bowles v. Russell*, 551 U.S. 205 (2007) ......................................................... 91, 95

11

*Brewster v. United States*, 437 F.2d 917 (9th Cir. 1970) ........................................... 76

12

*Brinkerhoff-Faris Tr. & Sav. Co. v. Hill* , 281 U.S. 673 (1930) ...................................... 4

*Browder v. Dir., Dep't of Corr.*, 434 U.S. 257 (1978) .............................................. 9

13

*Carter v. McCarthy*, 806 F.2d 1373 (9th Cir. 1986) ................................................ 85

14

*Caver v. Straub*, 349 F.3d 340 (6th Cir. 2003) ...................................................... 7

15

*Chaidez v. United States*, 568 U.S. 342 (2013) ...................................................... 8

16

*Chapman v. Moser*, 532 F.2d 426 (5th Cir. 1976) ................................................... 91

*Clemons v. Mississippi*, 494 U.S. 738 (1990) ...................................................... 100

17

*Coleman v. Thompson*, 501 U.S. 722 (1991) ......................................................... 94

18

*Danforth v. Minnesota*, 552 U.S. 264 (2008) ...................................................... 7, 8

19

*Davis v. Woodford*, 446 F.3d 957 (9th Cir. 2006) ................................................... 81

20

*Decker v. Tate*, 1992 U.S. App. LEXIS 20138 (6th Cir. Aug. 17, 1992) .............................. 91

21

*Dennis v. United States*, 339 U.S. 162 (1950) ...................................................... 57

*Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015) ............................................... 72, 73

22

*Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) .................................................... 61

23

*Edwards v. Carpenter*, 529 U.S. 446 (2000) ..................................................... 5, 79

24

*Estes v. Texas*, 381 U.S. 532 (1965) ................................................................ 60

*Estrada v. Scribner*, 512 F.3d 1227 (9th Cir. 2008) ................................................ 97

25

*Ex parte Tom Tong*, 108 U.S. 556 (1883) ......................................................... 8, 9

26

*Faretta v. California*, 422 U.S. 806 (1975) ......................................................... 48

27

*Fase v. Seafarers Welfare & Pension Plan*, 574 F.2d 72 (2nd Cir. 1978) ............................ 91

28

*Faust v. United States*, 1994 U.S. App. LEXIS 17119 (9th Cir. July 7, 1994) ....................... 91

*Foman v. Davis*, 371 U.S. 178 (1962) ................................................ 96, 97

*Ford v. Wainwright*, 477 U.S. 399 (1986) ................................................ 9

*Fruchtman v. Kenton*, 531 F.2d 946 (9th Cir.) ................................................ 85

*Futernick v. Sumpter Twp.*, 207 F.3d 305 (6th Cir. 2000) ............................. 92, 95

*Gardner v. Florida*, 430 U.S. 349 (1977) ................................................ 100

*George v. Black*, 732 F.2d 108 (8th Cir.1984) ................................................ 84

*Gilmore v. Utah*, 429 U.S. 1012 (1976) ................................................ 88

*Godinez v. Moran*, 509 U.S. 389 (1993) ................................................ 84

*Gooch v. Skelly Oil Co.*, 493 F.2d 366 (10th Cir. 1974) ................................. 91

*Gov't of the Virgin Is. v. Martinez*, 620 F.3d 321 (3rd Cir. 2010) .................... 95, 96

*Grady v. United States*, 929 F.2d 468 (9th Cir. 1991) ................................... 8

*Gray v. Netherland*, 518 U.S. 152 (1996) ................................................ 7

*Gregg v. Georgia*, 428 U.S. 153 (1976) ................................ 52, 53, 70, 71, 100

*Harris v. Pulley*, 885 F.2d 1354 (9th Cir. 1989) ........................................ 58

*Hayes v. Ayers*, 632 F.3d 500 (9th Cir. 2011) ........................................... 58

*Herrera v. Collins*, 506 U.S. 390 (1993) ................................................ 53

*Hollis v. Davis*, 941 F.2d 1471 (11th Cir. 1991) ........................................ 5

*House v. Bell*, 547 U.S. 518 (2006) ................................................ 5

*Howard v. United States*, 374 F.3d 1068 (11th Cir. 2004) ............................... 7

*Illinois v. Campbell*, 329 U.S. 362 (1946) ................................................ 10

*In re Murchison*, 349 U.S. 133 (1955) ................................................ 100

*In re Oliver*, 333 U.S. 257 (1948) ................................................ 100

*Indiana v. Edwards*, 554 U.S. 164 (2008) ................................................ passim

*Irvin v. Dowd*, 355 U.S. 717 (1961) ................................................ 60, 100

*Jenkins v. Anderson*, 447 U.S. 231 (1980) ................................................ 7

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ...................................... 72

*Jurek v. Texas*, 428 U.S. 262 (1976) ................................................ 100

*Kelly v. United States*, 29 F.3d 1107 (7th Cir. 1994) ................................... 2

*Kibert v. Peyton*, 383 F.2d 566 (4th Cir. 1967) ........................................ 38

*Kontrick v. Ryan*, 540 U.S. 443 (2004) ................................................ 95

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2nd Cir. 1991) ............................ 37

*LaFlamme v. Hubbard*, 225 F.3d 663 (9th Cir. 2000) ..................................... 30

*Lee v. Kemna*, 534 U.S. 362 (2002) ................................................ 7

*Lefrak v. Arabian Am. Oil Co.*, 527 F.2d 1136 (2nd Cir. 1975) ......................... 23, 24

*Lemke v. United States*, 346 U.S. 325 (1953) .................................................. 78

*Link v. Wabash R. Co.*, 370 U.S. 626 (1962) ................................................... 94

*Lockett v. Ohio*, 438 U.S. 586 (1978) ............................................................. 64

*Mack v. U.S. Postal Serv.*, 36 F.3d 1113 (Fed. Cir. 1994) ............................... 91

*Marlow v. Rollins Cotton Co.* (*In re Julien Co.*), 146 F.3d 420 (6th Cir. 1998) ...... 97

*Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152 (2000) ........... 53

*Martinez v. Court of Appeal*, 528 U.S. 152 (2000) .................................... 48, 53

*Martinez v. Ryan*, 566 U.S. 1 (2012) ............................................................. 99

*Martinez v. Trainor*, 556 F.2d 818 (7th Cir. 1977) ......................................... 91

*Massaro v. United States*, 538 U.S. 500 (2003) ........................................... 2, 6

*Massie v. Sumner*, 624 F.2d 72 (9th Cir. 1980) ............................................. 88

*McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001) ................................ 81, 82

*Montgomery v. Louisiana*, 136 S. Ct. 718 (2016) ............................................ 7

*Morrison-Knudsen Constr. Co. v. Dir.*, 461 U.S. 624 (1983) ......................... 101

*Munich v. United States*, 337 F.2d 356 (9th Cir. 1964) .................................. 84

*Murphy v. Florida*, 421 U.S. 794 (1975) ...................................................... 60

*Murray v. Carrier*, 477 U.S. 478 (1986) ......................................................... 5

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ............................. 4

*NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288 (1964) ................................ 4

*Old Chief v. United States*, 519 U.S. 172 (1997) .......................................... 71

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ................................................ 85, 86

*Parker v. Dugger*, 498 U.S. 308 (1991) ...................................................... 100

*Patton v. Yount*, 467 U.S. 1025 (1984) ........................................................ 60

*Powell v. Alabama*, 287 U.S. 45 (1932) .................................................. 56, 57

*Proffitt v. Florida*, 428 U.S. 242 (1976) ..................................................... 100

*Redwine v. Zuckert*, 317 F.2d 336 (D.C. Cir. 1963) ...................................... 85

*Reece v. Georgia*, 350 U.S. 85 (1955) ........................................................... 4

*Reed v. Farley*, 512 U.S. 339 (1994) ............................................................. 8

*Reina-Rodriguez v. United States*, 655 F.3d 1182 (9th Cir. 2011) .................. 11

*Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749 (1995) ................................ 10

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ................................................ 58, 59

*Roadway Express v. Piper*, 447 U.S. 752 (1980) ........................................... 23

*Rock v. Arkansas*, 483 U.S. 44 (1987) ........................................................... 9

*Rothgery v. Gillespie County*, 554 U.S. 191 (2008) ....................................... 11

*Sanchez v. United States*, 572 F.2d 210 (9th Cir. 1977) ........................................ 85

*Schlup v. Delo*, 513 U.S. 298 (1995) ........................................................................ 5

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ...................................................... 60, 87

*Shuti v. Lynch*, 828 F.3d 440 (6th Cir. 2016) .................................................... 74, 75

*Silagy v. Peters*, 905 F.2d 986 (7th Cir. 1990) ...................................................... 49

*Smith v. Barry*, 502 U.S. 244 (1992) ...................................................................... 97

*Smith v. United States*, 425 F.2d 173 (9th Cir. 1970) ............................................ 94

*Staub v. City of Baxley*, 355 U.S. 313 (1958) ........................................................ 4

*Stone v. United States*, 358 F.2d 503 (9th Cir. 1966) ............................................ 76

*Strickland v. Washington*, 466 U.S. 668 (1984) .............................................. 25, 100

*Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) .............................................. 84

*Teague v. Lane*, 489 U.S. 288 (1989) ....................................... 7, 11, 12, 54

*Torres v. Oakland Scavenger Co.*, 487 U.S. 312 (1988) .................................. 96, 97

*Torrey v. Estelle*, 842 F.2d 234 (9th Cir. 1988) ................................................ 84, 85

*Trest v. Cain*, 522 U.S. 87 (1997) ...................................................................... 6, 7

*Trevino v. Thaler*, 569 U.S. 413 (2013) ................................................................ 99

*Tumey v. Ohio*, 273 U.S. 510 (1927) ................................................................... 100

*Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453 (6th Cir. 1998) ......... 91, 92, 93

*Turner v. Murray*, 476 U.S. 28 (1986) ................................................................... 55

*U.S. Nat'l Bank v. Indep. Ins. Agents of Am.*, 508 U.S. 439 (1993) ......................... 2

*United States v. Arevalo*, 408 F.3d 1233 (9th Cir. 2005) ........................... 92, 93, 94, 95

*United States v. Bonahoom*, 484 F.3d 1003 (8th Cir. 2007) ................................... 91

*United States v. Brownlie*, 915 F.2d 527 (9th Cir. 1990) ....................................... 84

*United States v. Byfield*, 522 F.3d 400 (D.C. Cir. 2008) ........................................ 96

*United States v. Christnas*, 126 F.3d 765 (6th Cir. 1997) ...................................... 91

*United States v. Cochran*, 770 F.2d 850 (9th Cir. 1985) ....................................... 84

*United States v. Connolly*, 618 F.2d 553 (9th Cir. 1980) ...................................... 85

*United States v. Conte*, 489 F.2d 266 (9th Cir. 1974) ........................................... 84

*United States v. Cronic*, 466 U.S. 648 (1984) ...................................................... 11

*United States v. Davis*, 285 F.3d 378 (5th Cir. 2002) ............................... 49, 52, 53

*United States v. Dies*, 246 F.3d 677 (9th Cir. 2000) ............................................... 1

*United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011) ................................... 77, 89

*United States v. Evers*, 569 F.2d 876 (5th Cir. 1978) ........................................... 98

*United States v. Ferguson*, 560 F.3d 1060 (9th Cir. 2009) .................................... 99

*United States v. Frank*, 956 F.2d 872 (9th Cir. 1992) .................................................... 34

*United States v. Frias*, 521 F.3d 229 (2nd Cir. 2008) ............................................. 95, 96

*United States v. Garduno*, 506 F.3d 1287 (10th Cir. 2007) ........................................ 96

*United States v. Garrett*, 680 F.2d 64 (9th Cir. 1982) ............................................... 84

*United States v. Gaytan-Garza*, 652 F.3d 680 (6th Cir. 2011) ................................. 96

*United States v. Harris*, 534 F.2d 141 (9th Cir. 1976) ............................................. 84

*United States v. Hernandez*, 203 F.3d 614 (9th Cir. 2000) ................................. 12, 99

*United States v. Hirsch*, 207 F.3d 928 (7th Cir. 2000) .............................................. 91

*United States v. Houser*, 804 F.2d 565 (9th Cir. 1986) ............................................. 91

*United States v. Hubbard*, 96 F.3d 1223 (9th Cir. 1996) .......................................... 48

*United States v. Isom*, 85 F.3d 831 (1st Cir. 1996) ................................................... 81

*United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005) .......................... 69

*United States v. Lopez*, 562 F.3d 1309 (11th Cir. 2009) ........................................... 96

*United States v. Lujan*, 603 F.3d 850 (10th Cir. 2010) ........................................ 69, 70

*United States v. Machado*, 465 F.3d 1301 (11th Cir. 2006) ...................................... 91

*United States v. Makris*, 535 F.2d 899 (5th Cir. 1976) ............................................. 38

*United States v. Marbley*, 81 F.3d 51 (7th Cir. 1996) ............................................... 91

*United States v. Martinez*, 496 F.3d 387 (5th Cir. 2007) ..................................... 95, 96

*United States v. McKenna*, 327 F.3d 830 (9th Cir. 2003) .......................................... 76

*United States v. Mezzanatto*, 513 U.S. 196 (1995) ................................................. 2, 3

*United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007) ........................................... 48

*United States v. Mitchell*, 518 F.3d 740 (10th Cir. 2008) ......................................... 96

*United States v. Morgan*, 346 U.S. 502 (1954) .......................................................... 9

*United States v. Muhammud*, 701 F.3d 109 (3rd Cir. 2012) ...................................... 96

*United States v. Neff*, 598 F.3d 320 (7th Cir. 2010) .................................................. 95

*United States v. Olano*, 507 U.S. 725 (1993) ............................................................. 2

*United States v. Outen*, 286 F.3d 622 (2nd Cir. 2002) .............................................. 92

*United States v. Pulido*, 566 F.3d 52 (1st Cir. 2009) ................................................ 81

*United States v. Rapoport*, 159 F.3d 1 (1st Cir. 1998) .............................................. 91

*United States v. Robinson*, 361 U.S. 220 (1960) ...................................................... 91

*United States v. Robinson*, 844 F.3d 137 (3rd Cir. 2016) ......................................... 74

*United States v. Rose*, 215 F.2d 617 (3rd Cir. 1954) ................................................ 38

*United States v. Rubalcaba*, 811 F.2d 491 (9th Cir. 1987) .................................. 84, 85

*United States v. Runge*, 593 F.2d 66 (8th Cir. 1979) ................................................ 91

*United States v. Sadler*, 480 F.3d 932 (9th Cir. 2007) .................................................. 96

*United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007) ............................................... 69

*United States v. Sanchez-Cervantes*, 282 F.3d 664 (9th Cir. 2002) ............................ 8

*United States v. Taveras*, 488 F. Supp. 2d 246 (E.D.N.Y. 2007) ............................... 69

*United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016) ............................................... 74

*United States v. Urutyan*, 564 F.3d 679 (4th Cir. 2009) ............................................. 95

*United States v. Veatch*, 674 F.2d 1217 (9th Cir. 1981) ............................................. 76

*United States v. Watson*, 623 F.3d 542 (8th Cir. 2010) .............................................. 96

*United States v. West*, 2013 U.S. App. LEXIS 26197 (6th Cir. Apr. 11, 2013) .......... 96

*United States v. Woodley*, 732 F.2d 111 (9th Cir. 1984) ............................................ 85

*United States v. Wunsch*, 84 F.3d 1110 (9th Cir. 1996) .............................................. 24

*Von Moltke v. Gillies*, 332 U.S. 708 (1948) ................................................................ 81

*Wainwright v. Witt*, 469 U.S. 412 (1985) .................................................................... 57

*Waley v. Johnston*, 316 U.S. 101 (1942) ....................................................................... 2

*Ward v. Bd. of County Comm'rs*, 253 U.S. 17 (1920) .................................................. 4

*Welch v. United States*, 136 S. Ct. 1257 (2016) ..................................................... 8, 72

*Welch v. United States*, ___ U.S. ___ (2016) ............................................................. 75

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ............................................................... 76

*Williams v. Boeing Co.*, 681 F.2d 615 (9th Cir. 1982) ........................................... 91, 93

*Williams v. Taylor*, 529 U.S. 362 (2000) ..................................................................... 12

*Williams v. United States*, 553 F.2d 420 (5th Cir. 1977) ........................................ 91, 92

*Witherspoon v. Ill.*, 391 U.S. 510 (1968) ..................................................................... 58

*Wolfe v. North Carolina*, 364 U.S. 177 (1960) .............................................................. 4

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ............................................... 24, 100

*Wright v. West*, 505 U.S. 277 (1992) ........................................................................... 10

*Yen Zheng Zheng v. Mukasey*, 546 F.3d 70 (1st Cir. 2008) ............................... 91, 92, 93

**Federal Statutes**

18 U.S.C. § 16(b) .................................................................................................... 73, 74

18 U.S.C. § 72 ............................................................................................................... 45

18 U.S.C. § 77 ............................................................................................................... 47

18 U.S.C. § 924(c) ................................................................................................ 72, 73, 74

18 U.S.C. § 924(e) .................................................................................................... 72, 74

18 U.S.C. § 924(j)(1) ..................................................................................................... 73

18 U.S.C. § 2255 ...................................................................................................... 65, 72

18 U.S.C. § 3006A ................................................................................ 13

18 U.S.C. § 3592(c)(6) ......................................................................... 73

18 U.S.C. § 3593(c) ............................................................... 64, 69, 70

18 U.S.C. § 3595(a) ............................................................................. 90

18 U.S.C. § 4241 ................................................................................. 44

28 U.S.C. § 16 ..................................................................................... 74

28 U.S.C. § 16(b) ................................................................... 73, 74, 75

28 U.S.C. § 636(c) .............................................................................. 93

28 U.S.C. § 2107(a) ............................................................................ 95

28 U.S.C. § 2254 ................................................................................... 9

28 U.S.C. § 2255 ......................................................................... *passim*

**State Cases**

*Barnes v. State*, 29 So. 3d 1010 (Fla. 2010) ..................................... 49

*Cardenas v. Superior Court of L.A. County*, 56 Cal. 2d 273, 363 P.2d 889 (1961) ................... 98

*MacPherson v. State*, 533 P.2d 1103 (Alaska 1975) ......................... 98

*People v. Catten*, 69 N.Y.2d 547 (1987) ........................................... 98

*State v. Himes*, 153 Fla. 711, 15 So. 2d 613 (1943) ......................... 98

*State v. Hurd*, 496 N.W.2d 274 (Iowa Ct. App. 1992) ...................... 98

*State v. Reddish*, 181 N.J. 553, 859 A.2d 1173 (2004) ..................... 49

*Walker v. State*, 262 Ark. 331 (1977) ............................................... 98

**Other**

*Edwards: The Prospect of A Heightened Competency Standard for Pro Se Defendants*, 84 U. Colo. L. Rev. 433 (2013) ................................................... 32, 34

Fed. R. App. P. 3(a)(2) ........................................................................ 97

Fed. R. App. P. 3-4 ............................................................................. 90

Fed. R. App. P. 4(a) ............................................................................ 95

Fed. R. App. P. 4(b) ............................................................................ 95

Fed. R. App. P. 4(b)(1)(A) .................................................................. 90

Fed. R. App. P. 42 .............................................................................. 93

Fed. R. App. P. 42(b) .......................................................................... 93

Fed. R. App. P. 43 .............................................................................. 98

Fed. R. Civ. P. 54(b) ..................................................................... 93, 94

Fed. R. Evid. 403 ................................................................................ 69

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

G. Strafer, *"Volunteering for Execution: Competency, Voluntariness and the Propriety of Third Party Intervention,"* 74 J. Crim. L. & Criminology 860 (1983) .................................. 88

R. Hertz & J. Liebman, *Federal Habeas Corpus Practice and Procedure* § 26.2b (7th ed. 2017) ........................................................................................................... 10

U.S. Const. amend. VI ........................................................................................... 13

U.S. Const. amend. VIII ......................................................................................... 13

Comes now, Petitioner, JOSEPH EDWARD DUNCAN, III, by and through undersigned counsel, and submits this reply to the government's response in opposition to petitioner's Motion for collateral relief.

## I.    INTRODUCTION

In his § 2255 Motion, Mr. Duncan demonstrated that his capital trial proceedings were plagued by multiple, interlocking errors, which combined to produce a death sentence obtained absent meaningful adversarial testing or compliance with critical procedural safeguards intended to insure the reliability of death penalty procedures.  In its Answer, the government has mischaracterized the record and misconstrued events that occurred during Mr. Duncan's proceedings in an effort to convince this court that the myriad errors that permeated the entire trial process were inconsequential.  Mr. Duncan will address the government's arguments as necessary, *supra*.  Mr. Duncan continues to rely on the arguments and authority detailed in his § 2255 Motion.

## II.    THE GOVERNMENT'S ASSERTED AFFIRMATIVE DEFENSES SHOULD BE REJECTED

In addition to addressing Mr. Duncan's claims on the merits throughout the Answer, the government asserts the affirmative defense of procedural default and nonretroactivity as to various claims and subclaims.  For convenience's sake, Mr. Duncan will provide a consolidated discussion here, supplementing it as necessary in the course of replying to individual claims.

### A.  Procedural default

As the government notes, Answer at 11, the general rule is that collateral review is unavailable for issues that could have been, but were not, raised on appeal.  *See Bousley v. United States*, 523 U.S. 614, 621 (1998); *United States v. Dies*, 246 F.3d 677 (9th Cir. 2000).  The procedural default rule does not apply, however, to claims of ineffective assistance of

counsel not raised on direct appeal, even if the claims could have been raised on direct appeal.
*See, e.g., Massaro v. United States*, 538 U.S. 500, 504 (2003) ("an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal"). Claims that are largely record based but cannot be adequately presented without further factual development are not barred by failing to appeal. *See Waley v. Johnston,* 316 U.S. 101, 104 (1942) (*per curiam*) (refusing bar a claim that that a guilty plea had been coerced by threats made by a government agent, when the facts were "dehors the record and their effect on the judgment was not open to consideration and review on appeal").

As a matter of federal law, some claims are not subject to waiver. A court's lack of subject matter jurisdiction is a nonwaivable defect. *See, e.g.*, *Kelly v. United States*, 29 F.3d 1107, 1112–14 (7th Cir. 1994) ("[b]ecause jurisdictional defects are nonwaivable," section 2255 movant did not have to show "cause" and "prejudice" to raise unpreserved claim that the government's violation of notice provisions deprived court of jurisdiction to enhance sentence). Also unwaivable may be a court's action under a statute that has been repealed. *See United States Nat'l Bank v. Independent Ins. Agents*, 508 U.S. 439, 447 (1993) (if one or more parties claim rights under a law, then parties may not waive question of "'the existence of [the] law'" (quoting *Town of South Ottawa v. Perkins*, 94 U.S. 260, 267 (1877))). In fact, a reviewing court may be authorized to address various "issue[s] 'antecedent to … and ultimately dispositive of' the dispute … , [including] even an issue the parties fail to identify and brief." *United States Nat'l Bank*, 508 U.S. at 447 (quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990)). *See also United States v. Olano*, 507 U.S. 725, 737 (1993) (government "supposes" that Fed. R. Crim. P. 24(c) forbidding alternate jurors to view deliberations "is nonwaivable"). *See generally United States v. Mezzanatto*, 513 U.S. 196, 201, 204, 205, 206 & n.4, 209 & n.6, 210 (1995)

(courts may find rights nonwaiveable based on: (1) "specific common-law history" of nonwaiveability (citing right to presence at trial); (2) only partial allowance for waiver in provision creating right (citing provision making right to indictment waiveable in noncapital cases, suggesting it is not waiveable in capital cases); (3) right's "fundamental [contribution] to the reliability of the fact-finding process [such] that they may never be waived without irreparably 'discredit[ing] the … courts' " (citing right to "conflict-free counsel" and to trial before fair and competent decisionmaker); (4) right's status as " 'some minimum of civilized procedure … required by community feeling regardless of what the defendant wants or is willing to accept' "; (5) right's contribution to "truth-seeking function of trials"; (6) right's premise " 'that our … system should be given a stable and constant structure … that cannot be varied by a court with or without the consent of the parties' " (quoting *United States v. Olano*, 507 U.S. at 742, and citing rule forbidding alternate jurors to be present during jury deliberations); (7) absence of evidence that controlling provision "contemplate[s] a degree of party control … consonant with the background presumption of waivability"; (8) "structure and legislative history of [controlling provision] … evinc[ing] a specific 'legislative policy' of 'prevent[ing] private contracts' on such matters" (quoting *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 706 (1945)); (9) showing that waiveability is "fundamentally inconsistent"—or "empirical support" for prediction that it will "interfere"—with "goal" pursued by underlying right; (10) " 'clear evidence' " that waiveability would lead to "abuse of prosecutorial … power"); *id.* at 212–18 (Souter, J., dissenting) (right's legislative and common law "history may have something to say" about nonwaiveability; waiveability is inappropriate when it is inconsistent with policy underlying right and when waiver of right has hidden consequence of "waiver of trial itself"). Even where defaults have been imposed against a waivable claim, they must pass additional criteria before being deemed adequate to bar federal collateral review.  For example, procedural

requirements that are not "firmly established and regularly followed" are inadequate to bar

federal review. *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting *Beard v. Kindler*, 558 U.S.

53, 60 (2009).  *See also James v. Kentucky*, 466 U.S. 341, 348 (1984).  In addition, a federal

court is obligated to look beyond an earlier court's mere imposition of a procedural default to

determine whether the petitioner in fact "substantially complied" with procedural requirements.

*Lee v. Kemna*, 534 U.S. 362, 366 (2002) "(We hold that petitioner Lee, having substantially, if

imperfectly, made the basic showings [the state procedural rule], qualifies for adjudication of his

federal, due process claim.")  An asserted depend on a formal "ritual ... [that] would further no

perceivable state interest." *Osborne v. Ohio,* 495 U.S. 103, 124 (1990) (quoting *James v.*

*Kentucky*, 466 U.S. at 349 (in turn quoting *Staub v. City of Baxley*, 355 U.S. 313, 320 (1958)).  In

some instances, defaults that are imposed only as a matter of discretion are inadequate to bar

federal collateral review.  *Beard v. Kindler*, *supra*.

Indeed, the invocation of a procedural bar may be "inadequate" to bar collateral review

for any number of reasons; there is no one all-encompassing test of adequacy.  *See* generally,

16B Wright & Miller, §§ 4024-28 (1996); R. Hertz & J. Liebman, *Federal Habeas Corpus*

*Practice and Procedure* § 26.2b (7th ed. 2017).  The Supreme Court has found state law grounds

for a decision inadequate in a variety of settings, including cases where the state procedural rule

violated due process, *Reece v. Georgia*, 350 U.S. 85 (1955); *Brinkerhoff-Faris Trust & Sav. Co.*

*v. Hill*, 281 U.S. 673 (1930), lacked fair and substantial support in the facts, *Wolfe v. North*

*Carolina*, 364 U.S. 177, 185 (1960); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 455

(1958); *Ward v. Board of County Comm'rs of Love County*, 253 U.S. 17 (1920); *Ancient*

*Egyptian Arabic Order of Nobles of the Mystic Shrine v. Michaux*, 279 U.S. 737 (1929), or

lacked support in prior state practice, *Staub v. City of Baxley*, 355 U.S. 313, 319-20 (1958);

*NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288 (1964).

Where a court concludes an adequate procedural bar has been legitimately imposed, the bar will still not immunize the claim from collateral review where the petitioner shows cause and prejudice for the default.  *See House v. Bell,* 547 U.S. 518, 536 (2006); *Hollis v. Davis,* 941 F.2d 1471, 1476 (11th Cir.1991). In addition, there is a miscarriage of justice exception, which is based on the notion "that the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration." *Id.* (internal quotation marks omitted).  The Supreme Court has "not identified with precision exactly what constitutes 'cause' to excuse a procedural default." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Nevertheless, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrie*r, 477 U.S. 478, 488 (1986).

Under this miscarriage of justice exception, a prisoner asserting "actual innocence" as a gateway to a defaulted claim must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo,*  513 U.S. 298, 327 (1995); *see Bell,* 547 U.S. at 539 (holding that the *Schlup* standard applies to defaulted sentencing-related claims) or that honoring the bar would result in a manifest miscarriage of justice.

Not surprisingly, the government alleges that certain record-based claims are procedurally defaulted by virtue of Mr. Duncan's purported waiver of appeal, such as Claim 7 (future dangerousness), Answer at 91, and Claim 8 (admission of prejudicial videographic evidence), Answer at 91.  Taking an expansive, erroneous view of claims that could have or should have been presented on appeal, the government also asserts that virtually every claim (or in some instances only certain subclaims) are procedurally barred:  Claim 1 (ineffective

assistance of trial counsel), Answer at 33; Claim 2 (off the record discussions with Mr. Peven), Answer at 50; various aspects of Claims 3 and 4 (incompetency at various stages) Answer at 60-61; Claim 5 (inapplicability of *Faretta*); Claim 6 (ineffective assistance of counsel related to venue), Answer at 88; Claim 10 (challenges to the appeal waiver), Answer at 121; and Claim 12 (unconstitutionality of the federal death penalty statute), Answer at 130.

The discussion of the reasons why Claims 7 and 8 are not procedurally barred appears as part of the reply to Claim 10. In addition to those reasons the court should reject the government's invocation of procedural bar as to Claims 1, 2, 5 and 6 because they are expressly or essentially ineffective assistance of counsel claims. The government's assertion that some aspects of Claim 1 are only under the "guise" of ineffectiveness, Answer at 33, is irrelevant under *Massaro v. United States*, *supra*, 538 U.S. at 504. Moreover, Claim 1 and Claim 2 rely *extensively* on extra record evidence, as do Claim 6 and Clam 8, albeit to a lesser extent. Arguably, if Claim 12 were a facial challenge it might be subject to procedural default. But it is very much an as-applied challenge also relying on extensive extra-record evidence. The confused additional assertions of procedural defaults as to Claims 3, 4 and 10 are discussed there.

The Answer criticizes petitioner for failing to preemptively address the exceptions to the procedural default doctrine. *See, e.g.*, Answer at 33 ("Duncan makes no effort to demonstrate that his claims fall within an exception to the default doctrine"); *id*. at 88 (same); *id*. at 50 ("Duncan fails to establish, or even to argue, that cause and prejudice excuse his default"); *id*. at 60 ("Duncan's failure to acknowledge the cause and prejudice requirement … likely reflects the impossibility of satisfying the requirement."

The government's criticism is misplaced. Procedural default is an affirmative defense that, if not timely and properly raised by the government, is waived. *Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[P]rocedural default is normally a defense that the state is obligated to raise and

1  preserve if it is not to lose the right to assert the defense thereafter"); *accord Gray v. Netherland*,

2  518 U.S. 152, 165–66 (1996); *see also Lee v. Kemna*, 534 U.S. 362, 376 n.8 (2002) (state waived

3  procedural default by failing to assert the defense on federal appeal or in its brief in opposition to

4  petition for certiorari); *Jenkins v. Anderson*, 447 U.S. 231, 234 n.1, 100 S. Ct. 2124, 65 L. Ed. 2d

5  86 (1980) (declining to consider the state's procedural default argument because it was not raised

6  below); *Howard v. United States.*, 374 F.3d 1068, 1073 (11th Cir. 2004) (government's failure to

7  assert procedural default defense in district court constituted a waiver of the defense); *Caver v.

8  Straub*, 349 F.3d 340, 345–46 (6th Cir. 2003) (same).  By asserting Claim 10, which functions

9  largely as a gateway through the procedural default dense, Mr. Duncan implicitly anticipated the

10  assertion of the defense.  He had no obligation to do more in the Motion.

11  ### B.  Non-retroactivity

12  The government also asserts the "*Teague* nonretroactivity doctrine" as an affirmative

13  defense to several of Mr. Duncan's claims.  Under the plurality decision of *Teague v. Lane*, 489

14  U.S. 288 (1989), a federal habeas court may not enforce against the state courts a new rule of

15  criminal procedure if the new rule was announced after the petitioner's state court conviction

16  became final or if the petitioner is seeking to establish a wholly new rule or to apply settled

17  precedent in a novel way that would result in the creation of a new rule.  *See, e.g., Danforth v.

18  Minnesota*, 552 U.S. 264, 266 (2008).  The *Teague* doctrine is expressly rooted in concerns about

19  federalism and comity.  *See, e.g., Teague*, 489 U.S. at 308-10 (O'Connor, J., plurality opinion)

20  (justifying the nonretroactivity rule by noting that "interests of comity and finality must... be

21  considered in determining the proper scope of habeas review"); *Montgomery v. Louisiana*, 136 S.

22  Ct. 718, 736, 193 L. Ed. 2d 599 (2016) ("*Teague* sought to balance the important goals of finality

23  and comity with the liberty interests of those imprisoned pursuant to rules later deemed

24  unconstitutional.")

1    Although the Ninth Circuit has held that *Teague* acts to limit the ability of federal

2    petitioners to obtain the retroactive benefit of newly-created procedural rules, *United States v.*

3    *Sanchez-Cervantes*, 282 F.3d 664, 667–68 (9th Cir. 2002), the Supreme Court has never resolved

4    the question.  *See Welch v. United States*, 136 S. Ct. 1257, 1264 (2016) ("The parties here

5    assume that the *Teague* framework applies in a federal collateral challenge to a federal

6    conviction as it does in a federal collateral challenge to a state conviction, and we proceed on

7    that assumption.").  *See also Chaidez v. United States*, 568 U.S. 342, 358, n. 16 (2013); *Danforth*

8    *v. Minnesota*, *supra*, 552 U.S. at 269, n. 4.  Because principles of federalism are not implicated

9    by 28 U.S.C. § 2255, there are solid reasons for concluding *Teague* may not apply.

10    When Congress adopted § 2255 in 1948, the Senate Judiciary Committee contrasted that

11    procedure with the civil and collateral habeas corpus remedy, describing § 2255 as being "*in the*

12    *criminal proceeding* [such that] this section affords the opportunity and expressly gives the broad

13    powers," typically given criminal judges after trial but not given habeas corpus judges after

14    appeal, "to set aside the judgment" and to "discharge the prisoner or resentence him or to grant a

15    new trial or correct the sentence as may appear appropriate." S. Rep. 1526, 80th Cong., 2d Sess.

16    2 (1948) (emphasis added). *Compare* Advisory Committee Notes to Rule 1 of the Rules

17    Governing Section 2255 Proceedings for the United States District Courts ("1976 Adoption")

18    ("Motion under § 2255 is a further step in the movant's criminal case and not a separate civil

19    action") and, *e.g.*, *Reed v. Farley*, 512 U.S. 339, 362 n.4 (1994) (Blackmun, J. dissenting)

20    ("§ 2255 requires a prisoner to file his motion in the court that imposed his sentence, as a further

21    step in his criminal case, not as a separate civil action") *and Grady v. United States*, 929 F.2d

22    468, 470–71 (9th Cir. 1991) (challenges to probation revocation generally are not cognizable in

23    section 2255 proceedings because such proceedings are "further step in a … criminal case rather

24    than a separate civil action") *with Ex parte Tom Tong*, 108 U.S. 556, 560 (1883) (habeas corpus

motion is *not* part of criminal process and initiates separate, *civil* proceeding). Thus, section 2255 judges wield a trial judge's power, withheld from section 2254 judges, to release prisoners on grounds of insufficient evidence, and retrial relief ordered under section 2255, unlike section 2254, immediately nullifies the original judgment and returns the case to the pretrial stage so that no appealable final judgment exists. *See Andrews v. United State*s, 373 U.S. 334, 340 (1963).  *Cf. Browder v. Director*, 434 U.S. 257, 265–67 (1978) (habeas corpus relief requiring retrial is final order appealable before retrial).  In addition, section 2255's drafters designed it to "restate[ ], clarif[y] and simplif[y] the procedure in the nature of the ancient writ of coram nobis," 1948 Revisor's Note to 28 U.S.C. § 2255, which has long been treated as part of the original criminal process. *See United States v. Morgan*, 346 U.S. 502, 505 n.4 (1954).

Although the government seeks to characterize many of Mr. Duncan's contentions as novel, new or unsupported, what constitutes a "new rule" for *Teague* purposes can be very unclear.  The confusion over the definition of "new rules" begins with the plurality opinion in *Teague v. Lane* itself. There, the plurality acknowledges that "[i]t is … often difficult to determine when a case announces a new rule," then sets back analysis by offering conflicting characterizations:

> In general, … a case announces a new rule when [1] it breaks new ground or imposes a new obligation on the States or the Federal Government. See, *e.g.*, *Rock v. Arkansas*, 483 U.S. 44 (1987) (*per se* rule excluding all hypnotically refreshed testimony infringes impermissibly on a criminal defendant's right to testify on his behalf); *Ford v. Wainwright*, 477 U.S. 399, 410 (1986) (Eighth Amendment prohibits the execution of prisoners who are insane). To put it differently, a case announces a new rule if [2] the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

> Obviously, the *Teague* plurality's first definition—a "new" rule is one that "breaks new ground or imposes a new obligation"—tends towards the end of the spectrum of "new rule" definitions occupied by relatively rare overrulings (which the *Ford v. Wainwright* decision was) and announcements of rules to govern newly arisen procedural innovations (which, arguably, the *Rock v. Arkansas* decision was). To this extent, *Teague* uses the perspective of judges with an average proclivity for deciding in the prosecution's favor and fits easily within a long line of prior retroactivity decisions defining new rules as ones that

"overrul[e] clear past precedent on which litigants may have relied … or … decid[e] an issue of first impression whose resolution was not clearly foreshadowed.

R. Hertz & J. Liebman, *Federal Habeas Corpus Practice and Procedure, supra*, § 25.5 (footnotes omitted).

In a concurring opinion in *Wright v. West*, 505 U.S. 277 (1992), Justice Kennedy wrote:

If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule … . Where [as in the rule at issue in *Wright v. West*, the "mixed question" standard of *Jackson v. Virginia* for sufficiency-of-the-evidence claims] the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.

*Id*. at 308-09.  (Kennedy, J., concurring in judgment). *See also Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 761–64 (1995) (Kennedy, J., concurring in judgment, joined by O'Connor, J.) (reiterating view in *Wright v. West* that application of "clear and certain standard" to new facts, "'mere application of … existing precedent,'" or "'application of precedent which directly controls is not the stuff of which new law is made'" (quoting *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 112 (1993) (Kennedy, J., concurring in part and concurring in judgment))).

In *(Terry) Williams v. Taylor*, 329 U.S. 362 (2000), the Court majority expressly relied upon Justice Kennedy's *Wright v. West* concurrence in declaring that the application of a "mixed question" rule to a new fact pattern does not amount to the announcement of a "new" rule.  And in a combination of majority and concurring opinions, all members of the *Williams* Court agreed that the application of the legal standard for claims of ineffective assistance of counsel—a classic "mixed question"—would not produce a "new rule" even when applied to a factual context that is materially different from the one in *Strickland v. Washington*.

The government's Answer makes frequent references to *Teague*, most of which are at best half-hearted.  There are since instances in which the government invokes the *Teague* nonretroactivity doctrine, such as:

1.  With regard to Claim 1, which in the midst of its 34 pages, makes a three-sentence reference to the presumption of prejudice under *United States v. Cronic*, 466 U.S. 648 (1984), the government makes the following *Teague* "argument" stated in its entirety: "[A]ny attempt to extend *Cronic* to this situation would require a retroactive application of a new rule of law, forbidden by *Teague v. Lane*. *See Reina-Rodriguez v. United States*, 655 F.3d 1182, 1187 (9th Cir. 2011)."  Answer at 37.

The citation to *Reina-Rodriguez* is perplexing.  *Reina-Rodriguez (*which says nothing about *Cronic*, presumed prejudice or anything of the kind) is a case in which the government lost its *Teague* argument, and to the extent that the case is relevant, it is that is supports petitioner's position.  Among other reasons for the decision, the Ninth Circuit concluded that the issue in the case – the proper characterization under the Armed Career Criminal Act of a Utah State burglary conviction – like the issue here, did not involve a new rule of constitutional criminal procedure.

2.  With regard to Claim 4, which argues that Mr. Duncan was incompetent to represent himself under *Indiana v. Edwards*, 554 U.S. 208 (2008), the government cites *Teague* only prophylactically:  "To the extent Duncan suggests that any standard of competence greater than that recognized in *Edwards* applies (that is, a district court's discretion, based on its own observations of a gray-area defendant, to impose or not to impose counsel), such a suggestion runs afoul of *Teague*'s limitation of collateral relief to established law."  Answer at 75.

Mr. Duncan's argument involves the proper application of *Edwards* to his case, not an extension of *Edwards*.

3.  As to Claim 5, the government provides at least some argument:  "[H]aving failed to identify any existing authority to support his arguments, Duncan necessarily premises his request for relief on a newly-conceived rule of criminal procedure prohibited by *Teague v. Lane*, 489 U.S. 288, 310 (1989). …Here, no authority compelled Duncan's proposed rule at the time this case became final. Indeed, the present legal landscape bars relief, and the law will continue to do so absent some unforeseen Supreme Court action that curtails the right announced in *Faretta*. Given the absence of any existing rule to support Duncan's claim, he could not obtain relief unless the Supreme Court announced some new watershed rule between now and the time this Court rules."  Answer at 83-84.

The reasons relief under Claim 5 is not barred under the nonretroactively doctrine will be found in the reply to Claim 5.

4.  As to Claim 7, which alleges violations of Due Process and the Eighth Amendment's guarantee of death-sentencing reliability, the government similarly argues: "Having failed to identify any existing authority to support his complaints about the other crimes evidence, the instructions, or the prosecution's argument,

1

2

3

Duncan necessarily premises his request for relief on a newly-conceived rule of criminal procedure. *Teague v. Lane*, 489 U.S. 288, 310 (1989), prohibits this. ... Here, no existing authority compels a rule that would support Duncan's claims for relief. Given the absence of any authority to support his claims, Duncan cannot obtain relief or take advantage of any exception to *Teague*." Answer at 103.

4

5

As in *(Terry) Williams v. Taylor, supra*, Claim 7 involves the application of a "mixed question" rule to a new fact pattern.

6

7

8

5.  The government's invocation of *Teague* as to Claim 8 is relegated to a footnote and may be an actual afterthought: "The argument that, based on potential trauma to the factfinder, the Court should lessen the power of evidence is also a novel argument, and thus not cognizable under *Teague v. Lane*, 489 U.S. 288, 310 (1989)." Answer at 109, n. 34.

9

10

To argue the relevance of the actual impact, as opposed to mere potential impact, of evidence that is more prejudicial than probative is not to argue for a new rule of constitutional procedure. *Teague* is not a case about the admissibility of evidence in federal court.

11

12

13

14

15

16

17

6.  As to Claim 10, involving Mr. Duncan's challenges to the purported appellate waiver, the government argues: "Assuming, arguendo, Duncan could raise his procedurally-barred and meritless contentions about the waiver of his appeal, relief under his theories would require resort to a previously-unannounced procedural rule in derogation of *Teague v. Lane*, 488 [sic: 489] U.S. 288 (1989). To grant relief, this Court would have to rely on a previously-unarticulated rule that required, inter alia, unconditional statements by a defendant waiving appeal. Given that such a rule would contradict existing circuit authority, it certainly constitutes a novel legal proposition. *See Hernandez*, 203 F.3d at 621-22. ... Alternatively, relief might hinge on a previously-unannounced right to advice on collateral consequences. Given the absence of any existing authority to support Duncan's theories, and the omission of any effort by him to identify an exception to the *Teague* bar, relief should not lie." Answer at 128-29.

18

19

20

The reasons *Teague* does not bar relief as to Claim 10 is discussed in the reply thereto.  To state it briefly, however, the assertion that Mr. Duncan's arguments contravene existing authority regarding "unconditional" waivers and "collateral consequences" are based on mischaracterizations of relevant law.

21

22

23

24

25

26

27

As in the case of the government's assertion of the procedural default defense, as revealed by some of the quotations above, the government is at times in appropriately critical of petition for failing to include an anticipatory argument that *Teague* does not apply.  In none of the instances detailed above, does the government attempt to identify what new rule would need to be created to grant Mr. Duncan relief.  As shown above and *infra*, in no instance are concerns about the creation of new rules of constitutional procedure implicated.

28

III.   **CLAIM 1: MR. DUNCAN WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006A AND THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND HIS RIGHT TO A RELIABLE DEATH JUDGMENT AS GUARANTEED BY THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY THE MULTIPLE PREJUDICIAL ERRORS AND OMISSIONS OF TRIAL COUNSEL, ALL OF WHICH WERE EXACERBATED BY THE ERRONEOUS AND PREJUDICIAL RULINGS OF THE COURT**

The government's response to Mr. Duncan's ineffectiveness claim can be summed up by these three refrains: 1) Duncan had experienced defense counsel, including the country's top capital litigator, so they cannot have performed deficiently; 2) Duncan pled guilty so any possible deficiency by counsel is moot; and 3) given the facts of the crime, there can be no prejudice based on any errors or omissions of counsel. *See* Answer at 15-49.[1]  In highlighting those themes, the government gives short shrift to many of the points raised by Mr. Duncan.

*Defense Counsel:*

*Judy Clarke*

Quite predictably, the government makes much of Judy Clarke's involvement in the case. Answer at 16.  Ms. Clarke's reputation as an exceptional capital litigator is well-earned.  In virtually all of the cases in which she has been counsel, her clients have been spared the death penalty.  Her outstanding record is not the result of taking the "easy" cases. Ms. Clarke's reputation was built, in large part, on her willingness to take on the most challenging cases.  The government refers to several of Ms. Clarke's federal capital cases in support of their point that she has enjoyed a successful career in capital defense.  For example, the government cites the *Kaczynski* case.  In 1996, Ms. Clark was appointed to represent Theodore Kaczynski, aka the

_____

[1] The government also rests on its argument that this claim is procedurally barred by virtue of Mr. Duncan waiving his appeal.  This argument is addressed in section II. (A) of this reply.

"Unabomber." *See United States v. Kaczynski*, E.D. CA Case No. 2:96-cr-00259.  Importantly, Ms. Clarke was appointed in Mr. Kaczynski's case less than one month after his indictment. E.D. CA Case No. 2:96-cr-00259, Doc. 12.  Mr. Kacynski terrorized the nation for 18 years with nearly as many bombings, leaving three dead and dozens maimed from California to Alabama to Georgia and New Jersey. After a year and a half of doubtlessly arduous work with a severely mentally ill client, Clarke and her team prevailed, obtaining multiple life sentences without possibility of parole for their client.  E.D. CA Case No. 2:96-cr-00259, Docs. 521, 522, 549; *see also*: http://www.nytimes.com/1998/01/23/us/unabomber-case-overview-kaczynski-avoids-death-sentence-with-guilty-plea.html (last visited January 15, 2018).

Another of Ms. Clarke's infamous former clients, referenced by the government here, was that of Buford O. Furrow.  In August of 1999, with the intended purpose of killing Jewish people, Furrow entered the lobby of a Los Angeles area Jewish Community center where he fired 70 rounds from a semi-automatic weapon.[2]  Like Kaczynski before him, the United States sought the death penalty against Furrow and Ms. Clarke stepped up to the plate, once again becoming appointed just a month after the federal complaint was filed.  *United States v. Furrow*, C.D. CA Case No. 2:99-cr-00838, Docs. 1, 23.  Approximately a year-and-a-half later, following a negotiated guilty plea, Furrow, a remorseless, avowed white supremacist, was sentenced to life without parole in a 16-count indictment, which included terrorism and hate crimes charges, stemming from his shooting rampage at a Jewish Community Center, which injured five people

---

[2]
http://www.washingtonpost.com/wpsrv/national/longterm/hatecrimes/stories/furrow081399.html (last visited January 15, 2018).

– including three children, a subsequent carjacking, and the racially motivated murder of a postal worker.  C.D. CA Case No. 2:99-cr-00838, Docs. 164, 175; *See also*:

http://www.cnn.com/2001/LAW/01/24/furrow.plea.crim/ (last visited January 15, 2018).

Ms. Clarke was also central to the multi-jurisdictional defense of Eric Rudolph, who was facing capital charges in Georgia and Alabama for detonating four bombs over three years, killing two and injuring 150.  Rudolph's bomb sites included the 1996 Olympics in Atlanta, two abortion clinics, and a gay club, and he had additional plans to kill federal agents at the time of his capture.[3]  Ms. Clarke, who was lead counsel in the Alabama case, worked with her Georgia counterparts to negotiate a global settlement that would spare Rudolph the death penalty.  *See United States v. Rudolph*, ND AL Case No. 2:00-cr-00422 Docs. 283 and 537.  In exchange for his guilty plea and providing information to federal agents regarding 250 pounds of dynamite Rudolph had hidden in the North Carolina mountains, Rudolph was sentenced to four consecutive life sentences without possibility of parole.[4]

On January 10, 2011, just one day after a federal complaint was filed, Ms. Clarke was appointed to represent Jared Loughner in a 50-count federal indictment that included multiple death eligible offenses born out of his shooting rampage at a congressional meet-and-greet in Tucson, Arizona.  *United States v. Loughner*, D-AZ, Case No. 4:11-cr-00187, Docs. 1, 7.  On January 8, 2011, Loughner walked up to Congresswoman Gabrielle Giffords and shot her in the head, nearly killing her. Six others, including a federal judge and a congressional aide were

_____

[3] http://www.nytimes.com/2005/04/13/national/in-deal-to-avoid-death-penalty-bomber-pleads-guilty.html (last visited January 17, 2018).
[4] *Id*.

killed, and 12 other people sustained non-fatal gunshot wounds.[5]  Nearly two years after

Loughner's parking lot rampage, in connection with the plea agreement secured by Clarke and

her co-counsel (Case No. 4:11-cr-00187, Doc. 457), Loughner was sentenced to seven

consecutive life sentences, plus 140 years.  Case No. 4:11-cr-00187, Doc. 477.

Aside from the instant case, an anomaly in several respects, the only other case in which

one of Ms. Clarke's clients received a death sentence is that of Boston Marathon bomber,

Dzhkhar A. Tsarnaev, an anomaly in its own right.  *See* D. Mass. Crim. Case No. 13-10200.  Mr.

Tsarnaev, a Russian immigrant, received six death sentences in all for his planting of a pressure

cooker bomb on Boston's Boylston Street, which exploded during the marathon, killing three

and injuring 240 others.[6]  The Tsarnaev case gained the dubious distinction of being identified as

the "worst terrorist attack on American soil since September 11, 2001."[7]

The life sentences Ms. Clarke was instrumental in obtaining in other federal capital

prosecutions: Kaczynski, Furrow, and Loughner, are demonstrative of what can be accomplished

when the defense has the necessary time and resources to prepare for a capital trial.  Predating

Ms. Clarke's federal capital trial experience, she began to forge her reputation with her work on

a South Carolina state court prosecution, in which Clarke represented Susan Smith.  In 1995 Ms.

Clarke was counsel for Ms. Smith, a woman who drowned her two young sons in a lake.[8]  Ms.

---

[5] http://www.cnn.com/2012/11/08/justice/arizona-loughner-sentencing/index.html (last visited January 15, 2018).

[6] https://www.nytimes.com/2015/05/16/us/dzhokhar-tsarnaev-death-sentence.html (last visited January 15, 2018).

[7] https://www.nytimes.com/2015/05/16/us/dzhokhar-tsarnaev-death-sentence.html (last visited January 15, 2018).

[8] http://www.nytimes.com/1995/07/29/us/carolina-jury-rejects-execution-for-woman-who-drowned-sons.html?pagewanted=all (last visited January 16, 2018).

Clarke helped paint a picture of Ms. Smith as a troubled young woman, struggling with mental health issues, to counter the prosecution's portrait of selfish, calculated woman who murdered her children in order to pursue a boyfriend who did not want to be around kids. Prior to her arrest, Smith led law enforcement on false leads for nine excruciating days, claiming an African American man carjacked her and took her children, when all along she had pushed her car into a lake with her three year old and fourteen-month-old strapped into their car seats.

Harkening back to Ms. Clarke's other capital case work is relevant for this court to consider, but doing so illustrates a point inapposite to that intended by the government.  Had Ms. Clarke not been hamstrung by a series of orders that prevented her from preparing her case, hiring experts, and assembling a team like she had done in Kaczynski, Furrow, Rudolph and Loughner, cases no less horrific, cases which also had severely mentally ill defendants, there is a reasonable probability that Mr. Duncan, too, could have resolved his case without a death sentence.

### Roger Peven, Tom Monaghan, Mark Larranaga

Somewhat understandably, the government minimizes the degree of Mr. Peven's problems and the impact of those problems on the preparation of Mr. Duncan's defense.  Mr. Duncan will not repeat the litany of record evidence that establishes Mr. Peven's detrimental impact on Mr. Duncan's defense here as it is amply demonstrated by the record and by Mr. Duncan's § 2255 Motion.  *See* 2255 Motion at 14-29.

The government attempts to paint a picture of Peven leading a coordinated team effort, but nothing could be further from the truth.  The frustration felt by those dealing with Peven and the myriad ways Peven's lack of responsiveness and cooperation impacted the rest of the team's ability to make progress on the case are documented throughout counsel's file.  *See* Exh. 26, Mark Larranaga email regarding agenda April 27, 2007, at 227, 229-232, 235-236; Exh. 27,

Debra Garvey memorandum regarding proposed investigation plan May 2, 2007; Exh. 29, Thomas Monaghan emails regarding budget May 8, 2007, at 245-246; Exh. 30, Mark Larranaga emails regarding supplemental budget May 14, 2007; Exh. 31, Mark Larranaga emails regarding team additions May 14, 2007; Exh. 36, Team emails June 2007 at 261, 265-266, 274, Exh. 37, Judy Clarke email July 17, 2007.[9]

Peven's behavior went unchecked for far too long.  The explanation for why that happened lies in part on the blind faith of long time friends and colleagues who resisted seeing the warning signs and/or failed to act upon them, and in part on Peven's dishonesty about what was going on with him personally and how those things were adversely affecting his ability to function as a lawyer and administrator. Several of Peven's former colleagues have acknowledged some degree of willful blindness that allowed Peven's deficient performance to perpetuate. *See* Exh. 1, Declaration of Judy Clarke, at 2.  Exh. 5, Declaration of Stephen R. Hormel, at 36; Exh. 10, Declaration of Billy L. Proctor, at 80, 83; and Exh. 8, Declaration of Thomas Monaghan, at 61, 63.  Tom Monaghan, Peven's co-counsel on Mr. Duncan's case, captures the internal conflict which afflicted many of Peven's peers:

> I felt extremely conflicted throughout my time on Mr. Duncan's case . . . important tasks were being ignored and Roger's attitude seemed to be that there was no point to preparing for either the guilt/innocence or the penalty phase.
>
> *****
>
> Throughout the spring and summer [of 2007] I had an increasingly sinking feeling that we were not living up to our obligations to our client.  At the same time, I still felt great loyalty to Roger.

---

[9] Insofar as Mr. Duncan refers to trial exhibits or exhibits from the retrospective competency hearing, Mr. Duncan will identify those with specificity.  Otherwise, all references to "exh." are in reference to exhibits submitted in conjunction with the § 2255 motion, case no. 2:17-cv-00091.

1

*****

2

3

4

> There were times I considered going to Judy Clarke, going to FDEWI's Board, going to Dick Rubin, or even going to the Court, to make them aware that Roger seemed to be doing almost nothing on the case and was communicating very little with co-counsel about the case. I was torn about what to do, and in retrospect, I clearly did not do enough.

5

Exh. 8, Declaration of Thomas Monaghan, at 63, 64.

6

7

8

9

10

11

12

Mark Larranaga, an outsider by all accounts, worked earnestly in an effort to prepare for Mr. Duncan's trial. However, a fact glossed over by the government, no matter Larranaga's intentions or qualifications, he was at Peven's mercy because he controlled the purse strings. Peven's control of the funding – and consistent unexplained stonewalling – meant that Larranaga spent much of his time and energy strategizing over possible avenues to explore only to be met by a brick wall when it was time to turn ideas into action. Larranaga's frustration was palpable:

13

14

15

16

17

18

> Having to deal with Mr. Peven on this case was the most frustrating and disappointing experience I have ever had working with another lawyer. From very early on in my involvement, Mr. Peven was unengaged and unresponsive. That was, of course, frustrating as a general matter, but also had very specific implications for our ability to work on Mr. Duncan's case. Mr. Peven's attitude towards me and others working on the case, Ms. Garvey included, was nothing short of hostile at times. Though ostensibly I had been appointed to partner on the case with Mr. Peven and contribute my skills as a capital litigator, Mr. Peven alternated between dismissive and antagonistic when I sought to engage him about the case and certainly when I asked anything of him.

19

20

21

22

23

24

> This lack of professionalism had a particularly devastating impact on our ability to obtain the assistance of expert witnesses in the case, in a case where expert assistance was clearly of paramount importance. The defense team met of May 31, 2007 for the express purpose of discussing potential experts in the case. During that meeting we identified various potential areas of expertise and experts that might be helpful. However, we remained unable to retain experts for two primary reasons: 1) we had yet to do sufficient investigation to identify the best-suited experts or provide the same with the type of materials necessary for their review and 2) Mr. Peven would not approve funds directly resulting in our inability to obtain approval and funding for experts once identified. The authority to approval and fund experts rested solely with Mr. Peven.

25

Exh. 7, Declaration of Mark Larranaga, at 52-53.

26

By September, 2007 when Ms. Clarke was appointed in the case, and the file and funding

27

was transferred to her office, the impact of Peven's mishandling of the case was unmistakable.

28

As Ms. Clarke stated in her declaration, "[i]t was clear from the condition of the file and the lack of work product that Mr. Peven had not worked on the case since the conclusion of the state case [October, 2006], and had impeded other team members in their efforts to prepare the case." Exh. 1, Declaration of Judy Clarke, at 7.  In its Answer, the government states that the "transfer of leadership did not affect the hiring of investigators or experts."  Answer at 22.  The government's suggestion that the transfer from Peven to Clarke is a sort of "apples to apples" comparison falls flat.  At the time of Ms. Clarke's appointment, which was more than two years after Peven was appointed to represent Mr. Duncan, no one had reviewed the physical evidence, dozens of witnesses had yet to be interviewed, pressing legal issues had not been researched, and no mental health experts had been retained.  Exh. 1, Declaration of Judy Clarke, at 8.  The reconstituted defense team scrambled to make up for lost time, but with a trial date quickly approaching and the Court's refusal to grant the defense time to adequately prepare, the defense was faced with a Hobson's choice.  As Ms. Clarke attested, "there was no way we could adequately prepare for the guilt/innocence and the penalty phases in the time remaining before the then scheduled (January 2008) trial date."  *Id.*

### *Mr. Duncan's Guilty Plea*

By December, 2007, the Defense felt they had no choice but to have Mr. Duncan plead guilty, thereby allowing counsel to divert all their resources towards preparing for the penalty phase.  The government characterizes the defense's decision to have Mr. Duncan proceed with a guilty plea as "reasonable" and in keeping with Mr. Duncan's "best interests."  Answer at 42. This characterization flies in the face of the explanation provided by Ms. Clarke, to whom the government ascribes a great amount of clout:

> The Court's denial of a continuance, and denial of an extension of time to file a Rule 12.2 notice (expert mental health evidence) left us with an untenable Hobson's choice: prepare inadequately for both the guilt/innocence and the

1
2
3
4

> penalty phase with only weeks remaining and no chance of a continuance or have Mr. Duncan plead guilty, obtain the Government's cooperation in extending the date to commence the penalty phase, and shift all focus entirely to preparation of the penalty phase. Given the work that remained to be done, we opted to abandon the culpability issues as well as the rights afforded to Mr. Duncan were he to proceed to a full trial. This was triage, pure and simple, motivated exclusively by our need for more time to prepare.

5
6
7
8

> We did not share that motivation with Mr. Duncan. Mr. Duncan had expressed an interest in pleading guilty, which we capitalized on when it became clear that we had little choice other than a guilty plea if we were to obtain the desperately needed time to prepare for the penalty phase. Because of that desperation, we advised Mr. Duncan to plead guilty, with no meaningful discussion as to the process and cons involved in his doing so or of possible defenses we might raise.

9

Exh. 1, Declaration of Judy Clarke, at 9-10.

10

As Ms. Clarke's explanation makes clear, the "decision" that Mr. Duncan would

11

plead guilty had little to do with reason or his best interest, but was, as Clarke put it, "triage,

12

pure and simple." Moreover, had counsel had a more informed perspective at the time, in

13

consultation with an appropriate expert, they would have come to understand that many of

14

their odd interactions with Mr. Duncan were likely the result of Mr. Duncan's psychosis.

15
16

Instead, their limited perspective led them to plead their significantly mentally ill client

17

guilty, a move which helped propel Mr. Duncan into the next ill-informed decision: to

18

represent himself at sentencing.

19

### *Prejudice*

20

The breakdown of the defense function, which was further exacerbated by the Court's

21

refusal to remedy the situation by providing critically needed time to properly prepare for trial,

22
23

prejudiced Mr. Duncan's defense. The acts and omissions by trial counsel in this case are well

24

documented and Mr. Duncan need not repeat them here. Despite the government's contention

25

that a death sentence was a foregone conclusion, the government's Answer identifies several

26

examples where the same argument might have been made, but for competent counsel and the

27

requisite time and resources, which allowed such a fate to be averted. *See* Answer at 16, fn. 3.

28

Had Mr. Duncan been afforded those same provisions, there is a reasonable probability that Mr. Duncan would not have pled guilty, or represented himself at sentencing.  Finally, had Mr. Duncan proceeded with competent, adequately prepared counsel there is a reasonable probability that he would have received a sentence of less than death, as so many of Ms. Clarke's other clients have.

**IV.    CLAIM 2:  THE TRIAL COURT'S REFUSAL TO ALLOW MR. LARRANGA TO ATTEND THE AUGUST 28, 2007 STATUS CONFERENCE AND REFUSAL TO HAVE THE PROCEEDINGS RECORDED AND ITS SUBSEQUENT RELIANCE ON THE PROCEEDINGS TO DISALLOW A REASONABLE TIME FOR PREPARATION VIOLATED MR. DUNCAN'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

As detailed in his § 2255 Motion, Mr. Duncan's rights under the Fifth, Sixth and Eighth amendments were violated when the court allowed a private, unrecorded ex parte conference with attorney, Roger Peven, over the objection of Mr. Duncan's other defense counsel, Mark Larranaga. In his private meeting with the court, Mr. Peven was representing his own interests, not Mr. Duncan's; Mr. Larranaga's presence was essential to preserving Mr. Duncan's right to effective assistance of counsel; and the lack of a transcript or otherwise adequate record of the proceeding which was pivotal to all subsequent matters concerning timing and funding of the case deprived Mr. Duncan of his statutory rights and right to fundamental fairness.

The *ex parte* conference between Mr. Peven and the court was not, as the government contends, "solely" related to Mr. Peven's "personal troubles."  Answer at 53.  It strains credulity to suggest that Mr. Peven's pronounced personal problems, which included crippling alcoholism and an imploding marriage, did not impact his work on Mr. Duncan's case.  Indeed, the record belies any such claim. *See* Cr. Doc. 68, September 7, 2007 Declaration of Roger Peven at 4-5; Cr. Doc. 90, October 25, 2007 Declaration of Roger Peven at 1-2; Pet. Exh. 1, Declaration of Judy Clarke at 4-9; Pet. Exh. 7, Declaration of Mark Larranaga at 52-53; Cr. Doc. 193, Defense

Motion and Memorandum in Support of a Continuance of the Capital Sentencing Proceeding at 4-5; Cr. Doc. 174, November 13, 2007 Declaration of Stephen Hormel at 2-3; Cr. Doc. 174, November 20, 2007 Declaration of Stephen Hormel at 2-3; Cr. Doc. 174, Declaration of Christina Hunt at 2-4; Cr. Doc. 174, Declaration of Lisa Werner at 1-4.

The government ignores the central point of this claim: Mr. Peven's conduct directly impacted Mr. Duncan's defense and, further, the Court, upon being made aware of the deficiencies in the defense preparation for trial, failed to take the necessary steps to remedy the situation.  Mr. Peven materially misrepresented what he did do as well as failed to disclose what he had neglected to do in connection with his responsibilities as counsel. Mr. Peven claimed to be doing work on Mr. Duncan's case that he was not doing.  Mr. Peven refused to cooperate with fellow members of the defense team and actively obstructed their efforts to prepare for the case. Finally, Mr. Peven misled the Court about his work and his capacity to competently represent Mr. Duncan.

Mr. Peven's performance on Mr. Duncan's case failed to comport with his duties under Idaho's Rules of Professional Conduct, or his Sixth Amendment obligations.  Moreover, by misrepresenting the level of his preparedness, both to his co-counsel and to the Court, Mr. Peven violated his duty to maintain the integrity of the profession under Idaho Rule of Professional Conduct 8.4(c) and (d).

The lion's share of authority relied upon by the government centers around civil cases involving attorney conduct such as misuse of client funds, improper solicitation of new clients, or inappropriate conduct toward opposing counsel. The government emphasizes the district court's discretion in handling such matters.  *See* Answer at 50-52, (citing *Roadway Exp. Inc. v. Piper*, 447 U.S. 752, 766 (1980) (regarding judicial discretion in awarding attorneys' fees as a sanction for "vexatious" litigation in an employment discrimination action); *Lefrak v. Arabian*

*Am. Oil Co.*, 527 F.2d 1136, 1140 (2nd Cir. 1975) (disqualification motion based on alleged improper solicitation of clients); and *United States v. Wunsch*, 84 F. 3d 1110 (9th Cir. 1996) (Court of Appeals reverses lower court's sanctions against private counsel who sent a sexist message to former opposing counsel after having been removed from case, holding the attorney conduct did not amount to a violation of the rules at issue). Notably, none of the cases cited by the government implicate an individual's Sixth Amendment right to effective counsel. Neither do any of the cases cited by the government involve the unique circumstances of a capital prosecution. As the Supreme Court has made clear: death is different. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

As an initial matter, these cases are, at best, tangentially relevant to the issue at hand. A trial court's duty to ensure that a capitally charged defendant is receiving effective assistance of counsel consistent with the protections afforded by the Sixth Amendment is a weighty responsibility. The failure to fulfill that duty may literally be the difference between whether a defendant lives or dies. When the stakes are this high, and a court is informed that capital counsel has been woefully neglecting his duties, the court is duty bound to address and rectify the dire situation. Under the circumstances, the defense's request for additional time to prepare Mr. Duncan's defense was both warranted and necessary. However, as the record shows, the Court predetermined that it would not afford the defense more time, irrespective of the reasons. Such a conclusion, reached before the Court was provided critical facts surrounding the ways in which Mr. Peven's personal turmoil was adversely impacting his ability to prepare Mr. Duncan's defense, deprived Mr. Duncan's of his constitutional rights to effective assistance of counsel and a fair trial.

The government claims that "[t]he discussion dealt solely with the personal troubles that required Peven to take a less active role in Duncan's case – it did not venture into any legal

argument regarding Duncan's case." Answer at 53, citing CR Doc. 68 and 185.  This statement ignores the impact Mr. Peven's "personal problems" had on his capacity to function as Mr. Duncan's counsel. The two are inextricably linked. The Sixth Amendment provides that criminal defendants are entitled to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  When counsel performs deficiently, it is of no consequence why counsel has performed deficiently. Whether counsel simply neglects his duties out of laziness, lack of commitment, or – as in the instant case –is hampered in his ability to perform by interpersonal problems and addiction, the result is the same: the client is deprived of competent representation.

Upon being placed on notice, both Mr. Peven's co-counsel and the Court failed to acknowledge the problem and its impact on preparing Mr. Duncan's defense.  Around the same time the Court adjudged Mr. Peven as a continued asset to Mr. Duncan, rejecting Peven's belated request to withdraw from the case, Mr. Peven was being removed by his Board and ordered to enter residential treatment for alcoholism. It is implausible to suggest that someone who is so impaired in his role as an attorney and administrator that he had to be removed from his post and directed to enter rehab was nevertheless an asset to Duncan's capital case preparation. In fact, as the record bears out, Mr. Peven's dysfunction, which in some instances included outright obstruction of his fellow defense team's efforts, had a very real and negative impact on Mr. Duncan's defense preparation. *See* Exh. 7, Declaration of Mark Larranaga (noting Mr. Peven's refusal to approve funding requests necessary to retain experts, Mr. Peven's neglect in responding to the government regarding viewing physical evidence or interviewing crime scene witnesses) at 53-54; Exh. 10, Declaration of Stephen Hormel (also noting Mr. Peven's interference with co-counsel's attempts to obtain expert assistance in the case, as well as stating that Peven declared a "do nothing strategy" for the guilt-innocence portion of Mr. Duncan's case) at 36-38; Exh. 1, Declaration of Judy Clarke (Peven misleading other defense team

members about work he was doing on the case, Peven failing to prepare for the guilt-innocence

phase of Mr. Duncan's case – his primary responsibility, impeding fellow team members efforts

at making progress on the case, including but not limited to retention of experts) at 4-6, 8; and

Exh. 8, Declaration of Tom Monaghan (echoing other members of the defense team in regard to

Peven's refusal to approve requests for experts and generally ignoring tasks that needed

attention) at 63-64.

Though the government insists that Mr. Peven's ex parte, unrecorded meeting with the

Court "had no impact" on Mr. Duncan's rights, the record reveals a different picture.  Mr.

Peven's personal problems and his capacity to provide competent representation are inextricably

linked.  Mr. Peven confirmed as much in his declaration of September 7, 2007:

> After my wife's announcement to me in February 2007 until mid-August 2007,
> when my marriage collapsed totally, my focus was primarily on preserving my
> marriage and the well being of my young daughter . . . I was continually
> distracted by my failing marriage and child care issues.  The primary work I did
> on Mr. Duncan's case from the time of the federal indictment in mid-January
> 2007 to date was visit with Mr. Duncan in Boise, and seek a supplemental budget
> to fund the necessary defense, including the investigation and experts.  Even in
> that regard, it was not until late July 2007 that this supplemental budget was
> submitted and approved.  In mid-August I learned that staff in my office assigned
> to work on the case, including assisting in review of discovery and creating
> witness lists and files, had failed to do so, responsibility for which rests with me
> for not providing supervision.  This is an example that ***my priorities were directed
> toward my personal matters***.
>
> *****
>
> All of the above ***circumstances, which put my personal and other professional
> obligations in conflict with those representing Mr. Duncan***, caused me to advise
> my co-counsel that I needed to seek an ex parte meeting with this Court to explain
> my circumstances.  It was not until this point that I advised Mark Larranaga of my
> circumstances and my discovery of the failure of staff in my office to adequately
> fulfill obligations to the case.  Though I have always intended to fulfill the
> responsibilities of investigating and preparing Mr. Duncan's federal case for trial,
> ***unforeseen circumstances have created multiple loyalties to my parents, to my
> marriage, to my child and to this case which create a conflict and great concern
> in meeting the court's expectations and the needs of my client***.

Cr. Doc. 68 at 4-5 (emphasis supplied).

After the Court denied a continuance request by the reconstituted defense team, Mr. Peven submitted another declaration on October 25, 2007, where he explained:

> I have come to the realization that those factors that originally compelled me to move to withdraw, along with stresses related to my involvement in this case from the beginning, also impacted my performance prior to August, 2007. This necessarily impeded the defense team's efficient and adequate preparation for the January, 2008 trial date. As a result, I have come to the conclusion that I must again seek leave to withdraw as counsel of record because I feel I bear significant responsibility for current counsels' inability to be prepared inability to be prepared for trial in January, 2008.

\*\*\*\*\*

> I have also reviewed the government's arguments given in opposition to the Motion to Continue. It is important to note that they attach no significance to my *de facto* absence from the case.

Cr. Doc. 90 at 2.

Notwithstanding the government's attempt to minimize the significance of this ex parte conference and of Mr. Peven's tremendous dysfunction, the Court's handling of the Peven matter and its subsequent denial of the reconstituted team, had a major impact on the trajectory of the defense's case to the unmistakable detriment of Mr. Duncan. Mr. Peven's pronounced personal problems and his refusal to cooperate with other defense team members, which began shortly after the federal indictment was issued and continued until late August of 2007 crippled the ability of the other defense team members to prepare for trial in accordance with the schedule imposed by the Court. Once made aware of this, the Court refused to allow the reconstituted defense team critical time to adequately prepare for a complex capital trial. That refusal led directly to the defense's desperate decision to have Mr. Duncan plead guilty. Finally, all of these breakdowns set the stage for Mr. Duncan's ill-advised proclamation that he would represent himself at sentencing. When viewed in context, there can be no question that the Court's decisions to exclude Mr. Larranaga from the meeting with Mr. Peven, to omit having the meeting recorded, and to thereafter deny a much-needed extension sealed Mr. Duncan's fate.

1

2

## V.   CLAIMS 3 AND 4: PETITIONER'S REPLY TO THE GOVERNMENT'S ARGUMENTS IN OPPOSITION

3

4

In Claim 3 of the petition, Mr. Duncan alleged he was incompetent in 2007 when he

entered his plea of guilty.  § 2255 Motion at 53-120.  In Claim 4 he alleged he was incompetent

5

to represent during the sentencing trial which was conducted in August through November of

6

2008.  § 2255 Motion at 121-31.  In a combined opposition to the claims, the government

7

contends that except to the extent petitioner alleges ineffective assistance of counsel, the claims

8

are procedurally barred, Answer at 60-61, and that in light of the prior evidentiary hearing and

9

findings, all claims involving Mr. Duncan's competency should be rejected on the merits.

10

Petitioner replies as follows.

11

12

### A.   The Claims are Not Procedurally Barred

13

The government begins its response to Claims 3 and 4 with a confusing and internally

14

inconsistent set of contentions about procedural default.  In addition to the reasons set forth supra

15

in the section discussing procedural default (see sections II (A) and (B)), the court should reject

16

the government's defenses as to claims 3 and 4 for the reasons discussed below.

17

18

19

20

21

22

23

24

25

26

27

28

According to the government Claim 3 has four subparts, which it lists as parts A-D.[10] The government concedes that parts C and D are immune from procedural default in that they allege that Mr. Duncan was denied the effective assistance of counsel at trial and the retrospective competency hearing.  Subparts A and B, which the government frames in terms of errors at the retrospective competency hearing, are allegedly procedurally barred by Mr. Duncan's failure to appeal the conviction and sentence.  Those contentions were in fact raised in *Duncan II*.  The Ninth Circuit's rejection of them is not law of the case because as the government concedes, this court is obligated to reweigh the evidence in connection with the competency question not addressed in the retrospective competency order.  Then to make matters worse, in a separate section the government contends that subparts A and B are doubly defaulted

_____

[10] The government's listing is a combination of verbatim quotes of the § 2255 Motion topic headings and general descriptions of the allegations.  The government's description of the four headings is as follows:

A.  This Court incorrectly decided all the facts leading to its finding after the retrospective competency hearing that Duncan was competent to waive his right to appeal in November 2008. Notwithstanding the fact that the court of appeals affirmed this Court's competency determination, this Court should now find on the same evidence that Duncan was not competent in December 2007 to plead guilty and/or was unable to do so knowingly, intentionally, and voluntarily. (CR Dkt. 867 at 74-114, 115-17.)

1. The Court erred in considering the Riverside Proceeding when it considered Duncan's competence. (CR Dkt. 867 112-14.)

B.  By excluding some evidence, the district court rendered the retrospective competency hearing not full and fair. (CR Dkt. 867 at 117-20.)

C.  Duncan's counsel rendered ineffective assistance by failing to declare a doubt as to competence at the time of the guilty plea. (CR Dkt. 867 at 114-15.)

D.  Duncan's counsel at the retrospective competency hearing was ineffective. (CR Dkt. 867 at 117-20.)

Answer at 59.

1    because trial counsel did not raise them at trial, which is the reason for subpart C (ineffective

2    assistance of trial counsel for failure to object.)  Moreover, the government cannot

3    simultaneously complain that an issue was not preserved at trial and that the issue should have

4    been raised on appeal.

5        Apparently, what the government is trying to assert is that but for the allegations of

6    ineffective assistance the substantive due process challenge to Mr. Duncan's competency (*i.e.*,

7    the allegations that he was actually incompetent at the time of the guilty plea) would be waived

8    by counsel's failure to assert it.  That, however, is not the law.  Substantive incompetency claims

9    are not subject to waiver.  *LaFlamme v. Hubbard*, 225 F.3d 663, 664 (9th Cir. 2000) (citing *Pate*

10   *v. Robinson,* 383 U.S. 375, 384 (1966)).

11       The government makes a similar contention with regard to the claim it characterizes as

12   Claim 4.A.  "A. The Court violated procedural due process by failing to hold a full competency

13   hearing at the time Duncan decided to waive counsel and represent himself."  Answer at 59.

14   Inasmuch as that asserts a *sua sponte* duty by the court, the argument that it is barred by a lack of

15   a contemporaneous objection is nonsensical.  Given that such a claim is record-based, unlike any

16   of the other subclaims identified by the government, it arguably could be defaulted by failure to

17   appeal.  The reasons why Mr. Duncan's purported waiver of appeal, even if otherwise applicable,

18   does not bar collateral review of this claim are described in the discussion of Claim 10.

19   **B.  The Court Should Reject the Government's Merits Arguments**

20       Turning to the merits, the government presents several arguments, which should be

21   rejected for the reasons detailed below.

1

2

### 1. The current evidentiary record and prior findings are not dispositive of the competency claims presented herein

3

4

5

6

In opposing Mr. Duncan's competency claims on the merits, the government understandably makes much of the Court's prior competency finding. The government contends "common sense" suggests this Court's prior orders should be given preclusive effect, but admits "[n]o legal doctrine appears to precisely fit this situation." Answer at 62 n. 22.

7

8

9

10

11

12

13

14

So, the government argues "logical" preclusion should govern. The government's logic has these steps: (1) competency to waive appeal is the same as competency to plead guilty and proceed in pro per; (2) Mr. Duncan's mental state has remained remarkably similar over time, i.e., he had the same mental state when judgment was entered, when he entered his guilty plea, and when he represented himself; (3) the Court correctly found Mr. Duncan to be competent when judgment was entered; and (4) therefore Mr. Duncan was competent at all relevant times. Each step of the government's argument is fatally flawed, as petitioner will discuss below.

15

16

### 2. Competency Standards Are Varied; Mr. Duncan is Indeed at Least a "Gray Area" Defendant Within the Meaning of *Edwards*

17

18

19

20

21

22

23

24

25

26

27

28

The government asserts that except for "one small wrinkle," by which the government means the U.S. Supreme Court decision in *Indiana v. Edwards*, 554 U.S. 164 (2008), "the same standard applies to competency determinations to waive appeal, to plead guilty, to waive the right to counsel and ... to represent one's self." Answer at 73. In an effort to minimize Edwards' significance, the government claims "courts and commentators have repeatedly noted that the Supreme Court's decision did not establish any new, higher, substantive standard to replace Dusky." *Id.* (citing *United States v. Ferguson*, 560 F.3d 1060, 1067-68 (9th Cir. 2009); Ellesha LeCluyse, Note, The Spectrum of Competency: Determining a Standard of Competence for Pro Se Representation, 65 Case W. Res. L. Rev. 1239, 1247 (Summer 2015).) Neither *Ferguson* nor the LeCluyse note say anything of the sort. In the course of deciding to remand Mr. Ferguson's

1    case for reconsideration, the Ninth Circuit included an eight-paragraph discussion of the ways in

2    which *Edwards* changed prior law.  In discussing *Edwards*, LeCluyse stated "The Court

3    recognized that there are 'different capacities needed to proceed to trial without counsel' and that

4    'there is little reason to believe that Dusky alone is sufficient.'" 65 Case W. Res. L. Rev. at 1247

5    (quoting *Edwards*, 554 U.S. at 177).

6         The government's suggestion that *Dusky* continues to govern self representation is

7    misleading.  Competency to decide to waive counsel is government by Dusky, but competency to

8    engage in self representation is not.  The *Edwards* court cautioned against the use of a single

9    mental competency standard to determine both whether a defendant represented by counsel could

10   proceed to trial and whether a defendant who goes to trial must be permitted to represent

11   himself.  The Court explained that "[m]ental illness itself is not a unitary concept. It varies in

12   degree. It can vary over time.  It interferes with an individual's functioning at different times in

13   different ways." 554 U.S. at 175.  "Quintessentially, *Edwards* suggests that fair adjudication is of

14   greater concern and more fundamental to the adversary process than is the absolute preservation

15   of a defendant's autonomy and dignity.  Ashley N. Beck, *Indiana v. Edwards: The Prospect of A*

16   *Heightened Competency Standard for Pro Se Defendants*, 84 U. Colo. L. Rev. 433, 450 (2013).

17        The *Edwards* court referred to mental conditions that fall "in a gray area between *Dusky*'s

18   minimal constitutional requirement that measures a defendant's ability to stand trial and a

19   somewhat higher standard that measures mental fitness for another legal purpose," referring to

20   such defendants as "gray-area defendants."  554 U.S. at 172-73.  Thus, the Supreme Court

21   recognized a "gray area" of competency, noting that competency to stand trial with the assistance

22   of counsel may not equate to competency to proceed pro se. As the government acknowledges,

23   the Court held that a trial court retains the discretion to appoint and does not violate a

24   defendant's Sixth Amendment right when it appoints counsel over a "gray-area" defendant's

1    objection.

2         The government argues that *Edwards* has no effect on this case because Mr. Duncan

3    allegedly does not fall within the gray area between *Dusky* incompetency and competency to

4    conduct his own defense.  Answer at 74- 75.  The government contends that although the experts

5    whose testimony it presented during its case in chief opined that Mr. Duncan was close to being

6    *Dusky* incompetent, see Answer at 74 (noting Dr. Kirkish's testimony that distinguishing

7    between firmly held, highly ideological beliefs and delusions can be a thorny issue), this Court

8    weighed all the conflicting evidence and found Mr. Duncan competent under *Dusky*.  The

9    government's logic fails.  Far from removing Mr. Duncan from *Edwards*' gray area, this places

10   him squarely within it.

11        The government additionally contends that Mr. Duncan's handling of his own defense

12   amply demonstrates his competency to represent himself.  Answer at 74 (contending that Mr.

13   Duncan "successfully established points he wished to make on cross-examination, enlisted his

14   standby counsels' help when he wished to do so, etc.").  Whether Mr. Duncan made the points

15   that were important to him (putting aside legitimate questions whether Mr. Duncan had any point

16   to his questions in most instances) is not what matters.  What matters is whether the points he

17   tried to make in any way contributed to the competent handling of the defense.  And they most

18   certainly did not.

> [M]ental illnesses pose a genuine threat to reliable adjudication and to the
> constitutional right to a fair trial. Accordingly, policy considerations support the
> adoption of a heightened competency standard not only to further the likelihood
> of a fair trial within the confines of the adversary system, but also to preserve the
> dignity of the gray-area defendant.  As the *Edwards* Court noted, "the spectacle
> that could well result [from permitting a gray-area defendant to represent himself]
> . . . is at least as likely to prove humiliating as ennobling." Thus, trial courts
> confronted with a gray-area defendant who seeks to proceed pro se, should
> inquire into the defendant's competence by evaluating his ability to carry out the
> basic tasks needed to present a defense, make decisions, weigh advantages and
> disadvantages, and communicate coherently with others.

1  Ashley N. Beck, *Indiana v. Edwards: The Prospect of A Heightened Competency Standard for*

2  *Pro Se Defendants*, 84 U. Colo. L. Rev. 433, 456–57 (2013) (footnotes and citations omitted).[11]

3  ### 3.  Competency Varies at Over Time

4  The government concedes, as it must, that competency can vary over time.  It

5  nevertheless contends that the finding of competency at the time judgment was entered is binding

6  as to all other times because "[t] here is not a shred of evidence in the record that his competency

7  actually varied over the relevant period of time."  Answer at 66 (citing § 2255 Motion at 77-78),

8  implying that the finding as to competency to waive appeal is binding on all other competency

9  issues.

10  The government's position should be rejected.  The burden of proof of competency rests

11  with the government, not the defendant. *See United States v. Frank*, 956 F.2d 872, 875 (9th Cir.

12  1991). Thus, the government bears burden of establishing the temporal relevance of this Court's

13  retrospective competency to all relevant time periods.  As recognized by the Ninth Circuit, at the

14  time of trial, Mr. Duncan met his burden of production.

15  The government implicitly recognizes this and attempts to shoulder it by pointing out Mr.

16  Duncan's "own experts emphasized that Duncan's mental state had remained steady for a long

17  period of time."  *Id.* (citing CR Dkt. 826, Vol. 20, at 5130).  While true, that observation hardly

18  aids the government.  Even in the view of experts the prosecution presented, Mr. Duncan's

19  mental state hovers close to the line of incompetency.  The fact that even on a good day he is

---

[11] The government also contends it would violate *Teague* to hold apply *Edwards* in a manner to find Mr. Duncan to have been incompetent to represent himself.  Even assuming *Teague* would otherwise apply, Edwards was decided prior to Mr. Duncan's case becoming final on appeal. Nonretroactivity is not involved.

close to delusional does nothing to establish that he is consistently, and without exception, competent.  Only small fluctuations will cross the line for someone who is consistently near the line.  The stress of undergoing a trial for one's life – let alone conducting it oneself -- is unlike any other.

Moreover, the trust of much of the government's arguments, as well as this Court's competency finding, is that time does matter.  *See, e.g.*, Answer at 66 (arguing that "the Court-appointed experts had a temporal advantage over the defense experts because their evaluation of Duncan occurred closer in time to Duncan's appeal waiver than the evaluations of the defense experts.")  Indeed, the court found the government's experts were allegedly entitled to more weight, and the more remote evaluations by defense experts even those who say Mr. Duncan multiple times over a multi-year period, were less persuasive because they were slightly more remote in time from the entry of judgment.  *See* Cr. Doc. 843 at 32.

### 4.   The Court's Findings Should Be Reconsidered

The government ultimately concedes that at a minimum the court must reweigh the evidence previously presented in order to make findings as to competency at other times and for other purposes.  Answer at 66-67. Although this court's findings withstood review for clear error by the Ninth Circuit, that does not preclude this Court from reassessing the evidence incident to the undertaking suggested by the government.

Approximately 40 pages of the § 2255 Motion are devoted to the reasons this court should not follow its prior findings in reweighing the mental health evidence with regard to the other competency issues.  As set forth in the Motion, the reasons involved seven enumerated areas of concern with additional enumerated sub-concerns.  As described in the topic headings, there include:

1. The evidence clearly establishes Mr. Duncan has a mental disease, disorder, or defect;

2. Competency can vary over time;

3. The court's description of Mr. Duncan's in court statements as rational and coherent is contrary to the verbatim record and the uncontroverted expert opinion;

4. The evidence establishes Mr. Duncan's belief system is a delusion, not a rational insight;

5. The court overstated the importance of areas of strengths;

6. Even the supposed assessments of credibility themselves fail to withstand scrutiny in that;

    a. the "compelling" and "sound" opinions defended on cross-examination hinge on an objectively erroneous view of the facts;

    b. the prosecution experts conceded the issue was "thorny;"

    c. in clear contrast to the defense experts, the prosecution experts testified as to subjective, unverifiable conclusions not in accord with prevailing professional norms;

    d. the defense experts' opinions were based on reliable, objectively verified data; and

    e. because the prosecution experts spent little time together with Mr. Duncan their failure to observe signs of psychosis is of limited probative value; and

7. The court erred by relying on the riverside county proceedings in assessing credibility.

The government responds to a few of these matters directly.  *See, e.g.*, Answer at 68 (arguing the court properly considered the Riverside County competency finding).  For the most part, however, with little more than a wink and a nod to the evidence the government simply side steps Mr. Duncan's contentions.  The point is not as the government would appear to have it whether the court could reach the same conclusion based on the evidence before it, but whether it should do so.

For all of the reasons described in the § 2255 Motion, the court should reject the government's invitation to import a rubber-stamped version of its prior findings into a different,

1    albeit related, context.

2        **C.  Mr. Duncan's Evidentiary Contentions Are Meritorious**

3            **1.  The Court Erred in Taking Judicial Notice**

4        In the 2255 Motion at 113-14, Duncan argues that this court's retrospective competency

5    finding was tainted by the erroneous decision to take judicial notice of the Riverside County

6    competency finding.  Respondent contends that the Court properly took judicial notice of the

7    proceedings because "the parties stipulated to the introduction of the transcripts from the

8    Riverside Proceeding," Answer at 68, and "the defense urged the Court to follow an Eighth

9    Circuit case, *Rose v. United States*, 513 F.2d 1251, 1256 (8th Cir. 1975), which held that prior

10   and subsequent findings of competence, while not determinative in a res judicata sense, were

11   'evidence, to be weighed with other evidence on the question of competency.' (CR Dkt. 720 at

12   10 (quoting *Rose*, 513 F.2d at 1256-57 & nn.5-6))."

13       To be clear, Mr. Duncan's objection is not to the consideration of evidence that was

14   adduced in the Riverside County proceedings, but rather to the Court's reliance on the outcome

15   of those proceedings.  As stated in the § 2255 Motion, *id.* at 113, while a federal court may take

16   judicial notice of documents from, or an opinion of, another court it may do so only to establish

17   the existence of such litigation and related filings, not to establish the truth of the disputed

18   matters asserted in the other litigation. *Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2nd Cir.

19   1991).  "[W]hen a court takes judicial notice of another court's opinion, it may do so 'not for the

20   truth of the facts recited therein, but for the existence of the opinion, which is not subject to

21   reasonable dispute over its authenticity.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir.

22   2001) (*quoting Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181

23   F.3d 410, 426-27 (3rd Cir. 1999). "If it were permissible for a court to take judicial notice of a

24   fact merely because it has been found to be true in some other action, the doctrine of collateral

1  estoppel would be superfluous." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

2  The underlying facts adjudicated in another case do not meet the test of indisputability contained

3  in Rule 201. *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A.*, 146 F.3d 66

4  (2d Cir. 1998); *M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491

5  (9th Cir. 1983).

6          The government's claim that, in Cr. Doc. 720, retrospective competency counsel by

7  reference to *Rose v. United States, supra*, "urged" the Court to consider the outcome of the

8  Riverside County proceedings is misleading.  CR Dkt. 720 is Mr. Duncan's pretrial

9  memorandum, filed on September 6, 2012. *Rose* was cited in a discussion appearing under the

10  topic heading "Cases Addressing the Admissibility of Particular Evidence at Competency

11  Hearings." Cr. Doc. 720 at 5.  That section opens with the statement that "it is difficult to assess

12  the admissibility of particular evidence in this case without knowing exactly what that evidence

13  is," *id.*, but "three cases had addressed the admissibility of particular evidence at competency

14  hearings."  The first case was *United States v. Makis*, 535 F.2d 899 (5th Cir. 1976), which

15  counsel cited for the proposition that evaluations and other evidence remote in time from trial

16  lack probative value.  *Id.* at 7.  The second case was *Kibert v. Peyton*, 383 F.2d 566 (4th Cir.

17  1967), which generally describes the scope of permissible expert opinion evidence.  The third

18  case was *United States v. Rose, supra,* as to which counsel asserted "There the Eighth Circuit

19  addressed the relevance of a *prior* finding of incompetency in a state court proceeding, the exact

20  opposite of the situation here, where there was a **_subsequent_** finding in a state court proceeding."

21  *Id.* at 9-10 (emphasis in original).  Counsel quoted from *Rose* to illustrate that a prior finding of

22  competence could not be considered res judicata, and noted that the *Rose* court had rejected the

23  notion that evidence of events transpiring "shortly after" the time period in question was

24  necessarily irrelevant.  Counsel then stated, "Whether a period of eight months can be considered

a period 'shorter after' an event is, of course, a matter of debate and the admissibility of particular evidence will no doubt depend on the nature of that evidence and other factors to [sic] number to mention.  Because the cases do not provide anything more than general guidance as to the admissibility of evidence at a retrospective competency hearing, defendant urges the Court to allow further briefing once it becomes clearly from witness and exhibits lists exactly what evidence is being offered in this case."  *Id*. at 10-11.

Mr. Duncan raised the judicial notice issue on the second Ninth Circuit appeal.  Neither the government nor the Ninth Circuit addressed the issue.  Notably the government did not assert, as it does now, that counsel requested this Court to take judicial notice of the competency finding.  The Court's consideration was erroneous.

### 2.  The Court Erred in Failing to Consider Dr. Roesch's Interviews

Throughout the 2255 Motion, petitioner contends that the four-hour recorded interview with prosecution expert Ronald Roesch provides compelling evidence of incompetency, *see., e.g.*, Motion at 57, 59, 85, 91-95, 105, 121-22, and the Court's retrospective competency finding suffers from the refusal to consider, let alone discuss, that evidence.  *See* § 2255 Motion at 119-20 ("Mr. Duncan was … deprived of a full and fair [retrospective competency] determination based on all available and admissible evidence due to the government's withdrawal of Dr. Roesch's testimony.  Although the Court and prosecution wanted nothing to do with Dr. Roesch after the defense was finished cross-examining him, the defense wanted it rely of Dr. Roesch's interview[s]], and it was entitled to have those interviews considered.")

Retrospective competency counsel similarly emphasized the signs and symptoms of psychosis that Mr. Duncan manifested during the Dr. Roesch interviews.  In the "Defendant's Post-Hearing Response Brief (Corrected)," Cr. Doc. 839 the defense contended "the monologues evident in … Dr. Roesch's interviews" belied Dr. Rath's characterization of Mr. Duncan's

1   discourse, *id.* at 21, and included a three page "careful review of [Dr. Roesch's] interview (Ex.

2   II)" discussing of the psychotic symptomatology documented by Dr. Roesch's recordings.  *Id.* at

3   33-36.  The retrospective competency order does not mention or allude to any of the psychotic

4   behaviors established by the recordings of Dr. Roesch's interviews either as cited as direct

5   evidence in the defense briefing or as discussed and analyzed at length during the testimony of

6   various defense expert witnesses, such as Drs. Gur, Woods and Kalechstein.

7   
8   Instead, the Court provided the following discussion of Dr. Roesch:

9   
10      [T]he Government offered the testimony of its retained expert Dr. Roesch who
        had completed a retrospective competency evaluation of the Defendant. The
11      Government did not, however, rely upon Dr. Roesch's testimony in their post-
        hearing briefing. The defense effectively cross examined Dr. Roesch concerning
12      his report and the conclusions reached therein. In particular, the defense drew into
        question how Dr. Roesch used the raw score data from testing performed by other
13      practitioners, relied upon other experts' conclusions, and criticized his limited
        experience in conducting this type of retrospective evaluation. The Court has
14      reviewed Dr. Roesch's report, the video taped interview between Dr. Roesch and
        the Defendant, and the transcript from the retrospective competency hearing.
15      Having done so, the Court does not find Dr. Roesch's testimony or report to be
        useful or reliable in addressing the issue presented in this matter. For these
16      reasons the Court has not placed any weight on Dr. Roesch's testimony or report
        in reaching its decision herein.

17   Doc. 843 at 18-19.  Admittedly, the Court's statement has some ambiguity.  The statement is

18   clear that the interview was among the materials reviewed in considering whether to give

19   testimony or report any weight, but it is unclear whether the interview was given any weight

20   independently of showing Dr. Roesch's opinion to be unreliable.  In that the Court took 66 pages

21   to explain its views of the evidence, the failure to say anything else about Dr. Roesch's interview

22   – particularly in light of the defense's heavy reliance on it – strongly suggests it too was

23   excluded from consideration.

24   
25         Nonetheless, the government argues petitioner's contention "makes no sense" because

26   the defense got what it asked for:  exclusion of Dr. Roesch's testimony and report.  Answer at

27   69.  Petitioner has just responded in the paragraph above to that argument.  The government also

28

argues, in the alternative, that even if the Court erred, the errors to not rise to the level of a

constitution violation and therefore do not merit collateral relief.  *Id*.  This argument misses the

point.  The government concedes that at a minimum this Court must reweigh the evidence

previously adduced on the issue of Mr. Duncan's competency at the time of his appellate waiver

to assess his competency at the time of his plea and request to proceed pro se.  As a result, Mr.

Duncan is not required to show that the prior finding is tainted by an error of constitutional

magnitude.  He need only show that the evidence, if reevaluated either alone or in connection

with additional evidence to be adduced, should be given different weight.

### D. Petitioner was Denied Effective Assistance of Counsel at the Retrospective Competency Hearing

#### 1. Counsel mishandled the issue of familial abuse and incest

In the 2255 Motion, Mr. Duncan alleged that he was denied effective assistance of

counsel at the retrospective competency hearing as a result of defense counsel's failure to

introduce expert testimony regarding the effects of familial abuse and incest on Mr. Duncan's

mental functioning. Doc. 4 at 119.  The petition alleges that expert testimony concerning Mr.

Duncan's history of a victim of familial psychological, physical, and sexual abuse and incest

would have bolstered the case in chief for psychosis, while simultaneously explaining why – in

light of his atypical presentation – some of the experts failed to see the signs and symptoms of

his incompetency.  In particular, the petition alleged that an expert in the mental functioning of

male survivors of familiar sexual abuse such as Dr. Lisak would have been able to connect Mr.

Duncan's highly atypical psychiatric and psychological symptomatology to his history by

explaining that familial sexual abuse can "produce spectacularly idiosyncratic thought patterns"

similar to "thought disorder symptoms commonly seen in psychosis."  Motion at 119. Mr.

Duncan also alleged that at a minimum, retrospective competency counsel should have had

1  defense experts Gur, Woods, and Merikangas review Cheri Cox's hearing testimony, which

2  recounted the familial abuse in graphic and compelling detail, in order to more fully assess Mr.

3  Duncan's mental functioning.  *Id.*

4       The government argues, "Duncan's argument fails because, contrary to Duncan's

5  suggestion, the experts were well aware of the abuse and incest in Duncan's family history." To

6  be sure, the experts were aware of Mr. Duncan's self-reports, generally devoid of any significant

7  detail, of having been the victim of incest, but nowhere in the government's long string cite to

8  alleged evidence of Mr. Duncan's victimization, Answer at 70-71[12], is there anything but a few

9  relatively or entirely unadorned self-reports from Mr. Duncan.  Included in the string cite is not

10 simply one but two separate references to a defense reference "incest???" in a list of potential

11 issues to be investigated.  So while it may be true, that "[e]arly on, the defense team identified

12 the incest, abuse, and family dysfunction covered in his sister's testimony as 'themes' from

13 Duncan's life history," Answer at 70, that is beside the point.  Until Cheri testified, the defense

14 had no proof so the "theme" was entirely undeveloped either as a theme in mitigation or as a

15 causative factor in his psychotic thought process and atypical psychotic presentation.

16      Grasping for a slender reed, the government nonetheless asserts "the [defense] experts

17 were well aware of the underlying issues and incorporated their knowledge into their opinions

18 and testimony," Answer at 71, and "used the information to explain the 'etiology of [Duncan's]

19 impairment' at the retrospective competency hearing."  *Id.* (citing CR Dkt. 818, Vol. 12, at 3026-

20 27).  Cr. Doc. 818 is Day 12 of the retrospective competency hearing and transcript pages 3026-

---

[12] Citing Sealed Gov't Attach. 5; Sealed Gov't Attach. 3 at 2, 12-13, 20, 25; Sealed Gov't Attach. 12; Sealed Gov't Attach. 3 at 13, 36, 46, 52, 69, 72, 73, 76-77; Sealed Gov't Attach. 3 at 20-21; 52; Sealed Gov't Attach. 5 at 2; CR Doc. 812 at 1574, 1577-78.

27 support petitioner's contention, not the government's.  There the "explanation" of the role of Mr. Duncan's history of familial sexual abuse in his mental functioning consists of the following:

> Q. Did you, when you took a history from him, was there anything significant about his social history in terms of the issues you talked about before; abuse, things of that nature, genetics?
>
> A. Yes, all those things. He has a horrible background of mental illness on both sides of his family, of physical and sexual abuse in childhood, and passing through his adolescence and adulthood where he was raped in prison. And his head injuries, of which there are two significant ones that are reported and documented, one when he was a child when he was hit in the head with a pickax and the one when he was 15 in the car accident we have referenced. And from his medical history, his pediatric history that he had mumps, measles, and chicken pox, which are viruses that can affect the nervous system, and that he had high fevers with paratyphoid infection in Germany, which can also affect the brain and the nervous system. He had too many possible insults to his brain development to say which one in particular is the cause of it, but that we were able to demonstrate both functional and anatomical abnormalities on the MRI and the PET scan.
>
> Q. And is what you just said, that you cannot pinpoint what is called the etiology of his impairment?
>
> A. That's right. It is probably multifactorial, but we could show it is there and we know he has the psychosis and these things are probably related.

Cr. Doc. 818 at 3026-27 (cited in Answer at 71).  Not only does Dr. Merikangas not reference let alone explain the significance of incest or ***familial*** sexual abuse, he merely provides a litany of psycho social factors that are "probably related" to Mr. Duncan's psychosis.  To say that retrospective competency counsel (or trial counsel) and their experts adequately developed evidence, or explained the significance of, Mr. Duncan's victimization by his family members is to utterly misrepresent the facts and the record.

### 2.  Counsel prejudicially violated the court's discovery order

In the 2255 Motion at 117-19 petitioner alleges that retrospective habeas counsel's performance regarding the testimony of defense experts First, Amador and Beaver was deficient. Due in part to counsel's failure to provide full and complete prehearing disclosure of this

experts' anticipated testimony and opinions, the government was able to bar crucial testimony.

In its prehearing "OBJECTIONS TO DEFENSE COUNSEL'S EXPERT WITNESSES," the

government asserted:

> As part of their expert disclosure, defense counsel provided the United States with a copy of a "Supplement to Motion to Find Mr. Duncan Incompetent to Proceed or Alternatively for a Hearing Pursuant to 18 U.S.C. § 4241," which was filed with this Court, under seal, on July 28, 2008. (ECF No. 497). The supplement includes affidavits from Dr. First and Dr. Amador. Defense counsel disclosed no other reports from Dr. First or Dr. Amador. Defense counsel have provided the United States with raw data from neuropsychological testing Dr. Beaver, and/or an associate, conducted on the defendant in August of 2005 and February of 2008. Dr. Beaver did not prepare a report in connection with his involvement in the state or federal case.

Doc. 724 at 3. Contrary to the government's assertion, Dr. Beaver did in fact prepare a report

describing his involvement and his neuropsychological assessment of Mr. Duncan in 2005 and

2006, which was included in Defense Hearing Exhibit N, pages 184-86, and was admitted

without objection at RCHRT 3249. When the defense moved for admission of the report, the

government conceded:

> MR. WHATCOTT: Your Honor, I believe this is already part of the court record because it was something that was filed with this Court under seal. We just recently found out about this within the last month. But since it is already part of the court record, I have no objection to it coming in.

*Id.* However, as soon as the defense sought to elicit an opinion from Dr. Beaver regarding Mr.

Duncan's competency, the government again repeated it have never been provided any report,

and moved to preclude such testimony. RCHT 3284-85.

> MR. WHATCOTT: I believe what counsel is trying to do is to have this witness testify to his observations and his conclusions about the Defendant's actions at a time that he was hired as an expert witness for the State. Now, had the Defense wanted to use him in that manner, they very easily could have had him prepare a report and disclosed it in accordance with this Court's order. They chose not to do so. They represented to us and to the Court they did not intend to go there, and now Mr. Burt is trying to go away from that position here. We would ask the Court not to allow it.

RCHT 3285. The Court thereupon sustained the objection. RCHT 3285-86.

1    The government's first response, Answer at 71, is that the decisions to provide narrow

2    reports from Drs. First and Amador, and to provide no report from Dr. Beaver in discovery

3    "when examined in context … appear strategic."  The government then proceeds with an

4    impenetrable description of what is intended to pass for a contextualized appearance of a tactical

5    decision:

6

7        Doctors Amador and First were part of the defense team at sentencing, and had
         documented their opinions when Duncan wished to represent himself, around
8        April 2008. *See* Cr. (CR Dkt. 827, Vol. 21, at 5525-26.) Thus, their reports were
         from 2008. This was helpful to the defense: the reports were closer in time to
9        Duncan's decisions to plead guilty, to represent himself, and to waive appeal than
         any new reports from 2013 would be.
10

11   Answer at 71-72.  As best as can be determined, the government's view is that the trial team

12   made a strategic decision in 2008 to have the experts prepare narrow reports, which cast the

13   decision into stone for the 2013 retrospective competency hearing.  To the contrary, there is no

14   reason the retrospective competency team could not have requested the experts to provide

15   additional detail regarding their 2008 opinions, or even to form additional 2013 opinions.  In

16   fact, the government concedes this by acknowledging the defense "could have asked the experts

17   to create 2013 supplements to the reports." *Id*. at 72.  But then the government states the wholly

18   unsupported circular conclusion, "But supplements attempting to expand upon 2008 opinions

19   would have been of little value. The original reports were of far more value. Counsel made a

20   valid decision to use them." *Id*.  To the extent the government means to contend that the experts

21   might have been subject to impeachment for not including all relevant detail in their 2008

22   reports, that may or may not be true.  But even if such amendments might therefore be given

23   somewhat less weight, that does not render the failure to provide a complete report harmless.  To

24   the extent that the government is attempting to argue that newly rendered opinions would not be

25

26   close enough in time to the relevant waiver, it should be estopped from make such argument.

27

28

One of the Answer's principal arguments is that there is "not a shred of evidence in the record that [Mr. Duncan's] competency actually varied over the relevant period of time." Answer at 66. The government's response as to Dr. Beaver is equally enigmatic:

> Dr. Beaver was a mitigation expert who was part of the State of Idaho defense team, and had done his work significantly before the federal prosecution. He did not produce a report. (CR Dkt. 843 at 25 n.19; CR Dkt. 819, Vol. 13, at 3285-86.) Thus, there was no report that counsel could have produced. And again, a 2013 supplement would not have been of much value to a retrospective determination of Duncan's competency in November 2008.

Answer at 72. In addition to his December 4, 2007 declaration, the receipt of which the government acknowledged at the hearing, RCHT 3249 (Cr. Doc. 819 at 14), Dr. Beaver had contemporaneous notes of the seven times he met with Mr. Duncan in 2005 and 2006. In 2013, Dr. Beaver most certainly could have written up, and supported by incorporation of his contemporaneous notes, a description of the diagnostic impressions he formed in 2005 and 2006. Contrary to its current position, the government conceded that in its prehearing motion to preclude Dr. Beaver's testimony. The government wrote: "Given the length of time between his first involvement in this case, and the October 1, 2012 deadline, Dr. Beaver could have prepared a report detailing any expert opinions." Cr. Doc. 724 at 7. To the extent that the government may be arguing that a 2005-06 opinion may have been too remote in time from the 2008 waivers, it is answered by its argument regarding the alleged constancy of Mr. Duncan's mental condition.

### E. Respondent Admits the Court Violated Procedural Due Process by Failing to Make a Determination of Competency Prior to Accepting the *Faretta* Waiver

The government's response to Mr. Duncan's allegations that he was denied procedural due process at the time of his *Faretta* waiver, includes the following:

> When Duncan sought to represent himself, the Court had Duncan evaluated by Court appointed experts, who affirmed Duncan's competence to represent himself. The Court thus denied defense counsel's request for a competency

1

2

3

> hearing. As Duncan notes, the Ninth Circuit found fault with that decision, holding that a "bona fide doubt" regarding Duncan's competence existed at that time and that it was error not to hold a hearing. (*United States v. Duncan*, Appeal No. 08-99031, ECF No. 86-1 at 9251-52.) Thus, the Court of Appeals identified a procedural due process issue.

4

5

6

7

8

9

10

11

12

13

14

Answer at 76.  The government then argues that the procedural due process violation was "remedied by the Ninth Circuit's 2008 decision and this Court's retrospective competency hearing, and no further process is due, or even possible." Answer at 76.  Made manifest from the ensuing discussion is that all the government means by this enigmatic assertion is that the evidence already adduced is sufficient, in the government's view, to determine that Mr. Duncan was competent when he pleaded guilty and when he elected to proceed in pro per.  *See id.* at 77 ("It would be an academic exercise, and a complete waste of resources, to hold a second retrospective competency hearing to address Duncan's competency to plead guilty in December 2007 and to represent himself in August through November 2008.").

15

16

17

18

19

20

21

22

There is no question the 2013 competency hearing produced a substantial body of relevant evidence.  As this Court has noted, the retrospective competency hearing lasted longer than the sentencing trial.  Cr. Doc. 843 at 62.  That evidence certainly should be considered.  But the length of the hearing does not in and of itself insure that all necessary evidence is before the court, especially in light of: (a) petitioner's allegations of retrospective competency counsel's errors and omissions; and (b) the substantial dissimilarity of the question of competency to proceed and competency to handle one's own defense under *Indiana v. Edwards*.

23

24

**VI.   CLAIM 5:  THE COURT VIOLATED DUE PROCESS AND THE EIGHTH AMENDMENT WHEN IT ERRONEOUSLY ALLOWED PETITIONER TO REPRESENT HIMSELF AT THE SENTENCING TRIAL**

25

26

27

In Claim 5 of the 2255 Motion, Mr. Duncan alleges that even if he had been competent to represent himself, allowing him to do so resulted in a fundamental miscarriage of justice in that the Sixth Amendment right to self-representation does not extend to a capital sentencing trial and

28

his desire to represent himself was insufficient to override the societal interest in insuring

reliability in capital sentencing.  Motion at 132-39.  The government first asserts the affirmative

defense of procedural default, Answer at 78-79, which petitioner has already addressed.  *See*

*supra* at section II(A). The government then argues in the alternative that the claim is

substantively without merit in that *Faretta v. California*, 422 U.S. 806 (1975), applies at a capital

sentencing proceeding.  Answer at 79-84.

    The government begins its argument by setting up a strawman.  It repeatedly asserts that

Mr. Duncan's claim hinges on treating a capital sentencing trial as the functional equivalent of an

appeal. *See* Answer at 80 (asserting Duncan "analogizes the sentencing hearing to an appeal");

*id*. (asserting the facts "undermine[] any attempt to analogize the penalty phase to an appeal");

*id*. at 81  (stating that "Duncan's efforts to analogize the penalty phase to an appeal cannon

succeed.") The government even attempts to school petitioner in the nature of appeals by saying:

> While *Ring* and the FDPA require penalty phase fact finding, a reviewing court
> can neither consider facts new nor revisit the discretionary sentencing choices of
> the jury. *Cf. United States v. Mitchell*, 502 F.3d 931, 980 (9th Cir. 2007)
> (recognizing the FDPA's constitutionality though it does not require
> proportionality review); *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir.
> 1996) (describing the limited role of appellate courts in reviewing factual
> findings).

Answer at 81.

    In fact, the only reference to appeals it made in Claim 5 was regarding a brief *citation* to

*Martinez v. Court of Appeal of California*, 528 U.S. 152 (2000), in which the Supreme Court

held the Sixth Amendment right to counsel does not extend to on appeals, which followed a

*discussion* of *Betterman v. Montana*, 136 S.Ct. 1609, 1614 (2016), in which the Supreme Court

underscored the significance of the text of the Sixth Amendment, referencing  "—'accused' as

distinct from 'convicted,' and 'trial' as separate from 'sentencing'—." 2255 Motion at 135.  The

government's initial argument should be rejected.

The government next contends the "overwhelming weight of authority," Answer at 79, runs counter to Mr. Duncan's claim.  The government relies on a mere two cases, *United States v. Davis*, 285 F.3d 378 (5th Cir. 2002), and *Silagy v. Peters*, 905 F.2d 986, 1007-08 (7th Cir. 1990), as support.  The *Silagy/Davis* view has not received universal embrace.  In *State v. Reddish*, 181 N.J. 553, 859 A.2d 1173 (2004), the New Jersey Supreme Court refused to adopt the reasoning in *Davis*, stating:

> The Fifth Circuit concluded [in *Davis*] that because the "core" of a defendant's *Faretta* right is "his ability to preserve control over the case he chooses to present to the jury," this right must be honored during the penalty phase "regardless of whether society would benefit from having a different presentation of the evidence." *Ibid*. We respectfully disagree. In our view, it is difficult to square that conclusion with the Supreme Court's mandate in *Gregg*, *supra*, and *Eddings*, supra, that to constitutionally impose a death sentence, the sentencing jury cannot be deprived of an opportunity to make an individualized judgment based on a fair presentation of mitigating evidence.

*Id*. at 1204.  In *Barnes v. State*, 29 So. 3d 1010 (Fla. 2010), the Florida Supreme Court distinguished *Davis* in a case where, as here, the defendant had no strategy for achieving a sentence of less than death.   The court noted that Davis was a case in which the defendant's strategy was in direct conflict with counsel's approach, which caused the court to write:

> *Davis* is distinguished from the instant case because, contrary to what occurred in *Davis*, Barnes presented no mitigating testimony or evidence. Although he contends that he had a mitigation strategy-the fact that he took responsibility for the murder-we conclude that this amounted to nothing more than the fact of his guilty plea. While presentation of evidence of remorse could constitute mitigation evidence, Barnes never offered remorse as an element of his mitigation strategy. He explained that his confession and guilty plea were prompted by his conversion to the Muslim religion and his desire to have the benefit of doing a good deed during Ramadan. Thus, we conclude that, contrary to what occurred in *Davis*, the mitigation evidence presented by independent counsel in this case did not conflict with anything presented by Barnes and did not violate his right to self-representation.

*Id*. at 1024.

Indeed, the majority decision in *Davis* elicited a vigorous dissent, which merits reproduction of a lengthy excerpt:

The ultimate issue is whether a convicted federal capital murder defendant has the absolute right to choose death as his penalty and thus turn his sentencing hearing under the Federal Death Penalty Act of 1994 ("FDPA") into a charade. The majority misinterprets the record and ignores the district court's fully supported findings of fact, which show that *Davis* intends to incur the death penalty by presenting no adversary trial defense whatsoever. The majority errs grievously in interpreting the Supreme Court's cases as holding that a criminal defendant's right of self-representation is absolute and that the trial court is therefore powerless to exercise any significant supervision or regulation of the defendant's use of that right. I respectfully but emphatically dissent.

I. Overview

The majority commits legal error, in this case of first impression, by holding that a federal defendant convicted of capital murder may, prior to a sentencing hearing conducted under the FDPA, waive his right to counsel and assert his right to self-representation for the purpose of incurring the death penalty by presenting no defense at the sentencing hearing.   The majority conceives a criminal defendant's right to self-representation to be an insuperable right that is not diminished by the dramatic change in the defendant's autonomy interest resulting from his criminal conviction; an impregnable right that so outweighs the national interest in fairness, accuracy, and equality in federal capital sentencing proceedings that it permits of no significant regulation or supplementation by the trial courts; and a right that is so perfect and untrammeled that the convicted capital offender may, within his complete discretion, use it either to make a defense or to condemn himself to death.

But the majority's concept differs sharply from the right to self-representation expounded by the Supreme Court. The Court explained in *Faretta* that "[t]he Sixth Amendment includes a compact statement of the rights necessary to a full defense" and that the right of self-representation is merely one of the constituent rights.  It is not an absolute, free-standing right that can run counter to its source, the Sixth Amendment right to make a defense. The Court made this very clear when it said: "The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice-through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence. In short, the Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it.... Although not stated in the Amendment in so many words, the right to self-representation-to make one's own defense personally-is thus necessarily implied by the structure of the Amendment." In no way did the Court, in *Faretta* or any other case, ever suggest that self-representation can be separated from the right to make a defense and used negatively to eviscerate the basic Sixth Amendment right to resist the prosecution's attack, as the majority presently holds.

Because the right of self-representation is implied by and inherently part of the Sixth Amendment right to make a defense, the Supreme Court has recognized many exceptions and qualifications to the exercise of self-representation that enable trial courts to prevent it from being used to harm or defeat the basic right to make a defense. For example, the Court pointed out in *Faretta* that even when the defendant seeks to use the right of self-representation for the proper purpose of making a defense, the trial court must first determine that the defendant's

1
2
3
4
5
6

waiver of the assistance of counsel is knowing and intelligent and that the defendant is aware of the dangers and disadvantages of self-representation.  And "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." The trial court "may-even over objection by the accused-appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." Moreover, contrary to the majority's holding in the present case, *Faretta* left open the trial court's option of mitigating some of the problems resulting from self-representation by "appointing a qualified lawyer to sit in the case as the traditional 'friend of the court.'"

7
8

More recently, the Court affirmatively recognized the amicus counsel option and observed other limitations on the right to self-representation in *McKaskle v. Wiggins:*

9
10
11

A *pro se* defendant must generally accept any unsolicited help or hindrance that may come from the judge who chooses to call and question witnesses, from the prosecutor who faithfully exercises his duty to present evidence favorable to the defense, from the plural voices speaking "for the defense" in a trial of more than one defendant, or from an *amicus* counsel appointed to assist the court.

12
13
14
15
16

Accordingly, in *Martinez v. Court of Appeal of California,* the Court flatly stated that, "[a]s the *Faretta* opinion recognized, the right to self-representation is not absolute." After listing several exceptions and qualifications to the right of self-representation, the *Martinez* Court concluded that "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." Moreover, in holding that *Faretta* does not require a state to recognize a constitutional right to self-representation on direct appeal from a criminal conviction, the Court in *Martinez* gave reasons that are significant to the present case:

17
18

The status of the accused defendant, who retains a presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict....

19

            ....

20
21
22

... Yet the overriding state interest in the fair and efficient administration of justice remains as strong as at the trial level. Thus, the States are clearly within their discretion to conclude that the government's interests outweigh an invasion of the appellant's interest in self-representation.

23
24
25
26
27
28

The majority's decision to issue mandamus and reverse the district court's order is incongruous with all of the Supreme Court's cases; it permits the right of self-representation to be torn from the body of the basic Sixth Amendment right to make an adversarial defense and to be used to defeat the hopes and aspirations of that basic constitutionalized right. The majority's prior mandamus should not have issued because the district court was not clearly and indisputably wrong in refusing to allow Davis to waive his right to assistance of counsel and to represent himself. Davis had expressly informed the court that he would not use self-representation to make an adversarial defense as contemplated and protected by the Sixth Amendment. Instead, as he expressly stated, he intended to make no defense whatsoever, so as to ensure a death sentence. Under these circumstances,

the national interest in the fair and efficient administration of justice outweighed the defendant's interest in acting as his own lawyer, since his purpose was to defeat or relinquish his Sixth Amendment right to make a defense in an adversarial criminal proceeding. The present mandamus should not issue for the same reasons and also  because the Supreme Court clearly left open to the district court the option that it pursued on remand, namely, appointing a qualified lawyer to sit in the case as amicus curiae or friend of the court to safeguard the national interest in the integrity and fairness of the sentencing hearing and to mitigate some of the damage that will surely result from Davis's decision not to make any defense against the death penalty.

II. Mitigating Factors and the Eighth Amendment

In *Woodson v. North Carolina,* a plurality of the Supreme Court stated that

the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

This emphasis on individualized sentencing contributed to what Justice O'Connor would later identify as a tension that has long existed between the two central principles of our Eighth Amendment jurisprudence. In *Gregg v. Georgia [*428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)*]* Justices Stewart, Powell, and Stevens concluded that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." In capital sentencing, therefore, discretion must be "controlled by clear and objective standards so as to produce nondiscriminatory application." On the other hand, this Court has also held that a sentencing body must be able to consider any relevant mitigating evidence regarding the defendant's character or background, and the circumstances of the particular offense.

"Thus, the Constitution, by requiring a heightened degree of fairness to the individual, and also a greater degree of equality and rationality in the administration of death, demands sentencer discretion that is at once generously expanded and severely restricted." Although this seemingly paradoxical result has been challenged by minority views, it remains the Law of the Land that a sentencing body in a capital case must consider any relevant mitigating evidence. As stated by the Court in *Penry v. Lynaugh,* "[i]n order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,' the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime."

*United States v. Davis, supra*, 285 F.3d at 385–91 (Dennis, J., dissenting) (footnotes and

citations omitted).

As the government correctly notes, Answer at 82-83, under *Indiana v. Edwards*. 554 U.S.

1    164 (2008), the right to engage in self-representation, even when it applies, is not absolute.  The

2    *Edwards* Court cited *Martinez v. Court of Appeal of California, Fourth Appellate District*, 528

3    U.S. 152, (2000), for the proposition that "[e]ven at the trial level ... the government's interest in

4    ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in

5    acting as his own lawyer." *Edwards*, 554 U.S. at 176 (quoting *Martinez*, 528 U.S. at 162). In

6    *Martinez*, a case involving the participation of standby counsel rather than court counsel, the

7    Supreme Court also noted that "standby counsel may participate in the trial proceedings, even

8    without the express consent of the defendant, as long as that participation does not 'seriously

9    undermin[e]' the 'appearance before the jury' that the defendant is representing himself."

10   *Martinez*, 528 U.S. at 162 (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 187 (1984)).

12            *Edwards* thus undermines the core of *Davis's* holding – that because a defendant's

13   *Faretta* right is "his ability to preserve control over the case he chooses to present to the jury,"

14   this right must be honored during the penalty phase "regardless of whether society would benefit

15   from having a different presentation of the evidence." *Davis*, *supra*, 285 F.3d at 385.  After

16   *Edwards* and *Martinez*, it is difficult to square that conclusion with that conclusion with the

17   Supreme Court's mandate in *Gregg*, *supra*, and *Eddings*, *supra*, that to constitutionally impose a

18   death sentence, the sentencing jury cannot be deprived of an opportunity to make an

20   individualized judgment based on a fair presentation of mitigating evidence.

22            In this case, the court prohibited standby counsel from doing anything not expressly

23   authorized by Mr. Duncan.  In so doing the court abused its discretion by relying on an erroneous

24   interpretation of *Faretta*.  The death penalty has been recognized to be qualitatively different

25   from other forms of punishment. *See Gardner v. Florida*, 430 U.S. 349, 357 (1977)  (plurality

26   opinion).) The Eighth Amendment requires increased reliability of the process by which capital

27   punishment may be imposed. *Herrera v. Collins*, 506 U.S. 390, 406 (1993).  The demands of

1   increased reliability in the capital setting require that the accused be represented by counsel

2   notwithstanding his own desire to conduct his defense pro se.  At a minimum, the Sixth

3   Amendment right which *Faretta* recognized does not apply in situations, such as his, where no

4   evidence is presented in mitigation during the sentencing phase.  A decision not to present

5   mitigating evidence during the sentencing phase of his trial undermined the reliability of his

6   sentence that it cannot stand under the guarantees of the Eighth Amendment.

7   

8        Finally, the government argues that to grant relief would require the creation of "newly-

9   conceived rule of criminal procedure prohibited by *Teague v. Lane*, 489 U.S. 288, 310 (1989)."

10  Answer at 83.  Even assuming the general applicability of *Teague*, *see supra* at section II(B),  it

11  is not implicated by this claim.  Mr. Duncan's challenge to his conviction does not involve the

12  creation or extension of a previously-unrecognized constitutional right to be afforded to criminal

13  defendants.  Teague does not circumscribe the right of a federal habeas corpus court to declare

14  that a right previously assumed to apply at trial does not in fact exist.

15  

16       Nor does it require a new rule of criminal procedure to declare that the Eighth

17  Amendment prohibits accepting a *Faretta* waiver where the defendant manifestly intends to

18  present nothing in mitigation, not because he hopes to receive a death sentence but because of an

19  idiosyncratic, if not delusional, belief that Society will benefit from his silence.  *Faretta* itself

20  says the right to waive is not absolute.  *Indiana v. Edwards*, *supra*, makes clear *Faretta* rights

21  must yield where a defendant competent to waive counsel is mentally unable to assume the

22  responsibilities that waiver entails.  Where a defendant intends not to contest the government's

23  case, yet does not seek death but is simply indifferent to the outcome, it involves no extension of

24  his constitutional rights to declare that counsel, or advisory counsel, has the right and obligation

25  under the Eighth Amendment to contest the government's case.

1
2
3

**VII.    CLAIM 6: MR. DUNCAN'S TRIAL COUNSEL FAILED TO REQUEST A CHANGE OF VENUE IN VIOLATION OF MR. DUNCAN'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL**

4

The publicity surrounding Mr. Duncan's case was as pervasive as it was inflammatory.  It

5

was precisely the kind of media circus that would ordinarily lead counsel to move for a change in

6

venue.  Here, counsel flagged the issue, but due to a fatal breakdown within the defense team,

7

they failed to request a critically needed change in venue.  *See* Motion at 13-47.  For all the

8

reasons stated in his § 2255 Motion, Mr. Duncan was deprived of a fair and impartial jury in his

9
10

capital sentencing trial.

11

The government incorrectly asserts that because Mr. Duncan represented himself, he

12

cannot "deflect [the] failure" of ensuring that potential jurors were not biased as a result of pre-

13

trial exposure to prejudicial publicity.  Answer at 84.  Notwithstanding a defendant's right to

14

self-representation under *Faretta*, the Constitution requires, and trial courts have a duty to

15
16

ensure, that a defendant be afforded a fair trial by an impartial jury.  *Turner v. Murray*, 476 U.S.

17

28, 36 (1986).

18

*Break Down Of The Defense Function*

19

While Mr. Duncan ultimately proceeded pro se during his sentencing proceedings, the

20

time for filing a motion for a change of venue had come and gone well before Mr. Duncan was

21

granted leave to represent himself in July, 2008, making counsel's performance relevant to the

22
23

venue issue.  Counsel knew that a venue motion was likely appropriate given the deluge of

24

publicity in the case and given the trajectory Mr. Duncan's state case took. *See* Cr. Doc. 74 at 9

25

(10/3/2007 defense motion to continue trial date, referencing need to address venue) and Cr.

26

Doc. 143 at 2 (11/5/2007 defense motion for leave to file additional motions, noting defense was

27

"not adequately prepared" to file venue challenge).

28

In contending that Mr. Duncan cannot show that trial counsel could have successfully challenged venue in the case, the government states that the "reportage was . . . generally limited to the time of the crime, several years before Duncan's trial." Answer at 86. While true that the biggest barrage of media coverage came in the initial months after the offenses, by no means did the press lose interest in reporting on Mr. Duncan's case. In fact, as trial geared up, a new wave of coverage arose. This was noted by the Court during its voir dire of one of the jurors, who had been initially questioned during the first round jury selection (prior to Mr. Duncan declaring his intent to proceed pro se, which delayed proceedings for approximately four months). When follow up voir dire was conducted by the Court with that juror, SB, the Court observed, "[t]here has been considerable media coverage since you were released, but nothing there that has come to your attention that would affect your qualifications to serve as a juror?" Exh. 138 at 017278; *See also* Exh. 143 017547 (prospective juror noting there was coverage about the case just one day prior to being questioned); Exh. 146 at 017725 (juror referencing having learned through the media that Mr. Duncan pled guilty to all charges against advice of counsel – something that occurred only a few months prior); and Exh. 149 at 017927-28 (juror confirming having heard information about the case between April 2007 when jury selection first began and August 2007 when it resumed).

From the issuance of the federal indictment in January of 2007 until July 28, 2008, when Mr. Duncan was granted leave to proceed pro se (Cr. Doc. 500), Mr. Duncan was represented by counsel and was thus constitutionally guaranteed the right to the effective assistance of counsel under the Sixth Amendment. Mr. Duncan's trial counsel were, despite being well-qualified on paper, utterly dysfunctional in this case. The myriad reasons giving rise to that dysfunction are detailed in Mr. Duncan's § 2255 Motion. Motion at 13-47. *See Powell v. Alabama*, 287 U.S. 45, 71 (1932) (Sixth Amendment right to effective assistance of counsel can be jeopardized by

inadequate case preparation).

### The Role Of The Trial Court

The trial court has an independent duty to ensure that a capital defendant is provided an impartial and otherwise qualified jury.  *Dennis v. United States*, 339 U.S. 162, 168 (1950).  It is difficult to conceive of circumstances where the trial court's role is more critical than where, as here, the defendant was proceeding pro se.  Assuming arguendo that Mr. Duncan was competent to represent himself – which he was *not* (*see* claims 3 and 4, *supra*) – the Court was still required to make sure that the jury charged with deciding whether Mr. Duncan should live or die was free from bias.  The record below illustrates that the jury empaneled in this case was not qualified to sit in judgment of Mr. Duncan.  In fact, the vast majority of the seated jurors in the case provided powerful evidence through their answers on the juror questionnaires that they were biased and/or would automatically sentence Mr. Duncan to death based, at least in part on their exposure to pretrial publicity about the case.  Given that evidence and given trial counsel's ultimate "stand by counsel" role following Mr. Duncan proceeding pro se, it fell to this Court as a failsafe to guard against the inclusion of biased or otherwise disqualified jurors.

As noted, counsel failed to mount a challenge to the venue in violation of their Sixth Amendment duties.  That error was compounded when the Court failed to otherwise ensure that Mr. Duncan was afforded an impartial jury.  When a "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" and is nonetheless seated, the Sixth Amendment right to a fair and impartial jury has been violated. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).  In *Dennis v. United States*, 339 U.S. 162, 168 (1950), the United States Supreme Court highlighted the critical roles of trial courts in protecting defendants' right to an impartial jury: "When empaneling a jury the trial court has a serious duty to determine the question of actual bias, and a broad discretion in its

rulings on challenges  therefor. . . . In exercising its discretion, the trial court must be zealous to protect the rights of an accused."

### *Prejudice*

The Ninth Circuit has held that prejudice may be presumed in support of a motion for transfer of venue where "the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crimes."  *Harris v. Pulley*, 885 F. 2d 1354, 1361 (9th Cir. 1989).  Actual prejudice is shown, on the other hand, "when voir dire reveals that the jury pool harbors 'actual partiality or hostility against the defendant that cannot be laid aside.'"  *Hayes v. Ayers*, 632 F. 3d 500 (9th Cir. 2011).

The government's assertion that Mr. Duncan has not shown prejudice is belied by the record, as demonstrated in Mr. Duncan's § 2255 Motion and as detailed below.  Prejudice should be presumed based on this record.[13]

The byproduct of counsel's errors and those of the Court was a venire by which a death verdict was a virtual guarantee.  As the Supreme Court long ago made clear, "[a] state may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death."  *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968).  Whether viewed through the lens of ineffective assistance of counsel, trial court error, or structural error, the resultant death sentence cannot stand.

In *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Supreme Court reversed a conviction and death sentence based on jurors' pre-trial exposure to a filmed law enforcement interrogation

---

[13] As noted in his 2255 Motion, Mr. Duncan is constrained from illustrating actual prejudice due to the Court's order prohibiting juror interviews.  Cr. Doc. 479.  This should not be construed as "conceding" there was not bias in fact, as the government contends (Answer at 87).

of the defendant, which yielded a confession.  The Court made the following observations:

members of the jury admitted during voir dire that they had seen and heard the defendant's

interview with law enforcement and the interview was an exhibit in the court record.  *Id.* at 725.

The Court concluded due process "required a trial before a jury drawn from a community of

people who had not seen and heard Rideau's televised interview" and further that due process

demands that no one be sent "to his death" under circumstances like those in *Rideau.  Id.* at 727,

quoting *Chambers v. Florida*, 309 U.S. 227, 241 (1940).

Here, the circumstances bear several similarities to those which prompted the Supreme

Court to reverse in *Rideau.*  First, eleven out of the twelve seated[14] jurors admitted to having

heard/read/viewed media reports about the offenses Mr. Duncan was being tried for (in addition

to surrounding events for which he was charged in other jurisdictions). *See* Exh. 138 at 017252;

Exh. 141 at 017411, 017435-36; Exh. 142 at 017461, 017485-86; Exh. 143 at 017546; Exh. 144

at 017572, 017596-97; Exh. 145 at 017634, 017658-59, 017667;[15] Exh. 146 at 017701, 017725-

26; Exh. 147 at 01772, 017796, Exh. 148 at 017852; Exh. 149 at 017886, 017910-11, Exh. 151 at

018011, 018035; Exh. 152 at 018075, 018099-018100.

Moreover, viewed in their totality, the juror questionnaires pertaining to the seated jurors

contained numerous indicators that one or more of them would not be capable of being fair and

impartial in this case.  In one example, a juror who admitted having had substantial pre-trial

---

[14] Of the twelve seated jurors, only Juror CC stated that s/he had not been exposed to pretrial media.  *See* Exh. 139 at 017292. Two of the three alternate jurors were exposed to pretrial publicity. *See* Exh. 141 at 017411 and Exh. 143 at 017546.

[15] Notably, in response to the question "what did you think when you received the jury summons for this sentencing hearing," this juror stated, "It scared me a little because of the publicity.  I want to do my civic duty, but I also heard from the media what a horrible crime it was."

media exposure to critical facts and allegations relating to the offenses also stated that he "strongly agreed" that anyone who sexually abuses and murders children should get the death penalty.  *See* Exh. 138 at 01752, 017258; Exh. 141 at 017441; Exh. 142 at 017491; Exh. 149 at 017916; Exh. 150 at 017970; and Exh. 151 at 018041.

The error complained of is not simply a case where jurors were exposed to pretrial publicity.  The media saturation in Mr. Duncan's case clearly impacted the jurors preconceptions about Mr. Duncan and influenced their views about the application of the death penalty in his case.  The Supreme Court has presumed prejudice where the "community in which the trial was held had been subjected to a barrage of inflammatory publicity," noting that several of the jurors had formed opinions, even "so far as to say that it would take evidence to overcome their belief" renders a fair trial impossible.  *Murphy v. Florida*, 421 U.S. 794 (1975), citing *Irvin v. Dowd*, 366 U.S. 717, 728 (1961).  At least two of the seated jurors who were tasked with determining whether Mr. Duncan should live or die and who had been exposed to the press coverage in the case indicated they would need to "overcome" their predisposition to vote for death.  *See* Exh. 142 at 017488-91 and Exh. 152 at 018106.  Consistent with the Supreme Court's reasoning in *Murphy* and *Irvin*, the record in this case makes clear that a fair trial was impossible with this jury.

Contrary to the government's contention that this case is not within the ambit of those in which pretrial publicity should raise a presumption of prejudice (Answer at 84-86), the Supreme Court has made clear that prejudice may be presumed when the "trial atmosphere [is] utterly corrupted by press coverage," *Murphy v. Florida*, 421 U.S. 794 (1975), or when "a wave of public passion . . . makes a fair trial unlikely by the jury . . ." *Patton v. Yount*, 467 U.S. 1025, 1040 (1984).  *See also Irvin v. Dowd*, 355 U.S. 717 (1961); *Estes v. Texas*, 381 U.S. 532 (1965); *Sheppard v. Maxwell*, 384 U.S. 333 (1966).  This is such a case.

1

2

3          Finally, the presence of a biased juror is unquestionably a structural error. As with the

4    denial of counsel or a grand jury selected in a discriminatory manner, the presence of a biased

5    juror in a death penalty sentencing hearing is an error that cannot be quantitatively assessed in

6    the context of other evidence to determine if the error was harmless.  "Like a judge who is

7    biased, the presence of a biased juror introduces a structural defect not subject to harmless error

     analysis." *Dyer v. Calderone*, 151 F.3d 970, 973 n. 2 (9th Cir. 1998).

8          As with most of Mr. Duncan's claims, this cannot be viewed in isolation. It must instead

9    be understood as indicative of the larger systemic breakdown that plagued this case. A defendant

10   with a deep history of trauma and mental illness. A rotation of four defense attorneys spread

11   across three states. Two of the attorneys who were so consumed by alcoholism during the pretrial

12   proceedings that one had to be bailed out of jail by co-counsel after a late-night DUI and one of

13   whom was directed to inpatient rehab and removed as Federal Defender by his Board.

14         With a mentally ill client and a defense team in disarray, critical tasks were neglected and

15   the trajectory of the defense got tragically off course.  The defense failed to request the necessary

16   change of venue.  Thereafter, their mentally ill client pled guilty – an outcome counsel acceded

17   to only because they were not prepared for trial.  Then, on the second day of jury selection, Mr.

18   Duncan announced he wished to proceed pro se, a decision fueled by his mental illness.  The

19   remainder of jury selection cannot fairly be characterized as consistent with the Sixth

20   Amendment's requirement that Mr. Duncan be afforded a qualified, impartial jury. An error of

21   this magnitude should prompt the Court to grant relief.

22

23

24

25

26

27

28

## VIII.   CLAIM 7: THE ADMISSION OF FUTURE DANGEROUSNESS EVIDENCE, THE PROSECUTION'S ARGUMENTS, AND THE COURT'S INSTRUCTIONS VIOLATED THE FIFTH AND EIGHTH AMENDMENTS AND RESULTED IN A FUNDAMENTAL MISCARRIAGE OF JUSTICE

In its indictment against Mr. Duncan, the government alleged two non statutory aggravating circumstances the Government intended to prove at the selection phase of trial: victim impact and future dangerousness. As to future dangerousness, the notice alleged that the defendant is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others as evidenced by, at least, one or more of the following: (a) a continuing pattern of violence, attempted violence, and threatened violence, including, at least, the crimes in the instant case; (b) the prior murders of three other children; and (c) risk of flight. Cr. Doc. 10 at 5-6.  The defense challenged the government's proposed introduction of unadjudicated prior criminal conduct at the selection phase as unconstitutional, arguing that questions of dangerousness not limited to serious violence in prison are irrelevant, and that predications of future dangerousness are notoriously unreliable. Cr. Doc. 139-2 at 34-48.

In assessing whether evidence is appropriately admitted to show that a defendant poses a future danger to staff or inmates in a maximum security setting, such evidence must be evaluated in order to determine whether it is probative on the issue, as well as not unduly prejudicial. Here, the government submitted evidence of unadjudicated crimes against children from a decade earlier.  The Court sanctioned this evidence over the defense's strenuous objection on the grounds that the evidence of unadjudicated crimes against other children "is highly relevant in that it shows a pattern of violence throughout Mr. Duncan's adult life." Cr. Doc. 590 at 10.  The Court's logic simply doesn't hold up.  The admission of this evidence, notwithstanding the government's suppositions to the contrary, rendered Mr. Duncan's capital sentencing

1   fundamentally unfair.

2       In the context of assessing future dangerousness, the question must focus not simply on a

3   defendant's conduct outside a prison setting, but rather what his conduct is likely to be – often

4   gauged by what it has been – in a maximum security prison.  Mr. Duncan had an extensive

5   history of having been incarcerated, so on the most pertinent question, there was no dearth of

6   data.  Mr. Duncan's history, as is typical of those convicted of sexual offense against children,

7   was that of victim, not perpetrator.  *See* Exh. 13 at 118-119.  In mining his corrections records

8   for examples of misconduct committed by Mr. Duncan, the government was able to come up

9   with only these two incidents: on one occasion Mr. Duncan threw a plastic garbage can lid as if it

10  were a Frisbee, which hit a guard and, on another occasion, Mr. Duncan took an antenna wire,

11  radio jacks, a baseball and other items, suspected to be stolen from the prison electronics shop.

12  RT 3108; Trial Exhibits 178a, 178b.

13      Importantly, while the Court ultimately rejected the defense's challenges to the

14  government's proposed use of unadjudicated crimes as evidence of future dangerousness, the

15  Court agreed that "the Government's evidence as to the non-statutory aggravating factor of

16  future dangerousness in this case [should be limited] to the context of life imprisonment."  Doc.

17  313 at 21.  It follows that the evidence admitted should have been probative of what Mr.

18  Duncan's behavior was likely to be in a maximum security prison.  It was not.

19      As Mr. Duncan explained in his § 2255 Motion the non-statutory evidence utilized by the

20  government to advance their argument that Mr. Duncan posed a risk of future dangerousness

21  related to crimes against other children that were said to occur in Washington and California

22  several years prior to the instant offenses.  In its Answer, the government characterizes the

Washington and California offenses as improvisational sexual crimes against children.  Answer at 95-96.  Notably, Mr. Duncan's criminal history is marked by just that: sexual offenses against children.  Importantly, this translates in a very specific way to a prison context. In prison, offenders who have engaged in sexual offenses against children are especially vulnerable to becoming victims themselves.  Indeed, that was the case with Mr. Duncan, repeatedly, during his prior incarcerations.  Exh. 13 at 118-119.  Accordingly, the introduction of evidence regarding Mr. Duncan's prior sexual offenses against other children in Washington and California carried with it a risk of undue prejudice or, at minimum, confusion of the issues as the jury grappled with what weight to give such information in assessing whether Mr. Duncan posed a risk of future dangerousness.  Under 18 U.S.C. 3593(c), evidence may be excluded "if the probative value is outweighed by the danger of creating unfair prejudice, confusing the issues or misleading the jury." The government fails to meaningfully address these considerations in its Answer, focusing instead on the general "legitimacy" of future dangerousness as an aggravating factor.  Answer at 97.  Whatever legitimacy evidence of future dangerousness may have as a general matter (and Mr. Duncan detailed several points on which social science research has called that into question), the issue is *this* case is: whether the evidence submitted by the government is probative and not unduly prejudicial on the question of whether Mr. Duncan would pose a risk in a maximum security prison setting? The answer is no.

Penalty phase evidence must satisfy the "heightened reliability" requirements of capital sentencing, in light of the finality of the penalty.  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  The evidence at issue did not provide a reliable basis for deciding whether or not Mr. Duncan would likely pose a serious danger to staff or inmates at a maximum security prison. Additionally, whatever probative value so-called future dangerousness evidence may have, if it is outweighed by the danger of creating unfair prejudice, it should be excluded.  18 U.S.C. 3593(c).  The

evidence, unadjudicated crimes involving the murders of other children, when the jury was

assessing Mr. Duncan's moral culpability as it pertain to crimes against two children, D.G. and

S.G., undoubtedly cemented the picture of Mr. Duncan as a multiple child murderer.  Further, the

Court's limiting instruction that the evidence of unadjudicated crimes against other children

should only be considered in the context of whether Mr. Duncan would pose a danger in prison

was meaningless.  In sum, as challenged in his pretrial motions and as detailed in Mr. Duncan's §

2255, the submission of other crimes evidence to the jury, the prosecution's argument, and the

Court's instructions denied Mr. Duncan fundamental fairness, due process, and resulted in a

miscarriage of justice.

## IX.   CLAIM 8: THE ADMISSION OF GRUESOME VIDEOGRAPHIC EVIDENCE VIOLATED THE FIFTH AND EIGHTH AMENDMENTS AND RESULTED IN A FUNDAMENTAL MISCARRIAGE OF JUSTICE

As detailed in his § 2255 Motion, the admission of graphic videotapes depicting child

sexual abuse, torture and attempted murder violated Mr. Duncan's right to a fundamental

fairness, due process and a reliable death sentence. *See* Motion at 156-167.  This evidence was

introduced over Mr. Duncan's personal objection to victimizing the jurors. The evidence was

guaranteed to, and did in fact, evoke a strong visceral sense of revulsion and unfair prejudice far

outweighing any probative value.

In its Answer, the government repeats the refrain that the FDPA requires proof of any

aggravating factor.  Answer at 103-105.  The government emphasizes this point in support of its

argument that they *had to* present the videos because they "provided highly relevant evidence of

all four of the aggravating factors noticed by the government."  Answer at 104.  This argument

falls short.  The statutory aggravating factors, including 1) "death during the commission of

another crime;" 2) "heinous, cruel, or depraved manner of committing offense;" 3) "substantial

planning and premeditation," and "vulnerability of victim," were all established by other

evidence, and as even the Answer concedes they were well established by other evidence at trial. The government's suggestion that the videos were critical evidence in the eligibility context is misleading. The true purpose of introducing the videos was not to establish that Mr. Duncan was "eligible" for a death sentence, but rather to guarantee a death sentence by inflaming the jury with footage so graphic there was no other possible outcome.

In its Answer, the government claims that "Duncan's torture of D.G. in the course of the child's kidnapping and sexual abuse are thus established in the video." Answer at 107. This may be true, but that is quite different from contending the video was *necessary* to prove facts. At trial the government noted that the facts illustrated by the video were established by other evidence, namely Mr. Duncan's guilty plea, S.G.'s statements, and other collateral evidence. RT at 2781-2784 and 2790-2793. And in the course of arguing the error, if any, was harmless the government claims there was other "ample evidence" establishing the aggravating factors and establishing Mr. Duncan's intent. Answer at 109.

Thus, according to the government, the videos were both essential to proving the aggravators and also superfluous given that there was other "ample" evidence which served that function. The government cannot have it both ways. Its latter point supports Mr. Duncan's argument: this evidence was gratuitous, inflammatory, and wholly unnecessary.

Indeed, at the close of the eligibility phase, in addressing the element of intent, the government argued the conduct "that rendered [Duncan] eligible for a sentence of death didn't begin in the Lolo national forest, and it didn't even begin at Wolf Lodge. It began with the substantial planning and premeditation when he decided to flee Fargo, North Dakota…" as evidenced by the "document he prepared on his computer" while still in Fargo. RT at 2767.

In recounting the evidence proving Mr. Duncan killed D.G., the government emphasized S.G.'s statements, the photos and the associated metadata, and the auto track data, all of which

were exhibits introduced at trial.  RT at 2774-2775.  With regard to the evidence that proved the killing of D.G. was intentional, the government relied on Mr. Duncan's guilty plea, the transcript of which was introduced into evidence, thus providing the detailed factual basis for Mr. Duncan admitting to each count in the indictment, including establishing aggravators making him eligible for a death sentence.  RT at 2775-2776.  The government also argued evidence of Mr. Duncan's intent to kill D.G. was found in S.G.'s statements and in Mr. Duncan's blog.  RT at 2776-2677. The government submitted that the aforementioned evidence "proves that the Defendant intentionally killed D.G. and also satisfied each of those other three threshold intent levels."  RT at 2777.  The government's insistence now that the gratuitous videos at issue were necessary to establish Mr. Duncan's death eligibility, in light of the above record, rings hollow.

Turning to the evidence the government called "unrefuted" at trial, proving each of the statutory aggravating factors, the government once again relied on the transcript of Mr. Duncan's guilty plea, as well as Mr. Duncan's 2006 statement to Detective Maskell after having pled guilty to the Idaho state charges, and Duncan's statements to S.G, all of which went to count 1 – that D.G.'s death occurred during the course of another crime: kidnapping. RT at 2781-2784.  As to the prior conviction aggravator, the government noted that Mr. Duncan's guilty plea and resultant convictions on the Idaho state charges, which were exhibits in the federal trial proceedings, established the prior conviction aggravator.  RT at 2786-2787.

As to the aggravating factor alleged that D.G. was killed "in an especially heinous, cruel and depraved manner, and that it involved torture and serious physical abuse to D.G.", the government pointed to the medical examiner's testimony, S.G.'s stipulated testimony and other statements, Mr. Duncan's statements, photos, videos and other physical evidence from the crime scene.  RT at 2790-2793. Regarding the "substantial planning and premeditation" aggravator, the government underscored the extensive documentation indicating Mr. Duncan's planning while

still in Fargo and leading up to Wolf Lodge and referenced several witnesses who provided

testimony relevant to the planning issue.  RT at 2794-2806.  With regard to "vulnerability of the

victim" aggravator, the government handily referred to the unrefuted fact that D.G. was only

nine years old, making him vulnerable simply by virtue of his age and size.  RT at 2806-2808.

Finally, as to the "previously . . . convicted of a crime with a punishment of more than one year

that involved a firearm" aggravator, and that involving a conviction "of a crime of sexual assault

where the punishment was more than one year," the government pointed to Mr. Duncan's prior

rape conviction (also admitted as an exhibit) as the evidence establishing both of those

aggravators.  RT at 2808-2809.

     In sum, the government argued strenuously at trial that there was an abundance of

evidence establishing Mr. Duncan's death eligibility.  And while there was some reference to the

videos at issue here, the government mostly relied on other evidence. It is unmistakable that the

government had no need to present the videos in order to establish death eligibility; its own

arguments at trial prove the point.  Thus, the only reason to seek admission of the videos was to

inflame the jury, which they most certainly did.  As one media outlet, the Spokesman-Review,

reported, "Nothing previously presented in court could have prepared viewers for the level of

violence in the videos . . . As the videos played, one juror turned away and shielded her eyes

with her hand, looked back and again and then turned away again, her face contorted. Another

covered her mouth with a tissue, sobbing silently." Exh. 98 at 600a. An article in the Press-

Tribune, with a headline reading "Jurors cringe at graphic videos in Duncan Sentencing" said,

"Jurors cringed, cried and some desperately looked away as they were shown a series of deeply

disturbing and graphic videos taken by convicted child killer Joseph Edward Duncan III as he

tortured, sexually abused and nearly killed a 9-year-old boy." Exh. 98 at 593.  And an October

2008 AP story said that "During the federal trial, jurors watched a video made by Duncan of him

1   molesting and torturing [D.G.]. The case was so graphic that jurors were offered counseling
2   afterward." Exh. 13 at 596.
3        The government gives short shrift to the safeguards meant to exclude overly prejudicial
4   evidence, but that is the heart of this claim.  Mr. Duncan pled guilty to all charges, laying out the
5   factual basis that served as the building blocks for the government's case for death.  The standard
6   provided in the FDPA is more demanding than that set forth in Fed. R. Evid. 403, which permits
7   exclusion of "relevant evidence if the probative value is *substantially outweighed*" by the danger
8   of unfair prejudice, confusion of the issues, or misleading the jury.  Under the FDPA, evidence
9   may be excluded if its probative value is, simply, "outweighed by the danger of creating unfair
10  prejudice. . ."  *See* 18 U.S.C. § 3593(c) and *United States v. Sampson*, 486 F.3d 13, 42 (1st Cir.
11  2007) (recognizing that while Rule 403 requires that probative value be substantially outweighed
12  by the danger of unfair prejudice before evidence may be excluded, the FDPA omits this
13  substantiality requirement and directs that exclusion may result if the scales tip, even slightly, in
14  favor of unfair prejudice); *United States v. Taveras*, 488 F.Supp.2d 246, 250 (E.D.N.Y. 2007)
15  (noting that the "FDPA raises the bar for the admission of prejudicial evidence"); *United States
16  v. Johnson*, 362 F.Supp.2d 1043, 1105 (N.D. Iowa 2007).
17       The government's reliance on *United States v. Lujan*, 603 F.3d 850, 858 (10 Cir. 2010) is
18  misplaced.  Answer at 105-06.  Citing *Lujan*, the government states "excluding highly relevant
19  evidence on the ground that it is too powerful or too horrible would prevent the capital jury from
20  fulfilling its essential function – gaining a full understanding of the defendant's crimes, and the
21  manner in which he carried them out, in order to identify whether that particular defendant truly
22  merits the most extreme punishment."  Answer at 106.  In *Lujan*, the Tenth Circuit reversed the
23  district court, which had excluded any and all evidence relating to the other murder on the
24  grounds that its admission "creat[ed] a substantial risk that the jury could impose a sentence that

is based on, or appears to be based on, emotional considerations rather than instructed reason."

603 F.3d at 858.  The Court of Appeals held that it was an abuse of discretion by the district

court to exclude "any evidence" of other murders given its probative value and the availability of

curative instructions.  *Id*.

Here, the objection was to the admission of an incredibly graphic and disturbing video

lasting approximately a half hour, which depicted Mr. Duncan torturing the victim in the case, a

nine-year-old boy.  Mr. Duncan did not object to "any evidence" of the conduct at issue being

placed before the jury.  In fact, Mr. Duncan admitted to *each and every* underlying fact proving

the conduct.  Moreover, the government had – and admitted – approximately 20 pictures relating

to the same conduct as that depicted in the video (Gov. Trial Exhs. 76a-78g).  And, last, but

hardly least, the jury was provided with the detailed statements of the surviving child, and sister

of the homicide victim, S.G., who witnessed the conduct. The video at issue was "gratuitous[ly]

gruesome[] [and] inflammatory [in] detail beyond what is necessary to reveal to the jury the true

nature of what happened," and thus should be have been excluded.  603 F.3d at 858; *see also* 18

U.S.C. § 3593(c).

The government does not even attempt to grapple with the Eighth Amendment

implications of the admission of these videos.  One of the key questions in assessing whether a

death sentence has been obtained in violation of the Eighth Amendment's prohibition against

cruel and unusual punishment is whether "the sentence of death [was] imposed under the

influence of passion, prejudice, or any other arbitrary factor." *Gregg v. Georgia*, 428 U.S. 153,

167 (1976).  The government includes a passing reference to *Gregg*, oddly, for the proposition

that juries should be provided with "as much information as possible."  Answer at 105.

Interestingly, the government excludes the prior sentence, which includes a caveat directly

relevant to the claim at bar.  Specifically, the *Gregg* Court stated:

1

***So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant***, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information as possible when it makes the sentencing decision.

2

3

428 U.S. at 203-204. (Emphasis supplied).

4

5

As the Supreme Court articulated in the years following its decision in *Gregg*,

6

[Death] is a different kind of punishment from any other which may be imposed in this country . . . . From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

7

8

9

*Beck v. Alabama*, 447 U.S. 625, 637-638 (1980), *quoting Gardner v. Florida*, 430 U.S. 349, 357-

10

58 (1977).

11

12

In conclusion, as stated *supra* and in Mr. Duncan's § 2255 Motion, the guilty plea, and

13

Mr. Duncan's many admissions before and after the plea unquestionably established the

14

necessary elements to make him death eligible. The videos at issue were patently unnecessary to

15

demonstrate Mr. Duncan's intent or culpability regarding the killing of D.G. Most importantly,

16

while the videos were relevant in the sense that they depicted the commission of offenses by Mr.

17

Duncan, that is hardly the end of the inquiry. Notably, a narrative description of the contents of

18

the video would have been chilling enough to more than adequately make the government's

19

point about moral culpability. *See Old Chief v. United States*, 519 U.S. 172, 184 (1997) (noting

20

that when conducting the probative value/prejudice analysis, district courts may include in their

21

calculations the "evidentiary alternatives" that exist, including a party's willingness to concede

22

the issue to which the challenged evidence pertains). The government's clear goal to inflame the

23

jury in order to ensure a death sentence for Mr. Duncan was achieved, but at the price of

24

violating the Fifth and Eighth Amendments and the FDPA. This Court should declare that a

25

26

price too high.

27

28

1

2

**X.     CLAIM 9:  THE OFFENSE UNDERLYING MR. DUNCAN'S CONVICTION**
**        AND SENTENCE FOR FIREARM-USE MURDER IS VOID FOR VAGUENESS**

3

In Claim 9, Mr. Duncan asserts the death sentence imposed on Count 7 was

4

unconstitutionally imposed because Count 7 charges an offense under 18 U.S.C. § 924(c) that is

5

unconstitutionally vague.  § 2255 Motion at 167-174.  In response, the government contends §

6

924(c) does not suffer the problem of vagueness noted by various courts as to similar statutes.

7

Answer at 110-19.

8

Noting that the case upon which this claim relies, *Johnson v. United States*, 135 S. Ct.

9

2551 (2015), postdates the appeal waiver proceedings in this matter, the government begins by

10

conceding the absence of any procedural default.  Answer at 110.  At the same time, the

11

government impliedly contends the claim might be barred under the nonretroactivity doctrine.

12

*Id.* (stating "Duncan must show that a new and retroactive rule of constitutional law applies

13

here.").  That contention is meritless.  In *Welch v. United States*, 136 S. Ct. 1257 (2016), the

14

Supreme Court held that *Johnson* claims apply retroactively to cases that were final on appeal at

15

the time Johnson was decided.  Moreover, *Johnson* was decided prior to the time when Mr.

16

Duncan's conviction and death sentence became final on appeal when the U.S. Supreme Court

17

denied certiorari on February 29, 2016.  *Duncan v. United States*, No. 15-6408

18

19

In *Johnson v. United States*, 135 S. Ct. 2551 (2015), the Supreme Court held that the

20

Armed Career Criminal Act's so-called "residual clause"[16] definition of a "violent felony," is

21

22

unconstitutionally vague. 135 S. Ct. at 2557. In *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015),

23

24

25

26

[16] The "residual clause" defines a "violent felony" as "any crime punishable by imprisonment for
a term exceeding one year … that … is burglary, arson, or extortion, involves use of explosives,
or otherwise involves conduct that presents a serious potential risk of physical injury to another."
18 U.S.C. § 924(e)(2)(B)(ii).

27

28

1

2    the Ninth Circuit relied on *Johnson* to hold that the definition of a "crime of violence" found in

3    18 U.S.C. § 16(b) was void for vagueness. *Dimaya*, 803 F.3d at 1115. The Ninth Circuit stated

4    that the "residual clause" declared unconstitutional in *Johnson* and § 16(b), although not

5    identical, are both "subject to the same constitutional defects." *Id*. Section 16(b) and 18 U.S.C.

6    § 924(c)(3) are identical.  Under *Dimaya*, 18 U.S.C. § 924(c)(3) is unconstitutionally vague,

7    entitling Mr. Duncan to relief from an unconstitutional conviction.

8            The government correctly notes that the Supreme Court granted certiorari in *Dimaya* and

9    the case is now awaiting decision.  *Sessions v. Dimaya*, No. 15-1498 ( argued September 29,

10   2017).  As the government states, the Supreme Court's decision may well affect Mr. Duncan's

11   case.  Yet although the government does not deny that § 16(b) and § 924(c)(3) are identical, it

12   nonetheless contends that "[e]ven if *Johnson* is extended to § 16(b) under *Dimaya*, it should still

13   not be extended to § 924(c)."[17]  Answer at 119.

14

15          According to the government, even if § 16(b) is unconstitutionally vague § 924(c) is

16   different because under 924(c),

17

18        no prior state conviction is being construed. Rather, a current federal conviction,
          with the added requirement of a specific nexus to a firearm (and of murder using
19        that firearm for § 924(j)(1) and of torture or serious physical abuse under §
          3592(c)(6)), is being considered. This eliminates vagueness concerns that are
20        certainly present in ACCA, and that could be of concern in § 16(b) as well. Thus,
          § 924(c) and (j) statute differ meaningfully from ACCA, the statute previously

21   ───────────────────────

22

23   [17] That contention is preceded by a 7 page argument, which is the bulk of its response to Claim 7,
     with the argument heading  " *Johnson* should not extend to § 924(c) for the same reasons it
24   should not extend to § 16(b)."  Answer at 112-18.  Despite the Government's claim this
     argument comprises the first of two reasons an affirmance in *Dimaya* would not aid Mr. Duncan,
25   see Answer at 111-12 (stating "[t]wo additional factors distinguish § 924(c) from *Johnson*, the
     Armed Career Criminal Act ("ACCA"), and even § 16(b).  … Thus, even if the Supreme Court
26   affirms *Dimaya*,  *Johnson* should not be further extended to § 924(c)."), it is in fact an argument
     that *Dimaya* should not be affirmed.
27

28

construed by the Supreme Court, and § 16(b), the statute currently under the Supreme Court's consideration.

Answer at 119-20.  It is true that the ACCA (§ 924(e)) looks to the commission of prior "crimes of violence" while § 924(c) asks whether the current offense satisfies the statutory definition of a "crime of violence."[18]  In arguing the relevance of this distinction, the government cites two cases.  The first is clearly *dicta*.  In *United States v. Robinson*, 844 F.3d 137 (3rd Cir. 2016) (cited in Answer at 119), the Third Circuit held that the defendant's contemporaneously robbery conviction satisfied the "elements" clause of § 924(c), and it was unnecessary to decide whether it satisfied the "residual."  *Id*. at 141.  In a footnote, the court remarked that the vagueness of the residual clause as to a prior conviction would "not necessarily" apply to a contemporaneously-tried crime.  *Id*. at 141 n. 5.  The Government tacitly concedes that the "element" clause does not apply.

The government's second case is *Shuti v. Lynch*, 828 F.3d 440 (6th Cir. 2016) (cited in Answer at 119). In *Shuti*, like the Ninth Circuit in *Dimaya*, the Sixth Circuit held that § 16(b) is unconstitutionally vague.  In attempting to harmonize the decision with *United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016), upholding the constitutionality of § 924(c), the *Shuti* court relied in part on the fact that § 924(c) focuses on "the same proceeding."  *Id*. at 449.  Notably, however, *Taylor* made no such distinction. *See* 814 F. 3d at 375-379.  It merely adopted the identical arguments it asserts in *Dimaya* for limiting *Johnson* to the ACCA and not extending it to § 16 and specifically noted that "§ 16(b) appears identical to § 924(c)(3)(B) in all material respects."

---

[18] It is not entirely clear where § 16(b) falls in that it provides only a free standing definition of "crime of violence" devoid of any reference to crimes current or prior.  The question in *Dimaya* involves the proper characterization of a prior crime.

1

*Id*. at 379.[19]

2

Significantly, *Shuti* noted difficulties with the *Taylor* court's reasoning in light of *Welch*

3

*v. United States*, ___ U.S. ___, 136 S.Ct. 1257, 194 L.Ed.2d 387 (2016). There, the Court

4

clarified that the residual clause's vagueness "rests in large part on its operation under the

5

categorical approach," *id*. at 1262, stating that even for purposes of the residual claims courts are

6

to determine whether a crime involves "a 'serious potential risk of physical injury' by

7

considering not the defendant's actual conduct but an 'idealized ordinary case of the crime.'"

8

*Id*., *quoting Johnson*, 576 U.S. at ___, 135 S.Ct. at 2561. Additional briefing will likely be

9

warranted once *Dimaya* is decided. Further speculation on the effect of a yet undecided case

10

would be ill advised.

11

12

**XI.    CLAIM 10:  THE INVALIDITY OF THE APPELLATE WAIVER AND REFUSAL TO ALLOW WITHDRAWAL OF THE WAIVER PRECLUDES THE ASSERTED PROCEDURAL DEFAULT**

13

14

15

In Claim 10, Mr. Duncan alleges that this court violated due process by accepting a

16

waiver of appeal that was neither clear and unequivocal nor knowing, intelligent or voluntary.

17

2255 Motion at 175-88. As previously noted (section II(A)) the government contends that many

18

of the claims presented herein are procedurally barred by virtue of Mr. Duncan's supposed

19

failure to appeal. *See* Answer at 121-22.

20

Although the allegations that the appellate waiver was invalid have been styled as a claim

21

for relief, they are better understood as comprising some of the reasons consideration of the

22

record-based claims presented herein is not barred by the court's acceptance of an appellate

23

24

25

_____

26

27

[19] In fact in *Shuti*, the Government contended that § 16(b) was indistinguishable from § 924(c), the opposite of what it now contends. *See Shuti*, 828 F.3d at 449.

28

waiver.  *See* discussion, *supra*, at section II (unconstitutional procedural rulings are inadequate to bar collateral relief).

In opposition to Claim 10, the government argues that Mr. Duncan's challenges to the potential procedural bar of failure to appeal are themselves procedurally barred (by a separate but related alleged failure to appeal), that the challenges should be rejected on the merits, and that some of the challenges are barred by law of the case.  Answer at 120-29.  Petitioner replies as follows.

### A.  Mr. Duncan's Challenges to the Waiver Proceedings Are Not Procedurally Barred

In arguing that Claim 10's challenges to the alleged failure to appeal procedural bar are themselves procedurally barred, the government contends that, although they were asserted in both of the Ninth Circuit appeals, they were not *properly presented* either time.  According to the government, in neither appeal was there standing to challenge anything more than Mr. Duncan's mental competency.  The government also now contends that the Ninth Circuit's failure to discuss the challenges constitutes a *sub silentio* adoption of its argument and a holding that the challenges were rejected as procedurally improper.  Among the many things the government ignores is its extensive argument that the reason the challenges should be rejected on appeal is that § 2255 is the established, preferred remedy.  *See, e.g.*, Appellee's Brief, Ninth Cir. No. 08-99011, Doc. 57 at 31-32.[20]

---

[20] The government's argument to the Ninth Circuit included in relevant part:

There is no need to revamp fundamental [standing] rules for this case. If Duncan were indeed incompetent, as standby appellate counsel assert, an appropriately designated next friend could file a § 2255 motion challenging the issues that standby appellate counsel seek to raise. *See Whitmore*, 495 U.S. at 163-64.

1
2
3
4
5
6
7
8

On neither occasion did the Ninth Circuit say anything of the kind. In *Duncan I*, the Ninth Circuit expressly deferred consideration of them. *United States v. Duncan*, 643 F.3d 1242, 1247 n. 1 (9th Cir. 2011) ("we need not and do not reach any of standby counsel's other arguments. Standby counsel may press those arguments if, after the competency hearing for which we remand, they deem it appropriate to do so."). The challenges were reraised in *Duncan II*, but they received no mention in the Court's unpublished memorandum disposition. *United States v. Duncan*, No. 13-99011 (9th Cir. Mar. 17, 2015).

9
10
11
12
13
14

To that silence the government imputes a *sub silentio* holding that standing extended only to the issue of competence and in both appeals the "efforts to challenge the waiver proceeding were a legal nullity." Answer at 121. No such holding can be gleaned from the court's silence. Indeed, the government took the exact opposite view of the order in Mr. Duncan's petition for a writ of certiorari in which he challenged the Ninth Circuit's refusal to consider those arguments.

15

16

17

18
19
20
21
22
23
24
25
26
27
28

***It has been clear for many decades that § 2255 motions may challenge competence findings***. *See Stone v. United States*, 358 F.2d 503, 506 (9th Cir. 1966) (citing *Bishop v. United States*, 350 U.S. 961 (1956)). The doctrine of next friend standing applies in such proceedings. *See* Rule 2 of the RULES GOVERNING § 2255 PROCEEDINGS. ***And the remedy of direct appeal need not be exhausted to file a § 2255 motion***. *See* Rule 5 of the RULES GOVERNING § 2255 PROCEEDINGS, advisory committee's note to 1976 Adoption. In addition, such proceedings allow for record development. *See, e.g., United States v. McKenna*, 327 F.3d 830, 845 (9th Cir. 2003).
Finally, because the district court concluded it need not hold a hearing regarding competence in this case, review on collateral appeal would be searching. *See United States v. Veatch*, 674 F.2d 1217, 1224 (9th Cir. 1981) ("[A]ppellate review of a failure to provide a hearing on competence to stand trial is comprehensive and not limited by either the abuse of discretion or clearly erroneous standard."); *Brewster v. United States*, 437 F.2d 917, 919-20 (9th Cir. 1971) (holding that the district court properly denied a hearing on competence based on a psychiatric report finding the defendant competent, but noting and applying the searching standard applicable on collateral review to the decision not to hold a hearing). Thus, ***a well-established remedy exists: a collateral proceeding*** pursued by a next friend.
Ninth Cir. Doc. 57 at 31-32 (emphasis added).

*See Duncan v. United States*, No. 15-6408, Brief for the United States in Opposition at 24 n. 7

("Although petitioner claims that the court did not decide whether petitioner's waiver was

knowing and voluntary, the court squarely held that petitioner 'had validly and affirmatively

waived his right to file an appeal,' Pet. App. A4, thereby affirming the district court's conclusion

that petitioner 'ma[de] a knowing, voluntary, and rational choice to waive his right to appeal,'

SER 65.")

   All we know is that the Ninth Circuit said nothing about the challenges.  To impute a

reason for its silence is to engage in sheer speculation.  But assuming arguendo the government's

current reading of the order is incorrect, its conclusion is fatally flawed.   On remand this court

made the findings, challenged herein and challenged on appeal to the Ninth Circuit alike, that the

waiver was both competently made and properly executed.  Although the question of standing in

the first appeal, joined by Mr. Duncan shortly before the matter was submitted, might be subject

to some debate, there is no question regarding Mr. Ducan's personal involvement in the second

appeal, where the issues were again asserted.  No one has contended, nor could one do so, that

the second appeal was not fully joined by Mr. Duncan.[21]

---

[21] Because there is no issue of standing in *Duncan II*, the court need not address whether Mr.
Duncan's endorsement of the *Duncan I* waiver-order appeal shortly before *Duncan I* was argued
alone was sufficient to confer standing to raise the instant challenges even if standing were
otherwise absent.

The Supreme Court has recognized that subsequent events, including events occurring past the
time for filing an appeal, can cure substantive jurisdictional defects present at the time the notice
was filed. *Lemke v. United States*, 346 U.S. 325 (1953) (per curiam) (reversing Ninth Circuit's
dismissal of criminal appeal filed before entry of judgment; defect cured by district court's
subsequent entry of judgment).  *Accord*, *Anderson v. Allstate Ins. Co.*, 630 F.2d 677 (9th Cir.
1980) (notice of appeal from unappealable interlocutory order in civil case treated as a valid
appeal where district court entered final judgment prior to issuance of circuit court order
dismissing appeal).

Because Mr. Duncan did not procedurally default his opportunity to present the instant challenges on appeal, it is unnecessary to address the government's underlying premise that challenges to the adequacy of a procedural default can themselves be procedurally defaulted.  In *Edwards v. Carpenter*, 529 U.S. 446 (2000), the Supreme Court held in _some situations_ constitutional challenges offered as "cause" for overcoming a procedural default can themselves be subject to procedural bars.  Contrary to the government's view, Answer at 122, Mr. Duncan's challenges to his appellate waiver are not being offered as "cause" to overcome a validly imposed default; they are being offered to show the default was not validly imposed.  The government has cited, and petitioner is aware of, no authority suggesting such challenges to the adequacy of a procedural bar are subject to procedural default rules.[22]  Similarly, it is unnecessary to decide whether silence, as a matter of law, could adequately impose a procedural bar.  *Cf. Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004)  (holding that even where a procedural default might otherwise apply, federal review will not be barred unless "the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."  (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)).

### B.  The Purported Waiver Does Not Constitute an Adequate Procedural Bar Because It Was Neither Clear and Unequivocal, nor Knowing, Intelligent and Voluntary

The government opposes Claim 10 on the merits by asserting the court's November 24, 2008 colloquy with Mr. Duncan establishes that the waiver was clear and unequivocal as well as

---

[22] In addition, although Claim 10 draws heavily on the record of the November 24, 2008 hearing, it is not exclusively based on facts in the trial record.  The allegations supporting the claim Mr. Duncan was unaware of the long-term consequences of the supposed waiver include matters involving out of court advisements by counsel, and information about the Epiphany not included in the trial record.

knowing, intelligent and voluntary.  The argument relies on a few statements, cherrypicked from the long rambling, frequently incoherent colloquy that fundamentally expresses indifference, not opposition, to appeal.  The government attempts to minimize the ramblings, referring to them euphemistically  as "remarks about what he viewed as an invalid system of justice," Answer at 123, "statements of opinion about the justice system," *id*. at 24, and "attitudes about the justice system," *id*. at 125. These characterizations are unavailing, as is the attempt to suggest that the claim is fundamentally about the court's denial of Mr. Duncan's request to confer with counsel. Answer at 123.  Neither the effort to isolate a few clear statements or the attempt to minimize the blatant incoherence is persuasive.

A detailed, yet still abbreviated, description of the November 24, 2008, appeal waiver hearing is set forth in the § 2255 Motion at 175-82, and need not be repeated here.  Although the government places great emphasis on the finding that Mr. Duncan has been found competent to waive appeal, *see* Answer at 120 (arguing that "Duncan cannot challenge his competence or capacity to waive appeal"), that alone does not render his waiver valid, because "[a] finding that a defendant is competent … is not all that is necessary before he may be permitted to plead guilty or waive his right[s]. … In addition to determining that a defendant is competent …, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Godinez v. Moran*, 509 U.S. 389, 400-401 (1993) (citing *Parke v. Raley*, 506 U.S. 20 517 (1992); *Faretta v. California*, 422 U.S. 806 (1975). The federal courts are required to indulge every reasonable presumption against waiver of fundamental rights. *See Hodges v. Easton*, 106 U.S. 408 (1982); *United States v. Arlt*, 41 F.3d 516, 520 (9th Cir. 1994) (citing *Brewer v. Williams*, 430 U.S. 387 (1977).  Only clear and unequivocal waivers may be accepted. *See, e.g., United States v. Farhad*, 190 F.3d 1097, 1099 (9th Cir. 1999) (waiver of right to counsel).

1

2

### 1.  Mr. Duncan Expressed No Clear and Unequivocal Desire That His Conviction and Sentence Not Be Appealed

3

4      In contending Mr. Duncan expressed a clear desire to waive appeal, the government

5  acknowledges only a few snippets of the colloquy Mr. Duncan eventually acceded to this court's

6  insistence on a yes-or-no answer.  The government all but ignores his repeated statements that he

7  wanted the System to decide for itself and did not want to prevent the lawyers from doing what

8  they felt they were supposed to do on his behalf.  Those statements cannot be ignored.  His

9  statement must be judged as a whole, not by isolated portions.  *See, e.g., United States v. Pulido*,

10  566 F.3d 52 (1st Cir. 2009); *United States v. Isom*, 85 F.3d 831, 835 (1st Cir. 1996) (noting that

11  with regard to denial of a motion to withdraw guilty plea review should be on "the totality of the

12  circumstances surrounding the Rule 11 hearing, rather than apply a 'talismanic test'") (quoting

13  *United States v. Cotal-Crespo*, 47 F.3d 1, 4-5 (1st Cir. 1995)); *Davis v. Woodford*, 446 F.3d 957,

14  961 (9th Cir. 2006) (interpreting a plea colloquy "as a whole.").

15

16      Mr. Duncan's responses can be seen as clear only when viewed through a distorting lens

17  that removes them from his prolonged, bizarre, and irrational view of the world.  Although this

18  court eventually succeeding in extracting a few monosyllables from Mr. Duncan, that fails to that

19  Mr. Duncan was voluntarily choosing one of several known and rationally understood

20  possibilities: "A judge can make certain that an accused's professed waiver ... is understandingly

21  and wisely made only from a penetrating and comprehensive examination of ___**all the**___

22  ___**circumstances**___ under which such as plea is tendered."  *Von Moltke v. Gillies*, 332 U.S. 708

23  (1948) (emphasis added); *see also McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001)("We

24  emphasize that assessment of a procedural competency claim requires us to form a judgment on

25  the aggregate not the segment.  We examine the totality of the circumstances[.]")

26

27      Equivocal and unreliable shifting points of view pervade the entire waiver proceeding.

28

Mr. Duncan proclaimed, "my words [regarding the appeal] should have no bearing on the choice that society has made in this matter." Cr. Doc. 613. "I want the Court, I want society, I want the prosecutors, I want my attorneys, I want everyone to do this without me. I want you to make your choices. I don't want to be a part of that decision-making process." 11/24/08 RT 17. "I've made my choices and now you have to make yours as a system, as society or whatever you want to call it. And I want to allow and I want to accept that choice, but I don't want to participate in it." *Id.* "I am neutral [regarding an appeal]. I wish to allow you to do what you feel you need to do. I will allow the attorneys to do what they feel they need to do." *Id.* at 11. "I told [the attorneys], 'If you want to file an appeal, if you can find some way to file an appeal without my permission, then I'm not going to try to stop you. Go right ahead.'" Doc. 606.

Mr. Duncan was at most agnostic about an appeal until the court made clear it would not accept his equivocations.  Although Mr. Duncan ultimately stated a desire not to appeal, that occurred only after the court insisted that he not elaborate, confer with counsel, or answer anything but "yes" or "no." The court's error of attempting to isolate Mr. Duncan's final response from "the philosophical arguments you have been making," 11/24/08 RT 20, or from "how you view it in your mind," *id.* at 11, was fundamental. Having repeatedly stated that the lawyers were free to do as they chose provided he did not have to give his personal authorization, the only possible answer—whether accurate and reliable or not—to the follow-up question of whether that statement should be construed as his personal authorization was "no."

This philosophical view of the act of *authorizing* an appeal, as opposed to merely *having* an appeal, makes this case unique. Even before he decided to authorize an appeal, Mr. Duncan did not express a wish to be put to death, did not accept the appropriateness of the punishment, and appeared not to object to there being an appeal. His position was simply philosophical, a refusal to give affirmative authorization. This refusal was based on an entirely imaginary world

in which such refusal will bring about a universal epiphany of Truth, including truth that all killing, even state-sanctioned killing, is wrong. He has a grandiose delusion that he is on a higher plane of understanding which he wants the rest of the world to attain, but it could do so only if he declined to interfere with the world's spiritual evolution.

Mr. Duncan repeatedly indicated that he was not opposed to his lawyers taking action dictated by the "System." This court erred in refusing to accept that as his word.

> **2.  Because Mr. Duncan Was Unaware His Failure to Endorse an Appeal of his Conviction and Sentence Would Itself Authorize a Competency Appeal, His Actions Cannot be Deemed Knowing and Intelligent**

To the extent that any clear position eventually emerged from the record and the court's jousting with Mr. Duncan, it was one of indifference to whether an appeal would be prosecuted on his behalf. All that mattered to him, he indicated, was that he personally take no action to endorse or facilitate such an appeal, because to him all litigation was antithetical to Truth. Having received enlightenment, he no longer concerned himself with attempting to influence the actions of others. In his view others should be free to do as they chose, even if it leads them to turn from Truth in a deluded belief that any of this matters.

Neither the court nor counsel ever advised Mr. Duncan that his choices were limited to: (1) authorizing an appeal of the conviction and sentence on the one hand by endorsing counsel's notice of appeal; or (2) authorizing an appeal of the flawed competency proceeding and purported appellate waiver by disavowing counsel's notice of appeal. Mr. Duncan clearly expressed a willingness to have counsel appeal if they could do so despite his desire not to participate. He was never properly advised that under prevailing Ninth Circuit law counsel was authorized, not in spite of his non-authorization, but because of his non-authorization, to appeal the acceptance of the appeal waiver.  As such Mr. Duncan was unaware the consequences of his "choice" not to participate in appeal were the exact opposite of what he supposedly hoped to

accomplish.

Thus, the purported waiver is therefore invalid. "Because a waiver is an 'intentional

relinquishment or abandonment of a known right,' a trial court should make sure that a defendant

knows what the right guarantees before waiving it."  *United States v. Cochran*, 770 F.2d 850,

852 (9th Cir. 1985) (quoting *Johnson v. Zerbst, supra*, 304 U.S. at 464.). As explained by the

Supreme Court, the purpose of the "'knowing and voluntary' inquiry … is to determine whether

the defendant actually ***does*** understand the significance and consequences of a particular

decision." *Godinez v. Moran, supra*, 509 U.S. at 401 n. 12 (emphasis in original). An uninformed

waiver decision is not knowing and intelligent. *See Summerlin v. Schriro*, 427 F.3d 623, 639 (9th

Cir. 2005).

Thus, the purported waiver was not knowing and intelligent because Mr. Duncan was

unaware of the direct consequences of a waiver – that the waiver in and of itself would confer

standing on counsel to challenge the waiver.  The government correctly notes that a waiver does

not fail to be knowing and intelligent by virtue of a mere lack of appreciation of all potential

collateral consequences.  Answer at 126 (citing *United States v. Brownlie*, 915 F.2d 527, 528

(9th Cir.1990); *Torrey v. Estelle*, 842 F.2d 234, 235 (9th Cir.1988); and *United States v. Garrett*,

680 F.2d 64, 65-66 (9th Cir. 1982).)  The attempt to bring this case within that doctrine is

thoroughly unpersuasive.  *Torrey* instructs:

> The distinction between a direct and collateral consequence of a plea "'turns on
> whether the result represents a definite, immediate and largely automatic effect on
> the range of the defendant's punishment.'" *George v. Black*, 732 F.2d 108, 110
> (8th Cir.1984) (quoting *Cuthrell v. Director, Patuxent Institution*, 475 F.2d 1364,
> 1366 (4th Cir.), cert. denied, 414 U.S. 1005, 94 S.Ct. 362, 38 L.Ed.2d 241
> (1973)). Under this standard, direct consequences include a mandatory special
> parole term, *United States v. Harris*, 534 F.2d 141 (9th Cir.1976); ineligibility for
> parole, *Munich v. United States*, 337 F.2d 356, 361 (9th Cir.1964); and the
> maximum punishment provided by law, *Pebworth*, 489 F.2d at 267.
>
> In contrast, collateral consequences include the possibility that sentences may run
> consecutively, *United States v. Rubalcaba*, 811 F.2d 491, 494 (9th Cir.), cert.

1
2
3
4

    *denied*, --- U.S. ----, 108 S.Ct. 107, 98 L.Ed.2d 66 (1987); the possibility of revocation of parole, *Sanchez*, 572 F.2d at 211; potential deportation, *Fruchtman v. Kenton*, 531 F.2d 946, 949 (9th Cir.), cert. denied, 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 158 (1976); civil tax liability, King, 618 F.2d at 553; the likelihood of an undesirable military discharge, *Redwine v. Zuckert*, 317 F.2d 336(D.C.Cir.1963); and the potential for civil commitment proceedings, *George v. Black*, 732 F.2d at 111.

5
6
7
8
9

    In many cases, the determination that a particular consequence is "collateral" has rested on the fact that it was in the hands of another government agency or in the hands of the defendant himself. For example, where a defendant is subjected to mental health commitment proceedings, commitment is not an automatic result of such proceedings and the proceedings are conducted by a different tribunal. *George*, 732 F.2d at 111. Similarly, the time of potential parole eligibility is not certain result of a guilty plea, but depends upon the defendant's conduct and is purely discretionary. *Carter v. McCarthy*, 806 F.2d at 1375.

10

*Torrey v. Estelle*, 842 F.2d at 236-37.[23]  Given that Mr. Duncan's primary concern – to the

11

extent it could be understood – was to avoid taking any action that would affect the "System's

12

decision" whether or not there should be an appeal in his case.  There is little information more

13

directly coupled with the decision than the fact that either "choice" would constitute

14

authorization for an appeal.  The authorization of the competency appeal that came as a direct

15
16

consequence of his failure to endorse a merits appeal was absolute an automatic.  It was not a

potential, hypothetical, or theoretical eventuality that might emerge depending on the actions or

17
18

decisions of another tribunal or agency.

19

      Mr. Duncan's purported waiver of appeal was invalid and the dismissal of his appeal fails

20

to constitute an adequate procedural default.

21
22
23
24
25
26
27

---

[23] In *Padilla v. Kentucky*, 559 U.S. 356,  366 (2010), the Supreme Court noted that deportation is

28

"uniquely difficult" to classify as either a direct or a collateral consequence.

### 3. Mr. Duncan Completely Misapprehended the Long-Term Consequences of a Decision Not to Endorse an Appeal

The government seeks to frame the issue in terms of whether Mr. Duncan understood he had a right to appeal, and whether he understood there would be no appeal if he chose to waive that right. *See* Answer at 124-25 (asserting Mr. Duncan "provided affirmative responses to direct questions.") To do so is to miss the forest for the trees. Those facts were irrelevant to Mr. Duncan. All that mattered was his belief – as irrational, fantastical or delusional as it might be – that his refusal to endorse an appeal could influence Society's spiritual and philosophical evolution. The record is replete with statements indicating that Mr. Duncan's view of an appeal bears little resemblance to reality. *See, e.g.*, 11/24/08 RT at 10 ("... I don't believe that this Court has the authority to grant such a right [to appeal] or a right as that. And so on the surface I can say honestly that I understand your intention of granting me that, what you call a right, but -- and I accept your intention. I'm not opposed to your intention. I accept that. That is your view, that is your world, that is your law, but it is not mine and I don't accept it."); *id*. at 9 ("I don't know if it is clear or not, but to me it seemed clear that what I was trying to say is that in my opinion this whole proceeding is criminal, and as a criminal proceeding, any appeal doesn't make any sense.")

A waiver "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *Boykin v. Alabama*, 395 U.S. 238, 243 (1969) (citing *Johnson v. Zerbst*, 304 U.S. 458, 466 (1938).) Mr. Duncan's statements revealed an insufficient rational and factual understanding of the consequences of waiving review. The record on remand makes clear that he did not understand that death would be the likely outcome of a decision not to authorize an appeal, and, unlike the majority of inmates involved in waiving review, he provided no reassuring statement that death was his ultimate goal.

1   Instead, he said that what he sought was the world's enlightenment, an event dependent

2   not on whether he lives or dies but only on his steadfast adherence to a principle of non-

3   interference, *i.e.*, his belief that we can only reach a state of enlightenment if he refuses to lead

4   the way. As such, his actions could not be based on a knowing and intelligent choice made

5   voluntarily, but only one entirely dictated by his delusional belief system in the service of a

6   delusional goal. In the parlance of *Rees v. Peyton*, supra, 384 U.S. at 314, rather than making a

7   knowing, intelligent and voluntary choice, he was reacting to "a mental disease, disorder, or

8   defect which [was] substantially affect[ing] his [decisional] capacity."

9

10   The government contends the finding, affirmed on appeal, that Mr. Duncan was

11   competent bars considering how Mr. Duncan's "Epiphany" bears on the question whether his

12   actions were knowing and intelligent.  Answer at 125 ("The law of the case doctrine generally

13   precludes courts from reconsidering previously decided issues.")  Law of the case does not

14   apply.  Whether Mr. Duncan was competent is entirely distinct from whether his actions were

15   knowing and intelligent.

16

17   The government nonetheless contends this court's statement the Epiphany did not

18   "motivate[ ], drive [ ] or cause[]" him to waive his right to file an appeal, Cr. Doc. 843 at 63, is

19   preclusive.  The government overstates the matter and takes that comment out of context.  That

20   observation comes and the concluding remark recapitulating the preceding 12-page discussion,

21   all of which was devoted to the reasons the court believed that despite Mr. Duncan's mental

22   problems he still possessed some rational capacities. The statement that his decision not to

23   endorse appeal was not "motivated, driven, or caused" by mental illness does not follow from

24   any of the preceding discussion. Read in the context of a concluding, summarizing statement, it

25   is difficult to treat it as a legitimate alternative finding.

26

27   No one at any time has contended that his reason for any of his post-Epiphany actions

28

were attributable to anything other than the Epiphany.  Everyone agreed that all of his actions

were in furtherance of the belief system.  To be sure, there can be rational reasons a capital

defendant might wish to forgo appeal, and many have done so.  Such individuals usually fall into

one of two categories: "(1) those suffering from psychological illnesses characterized by suicidal

impulses who, for whatever reasons, are unable to commit the act themselves and seek the

State's assistance through the death penalty; and (2) those suffering, both physically and

psychologically, from the combined stress of being condemned to die at some indefinite point in

the future while being confined for prolonged periods in brutalizing and dehumanizing

conditions on 'death rows' across the country." G. Strafer, "Volunteering for Execution:

Competency, Voluntariness and the Propriety of Third Party Intervention," 74 J. Crim. L. &

Criminology 860, 862 (1983); *see, e.g., Gilmore v. Utah*, 429 U.S. 1012, 1015 (1976) (quoting

Mr. Gilmore's statement that "he did not 'care to languish in prison for another day'"); *Massie v.*

*Sumner*, 624 F.2d 72, 73 (9th Cir. 1980) (noting that Mr. Massie found "execution preferable to

spending a lengthy period incarcerated on death row"). Mr. Duncan has been incarcerated for

most of his life, and his stated goal is neither to escape confinement nor to die. In the FBI

interviews that were used to support the Government's motion to strike the notice of appeal, he

specifically stated:

> It's like I said, it's not that I want to die. I don't want to die, so if my attorneys
> want to file an appeal, and I told them this too, just to be honest. You know I told
> them, "If you want to file an appeal, if you can find some way to file an appeal
> without my permission, then I'm not going to try to stop you. Go right ahead."

Cr. Doc. 606 (Gneckow affidavit) at 4. Mr. Duncan's actions were motivated by his belief –

whether view as psychotic or merely untethered to reality – that he could teach Society the Truth

through silence and nonparticipation.  Although this court has determined that belief not to be

delusional, a determination with which petitioner disagrees, the belief nonetheless precludes a

knowing and intelligent understanding of the consequences of an appellate waiver.

### C. Whether Viewed as a Motion to Reinstate his Appeal or A Motion to Withdraw His Prior Motion for Voluntary Dismissal, the Ninth Circuit's Decision To Disallow Mr. Duncan's Endorsement of Appeal Is Not an Adequate Procedural Bar

On or about December 9, 2010, prior to the argument and decision of *Duncan I*, Mr. Duncan wrote to the Ninth Circuit to say he was repudiating his statements regarding an appeal of his conviction and sentence which this court construed as an appellate waiver. *United States v. Duncan*, No. 08-99031, Cr. Doc. 79-2 ("I hereby inform you, and any others concerned, that I withdraw my waiver of appeal, and consent fully to all efforts and advice given by my attorneys to appeal.") The record in this case shows that he has continued in his approval of appeal since then. *See* RCHT 2025-31 (Testimony of Dr. Roesch); RCHT 5788-5801 (Testimony of Dr. Woods, M.D.); Retrospective Competency Exh. JJ (Transcript of Videotaped Proceedings) at 75-78.

In its subsequent decision of counsel's appeal, the *United States v. Duncan,* 643 F.3d 1242, 1247 (9th Cir. 2011), which found this Court's acceptance of the appellate waiver to have been improper, the Court wrote:

> Shortly before argument, standby counsel informed us that Defendant …now wishes to endorse this appeal. We need not decide whether a defendant may withdraw his waiver of appeal… Standby counsel may press [that] argument[] if, after the competency hearing for which we remand, they deem it appropriate to do so.

*Id*. at 1247 n. 2.

On appeal of this Court's retrospective competency finding, Mr. Duncan did so by means of a "Motion to Reinstate Appeal of Judgment of Conviction and Sentence," filed in Ninth Circuit Case No. 13-99011 on November 26, 2014 (9th Cir. Doc. 40). In response to a motion filed by the Government, the Ninth Circuit directed the parties to be prepared to discuss the

motion at oral argument. Following oral argument, the court denied the motion without

explanation. The ruling on the motion read in its entirety: "Defendant's motion to reinstate his

appeal, filed initially in this court on December 24, 2010, and renewed on November 24, 2014, is

DENIED." (9th Cir. Cr. Doc. 55-1 at 4.)

With respect to a related argument that Mr. Duncan had an automatic right to

reinstatement, as opposed to a discretionary right, the Ninth Circuit wrote:

> Because Defendant was competent in November 2008, the notice of appeal that
> standby counsel filed on November 17, 2008, was a nullity. At that time,
> Defendant had validly and affirmatively waived his right to file an appeal. His
> decision to withdraw that waiver, which he made more than two years later, came
> too late. *See* 18 U.S.C. § 3595(a) (requiring the notice of appeal to be filed
> "within the time specified for the filing of a notice of appeal"); Fed. R. App. P.
> 4(b)(1)(A) (requiring a notice of appeal in a criminal case to be filed "within 14
> days after . . . the entry of . . . the order being appealed").

*Id*. at 3-4.

The government contends that the Ninth Circuit's holding that Mr. Duncan had neither an

automatic nor a discretionary right to reinstate the appeal (or to withdraw the withdrawal) is law

of the case. Accordingly, the government contends this court may not entertain his arguments.

Answer 127-28. The government misses the point. Mr. Duncan concedes this court lacks

authority to overturn a decision of the appellate court. The question here is not whether Mr.

Duncan should now be allowed to appeal his conviction and sentence but whether the alleged

procedural default of failing to appeal is adequate to bar review under § 2255.

For all of the reasons stated in Claim 10, the acceptance of the appellate waiver is

inadequate to bar collateral review under the procedural default doctrine. Similarly, under the

authorities cited supra at section II(A), the Ninth Circuit's refusal to allow the appeal to proceed

in light of Mr. Duncan's retraction of his waiver fails to bar collateral review. There is no firmly

established and regularly followed federal procedural rule that an appeal having been improperly

dismissed may not be reinstated.  The law in this area is exceedingly unclear.  Historically, motions for reinstatement of an appeal that had been voluntarily dismissed were committed to the sound discretion of the courts of appeals and were commonly granted.  *E.g.*, *United States v. Runge*, 593 F.2d 66, 68 n.2 (8th Cir. 1979)(per curiam); *Williams v. Boeing Co.,* 681 F.2d 615 (9th Cir. 1982); *Decker v. Tate*, 1992 U.S. App. LEXIS 20138 (6th Cir. Aug. 17, 1992); *Mack v. United States Postal Serv.*, 36 F.3d 1113 (Fed. Cir. 1994); *Faust v. United States*, 1994 U.S. App. LEXIS 17119, 2-3 (9th Cir. 1994); *Turker v. Ohio Dep't of Rehabilitation & Corrections*, 157 F.3d 453, 456 (6th Cir. 1998); *Zheng v. Mukasey*, 546 F.3d 70 (1st Cir. 2008) (per curiam).

Cases describing timely notices of appeal as "mandatory and jurisdictional" date back to the 1950's and even earlier, *see United States v. Robinson*, 361 U.S. 220, 224 (1960) (collecting cases), but use of the phrase exploded during the 1970's.  *See, e.g., Martinez v. Trainor*, 556 F.2d 818, 819 (7th Cir. 1977); *Chapman v. Moser*, 532 F.2d 426, 428 (5th Cir. 1976); *Gooch v. Skelly Oil Co.*, 493 F.2d 366, 368 (10th Cir. 1974); *Fase v. Seafarers Welfare & Pension Plan*, 574 F.2d 72, 75-76 (2nd Cir. 1978).  At least prior to *Bowles v. Russell*, 551 U.S. 205 (2007), it eventually became one of the most familiar principles of federal appellate practice.  *See, e.g., United States v. Bonahoom*, 484 F.3d 1003, 1005 (8th Cir. 2007) (per curiam); *United States v. Machado*, 465 F.3d 1301, 1305 (11th Cir. 2006); *United States v. Houser,* 804 F.2d 565, 568 (9th Cir. 1986); *United States v. Hirsch,* 207 F.3d 928, 930-31 (7th Cir. 2000) (if the notice of appeal is untimely the "appeal must be dismissed for want of jurisdiction"); *United States v. Rapoport,* 159 F.3d 1, 2-3 (1st Cir. 1998) (same); *United States v. Christunas,* 126 F.3d 765, 768-69 (6th Cir. 1997) (Rule 4(b) compliance "is a jurisdictional prerequisite which this court can neither waive nor extend"); *United States v. Marbley,* 81 F.3d 51, 52 (7th Cir. 1996) (same).

The first case explicitly tethering a motion to reinstate to the requirements of a notice of appeal was *Williams v. United States*, 553 F.2d 420 (5th Cir. 1977).  There the court wrote:

1
2
3

> It has been authoritatively stated on numerous occasions that, unless appellants
> timely file a notice of review, a court of appeals has no jurisdiction over the case.
> The appellants here did timely file a notice of appeal, but then had it dismissed
> before it had been docketed. In our view, this placed them in the same position as
> if they had never filed a notice of appeal in the first place.

4

*Id.* at 422 (citations omitted).  The superficial appeal of this bright-line analysis soon took hold in

5

other jurisdictions.  *E.g.*, *Barrow v. Falck*, 977 F.2d 1100, 1103 (7th Cir. 1992) ("A notice of

6

7

appeal filed and dismissed voluntarily is gone, no more effective in conferring jurisdiction on a

8

court than a notice never filed. Attempts to resurrect notices of appeal must be treated the same

9

as belated notices of appeal.") (citation omitted); *Futernick v. Sumpter Township*, 207 F.3d 305,

10

312 (6th Cir. 2000); *United States v. Arevalo*, 408 F.3d 1233, 1236 (9th Cir. 2005); *see also*

11

*United States v. Outen*, 286 F.3d 622, 631 (2nd Cir. 2002) ("A withdrawal of an appeal is an

12

expression of intent of the parties [] not to pursue the appeal any further and brings the appeal to

13

14

an end.").  The simplistic approach did not sit well with all courts, however, and even those who

15

purport to follow it tend to employ ill-defined exceptions.

16

In *Turker v. Ohio Dep't of Rehabilitation & Corrections*, *supra*, 157 F.3d at 456, the

17

court granted reinstatement on allegations that the voluntary dismissal was made without client

18

approval.  *Turker* was a civil rights action brought by a former Ohio Department of Corrections

19

employee alleging wrongful discharge, malicious prosecution, and other tortious violations. In

20

addition to the federal suit, Turker had filed an action in the Ohio Court of Claims. The

21

22

defendants obtained a dismissal in the district court on a waiver theory. After filing a timely

23

notice of appeal, Turker voluntarily dismissed it. More than two months later, Turker

24

successfully moved for reinstatement of the appeal "contending that her attorney dismissed her

25

appeal without her approval."  *Id.*

26

In *Zheng v. Mukasey*, *supra*, 546 F.3d at 71, the court reinstated a previously-dismissed

27

appeal due to "extraordinary circumstances" consisting of allegations that the client had not

28

consented to dismissal.  *Zheng* involved an appeal of the Board of Immigration's denial of the

petitioner's request for asylum and related relief.  The petitioner alleged that her appeal was

"withdrawn by her attorney due to a miscommunication and that she never intended to abandon

the appeal."  *Id*. The Court explained:

> While the voluntary dismissal of an appeal usually deprives an appellate court of
> jurisdiction, *see United States v. Arevalo*, 408 F.3d 1233, 1236 (9th Cir. 2005),
> courts have reinstated out of time appeals in extraordinary circumstances, such as
> when an appeal has been dismissed by an attorney without the approval of the
> client, *Turker v. Ohio Dept. of Rehabilitation & Corrections*, 157 F.3d 453, 456
> (6th Cir. 1998). Since it is uncontested that the instant appeal was withdrawn
> without Zheng's consent, we reinstate the appeal.

*Id*.  In neither case was there any contention that the dismissal had been improper.[24]  Yet in both

cases, the courts concluded that the interests of fairness warranted reinstatement.

In *Williams v. Boeing*, 681 F.2d 615, a Fed.R.Civ.P. 54(b) partial judgment was entered

in the district court on March 19, 1982. A motion for voluntary dismissal was granted on May

17, 1982.  On July 13, 1982, the Court published its order granting reinstatement of the appeal in

order "to address a question of appellate jurisdiction that the court has not previously had

occasion to decide."  *Id.*  The court explained the appellant's request for dismissal had been

prompted by attorney error:

> Appellant's motion for voluntary dismissal was premised on the belief that the
> district court's grant of summary judgment in favor of one defendant entirely and
> in favor of all defendants on certain claims, entered by a magistrate pursuant to 28
> U.S.C. § 636(c), was not appealable because it did not finally resolve all claims
> against all parties in the action. Through apparent lack of attention to the specific
> language of the order, appellant did not realize, until after the appeal had been
> dismissed, that the order directed the entry of judgment in accordance with the
> provisions of Fed.R.Civ.P. 54(b).

---

[24] Fed.R.App.P. 42 does not require the defendant's personal written consent to dismiss a
docketed appeal. Rather, it provides that "[t]he circuit clerk may dismiss a docketed appeal if *the
parties* file a signed dismissal agreement." Fed.R.App.P. 42(b) (emphasis added).

*Id*. The Court concluded that

> to deny reinstatement of this appeal would be to preclude the possibility of any appellate review. We do not condone the lack of understanding of appellate procedure demonstrated by appellant's counsel, but we see no reason to let counsel's failings in this case work to his client's detriment.

*Id*.[25]  As in *Turker* and *Zheng*, reinstatement was not premised on any finding that the dismissal had been invalid, and for good reason. An attorney is a litigant's "agent when acting, or failing to act, in furtherance of the litigation, and the [litigant] must 'bear the risk of attorney error.'" *Coleman v. Thompson*, 501 U.S. 722, 753 (1991), *quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also See Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962) (in "our system of representative litigation . . . each party is deemed bound by the acts of his lawyer-agent").

Thus, the same principles that have led to harsh consequences with regard to the failure to file a timely notice of appeal in the first instance, *e.g.*, *Berman v. United States*, 378 U.S. 530 (1964) (per curiam) (affirming dismissal of appeal where notice was one day late because counsel failed to file notice due to illness); *Smith v. United States*, 425 F.2d 173, 174 (9th Cir. 1970) (late appeal dismissed where attorney failed to file notice after informing defendant that it would be filed), *have been applied to reach the opposite result* in reinstatement cases.  The paradox of the result -- reinstatement is governed by the same principles that govern initial filings except when it isn't -- has not been addressed by the courts of appeal or by the Supreme Court.

---

[25] In *Arevalo*, *supra*, the Ninth Circuit purported to adopt the bright line view while inartfully attempting to distinguish *Williams v. Boeing*.  The *Arevalo* court noted that that unlike the appellant in Williams, "Arevalo [made] no allegations, much less provides any proof, that he was misled or that his counsel was negligent." 408 F.3d at 1238.

1

2          Adding to the disarray is the fact that the Supreme Court removed the bright line

3   foundation as to criminal cases –more than a decade ago.[26]  Yet in *Bowles v. Russell*, *supra,* the

4   Supreme Court explained the "jurisdictional distinction between court-promulgated rules and

5   limits enacted by Congress."  551 U.S. at 211-12. The Court held that the time limits set forth in

6   Federal Rule of Appellate Procedure 4(a) are jurisdictional because the limits are derived from

7   statute*,* 28 U.S.C. § 2107(a), which provides that no appeal from a civil judgment, order, or

8   decree shall be reviewed by a court of appeals "unless notice of appeal is filed, within thirty days

9   after the entry of such judgment, order or decree." 551 U.S. at 212-13. "Within constitutional

10  bounds, Congress decides what cases the federal courts have jurisdiction to consider. Because

11  Congress decides whether federal courts can hear cases at all, it can also determine when, and

12  under what conditions, federal courts can hear them." *Id.* at 212-13.

13         Court-prescribed rules of practice and procedure, as opposed to statutory time limits, "do

14  not create or withdraw federal jurisdiction." *Kontrick v. Ryan,* 540 U.S. 443, 453 (2004)

15  (quotation and citation omitted).  Because the Fed.R.App.P. 4(b)'s time limits are not grounded

16  in statute, the courts of appeal have uniformly deemed them non-jurisdictional.  *See, e.g.*, *Virgin*

17  *Islands v. Martinez*, 620 F.3d 321, 328 (3rd Cir. 2010); *United States v. Neff*, 598 F.3d 320, 323

18  (7th Cir. 2010); *United States v. Urutyan*, 564 F.3d 679, 685 (4th Cir. 2009); *United States v.*

19  *Frias*, 521 F.3d 229, 232 (2d Cir. 2008); *United States v. Martinez*, 496 F.3d 387, 388-89 (5th

20

21

22

23

24   _____

25

26

27  [26] The "mandatory and jurisdictional" nature of the notice of appeal figures prominently in the
    *ratio decidendi* of the bright lines cases.  *See Barrow*, 977 F.2d at 1103; *Futernick*, 207 F.3d at
28  311; *Arevalo*, 408 F.3d at 1236.

Cir. 2007) (per curiam); *United States v. Sadler*, 480 F.3d 932, 940 (9th Cir. 2007).[27]

As far as Mr. Duncan has been able to determine, no court has revisited the bright line

analysis of *United States v. Williams* and *Barrow v. Falck* post-*Bowles*.  Mr. Duncan specifically

requested the Ninth Circuit to do so during both of his appeals to that court.  The Ninth Circuit

refused to do so, or even to address his contention that under the circuit-recognized exception to

the bright line approach, his motion to reinstate was amply justified.

The suggestion that the notice of appeal was a "nullity," in addition to simply begging the

question is manifestly incorrect.  Mr. Duncan's purported desire not to appeal does not render the

notice of appeal filed by counsel a nullity.  A notice is complete and valid provided that it

identifies:  (1) the party taking the appeal; (2) the order from which the appeal is taken; and (3)

the court in which the appeal will be heard.  *Foman v. Davis*, 371 U.S. 178 (1962); *Torres v.*

---

[27] The criminal case notice of appeal's diminution in status has occasioned substantial litigation over questions of waiver.  The majority of the courts of appeal have held that an appellee may object to the timeliness of an appeal for the first time in its merits brief.  *E.g.*, *United States v. Muhammud*, 701 F.3d 109, 111 (3rd Cir. Pa. 2012)*, United States v. Watson*, 623 F.3d 542, 546 (8th Cir. 2010); *United States v. Lopez*, 562 F.3d 1309, 1313 (11th Cir. 2009); *United States v. Byfield*, 522 F.3d 400, 380 U.S. App. D.C. 375 (D.C. Cir. 2008); *United States v. Garduno*, 506 F.3d 1287, 1292 n.7 (10th Cir. 2007).  Some courts have also held that *as a matter of discretion* untimeliness may be raised by a court *sua sponte.  See, e.g.*, *United States v. Mitchell*, 518 F.3d 740, 750-751 (10th Cir. 2008) (refusing to dismiss late notice of appeal because "judicial resources and administration [were] not implicated and the delay [was not] inordinate"); *United States v. Gaytan-Garza*, 652 F.3d 680, 681 (6th Cir. 2011) (dismissal of appeal filed four years late warranted by "judicial interests of finality of convictions and efficient administration of claim processing."); *accord United States v. West*, 2013 U.S. App. LEXIS 26197 (6th Cir. 2013) (dismissal warranted by interests of justice where appellant "offered no reason for the delay, and identified no argument he wishes to assert on appeal."); *see also United States v. Frias*, 521 F.3d 229, 234 (2nd Cir. 2008) (holding that where "government forfeits an objection to the untimeliness of a defendant's appeal by failing to raise it, we act within our jurisdiction when we decide to consider the appeal as though it were timely filed."); *but see Martinez*, *supra*, 620 F.3d at 329 n. 6 (stating that the question whether a court may invoke Rule 4(b)'s time limit *sua sponte* remains open.)

*Oakland Scavenger Co.*, 487 U.S. 312 (1988); *Estrada v. Scribner*, 512 F.3d 1227 (9th Cir. 2008).  The notice on Mr. Duncan's behalf was neither a nullity, nor was it void.  It complied with all of the notice requirements.  At best it was voidable, rather than void.  *Marlow v. Rollins Cotton Co. (In re Julien Co.)*, 146 F.3d 420, 423 (6th Cir. 1998).  *Accord*, Fed. R. App. P. 3(a)(2) (failure to take "any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal.").

As the Supreme Court stated in *Smith v. Barry*, 502 U.S. 244 (1992):

> While a notice of appeal must specifically indicate the litigant's intent to seek appellate review, *see Foman*, *supra*, at 181; *Torres*, 487 U.S. at 317-318, the purpose of this requirement is to ensure that the filing provides sufficient notice to other parties and the courts. *See id.*, at 318. ***Thus, the notice afforded by a document, not the litigant's motivation in filing it, determines the document's sufficiency as a notice of appeal. If a document filed within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal***.

*Id.*, 502 U.S. at 248-49 (emphasis added).

It follows from this that a notice of appeal filed without the client's express authorization is void but merely voidable.  *Marlow v. Rollins Cotton Co. (In re Julien Co.)*, 146 F.3d 420, 423 (6th Cir. 1998).  Accord, Fed. R. App. P. 3(a)(2) (failure to take "any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal.").[28]  Where,

---

[28] That the notice of appeal filed on Mr. Duncan's behalf did not bear indicia of his agreement is at most the functional equivalent of a failure of a litigant to sign a notice, which the Supreme Court has held to be a nonjurisdictional defect.

as here, counsel has filed a protective notice of appeal, the federal rules contain an express

mechanism for withdrawing the appeal at the client's behest – a Fed.R.App.P. 43 motion for

voluntary dismissal.

Similarly, if Mr. Duncan's letter is viewed not as a motion to reinstate an improperly

dismissed appeal but rather as a request to withdraw the then still pending motion to dismiss the

appeal, there is also no clearly established and regularly followed rule that would call for denial

of the request.  Quite the contrary.  The overwhelming weight of authority from jurisdictions

across the Nation is that a pending motion may be withdrawn at any time prior to final

resolution, at least where, as here, there is no prejudice to the opposing side. See, e.g., *Cardenas

v. Superior Court*, 56 Cal. 2d 273, 276–77, 363 P.2d 889, 891–92 (1961) ("we can see no good

reason why a party making a motion during the course of a trial may not, upon reflection,

withdraw it at any time before the court has made an order responsive to the motion.")  *Accord*,

*People v. Catten,* 69 N.Y.2d 547, 555-56, 508 N.E.2d 920, 925, 516 N.Y.S.2d 186, 190

(1987); *Walker v. State,* 262 Ark. 331, 332-33, 556 S.W.2d 655, 656 (1977); *MacPherson v.

State,* 533 P.2d 1103, 1105-06 (Alaska 1975). *See also United States v. Evers,* 569 F.2d 876, 878

(5th Cir.1978);  *State v. Himes,* 153 Fla. 711, 15 So.2d 613 (1943); *State v. Hurd*, 496 N.W.2d

274, 277 (Iowa Ct. App. 1992).  The government may argue that in fact the motion had been

granted prior to the time Mr. Duncan sought to withdraw the motion.  But that argument would

 [T]he Federal Rules require a notice of appeal to be signed. That requirement derives from Civil
Rule 11(a), and so does the remedy for a signature's omission on the notice originally filed. On
the facts here presented, the Sixth Circuit should have accepted Becker's corrected notice as
perfecting his appeal. We therefore reverse the judgment dismissing Becker's appeal and remand
the case for further proceedings consistent with this opinion.
*Becker v. Montgomery*, 532 U.S. 757, 768 (2001).

be unavailing.  On appeal, the Ninth Circuit vacated this court's acceptance of the waiver, thereby truly making a nullity of that order.

### D.  The *Teague* Doctrine is Inapplicable

Finally, the government argues Claim 10 relief is barred by *Teague v. Lane* in that the court would have to "rely on a previously-unarticulated rule that required, inter alia, unconditional statements by a defendant waiving appeal."  Answer at 128-29 (citing *United States v. Hernandez*, 203 F.3d 614, 621-22 (9th Cir. 2000), *abrogated on other grounds by Indiana v. Edwards*, 554 U.S. 164 (2008), *as recognized in United States v. Ferguson*, 560 F.3d 1060 (9th Cir. 2009).  *Hernandez* was a case in which the defendant clearly and unequivocally invoked his right to self-representation after the court refused to appoint new counsel, a circumstance to which the Ninth Circuit referred in passing as a "conditional waiver."  The government's attempt to analogize Mr. Duncan's repeated equivocations with the "conditional waiver" upheld in *Hernandez* is unpersuasive.  The law, set forth above, requiring clear and unequivocal waivers is fully applicable to this case.  No "new rule" is implicated.

Moreover, to the extent the allegations of Claim 10 constitute a gateway for overcoming the asserted procedural default as opposed to a freestanding basis for collateral relief, the *Teague* doctrine would not bar consideration of petitioner's arguments, even if they did in fact rely on a "previously-unarticulated rule."  *See, e.g., Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013) (both recognizing "new rules" within the procedural default doctrine without reference to *Teague*).

## XII.   CLAIM 11: THE COMBINATION OF PROBLEMS AT EVERY STEP OF THE PROCEEDINGS DEPRIVED MR. DUNCAN OF FAIR AND RELIABLE PROCEEDINGS AND THE DUE PROCESS TO WHICH HE WAS ENTITLED

As Mr. Duncan illustrated in detail in his § 2255 Motion, his was a case that was fraught with problems, almost from the beginning.  Those problems, which went to the core of the defense function, were overlapping and interrelated.  The procedural safeguards which ordinarily insure that capital trial proceedings are fair, and which facilitate a robust adversarial process were stripped away as the result of one unfortunate event after another.

The government attempts to recast this as a garden variety "cumulative error" claim, devoting a single paragraph to it, arguing that all of Mr. Duncan's claims lack merit and thus, there are "no errors to accumulate."  Answer at 129.  The government's argument fails to grapple with the Eighth Amendment and Due Process implications at issue in a case where virtually everything that could have gone wrong did.

The United States Supreme Court has long recognized that the death penalty is different both in its severity and finality. *Gardner v. Florida*, 430 U.S. 349 (1977).  The lack of meaningful adversarial testing or compliance with procedural safeguards do not comport with the Constitutional protections that apply to capital trial proceedings.  Chief among those protections are: the right to effective assistance of counsel (*see Strickland v. Washington*, 466 U.S. 668 (1984)), the right to a fair and impartial jury (*see Irvin v. Dowd*, 366 U.S. 717 (1961))), the right to a reliable trial free from caprice and arbitrariness (*see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) and *Gregg v. Georgia*, 428 U.S. 153 (1976)), the right to Due Process (*In re Oliver*, 333 U.S. 257 (1948); *Tumey v. Ohio*, 273 U.S. 510; *In re Murchison*, 349 U.S. 133 (1955)), and the right to appellate review (*see Parker v. Dugger*, 498 U.S. 308, 321 (1991); *Clemens v. Mississippi*, 494 U.S. 738, 749 (1990); *Gregg v. Georgia*, 428 U.S. 153, 204-06 (1976); *Proffitt v. Florida*, 428 U.S. 242, 253 (1976); *Jurek v. Texas*, 428 U.S. 262, 276 (1976)).

For a multitude of reasons – reasons fully articulated in the § 2255 motion – Mr. Duncan was deprived of all of those protections.  As a result, there was no meaningful check on the government's power to obtain a death judgment in this case.  As Justice Douglas stated more than forty years ago, "[t]hose who have experienced the full thrust of the power of the government when leveled against them know that the only protection the citizen has is in the requirement for a fair trial." *Donnelly v. DeChristoforo*, 461 U.S. 637 (1974) (Douglas, J. *Dissent*).  Whether due to counsel's acts or omissions, errors of the trial court, or overreach by the government, Mr. Duncan did not receive the protections to which he was entitled.

## XIII.   CONCLUSION

WHEREFORE, for the foregoing reasons, as well as those delineated in Mr. Duncan's § 2255 Motion, Mr. Duncan respectfully requests that this Court vacate his conviction and sentence of death.

Date:   January 30, 2018                                RESPECTFULLY SUBMITTED,

HEATHER E. WILLIAMS
Federal Defender

*/s/ Lindsay N. Bennett*
LINDSAY N. BENNETT
Assistant Federal Defender

*/s/ Kelly L. Culshaw*
KELLY L. CULSHAW

Attorneys for Petitioner,
JOSEPH EDWARD DUNCAN, III

**CERTIFICATION PURSUANT TO RULE 2(b)(5)**
**OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS**

The undersigned, being authorized to sign for the movant, declares under penalty of

perjury that the foregoing is true and correct to the best of my knowledge.

Executed on:   January 30, 2018

/s/ Lindsay N. Bennett
LINDSAY N. BENNETT

1

**CERTIFICATE OF SERVICE**

2

I HEREBY CERTIFY that on the 30th day of January, 2018, I filed the foregoing

3

electronically through the CM/ECF system, which caused the following parties or counsel to be

4

served by electronic means, as more fully reflected on the Notice of Electronic Filing.

5

6

Bart M. Davis                           Katherine L. Horwitz

7

United States Attorney                  Assistant United States Attorney
United States Attorney's Office         Email:  Katherine.horwitz@usdoj.gov

8

Washington Group IV                     United States Attorney's Office
800 Park Blvd., Suite 600               Washington Group IV

9

Boise, Idaho 83712                      800 Park Blvd., Suite 600
Boise, Idaho 83712

10

Syrena C. Hargrove

11

Assistant United States Attorney
Email:  Syrena.hargrove@usdoj.gov

12

United States Attorney's Office
Washington Group IV

13

800 Park Blvd., Suite 600
Boise, Idaho 83712

14

15

Jeffrey B. Kahan
Trial Attorney

16

Email:  Jeffrey.kahan@usdoj.gov
U.S. Department of Justice

17

Capital Case Section
1331 F Street, NW; 6th FL

18

Washington, DC  20530

19

20

21

*/s/ Lindsay N. Bennett*
LINDSAY N. BENNETT

22

23

24

25

26

27

28